1   ELIZABETH A. STRANGE
    First Assistant United States Attorney
2   District of Arizona

3   KRISTEN BROOK
    Arizona State Bar No. 023121
4   kristen.brook@usdoj.gov
    JOSEPH E. KOEHLER
5   Arizona State Bar No. 013288
    joe.koehler@usdoj.gov
6   Assistant United States Attorneys
    Two Renaissance Square
7   40 N. Central Ave., Suite 1800
    Phoenix, Arizona  85004
8   Telephone:  602-514-7500
    Attorneys for Plaintiff
9

10          IN THE UNITED STATES DISTRICT COURT

11          FOR THE DISTRICT OF ARIZONA

12

13   United States of America,                     No. 2:17-CR-00360-PHX-JJT

                 Plaintiff,
14

15          v.                                      **RESPONSE TO DEFENDANT'S
                                                    REQUEST TO DENY EXPERT
16   Abdul Khabir Wahid,                            WITNESS: DR. MATTHEW LEVITT
                                                    FROM TESTIFYING**
                 Defendant.
17

18          The United States of America, through undersigned counsel, respectfully submits

19   this opposition to defendant Wahid's motion to preclude or limit the expert testimony of

20   Matthew Levitt, styled as  an "Request to Deny Expert Witness: Dr. Matthew Levitt From

21   Testifying" (CR 139). Wahid asserts the following reasons for his objection to Levitt's

22   testimony:  (1) "it has already been established that I had nothing to do with the terrorist

23   attacks that happen (sic) in Garland, Texas," (2) that the charges he faces (witness

24   tampering and making false statements) are not terrorism offenses, (3) "there is no real

25   concrete evidence that actually suggest terrorism in these charges just speculation on the

26   plaintiffs (sic) part," and (4) introducing expert testimony concerning terrorism will be

27   unfairly prejudicial by "imprint[ing] in the minds of jurors that I am a possible terrorist and

28

1    therefore convict me based on terrorism solely when in actuality the charges against me

2    doesn't suggest such."  (CR 139 at 2.)

3          **I.      Background**

4          The United States intends to introduce expert testimony from Dr. Matthew Levitt, a

5    subject matter expert on ISIS, terrorism and the intended effects of ISIS terror attacks.

6    Levitt will testify in lieu of the government's previously-noticed expert, Dr. Lorenzo

7    Vidino, due to Dr. Vidino's unavailability.

8          Dr. Levitt will provide background information on ISIS, ISIS inspired attacks, the

9    means of communication between U.S. based foot soldiers and ISIS members abroad,

10   homegrown violent extremists (individuals who became mobilized outside of Syria or Iraq)

11   and ISIS recruitment by individuals including Junaid Hussain and Mohamed Abdullahi

12   Hassan (aka Miski).  Dr. Levitt will testify regarding ISIS's strategy in conducting attacks

13   outside of Syria and Iraq, and the intended and actual effects of those attacks on

14   governments and civilian populations.  Dr. Levitt will testify about ISIS propaganda and

15   communication over online mediums (including Twitter and *Dabiq* in 2015) and ISIS

16   spokesperson Abu Mohammed al-Adnani's call to action in September 2014.  Dr. Levitt

17   will testify about the specific vocabulary used by Elton Simpson and Nadir Soofir (in

18   online tweets and posts leading up to the attack at the Curtis Culwell Center in Garland,

19   Texas) to describe themselves, the world and the community of people around them.

20   Finally, Levitt will explain how certain items of evidence collected in the investigation of

21   this matter are specifically related to the violent jihadist movement.

22         As discussed below, Levitt's testimony will be relevant and helpful to the jury, his

23   methods are reliable, and his testimony will not be not unfairly prejudicial.  Specifically,

24   Levitt's testimony is relevant to the applicability of the "involved terrorism" element that

25   increases the statutory penalty from five to eight years under 18 U.S.C. § 1001(a)(2).  It

26

27                                          - 2 -

28

will be helpful to the jury's understanding of the relationship between Elton Simpson's and Nadir Soofi's May 3, 2015, attack on the Muhammad Art Exhibit and Contest in Garland, Texas, and the Islamic State (ISIS).  Levitt's testimony will help the jury understand how a domestic attack in support of ISIS constitutes domestic and international terrorism, and how Wahid's false statements to law enforcement had the potential to impede the FBI's investigation into the attack.  The Court therefore should deny defendant's motion.

