1    **UNITED STATES DISTRICT COURT**

2    **FOR THE DISTRICT OF ARIZONA**

3    _____

4
     **United States of America**,            )
5                                             )
                              Plaintiff,      )
6    vs.                                      )
                                              )   CR-17-00360-PHX-JJT-1
7    **Abdul Khabir Wahid**,                  )
                                              )
8                              Defendant.     )
                                              )   February 26, 2019
9    _____ )
10

11

12        **BEFORE:  THE HONORABLE JOHN J. TUCHI, JUDGE**

13        **REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

14        BENCH TRIAL - DAY 1 (Witness testimony only)

15              (Pages 1 through 130)

16

17

18

19

20

21   Official Court Reporter:
     **Elaine Cropper, RDR, CRR, CCP**
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 35
23   Phoenix, Arizona  85003-2151
     (602) 322-7245/(fax) 602.322.7253
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

<u>**I N D E X**</u>

**TESTIMONY**

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| GREG STEVENS | 8 | | | |
| BRIAN MARLOW | 22 | | | |
| KIM EDWARD JENSEN | 40 | 87 | 92 | |
| ALI SOOFI | 95 | | | |

<u>**E X H I B I T S**</u>

| Number | | Ident | Rec'd |
|---|---|---|---|
| 1 | Overhead Photograph - Curtis Culwell Center | 10 | 13 |
| 2 | Helicopter Night Photo 1 | 17 | 18 |
| 3 | Helicopter Night Photo 2 | 19 | 20 |
| 5 | Garland crime scene photos | 23 | 25 |
| 6 | Photo of Elk River Tool and Die AK-74 rifle | 25 | 26 |
| 7 | Photo of Roman AK-47 pistol grip | 26 | 27 |
| 8 | Photo of Jimenez Arms 9mm pistol | 27 | 27 |
| 9 | Photo of Taurus .357 revolver in pocket | 28 | 28 |
| 10 | Photo of Keltec 9mm rifle | 28 | 29 |
| 11 | Photo of HiPoint 9mm pistol | 29 | 32 |
| 12 | Photo of ammunition | 30 | 32 |
| 13 | Photo of ammunition | 30 | 32 |
| 14 | Photo of ammunition | 30 | 32 |
| 15 | Photo of 016 White Galaxy S5 | 31 | 32 |
| 16 | White Samsung Galaxy S5 | 32 | 33 |

**E X H I B I T S** (Continued)

| Number | | Ident | Rec'd |
|--------|--------------------------------------------------|-------|-------|
| 22 | Printed IS Flags | 33 | 34 |
| 24 | Book: Defence of the Muslim Lands | 34 | 35 |
| 25 | Wallet with Bank of America card and driver's license (Soofi) Item BB | 35 | 36 |
| 26 | Simpson's driver's license with wallet – Item H | 36 | 36 |
| 27 | Photo of Simpson/Soofi apartment living room | 100 | 101 |
| 28 | Photo of plexiglass table | 101 | 102 |
| 85 | Recording Excerpt 1 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 54 | 59 |
| 86 | Recording Excerpt 2 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 55 | 55 |
| 87 | Recording Excerpt 3 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 58, | 58 |
| 88 | Recording Excerpt 4 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 59 | 59 |
| 89 | Recording Excerpt 5 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 60 | 60 |
| 90 | Recording Excerpt 6 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 60 | 60 |
| 91 | Recording Excerpt 7 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 62 | 62 |
| 92 | Recording Excerpt 8 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 63 | 63 |
| 93 | Recording Excerpt 9 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 64 | 64 |
| 94 | Recording Excerpt 10 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 64 | 64 |

E X H I B I T S (Continued)

| Number | | Ident | Rec'd |
|--------|--------|-------|-------|
| 95 | Recording Excerpt 11 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 65 | 65 |
| 96 | Recording Excerpt 12 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 65 | 65 |
| 97 | Recording Excerpt 13 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 66 | 66 |
| 98 | Recording Excerpt 14 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 67 | 67 |
| 99 | Recording Excerpt 15 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 67 | 67 |
| 100 | Recording Excerpt 1 of Interview of Abdul Khabir Wahid dated June 10, 2015 | 73 | 73 |
| 101 | Recording Excerpt 2 of Interview of Abdul Khabir Wahid dated June 10, 2015 | 75 | 75 |
| 102 | Recording Excerpt 3 of Interview of Abdul Khabir Wahid dated June 10, 2015 | 76 | 76 |
| 103 | Recording Excerpt 4 of Interview of Abdul Khabir Wahid dated June 10, 2015 | 76 | 76 |
| 104 | Recording Excerpt 5 of Interview of Abdul Khabir Wahid dated June 10, 2015 | 77 | 77 |
| 105 | Recording Excerpt 6 of Interview of Abdul Khabir Wahid dated June 10, 2015 | 77 | 77 |
| 106 | Recording Excerpt 7 of Interview of Abdul Khabir Wahid dated June 10, 2015 | 78 | 78 |
| 107 | Recording Excerpt 1 of Interview of Abdul Khabir Wahid dated December 11, 2015 | 82 | 82 |
| 108 | Recording Excerpt 2 of Interview of Abdul Khabir Wahid dated December 11, 2015 | 82 | 82 |

**E X H I B I T S** (Continued)

| Number | | Ident | Rec'd |
|--------|--|-------|-------|
| 118 | Recording Clip 1 of Phone Call Between Abdul Khabir Wahid and A.S. on June 6, 2015 at 8:24 p.m. | 120 | 120 |
| 119 | Recording Clip 2 of Phone Call Between Abdul Khabir Wahid and A.S. on June 6, 2015 at 8:24 p.m. | 121 | 121 |
| 120 | Recording Clip 3 of Phone Call Between Abdul Khabir Wahid and A.S. on June 6, 2015 at 8:24 p.m. | 121 | 121 |
| 121 | Recording Clip 4 of Phone Call Between Abdul Khabir Wahid and A.S. on June 6, 2015 at 8:24 p.m. | 122 | 122 |
| 122 | Recording Clip 1 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 124 | 124 |
| 123 | Recording Clip 2 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 124 | 124 |
| 124 | Recording Clip 3 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 125 | 125 |
| 125 | Recording Clip 4 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 126 | 126 |
| 126 | Recording Clip 5 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 127 | 127 |
| 127 | Recording Clip 6 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 127 | 127 |
| 128 | Recording Clip 7 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 128 | 128 |

1                    **E X H I B I T S** (Continued)

2    Number                                    Ident   Rec'd

3    159     Photo of Exterior of Abdul Khabir      49      50
             Wahid Residence, XXXX W. Port Au
4            Prince Lane, Phoenix, AZ.

5    160     Photos of A.S. Cell Phone Properties   116     117
             Screen & Call Log

6

7

8                        **RECESSES**

9                                              Page    Line

10   (Recess at 12:12; resumed at 12:16.)       38      23
     (Recess at 12:30; resumed at 1:46.)        49      10
11   (Recess at 3:07; resumed at 3:24.)         94      13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **A P P E A R A N C E S**

2

For the Government:
3              **JOSEPH E. KOEHLER, ESQ.**
               **KRISTEN BROOK, ESQ.**
4              U.S. Attorney's Office
               40 North Central Avenue, Suite 1200
5              Phoenix, AZ  85004-4408
               602.514.7500
6
For the Defendant:
7              **PRO SE**
               **ABDUL KHABIR WAHID**
8              3407 W. Port Au Prince Lane
               Phoenix, Az  85053
9              480.205.1354

10  For the Defendant as Advisory Counsel:
               **JOHN W. MCBEE, ESQ.**
11             Law Office of John W. McBee
               3104 E. Camelback Road, PMB 851
12             Phoenix, AZ  85016
               602.903.7710

13

14

15

16

17

18

19

20

21

22

23

24

25

                  United States District Court

1        **P R O C E E D I N G S**

2              (The following excerpt was separately transcribed,

3    beginning at 11:28 a.m.)

4              THE COURT:  All right.  Thank you, sir.

5              Ms. Brook or Mr. Koehler, if you want to call your          11:28:30

6    first witness.

7              MR. KOEHLER:  Thank you, Your Honor.  The United

8    States calls Greg Stevens.

9              THE COURT:  Mr. Stevens, if you will step up past the

10   bar to my courtroom the deputy, she will swear you in.          11:28:56

11             COURTROOM DEPUTY:  If you can please state your name

12   and spell your last name for the record.

13             THE WITNESS:  I'm Greg Stevens.  My last name is

14   spelled S-T-E-V-E-N-S.

15             COURTROOM DEPUTY:  Please raise your right hand.          11:29:09

16             (GREG STEVENS, a witness herein, was duly sworn or

17   affirmed.)

18                         **DIRECT EXAMINATION**

19   BY MR. KOEHLER:

20   Q.   Good morning, Mr. Stevens.          11:29:33

21   A.   Good morning.

22   Q.   Would you please introduce yourself to the Court and to

23   Mr. Wahid?

24   A.   I am Greg Stevens.  I am a retired police officer from the

25   Garland, Texas, police department.          11:29:44

GREG STEVENS - Direct

1  Q.  How long did you work for the Garland Police Department?  11:29:49

2  A.  Just over 40 years.

3  Q.  And what was your assignment when you worked there?

4  A.  Primarily I started out working in the Patrol Division for

5  about eight years.  After that I was assigned to the Traffic  11:30:00

6  Division and, for the most part, worked the rest of my career

7  there in the traffic division.

8  Q.  So you were a traffic officer?

9  A.  That is correct.

10  Q.  And were you on duty on March 3 of 2015?  11:30:13

11  A.  I was -- probably but -- are you referring to May 3?

12  Q.  I'm sorry, May 3, 2015.  I misspoke.

13  A.  Yes, sir, I was.

14  Q.  And what were you doing that day?

15  A.  I was working -- it was an off-duty assignment sponsored  11:30:31

16  by the City.  There was an event at the Curtis Culwell Center,

17  which is a convention center there in the City of Garland, and

18  I was working a security assignment there.

19  Q.  And what was the name of the event that was going on that

20  day there?  11:30:54

21  A.  It was called the Draw the Prophet art contest.

22  Q.  Okay.  And did that have to do with the Prophet Muhammed?

23  A.  Did it?

24  Q.  Do you recall where you were stationed there at the Curtis

25  Culwell Center?  11:31:05

United States District Court

1   A.   Yes, sir.  I was stationed 29 West entrance, a driveway        11:31:06

2   entrance on the West side of the complex.

3          MR. KOEHLER:  If I could place Exhibit 1 up on the

4   monitor before the witness.

5   BY MR. KOEHLER:                                                     11:31:56

6   Q.   Sir, do you recognize that photo?

7   A.   I do.

8   Q.   What is that?

9   A.   That's an aerial photograph including the Curtis Culwell

10  Center.                                                             11:32:01

11  Q.   Are you able to see the place where you were stationed on

12  that photograph?

13  A.   I am.

14  Q.   If you touch it, you can draw a circle there.

15  A.   Okay (Witness complies).                                       11:32:09

16  Q.   And so where was your vehicle parked?

17  A.   It was parked inside the driveway probably 20 feet, 20

18  plus feet back from the entrance of the driveway.

19  Q.   Okay.  And so the road that's running kind of vertical and

20  then curving back toward the right down at the lower right end      11:32:35

21  that's the entrance road; is that correct?

22  A.   That goes down kind of a hill to the -- to a large

23  entrance to the arena portion of the Culwell Center.

24  Q.   All right.  And that road that's wider that's going past

25  the point where your circle is, what the name of that road?        11:32:55

United States District Court

GREG STEVENS - Direct

1   A.   That is Naaman Forest Boulevard.                          11:32:58

2   Q.   And what time did you go on station there?

3   A.   I arrived about 1:30 in the afternoon and took up my

4   position almost immediately after that.

5   Q.   Was the security profile that you had there at that event  11:33:13

6   normal for the Culwell Center that day?

7   A.   No.  It was different than what we typically would have

8   done simply because we had some concerns about the nature of

9   the event.

10  Q.   Were you aware of threats having been made to the event?   11:33:30

11  A.   I was, yes.

12  Q.   And was there also private security on scene?

13  A.   The school district had their security officers, a number

14  of them, there as well.

15  Q.   Is that because the Garland School District owns the       11:33:44

16  Curtis Culwell Center?

17  A.   Yes, sir.

18  Q.   And then do you remember who the promoter of this event

19  was?

20  A.   It was a lady from New York named Pamela Geller.           11:33:56

21  Q.   Did she have her own security detail at the event?

22  A.   She did, yes.

23  Q.   Do you recall who the keynote speaker was for the event?

24  A.   He was a Dutch politician.  I believe his name is

25  pronounced Geert Wilders.                                       11:34:10

United States District Court

GREG STEVENS - Direct

1   Q.   Very good.  And did he have his own security team as well?  11:34:13

2   A.   Yes, sir, he did.

3   Q.   All right.  Was there a point later in the day that you

4   took a break?

5   A.   Very late in the day.  Just several hours later, yes, sir.  11:34:21

6   Q.   Okay.  And where did you go?

7   A.   I went up to the side of the building kind of on the front

8   West side of the building there just to take a bathroom break.

9   Q.   All right.  And from that did you return to your post?

10   A.   I did.  11:34:44

11   Q.   When you returned to your post, how close was that in

12   proximity to the end of the event?

13   A.   Well, actually, when I was up at the building, I heard

14   somebody, the radio or police radio kind of crackled and

15   somebody said that it looked like it just ended.  So it was  11:34:55

16   ending just as I was going back to my post.

17   Q.   When you returned to your post, did something unusual

18   happen?

19   A.   Yes, sir.

20   Q.   Could you please describe that?  11:35:07

21   A.   Well, I had repositioned my car where I had it before kind

22   of parallel to the driveway entrance back away from the

23   entrance a ways.  I had large cones blocking the entirety of

24   the entrance to the parking area except for about an area ten

25   feet wide or so on the -- if you're looking at the street, it  11:35:30

GREG STEVENS - Direct

1   was on the left-hand side.  And my assignment was just to allow    11:35:34

2   the dignitaries in and out and a caterer and nobody else was

3   supposed to be admitted to that entrance and so on.  So I had

4   it blocked to where I spent my time standing in that entrance.

5   Q.   If I can interrupt for a second.  Were there points    11:35:54

6   throughout the day that people pulled up to your checkpoint and

7   you had to direct them elsewhere in the course of the day?

8   A.   Yes.

9   Q.   Can you explain that briefly?

10  A.   On occasion somebody would pull up asking where to park or    11:36:02

11  where the event was -- the parking for the event was.  Those

12  kinds of things typical of any event where you have a gathering

13  of folks.  There's going to be people that need instruction.

14          MR. KOEHLER:  Before you go on, I would like to move

15  to admit Exhibit 1.    11:36:22

16          THE COURT:  Any objection?

17          MR. WAHID:  No.

18          THE COURT:  There being no objection, Exhibit 1 is

19  admitted.

20          (Exhibit Number 1 was admitted into evidence.)    11:36:30

21  BY MR. KOEHLER:

22  Q.   Now, you mentioned something unusual happened.  Can you

23  describe what happened as you got back to your post?

24  A.   Yes, sir.  So I was standing in the open area of the

25  driveway where I had removed the cones and a small two-door    11:36:42

United States District Court

1    vehicle came from what would be my left down Naaman Forest          11:36:48

2    Boulevard, pulled into the driveway past where I was standing,

3    was partially in the driveway and partially in the road

4    parallel with the roadway and stopped kind of at the far side

5    of the entrance itself and did it rather abruptly, kind of got     11:37:08

6    my attention.  It was unusual.

7              My first thought, it was somebody was going to ask a

8    question and I didn't know why they would drive past me so it

9    kind of garnered my attention.

10   Q.   What color was the car?                                        11:37:27

11   A.   It was black.

12   Q.   Okay.  Go ahead.

13   A.   So as I'm watching, I can see the back of the car clearly.

14   I can see the passenger side clear.  I can't see the driver's

15   side as clearly.  It was a two-door car.  I remember noticed it     11:37:38

16   had Arizona license plates on it, which is something we would

17   talked about in briefing, about out-of-state license plates.

18   But as I'm standing there watching it, I noticed both the

19   passenger and driver door -- it was a two-door car -- they both

20   opened simultaneously.                                              11:37:55

21             I was watching the passenger side more closely

22   because I had a better view of it.  And once the doors opened,

23   the next thing I see is somebody stepping out of the car.  They

24   were armed with some kind of a rifle and I saw the rifle barrel

25   coming up in my direction.                                          11:38:13

1    Q.    What did you do in response to that?

2    A.    Well, obviously I detected that to be a threat.    My

3    training kicked in at that point.    I unholstered and engaged

4    the passenger immediately with my duty pistol.    It was a Glock,

5    .45 caliber.    Fired several rounds.    The passenger that had

6    exited the vehicle fell to the ground, dropped his rifle, was

7    still within proximity but he was temporarily out of the fight

8    as far as I was concerned.    I then immediately acquired where

9    the driver was who was coming around the back of the car, the

10    driver had a rifle as well, had the rifle up.

11    Q.    Was he firing?

12    A.    Yes.    And I believe he was probably firing at a security

13    guard that had been assigned to that post with me.    He was

14    unarmed.    He had a uniform on but he was not a police officer.

15    He was a security officer and he wasn't authorized to be armed.

16    Q.    What was the name of the security officer?

17    A.    His name is Bruce Joiner.

18    Q.    Okay.    Go ahead.

19    A.    So I acquired the driver coming around.    I turned and I

20    fired several rounds at the driver who also fell, dropped his

21    rifle in a similar fashion as to what happened to the

22    passenger.    Once again, temporarily got him out of the fight.

23        I then redirected my attention back to the passenger

24    who was still on the ground within reach of the rifle.    My

25    greatest concern, though, was he had his hands up near his

GREG STEVENS - Direct

1  upper chest and his throat area.  His hands are moving around.    11:40:05
2  You are concerned about -- we had talked about in briefings
3  about IEDs, improvised explosive devices.  I was concerned
4  whether he might be attempting to activate some kind of device
5  either that he had on his body or in the vehicle.    11:40:21
6  Q.  Was there anything about his clothing that indicated that
7  that could be a possibility?
8  A.  Both of the occupants were wearing dark clothing, like a
9  military style clothing.  They both had load-bearing vests,
10 what we call load-bearing vests, which is a vest that goes over    11:40:37
11 the top of your clothing that has lots of pockets in it and
12 they both had extra magazines for their rifle in there.  They
13 both were wearing what looked like small backpacks.  They
14 looked very military in nature.
15 Q.  So did that contribute to your concern that they might    11:40:59
16 have explosives on them?
17 A.  Absolutely.  And like I said, the passenger, the way he
18 had his hands up near his upper chest area and was moving
19 around, I couldn't -- I wasn't sure if he might be attempting
20 to pull a pin on like a grenade or trying to press a plunger or    11:41:16
21 a button of some sort to activate some kind of explosive
22 device.
23 Q.  And then what happened when you observed that?
24 A.  I reengaged and fired several more rounds simply because
25 he was still a very viable threat and then he seemed to stop    11:41:33

United States District Court

1  moving very much at all at that point.  And I redirected my                   11:41:42

2  attention back to the driver who was less active but, once

3  again, was within proximity of the rifle.  I fired a couple

4  more rounds.  That's when my slide locked back on my service

5  pistol indicating that I needed to reload and I did.  I did a                  11:42:02

6  tactical reload and redirected my attention back to the

7  passenger, was approaching the passenger when I was called to

8  the point of cover by some other officers that had arrived to

9  assist in what was going on.

10  Q.   And was that the S.W.A.T team?                                           11:42:22

11  A.   Yes, sir.  Primarily it was members of our S.W.A.T team.

12  Q.   And did members of the S.W.A.T team fire more rounds at

13  the two subjects?