## II.    Applicable Law

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) the Supreme Court held that Rule 702 imposes a "gatekeeping" obligation on the trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable."  *Id.* at 589.  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court clarified that the gatekeeper role is not just limited to scientific expert testimony, but applies to all expert testimony.  The trial court has broad discretion to decide whether to admit expert testimony and "must have the same kind of latitude in deciding how to test an expert's reliability."

*Kumho Tire Co.*, 526 U.S. at 1176.  The *Daubert* factors were not intended to be exhaustive nor apply in every case.  *Id*. at1178.

"Likewise, in considering the admissibility of testimony based on some 'other specialized knowledge,' Rule 702 generally is construed liberally. (Internal citation omitted.)" *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  In admitting the testimony of a police officer about gang practices, the Ninth Circuit found that "[t]he *Daubert* factors (peer review, publication potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hankey* at 1169.   In fact, when an expert's testimony is not scientific or technical, the reliability of that testimony need not be based on "a particular methodology or technical frame," but instead can be found reliable based on the expert's knowledge and experience alone. *Hangarter v. Provident Life and Acc. Ins. Co*., 373 F.3d 998, 1018 (9th Cir. 2004).

The "Rules of Evidence provide a liberal standard for the admissibility of expert testimony," *United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003), as "[e]xpert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

Courts have "considerable leeway in deciding in a particular case how to go about determining whether particular testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152.  The object is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*.

A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.  *See* Advisory Committee Notes to Fed. R. Evid., Rule

- 4 -

702.  As described herein, specific to the type of testimony at issue here, courts have repeatedly approved the admission of expert testimony regarding terrorist organizations and activities.  Moreover, "[t]he Rule of Evidence has a strong and undeniable preference for admitting any evidence which has the potential of assisting the trier of fact. *Kannankeril v. Terminix International, Inc.*, 128 F.3d 802, 806 (3rd Cir. 1997); *see also*, *Daubert*, 509 U.S. at 588.

Under these standards, a number of Federal Circuit Courts have specifically upheld the admission of similar expert testimony relating to terrorism issues.  *See, e.g.*, *United States v. Farhane*, 634 F.3d 127, 158-60 (2d Cir. 2011) (upholding expert testimony regarding "al Qaeda and Azzam Publications, the publisher of a jihadist videotape"); *United States v. Mustafa*, 406 Fed. Appx. 526, 528-29 (2d Cir. 2011) (affirming the trial court's decision to allow testimony of "terrorism expert" regarding al Qaeda; *United States v. Aref*, 285 Fed. Appx. 784, 792 (2d Cir. 2008) (upholding expert testimony regarding Pakistani and Kurdish terrorist groups); *United States v. Paracha*, 313 Fed. Appx. 347, 351 (2d Cir. 2008) (upholding expert testimony regarding "the organization and structure of al Qaeda"). More recently, the Fourth Circuit, in *U.S. v. Hassan et al*, 742 F.3d 104, 131 (4th Cir. 2014) affirmed the trial court's decision to admit expert testimony regarding terrorism.  *See also*, *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008).

**A.  Levitt's Proposed Testimony Will be Relevant and Helpful to the Jury**

Count 1 of the Indictment charges Wahid with a violation of 18 U.S.C. § 1001(a)(2), making material false statements to FBI agents in  a matter within the jurisdiction of the FBI.  Count 1 further alleges the false statement involved terrorism, thus triggering an increase in the statutory maximum term of imprisonment from five to eight years.