14  A.   They did.

15  Q.   All right.  And were the two subjects deceased at the                    11:42:32

16  scene after that?

17  A.   Yes, sir.

18  Q.   All right.  I want to direct your attention now to Exhibit

19  Number 2.  Can you describe what this is on your screen?  And

20  can you hit -- I think it's the upper left corner of your                     11:43:03

21  screen to clear?

22          COURTROOM DEPUTY:  I've got it.  I'll clear it.

23          MR. KOEHLER:  Okay.  Thank you.

24  BY MR. KOEHLER:

25  Q.   Can you describe what this photograph is?                                11:43:10

United States District Court

A.   This is -- I would call it a FLIR image or a heat image    11:43:17
taken above the crime scene where the attack occurred.

Q.   Does that photographically depict the scene after the two
subjects were neutralized?

A.   Yes, sir, it does.                                          11:43:31

Q.   And can you --

          MR. KOEHLER:  First off, I'll move to admit Exhibit
Number 2.

          THE COURT:  Mr. Wahid, any objection?

          MR. WAHID:  No.                                        11:43:40

          THE COURT:  There being no objection, number two is
admitted.

          (Exhibit Number 2 was admitted into evidence.)

BY MR. KOEHLER:

Q.   Starting at the back of the vehicle and working your way    11:43:44
left, there appears to be something on the ground near the
trunk of the car.  Can you tell us what that is?

A.   This -- shall I draw a circle on it to be sure we're
talking about the same thing?

Q.   Absolutely?                                                 11:44:02

A.   Is this the item you're talking about?

Q.   Yes.

A.   That is a weapon, a rifle.

Q.   Okay.  And whose weapon was that?

A.   That would be the passenger's.                              11:44:14

1  Q.   All right.  And where is the passenger in the photograph?   11:44:15

2  A.   Right beside it.  Right here (Indicating).  This is the

3  passenger.

4  Q.   Now, I think you can touch the upper left corner of the

5  screen and change the color from red to a different color.   11:44:26

6          And then can you indicate where the driver is and

7  then his rifle?

8  A.   This is the driver here and his rifle is right here

9  (Indicating)?

10  Q.   Now, can you put an X where you were standing when you   11:44:40

11  engaged these two?

12  A.   I was approximately -- when they stepped out of the

13  vehicle, I was about here (Indicating).

14  Q.   All right.  Now, looking down below where you were

15  standing in the photo, there appears to be a vehicle and   11:44:58

16  another vehicle.  What are those?

17  A.   The one that looks like a car is a car.  It is actually my

18  car that I was assigned and that is where I had parked it when

19  I returned and the vehicle next to it is a police motorcycle

20  and it arrived after the attack.   11:45:16

21  Q.   So --

22  A.   Just as the attack was ending actually and was that

23  Officer Orman, O-R-M-A-N.

24  Q.   Now, I'm going to direct your attention to Exhibit

25  Number 3.  If you could remove your marks, please.  Is that a   11:45:32

United States District Court

GREG STEVENS - Direct

1  closeup of the same photograph, Mr. Stevens?                    11:45:40

2  A.   Yes, sir.  It appears to be.

3  Q.   And does that also fairly and accurately depict the scene?

4  A.   Yes, sir.

5           MR. KOEHLER:  Move to admit Exhibit 3.               11:45:48

6           THE COURT:  Mr. Wahid, any objection?

7           MR. WAHID:  No.

8           THE COURT:  All right.  Number three is admitted.

9           (Exhibit Number 3 was admitted into evidence.)

10  BY MR. KOEHLER:                                                11:45:54

11  Q.   Did you also create a diagram yourself of the scene?

12  A.   No, sir, I didn't personally do that.

13  Q.   So this right here is not something that you did?

14  A.   I don't recall doing that unless somebody was interviewing

15  me and asked me to do it but I don't remember doing that, no,   11:46:11

16  sir.

17  Q.   Okay.  We'll just move on from that one then.

18       The passenger of the vehicle when he was shooting, do

19  you recall whether he was shooting from the hip area or from

20  the shoulder area?                                             11:46:32

21  A.   I do not recall specifically.  Probably somewhere between

22  the two.  As he got out of the vehicle, he had to transition

23  his weapon up if he were going to shoot from the shoulder.

24  Q.   And you got a look at his weapon after; is that right?

25  A.   Not other than what you see in these pictures here.       11:46:51

United States District Court

GREG STEVENS - Direct

1  Q.   Okay.  Fair enough.                                    11:46:55

2        And then the driver, how was he firing?

3  A.   The driver, by the time I acquired him and engaged him, he

4  did have his rifle shouldered.

5  Q.   He had it shouldered, all right.  And then last, but not   11:47:06

6  least, did the Garland PD respond to the explosives concern

7  that you had?

8  A.   Yes, sir.

9  Q.   What did they do?

10 A.   We have some officers that are dedicated bomb technicians. 11:47:21

11 They kind of took the scene once everybody was moved out of the

12 scene and they went through a rather arduous process.  And I

13 can't describe it because I'm not trained in that, but they

14 went through a rather arduous process of using robots and other

15 technology to be able to clear the vehicle and the victims to   11:47:40

16 be sure there weren't any explosive devices at hand.

17 Q.   Did you witness them do that?

18 A.   Some of it.  I wasn't watching them do that but part of

19 what they did involved using explosive charges and I certainly

20 heard those.  And we were warned on the radio before they were  11:48:02

21 going to discharge something, but I wasn't -- I couldn't --

22 from the place I was, I couldn't see down to the actual scene.

23 Q.   Did you see the aftermath of that explosion?

24 A.   Mostly in photographs.

25 Q.   Okay.                                                    11:48:24

United States District Court

BRIAN MARLOW - Direct

1          MR. KOEHLER:  I have no further questions for the          11:48:29

2     witness at this time.

3               THE COURT:  Thank you, Mr. Cole.

4               Mr. Wahid, do you have any questions?

5               MR. WAHID:  No questions, Your Honor.          11:48:35

6               THE COURT:  All right.

7               Mr. Stevens, I can excuse you and I can let you down.

8     You may step down.

9               (Witness excused.)

10              THE COURT:  Mr. Koehler, would you call your next          11:48:49

11     witness, please.

12              MR. KOEHLER:  The United States calls Brian Marlow.

13              THE COURT:  Mr. Marlow, if you would step up to my

14     courtroom deputy, she will wear you in.

15              COURTROOM DEPUTY:  Please state your name and spell          11:49:15

16     your last name for the record.

17              THE WITNESS:  Brian Marlow.  M-A-R-L-O-W.

18              (BRIAN MARLOW, a witness herein, was duly sworn or

19     affirmed.)

20                        **DIRECT EXAMINATION**          11:49:21

21     BY MR. KOEHLER:

22     Q.   Sir, would you please introduce yourself to the Court?

23     A.   My name is Brian Marlow.  I'm a Special Agent with the

24     FBI.

25     Q.   And where are you stationed?          11:50:05

United States District Court

BRIAN MARLOW - Direct

1    A.    In Dallas.                                                    11:50:07

2    Q.    Are you in the a member of the Dallas Field Office?

3    A.    I am.

4    Q.    How long have you been with the FBI?

5    A.    Since 2006.                                                   11:50:14

6    Q.    Do you have any principal areas of responsibility?

7    A.    I'm the senior team leader for our Evidence Response Team.

8    Q.    So when an event happens, are you generally one of the

9    people who is in charge of going out to the scene and gathering

10   the evidence?                                                      11:50:28

11   A.    Yes.

12   Q.    And were you a team leader of the Evidence Response Team

13   on May 3 of 2015?

14   A.    I was.

15   Q.    And on that date, did an event occur to which you          11:50:39

16   responded?

17   A.    Yes, there was a shooting in Garland, Texas.

18   Q.    And did you respond to the Curtis Culwell Center for that

19   event?

20   A.    I did.                                                      11:50:51

21   Q.    What was your role at that event?

22   A.    I was the senior team leader.

23   Q.    Looking at your screen there on the right side of your

24   screen, do you see a photograph there?

25   A.    I do.                                                       11:51:16

United States District Court

BRIAN MARLOW - Direct

1  Q.   Can you tell us what that depicts?

2  A.   That's a portion of the crime scene that we processed on

3  that date.

4  Q.   And is the entrance area in the building there straight

5  behind in the back of the photo, is that the entrance to the

6  Curtis Culwell Center?

7  A.   It is, yes.

8  Q.   All right.  So we're looking at the vehicle from the

9  backside; is that right?

10  A.   Yes.

11  Q.   Does that photograph fairly and accurately depict the

12  crime scene as it appeared the morning after the attack?

13  A.   Yes, it does.

14  Q.   And I'm going to show you the second half of that.  Can

15  you tell the Court what that is?

16  A.   That's another portion of the crime scene:  It's the

17  vehicle that we saw in the previous photo off to the right.

18  Q.   Does that fairly and accurately depict that portion of the

19  crime scene?

20  A.   It does.

21       MR. KOEHLER:  Move to admit Exhibit Number 5.

22       THE COURT:  I have a question for you, Mr. Koehler.

23  This is all one exhibit?

24       MR. KOEHLER:  Yes, it is.

25       THE COURT:  How come I saw it in two pieces?

United States District Court

11:51:16

11:51:30

11:51:39

11:52:00

11:52:18

11:52:25

1     MR. KOEHLER:  I don't recall, Your Honor.                    11:52:28

2     THE COURT:  Well, the exhibit is one photograph?

3     MR. KOEHLER:  Two photos in one image set.

4     THE COURT:  All right.  Understood.

5     Are there any objections, Mr. Wahid?                          11:52:39

6     MR. WAHID:  No.

7     THE COURT:  All right, sir.  The exhibit is admitted.

8     (Exhibit Number 5 was admitted into evidence.)

9   BY MR. KOEHLER:

10  Q.   And Mr. Marlow, can you tell us why this scene is so big,  11:52:46

11  why there's so much stuff so far away from the vehicle when it

12  was merely a shooting, at least the initiation of this event?

13  A.   Our bomb technicians removed certain bags out of the car

14  and also the car itself.  They made it safe, made sure there

15  wasn't any explosive devices there.                            11:53:13

16  Q.   Did they use a water device to essentially blow up the car

17  and neutralize any potential explosives?

18  A.   I believe so, yes.

19  Q.   Let me move on to Exhibit Number 6.

20       Did FBI agents recover weapons the scene?                 11:53:34

21  A.   Yes.

22  Q.   And directing your attention to Exhibit Number 6, do you

23  recognize that?

24  A.   I do.

25  Q.   Is that one of the weapons that was recovered at the      11:53:49

United States District Court

BRIAN MARLOW - Direct

1    scene?                                                                    11:53:52

2    A.    It was.

3    Q.    And do you recall whose body that was near?

4    A.    That was near Mr. Soofi.

5    Q.    And do you know Mr. Soofi's full name?          11:54:02

6    A.    I do not.

7    Q.    Okay.  Is that a fair and accurate depiction of that

8    rifle?

9    A.    It is.

10          MR. KOEHLER:  November to admit Exhibit 6.     11:54:14

11          THE COURT:  Any objection, Mr. Wahid?

12          MR. WAHID:  No.

13          THE COURT:  Thank you.

14          No objection.  Number six is admitted.

15          (Exhibit Number 6 was admitted into evidence.)  11:54:22

16   BY MR. KOEHLER:

17   Q.    Now moving on to Exhibit Number 7.  Do you recognize that?

18   A.    I do.

19   Q.    Was that also a rifle found at the scene?

20   A.    It was.                                                             11:54:36

21   Q.    What type of a rifle is that?

22   A.    It's a Romanian Draco AK47 pistol.

23   Q.    And whose body was that next to?

24   A.    That's near Mr. Simpson's.

25   Q.    All right, sir.  Do you know which person was the     11:54:48

United States District Court

BRIAN MARLOW - Direct

1   passenger and which person was the driver of the car?                    11:54:49

2   A.    I do not.

3   Q.    Okay.  Very good.

4         MR. KOEHLER:  Move to admit Exhibit 7.

5         THE COURT:  Any objection, Mr. Wahid?                              11:55:01

6         MR. WAHID:  No objection, Your Honor.

7         THE COURT:  All right.  Seven is admitted.

8         (Exhibit Number 7 was admitted into evidence.)

9   BY MR. KOEHLER:

10  Q.    Now directing your attention to Exhibit Number 8.  Do you          11:55:10

11  recognize that?

12  A.    I do.

13  Q.    What is that?

14  A.    It's a Jimenez Arms 9mm pistol.

15  Q.    Do you recall where that was recovered from the scene?            11:55:18

16  A.    That was recovered out of the ammo carrier, ammunition

17  carrier, that Mr. Simpson was wearing.

18  Q.    Does that fairly and accurately depict that firearm?

19  A.    It does.

20  Q.    Move to admit Exhibit 8.                                          11:55:34

21        THE COURT:  Any objection, Mr. Wahid?

22        MR. WAHID:  No.

23        THE COURT:  Eight is admitted.

24        (Exhibit Number 8 was admitted into evidence.)

25  \\\

United States District Court

BRIAN MARLOW - Direct

1   BY MR. KOEHLER:

2   Q.   Now, directing your attention to Exhibit 9, what is that?

3   A.   That's a Taurus .357 Magnum five shot revolver.

4   Q.   And where was that recovered?

5   A.   That was located in the pocket of Mr. Simpson.   11:55:55

6   Q.   Does that photo fairly and accurately reflect that item?

7   A.   It does.

8        MR. KOEHLER:  Move to admit Exhibit 9.

9        THE COURT:  Any objection, Mr. Wahid?

10       MR. WAHID:  No.   11:56:07

11       THE COURT:  Nine is admitted.

12       (Exhibit Number 9 was admitted into evidence.)

13  BY MR. KOEHLER:

14  Q.   Now, directing your attention to Exhibit Number 10.  Do

15  you recognize that?   11:56:18

16  A.   I do.

17  Q.   What is that?

18  A.   It's a Keltec 9mm rifle.

19  Q.   Do you know where that was recovered?

20  A.   That was recovered next to the passenger door of the   11:56:24

21  vehicle on the ground.

22  Q.   And does that photograph fairly and accurately depict that

23  weapon?

24  A.   It does.

25       MR. KOEHLER:  Move to admit Exhibit 10.   11:56:35

United States District Court

BRIAN MARLOW - Direct

1    THE COURT:  Mr. Wahid, any objection to number 10?    11:56:38

2    MR. WAHID:  No.

3    THE COURT:  All right.  Number ten is admitted.

4    (Exhibit Number 10 was admitted into evidence.)

5    THE COURT:  Mr. Koehler, it sounds like you've got    11:56:42

6    several more that you're going to go through here.

7    MR. KOEHLER:  I'm going to go through Exhibit 16 and

8    then 22 through 26 with this witness.

9    THE COURT:  That's just fine.  Just to be efficient

10   with this, I have been asking Mr. Wahid whether he objects to    11:56:56

11   each exhibit.  I will simply hold for a moment.  As you move

12   something in and if, Mr. Wahid, if you have an objection,

13   please raise it.  If you don't, I will assume you don't.

14   MR. WAHID:  Okay.

15   THE COURT:  Thank you.    11:57:11

16   BY MR. KOEHLER:

17   Q.   Now moving on to Exhibit Number 11, do you recognize that?

18   A.   Yes.

19   Q.   What is that?

20   A.   It's a HiPoint 9mm pistol.    11:57:22

21   Q.   Does it have an extended magazine?

22   A.   It does.

23   Q.   And where was that recovered?

24   A.   It was on the ground next to Mr. Soofi.

25   Q.   Also fairly and accurately depicting that item?    11:57:32

United States District Court

1  A.   It does.                                                    11:57:36

2  Q.   And I'll just hold moving for admission until we get

3  through these.

4         I'm going to direct your attention now to Exhibit 12.

5  Will you tell the Court what that is?                            11:57:45

6  A.   It's a bag of 9mm ammunition.

7  Q.   And does that fairly and accurately depict some of the

8  ammunition that was found at the scene?

9  A.   It does.

10 Q.   Exhibit 13?                                                 11:58:05

11 A.   Again, a bag of 5.45 x 35 millimeter ammunition.

12 Q.   And does this ammunition correspond to one of the weapons

13 that was recovered at the scene?

14 A.   Yes.  The Elk tool and die weapon by Mr. Soofi.

15 Q.   So the rifle with the two little drum barrels attached to   11:58:22

16 it in the previous photo?

17 A.   Yes.

18 Q.   And that fairly and accurately depicts that ammunition?

19 A.   It does.

20 Q.   Now moving on to Exhibit Number 14, what is that?          11:58:37

21 A.   That's a bag of, again, the 5.45 x 35 millimeter

22 ammunition.

23 Q.   Also corresponding to that Elk River tool and die AK47

24 rifle?

25 A.   Yes.                                                        11:58:56

BRIAN MARLOW - Direct

1   Q.   And does that fairly and accurately depict those items.          11:59:00

2   A.   It does.

3   Q.   15 and specifically I want you to look both at the

4   dashboard of the vehicle and at the front passenger seat of the

5   vehicle.  In the -- first of all, what does this picture          11:59:18

6   depict?

7   A.   It's the interior compartment of the vehicle that was on

8   the scene.

9   Q.   All right.  And on the dashboard in the upper right corner

10  to the right of the black card that says G on it, can you tell     11:59:35

11  the Court what is depicted there?

12  A.   It's a Galaxy S5 cell phone.

13  Q.   All right.  And then down on the seat itself, do you have

14  a book present there?

15  A.   Yes.  It was a fortress book is the title or portion of      11:59:51

16  the title.

17  Q.   And does this photograph fairly and accurately depict the

18  interior of the car shortly after the scene was that under

19  control?

20  A.   Yes.                                                         12:00:07

21        MR. KOEHLER:  All right.  I'm going to move to

22  admit -- I think we stopped at 12 or perhaps 11 and moved to

23  admit 11 through 15.

24        THE COURT:  There being no objection, Exhibits 11

25  through 15 are admitted.                                          12:00:23

United States District Court

1    (Exhibit Numbers 11 through 15 were admitted into         12:00:24

2 evidence.)

3         MR. WAHID:  No.

4         MR. KOEHLER:  If I may have the case agent approach

5 the witness with Exhibit Number 16, please.                    12:00:30

6         THE COURT:  You may.

7         MR. KOEHLER:  And while we're at it, let's add 22,

8 23 -- excuse me, 23 is off.  22, 24, 25, and 26 to speed things

9 up.

10        Your Honor, may I approach the exhibit box, quickly?   12:03:19

11        THE COURT:  You may.

12        COURTROOM DEPUTY:  Mr. Koehler, did you take 16, 22,

13 24, 25 from the box?

14        MR. KOEHLER:  Yes.  They are physical items.  I am

15 going to staple the cover sheets to the plastic.              12:04:14

16        COURTROOM DEPUTY:  I just want to track what you

17 took.

18        MR. KOEHLER:  May I approach the witness, Your Honor?

19 BY MR. KOEHLER:

20 Q.   Mr. Marlow, do you recognize that item?                 12:04:51

21 A.   I do.

22 Q.   What is it?

23 A.   This is the Galaxy S5 cell phone that was found at the

24 scene in the car.

25 Q.   Okay.  So that's the same -- the same phone that was on  12:05:00

BRIAN MARLOW - Direct

1    the dashboard that is displayed in Exhibit Number 15?          12:05:04

2    A.   Yes.

3              MR. KOEHLER:  Move to admit Exhibit 16.

4              THE COURT:  There being no objection, 16 is admitted.

5              (Exhibit Number 16 was admitted into evidence.)      12:05:16

6              MR. KOEHLER:  May I approach the witness again, Your

7    Honor?

8              THE COURT:  You may.

9    BY MR. KOEHLER:

10   Q.   Directing your attention first to Exhibit Number 22, can   12:05:39

11   you tell the Court what that is, please?