The government will prove at trial that on May 3, 2015, Elton Simpson and Nadir Soofi attacked the Muhammad Art Exhibit and Contest in Garland, Texas (the Garland

- 5 -

attack).  Simpson and Soofi exited their vehicle near the scene of the contest and began firing guns at police and security officers shortly before the event was to end.  Both Simpson and Soofi died in the course of the attack.  The government next will prove Wahid knowingly made false statements to FBI agents a few days after the attack, on May 6, 2015. Wahid's false statements related to his interaction with Simpson and Soofi on May 1, 2015. Wahid accepted an envelope and a set of keys from Simpson and Soofi on the night of May 1.  Wahid also accepted specific instructions from Simpson and Soofi on when and to whom to deliver the envelope and the keys.  On May 6, 2015, three days after the attack, Wahid delivered the envelope and keys to Saabir Nurse, as instructed by Simpson and Soofi.  Wahid made the delivery the same day that he lied to FBI agents and covered up having received the envelope and keys.  The government will establish that this information was material to the FBI's investigation of the Garland attack, which involved international and/or domestic terrorism.  The government will prove Wahid's lie involved an act of domestic or international terrorism because it impeded the FBI's investigation into the Garland attack.  *See United States v. Phillipos*, 849 F.3d 464 (1st Cir.), as clarified on denial of reh'g, 869 F.3d 15 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 683, (2018) (Evidence sufficient to find defendant's false statements to authorities in weeks following Boston Marathon bombing were material; defendant stated no one entered dorm room of bombing suspect and nobody took anything from room, statements were made in midst of terrorism investigation and were false as defendant and others had removed evidence from room, and statements deprived law enforcement of corroborating information.).

Title 18, United States Code, Section 1001(a)(2) provides, in pertinent part: "If the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both.  18 U.S.C. § 1001(a)(2) (2019).  Because this provision sets forth a fact that increases the maximum penalty for the offense, the terrorism

- 6 -

enhancement is an element of the offense the government must allege in the indictment and prove to the jury beyond a reasonable doubt.  *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  The government will prove that the Garland attack falls within the ambit of 18 U.S.C. § 2331, in that Simpson and Soofi were inspired by ISIS and conspired with each other and additional individuals to provide material support to ISIS, and committed the attack in furtherance of that conspiracy.  The government will prove, that this attack, like other ISIS inspired attacks appears to be (i) intended to intimidate or coerce a civilian population and (ii) to influence the policy of a government by intimidation or coercion.  *See* 18 U.S.C. § 2331(1), (5) (defining international and domestic acts of terrorism as "acts dangerous to human life that are a violation of the criminal laws of the United States" that "appear to be intended to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion …").  The government further will prove ISIS claimed responsibility for the attack.

The parties have agreed to a jury instruction for Count 1 that provides the following definitions for domestic terrorism and international terrorism:

"International terrorism" means activities that:
(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
(B) appear to be intended—
(i) to intimidate or coerce a civilian population;
(ii) to influence the policy of a government by intimidation or coercion,
(iii) or to affect the conduct of a government by mass destruction, assassination, or kidnaping; and
(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they

- 7 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

"Domestic terrorism" means activities that:

    (A)   involve acts dangerous to human life that are a violation of the criminal laws of the United States or of any State;

    (B)  appear to be intended—

        (i)   to intimidate or coerce a civilian population;

        (ii)   to influence the policy of a government by intimidation or coercion; or

        (iii)   to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

    (C)   occur primarily within the territorial jurisdiction of the United States.

(CR 102 at 4-5.)

Numerous courts have upheld expert testimony as relevant in the context of terrorism-related charges. For instance, in *United States v. Paracha*, 313 Fed. Appx. 347 (2d Cir. 2008), the court noted the expert's testimony was "relevant to the jury's understanding of al Qaeda." *Id.* at 351. In *Paracha*, the district court allowed an expert to testify "regarding al Qaeda's origin, leadership, and operational structure," despite the fact that it was "undoubtedly true . . . that the jurors will already be aware of the existence of an entity known as al Qaeda and that its leader is Usama bin Laden." *United States v. Paracha*, 2006 WL 12768, at *21-22. Relying on cases involving expert testimony of organized crime families, the district court concluded that "expert testimony about al Qaeda is appropriate despite its regular appearance in the popular media both because the media's depiction may be misleading and because some features of al Qaeda relevant to the allegations in this case remain 'beyond the knowledge of the average citizen.'" *Id.* at *22 (quoting *United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994)). The Second Circuit agreed. *Paracha*, 313 Fed. Appx. at 351 (holding the expert testimony was "relevant to the jury's understanding of al Qaeda"). The same is true of the Islamic State. "[T]he media's