12   A.   This is some paper ISIL or ISIS flags we found at the

13   scene?

14   Q.   Are you familiar with the ISIS flag?  Have you seen in it

15   your line of work in past?                                      12:05:57

16   A.   I have.

17   Q.   And do those printed sheets of paper match the ISIS flag

18   images that you've seen in the past?

19   A.   To the best of my knowledge, yes.

20   Q.   Was there a fairly large quantity of those found at the    12:06:08

21   scene?

22   A.   There was a stack of them.  They are all together.

23   Q.   And were they damaged in the water event that took apart

24   the car?

25   A.   Yes.                                                       12:06:20

United States District Court

BRIAN MARLOW - Direct

1  Q.   Are those in substantially the same condition they were in       12:06:22

2  when they were recovered at the scene?

3  A.   Yes.

4         MR. KOEHLER:  Move to admit 22.

5         THE COURT:  There being no objection, 22 is in                 12:06:31

6  evidence.

7         (Exhibit Number 22 was admitted into evidence.)

8  BY MR. KOEHLER:

9  Q.   Now, directing your attention to Exhibit Number 24.  Can

10 you tell us what that is?                                             12:06:38

11 A.   It's a book, Defence of the Muslim Lands.

12 Q.   Was that also recovered at the seen?

13 A.   It was.

14 Q.   Where was that recovered, if you recall?

15 A.   It was in the median in a grassy area near a bag that was        12:06:49

16 opened up by the bomb techs.  It was just north, northwest of

17 the vehicle.

18 Q.   So it likely came out of the backpack that it was next to

19 or the bag?

20 A.   Yes.                                                             12:07:07

21 Q.   And is that in substantially the same condition it was in

22 when it was recovered?

23 A.   Yes.

24         MR. KOEHLER:  Move to admit Exhibit Number 24.

25         THE COURT:  All right.  There being no objection and          12:07:16

United States District Court

1    before we move on, Agent Marlow, as the supervisor of the    12:07:18

2    Evidence Response Team, are you signing off on each of these

3    seizures on the evidence bags?

4             THE WITNESS:  No, sir.  Members of my team do that.

5             THE COURT:  And they are signatures or initials that    12:07:35

6    you would recognize?

7             THE WITNESS:  Yes.

8             THE COURT:  All right.  24 is admitted.

9             (Exhibit Number 24 was admitted into evidence.)

10             MR. KOEHLER:  To be clear, we have a stipulation    12:07:42

11    about Mr. Marlow being entitled to serve as the evidence

12    custodian for all of these items from the Garland scene.

13             May the case agent approach the witness?

14             THE COURT:  She may.

15    BY MR. KOEHLER:    12:08:07

16    Q.    Before we move to those two exhibits, Mr. Marlow, looking

17    at Exhibit Number 24, does that reflect who the author of that

18    text is?

19    A.    It does.

20    Q.    What is the name?    12:08:15

21    A.    I'll butcher the pronunciation but it's Shaykh Abdullah

22    Azzam.

23    Q.    Thank you.

24             Now, so now directing your attention to Exhibit

25    Number 25, what is that?    12:08:34

BRIAN MARLOW - Direct

1   A.   This is a brown wallet with Mr. Soofi's driver's license          12:08:41

2   and a bank visa card.

3   Q.   And were those recovered from Mr. Soofi's body at the

4   scene?

5   A.   No.  They were recovered from the vehicle itself.               12:08:52

6   Q.   Are they in substantially the same condition in as when

7   they were recovered?

8   A.   Yes.

9           MR. KOEHLER:  Move to admit 25.

10          THE COURT:  25 is admitted.                                  12:09:03

11          (Exhibit Number 25 was admitted into evidence.)

12  BY MR. KOEHLER:

13  Q.   And now directing your attention to 26.  Can you tell us

14  what that is?

15  A.   It's a wallet with Mr. Simpson's driver's license.              12:09:17

16  Q.   And where was that recovered?

17  A.   That was recovered on Mr. Simpson's body.

18  Q.   All right.  And is that in substantially the same

19  condition it was in at the time it was recovered?

20  A.   Yes.                                                            12:09:33

21          MR. KOEHLER:  Move to admit Exhibit Number 26.

22          THE COURT:  Hearing no objection, 26 is admitted.

23          (Exhibit Number 26 was admitted into evidence.)

24  BY MR. KOEHLER:

25  Q.   Now, Agent Marlow, given what you knew about what unfolded       12:09:43

United States District Court

1    at the scene and these items, among other items that were        12:09:46

2    recovered at the scene, couple of things.  Number one,

3    approximately how many rounds of ammunition were recovered at

4    the scene?

5    A.    There was over 1500.        12:09:58

6    Q.    And what was the total number of firearms that they

7    carried?

8    A.    Six firearms were recovered at the scene.

9    Q.    And in light of the nature of the contest, the ISIS flags

10   and the other items recovered, what kind of investigation did        12:10:10

11   the FBI treat this as at that point?

12   A.    Courter-terrorism investigation.

13           MR. KOEHLER:  I have no further questions for the

14   witness, Your Honor.

15           THE COURT:  All right.  Thank you, Mr. Koehler.        12:10:24

16           Mr. Wahid, do you have any questions for Agent

17   Marlow?

18           MR. WAHID:  No.

19           THE COURT:  All right.  Then the witness may be

20   excused.        12:10:32

21           Mr. Marlow, you may be excused.  You may step down.

22   Thank you, sir.

23           THE WITNESS:  Thank you.

24           (Witness excused.)

25           THE COURT:  Mr. Koehler, you can go ahead and call        12:10:38

1    your next witness.                                               12:10:40

2          Just for planning purposes, as I had told you

3    consistently with the Friday hearing, we're going to go until

4    about 12:30 so let's see what we can get done in the next 20

5    minutes.                                                         12:10:49

6          MS. BROOK:  Just one moment, Your Honor.  If I may,

7    our next witness is going to be Kim Jensen.  He's actually

8    downstairs on the third floor.  We can bring him up.  Or if

9    Your Honor wants to break now, we can do that as well.

10   Whichever.                                                       12:11:28

11         THE COURT:  Is he available?

12         MS. BROOK:  He's available but we have to go

13   downstairs and grab him.

14         THE COURT:  I would rather do that.

15         MS. BROOK:  Okay.  I'll go down and get him.             12:11:35

16         MR. KOEHLER:  While we do that, I'm going to move the

17   laptop over to counsel table.

18         THE COURT:  While we wait, if anybody in the

19   courtroom needs a break to stand and stretch, that's fine.

20         MR. WAHID:  I need to go to the bathroom.                 12:11:51

21         THE COURT:  And if you need to go to the restroom,

22   we'll take a break for five minutes.  That's fine.

23         (Recess at 12:12; resumed at 12:16.)

24         THE COURT:  All right.  Let's go back on the record

25   for just a second while we wait.                                12:16:04

United States District Court

12:16:06
1      Ms. Martinez is going to have to handle some of the

2  exhibits that have been recently introduced and I need to ask a

3  question on the record because I see that the case agent is

4  handling everything with gloves but the witness did not.  What

12:16:20
5  is the precaution?  Are the gloves to keep from altering the

6  evidence or are the gloves because there is some concern that

7  the handler could be harmed by the evidence?

8      MS. BROOK:  And it would be the latter, Your Honor.

9  The concern would be with some --

12:16:34
10      If you want to respond, Joe.

11      MR. KOEHLER:  There's one piece inside the envelope

12  that is not in sealed plastic and the other exhibits that have

13  been pulled out are in sealed plastic so they are fine.  But

14  when she reaches into the envelope to retrieve those pieces,

12:16:52
15  there's one piece that could be contaminated.  That's why she's

16  wearing gloves.

17      THE COURT:  My concern is that Ms. Martinez is not at

18  any risk by having to sign or handle the documents?

19      MR. KOEHLER:  No risk whatsoever, Your Honor.

12:17:06
20      THE COURT:  All right.  Thank you.

21      All right.  Mr. Jensen, if you would come up past of

22  the bar and to my courtroom deputy, she'll swear you in.

23      COURTROOM DEPUTY:  If you can please state your name

24  and spell your last name for the record.

12:17:35
25      THE WITNESS:  Kim Edward Jensen.  J-E-N-S-E-N.

1     (KIM EDWARD JENSEN, a witness herein, was duly sworn

2  or affirmed.)

3                    **DIRECT EXAMINATION**

4  BY MS. BROOK:

5  Q.   Good afternoon.

6  A.   Good afternoon.

7  Q.   Would you please introduce yourself to the Court?

8  A.   My name is Kim Jensen.

9  Q.   And, sir, for the better part of your professional career,

10  what did you do for a living?

11  A.   I was an FBI agent for approximately 30 years.  Prior to

12  that I was in the military.

13  Q.   When did you first become an FBI agent?

14  A.   I first became an FBI agent in 1987.

15  Q.   And then when did you retire from the FBI?

16  A.   Three years ago, in 2016.

17  Q.   You had mentioned that at some point prior to 1987 that

18  you were in the military?

19  A.   Yes, I was.

20  Q.   So during your time in the military, your 30-some odd

21  years working with the FBI, were you trained in interview

22  skills?

23  A.   Yes, I was.  I was what's called the 96 Charlie in the

24  military.  I was an interrogator.

25  Q.   And then again when you joined the FBI in '87 throughout

1  your 30 years with them as a Special Agent, did you have          12:18:57
2  training to do interviews?
3  A.   I did throughout my career, yes.
4  Q.   And in fact, when you were working in the military, were
5  you certified as an interviewer?                                  12:19:09
6  A.   I was.  I was certified as an interviewer and interrogator
7  as a 96 Charlie.
8  Q.   So let's focus in on May of 2015.  Which branch of the FBI
9  were you working for?
10 A.   I was working in the Phoenix Division within the JTTF,       12:19:23
11 which is the Joint Terrorism Task Force.
12 Q.   So as a special agent within the JTTF, in the immediate
13 aftermath of the Garland, Texas, attack, what were your
14 specific roles?
15 A.   My specific roles in the -- after the attack was to          12:19:40
16 interview -- was to conduct as many interviews as I could and
17 to follow leads and then report those interviews and leads back
18 to my supervisor.
19 Q.   And did you interview just one person or multiple people
20 during the time you were assigned to work?                        12:19:58
21 A.   As a result of those attacks we -- I myself interviewed
22 multiple people.
23 Q.   As you were working in the field as part of the follow-up
24 investigation to the Garland, Texas, attack, did you get an
25 idea roughly of the amount of assets or resources that the        12:20:18

United States District Court

1  Phoenix FBI was contributing to this particular investigation?    12:20:21

2  A.    I did.    As a member of the JTTF, I saw that our entire

3  JTTF, which is approximately five or six squads, was completely

4  mobilized to deal with all of the leads that came about as the

5  Garland attack.    So there was probably, I would estimate,    12:20:35

6  around 100 people at least in the Phoenix Division that was

7  involved in investigating those attacks.

8  Q.    At what point during the course of this investigation did

9  it become a terrorism investigation?

10  A.    Immediately.    In my opinion, immediately because there was    12:20:55

11  a significant amount of press coverage regarding that Garland

12  attack and myself and as well as other people that I work with

13  knew that there was the Draw the Prophet Muhammed contest being

14  in Texas which had been targeted before by people that belonged

15  to al-Qaeda and ISIS.    So when that happened everyone, that I    12:21:20

16  worked with knew it was probably or most likely a result of a

17  terrorist incident.

18  Q.    And you had mentioned the news as well.    Was that you

19  reporting that this was a suspected terrorism attack?

20  A.    Yes.    It was reported extensively.    12:21:39

21  Q.    Were you aware that ISIS had claimed responsibility for

22  the attack?

23  A.    No, I was not aware immediately that ISIS had -- I

24  postulated that but I was not aware immediately until about a

25  day afterwards.    12:21:51

United States District Court

KIM EDWARD JENSEN - Direct

| | | |
|---|---|---|
| 1 | Q.   So roughly around May 4 or so? | 12:21:55 |

1    Q.   So roughly around May 4 or so?                    12:21:55

2    A.   May 4, yeah.

3    Q.   Let's take a step back.  So you had mentioned that you

4    were staffed on the JTTF.  At is pertains to engaging in

5    terrorism investigations, were you specifically trained on    12:22:08

6    leads to follow and important pieces of evidence to collect?

7    A.   Yes, I was.  I had been trained regarding terrorism

8    investigations extensively.

9    Q.   And that training obviously was before the May of 2015?

10   A.   Pardon?                                            12:22:27

11   Q.   Was before the May of 2015, that training?

12   A.   Yes.  Yes.  It was, it was for several decades.

13   Q.   And additionally out in the field, is this something that

14   you would put into practice if need be during other types of

15   terrorism investigations?                              12:22:38

16   A.   Yes, it would be.

17   Q.   So let's break it down for a moment.  During a terrorism

18   investigation, what sorts of pieces of evidence are important

19   to collect?

20   A.   During a terrorism investigation, it is almost like    12:22:50

21   putting together a jigsaw puzzle with an innumerate amount of

22   small, tiny pieces of puzzle which then, during the course of

23   the investigation, that you try to amass and to try to collect

24   or gather a picture of what's happening.

25          Even though those pieces may be disparate or        12:23:07

United States District Court

1  seemingly insignificant; but when you look a at them in the          12:23:11

2  totality of everything else, they paint a pretty good picture.

3  So the type of evidences that we are looking for when we do a

4  terrorism investigation are things like individuals involved,

5  monetary, any kind of monetary instruments that was used, just      12:23:26

6  a myriad of evidentiary things which you're looking for,

7  people, places, who, what, where, when, and how.

8  Q.   So let's unpack that just a little bit.  You had mentioned

9  that some of the evidence that you're looking for may appear

10 insignificant.  What does that mean?                                 12:23:47

11 A.   Well, some of the -- for example, money.  Money in and of

12 itself is just a monetary instrument.  But in a lot of times in

13 my experience, money is used to repay people for services they

14 committed or especially to repay people, survivors of terrorist

15 attacks.  So something that doesn't seem that much or to have       12:24:06

16 that much weight, for example, money, maybe could be overlooked

17 but, in fact, that is a clear indication as to intention and

18 it's evidence.

19 Q.   And additionally, if you are in the field and you find

20 evidence of a financial transaction or some sort of money           12:24:24

21 distribution in a case like this, do you follow up on it?

22 A.   We certainly do.  We employ a vast amount of resources to

23 follow up on those types of evidence.

24 Q.   What are some of the other things that you are looking for

25 in the immediate aftermath of a terrorism attack investigation      12:24:49

1  like this?  What are some of the concerns that you have          12:24:52
2  investigatively?
3  A.    The primary concern that we have is preventing a secondary
4  incident from taking place.
5        Oftentimes in terrorism investigations, there's --        12:25:04
6  there are more than one incidences or planned events which may
7  take place.  So our primary goal, the reason why we go out as
8  fast as we do and as hard as we do is to prevent a secondary
9  attack from happening.
10  Q.    And in order to do so, are there types of evidence that    12:25:28
11  you look for or things that you are on the watch for during
12  that investigation?
13  A.    Yes.  We are.  We are primarily looking for things
14  obviously like bombs, like weapons, caches of money that could
15  be used to purchase things, individual involved, communications  12:25:47
16  equipment, transportation equipment.  A myriad of things that
17  one could use to perpetrate another attack.
18  Q.    Are you also looking to identify who the attackers, the
19  original attackers, were in connection with or contact with
20  before the attack?                                               12:26:05
21  A.    Absolutely.  We're trying to identify those individuals
22  that did the attack, if that can be done, and then to
23  immediately identify their circle of associates so that we can
24  investigate whether those individuals were involved or will be
25  involved in a subsequent attack.                                 12:26:21

KIM EDWARD JENSEN - Direct

1  Q.   So to go out, speak with or communicate, interview, follow    12:26:26
2  up on those circle of associates?
3  A.   Absolutely.
4  Q.   Let's turn our attention to May 6 of 2015.  On that
5  particular day, did you interview an individual by the name of    12:26:41
6  Abdul Khabir Wahid?
7  A.   Yes, I did.
8  Q.   And here with us in the courtroom today, do you recognize
9  him?
10  A.   Yes, I do.    12:26:49
11  Q.   Can you point to him and identify him by something that
12  he's wearing?
13  A.   He's sitting there, wearing a maroon shirt.
14        MS. BROOK:  Your Honor, may the record reflect that
15  the witness has identified the defendant?    12:26:58
16        THE COURT:  It does.
17  BY MS. BROOK:
18  Q.   On May 6 of 2015, did you interview Mr. Wahid?
19  A.   Yes, I did.
20  Q.   And where was it that you interviewed him?    12:27:10
21  A.   At his house on Port au Prince Lane in Glendale.
22  Q.   Do you remember or recall roughly what time it was?
23  A.   It was in the afternoon, probably around 2:30.
24  Q.   And when you arrived to do the interview, did you call in
25  advance?    12:27:31

1  A.   No, we did not.  We didn't actually know where he lived                    12:27:32

2  and so prior to showing up at his house, we had gone to two

3  other residences to try to track down where Mr. Wahid lived.

4  Q.   So when you arrived at that address on Port au Prince and

5  I think you mentioned it was in the 3,000 block of Port au                      12:27:45

6  Prince?

7  A.   Yes.  Somewhere in the 3000 block.

8  Q.   When you arrived at that house, were you by yourself?

9  A.   I was not.  I was with another special agent by the name

10  of Robert Byrne.                                                               12:28:01

11  Q.   And how were you two dressed?

12  A.   We were dressed fairly casually which is what we typically

13  do when we do investigations.

14  Q.   How was it that you first made contact with Mr. Wahid

15  there at the house on Port au Prince?                                          12:28:14

16  A.   We drove our vehicle up to his house and parked in the

17  street and then we entered through a gate which he has on his

18  property which is about 15 feet away from his front door.

19  After entering the gate, which is a courtyard, we knocked on

20  his house.                                                                     12:28:30

21  Q.   Were you using recording equipment?

22  A.   Yes.  Special Agent Byrne was wearing recording equipment.

23  Q.   And was that recording equipment recording from the point

24  that you came up and knocked at the door?

25  A.   Yes, it was.                                                              12:28:43

United States District Court

KIM EDWARD JENSEN - Direct

1  Q.   And that equipment, is it on your exterior or is it on the          12:28:44

2  interior of clothing?

3  A.   Interior, principally in a pocket.

4  Q.   Do you announce and did you announce during this interview

5  that you were recording the interview?                                   12:28:54

6  A.   No, we did not.

7  Q.   So what was the purpose of going to Mr. Wahid's house to

8  interview him on that day?

9  A.   Well, the day before, on May 5, I had on opportunity to

10 speak with Ali Soofi regarding the incident regarding his               12:29:09

11 brother Nadir who was one of the attackers in Garland, Texas.

12 And in the course of that short interview that I conducted at

13 the airport while he was preparing to fly out to Missouri, I

14 asked him some details regarding his brother.  Regarding the

15 apartment and where he lived with his brother and I also asked          12:29:34

16 him about some associates that he saw over at his residence.

17 And as a result of that interview, we decided to go speak with

18 Mr. Wahid.

19      MS. BROOK:   At this is point, Your Honor, we're

20 briefly going to start the recordings.  Do you think this is a          12:29:56

21 good time?

22      THE COURT:   If you think this is a good breaking

23 point, this is when I intended to let you all go for lunch.

24 Why don't we go ahead and do that then?

25      All right.  Ladies and gentlemen, it's 12:30.  The                  12:30:08

United States District Court

1  parties need time to prepare so we're going to start again at    12:30:11

2  1:45.  If everybody can be ready to go then.  Until then, we

3  will be in adjournment.

4         Mr. Jensen, to save us just a minute, when we come

5  back, if you want to just resume your place on the stand, it    12:30:24

6  will save us an interruption calling you up.