- 8 -

depiction [of ISIS] may be misleading and because some features of [ISIS] relevant to the allegations in this case remain 'beyond the knowledge of the average citizen." *Id.*

In a similar case, the Second Circuit spoke approvingly of expert testimony in this context.

> We have approved the use of expert testimony to provide juries with background on criminal organizations, notably organized crime families. *See*, e.g., *United States v. Matera*, 489 F.3d 115, 121-22 (2d Cir. 2007). . . . Despite the prevalence of organized crime stories in the news and popular media, these topics remain proper subjects for expert testimony. Aside from the probability that the depiction of organized crime in movies and television is misleading, the fact remains that the operational methods of organized crime families are still beyond the knowledge of the average citizen. The rationale applies with equal force to terrorist organizations, including al Qaeda.

*United States v. Farhane*, 634 F.3d 127, 159 (2d Cir. 2011) (internal quotation marks, citation, and alteration omitted) (quoting *Amuso*, 21 F.3d at 1264).

Here, Levitt's testimony is imperative to a proper jury determination of whether Wahid's false statement involved terrorism – that is, it had the potential to impede the FBI's investigation into an act of international or domestic terrorism.  The government will establish that the FBI was investigating a terrorist attack, including whether persons other than Simpson and Soofi were involved and whether other attacks were imminent, and Wahid's false statement had the potential to impede that investigation.  Therefore, as a threshold matter, the jury must have a working knowledge of what and who ISIS is, how it operates, and the basis for its beliefs.  Levitt will testify about ISIS's history and its stated mission – the formation of a world-wide caliphate – and its call to violent jihadists around the world to join ISIS in Syria and Iraq or to conduct attacks in their home countries.  This

- 9 -

testimony is central to establishing a connection between the Garland attack and ISIS in order to demonstrate that Wahid's false statement involved international or domestic terrorism.  Without it, the jury will be left without the tools to properly evaluate the Government's evidence.

In addition, Levitt will assist the trier of fact in understanding certain evidence seized and internet sites accessed by Simpson and Soofi and how that evidence relates to the violent jihadist movement advocated by ISIS and others.   The Government will introduce evidence of terrorist propaganda allegedly seized or accessed from Simpson's and Soofi's electronic media containing documents or recordings of violent jihadist advocates, including prominent persons who have inspired ISIS and its members.  Expert testimony identifying these individuals and their role in the violent jihadist movement would place this evidence into context and help the jury understand its relevance to the charges.

Importantly, the jury must understand how ISIS both recruits terrorists and promotes and encourages terrorist acts against the United States and its citizens around the world in order to intimidate and coerce civilian populations, and to influence government policies through intimidation and coercion. Levitt will explain that ISIS creates and disseminates video and audio recordings for the purpose of recruiting new members and promoting terrorist attacks.  Levitt is highly qualified to explain the import and purpose of these videos, and place the videos in the context of ISIS's recruiting and propaganda efforts.

Put simply, Levitt's testimony will advance the truth-seeking process. Levitt's testimony is therefore necessary to give the jury the tools and appropriate background to fairly weigh the Government's evidence in this matter. His testimony should be permitted and the Court should deny Wahid's motion.