7             THE WITNESS:  Okay.

8             THE COURT:  All right.  Thank you.

9             MS. BROOK:  Thank.  You, Your Honor.

10             (Recess at 12:30; resumed at 1:46.)    12:30:34

11             THE COURT:  All right.  Looks like we're ready to

12  proceed.  Thank you, everyone, for resuming your positions as

13  well.

14             Ms. Brook, you can proceeds whenever you're ready.

15             MS. BROOK:  Thank you, Your Honor.    01:46:21

16  BY MS. BROOK:

17  Q.    Sir, we left off, we were talking about interviews that

18  you conducted on May 6 of 2015?

19  A.    Yes.

20  Q.    And that was at a residence on Port au Prince Lane?    01:46:29

21  A.    Yes.

22             MS. BROOK:  Can we place on the overhead Exhibit

23  Number 159, please.

24  Q.    I just wanted to clarify.  So what has been put up on the

25  overhead as Exhibit 159, do you see, recognize what's in this    01:47:13

KIM EDWARD JENSEN - Direct

1  photo?                                                          01:47:16

2  A.    I do.

3  Q.    And what is it?

4  A.    It's the residence of Mr. Wahid's residence.

5  Q.    So when you went to the residence on Port au Prince on May  01:47:20

6  6 of 2015, is this the residence you're referring to?

7  A.    Yes, it is.

8         MS. BROOK:  Your Honor, may the Government move to

9  admit Exhibit 159?

10         THE COURT:  There being no objection --               01:47:31

11         MR. WAHID:  No.

12         THE COURT:  -- then, yes, 159 is admitted.

13         (Exhibit Number 159 was admitted into evidence.)

14  BY MS. BROOK:

15  Q.    So as you look at this residence, is that a green gate?  01:47:39

16  A.    Yes, it is.

17  Q.    If you're going to go in and knock on the front door of

18  this residence, how do you approach it?

19  A.    You have to open the green gate and walk about 15 feet

20  away to the front door which is right behind it.           01:47:51

21  Q.    Can you go ahead and I think just by touching it, you

22  could put an X on what is actually the front door of this

23  residence.

24  A.    (Witness complies).

25  Q.    Just a dot.  Do you mind putting an X?               01:48:07

KIM EDWARD JENSEN - Direct

1   A.   (Witness complies).                                        01:48:10

2   Q.   So where the X and the arrow is the front door and then

3   draw a line through the green gate so we all know what we're

4   referring to.

5        So as you and Special Agent Byrne approached that        01:48:23

6   afternoon and came to the front door, is that where you went?

7   A.   Yes, it is.

8   Q.   And at some point you mentioned you came into contact with

9   Mr. Wahid?

10  A.   Yes.                                                       01:48:32

11  Q.   What happened at that point?  Where did the interview

12  actually take place?

13  A.   Initially we knocked on the green gate to look for dogs,

14  which is a safe thing to do.  And once we determined there were

15  no dogs in there, we let ourselves in the green gate but we did  01:48:44

16  knock on at first just to see if there was any dogs.  Once we

17  passed the green gate, we approached the front door and we

18  knocked on the front door.

19  Q.   And what happened then?

20  A.   Mr. Wahid's daughter answered the door and we identified    01:48:58

21  ourselves to his daughter and we asked that we be able to speak

22  with her father.

23  Q.   And at that point, did you see Mr. Wahid?

24  A.   We did not because it was a closed screen door so we asked

25  him to open the screen door.                                    01:49:20

United States District Court

KIM EDWARD JENSEN - Direct

1  Q.  And then was the screen door opened?                          01:49:22

2  A.  Yes.  Mr. Wahid opened the screen door and we asked if we

3  could come in to speak with him.

4  Q.  And what did he say?

5  A.  He said we could so we entered his house and spoke with       01:49:29

6  him.

7  Q.  And when was it after you entered his house that you spoke

8  with him?

9  A.  In the living room in close proximity to the front door.

10 Q.  Describe for us what the setup was during the interview.      01:49:38

11 Were you standing or sitting or something else?

12 A.  We were all seated on chairs and couches in his front

13 living room.

14 Q.  And by "all," who are we talking about?

15 A.  Myself, Special Agent Robert Byrne, and Mr. Wahid.            01:49:50

16 Q.  And was that for the duration of the interview?

17 A.  That was for the duration of the interview, yes.

18 Q.  It seems like an obvious question but at any point were

19 your guns drawn?

20 A.  No.                                                           01:50:02

21 Q.  And the tone and demeanor, was it pretty much consistent

22 throughout the interview?

23 A.  It was.  Everything was very amicable and very

24 cooperative.

25 Q.  Did you explain to Mr. Wahid why you were there?              01:50:26

United States District Court

1   A.   We did.  We explained that we were there because of the
2   attack in Garland, Texas.                                        01:50:28
3   Q.   And at what point during the interview was that?
4   A.   Within a few minutes of speaking with him.
5   Q.   And did Mr. Wahid seem to understand what that meant?        01:50:41
6   A.   Yes.  He did seem to understand what that meant.
7   Q.   Did you also explain to him that it's a crime to lie to
8   the FBI?
9   A.   We did.  We explained that it was a crime to lie to the
10  FBI and withhold anything that was of material.                  01:50:53
11  Q.   Have you had the opportunity to listen to and review the
12  full audio recording of that May 6 interview?
13  A.   I have.
14  Q.   And additionally, have you had the opportunity to sit and
15  listen to review audio clips 85 through 99?                      01:51:09
16  A.   Yes, I have.
17  Q.   Do each of those clips fairly and accurately represent a
18  portion of the interview that you had that day with the
19  defendant on May 6?
20  A.   Yes, they do.                                                01:51:22
21  Q.   You mentioned a moment ago that there was a portion of the
22  interview where you explained that it was a crime to lie to the
23  FBI.
24  A.   Yes.
25  Q.   Does Exhibit Number 85 fairly and accurately represent      01:51:34

KIM EDWARD JENSEN - Direct

| | | |
|---|---|---|
| 1 | that component of the conversation? | 01:51:37 |
| 2 | A.   Yes, it does. | |
| 3 | MS. BROOK:  Your Honor, we're going to move to play | |
| 4 | Exhibit Number 85. | |
| 5 | THE COURT:  Any objection, Mr. Wahid? | 01:51:44 |
| 6 | MR. WAHID:  No. | |
| 7 | THE COURT:  All right.  You may. | |
| 8 | (Exhibit 85 was played.) | |
| 9 | BY MS. BROOK: | |
| 10 | Q.   Shortly after that portion of the conversation, did Wahid | 01:53:33 |
| 11 | talk about watching Simpson in the months nearing the attack | |
| 12 | become more radicalized? | |
| 13 | A.   Yes, he did. | |
| 14 | Q.   And what was said? | |
| 15 | A.   He basically said that he watched the process in which | 01:53:46 |
| 16 | Simpson was becoming more and more upset. | |
| 17 | Q.   And what did you say, more and more upset? | |
| 18 | A.   More and more upset, radicalized. | |
| 19 | Q.   Did Mr. Wahid describe the last time that he saw Simpson | |
| 20 | and Soofi before the attack? | 01:54:11 |
| 21 | A.   Yes.  He spoke to us about the occasion that he had to | |
| 22 | meet with Simpson and Nadir Soofi on Friday before the attack. | |
| 23 | Q.   And does Exhibit Number 86 reflect that part of the | |
| 24 | conversation? | |
| 25 | A.   Yes, it does. | 01:54:28 |

United States District Court

1    MS. BROOK:  Your Honor, the Government is going to

2  move to admit and play 86.

3    THE COURT:  All right.  Hearing no objection, 86 is

4  admitted.  You may play.

5    (Exhibit Number 86 was admitted into evidence.)

6    (Exhibit Number 86 was played.)

7  BY MS. BROOK:

8  Q.    As part of this terrorism investigation into the Garland

9  attack, was this component of the interview you had with Wahid

10  important?

11  A.    Yes, it was important, very important.

12  Q.    Why so?

13  A.    Because at this point in the interview, we realized that

14  Mr. Wahid may have been the very last person to see Simpson and

15  Soofi prior to their travel to Garland, Texas, to carry out the

16  attack.

17  Q.    So, therefore, why would the details of that interaction

18  be important in this terrorism investigation?

19  A.    Historically, the last person to spend time with subjects

20  who are going to go perpetrate or go do something nefarious,

21  that last person has some cogent details and facts that will

22  aid in the investigation of the case and help us recover

23  evidence as quickly as we can.

24  Q.    And is the timing of the recovery of that evidence

25  important?

01:54:29

01:54:37

01:55:22

01:55:34

01:55:50

01:56:07

1  A.   It's very important because almost all evidence is          01:56:08

2  perishable.  It disappears, it goes away, it walks away and so

3  the speed at which we can get to that evidence is extremely

4  important.  And specifically in this case, it's very important

5  because there was a terrorist attack and we were concerned      01:56:25

6  there was going to be another one.

7  Q.   Based upon your training and experience, your work in the

8  JTTF as well as your work in the military dealing with these

9  type of situations, are you familiar with something called a

10 farewell message?                                               01:56:40

11 A.   Yes, I am.

12 Q.   And what is that in relationship to terrorism attacks?

13 A.   Oftentimes when individuals go to commit an act of

14 terrorism they leave behind either a written message or

15 recorded message or video message explaining their motives and  01:56:54

16 giving some clues as to what they were going to do and why they

17 were going to do it so it's a common practice for people to

18 leave a message of some sort.

19 Q.   Additionally we spoke briefly before the break about the

20 follow-on attack.  Based upon your training and experience,     01:57:18

21 both in the JTTF as well as in relation to other terrorist

22 attacks that have happened in other locations, is the concern

23 of a follow-on attack an important one?

24 A.   The concern of a follow-on attack is probably one of the

25 most important things we look at in the course of an            01:57:34

United States District Court

1  investigation.  Typically, a lot of attacks happen in             01:57:36

2  coordination and are linked to other attacks that follow those

3  attacks.  So we were focused like a laser beam on anything that

4  could happen as a result of that attack to see if there was a

5  pending attack or if there was a planned attack or if there was  01:57:54

6  anything set in motion which may precipitate a secondary

7  attack.

8  Q.  You mentioned the word "coordination," how could that or

9  has it, based on your training and experience, come into play

10 in terms of the aftermath of a first attack leading to a second  01:58:08

11 attack?

12 A.  Many, also times, many occasions, specifically in

13 terrorist attacks, many bombings or it could be any type of

14 attack really are daisy or chain-linked to other events.

15     So, for example, a bomb could go off and that bomb          01:58:29

16 would cause people to scurry in one direction and many times

17 there is a secondary device at that location and many times

18 there's a third or a fifth device which I've seen in my career

19 on numerous occasions.

20 Q.  Is it possible for the attackers to coordinate via          01:58:48

21 messages?

22 A.  And the attackers do communicate with each other via

23 messages or telephone calls or video messages or couriers or

24 any manner or means they communicate with each other, either to

25 aid or assist or to redirect.                                    01:59:05

KIM EDWARD JENSEN - Direct

1  Q.  Did you follow up specifically on different components

2  after the defendant said about the interaction he had with

3  Simpson and Soofi on Friday?

4  A.  We followed up on everything that he told us.

5  Q.  Let me ask a better question.  Did you follow up with him

6  in the interview when you were talking to him?

7  A.  We followed up on questions that -- that we asked him and

8  we followed up on the answers that he gave us.

9  Q.  Did you inquire about what the attackers were wearing when

10  they were at his house?

11  A.  I did.

12  Q.  Whether or not they were carrying or bringing anything?

13  A.  Yes, I did.

14  Q.  Does Exhibit Number 87 reflect that part of the

15  conversation?

16  A.  Yes, it does.

17       MS. BROOK:  The Government is going to move to admit

18  and play 87.

19       THE COURT:  There being no objection, 87 is admitted.

20       (Exhibit Number 87 was admitted into evidence.)

21       (Exhibit Number 87 was played.)

22  BY MS. BROOK:

23  Q.  Did you then ask Wahid where the attackers, the two men,

24  Simpson and Soofi, were standing when they came to the house?

25  A.  Yes, I did.

01:59:11

01:59:26

01:59:40

01:59:49

02:00:02

02:00:31

KIM EDWARD JENSEN - Direct

1  Q.   Does clip number 88 represent that part of the                02:00:34

2  conversation?

3  A.   Yes, it.

4        MS. BROOK:  Your Honor, the Government is going to

5  move to admit and play Exhibit 88.                                 02:00:40

6        THE COURT:  There being no objection, 88 is being

7  admitted; and if I didn't say it before, 85 is admitted.

8        (Exhibit Number 85 was admitted into evidence.)

9        (Exhibit Number 88 was admitted into evidence.)

10       (Exhibit Number 88 was played.)                              02:00:50

11 BY MS. BROOK:

12 Q.   Let me just follow up on that for a moment.  Did you

13 understand or did he point to or explain exactly where the part

14 of the house was that Simpson, he, and Soofi stood that Friday

15 night?                                                             02:01:19

16 A.   Yes.  Mr. Wahid was adamant about where they were standing

17 when they had the conversation.

18 Q.   And where was that?

19 A.   In front of his front door outside of his house on his

20 property.                                                          02:01:31

21 Q.   Outside of that white door that we were just looking at a

22 minute ago on exhibit admitted number 159?

23 A.   Yes.

24 Q.   Did you then ask him to describe again what happened when

25 Simpson and Soofi visited his home on May 1 that evening?          02:01:44

United States District Court

KIM EDWARD JENSEN - Direct

1   A.   I did.                                                    02:01:48

2   Q.   And does Exhibit Number 89 represent that part of the

3   conversation?

4   A.   Yes, it does.

5         MS. BROOK:   The Government moves to admit and play      02:01:55

6   Exhibit 89.

7         THE COURT:   All right.   There being no objection, 89

8   is admitted.

9         (Exhibit Number 89 was admitted into evidence.)

10        (Exhibit Number 89 was played.)                          02:02:02

11  BY MS. BROOK:

12  Q.   Did you follow up on this and ask exactly what Simpson and

13  Soofi said to him that night?

14  A.   I did.   I asked him repeatedly.

15  Q.   And does clip number 90 represent one of the times where  02:03:59

16  you asked?

17  A.   Yes, it does.

18        MS. BROOK:   Government moves to admit and play

19  Exhibit Number 90.

20        THE COURT:   All right.   There being no objection, 90   02:04:08

21  is admitted.

22        (Exhibit Number 90 was admitted into evidence.)

23        (Exhibit Number 90 was played.)

24  BY MS. BROOK:

25  Q.   At this point in the interview, based upon your training  02:05:34

United States District Court

1   experience, did it seem odd to you that Simpson and Soofi came    02:05:39

2   over to the house that night, gave a bowel of soup to Wahid,

3   talked about the kids needing good Muslim role models and his

4   son needing -- being a good Muslim and that was it?

5   A.   Yes, it did.  And I --                                        02:05:56

6          MR. WAHID:  Objection.  Speculation.

7          THE COURT:  The objection is overruled.  The witness

8   can answer the reasons he has and the Court will test those.

9          Go ahead.

10         THE WITNESS:  Yes.  It felt very strange and very odd    02:06:08

11  to me and that's why I kept pressing him and asking the same

12  questions over and over.

13  BY MS. BROOK:

14  Q.   Based upon your training and experience, why did it seem

15  odd?                                                              02:06:19

16  A.   It seemed odd that someone would come over before they

17  were going to commit a horrendous act to give someone a bowl of

18  soup.

19  Q.   At this point, did you continue to push, to ask what all

20  happened?                                                         02:06:37

21  A.   Yeah, because of the -- because of the oddity of that, we

22  continued to push I think for another hour asking the same

23  questions over and over.

24  Q.   Does Exhibit 91 represent the next part of the

25  conversation on that point?                                       02:06:52

KIM EDWARD JENSEN - Direct

1  A.   Yes.                                                          02:06:54

2         MS. BROOK:   Government moves to admit and play

3  Exhibit Number 91.

4         THE COURT:   There being no objection, 91 is admitted.

5         (Exhibit Number 91 was admitted into evidence.)          02:07:02

6         (Exhibit Number 91 is played.)

7  BY MS. BROOK:

8  Q.   Did Wahid's statement to you that Simpson had asked him to

9  join in conducting another attack on a military base before the

10 attack on the Draw the Prophet Muhammed contest in Garland, did  02:12:24

11 that affect your interview with the defendant?

12 A.   It certainly did.

13 Q.   How so?

14 A.   Well, now we know that Simpson had approached Mr. Wahid

15 approximately two months before the day we were interviewing     02:12:42

16 him and asked him to go on an attack mission with him to a

17 marine base.  And it's conversation, according to what he told

18 me, was that it took place right outside his house, the same

19 place that the conversation was taking place where the soup was

20 exchanged at this point, our feelers and suspicions were         02:13:05

21 realized based on our experience that terrorist attacks usually

22 are accompanied by numerous other similar events.  And so this

23 put the interview in a different light.

24 Q.   Did you ask Wahid again at that point what else he

25 remembered about what transpired with he, Simpson, and Soofi on  02:13:31

United States District Court

KIM EDWARD JENSEN - Direct

1  that Friday night?

2  A.   Yes, I did.  Because he let us know that he was invited to

3  participate in one attack previously two months ago and I

4  suspected at that point that they came to his house Friday

5  night possibly asking him to join them in another attack in

6  Garland, Texas.

7  Q.   Does Exhibit Number 92 represent that part of the

8  conversation?

9  A.   Yes, it does.

10        MS. BROOK:  Your Honor, the Government is going to

11  move to admit and play Government Exhibit Number 92.

12        THE COURT:  All right.  There being no objection, 92

13  is admitted.

14        (Exhibit Number 92 was admitted into evidence.)

15        (Exhibit 92 is played.)

16  BY MS. BROOK:

17  Q.   What was the top of the black car that was referred to in

18  the questions asked to Wahid?

19  A.   It was the car that was sitting outside of the fence just

20  on the other side of his property.

21  Q.   Was that Nadir's car that was driven over that night?

22  A.   That was I believe Nadir's car.

23  Q.   Did you go on to ask Wahid why he thought that Simpson and

24  Soofi came to his house that night of all places?

25  A.   I did.

02:13:34

02:13:51

02:14:04

02:14:21

02:15:42

02:16:00

KIM EDWARD JENSEN - Direct

1  Q.  And does Exhibit Number 93 represent fairly that part of    02:16:00

2  the conversation?

3  A.   Yes, it does.

4         MS. BROOK:  Government moves to admit and play

5  Exhibit Number 93.                                              02:16:09

6         THE COURT:  All right.  Without objection, 93 is

7  admitted.

8         (Exhibit Number 93 was admitted into evidence.)

9         (Exhibit 93 was played.)

10  BY MS. BROOK:                                                   02:18:23

11  Q.  Did you ask Wahid which one of the two, Simpson or Soofi,

12  had told him that his daughter needed a good role model?

13  A.   Yes, I did.

14  Q.   Does 94 represent that part of the conversation?

15  A.   Yes, it does.                                              02:18:36

16         MS. BROOK:  Government moves to admit and play 94.

17         COURTROOM DEPUTY:  There being no objection, 94 is

18  admitted.

19         (Exhibit Number 94 was admitted into evidence.)

20         (Exhibit 94 was played.)                                 02:18:47

21  BY MS. BROOK:

22  Q.  Did you ask Wahid when he thought that Simpson and Soofi

23  left Phoenix and drove to Texas?

24  A.   Yes, I did.

25  Q.   And does Exhibit Number 94 fairly and accurately represent  02:19:33

United States District Court

KIM EDWARD JENSEN - Direct

1  that part of the conversation?                                      02:19:37

2  A.   Yes, it does.

3           MS. BROOK:  Government moves to admit and play 95.

4           THE COURT:  With no objection, 95 is admitted.

5           (Exhibit Number 95 was admitted into evidence.)        02:19:46

6           (Exhibit 95 is played.)