**B.  Levitt's Proposed Testimony Is Reliable**

Levitt's credentials as an expert in the field of terrorism are noteworthy. Indeed, his methodology has been recognized as the "gold standard in the field of international terrorism." *United States v. Damrah,* 412 F.3d 618, 625 (6th Cir. 2005) (quoting the district court).[1]  He possesses vast experience in the field. Levitt is currently the Director of Reinhard Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy. This is Dr. Levitt's second stint at the well-respected think tank, whose focus is on U.S. interests in the Middle East. In between working at the Washington Institute, Dr. Levitt was the Deputy Assistant Secretary of Treasury for Intelligence and Analysis where he focused on terrorism financing.

---

[1] Levitt has qualified as an expert witness and provided expert testimony in numerous criminal and civil federal court proceedings, including *United States v. Hammoud* (W.D.N.C., June 2002); *United States v. Assed* (E.D.N.Y., March 2003); *United States v. Damrah* (N.D. OH, June 2004); *United States v. Al Moayad* (E.D.N.Y., Feb. 2005); *United States v. Al Arian* (M.D. FL, 2005); *United States v. Marzook* (N.D. IL, Nov. 2006); *United States v. Holy Land Foundation for Relief and Development* (N.D. TX, Dallas Division, July 2007); *United States v. Mubayyid* (District of Massachusetts, December 2007); *United States v. Holy Land Foundation for Relief and Development* (N.D. TX, Sep. 2008 retrial); *Soussi v. Napolitano* (E.D. CA, Aug. 2009); *United States v. Banki* (S.D.N.Y., May 2010); *United States v. Defreitas* (E.D.N.Y., July 2010); *United States v, Vaghari* (E.D. PA, Feb. 2011); *Atalla v. USCIS* (D. AZ, April 2011); *United States v. Ibrahim* (E.D.N.Y., May 2011); *United States v. Allouche* (W.D. TX, Feb. 2015); *United States v. Tsarnaev* (D. MA, March 2015); *Boim \v. Quranic Literacy Institute* (N.D. IL, Dec. 2004); *Gates v. Syria* (D.D.C., Jan. 2008); *Amduso v. Sudan* (D.D.C., Oct. 2010); *Wultz v. Islamic Republic of Iran* (D.D.C., Feb. 2012); *Wyatt v. Syria* (D.D.C., Aug. 2012); *Linde v. Arab Bank* (E.D.N.Y., Aug. 2014); *Fraenkel v. Iran* (D.D.C., Dec. 2016); *Fritz v. Iran* (D.D.C., April 2018); *Hirshfeld v. Iran* (D.D.C., April 2018); *Force v. Iran* (D.D.C., Oct. 2018); *Karcher v. Iran* (D.D.C., Dec. 2018).

He also has testified as expert witness in foreign terrorism cases: *Denmark v Al Aqsa Foundation* (Copenhagen City Court, Courts of Law of the Kingdom of Denmark, December 2007); *CBSP v. Samuels* (Court of Appeals, Paris, France, 2008); *Denmark v "Fighters + Lovers"* (Copenhagen City Court, Courts of Law of the Kingdom of Denmark, September 2008); *HMA v. Menni* (Scottish High Court of Judiciary, Glasgow, June 12, 2012); *HMA v. Badri* (Scottish High Court of Judiciary, Glasgow, September 2015).

- 11 -

Dr. Levitt has a Ph.D. in International Relations, and a Masters Degree in Law and Diplomacy from Tufts University. He has taught courses in the field of terrorism at Georgetown University and John Hopkins University. He has also lectured at the Combating Terrorism Center at West Point and has presented at terrorism conferences around the world.

Levitt is the author of books, articles, and reports that focus in whole or in part on the Islamic State, including *From the Boston Marathon to the Islamic State: Countering Violent Extremism* (April 2015). His articles and reports appear in publications as varied as the *New York Times*, *Foreign Poli*cy and *al Hurra*, as well as for Washington Institute policy briefs. Levitt is the editor of several volumes that discuss the Islamic State, including *The Rise of ISIL* (August 2016); and *Neither Remaining Nor Expanding: The Decline of the Islamic State* (July 2018). Levitt has also contributed to studies related to the Islamic State, such as the Washington Institute monograph *Toward a New U.S. Policy in Syria* (July 2018).