7  BY MS. BROOK:

8  Q.   Did you ask Wahid exactly how Nadir handed the soup to

9  him?

10 A.   Yes, I did.                                                   02:21:23

11 Q.   Does Exhibit Number 96 fairly and accurately represent

12 that part of the conversation?

13 A.   Yes, it does.

14          MS. BROOK:  The Government moves to admit and play

15 Exhibit Number 96.                                                02:21:33

16          THE COURT:  All right.  If there's no objection, 96

17 is admitted.

18          (Exhibit Number 96 was admitted into evidence.)

19          (Exhibit 96 is played.)

20 BY MS. BROOK:                                                     02:22:15

21 Q.   A few minutes ago we listened to a clip where Wahid talked

22 about receiving phone calls that day or text messages from

23 Simpson.

24 A.   Yes.

25 Q.   During this interview, did you follow up with Wahid on      02:22:28

United States District Court

KIM EDWARD JENSEN - Direct

1    that point and ask him to show you his call history from his          02:22:32

2    phone from Friday through the weekend?

3    A.    Yes, I did.

4    Q.    And does Exhibit Number 97 fairly and accurately represent

5    that part of the conversation?                                        02:22:42

6    A.    Yes, it does.

7              MS. BROOK:   The Government moves to admit and play

8    Exhibit Number 97.

9              THE COURT:   Hang on for a second.

10             There being no objection, 97 is admitted.                   02:22:56

11             Now you may publish.

12             (Exhibit Number 97 was admitted into evidence.)

13             (Exhibit 97 was played.)

14   BY MS. BROOK:

15   Q.    Again, it was Wednesday, May 6, that you were at the            02:23:49

16   house?

17   A.    Yes.

18   Q.    Does you ask Wahid for Abdul Malik's phone number?

19   A.    Yes, I did.

20   Q.    And does Exhibit Number 98 fairly and accurately represent      02:24:04

21   that part of the phone call?

22   A.    Yes, it does.

23   Q.    Abdul Malik Abdul Kareem, was that the individual that

24   Wahid was referring to a few clips ago?

25   A.    Yes, it is.                                                     02:24:18

United States District Court

 1          MS. BROOK:  The Government moves to admit and play          02:24:18

 2   Exhibit Number 98.

 3          THE COURT:  All right, sir.  With no objection, 98 is

 4   admitted.

 5          (Exhibit Number 98 was admitted into evidence.)          02:24:35

 6          (Exhibit 98 is played.)

 7   BY MS. BROOK:

 8   Q.   Did you ask Wahid for his phone number?

 9   A.   Yes, I did.

10   Q.   And does Exhibit Number 99 fairly and accurately represent     02:25:10

11   that part?

12   A.   Yes, it does.

13          MS. BROOK:  The Government moves to admit and play

14   Exhibit Number 99.

15          THE COURT:  There being no objection, 99 is admitted.     02:25:20

16          (Exhibit Number 99 was admitted into evidence.)

17          (Exhibit 99 is played.)

18   BY MS. BROOK:

19   Q.   When -- well, a few moments ago before we started playing

20   these clips, I asked you if Government Exhibit Numbers 95          02:25:47

21   through 99 fairly and accurately represented each of the clips

22   that you listened to and that we played here in court.  I just

23   want to ask that one more time because we didn't do that for

24   each one, just for the sake of expediency throughout, but I

25   wanted to make sure that the record is correct.          02:26:09

KIM EDWARD JENSEN - Direct

1    A.   Yes.  All of those clips accurately represent what                   02:26:11

2    happened.

3    Q.   How long was this interview that you had with the

4    defendant on May 6 at his house?

5    A.   A little more than two hours.                                        02:26:23

6    Q.   And at any point during this two-hour plus interview did

7    the defendant tell you that Simpson and Soofi also provided him

8    an envelope?

9    A.   No, he did not.

10   Q.   At any point during this interview, did the defendant also           02:26:41

11   tell you that Simpson and Soofi, when they were there, also

12   provided him a set of car keys?

13   A.   No, he did not.

14   Q.   At any point did he mention an envelope or car keys?

15   A.   No, he did not.                                                      02:26:54

16   Q.   At any point during this interview, did he mention whether

17   or not he was given instructions by Simpson or by Soofi to do

18   something after they left that night?

19   A.   No, he did not.

20   Q.   Would that have been important in your investigation?               02:27:06

21   A.   That would have been very important.

22   Q.   How?

23   A.   Well, you have to realize this was Wednesday.  The attack

24   happened on Sunday.  We had two dead bodies.  We were rushing

25   to find everything that we could as quickly as we could to              02:27:19

United States District Court

1  prevent anything else from happening.  So any material fact on    02:27:22

2  this case would have helped us out significantly.  It would

3  have given us leads.  It would have given us the opportunity to

4  examine the perishable evidence before it disappeared before we

5  had a chance to examine it and look at it to see where those    02:27:38

6  leads took us, to see if there was another pending attack, to

7  see if there were other individuals involved, to see the

8  totality of all of these circumstances.  We were not able to do

9  that.

10  Q.  During this interview, at any point, was Saabir Nurse    02:27:52

11  brought up?

12  A.  No, I do not believe he was brought up in this interview.

13  Q.  And if you had known that the defendant had been given an

14  envelope and a set of car keys and asked to provide them to

15  another person, what would you have done with that information?    02:28:09

16  A.  We would have immediately set out possibly to retrieve

17  the -- those pieces of evidence to see what they were to see if

18  they were coded messages, to see if it was a last will, to see

19  if it provided instructions to anyone else.  We would have run

20  that to ground as quickly as we possibly could have.    02:28:30

21  Q.  At any point during this interview were you told that he

22  provided those keys and envelope to Saabir Nurse in the early

23  hours of that particular day, Wednesday, May 6?

24  A.  No.

25  Q.  And if you had been told that, what specifically would you    02:28:48

KIM EDWARD JENSEN - Direct

1    have done with regard to the investigation of Saabir Nurse?    02:28:53

2    A.   We probably would have requested Mr. Wahid help us out and

3    trying to track down that evidence to see who he gave it to,

4    when he gave it to him, where he was when he gave it to him,

5    where were they possibly located.  And we may have asked for    02:29:07

6    his assistance and if he had declined assisting us, then we

7    would have had to figure out other means to get ahold of that

8    material that was given to Saabir Nurse.

9    Q.   What are other investigative means that you have at your

10   disposal that you may have used if you knew about this    02:29:25

11   information?

12   A.   Well, we could have employed undercover agents.  We could

13   have employed sources.  We could have everything at our

14   disposal to find out where that evidence was.

15   Q.   Would a search warrant have been possible?    02:29:37

16   A.   A search warrant definitely would have been possible,

17   either orders for text messages, 2703(d) orders, electronic

18   order, physical search orders.

19   Q.   And, again, did any of that happen?

20   A.   None of that happened.    02:29:55

21   Q.   On June 10 of 2015, did you interview the defendant again?

22   A.   Yes, I did.

23   Q.   And where was that?

24   A.   That was at the same residence on Port au Prince Lane.

25   Q.   Let's talk a little bit about the setup to that interview.    02:30:14

United States District Court

1  Where did it occur, the interview itself?                   02:30:17

2  A.   It occurred in the yard, on the side of his house.

3  Q.   And during the interview, was the defendant restrained at

4  all?

5  A.   Initially he was.  It was an interview that was concurrent   02:30:27

6  with a search warrant and so, typically, what we do when we

7  serve a search warrant, we secure the scene to make sure

8  there's nothing dangerous that's going to happen.  And then

9  after we secure the scene, we let everybody go.  And is exactly

10 what happened with Mr. Wahid.  We --                          02:30:44

11 Q.   I'm sorry.  Go ahead.

12 A.   We initially handcuffed him, as what we always do when we

13 serve a search warrant, and we read him his rights.  We tell

14 them after we have secured the scene, he is free to go and we

15 informed him that he was not under arrest.                    02:30:58

16 Q.   Okay.  And the restraint that's used, is that used for

17 officer safety or something else?

18 A.   That is for everyone's safety, to include his safety, as

19 well as anyone in the vicinity.

20 Q.   So during the duration of the interview, was he           02:31:10

21 handcuffed?

22 A.   No, he was not handcuffed.

23 Q.   And were your weapons drawn?

24 A.   During the knock of serving the search warrant there were

25 weapons drawn, yes.                                            02:31:22

United States District Court

KIM EDWARD JENSEN - Direct

1    Q.    But during the duration of the interview, during that time    02:31:24
2    period, were weapons drawn?
3    A.    After the scene was secure, after his house was secure and
4    the proximity of his house was secure -- when I say "secure,"
5    someone went and looked to make sure there was no one there --    02:31:36
6    then all of our weapons were put back in holsters.
7    Q.    This interview, like the first interview we talked about,
8    the May 6 one, was it recorded?
9    A.    Yes, it was.
10   Q.    And did the recording mechanism work as it should?    02:31:50
11   A.    Yes, it did.
12   Q.    Have you had an opportunity to review the recording in its
13   entirety?
14   A.    Yes, I have.
15   Q.    Have you also separately had an opportunity to review    02:31:59
16   Government's Exhibits 100 through 106?
17   A.    Yes, I have.
18   Q.    And do each of those exhibits fairly and accurately
19   represent component parts of the interview that you did with
20   the defendant on June 10 of 2015?    02:32:12
21   A.    Yes, they do.
22   Q.    Was he provided his rights?
23   A.    Pardon?
24   Q.    Was he read his rights?
25   A.    Yes, he was.    02:32:26

United States District Court

1  Q.   And does Exhibit Number 100 represent that part of the    02:32:27

2  conversation?

3  A.   Yes, it does.

4        MS. BROOK:   Government moves to admit and play

5  Exhibit Number 100.    02:32:35

6        THE COURT:   With there being no objection, 100 is

7  admitted.

8        (Exhibit Number 100 was admitted into evidence.)

9        (Exhibit 100 was played.)

10 BY MS. BROOK:    02:33:39

11 Q.   Couple of quick points.   We heard somebody's voice on that

12 recording.   Who was reading the defendant his rights?

13 A.   Special Agent Robert Byrne.

14 Q.   And, again, like the first interview you did, was it you

15 and Special Agent Byrne together that conducted that interview?    02:33:55

16 A.   Yes, we were together.

17 Q.   Were there additional agents there or primarily you two?

18 A.   There were several agents there that were effecting a

19 search warrant, but myself and Special Agent Byrne were the

20 ones that accompanied Mr. Wahid throughout the duration.    02:34:08

21 Q.   And, again, just to ground ourselves a little bit here,

22 Special Agent Byrne made mention of Malik.   Who was that?

23 A.   Abdul Malik, we -- at this point, we ascertained that he

24 may be a co-conspirator in this case regarding the Garland,

25 Texas attack, an associate of Mr. Wahid.    02:34:30

1  Q.  And that's Abdul Malik Abdul Kareem?                    02:34:35

2  A.  Abdul Malik Abdul Kareem, yes.

3  Q.  Did Mr. Wahid at that point agree to talk and to continue

4  talking with you?

5  A.  Yes, he did.                                            02:34:50

6  Q.  What was the purpose of this interview?

7  A.  The purpose of this interview, honestly, we didn't think

8  that he would speak with us while we were effecting the search

9  warrant at his house.  And we just asked to ask him some

10 follow-up questions, to which he agreed.  So we wanted to ask   02:35:09

11 him some follow-up questions regarding the first interview

12 which took place on the sixth of May.

13 Q.  So, again, these questions, follow-up questions, following

14 up on the May 6 interview, the essence of the questions, what

15 were they about?                                            02:35:24

16 A.  Well, like I said previously, the onset of my testimony,

17 these cases are like a giant puzzle piece so in the course of

18 all of these interviews that we were conducting, we would

19 ascertain a small piece or a small puzzle piece, small puzzle

20 piece.  And at this time we were starting to put those small   02:35:43

21 puzzle pieces together to form a picture.

22          And from that picture, we had ascertained that Mr.

23 Wahid may be in receipt of something from Simpson and Soofi.

24 Q.  When you say "these cases," what type of cases in

25 particular are we referring to?                             02:36:01

KIM EDWARD JENSEN - Direct

1   A.   We're talking about terrorism cases.                    02:36:03

2   Q.   So, again, was this more information, gathering more

3   information about the Garland attack and the people that may be

4   involved?

5   A.   Yes.                                                    02:36:14

6   Q.   Did you ask Wahid if he texted Simpson and Soofi to thank

7   them for the soup after that Friday night encounter before the

8   attack?

9   A.   Yes, we did.

10  Q.   And does clip 101 represent that part of the conversation? 02:36:27

11  A.   Yes, it does.

12          MS. BROOK:   The Government moves to admit and play

13  Exhibit 101.

14          THE COURT:   If there's no objection, 101 is admitted.

15          (Exhibit Number 101 was admitted into evidence.)      02:36:46

16          (Exhibit 101 was played.)

17  BY MS. BROOK:

18  Q.   Was this the first time during any of your interviews with

19  Wahid where he told you that Simpson and Soofi gave him a key

20  and an envelope?                                             02:38:44

21  A.   Yes, it was the first time he mentioned that.

22  Q.   Did you ask him why he didn't tell you about the envelope

23  and the key the first time you all talked to him?

24  A.   Yes, I did.

25  Q.   Does Exhibit Number 102 reflect part of that?           02:39:09

United States District Court

KIM EDWARD JENSEN - Direct

1    A.    Yes, it does.                                              02:39:12

2          MS. BROOK:    The Government moves to admit and play

3    Exhibit Number 102.

4          THE COURT:    All right.    With no objection, 102 is

5    admitted.                                                        02:39:22

6          (Exhibit Number 102 was admitted into evidence.)

7          (Exhibit 102 is played.)

8    BY MS. BROOK:

9    Q.    Did Wahid talk to you during this interview about him

10   knowing about Simpson's loyalties with ISIS or violent jihadi   02:41:21

11   tendencies?

12   A.    During this particular interview?

13   Q.    Yes.

14   A.    I believe he did.

15   Q.    Did you ask him in these conversations about Simpson's     02:41:41

16   loyalties, did Wahid talk about any ISIS videos that he had

17   seen through Simpson?

18   A.    Yes, he did.

19   Q.    And does clip 103 represent that part of the interview?

20   A.    Yes, it does.                                              02:41:58

21         MS. BROOK:    Government moves to admit and play

22   Exhibit Number 103.

23         THE COURT:    If there's no objection, 103 is admitted.

24         (Exhibit Number 103 was admitted into evidence.)

25         (Exhibit 103 played.)                                      02:42:17

United States District Court

KIM EDWARD JENSEN - Direct

1    BY MS. BROOK:                                                   02:42:39

2    Q.   Did you ask Wahid how he knew that the key he was provided

3    was a car key?

4    A.   Pardon?

5    Q.   Did you ask Wahid how he knew the car or the key he was    02:42:45

6    provided was a car key?

7    A.   Yes, I did.

8    Q.   And does Exhibit 104 represent that?

9    A.   Yes, it does.

10            MS. BROOK:  The Government moves to admit and play      02:42:56

11   Exhibit Number 104.

12            THE COURT:  If there's no objection, 104 is admitted.

13            (Exhibit Number 104 was admitted into evidence.)

14            (Exhibit Number 104 is played.)

15   BY MS. BROOK:                                                   02:43:56

16   Q.   And I apologize, Exhibit 104 certainly talks about the key

17   and the envelope but the distinction between the two, is that

18   also in Exhibit 105?

19   A.   Yes.

20            MS. BROOK:  The Government moves to admit and play      02:44:07

21   Exhibit Number 105.

22            THE COURT:  With no objection, 105 is admitted.

23            (Exhibit Number 105 was admitted into evidence.)

24            (Exhibit 105 is played.)

25   \\\

United States District Court

KIM EDWARD JENSEN - Direct

1  BY MS. BROOK:                                                          02:44:28

2  Q.  Did you again in this interview ask him more about the

3  envelope and the key?

4  A.  Yes, I did.

5  Q.  And is that represented in Exhibit Number 106?          02:44:34

6  A.  Yes.

7        MS. BROOK:  Government moves to admit and play

8  Exhibit Number 106.

9        THE COURT:  With no objection, 106 is admitted.

10       (Exhibit Number 106 was admitted into evidence.)      02:44:50

11       (Exhibit 106 is played.)

12  BY MS. BROOK:

13  Q.  So this interview on June 10 of 2015 was approximately one

14  month and seven days after the attack on the Curtis Culwell

15  Center?                                                     02:45:32

16  A.  Yes.

17  Q.  How, if at all, does the discovery of the transfer of this

18  envelope and key at that point, one month and one week after

19  the event, affect the investigation?

20  A.  Well, I initially thought when he told me about the key   02:45:49

21  that the key could just as well have been to a locker.  And

22  numerous cases that I've worked, terrorism investigations,

23  there have been things that have been locked up and in

24  containers, there have been things have been locked up in cars

25  and trunks in which they are materially relevant to a case, for  02:46:07

United States District Court

1  example, explosives and other such evidence.                    02:46:10

2       So without having -- with passing over a month, that

3  evidence was not available to us and we could have dispatched a

4  number of individuals on the fifth probably at 5 o'clock that

5  afternoon the first time we interviewed him to ascertain         02:46:28

6  whether there was anything locked in any compartment, any

7  storage facility, anything which would require a key to open it

8  wherein explosive material or other perishable evidence could

9  be.  And that happens quite a bit during terrorism

10 investigations.                                                  02:46:48

11 Q.   And so you said the fifth.  Were referring to the

12 interview on May 6?

13 A.   Right.  The first interview in May.

14 Q.   So the passage of time, does that affect the potential to

15 recover something like the envelope?                             02:47:00

16 A.   It does because all evidence, as I said, is perishable.

17 After one month and five days, a lot of things can happen to

18 evidence after that amount of time.  That's why when we conduct

19 these investigations, that is why we try to cover every single

20 lead as expeditiously and as quickly as we possibly can, to      02:47:21

21 avoid that loss of evidence.

22 Q.   To your knowledge, was the envelope ever recovered in this

23 investigation?

24 A.   I do not know.

25 Q.   On December 11 of this same year, 2015, did you, again,     02:47:34

1    interview the defendant?                                    02:47:37

2    A.    Yes, I did.

3    Q.    And where did that interview occur?

4    A.    It occurred in the lobby of the FBI office on 7th Street.

5    Q.    How was it that Mr. Wahid came to appear, come to the FBI    02:47:46

6    office?

7    A.    It had to do with something with his son's computer.

8    Q.    Did he come voluntarily?

9    A.    Yes, he did.

10   Q.    And were you by yourself when you interviewed him or with    02:47:58

11   somebody else?

12   A.    I was not.  I was with Robert Byrne and Rob -- I can't

13   remember Rob's last name but I was with two other individuals.

14   Q.    Rob, is he also an employee of the FBI?

15   A.    Yes.  He's a DHS agent.                                02:48:14

16   Q.    Okay.  Where did the interview happen?

17   A.    In the lobby of the FBI building.

18   Q.    And, again, was this interview recorded?

19   A.    It was recorded.

20   Q.    Have you had the opportunity to review in totality the    02:48:27

21   interview of December 11, 2015, of the defendants?

22   A.    Yes, I have.

23   Q.    And did you also have an opportunity to review and listen

24   to Exhibit Number 107 and Government's Exhibit 108?

25   A.    Yes, I have.                                           02:48:43

United States District Court

KIM EDWARD JENSEN - Direct

1    Q.   Do those two clips fairly and accurately represent          02:48:44

2    component pieces of the interview that you conducted that day

3    of the defendant at the FBI?

4    A.   Yes, they do.

5    Q.   During this interview, did Wahid tell you -- did he          02:49:06

6    explain to you, in his words, why he lied to you all on May 6

7    of 2015?