Levitt has accumulated significant expertise regarding the Islamic State terrorist group, identifying people and entities who formed this group and its progenitors as early as 2002, when he began to research and write about Fedel Nazzel Khalayleh, better known as Abu Musab al-Zarqawi. Levitt discussed Zarqawi in his 2002 Washington Institute monograph, *Targeting Terror: U.S. Policy toward Middle Eastern State Sponsors and Terrorist Organizations, Post-September 11*. By December of that year, he publicly forecast that terrorist groups would likely see a U.S. war in Iraq as distracting Washington from fighting terrorism and could therefore look to take the opportunity to strike American

interests.[2]  Just weeks later, in early 2003, Levitt began publishing detailed reports on Abu Musab al Zarqawi and his terrorist network, which became known as al Qaeda in Iraq.[3]  In April 2003, Levitt warned that "al Qaeda's relative recent silence should not be interpreted as an inability to carry out operations; their attacks are likely to resume during postwar reconstruction in Iraq."[4]  Indeed, Zarqawi would play a tremendously important role in doing just that, and his group grew and transformed into ultimately would be known as the Islamic State.

Levitt conducted primary field research on this issue around the world, from the Middle East to Europe, Australia and New Zealand, and the United States and Canada. As the war in Syria expanded from a local protest to a full-fledged rebellion to a sectarian and regional crisis, Levitt continued to focus on these issues as they affected the group known over this period of time as AQI, then ISI, then ISIL, and now the Islamic State.  This included lectures at conferences and international bodies, such as the Global Counterterrorism Forum, and a Washington Institute conference, Levitt organized and chaired, entitled "Taking the Fight to ISIL: Operationalizing CT Lines of Effort against the Islamic State" (February 2, 2015).  Similarly, on the sidelines of the February 2015 White House Summit on Countering Violent Extremism, Levitt hosted an event—coordinated

[2] See Bruce Hoffman, Daniel Benjamin and Matthew Levitt, "The War on Terror in the Shadow of the Iraq Crisis," Policywatch #690, December 12, 2002

[3] See Matthew Levitt, "The Zarqawi Node in the Terror Matrix," National Review Online, February 6, 2003; Matthew Levitt, "Placing Iraq and Zarqawi in the Terror Web," Policywatch #710, February 13, 2003

[4] Matthew Levitt, Roger Cressey, and Avi Jorisch, "A Terrorist Front in Iraq?" Policywatch #745, April 8, 2003

- 13 -

with the State Department—on the "Rehabilitation and Reintegration of Returning Foreign Terrorist Fighters."

Levitt also has lectured widely on the Islamic State group, including lectures focused on foreign terrorist fighter (FTF) travel patterns, Islamic State propaganda and radicalization, Islamic State financing patterns, and more.  These include lectures for the Global Counterterrorism Forum, NATO, and academic conferences in places like Qatar, Germany, and the United States.  Levitt also has testified before various U.S. House and Senate committees, as well as the Canadian Parliament, on issues related to the Islamic State.  These include testimony before the Senate Foreign Relations Committee in March 2014, the House Financial Services Committee in November 2014, the Canadian House of Commons Standing Committee on Finance and the Standing Senate Committee on National Security and Defence in May 2015, the Senate Foreign Relations Committee in April 2016, the Senate of Canada, National Security and Defence Committee in February 2017, and the House Financial Services Committee in September 2017.   In November 2017, Levitt testified before the United Nations Counter-Terrorism Executive Committee (CTED) in New York.

The factual basis to support Levitt's opinions is more than sufficient.  Even if the factual basis were lacking, however, "[t]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility; it is up to the opposing party to examine the factual basis for the opinion in cross-examination.  Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."  *Bonner v. ISP Tech, Inc.*, 259 F.3d 924, 929-930 (8th Cir. 2001) (citing *Hose v. Chicago NW Transp. Co.*, 70 F.2d 968, 974 (8 Cir. 1996)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### C.  Levitt's Testimony is Not Unfairly Prejudicial

As set out above, the evidence in this case is highly relevant for several reasons. Nevertheless, defendant argues that the Court should preclude it because it would be unfairly prejudicial by "imprint[ing] in the minds of jurors that [he is] a possible terrorist" and cause them to "convict [him] based on terrorism solely . . . ."  (CR 139 at 2.)