8    A.   Yes, he did.

9    Q.   Does clip number 107 fairly and accurately represent that

10   part of the conversation?                                        02:49:20

11   A.   Yes, it does.

12   Q.   And, again, this lie was about the key, the envelope, and

13   the instructions?

14   A.   Yes.

15          MS. BROOK:   Government moves to admit and play           02:49:28

16   Government's Exhibit 107.

17          THE COURT:   All right.   There being no objection --

18          MR. WAHID:   I object to the characterization of

19   lying.

20          THE COURT:   I'm going to sustain that objection as       02:49:40

21   well as leading on that.

22          Please be careful with the kind of questions that you

23   ask the witness, Ms. Brook.

24          But the exhibit is admitted.   There being no

25   objection to that, you may publish.                              02:49:50

United States District Court

KIM EDWARD JENSEN - Direct

1          (Exhibit Number 107 was admitted into evidence.)          02:49:54

2          (Exhibit 107 was played.)

3     BY MS. BROOK:

4     Q.    Did you explain to Wahid why you continued to ask him

5     questions that Friday night?                                   02:50:47

6     A.    Yes, I did.

7     Q.    And does Exhibit Number 108 reflect that part of the

8     interview?

9     A.    Yes, it does.

10          MS. BROOK:  Government moves to admit and play          02:50:55

11    Exhibit Number 108.

12          THE COURT:  There being no objection, 108 is

13    admitted.

14          You may publish.

15          (Exhibit Number 108 was admitted into evidence.)        02:51:05

16          (Exhibit 108 is played.)

17    BY MS. BROOK:

18    Q.    At this point, did you have any concerns about the type of

19    answers he was providing during his interview?

20    A.    Yes, I did.                                              02:51:39

21    Q.    And what were those concerns?

22    A.    Those concerns were based on what he told me, that

23    information that we were asking wasn't our business and he

24    emphatically demonstrably told me that it was none of my damn

25    business regarding the information that he had received from    02:51:54

United States District Court

1    Ibrahim.                                                          02:52:04

2    Q.    When we started talking a while ago, you mentioned that

3    you also were part of other pieces of the investigation related

4    to the Garland attack?

5    A.    Yes.                                                        02:52:14

6            MS. BROOK:   And Your Honor, I saw you looking at the

7    clock.  Are we okay to keep going?

8            THE COURT:   You're fine.

9    BY MS. BROOK:

10   Q.    Did you happen in this investigation to also interview an   02:52:21

11   individual by the name of Ali Soofi?

12   A.    I did.

13   Q.    And who is Ali Soofi?

14   A.    Ali Soofi is Nadir Simpson's brother.

15   Q.    On May 5, 2015, did you interview Ali?                      02:52:34

16   A.    I did.

17   Q.    And where was it that you interviewed Ali on May 5?

18   A.    The interview took place at the Phoenix Airport, I believe

19   in Terminal 2.

20   Q.    Do you recall how that interview was set up?               02:52:51

21   A.    I do.  I was asked to accompany a couple of FBI agents to

22   go and speak with Ali at any time prior to his departure.

23   Q.    And did you do that?

24   A.    I did.

25   Q.    Did you have an opportunity to talk to Ali during that     02:53:02

KIM EDWARD JENSEN - Direct

| 1 | interview? | 02:53:05 |

A.    I did.

Q.    Describe for us what Ali's demeanor was like during that
interview.

A.    This was the day before that we interviewed Mr. Wahid so
just a short period of time after his brother was killed in
Garland, Texas.  So, understandably, he was very distraught.  I
felt bad about asking him questions because I could see how he
was suffering mentally and emotionally.  He was very upset that
his brother had been killed.  I believe he told me he was going
to go get ready for his brother's funeral around the Kansas
City area.

Q.    Without getting into the details of exactly what he said,
was he able to sit with you all and provide you some
information about things he had witnessed?

A.    He was.

Q.    And did he provide you and the FBI information that was of
investigative value to the FBI?

A.    It was.  The types of questions that I asked him was
specifically who was at his apartment when he was residing with
his brother -- his brother Nadir and also Ibrahim Simpson, and
I also asked him the duration of the time that -- what kind of
time frame we were looking at, the individuals that came over
to his house to visit his brother, if there were any weapons at
his brother's house.

United States District Court

KIM EDWARD JENSEN - Direct

| | | |
|---|---|---|
| 1 | Q.   And without telling us what he said, did he answer those | 02:54:34 |
| 2 | questions? | |
| 3 | A.   Yes, he did. | |
| 4 | Q.   On May 2012, so roughly seven days after meeting Ali at | |
| 5 | the airport, did you meet up with Ali again? | 02:54:45 |
| 6 | A.   I believe we did. | |
| 7 | Q.   And without telling us what city, what state was it where | |
| 8 | he was interviewed? | |
| 9 | A.   Missouri. | |
| 10 | Q.   Could it have been Kansas? | 02:55:07 |
| 11 | A.   It was right on the border so I'm unsure exactly what | |
| 12 | state because that city is split right down the middle. | |
| 13 | Q.   Additionally, on June 4 of 2015, were you present in | |
| 14 | another meeting with FBI agents with Ali Soofi? | |
| 15 | A.   Yes, I was. | 02:55:24 |
| 16 | Q.   And without telling us what he said, what was the purpose | |
| 17 | of that interview? | |
| 18 | A.   The purpose of the interview was to talk to Ali about some | |
| 19 | of the previous questions that we had asked him, specifically | |
| 20 | about the individuals that were visiting his brother, if there | 02:55:39 |
| 21 | were any weapons at all.  We wanted him to give us more precise | |
| 22 | details about the weapons that his brother had in his | |
| 23 | possession and also Mr. Simpson may have had in his possession. | |
| 24 | Q.   Are you aware of whether or not during that particular | |
| 25 | interview Ali was instructed in how to use recording devices to | 02:55:56 |

United States District Court

KIM EDWARD JENSEN - Direct

1  make phone calls?                                                     02:56:01

2  A.    Yes, he was.

3  Q.    Were you there for that?

4  A.    I was.  However, I was speaking with his parents most of

5  the time so I wasn't privy to the exact nature of those              02:56:09

6  conversations regarding the technical aspects of the phone.

7  Q.    Do you know whether or not Ali had agreed at that point to

8  make consensual calls on behalf of the FBI?

9  A.    Yes, he had.

10 Q.    Throughout the time that you met with Ali during the month     02:56:28

11 of May and that time in June, June 4 of 2015, did Ali continue

12 to provide information to the FBI that was of investigative

13 value?

14 A.    He did.

15        MS. BROOK:  May I have a moment?                               02:56:47

16        THE COURT:  You may.

17        MS. BROOK:  I have no more questions of this witness.

18        THE COURT:  All right.  Ms. Brook, thank you.

19        Mr. Wahid, do you have any questions for this

20 witness?                                                             02:57:05

21        MR. WAHID:  Yes.

22        THE COURT:  All right.  If you're going to ask him

23 questions, I would like you to do it from the lectern so that

24 the witness has a clear line of sight to you, please.

25

United States District Court

**CROSS - EXAMINATION**                                    02:57:12

BY MR. WAHID:

Q.   In your first visit to Mr. Wahid's home, did you have a
subpoena?

A.   Pardon?                                              02:57:31

Q.   Did you have a subpoena?

A.   I received a subpoena, yes.

Q.   No.  No.  I said in your visit to Mr. Wahid's home, did
you have a subpoena?

A.   I'm sorry.  I can't understand the question.        02:57:40

        THE COURT:  Mr. Wahid, you're asking him did he have
a subpoena for you when he came to see you the first time?

        MR. WAHID:  Right.  Yes.

BY MR. WAHID:

Q.   "Yes" or "no"?                                       02:57:50

A.   I did not have a subpoena the first time I came to see
you.  You're talking about the fifth?

Q.   The very first time.  That's what I mean by the first
time.

A.   On the sixth, now, we did not have a subpoena.       02:58:02

Q.   Both times when you were at Mr. Wahid's home, was he
obligated to speak with you?

A.   No, he was not.

Q.   Would you say that both times you were at Mr. Wahid's
home, it was voluntary on his part that he spoke with you?  02:58:19

United States District Court

1    A.    Yes.                                                           02:58:22

2    Q.    Was Mr. Wahid obligated to tell you about the envelope and

3    the key?

4    A.    He was obligated -- he was admonished to tell the truth,

5    yes.                                                                 02:58:35

6    Q.    In your first visit to Mr. Wahid's home, did you ask him

7    if Elton Simpson gave him anything?

8    A.    Yes.

9    Q.    Your first visit?

10   A.    I asked him what else did he tell you, what else happened?    02:58:56

11   I asked I think what else three or four different times.  If I

12   said, "What else did Simpson give you," no, I did not ask,

13   "What else did Simpson give you," because Mr. Wahid told me

14   that Nadir gave him the soup.

15   Q.    When you returned on your second visit with the search       02:59:19

16   warrants, did you ask Mr. Wahid if Elton Simpson had given him

17   anything?

18   A.    Can you say that one more time?

19   Q.    When you returned on your second visit with the search

20   warrant, did you ask Mr. Wahid if Elton Simpson had given him      02:59:31

21   anything?

22   A.    Yes.

23   Q.    In your first visit to Mr. Wahid's home, what was it that

24   Mr. Wahid had told you that this gentleman Nadir Soofi had

25   given him?                                                         02:59:51

1  A.    I think Mr. Wahid told me that Nadir Soofi gave him a bowl    02:59:54

2  of soup.

3  Q.    In your first visit to Mr. Wahid's home, what was the

4  statement that Mr. Wahid omitted and not tell you that Elton

5  Simpson had given him?                                          03:00:11

6           THE WITNESS:  Can you read that one?

7  A.    I can't hear your words very well.

8  Q.    Okay.  In your first visit to Mr. Wahid's home, what was

9  the statement that Mr. Wahid omitted and not tell you that

10 Elton Simpson had given him?                                    03:00:26

11 A.    What he admitted was the instructions that he had received

12 from Simpson, the key that he received from Simpson --

13          MS. BROOK:  Your Honor, I'm going to object.  I

14 believe the question was not heard by the witness.

15          THE COURT:  I believe the question was "omitted," not   03:00:45

16 "admitted."

17          But the other reason that this is confusing for

18 everyone is, because Mr. Wahid, you're referring to yourself in

19 the third person.

20          And, Mr. Jensen, you're answering in the third          03:00:53

21 person.  I think it would simplify, and we would all be on the

22 same page, if we used "I" and "me" rather than "Mr. Wahid."

23 Let's try it that way.

24          If you could ask the question again, Mr. Wahid, using

25 "I" and "me."                                                   03:01:10

KIM EDWARD JENSEN - Cross

BY MR. WAHID:

Q.   In your first visit to my home, what was the statement
that I omitted and not tell you that Elton Simpson had given
him?

A.   That Elton Simpson had given you?  That what you omitted
were the statements from Elton Simpson that he gave you some
instructions, that he gave you an envelope, and that he gave
you a key.  Those were the three things that you omitted.

Q.   When did you find out that I had omitted a statement about
the envelope and the key?

A.   Probably four or five days after I spoke to you the first
time.

Q.   Okay.  This is a "yes" or "no" question.  Did Mr. Wahid
correct his omitted statement by admitting that Elton Simpson
had given him a key and envelope?

          MS. BROOK:  Your Honor, I didn't hear the question.

          THE COURT:  Please repeat it and please try and use
"I" and "me."

          MR. WAHID:  Okay.  Yeah.  I keep forgetting about
that.

BY MR. WAHID:

Q.   Did I correct the omitted statement by admitting that
Elton Simpson had given me a key and envelope?

A.   You corrected -- you corrected your own statement when
you -- the second time that we interviewed you when Mr. Byrne

United States District Court

KIM EDWARD JENSEN - Cross

1  asked if you Elton Simpson gave you something.  You said, "No."  03:02:40

2  And then you corrected yourself after you said, "No."

3  Q.  I asked you "yes" or "no".  I didn't ask for all of that.

4  A.  Yes.

5  Q.  Okay.  What did Mr. Wahid say he did with the key and  03:02:52

6  envelope?

7       MS. BROOK:  Your Honor, objection to the form of the

8  question.

9       THE WITNESS:  Can you say that one more time?

10 BY MR. WAHID:  03:03:05

11 Q.  I keep forgetting.  I'm sorry.

12      What did I say that I did with the key and envelope?

13 A.  I still can't hear you very well.  You say what did I

14 say --

15 Q.  -- that I did with the key and the envelope?  03:03:13

16      MS. BROOK:  And, Your Honor, just speculation in

17 terms of what time.  So what date is he referring to?  May 6?

18 June 10.

19      THE COURT:  Right.  So this is a foundational issue.

20 There have been multiple meetings between the two of you.  If  03:03:28

21 you could tell us May 6, the June meeting or the December

22 meeting, which one are you referring to, Mr. Wahid?

23      MR. WAHID:  I guess June 10.

24      THE COURT:  And do you need the question repeated

25 again?  03:03:45

United States District Court

1        THE WITNESS:  Yes, please.                          03:03:46

2        THE COURT:  I'm going to ask the court reporter to

3   read it back.

4        (Requested portion of record read:  What did I say

5   that I did with the key and envelope?)                   03:04:03

6        THE WITNESS:  The second time we interviewed you, you

7   said you gave the key and the envelope to Saabir Nurse.

8   BY MR. WAHID:

9   Q.   Were there any more attacks because Mr. Wahid - because I

10  failed to give you that information about the key and envelope?  03:04:21

11  A.   Not to my knowledge.

12  Q.   Were there any more new developments in the investigation

13  such as naming more terrorists?

14  A.   Yes.

15  Q.   Was anyone injured or killed because I failed to give you  03:04:47

16  the information about the key and envelope?

17  A.   Not to my knowledge.

18        MR. WAHID:  I have nothing else, Your Honor.

19        THE COURT:  All right.  Thank you, Mr. Wahid.

20        Is there any redirect, Ms. Brook?                   03:05:13

21        MS. BROOK:  Briefly.

22              **REDIRECT EXAMINATION**

23  BY MS. BROOK:

24  Q.   For clarification sake, at any point during your two plus

25  hour interview of the defendant on May 6 of 2015, did he tell  03:05:26

1  you that Simpson and Ibrahim had provided him on the Friday                   03:05:30

2  before the attack an envelope and a key?

3  A.    No, he did not.

4  Q.    At any point did he say either of them gave him an

5  envelope or a key?                                                            03:05:45

6  A.    No, he did not.

7  Q.    At any point did he make any reference or indication to

8  there being an envelope and a key?

9  A.    No, he did not.

10 Q.    At any point did he discuss any instructions that either   03:05:53

11 Simpson or Soofi gave him on May 1?

12 A.    No, he did not.

13 Q.    As we listened to in the audio clip on June 10, 2015, when

14 first asked if there was anything else given or anything else

15 that happened during that May 1 of 2015 encounter, at first did   03:06:32

16 he say, "No."

17 A.    He said, "No."

18        MS. BROOK:  I have no further questions.

19        THE COURT:  All right.  Thank you, Ms. Brook.

20        And then the witness may be excused.                        03:07:08

21        Mr. Jensen, you may step down.  Thank you, sir.

22        (Witness excused.)

23        THE COURT:  Counsel, for the parties, let's go ahead

24 and take the afternoon break now.

25        Mr. Wahid, I saw you trying to get my attention.           03:07:18

1          MR. WAHID:  I was just going to ask you could I use          03:07:20

2    the bathroom.

3          THE COURT:  Yes.  We're going to go ahead and take a

4    15-minute break.  Everybody can be ready to go just a little

5    bit after 3:20 and we'll go through to the end of the day at          03:07:27

6    4:30.

7          We're on recess.  Thank you.

8          MR. MCBEE:  Your Honor, may I ask what time the Court

9    intends to start court tomorrow?

10          THE COURT:  I was intending to start at 9 o'clock.          03:07:47

11   Does that work for you?

12          MR. MCBEE:  Yes.  That's fine.

13          (Recess at 3:07; resumed at 3:24.)

14          THE COURT:  All right.  Thank you, everyone.  The

15   Government can call its next witness.          03:24:21

16          MS. BROOK:  Thank you, Your Honor.  The Government

17   calls Ali Soofi.

18          THE COURT:  All right.  Mr. Soofi, if you would step

19   up past the bar to my courtroom deputy, she'll swear you in.

20          COURTROOM DEPUTY:  If I can have you state your name,          03:25:00

21   spell your first and last name for the record, please.

22          THE WITNESS:  First name is Ali, A-L-I.  Last name is

23   Soofi, S-O-O-F-I.

24          COURTROOM DEPUTY:  Thank you.  Please raise your

25   right hand.          03:25:11

03:25:12

1        (ALI SOOFI, a witness herein, was duly sworn or

2    affirmed.)

3                        **DIRECT EXAMINATION**

4    BY MS. BROOK:

03:25:37

5    Q.    Good afternoon.  And Mr. Soofi, can you please introduce

6    yourself to the Court?

7    A.    My name is Ali Hamid Soofi.

8    Q.    And just as you get up there and get comfortable, there's

9    water right there if you need it and want to pour yourself a

03:25:56

10   cup.

11   A.    I'm good.  Thank you.

12   Q.    How old are you?

13   A.    36.

14   Q.    And do you live here in Phoenix, Arizona?

03:26:04

15   A.    No.  I live outside the state.

16   Q.    When was it that you moved away from Phoenix?

17   A.    It was in, like, 2015.

18   Q.    Was it during summertime?

19   A.    It was during May, May 4 or 5 I left to go to Kansas.

03:26:31

20   Q.    And so that's when you left and you didn't come back here

21   to Phoenix to live?

22   A.    Yes.

23   Q.    Let's talk for a moment, is Nadir Soofi, was he your

24   brother?