Federal Rule of Evidence 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needlessly presenting cumulative evidence.  Fed. R. Evid., Rule 403.  "Proof that evidence was prejudicial to one party is insufficient to establish that the prejudice was unfair, or that the trial court abused its discretion in weighing that prejudice against the evidence's probative value.  *Boyd v. City and Cnty. of S.F.*, 576 F.3d 938, 948 (9th Cir. 2009).  "As long as it appears from the record as a whole that the trial judge adequately weighed the probative value and prejudicial effect of proffered evidence before its admission … the demands of Rule 403 have been met." *United States v. Verduzco*, 373 F.3d 1022, 1029 n. 2 (9th Cir. 2004).  "Normally, the decision of the trial court is reversed under the abuse of discretion standard only when the appellate court is convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances."  *United States v. Harman*, 211 F.3d 1172, 1175 (9th Cir. 2000).

The Ninth Circuit, in upholding the admission of expert opinion testimony regarding gang activities under Rule 403, declared:

> Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.

*United States v. Hankey*, 203 F.3d 1160, 1168, 1172 (9th Cir. 2000) (quoting *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir.1983)).

Simpson's and Soofi's attack in Garland, Texas, along with Wahid's false statement about their visit to his home on the night of May 1, 2015, forced the issue of terrorism into the center of this case.  *See*, *e.g. United States v. Felton*, 417 F.3d 97, 103 (1st Cir. 2005) (finding that the government's use of the term "terrorist" to describe defendants and their actions was appropriate because, while the term is "highly pejorative," it was a "function of the acts defendants engaged in, not the government's inaccurate description of those acts."  Simply put, Simpson's and Soofi's attack, and Wahid's false statements about their statements and actions prior to the attack, require a discussion of terrorism.

Moreover, any unfair prejudice could at most serve to limit, rather than preclude, Levitt's testimony.  In *United States v. Kabir*, et al, 12 Cr. 92 (VAP) (C.D. Cal. July 14, 2014), the court permitted an expert to testify on the history and context of Islamic extremism; the use of various social and internet media employed by Islamic terrorist organizations; and the terms, concepts and phrases used in that context.  The court limited the expert's testimony, however, by precluding the expert from testifying about a "homegrown terrorist" profile as an expert opinion.

Similarly in the present case, Levitt will be providing a history of modern violent jihadist groups, their practices and methods, and will put in context Internet sites and documents seized in connection with the FBI's investigation of the Garland attack. Unlike *Kabir*, he will not testify about a terrorist profile.  As mentioned above, the expert testimony is probative in this case because it will assist the trier of fact in determining whether the Simpson and Soofi had a motive and intent to conduct an attack in the United States in support of ISIS, in turn demonstrating the attack was an act of international or

- 16 -

domestic terrorism.  On the other hand, any resulting prejudice is not unfair.  Accordingly, Levitt's expert testimony is admissible under Rule 403.

### III.    Conclusion

For all of these reasons, the Court should deny Wahid's "Request to Deny Expert Witness: Dr. Matthew Levitt From Testifying."

Respectfully submitted this 11 day of February, 2019.

<div style="margin-left:50%">

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*s/ Kristen Brook*
*s/Joseph E. Koehler*
KRISTEN BROOK
JOSEPH E. KOEHLER
Assistant U.S. Attorneys

</div>

### CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of February, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that true and accurate copies have been transmitted electronically to advisory counsel for the defendant via the ECF system.

**John McBee, Advisory Counsel for Defendant**

In addition, on the same date I deposited a copy of the foregoing in the United States mail addressed to the defendant, Abdul Khabir Wahid, at his mailing address as set forth in the CM/ECF system.

*s/Theresa A. Hanson*
*Legal Assistant/US Attorney's Office*