03:26:43

25   A.    Yes.

ALI SOOFI - Direct

| | | |
|--|--|--|
| 1 | Q.   Was he older or younger than you? | 03:26:43 |
| 2 | A.   Younger. | |
| 3 | Q.   And back in 2014, did you live here in Phoenix? | |
| 4 | A.   I'm sorry? | |
| 5 | Q.   Back in 2014, did you live here in Phoenix? | 03:26:56 |
| 6 | A.   Yes. | |
| 7 | Q.   And when you were living here in Phoenix in 2014, who did | |
| 8 | you move in with? | |
| 9 | A.   My brother. | |
| 10 | Q.   And that's Nadir? | 03:27:07 |
| 11 | A.   Yes. | |
| 12 | Q.   Did you live with just him or somebody else, too? | |
| 13 | A.   He had a friend Ibrahim, or Elton Simpson, that he was | |
| 14 | living with. | |
| 15 | Q.   So did the three of you move in together? | 03:27:18 |
| 16 | A.   They were already living together.  I had moved in with | |
| 17 | them because I had nowhere to go so I pretty much had got | |
| 18 | divorced and moved out so I moved in with them. | |
| 19 | Q.   So you got divorced you moved here to Phoenix, you moved | |
| 20 | in with your brother Nadir and he was living with Elton | 03:27:38 |
| 21 | Simpson? | |
| 22 | A.   Yes. | |
| 23 | Q.   Do you remember generally where that apartment complex was | |
| 24 | that you lived? | |
| 25 | A.   I think it was off of 16th Avenue and Thunderbird area. | 03:27:50 |

ALI SOOFI - Direct

|    |                                                              |          |
|----|--------------------------------------------------------------|----------|
| 1  | Q.   Was it near 19th Avenue?                                 | 03:27:54 |
| 2  | A.   19th.  I'm sorry, I can't remember the exact address.  I |          |
| 3  | know it was on Thunderbird around -- that area.               |          |
| 4  | Q.   And you mentioned that the three of you lived together.  |          |
| 5  | Do you remember when in 2014 that started?  Do you remember   | 03:28:05 |
| 6  | about what time of year in 2014 you moved in with the two of  |          |
| 7  | them?                                                         |          |
| 8  | A.   It would be -- it was February.                          |          |
| 9  | Q.   February of 2014?                                        |          |
| 10 | A.   Yes.                                                     | 03:28:23 |
| 11 | Q.   And how long was it that you stayed living there in that |          |
| 12 | apartment with your brother and with Elton Simpson?          |          |
| 13 | A.   A little bit less than a year and a half, about two months |        |
| 14 | less.  About a year and four months.                         |          |
| 15 | Q.   So approximately when in 2015 did you move out?  You had | 03:28:36 |
| 16 | mentioned that you moved back to Kansas on May 4.  At that    |          |
| 17 | point, had you been no longer living with your brother and    |          |
| 18 | Elton Simpson?                                                |          |
| 19 | A.   Yes.  I was -- I had moved in with a girlfriend in the   |          |
| 20 | beginning of April.                                           | 03:28:55 |
| 21 | Q.   So April of 2015.                                        |          |
| 22 |      So I want to rewind a little bit and ask you about       |          |
| 23 | how it was you first met Elton Simpson.                       |          |
| 24 | A.   My wife had kicked me out previously in 2010.  I had moved |        |
| 25 | to Phoenix.  My brother owned a pizza place so I came out to  | 03:29:17 |

United States District Court

ALI SOOFI - Direct

1   live with him and he was still in the same apartment that he          03:29:23
2   was in after.  Elton was someone that would come to the
3   restaurant, the pizza place we owned, on almost like a daily
4   basis because my brother would pray with him, go to the mosque
5   nearby.                                                              03:29:46
6   Q.   So was this 2010, 2011?
7   A.   Yes.
8   Q.   So you were working at the pizza shop with your brother?
9   A.   Yes.  When I arrived there, my brother had given me a cook
10  position.                                                            03:29:59
11  Q.   And -- I'm sorry.  Go ahead.
12  A.   I was going to say I would work every day, pretty much
13  all -- six to seven days a week sometimes.
14  Q.   So it was during that period of time that you first met
15  Elton Simpson at the pizza shop?                                     03:30:13
16  A.   Yes.
17  Q.   Did you spend time with him back then outside of the pizza
18  shop?
19  A.   Not really because I wasn't really religious so the only
20  time would be when we went out to eat or when my brother would,     03:30:29
21  you know, take us to eat.  Other than that, it was nothing
22  really.
23  Q.   At some point did you leave Phoenix during that time
24  period, the 2011 time period?
25  A.   It was probably around the same time, around February,         03:30:48

United States District Court

ALI SOOFI - Direct

1   March that I had gone back to get back with my wife or ex-wife.   03:30:51

2   Q.   And at that point in time, who was your brother living

3   with?

4   A.   Nobody.

5   Q.   And then you returned back to Phoenix in February of 2014?   03:31:07

6   A.   Well, so in 2011 when I left, Elton took my position like

7   pretty much.  I left and he moved in.  So when I left, he

8   wasn't in there living with him but he moved in after the fact

9   I had left.

10  Q.   So for a period of time in 2011 he lived there but you had   03:31:28

11  left or were about to leave?

12  A.   Yes.

13  Q.   So I want to talk about the apartment complex that you

14  were living in for that roughly 14-month period, February of

15  2014 through April of 2015.  You had mentioned who you lived   03:31:44

16  with.  You lived with your brother and Simpson.  Can you

17  describe the apartment for us?

18  A.   It was a small, one-bedroom apartment.  The main living

19  area was not that big.  I mean, it had the living room and the

20  kitchen and then it would go straight to the bathroom and   03:32:07

21  bedroom.

22  Q.   So there was one bedroom.  Who had the one bedroom?

23  A.   My brother occupied that.

24  Q.   And then where did you sleep?

25  A.   I slept on the couch.  We had a big L-shaped couch in the   03:32:19

1  living room.  We kind of divided that so we could sleep, like        03:32:24

2  our feet would kind of meet at one point.

3  Q.   Who is "our."  Who is the other person?

4  A.   Elton.  He was the other one that lived -- basically, we

5  would share the living room.                                          03:32:38

6  Q.   And other than the living room, the one bedroom, I presume

7  a kitchen, bathroom, is that the extent of the apartment?

8  A.   Yes.  We had a small balcony with a storage room, a little

9  storage room.

10 Q.   Can you explain to us roughly how big that living room        03:32:56

11 was?

12 A.   It was probably, like, 20 by 15 and it was pretty small.

13 Q.   I'm going to place on the overhead what's already been

14 marked as Government's Exhibit number 27.

15         COURTROOM DEPUTY:  Is it on the computer or the Elmo?     03:33:21

16         MS. BROOK:  It's on the computer.

17 BY MS. BROOK:

18 Q.   Looking at Government's Exhibit Number 27, do you

19 recognize that?

20 A.   Yes.                                                             03:33:34

21 Q.   And what do you recognize it as?

22 A.   It's the living room of the apartment.

23 Q.   The apartment that we've been talking about?

24         MS. BROOK:  Your Honor, the Government moves to admit

25 Government's Exhibit Number 27.                                       03:33:56

ALI SOOFI - Direct

1    THE COURT:  Any objection, Mr. Wahid?                    03:34:00

2    MR. WAHID:  No.

3    THE COURT:  All right.  27 is admitted.

4    (Exhibit Number 27 was admitted into evidence.)

5  BY MS. BROOK:                                             03:34:09

6  Q.   And Mr. Soofi, on the back wall depicted in this

7  photograph, what are the black boxes?

8  A.   Those are surround speakers.  We hooked up a stereo

9  system.

10 Q.   Sorry?                                               03:34:29

11 A.   They were just surround speakers.

12 Q.   Did that stereo system connect at all to the TV or what

13 was playing on the TV?

14 A.   Yes.

15 Q.   And do we see the TV in this picture?                03:34:39

16 A.   No.

17 Q.   Was the TV in this room?

18 A.   Yes, where the black chair is, it would have been on the

19 table.

20 Q.   Okay.  So looking here on the right side where that black 03:34:56

21 chair is?

22        We're going to put another picture up there,

23 Government's Exhibit Number 28.  Just one moment.  What's this

24 a picture of?

25 A.   That's a plexiglass -- we had turned it into a table but  03:35:25

United States District Court

1    it was a plexiglass -- it was an idea that my brother and I had    03:35:32

2    to use to clean the air vents because we had an air vent

3    cleaning business as well.  So it was made too heavy so we

4    converted it into a table.

5    Q.   And was that in the living room?    03:35:49

6    A.   Yes.  That was the middle, the main table.

7         MS. BROOK:  The Government moves to admit Exhibit

8    Number 28 and to place back on the overhead Exhibit Number 27.

9         THE COURT:  Any objection to 28, Mr. Wahid?

10        MR. WAHID:  No.    03:36:05

11        THE COURT:  28 is admitted.

12        (Exhibit Number 28 was admitted into evidence.)

13        THE COURT:  Ms. Brook, I could use a little context

14   as to the dating of the two photographs because we have had

15   testimony that Mr. Soofi lived in this apartments two different    03:36:13

16   times and I don't know when this came from.

17        MS. BROOK:  Sure.

18   BY MS. BROOK:

19   Q.   Was it in this apartment that you lived two different

20   times?    03:36:21

21   A.   Yes.

22   Q.   So in looking at this picture that we see, Government's

23   Exhibit Number 27, does this fairly and accurately represent

24   how the apartment looked during the time period that you lived

25   there the last time period, so the 2014-2015 time period?    03:36:36

ALI SOOFI - Direct

1   A.   Yes.  It's exactly the same minus -- I mean, the table was          03:36:41

2   2014 when we made that but from 2010 it's pretty much the same.

3   Q.   You had mentioned that you moved out of the apartment

4   early April of 2015.  Did you have occasion to go back into the

5   apartment before the attack happened on May 3, in that               03:37:01

6   in-between period of time?

7   A.   I would visit at times.

8   Q.   And so the room as it's depicted here, is that how it

9   continued to look when you were back in the apartment?

10  A.   Yes.                                                             03:37:22

11  Q.   We had talked a moment ago about a TV.  Roughly how large

12  was the TV that was in this room?

13  A.   It was about 52 inch.

14  Q.   When you were in this particular room, the living room,

15  could you clearly see that TV?                                       03:37:43

16  A.   Yes.  Sitting in that room, anybody that was sitting in

17  there, it was positioned in front of them.

18  Q.   Was there anything that obstructed your view of that TV?

19  A.   No, not at all.

20  Q.   At some point did you meet an individual by the name of          03:38:06

21  Abdul Khabir Wahid?

22  A.   Yes.

23  Q.   How did you meet him first?

24  A.   It was through my brother.  I had heard about him

25  previously in 2010, you know, when we were at the pizza place         03:38:27

United States District Court

ALI SOOFI - Direct

1    but I had never met him until 2014.                          03:38:30

2    Q.    Do you see him here in the courtroom with us?

3    A.    Yes.

4    Q.    Can you point to him and identify something that he's

5    wearing?                                                      03:38:42

6    A.    The plaid red shirt.

7           MS. BROOK:   Your Honor, may the record reflect that

8    the witness identified the defendant?

9           THE COURT:   It does.

10   BY MS. BROOK:                                                 03:38:51

11   Q.    What did you call him?  Did you call him Mr. Wahid or what

12   name was he referred to as?

13   A.    I knew him by AK.

14   Q.    And is that how others referred to him, that you heard?

15   A.    Yes.                                                    03:39:05

16   Q.    You had mentioned that in 2010, 2011 you had heard of him.

17   When was the first time that you met him?

18   A.    It was at the apartment with my brother and Elton.

19   Q.    Which apartment?

20   A.    The one on the screen.                                  03:39:25

21   Q.    And roughly during which time period was that when you met

22   him in this apartment that we're looking at here, Exhibit

23   Number 27?

24   A.    I think it was -- I think it was shortly after I had

25   reached -- I was living there.                               03:39:42

United States District Court

ALI SOOFI - Direct

1    Q.    So shortly after you moved in in February of 2014?

2    A.    Yes.

3    Q.    Did you see him at that apartment, your apartment, the

4    apartment you shared with Nadir and with Simpson, just once or

5    more than once?

6    A.    I had seen him there more than once.  A lot of the times

7    as well I would go on runs.  I would, you know, just some

8    conversation after I would hear from my brother or Elton that

9    they were hanging out.

10   Q.    Hanging out at the house, the apartment, or somewhere

11   else?

12   A.    Both.

13   Q.    And approximately how many times do you think that you saw

14   him in this apartment with your brother and or Simpson?

15   A.    It was on occasion.  Me personally, it was maybe once or

16   twice here and there.  Just from their conversation, I would

17   hear other times.

18   Q.    So did you see him more than two times in this apartment?

19   A.    Yes.

20   Q.    And you say here that, to your knowledge, was he there

21   once a week, once a month, how often?

22   A.    I would say once or twice a week maybe.

23   Q.    I want to talk about what was occurring in this living

24   room that we're looking at.  During the time that you lived in

25   2014 and 2015 with your brother and with Elton Simpson, were

03:39:45
03:40:08
03:40:32
03:40:50
03:41:09
03:41:31

1  there videos that were watched, displayed on the TV in the     03:41:37

2  living room of this house?

3  A.   Yes.  At first I didn't know what they were.  It was a lot

4  of guys with their head wraps driving around in trucks shooting

5  guns with black flags with -- you know, there was Arabic        03:42:00

6  writing with the swords crossing.  I mean, we would get a lot

7  of, you know, complaints because they would have it up so loud.

8  Q.   Who is "they"?

9  A.   Just general neighbors.  We had people that lived around

10  us.                                                             03:42:20

11  Q.   So there were, obviously, people in the living room that

12  were watching those videos.  Who was it that you recall

13  watching those videos?

14  A.   I mean, Elton would always or my brother would always be

15  at the computer.  It would be Abdul Kareem, the other guy, and  03:42:38

16  then I remember on occasions there would be AK as well.

17  Q.   And when AK was there, were there ever any of these videos

18  playing?

19  A.   They had them constantly playing unless I got on the

20  computer and like put on something I personally watched.  They  03:43:06

21  were always --

22  Q.   Go ahead.

23  A.   They would always have something of that sort playing.

24  Q.   You said of that sort, so you talked about videos with

25  people head wraps, with guns in the back of trucks with the     03:43:20

1  black flags, with the swords.  Did you see any other types of   03:43:25

2  videos?

3  A.   On occasion they would put on the execution videos of

4  people that went against the beliefs of, you know -- of the

5  people that were in the videos.   03:43:45

6  Q.   In the execution videos that you saw shown on the TV in

7  this living room, how were people executed?

8  A.   By beheading.

9  Q.   You had mentioned that Simpson and your brother watched

10  those videos all the time.  Is that something that happened   03:44:10

11  daily?  Weekly?  How often is all the time?

12  A.   It was a daily thing.

13  Q.   During the time that you were in the apartment, did you

14  hear Simpson express support for ISIS?

15  A.   Not directly but a lot of hate towards people that didn't   03:44:34

16  believe in the same beliefs that he had, basically saying that,

17  you know, if you didn't believe what he did, you were a kaffir

18  and that basically you should be killed because you're going

19  against, you know, the beliefs.

20  Q.   Did he the word "kaffir"?   03:44:53

21  A.   Yes.  I was called a kaffir plenty of times.

22  Q.   And by whom?

23  A.   My brother and Elton.

24  Q.   Anybody else?

25  A.   I mean, Abdul Kareem would joke around with me but he   03:45:08

1   directly wouldn't come at me with that, kind of like accusing      03:45:12

2   me of, you know, doing wrong.

3   Q.   And what were the wrong things that you did that got

4   judgment by your brother and others in this home?

5   A.   Dating outside of marriage.  I guess having relations with    03:45:30

6   females in general outside of marriage.

7   Q.   Did Simpson and your brother ever talk about violence

8   towards you for things that you did?

9   A.   I mean, my brother had at times told me that people like

10  me that usually do that, you know, they usually, you know,         03:45:54

11  should be killed because, you know, you're -- I mean I was

12  raised Muslim but I was never really practicing.  I mean I did

13  it more for, you know, to please my dad at times and my

14  brother.  If I went against it, I wouldn't have had a place to

15  live.  So, I mean, I kind of just, you know, did it to please,     03:46:16

16  you know.

17  Q.   At any point when you were living in this house, did you

18  hear anybody talk about an attack on the Draw the Prophet

19  Muhammed contest?

20  A.   No.                                                           03:46:37

21  Q.   Did Simpson and your brother know that you did not share

22  their views on violence towards people who didn't believe what

23  they believe?

24  A.   I mean, yes, they clearly understood that I wasn't

25  anywhere near, you know, on their level of things thinking         03:46:58

1  towards especially harming people.                          03:47:04

2  Q.   Did they try to convince you to believe what they

3  believed?

4  A.   When I first moved there, yes.  I mean, I had to pray five

5  times a day.  I had to go to the mosque.  You know, I had to   03:47:15

6  listen to my brother's lectures.  It's almost like when I would

7  leave and come back, my brother would have a whole knew agenda,

8  he would have this whole new -- almost like the vibe of my

9  brother was different.  He was -- he would try to push things

10 onto me, you know, and threaten me with, you know, "I'm going   03:47:39

11 to kick you out," or -- you know, "You're not my brother unless

12 you believe the same things I do."

13 Q.   Did the lectures that your brother gave you talk about

14 violence towards people who didn't believe what he did?

15 A.   Yes.                                                   03:47:57

16 Q.   Did Simpson also regularly talk to you about violence

17 against people who didn't believe what he believed?

18 A.   He wouldn't directly talk to me but my brother and Elton

19 would talk in front of me.

20 Q.   Did you see weapons in this apartment during the months   03:48:14

21 that you lived there in 2014 and 2015?

22 A.   Yes.

23 Q.   Were the weapons regularly kept in the apartment?

24 A.   The original handguns that they had in there were

25 concealed to where they would stay.  My brother would have his   03:48:37

ALI SOOFI - Direct

1  in his room and Elton would have his tucked away on the side of    03:48:40

2  the couch.  But later on they had acquired the two AK47s and

3  those were in plain sight.

4  Q.   Did you ever see Wahid near the weapons that were inside

5  this apartment?                                                     03:48:58

6  A.   I can remember the first day my brother had got his

7  weapon, we were all over there and we were passing it around

8  checking it out.

9  Q.   So Nadir got a weapon and you're in this apartment that we

10  are looking at here in 19th Avenue.  What type of weapon was      03:49:16

11  it, just generally?

12  A.   I think it was AK74.

13  Q.   And was Wahid there at any point?  Did he -- did you see

14  him near the weapon?

15  A.   I mean, Elton, my brother, and I and AK were there that      03:49:36

16  day when he had brought it back.

17  Q.   Abdul Malik Abdul Kareem was also there?

18  A.   Yes.

19  Q.   What happened when the weapon was brought back, when the

20  weapon was in the house and Wahid was there?                      03:49:52

21  A.   I mean it was passed around.  Naturally when people get

22  new things, they pass them around.  Everybody was checking it

23  out, basically just seeing how the weapon was.

24  Q.   Why was it that you moved out?

25  A.   Just the increasing -- you know, my brother had changed      03:50:24

United States District Court

ALI SOOFI - Direct

1   completely.  My brother was getting more violent towards me.  I    03:50:27

2   was -- you know, I slept there and Elton would sleep next to me

3   so, you know, I felt that, you know, sooner or later something

4   was going to happen to me.  So I felt like the need to get out

5   and get away just for my own safety.                             03:50:46

6   Q.   How do you mean your brother was becoming more violent?

7   A.   He wasn't my brother any more.  He was always -- he didn't

8   want to leave the apartment.  He was talking about, you know,

9   people outside you are, you know, are kaffirs, people that

10  should be killed that don't believe in what I believe in.  And,  03:51:08

11  you know, that you're -- basically, it's hard when you know

12  your own family member switches up on you and is willing to

13  kill you over something that someone else has put that idea

14  into his head.

15  Q.   Over the time that you were living in the house in 2014,     03:51:32

16  2015, did Simpson change as well?

17  A.   Oh, yeah.  He would stay in the apartment as well.  They

18  would rarely leave towards the end.  They would both stay

19  secluded with each other basically just playing their videos

20  and reading their books nonstop.                                 03:51:54

21  Q.   You mentioned that Simpson would rarely leave.  To your

22  knowledge, was he working?

23  A.   He wasn't able to get employment because he had told me he

24  was on the FBI watch list previously so he was working for a

25  friend just to make enough money to pay rent.                    03:52:13

United States District Court

ALI SOOFI - Direct

1  Q.  Were you or your brother working in 2014, 2015?                    03:52:19

2  A.  Yes.  We were contracted through a carpet cleaning

3  company, but then we opened up our own cleaning company after

4  that.  So we would work during those times.  But towards the

5  end, my brother didn't get any contracts.  He kind of shut      03:52:38

6  down, you know, and said that God would provide for us.  So it

7  kind of fell apart.

8  Q.  How were you paying rent?

9  A.  My dad.  He would send money for rent.

10 Q.  How was it that you heard that your brother was dead?         03:53:03

11 A.  It was the morning I woke up.  My girlfriend had turned on

12 the news and I basically saw his car on the news and saw

13 Elton's face.  So I pretty much put two and two together and I

14 kind of figured, you know, they had -- they had gotten so close

15 and so intense with each other, it was a pretty much a dead      03:53:55

16 give-away that he would have gone with him.

17 Q.  From what you heard on the news, did you know right away

18 that there was a terrorism investigation?

19 A.  From what I saw on the news, the headlines, yes, that he

20 had gone to shoot up a cartoon drawing contest.                   03:54:20

21 Q.  Did you reach out to the FBI?

22 A.  Yes.  The morning that I found out, my girlfriend had a

23 friend in the FBI that she had contacted and I had met up with

24 two agents that morning to answer any questions they had.

25 Q.  So that was on the first morning after May 4, the Monday?     03:54:48

United States District Court

ALI SOOFI - Direct

1    A.    Yes.                                                      03:54:52

2    Q.    On that day, May 4, did you get a phone call from AK?

3    A.    Yes.

4    Q.    And did you talk to him?

5    A.    Yes.                                                      03:55:07

6    Q.    What did he say to you?

7    A.    Just basically that he was checking, basically letting me

8    know like more of what had happened and basically advising me

9    not to speak with the FBI about anything.

10   Q.    You said "more of what had happened."  More of what had   03:55:38

11   happened in relation to what?

12   A.    To the incident with my brother because I guess they had

13   gone to the apartment to go check and that's when they had

14   everything boarded up and the FBI or the cops were there.

15   Q.    So that AK Wahid had gone to Nadir and Simpson's apartment 03:56:03

16   and seen stuff boarded up?

17   A.    Yes.

18   Q.    And you also said that he told you not to talk to the FBI.

19   Was that in that call there on the fourth?

20   A.    Yes.                                                      03:56:24

21   Q.    Do you recall had you had a conversation on the phone with

22   AK before that day?  Had he ever called you before?

23   A.    Not really.  I mean, it was more of just, you know, the

24   occasional run-in when I was with my brother.

25   Q.    Do you have any memory of ever talking to him on the phone 03:56:49

1   before that day?                                              03:56:53

2   A.    No.

3   Q.    And May 5, the next day, Tuesday, did you meet again with

4   the FBI?

5   A.    Yes.                                                    03:57:07

6   Q.    Both days, on May 4 and May 5 when you met with the FBI,

7   did you talk to them?

8   A.    Yes.

9   Q.    And generally speaking, what were some of the topics that

10  you talked to them about?                                     03:57:24

11  A.    It basically was everything that had happened.  It was --

12  just because of what had happened, it all came out jumbled but

13  pretty much they had asked, you know, the involvement, who was

14  all involved, the names of the people, if I recognized, you

15  know, pictures of other people, just the generally of what had  03:57:50

16  happened.

17  Q.    Without telling us what you said, did you tell them about

18  what you had seen inside the apartment?

19  A.    Yes.

20  Q.    And start to talk to them about things that you heard      03:58:10

21  inside the apartment?

22  A.    Yes.

23  Q.    People that you saw that came to the apartment and visited

24  your brother and Simpson?

25  A.    Yes.                                                      03:58:22

ALI SOOFI - Direct

1   Q.   Weapons that you saw in the apartment?                    03:58:23

2   A.   Yes.

3   Q.   Did you talk to them voluntarily?  Did you choose to talk

4   to them?

5   A.   Yes.                                                      03:58:36

6   Q.   On that day, on May 5, did you leave Phoenix and fly

7   somewhere else?

8   A.   Yes.

9   Q.   What state did you go to?  Where did you head to?

10  A.   To Kansas.                                                03:58:51

11  Q.   On May 7 did you receive a phone call from Salim Sampson?

12  A.   Yes.

13  Q.   And where were you when you got that call?

14  A.   I was at my parents' house.

15  Q.   When you were on the phone with Salim, did anybody else   03:59:16

16  get on the phone?

17  A.   AK was with him the original time that I was called.

18  Q.   And did you talk to AK?

19  A.   Yes.

20  Q.   Do you recall what AK said to you on the phone that day on 03:59:36

21  May 7?

22  A.   The first time I talked to him he was basically just

23  saying, you know, how I was and what was going on, you know,

24  where I was, when was I coming back.  Basically just giving me

25  advice on what to say and who not to talk to.                 04:00:04

ALI SOOFI - Direct

1  Q.   What do you mean "who not to talk to"?                        04:00:10

2  A.   To not say anything, you know, that doesn't need to be

3  said to the FBI.

4  Q.   Did he specifically talk about the FBI to you during that

5  conversation on May 7?                                            04:00:22

6  A.   Yes.

7  Q.   Do you recall the FBI coming to your father's home there

8  in Kansas on May 12?

9  A.   Yes.

10 Q.   And did you show them your phone during the time that they   04:00:38

11 were at the house?

12 A.   Yes.  They had taken my phone and examined it.

13 Q.   Did they take some screen shots of your phone?

14 A.   Yes.

15 Q.   I'm going to place on the overhead what's been marked as     04:01:15

16 Government's Exhibit 160.

17        MS. BROOK:  And, Your Honor, this I believe is three

18 pages so we're just going to look at each page for foundation

19 purposes.

20        Your Honor, may I approach?  We can do it off the          04:01:37

21 Elmo.

22        THE COURT:  You can use the Elmo if you like, yeah.

23 BY MS. BROOK:

24 Q.   We're going to look at three separate pages all marked as

25 Government's Exhibit 160.  Here's the first page, second page,    04:02:16

United States District Court

ALI SOOFI - Direct

1    and third page.  Do you recognize what's depicted in these          04:02:33
2    photos?
3    A.    It's from my old cell phone.
4    Q.    And can you tell by -- how can you tell?
5    A.    On the previous page it had contacts for my ex-girlfriend,     04:02:49
6    my mom, friends, and Salim.
7    Q.    You had mentioned a call that you received from Salim on
8    May 7.  Who is Salim Sampson?
9    A.    He was a mutual friend of the group I guess.
10   Q.    Which group?                                                   04:03:18
11   A.    With Elton, AK, my brother.
12   Q.    And looking at page three of Exhibit Number --
13          MS. BROOK:  Before I do that Your Honor, the
14   Government moves to admit Exhibit Number 160.
15          THE COURT:  If there is no objection, 160 is                  04:03:34
16   admitted.
17          (Exhibit Number 160 was admitted into evidence.)
18   BY MS. BROOK:
19   Q.    Do you recognize this call detail?
20   A.    Yes.                                                           04:03:44
21   Q.    And what is it?
22   A.    It was a call that I received from Salim.
23   Q.    And here where it says eight minutes and 19 seconds, based
24   on using your phone and looking at this, what does that mean?
25   A.    That means that -- the duration of the call.                   04:04:00

United States District Court

ALI SOOFI - Direct

1    Q.   You had spoken a moment ago about a call where AK got on    04:04:03
2    the phone when you were talking to Salim Sampson.  Was it this
3    call?
4    A.   Yes.
5    Q.   Did you continue to talk to the FBI during the month of    04:04:26
6    May?
7    A.   Yes.  I was in contact with them.
8    Q.   And did you continue to provide them information of things
9    that you had seen when you lived in the apartment on 19th
10   Avenue?    04:04:39
11   A.   Yes.
12   Q.   Details of things that were said, what you saw, what you
13   knew?
14   A.   Yes.
15   Q.   On June 4 of 2015, did you meet with some agents who    04:04:51
16   provided you recording devices?
17   A.   Yes.
18   Q.   Explain to us what happened that day.  What did you agree
19   to do?
20   A.   Well, basically, they had given me a 1-800 number and a    04:05:09
21   password.  When I was receiving a phone call, I would basically
22   agree to put that in and so they would record the call.
23   Q.   Did you need to dial the 1-800 number before you connected
24   to the person that you were speaking with to make the
25   recording?    04:05:36

United States District Court

ALI SOOFI - Direct

1  A.   Yes.  I would have to let the call go through and then

2  dial the number, the 1-800 number, their phone number and the

3  password for it to record the call.

4  Q.   Did you agree to make recorded conversations or recordings

5  based upon conversations with AK?

6  A.   Yes.

7  Q.   And did you, over the month of June and July do that?

8  A.   Yes.

9  Q.   You had mentioned that you would need to call him to set

10 up the recording device.  How was it that that would happen?

11 Would he call and it would be a missed call or what would spur

12 the time that you would call him to talk?

13 A.   I would receive a call and I would let it go through and

14 then after that, I would put in the 1-800 number and then call

15 back.

16 Q.   So you would receive a call from AK, Mr. Wahid, let it go

17 to voicemail and then call him back using the 1-800 number?

18 A.   Yes.

19 Q.   On June 6 of 2015, did you record a conversation with

20 Wahid?

21 A.   Yes.

22 Q.   And have you had the opportunity to listen to the entire

23 recorded -- recording of the recording that you made of that

24 conversation?

25 A.   Yes.

04:05:37

04:05:56

04:06:16

04:06:38

04:07:03

04:07:13

United States District Court

ALI SOOFI - Direct

1    Q.   That recording, does it fairly and accurately reflect the    04:07:14
2    conversation you recorded with the defendant on June 6 of 2015?
3    A.   Yes.
4    Q.   Did you also listen to Government Exhibits 118, 119, 120
5    and '21?                                                         04:07:32
6    A.   Yes.
7    Q.   And did those fairly and accurately represent snippets of
8    the conversation that you had that day and recorded with the
9    defendant?
10   A.   Yes.                                                        04:07:44
11   Q.   During that call on June 6, did the defendant tell you not
12   to call the FBI?
13   A.   Yes.
14   Q.   Does Government's Exhibit 118 reflect that part of the
15   call?                                                            04:08:06
16   A.   Yes.
17            MS. BROOK:  Government moves to admit and play
18   Government's Exhibit 118.
19            THE COURT:  Any objection, Mr. Wahid?
20            No objection.  It's admitted.                           04:08:17
21            (Exhibit Number 118 was admitted into evidence.)
22            (Exhibit 118 was played.)
23   BY MS. BROOK:
24   Q.   Did the defendant tell you to tell the FBI that you didn't
25   know anything?                                                   04:10:03

United States District Court

ALI SOOFI - Direct

1  A.   Yes.                                                         04:10:07

2  Q.   Does Government's Exhibit 119 reflect that part of the

3  conversation?

4  A.   Yes.

5            MS. BROOK:   Government moves to admit and play         04:10:15

6  Exhibit Number 119.

7            THE COURT:   There being no objection, 119 is

8  admitted.

9            (Exhibit Number 119 was admitted into evidence.)

10           (Exhibit 119 is played.)                                04:10:26

11 BY MS. BROOK:

12 Q.   Throughout this call, did the defendant tell you multiple

13 times to not call and not talk to the FBI?

14 A.   Yes.

15 Q.   Does Exhibit 120 reflect that?                               04:11:20

16           MS. BROOK:   Government moves to admit and play

17 Exhibit Number 120.

18           THE COURT:   Without objection, 120 is admitted.

19           Can you start it again, Mr. Koehler?   I didn't hear

20 the first part.                                                   04:11:42

21           (Exhibit Number 120 was admitted into evidence.)

22           (Exhibit 120 is played.)

23 BY MS. BROOK:

24 Q.   Did the defendant tell you during this conversation what

25 happens if the FBI catches you in a lie?                          04:12:07

ALI SOOFI - Direct

1   A.   Yes.                                                    04:12:09

2   Q.   Does Exhibit Number 121 reflect that part of the

3   conversation?

4   A.   Yes.

5           MS. BROOK:   Government moves to admit and play       04:12:17

6   Exhibit Number 121.

7           THE COURT:   There's no objection so 121 is admitted.

8           (Exhibit Number 121 was admitted into evidence.)

9           (Exhibit 121 is played.)

10  BY MS. BROOK:                                                04:12:50

11  Q.   In Exhibit Number 199, which we heard a moment ago, the

12  defendant told you to tell the FBI that you didn't know

13  anything.  From your perspective, did you know information that

14  you wanted to convey to the FBI?

15  A.   Yes.                                                    04:13:06

16  Q.   And was that information that you were telling the FBI?

17  A.   Yes.

18  Q.   Did that information relate in part to things you had

19  observed with AK, Mr. Wahid?

20  A.   Yes.                                                    04:13:28

21  Q.   On June 7, so the next day, did you miss another call from

22  the defendant?

23  A.   Yes.

24  Q.   And did you call him back?

25  A.   Yes.  He was in -- using the number they had provided me.  04:13:41

United States District Court

ALI SOOFI - Direct

1  Q.   Using the recording system?                                    04:13:48

2  A.   Yes.

3  Q.   Have you had an opportunity to review that recording in

4  its entirety?

5  A.   Yes.                                                            04:13:53

6  Q.   And did that recording fairly and accurately represent the

7  conversation that you had with the defendant on June 7 of 2015?

8  A.   Yes.

9  Q.   Have you also had the opportunity to review clips,

10 Government's Exhibit 122, 123, 124, 125, 126, 127 and 128?          04:14:07

11 A.   Yes.

12 Q.   Do those clips fairly and accurately reflect component

13 parts or snippet pieces of the recorded conversation you

14 recorded of the defendant from that day?

15 A.   Yes.                                                            04:14:27

16 Q.   During that call, did the defendant say to you that the

17 FBI doesn't know what you know?

18 A.   Yes.

19 Q.   And, again, tell you to tell the FBI that you don't know

20 anything?                                                           04:14:48

21 A.   Yes.

22 Q.   Does Exhibit Number 122 reflect that part of the

23 conversation?

24 A.   Yes.

25          MS. BROOK:  Government moves to admit and play 122.        04:14:57

United States District Court

ALI SOOFI - Direct

1    THE COURT:  Without objection, 122 will be admitted.    04:15:00

2    (Exhibit Number 122 was admitted into evidence.)

3    (Exhibit 122 is played.)

4  BY MS. BROOK:

5  Q.   When the videos were being played, the ISIS propaganda    04:16:40

6  videos --

7  A.   Yes.

8  Q.   -- did you see them?

9  A.   Yes.

10 Q.   During this call, did the defendant tell you to call the    04:16:55

11 FBI, don't go in and talk to them in person?

12 A.   Yes.

13 Q.   Does Exhibit Number 123 reflect that part of the

14 recording?

15 A.   Yes.    04:17:09

16    MS. BROOK:  Government moves to admit and play

17 Exhibit 123.

18    THE COURT:  No objection.  123 is admitted.

19    (Exhibit Number 123 was admitted into evidence.)

20    (Exhibit 123 is played.)    04:17:27

21 BY MS. BROOK:

22 Q.   Did the defendant tell you to make your answers to the FBI

23 short and quick?

24 A.   Yes.

25 Q.   And, additionally, for you to tell them that you weren't    04:18:03

United States District Court

1  there, you don't know anything?                                    04:18:06

2  A.    Yes.

3  Q.    Does Exhibit Number 124 reflect that?

4  A.    Yes.

5        MS. BROOK:  Government moves to admit and play 124.           04:18:15

6        THE COURT:  There's no objection so 124 is admitted.

7        (Exhibit Number 124 was admitted into evidence.)

8        (Exhibit 124 is played.)

9  BY MS. BROOK:

10 Q.    Is it true that you were never at the apartment?              04:19:31

11 A.    No.

12 Q.    And is it true that you only saw Wahid, the defendant, at

13 the apartment one or two times?

14 A.    No.

15 Q.    Why did you say that?                                         04:19:43

16 A.    I'm sorry.  I kind of lost my train of thought.

17 Q.    That's okay.

18        So the defendant said to you in this recording:  I've

19 never seen you except one time.

20        And you said:  Yeah, I would always take off on my           04:20:09

21 runs.  Is it true that you only saw him there one or two times?

22 A.    No.

23 Q.    So in the midst of this conversation with him, do you have

24 a purpose?  What are you trying to do as you talk to him?

25 A.    Just to, you know, let him know that they have, you know,     04:20:36

United States District Court

1    all the -- you know, all the evidence all in front of them.          04:20:40

2    So, I mean, like me saying, like, I can't lie to them.

3    Basically I came forward and told them what it was, you know,

4    how everything played out.

5    Q.    Throughout the course of this conversation, did the          04:21:04

6    defendant tell you what to say to the FBI?

7    A.    Yes.

8    Q.    Did he also tell you that if you talked to the FBI, you

9    would be charged?

10   A.    Yes.                                                          04:21:19

11   Q.    Does clip number 125 represent that part of the

12   conversation?

13   A.    Yes.

14   Q.    Government moves to admit and play 125.

15          THE COURT:  If there's no objection, 125 is admitted.       04:21:30

16          (Exhibit Number 125 was admitted into evidence.)

17          (Exhibit 125 is played.)

18   BY MS. BROOK:

19   Q.    Did Simpson and your brother keep the weapons secret from

20   you?                                                                04:22:18

21   A.    No.

22   Q.    Were they readily apparent when you were in the apartment?

23   A.    Yes.

24   Q.    And at times was Wahid present when those guns were

25   readily apparent or obvious in plain sight in the apartment?       04:22:35

ALI SOOFI - Direct

1    A.    Yes.                                                          04:22:40

2    Q.    During this call, did the defendant repeatedly tell you

3    that you don't know anything?

4    A.    Yes.

5    Q.    Does Exhibit Number 127 reflect that?                        04:22:52

6    A.    Yes.

7              MS. BROOK:   The Government moves to admit and play

8    127.

9              THE COURT:   There being no objection, 127 is

10   admitted.                                                          04:23:03

11             (Exhibit Number 127 was admitted into evidence.)

12             (Exhibit 127 is played.)

13   BY MS. BROOK:

14   Q.    Did the defendant also tell you to tell the FBI that you

15   never saw any guns?                                                04:24:08

16   A.    Yes.

17   Q.    Does 126 reflect that?

18             THE COURT:   Oh, I see.

19             MS. BROOK:   I inadvertently skipped one, Your Honor.

20   The Government moves to admit and play 126.                        04:24:24

21             THE COURT:   If there's no objection, 126 is admitted.

22             (Exhibit Number 126 was admitted into evidence.)

23             (Exhibit 126 is played.)

24   BY MS. BROOK:

25   Q.    Did the defendant also tell you again don't go into the     04:25:00

United States District Court

ALI SOOFI - Direct

1   office; call them?                                                    04:25:03

2   A.    Yes.

3   Q.    Does Exhibit Number 128 reflect that part of the call?

4   A.    Yes.

5            MS. BROOK:  Government moves to admit 128.                    04:25:13

6            THE COURT:  With no objection, 128 is admitted.

7            (Exhibit Number 128 was admitted into evidence.)

8            (Exhibit 128 is played.)

9   BY MS. BROOK:

10  Q.    On June 18 of 2015, did you also record a conversation          04:26:17

11  with the defendant?

12  A.    Yes.

13  Q.    And did it occur the same way that we've talked about

14  previously where you missed a call and then you called him back

15  with the recording phone number or did it come about a             04:26:30

16  different way?

17  A.    It was the same process with the recording.

18  Q.    So you missed a call from him and then you called him

19  back?

20  A.    Yes.                                                            04:26:42

21           THE COURT:  Ms. Brook, I'm thinking if we were going

22  to end for the day in about two and a half or three minutes

23  anyway, this is a new call, maybe this is a good place to break

24  for the day.

25           MS. BROOK:  Okay.                                            04:26:52

United States District Court

ALI SOOFI - Direct

1    THE COURT:  Does that work?                           04:26:53

2    MS. BROOK:  Yeah.

3    THE COURT:  All right.

4         So, ladies and gentlemen, we're going to go ahead and

5    recess for the day.  It's just two minutes shy of 4:30.  If the   04:26:58

6    parties can be ready to go again tomorrow morning at 9 o'clock,

7    we will resume.

8    MS. BROOK:  Thank you.

9    THE COURT:  All right.  Thank you, all.  We are

10   adjourned.                                            04:27:10

11        The courtroom should open up at about 8:45.

12        Is that right, Julie?

13   COURTROOM DEPUTY:  Correct.

14   THE COURT:  Okay.

15        (Whereupon, these proceedings recessed at 4:27 p.m.)

16                    *  *  *  *  *

17

18

19

20

21

22

23

24

25

United States District Court

1       C E R T I F I C A T E

2

3           I, ELAINE M. CROPPER, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of

6   Arizona.

7

8           I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15          DATED at Phoenix, Arizona, this 8th day of February,

16  2019.

17

18

19

20              s/Elaine M. Cropper

21          _____

22              Elaine M. Cropper, RDR, CRR, CCP

23

24

25