CR-17-00360-PHX-JJT-1, February 28, 2019

1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3                    _____

4
     **United States of America**,          )
5                                          )
                            Plaintiff,     )
6      vs.                                 )
                                           )   CR-17-00360-PHX-JJT-1
7      **Abdul Khabir Wahid**,               )
                                           )
8                            Defendant.    )
                                           )   February 28, 2019
9      _____    )   10:01 a.m.
                                           )
10

11

12         **BEFORE:   THE HONORABLE JOHN J. TUCHI, JUDGE**

13         **REPORTER'S EXCERPT TRANSCRIPT OF PROCEEDINGS**

14          BENCH TRIAL - DAY 3 (Witness testimony only)

15               (Pages 318 through 409)

16

17

18

19

20

21     Official Court Reporter:
       **Elaine Cropper, RDR, CRR, CCP**
22     Sandra Day O'Connor U.S. Courthouse, Suite 312
       401 West Washington Street, SPC 35
23     Phoenix, Arizona  85003-2151
       (602) 322-7245/(fax) 602.322.7253
24
       Proceedings Reported by Stenographic Court Reporter
25     Transcript Prepared by Computer-Aided Transcription

                United States District Court

CR-17-00360-PHX-JJT-1, February 28, 2019

1                    <u>I N D E X</u>

2                      **TESTIMONY**

3  **WITNESS**              **Direct**   **Cross**   **Redirect**   **Recross**

4    MATTHEW LEVITT            323      341
     STEWART WHITSON          343
5    ABDUL KHABIR WAHID       379      388

6

7                    <u>E X H I B I T S</u>

8  Number                                        Ident   Rec'd

9  18     Dabiq Issue 8                          323

10 19     Hijrah to the Islamic State            332

11 21     ISHD LEAK pages                        352

12 42     Photo of the screen of another digital  333
          device  (LG GPLG440GB -- 480-849-8186;
13        Item #38-41)

14 44     Dark Blue Spiral Memo Book, 3" x 5"    351
          (Lab Item 16)
15
   45     Photo of notebooks                     350    351
16
   48     Electrostatic image of front face of   358
17        page 49 from forensic analysis of dark
          blue spiral memo book (Item 17)
18
   49     Electrostatic image of rear face       358
19        reversed of page 49 from forensic
          analysis of dark blue spiral memo book
20        (Item 17)

21 52     List of scholars                       390    407

22 71     Twitter screenshots:                   328    329
          AbuHussainAlBritani
23
   72     Pages from Dabiq Magazine Issue 9      334    335
24        regarding Garland attack

25

                    United States District Court

CR-17-00360-PHX-JJT-1, February 28, 2019

**E X H I B I T S** (Continued)

| Number | | Ident | Rec'd |
|--------|--|-------|-------|
| 74 | Simpson Twitter DM Excerpts | 333 | |
| 84 | Photo of Abdul Khabir Wahid with Nadir Soofi | 401 | |
| 109 | (Marked but not referenced.) | | 365 |
| 110 | (Marked but not referenced.) | | 365 |
| 111 | (Marked but not referenced.) | | 365 |
| 112 | Excerpt of Sworn Trial Testimony of Abdul Khabir Wahid in CR 15-707-PHX-SRB on March 8, 2016, pages 19-20 | 366 | 365 |
| 113 | Excerpt 5 of Sworn Trial Testimony of Abdul Khabir Wahid in CR 15-707-PHX-SRB on March 8, 2016, pages 25-26 | 368 | 365 |
| 114 | Excerpt 6 of Sworn Trial Testimony of Abdul Khabir Wahid in CR 15-707-PHX-SRB on March 8, 2016, page 39 | 368 | 365 |
| 115 | Excerpt 7 of Sworn Trial Testimony of Abdul Khabir Wahid in CR 15-707-PHX-SRB on March 8, 2016, pages 47-49 | 369 | 365 |
| 116 | Excerpt 8 of Sworn Trial Testimony of Abdul Khabir Wahid in CR 15-707-PHX-SRB on March 8, 2016, pages 55-56 | 370 | 365 |
| 117 | Excerpt 9 of Sworn Trial Testimony of Abdul Khabir Wahid in CR 15-707-PHX-SRB on March 8, 2016, pages 57-60 | 372 | 365 |
| 118 | Recording Clip 1 of Phone Call Between Abdul Khabir Wahid and A.S. on June 6, 2015 at 8:24 p.m. | 376 | |

United States District Court

CR-17-00360-PHX-JJT-1, February 28, 2019

**E X H I B I T S** (Continued)

| Number | | Ident | Rec'd |
|---|---|---|---|
| 163 | Photograph | 401 | |
| 164 | Photograph | 397 | |

**MISCELLANEOUS NOTATIONS**

| Item | Page |
|---|---|
| Government rests | 377 |

**RECESSES**

| | Page | Line |
|---|---|---|
| (Recess at 11:25; resumed at 11:41.) | 378 | 7 |

United States District Court

CR-17-00360-PHX-JJT-1, February 28, 2019

1            **A P P E A R A N C E S**

2

    For the Government:
3            **JOSEPH E. KOEHLER, ESQ.**
             **KRISTEN BROOK, ESQ.**
4            U.S. Attorney's Office
             40 North Central Avenue, Suite 1200
5            Phoenix, AZ  85004-4408
             602.514.7500
6
    For the Defendant:
7            **PRO SE**
             **ABDUL KHABIR WAHID**
8            3407 W. Port Au Prince Lane
             Phoenix, Az  85053
9            480.205.1354

10   For the Defendant as Advisory Counsel:
             **JOHN W. MCBEE, ESQ.**
11           Law Office of John W. McBee
             3104 E. Camelback Road, PMB 851
12           Phoenix, AZ  85016
             602.903.7710
13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

MATTHEW LEVITT - Direct

1          **P R O C E E D I N G S**

2               (The following excerpt was separately transcribed.)

3               (Court was called to order by the courtroom deputy.)

4               (Proceedings begin at 10:01.)

5               (The defendant is present and out of custody.)            10:01:10

6          THE COURT:  Good morning, everyone.  Please be

7     seated.

8               All right.  Before we commence, I want to remind

9     everyone here that by the local rules of practice, there is no

10    recording of any proceedings in the courtroom.  And I'm going   10:01:22

11    to make sure that the parties monitor that, including any

12    family members that you might have here.

13              Mr. Wahid, I do not know that a recording was

14    occurring, but I want to remind everybody right now that cannot

15    happen.  We can resume.                                          10:01:39

16              MS. BROOK:  Your Honor, before I had mentioned -- I

17    had mentioned at the close we had about 20 more minutes.  It's

18    probably more like 30 but we'll keep it as brief as possible.

19              (MATTHEW LEVITT, a witness herein, was previously

20    duly sworn or affirmed.)                                         10:01:54

21              **DIRECT EXAMINATION** (Continued)

22    BY MS. BROOK:

23    Q.   We left a off yesterday talking about *Dabiq* issue number

24    five and put out by the Islamic State.

25              MS. BROOK:  I'm going to place on the overhead what    10:02:02

United States District Court

MATTHEW LEVITT - Direct

1    has already been admitted as Government's Exhibit 18.                10:02:04

2    BY MS. BROOK:

3    Q.    Do you recognize this issue of *Dabiq*?

4    A.    Yes.   This is the eighth issue of *Dabiq*.

5    Q.    And when was it published?                                     10:02:20

6    A.    In March, late March 2015.

7    Q.    Again, this is the same publication of *Dabiq* of which is

8    produced by the Islamic State?

9    A.    Yes.

10   Q.    And in this particular issue of *Dabiq*, what was detailed,   10:02:31

11   discussed, in the forward?

12   A.    The forward always covers recent events and in this one,

13   it covers a series of attacks and issues related to a

14   particular instance regarding another drawing of Prophet

15   Muhammed.                                                           10:02:58

16   Q.    Again, a pretty obvious question but, for the record,

17   where is the placement in this particular magazine?

18   A.    It's the very first article.   So cover page, the table of

19   contents forward.

20   Q.    Table of contents, again, you had mentioned yesterday that   10:03:10

21   Zarqawi's quote is always there on the header?

22   A.    Yes, and there it is.

23   Q.    Turning to page three and then to page four and five.   I

24   want to focus in, who was Abu Ramadan?

25   A.    Abu Ramadan -- his real name is Omar Hussain -- is a         10:03:48

United States District Court

MATTHEW LEVITT - Direct

1    Danish citizen, Muslim who carried out an attack, a couple of          10:03:51

2    attacks actually in Copenhagen, one targeting a gathering of

3    people who were celebrating cartoons, including cartoons

4    depicting the Prophet Muhammed, and one cartoon in particular

5    depicting the Prophet Muhammed in a particularly insulting way,         10:04:08

6    and then also carried out an attack on a Jewish synagogue in

7    Copenhagen.

8    Q.   Did this article detail the Islamic State's position about

9    the purpose of this particular attack?

10   A.   Correct.   Yes.                                                     10:04:25

11   Q.   Did it go on to talk about the purpose, to intimidate the

12   West?

13   A.   It does.

14   Q.   And, in effect, to try to bring about Dabiq?

15   A.   Correct.                                                           10:04:39

16   Q.   Can you read for -- what it says there under Abu Ramadan's

17   picture?

18   A.   This is the bottom right-hand corner of page five.   "It

19   was also the rejection of nationalism that drove Abu Ramadan

20   al-Muhajir (Omar Abdel Hamid el-Hussein -- may Allah accept             10:04:51

21   him) despite his Danish birth and upbringing -- to target

22   Danish Jews and Danish mockers of the Messenger" -- Prophet be

23   upon him it says in Arabic -- "until he achieved martyrdom in

24   Denmark, after pledging bay'ah to the Khilafah from Denmark,"

25   pledging allegiance to the caliph.                                      10:05:22

MATTHEW LEVITT - Direct

1  Q.   So in effect, did he target civilians and attack them      10:05:33

2  attempting to harm and kill people?

3  A.   Exactly.

4  Q.   And what was the Islamic State's position on the purpose

5  of that attack and the effect of it?      10:05:41

6  A.   Their position was that this is a response to the call

7  that they had put out asking for exactly this type of attack

8  and highlighted the fact that he had not given credence to his

9  Danish nationality, that the idea of nationalism was an

10 anathema to them.  One was a Muslim and a member of the Muslim      10:06:03

11 nation, the ummah, and that was all that mattered, whatever

12 one's, quote unquote, nationality.

13 Q.   Whose picture is that right there?

14 A.   On the left?  Lars Vilks, who is the cartoonist who drew

15 this particularly insulting cartoon.      10:06:19

16 Q.   And based upon the content of this article, what's the

17 purpose of having his picture there?

18 A.   He is the face of disbelievers who are the types of people

19 who should be attacked, among others.

20 Q.   Can you read for us the words put out by the Islamic State      10:06:39

21 starting here at the top of column two on this page?

22 A.   Starting with "The Khalifah"?

23 Q.   Yes.  And I guess maybe it would be better to start down

24 here.  Perhaps, "He gathered."

25 A.   "He gathered what he could of arms, surveyed targets,      10:06:58

United States District Court

MATTHEW LEVITT - Direct

| 1 | relied upon his Lord, and executed his brave and selfless | 10:07:01 |
| 2 | attack, terrorizing the Christians, Jews, and athiests of |
| 3 | Denmark," go up to the next column, "a pagan nation that |
| 4 | insulted the Messenger," peace be upon him in Arabic, "and a |
| 5 | member of the crusader coalition against the Islamic State. | 10:07:22 |

relied upon his Lord, and executed his brave and selfless

attack, terrorizing the Christians, Jews, and athiests of

Denmark," go up to the next column, "a pagan nation that

insulted the Messenger," peace be upon him in Arabic, "and a

member of the crusader coalition against the Islamic State.

The filthy blood of the Danes was spilled by his blessed hands,

by which he guaranteed for himself a place in Paradise,

inshaallah," God willing.  "And with the noble blood and

tireless sweat of his likes, history is written and preserved."

          "And now, has the time not come for the crusaders,

athiests, and apostates to realize that the Islamic State and

its message to the world is here to stay?"

          "The Khalifah said, quote, Let the world know that we

are living today in a new era.  Whoever was heedless must now

be alert.  Whoever was sleeping must now awaken.  Whoever was

shocked and startled must comprehend.  The Muslims today have a

loud, thundering statement, and possess heavy boots.  They have

a statement" --

Q.   I'm sorry.  Let me go back for just a moment.  Did the top

of this one paragraph that we started halfway through also

speak to the issue of, quote, citizenship, in quotes, and how

Abu Ramadan didn't let citizenship prevent him from carrying

out the duties of the Islamic State?

A.   That's right.

          MS. BROOK:  We've covered this in a stipulation but

United States District Court

MATTHEW LEVITT - Direct

1    we might as well cover in testimony, too.                        10:08:53

2    BY MS. BROOK:

3    Q.    Are you aware that the Islamic State is a designated

4    terrorist organization?

5    A.    Yes.                                                        10:08:58

6    Q.    And who are they so designated by?

7    A.    The State Department as a foreign terrorist organization

8    and there's also designation under the Treasury, especially

9    designated global terrorist entities list.

10   Q.    And, in fact, they were so designated back in 2014 and    10:09:11

11   2015 just as they are today?

12   A.    Correct.

13   Q.    Are you aware, based upon your research, your work in the

14   field, of the attack on the Curtis Culwell Center that happened

15   on May 3 of 2015?                                                10:09:26

16   A.    I am.

17   Q.    And we're going to return to an issue, *Dabiq* issue number

18   nine, in a moment but are you aware of who claimed

19   responsibility for that attack?

20   A.    The Islamic State did.                                     10:09:38

21   Q.    Placed on the overhead what's already been --

22           MS. BROOK:  You know actually, Your Honor, I'm going

23   to place on the overhead Exhibit Number 71.  These were

24   discussed yesterday and read.  I don't believe they were

25   actually admitted so the Government would move to admit them.    10:09:53

329

MATTHEW LEVITT - Direct

1        THE COURT:  This is 71, the Twitter screen shots?          10:09:59

2        MS. BROOK:  Correct.

3        THE COURT:  All right.  I'll give Mr. Wahid a second

4   to catch up.

5        Mr. Wahid, is there any objection?          10:10:06

6        MR. WAHID:  No.

7        THE COURT:  All right.  71 is admitted.

8        (Exhibit Number 71 was admitted into evidence.)

9   BY MS. BROOK:

10  Q.   In terms of attacks here on the United States soil, was          10:10:16

11  this the first attack on the United States soil that the

12  Islamic State claimed responsibility for?

13  A.   Yes.

14  Q.   And are you familiar with Junaid Hussain?

15  A.   I am.          10:10:31

16  Q.   Can you read for us the second tweet here that I'm

17  pointing to?

18  A.   "The 2 Brothers attained shahdah in Texas.  O Kuffar know

19  that death is better than living humiliated!  Allahu Akbar!!

20  #garlandshooting."          10:10:43

21  Q.   Okay.  Does the Islamic State use mediums like Twitter to

22  communicate messages to supports?

23  A.   Extensively, on multiple platforms.

24  Q.   And does it also use to gain supporters?

25  A.   Absolutely.          10:11:05

United States District Court

MATTHEW LEVITT - Direct

1   Q.   Is it used to carry out messages from the Islamic State?   10:11:05

2   A.   Yes.

3   Q.   Junaid Hussain's role within the Islamic State, what's his

4   position?  Well, let me ask a better question.  What was his

5   position back in May of -- well, let's do January through May   10:11:14

6   of 2015?

7   A.   Junaid Hussain was a hacker and had become one of the

8   heads of the Islamic State's external operations so he was

9   tremendously intimately involved recruiting, encouraging, and

10  sometimes even directing people to carry out attacks on   10:11:38

11  multiple platforms -- Twitter, Kick, Surespot and many

12  others -- and has been tied to a significant number of cases,

13  not only in the United States but around the world.

14  Q.   Are you familiar with the execution videos that are

15  released by the Islamic State?   10:11:54

16  A.   I'm afraid so.

17  Q.   Based upon your research in this field, familiarity with

18  the Islamic State, what's the purpose for both the release of

19  those videos as well as having individuals watch those videos?

20  A.   Islamic State released both videos that tried to show its   10:12:13

21  kind of idyllic caliphate that it was building, but it also

22  released these horrific videos of beheadings and burning people

23  alive and stuff like that as a means of demonstrating how

24  powerful they are, how ascendent they are.  Remember this

25  millennial apocalyptic idea had been purveyed by others,   10:12:35

United States District Court

MATTHEW LEVITT - Direct

1    including Anwar al-Awlaki, who we discussed yesterday.  And                    10:12:40

2    here they are actualizing that prophecy and from the -- from

3    their perspective, it also helped, as we discussed yesterday,

4    radicalize people and get recruits, inspire people to do things

5    of their own and sometimes also would be successful in terms of   10:13:00

6    fundraising.

7            From the consumers' point of view, especially when

8    we're talking about the home-grown violent extremist which is,

9    maybe not in Europe but certainly in the United States, the

10   primary terrorist threat we face.  This is a way of giving        10:13:15

11   someone a sense of belonging.  This like-minded follower

12   watches these things and feels like he or she is a part of

13   this.  And for many it can actually be a form of not only

14   belonging but of worship, but of -- because this is a religious

15   calling.  This is getting in on the ground floor and doing        10:13:40

16   something that is bigger than yourself and is changing the

17   world in God's image and is helping to bring Islam around the

18   world.  Borders don't matter, countries don't matter and you're

19   a part of it.  And it becomes a form of worship.

20           And it's a key element in helping not only radicalize     10:13:58

21   people but then mobilize people.  Lots of people get

22   radicalized.  We stub our toes and get angry but far fewer

23   people get mobilized to go do something violent about it.  And

24   mobilization that is critical and part of the video is, we've

25   come and done this.  You can do it.  You can come and join us     10:14:15

MATTHEW LEVITT - Direct

1    here and do it.  You can do where you are at home, and it's          10:14:18
2    become a very effective radicalizing and mobilizing tool.
3    Q.    You had mentioned also the component of you can come here
4    and help or you can act where you are, where you happen to be;
5    right?                                                               10:14:33
6    A.    Correct.
7    Q.    The concept of coming to the Islamic -- well, coming to
8    the area of Iraq and Syria to help, is that called hijrah?
9    A.    Correct.
10   Q.    And are you familiar with Government's Exhibit Number 19,      10:14:43
11   already admitted, placing on the overhead?  Are you familiar
12   with this?
13   A.    I am.
14   Q.    In terms of locations where individuals may fly in in
15   order to commit hijrah, are there some popular destinations?        10:15:01
16   A.    The most popular and simplest way to get to Syria was via
17   Turkey, especially before the Turks really started monitoring
18   that about 100-mile swath of the border which then President
19   Obama actually called them out on publicly.  So it was very
20   common for people to fly into Istanbul and then either rent a        10:15:27
21   car, take a bus or take a flight to airports closer to the
22   border.  So you see here to the left here Gaziantep, Sanliurfa,
23   et cetera, towns closer to the border through which they could
24   then make the final leg of the journey south into northern
25   Syria.                                                               10:15:45

United States District Court

MATTHEW LEVITT - Direct

1          MS. BROOK:  I'm placing on the overhead now, Your                    10:15:45
2   Honor, Exhibit Number 42 already admitted, screen shots from
3   the phone, also admitted, that was found in Simpson and Soofi's
4   apartment on that phone.
5   Q.    What is Sabihan Gökcen?                                               10:16:10
6   A.    An airport, Turkish airport.
7   Q.    And how about Ataturk?
8   A.    That's the main airport, yes.  Istanbul.
9   Q.    I'm going to place back on the overhead the next page of
10  Exhibit 42 already admitted.  Can you read that message for us?            10:16:51
11  A.    "You're not one way.  You're have a trip both ways to
12  IST and back to Bulgaria."
13  Q.    Is that message consistent with the instructions in the
14  hijrah literature put out by the Islamic State?
15  A.    Yes.  It was better not to book a one-way trip ticket               10:17:14
16  which is more suspicious to law enforcement.
17  Q.    Placing on the overhead one of the screen shots from
18  Exhibit Number 74, also already admitted.  Can you read for us
19  what Elton Simpson there under Bird of Green wrote?
20  A.    "I wonder what it means when one sees imam Anwar in a               10:17:55
21  dream.  You don't have to ask the sheikh akhi lol."
22  Q.    And then there we have Miski.
23  A.    Who responds, "Maybe he's telling you what he told nidal."
24  Q.    Let's break that apart just for a moment.  Miski, who is
25  that?                                                                      10:18:14

MATTHEW LEVITT - Direct

1  A.   Goes by the name Muhajir Miski.  He's on your board here                    10:18:15

2  in the bottom middle, Mohamed Abdullahi Hassan, originally from

3  Minneapolis, went to Somalia, joined al-Qaeda there, the

4  al-Shabaab group, but over time became a follower and promoter

5  of the Islamic State.                                                             10:18:35

6  Q.   Based upon the context of this direct message, who do you

7  interpret Nidal to be?

8  A.   I interpret this to be a reference to Nidal Hassan, Major

9  Nidal Hassan, who carried out a shooting attack in Fort Hood in

10 2009 killing I think 13 and wounding 30 something people.  The    10:18:53

11 reason is because Nidal Hassan had also been or had been in

12 direct contact with Anwar al-Awlaki.  That was very much in the

13 public domain.  And here you have Elton Simpson talking about

14 Imam Anwar, which seems clearly to be a reference to Anwar

15 al-Awlaki, saying, what happens if I saw Anwar al-Awlaki in my    10:19:18

16 dream?  Maybe he's telling you what he told Nidal.  And what

17 Anwar al-Awlaki told Nidal was to go carry out this attack.

18 Q.   Placing on the overhead what has not yet been admitted,

19 Government's Exhibit Number 72.  So we can see it in its

20 entirety.  I'm going to scan it so you can see it in its          10:19:56

21 entirety.

22       Do you recognize this?

23 A.   Yes.

24 Q.   And have you had the opportunity to review all of Exhibit

25 Number 72?                                                        10:20:06

                    MATTHEW LEVITT - Direct

1   A.   Yes.  And not only -- I saw it when it came out, not just        10:20:08

2   for this case.

3   Q.   What's it from?

4   A.   This is from another edition of *Dabiq* magazine, number

5   nine I believe, which came out about three weeks after the           10:20:18

6   Garland attack.

7   Q.   And what part of *Dabiq*, issue number nine, did this appear

8   in, this forward?

9   A.   This is in the forward which is that first section of

10  articles after the cover and the table of contents.                  10:20:33

11  Q.   Explain for us what this forward discusses.

12  A.   Like most forwards for *Dabiq*, it discusses current events.

13  This one discusses again attacks on Prophet Muhammed depictions

14  and, in particular, it discusses the attack at Culwell Center

15  in Garland.                                                           10:20:57

16         MS. BROOK:  Your Honor, the Government moves to admit

17  Government's Exhibit Number 72.

18         THE COURT:  All right.

19         Mr. Wahid, any objection?

20         MR. WAHID:  No.                                                10:21:05

21         THE COURT:  All right.  72 is admitted.

22         (Exhibit Number 72 was admitted into evidence.)

23  BY MS. BROOK:

24  Q.   Who does that photograph depict?

25  A.   This is Geert Wilders whose is a far right Dutch                 10:21:10

MATTHEW LEVITT - Direct

1  parliamentarian who has been convicted actually of inciting --          10:21:13
2  incitement against the Moroccan community in the Netherlands
3  and he's quite the Islamophobic politician.
4  Q.    Are you familiar with these pages here?  Whose pictures
5  are these?                                                              10:21:42
6  A.    This is Simpson and Soofi.
7  Q.    And what does the article say about them and their actions
8  specifically?
9  A.    It lauds them as examples to follow, as people whose
10  actions should help inspire others to overcome any reticence           10:21:57
11  they may have to like Simpson and Soofi, do what needs to be
12  done on behalf of the Islamic State.
13  Q.    Here it says, "As for those who continue to suffer from
14  the disease of being indifferent or the obligations of hijrah,
15  jihad, and bay'ah, so much so that they see nothing wrong with         10:22:15
16  residing amongst, and paying taxes to," that particular
17  section, does that resonate with the message?
18  A.    It does.  In other words, for those people who might
19  still, as they put it here, suffer from the disease of not yet
20  following the message and they continue living among                   10:22:34
21  disbelievers and they maybe even continue paying taxes to those
22  countries that are fighting the Islamic State and who belittle
23  Islamic law, Shariah, and on their entertainment programs and
24  who imprison and torture Muslims, maybe even burn the Qur'an
25  and mock the Prophet Muhammad, specifically as mentioned here,         10:22:52

United States District Court

MATTHEW LEVITT - Direct

```
 1    then -- and I quote here at the end of that paragraph, quote,        10:22:57
 2    then let them prepare their flimsy excuses for the angels of
 3    death, end quote, meaning even -- not just disbelievers who are
 4    not Muslim but even Muslims who are not sufficiently believers
 5    and are, therefore, disbelievers, they are eligible to face a     10:23:14
 6    flimsy death, too.  They will have no argument to make to God
 7    at the end of the day when they go up to the pearly gates
 8    having not followed through on this call to action.
 9    Q.   Does this article state exactly how the Islamic State
10    views Elton Simpson and Nadir Soofi?                               10:23:42
11    A.   Absolutely.
12    Q.   What does it say?
13    A.   I'll quote:  "The hypocrites will sit back, the true men
14    will step forward, and the kuffar will have no peace and no
15    security."                                                         10:23:54
16         "May Allah accept our two brothers amongst the
17    leaders of the shuhada in Jannah."  They are martyrs in
18    paradise.
19    Q.   Based on your knowledge of terrorist attacks, specifically
20    home-grown extremist attacks in the West, are you familiar with   10:24:17
21    cases where material is found in the aftermath of the attack
22    that would have been and was of value to law enforcement?
23    A.   That describes just what every case there's been.  The
24    nature of investigating case terrorism or otherwise is running
25    down the leads that you get access to, especially in the          10:24:40
```

United States District Court

MATTHEW LEVITT - Direct

1    immediate aftermath of the attack.   This material can often          10:24:44
2    have a short expiration date.   In other words, its value is
3    only useful for a short period of time.   So there's a rush
4    against the clock to get it and exploit it to be able to
5    identify not only kind of what that material was, was it money?   10:24:59
6    Was it access to a locker, you know, a key for something, or
7    was it just to be able to identify who it was being delivered
8    to and whether that person or persons are some type of network,
9    whether there's additional plotting going on.   So that can be
10   very important.                                                      10:25:18
11   Q.   Why is the transfer of currency or money important?
12   A.   Well, we have plenty of cases where people raised or
13   collected funds to do something and didn't use it all.   Think
14   of 9/11.   The 9/11 highjackers actually sent back to the Middle
15   East unused funds so that that money, considered sacred for        10:25:36
16   them, can be used for another attack.
17   Q.   Based upon your understanding of the Islamic State, is the
18   return of unused money for an attack an important concept to
19   them?
20   A.   I do think that they would consider that an important         10:25:50
21   concept.   Again, because for them these types of attacks are a
22   form of worship.   They are a form of service.   That money is,
23   in a sense, sacred and just operationally, the religious or
24   ideology side, why waste that money?   Provide to it someone
25   else who can do something else with it in support of the           10:26:13

MATTHEW LEVITT - Direct

1    Islamic State.                                                          10:26:16

2    Q.   We've talked about different forms of support, du'a, that

3    people can make towards the Islamic State, does the Islamic

4    State ask for people to make financial contributions?

5    A.   Sure.                                                              10:26:27

6    Q.   And is that, too, a form of support that a person who

7    supports the Islamic State can provide?

8    A.   Yes.

9    Q.   Based upon the research you've done, your awareness of

10   what happens in the aftermath of these terrorist attacks, have         10:26:46

11   you encountered situations where information may appear

12   innocuous but actually has value to the investigation?

13   A.   Again, that's a description of almost any case I've ever

14   heard of.  Sometimes you'll find assumptions that -- that

15   clearly is relevant.  You'll find a weapon.  You'll find a             10:27:09

16   suicide note.  But you'll also find all kinds of other material

17   that you simply cannot know if it's relevant until you run it

18   down.  Which is why, you know, if you -- in your exercise of a

19   search warrant, you're going to be looking for all kinds of

20   things whether or not they have a brass plate next to them             10:27:27

21   saying "this was related to the attack" to be able to determine

22   if it had anything to do with the attack, with the people

23   involved in the attack, again, whether there were others

24   involved in the planning.

25         So I would argue that the majority of the information            10:27:39

MATTHEW LEVITT - Direct

1  actually is going to seem innocuous and won't be known to be          10:27:41

2  relevant or not until people who are properly trained and have

3  the tools to be able to run down those leads can do so.

4  Q.   You had mentioned a moment ago that time was of the

5  essence in gathering that information.  How have you seen that     10:27:55

6  appear in cases that you're aware of --

7  A.   Like I said, the most pressing is concern that perhaps

8  there are other operatives who are planning similar types of

9  activities and it can become even more time-sensitive because

10  when an operation, a terrorist attack happens, when one is        10:28:15

11  thwarted, we have many cases where then operatives who were

12  planning other attacks decide to move up their timetable and

13  attack more quickly.

14            So, for example, there was one last Islamic State

15  terrorist from the late 2015 attacks in Paris, Abduo Salam, who   10:28:31

16  had escaped.  He was ultimately found in Brussels, which is

17  where he had been from -- but when authorities kicked down a

18  door in an apartment and he had just escaped but found one of

19  his compatriots and an Islamic State flag and a weapon, et

20  cetera, other people who were part of that cell and were          10:28:57

21  planning a series of attacks moved up their planning and

22  carried out attacks at the Brussels Metro and the Brussels

23  Airport earlier than they had anticipated because they were

24  afraid that they, too, would get caught.  So there really is a

25  rush against the clock.                                           10:29:13

United States District Court

MATTHEW LEVITT - Cross

1   Q.   And the type of involvement in a cell can include                10:29:14

2   financial providers?

3   A.    Absolutely.  It can include financial providers, people

4   who are actually going to carry out an attack, people who might

5   provide weapons or lookout or automobiles or safe houses.            10:29:25

6   There's a tremendous spectrum of types of activity that need to

7   go into a successful operation.

8            MS. BROOK:  May I have one moment, Your Honor?

9            THE COURT:  You may.

10           MS. BROOK:  I don't have any other questions.               10:29:48

11           THE COURT:  All right.  Thank you.

12           Mr. Wahid, do you have any questions for this

13   witness?

14           MR. WAHID:  I just got one question.

15                        **CROSS - EXAMINATION**                         10:29:57

16   BY MR. WAHID:

17   Q.   I am Muslim myself and even I don't know very much about

18   ISIS and like most Main Street Islam --

19           MS. BROOK:  Objection, Your Honor.  Statement, not a

20   question.                                                           10:30:24

21           THE COURT:  You need to get to the question, Mr.

22   Wahid.

23           MR. WAHID:  Okay.

24   BY MR. WAHID:

25   Q.   What is your opinion on the matter, do you agree that ISIS     10:30:31

United States District Court

MATTHEW LEVITT - Cross

```
 1   has no bias and that they will not only attack people in the    10:30:34
 2   West.  They also attack Muslims who are the very people ISIS
 3   organization claims it is a part of?
 4           MS. BROOK:  Your Honor, can you repeat the question.
 5   I just couldn't hear him.                                        10:30:45
 6           THE COURT:  I'm going to have the court reporter read
 7   it back, please.
 8           (Requested portion of record read:  What is your
 9   opinion on the matter, do you agree that ISIS has no bias and
10   that they will not only attack people in the West.  They also    10:31:07
11   attack Muslims who are the very people ISIS organization claims
12   it is a part of?)
13   A.   ISIS does attack Muslims, but I would argue it's because
14   of extreme bias.  The bias is against anybody who does not
15   practice the Muslim faith as they say it should be practiced.    10:31:14
16           And as I said yesterday, that excludes the vast
17   majority of Muslims around the world who reject them.  So this
18   extreme bias, even more than al-Qaeda and others, means for the
19   Islamic State if you are not Muslim like us, then you are
20   liable to be killed just like anybody else.  So they will        10:31:31
21   absolutely kill Muslims as well.
22           MR. WAHID:  Gotcha.
23           Nothing else, Your Honor.
24           THE COURT:  All right.  Thank you.
25           Is there any redirect?                                   10:31:43
```

United States District Court

STEWART WHITSON - Direct

1        MS. BROOK:  No.                                                    10:31:44

2        THE COURT:  All right.  I'm he going to be able to

3   excuse you and let you go.  Thank you.

4        THE WITNESS:  Thank you, Your Honor.

5        (Witness excused.)                                                 10:31:58

6        THE COURT:  If the Government will call its next

7   witness, please.

8        MS. BROOK:  Thank you, Your Honor.  The Government

9   calls Special Agent Stewart Whitson.

10       THE COURT:  Agent Whitson, if you would step forward    10:32:33

11  to the courtroom deputy, she'll swear you in.

12       COURTROOM DEPUTY:  If you can please state your name

13  and spell your last name for the record.

14       THE WITNESS:  Stewart Whitson.  W-H-I-T-S-O-N.

15       COURTROOM DEPUTY:  Thanks you.  Raise your right       10:32:44

16  hand.

17       (STEWART WHITSON, a witness herein, was duly sworn or

18  affirmed.)

19                    **DIRECT EXAMINATION**

20  BY MS. BROOK:                                                 10:33:09

21  Q.   Good morning.

22  A.   Good morning.

23  Q.   Would you please introduce yourself to the Court?

24  A.   Good morning, Your Honor.  I'm Stewart Whitson.  I'm a

25  Special Agent with the Federal Bureau of Investigation.       10:33:16

STEWART WHITSON - Direct

1    Q.    And, sir, how long have you been an FBI agent?          10:33:20

2    A.    I've been an FBI agent for seven years.

3    Q.    Back in May of 2015, where were you assigned?

4    A.    In May of 2015 I was assigned to Phoenix Division Office

5    here in Arizona.                                              10:33:33

6    Q.    I want to talk about some of the positions you've held

7    since you became an FBI agent seven years ago.  Where were you

8    first assigned?

9    A.    So my first assignment was withing Phoenix Division.

10   Q.    And what focus or specialty did you have as you worked  10:33:44

11   here in the Phoenix Division?

12   A.    I was a counter-terrorism agent so it was essentially a

13   case agent that investigated terrorism investigations here in

14   Arizona.

15   Q.    Prior to joining the FBI, what was your educational     10:33:55

16   background?

17   A.    Prior to joining the FBI, I have -- I had obtained a law

18   degree from the University of Minnesota and a bachelor of arts

19   degree from the University of Minnesota.

20   Q.    And were you in the military?                           10:34:10

21   A.    Yes.

22   Q.    What was the nature of your service in the military?

23   A.    I was in the U.S. Army.  I was an infantry officer and so

24   I served as a platoon leader in Iraq where I was stationed for

25   16 months and then I was later a company commander for an     10:34:22

United States District Court

1    infantry company.                                                    10:34:25

2    Q.    In early May of 2015, did you become the lead case agent

3    in the Phoenix FBI investigation into the attack on the Draw

4    the Prophet Muhammad?

5    A.    Yes.                                                           10:34:42

6    Q.    And can you briefly describe for us the scope of the FBI

7    investigation into the attack?

8    A.    Yes.  So following the attack, which occurred on May 3,

9    2015, the FBI launched what could be described as the largest

10   terrorism investigation in the history of the office here in    10:34:59

11   Phoenix.  Obviously it spanned three different divisions

12   because the attack had occurred in Dallas.  It involved the

13   Dallas Division as well as the Phoenix Division.  But it

14   encompassed work being done by hundreds of agents, not just

15   from Phoenix but across the nation, as well as numerous         10:35:15

16   intelligence analysts and other FBI professionals.

17   Q.    At what point did it become clear that this was a

18   terrorism investigation?

19   A.    Immediately from the outset of the investigation it was

20   clear that this was a terrorism investigation.                  10:35:28

21   Q.    How was that?

22   A.    Numerous factors.  One was the tweet that one of the

23   attackers sent out 16 minutes prior to the attack pledging

24   loyalty to Amir al-Muminin, commander of the faithful, is

25   Arabic for commander of the faithful, which is a title bestowed 10:35:52

STEWART WHITSON - Direct

| | |
|---|---|
| 1 | on Abu Bakr al-Baghdadi, the leader of ISIS.  So that tweet | 10:35:53 |
| 2 | that gone out 16 minutes prior to the attack.  And then |
| 3 | obviously the nature of the attack itself.  It was an attack |
| 4 | upon a contest, a drawing contest of the Prophet Muhammed which |
| 5 | was obviously something offensive to many Muslims.  So that | 10:36:11 |
| 6 | would be a natural target. |

7        And then obviously the subjects involved in the
8   attack, one of which was Elton Simpson, which had been known to
9   the FBI as an individual who had been investigated for
10  terrorism-related offenses in the past.                          10:36:26
11  Q.   Based upon your work in the military and your work in the
12  FBI, specifically in the Counter-Terrorism Division, did you
13  have specific knowledge and training as it related to terrorism
14  investigations?
15  A.   Yes.                                                        10:36:43
16  Q.   And can you explain how you came about that information
17  and what sort of special skills you had?
18  A.   Well, obviously there's -- all agents receive training at
19  FBI academy at Quantico and with terrorism being the number one
20  priority of the FBI, a large part of that training is focused   10:37:00
21  on terrorism-type training.  So that includes familiarization
22  with the groups in the areas where a lot of these groups
23  operate out of but also just the investigative techniques that
24  are involved in these kinds of investigations which oftentimes
25  are the same techniques we use in criminal investigations as    10:37:17

STEWART WHITSON - Direct

1   well.  But just the added knowledge of the groups involved such     10:37:20
2   as ISIS and other terrorist groups.
3   Q.   So let's turn back to the investigation itself.  Out of
4   the Phoenix Field Division roughly how many interviews were
5   conducted in this terrorism investigation?                          10:37:31
6   A.   My best estimate would be somewhere between 300 and 400
7   interviews were conducted related to this investigation.
8   Q.   And roughly how many search warrants were executed in the
9   aftermath of the attack here in Phoenix?
10  A.   My best estimate would be well over 30 and probably a lot      10:37:52
11  more than 30 but at least 30 search warrants.
12  Q.   Additionally, were 2703(d) warrants sought and obtained?
13  A.   Yes.
14  Q.   So during this investigation, did you familiarize yourself
15  with the associates of Nadir Soofi and Elton Simpson?               10:38:11
16  A.   Yes.
17  Q.   And did you come to learn that there was a core group of
18  individuals who hung out with Simpson and Soofi?
19  A.   Yes.
20  Q.   In terms of adults, like on a more regular daily basis,        10:38:28
21  who would that be?
22  A.   Their closest most intimate group I guess you would
23  describe them as would have been Elton Simpson, Nadir Soofi,
24  Mr. Wahid, and Abdul Malik Abdul Kareem.  And there was another
25  individual that was close to others was Saabir Nurse but he         10:38:48

STEWART WHITSON - Direct

1   wasn't as close to that inner group.                          10:38:53

2   Q.   Do any of the associates, those close associates, look

3   like Abdul Khabir Wahid?

4   A.   No.

5   Q.   Just for the purposes of the record, are you familiar with  10:39:15

6   what a 2703(d) order is?

7   A.   Yes.

8   Q.   What is it?

9   A.   So it's something a little less than a search warrant but

10  essentially it's seeking content related to communications      10:39:23

11  devices.   It has a lower standard than a search warrant which

12  requires probable cause.   I'm just requires reasonable

13  suspicion but gives you a little less than what a search

14  warrant would give you.

15  Q.   Based upon your knowledge of this investigation and the    10:39:42

16  prosecutions that have come from it, what role did Ali Soofi

17  serve in the investigation?

18  A.   Ali Soofi served a critical role as witness in the

19  investigation.

20  Q.   Did he provide valuable information?                       10:39:56

21  A.   Yes.

22  Q.   In fact, did he provide valuable information in the

23  investigation of Abdul Malik Abdul Kareem?

24  A.   Yes.

25  Q.   Are you familiar with Abdul Malik Abdul Kareem being       10:40:11

United States District Court

STEWART WHITSON - Direct

| | | |
|---|---|---|
| 1 | indicted in this courthouse back in 2015? | 10:40:12 |
| 2 | A.   Yes. | |
| 3 | Q.   In CR -- case number CR 15-00707? | |
| 4 | A.   That sounds right. | |
| 5 | Q.   Was that a case in front of Judge Bolton? | 10:40:24 |
| 6 | A.   Yes. | |
| 7 | Q.   And what was he charged with? | |
| 8 | A.   On June 10 he was initially charged with illegal | |
| 9 | transportation of firearms and I believe under 18 USC 92 and | |
| 10 | then ultimately there was a superseding indictment where he was | 10:40:37 |
| 11 | charged with additional charges including material support to | |
| 12 | terrorism under 18 USC 2339(b) as well as felon in possession | |
| 13 | of a firearm.  And then I believe the two charges of 924 were | |
| 14 | already there and then also false statement under 1001. | |
| 15 | Q.   The factual basis of that indictment, did it span from -- | 10:41:00 |
| 16 | well, tell us.  What conduct did it come from? | |
| 17 | A.   The factual basis? | |
| 18 | Q.   Yes.  So what, in essence, was the indictment?  What | |
| 19 | conduct did it relate to? | |
| 20 | A.   It related to the conduct of the group essentially | 10:41:13 |
| 21 | conspiring together and planning to conduct attacks first in | |
| 22 | the Phoenix area and then later the Garland attack. | |
| 23 | Q.   And was that during the time period of 2014 and 2015? | |
| 24 | A.   Yes.  The current time would have been from June of 2014 | |
| 25 | through the attack that occurred on May 3, 2015. | 10:41:33 |

STEWART WHITSON - Direct

1   Q.  As the lead case agent, did you sit through the trial in   10:41:35

2   that case?

3   A.  Yes, I did.

4   Q.  And are you familiar with one of the subjects at trial

5   being Abdul Malik Abdul Kareem's conduct and activities that   10:41:41

6   occurred inside Soofi's 19th Avenue apartment?

7   A.  Yes.

8   Q.  As it is specifically related to actions inside the

9   apartment, which witness testified specifically about that

10   conduct?   10:41:58

11   A.  Ali Soofi.

12   Q.  Was he the only witness that testified about Abdul Malik

13   Abdul Kareem's conduct and actions inside Simpson's and Soofi's

14   apartment on 19th Avenue?

15   A.  Yes.   10:42:12

16   Q.  Are you familiar with a search warrant that was issued on

17   that apartment, the 19th Avenue apartment, on the evening of

18   May 3 of 2015 and into the early morning hours of May 4 of

19   2015?

20   A.  Yes.   10:42:50

21   Q.  As part of the execution of that search warrant, did

22   agents locate a small notebook?

23   A.  Yes.

24   Q.  And inside that small notebook -- I'm placing on the

25   overhead exhibit that was already admitted, Exhibit Number 45,   10:42:58

STEWART WHITSON - Direct

1   page two, Major Gena M. Feroduk's name?                        10:43:03

2           THE COURT:  Excuse me.  Ms. Brook, I don't have 45 in

3   evidence.

4           MS. BROOK:  You do not?  The Government would move to

5   admit Exhibit Number 45.                                       10:43:29

6           May I approach and grab 44?

7           THE COURT:  44 is in.

8           MS. BROOK:  44 is in.

9           THE COURT:  So 45 has been moved.

10          Mr. Wahid, is there any objection?                     10:43:44

11          MR. WAHID:  No.

12          THE COURT:  45 is in evidence now.

13          (Exhibit Number 45 was admitted into evidence.)

14  BY MS. BROOK:

15  Q.   And for clarification of the record, we had talked about  10:43:53

16  the small blue notebook and you had mentioned you recognized

17  these pages from the small, blue notebook.  Is that true?

18  A.   I do recognize these pages from the small, blue notebook

19  discovered in Simpson's and Soofi's apartment.

20  Q.   I'm placing on the overhead Exhibit Number 44 which is    10:44:09

21  already admitted.  Is that the notebook we're talking about?

22  A.   Yes, it is.

23  Q.   Do you recall where it was found?

24  A.   Yes.  It was found in the common area, the living room,

25  next to the couch.  There's an L-shaped couch that faced the   10:44:29

STEWART WHITSON - Direct

| | | |
|---|---|---|
| 1 | only TV in that room and it was found next to that couch on the | 10:44:32 |
| 2 | floor. | |
| 3 | Q.   What value, if any, did that name have in the course of | |
| 4 | this investigation? | |
| 5 | A.   It had a lot of value. | 10:44:40 |
| 6 | Q.   How so? | |
| 7 | A.   That name was a name that was included on a kill list that | |
| 8 | was published by the Islamic State Hacking Division back on | |
| 9 | March 20 of 2015, also known as the ISHD.  ISIS had essentially | |
| 10 | published a list of 100 U.S. service members along with their | 10:44:59 |
| 11 | addresses and provided that list to U.S.-based supporters as | |
| 12 | essentially a target list for U.S.-based supporters who were | |
| 13 | unable to travel to the Islamic State or perform hijrah. | |
| 14 |          On that list of 100 was this -- this was the only | |
| 15 | name of a person who resided in Arizona that was on that list | 10:45:15 |
| 16 | of 100, and it was Major Gena Fedoruk who resided at the | |
| 17 | address that you can see on that page in Phoenix, Arizona. | |
| 18 | Q.   That's exactly what I was going to ask.  I'm going to | |
| 19 | place on the overhead already admitted Exhibit Number 21.  When | |
| 20 | you spoke about the Islamic State Hacking Division's list of | 10:45:35 |
| 21 | 100, the kill list, is this what you were referring to? | |
| 22 | A.   Yes. | |
| 23 | Q.   Do you know approximately when this list was released? | |
| 24 | A.   Yes.  It was on March 20 of 2015. | |
| 25 | Q.   Based upon your training and experience in the aftermath | 10:46:20 |

United States District Court

STEWART WHITSON - Direct

| | | |
|---|---|---|
| 1 | of a terrorist attack, what sort of material, as an FBI agent, | 10:46:24 |
| 2 | are you looking to collect? | |
| 3 | A.   Well, you're looking for evidence, first of all, to see if | |
| 4 | there's a follow-on attack.  So safety is first and foremost so | |
| 5 | you're worried about a follow-on attack, so you're looking for | 10:46:39 |
| 6 | evidence to see if there is any such follow-on attack that is | |
| 7 | about to take place and you want to try to disrupt that. | |
| 8 | The other thing you're looking to do is to understand | |
| 9 | why that attack took place and to gather evidence that might | |
| 10 | bring to justice those involved in the attack that had already | 10:46:51 |
| 11 | occurred and so, obviously, a motive is part of that as well as | |
| 12 | physical evidence that might implicate people. | |
| 13 | Q.   Is time of the essence in collecting that information? | |
| 14 | A.   Absolutely. | |
| 15 | Q.   How so? | 10:47:06 |
| 16 | A.   Well, every bit of time that is allowed to pass could lead | |
| 17 | to the loss of evidence, evidence could be destroyed or simply | |
| 18 | misplaced or lost by individuals involved.  People's memory | |
| 19 | fades over time.  Your ability to go out and conduct interviews | |
| 20 | of individuals that might be yet unknown co-conspirators.  With | 10:47:28 |
| 21 | the passage of time they are able to get with each other and | |
| 22 | establish common stories and things like that.  So time is | |
| 23 | definitely of the essence in this or any kind of investigation. | |
| 24 | Q.   Are you looking for farewell messages? | |
| 25 | A.   Absolutely. | 10:47:46 |

United States District Court

STEWART WHITSON - Direct

1   Q.   In what sense?                                          10:47:48

2   A.   Well, so it's common for individuals engaging in terrorist

3   attacks where they give their lives or martyr themselves to

4   leave farewell messages and things like that.  And a lot of

5   times those messages will explain that very thing we're looking   10:48:01

6   for, their motive.  And sometimes it can implicate others,

7   whether they mean for that to happen or not.  So, obviously,

8   that's one thing we're searching for.

9   Q.   Somewhat obvious question, but are those types of messages

10  things that can be easily destroyed?                        10:48:16

11  A.   Absolutely.

12  Q.   Are you looking for evidence of financial transfers?

13  A.   Yes.

14  Q.   How so?  I guess a better question, what sort of

15  information would those provide you?                        10:48:30

16  A.   Obviously, in order to conduct an attack, it generally

17  costs money so it costs money for weapons or ammunition or

18  things like that.  And so conducting a financial investigation

19  allows to us determine where people got money from to use in

20  support of the attack and what they spent that money on.  It's   10:48:47

21  just one of the many pieces that we can pull together to try to

22  get a clear picture of what happened, who all was involved and

23  kind of establish a timeline of the events leading up to the

24  attack and after the attack but it's obviously a critical

25  component.                                                  10:49:04

United States District Court

STEWART WHITSON - Direct

1   Q.   Throughout the course of this particular investigation,          10:49:05

2   did you come to learn at some point that Elton Simpson had

3   provided Abdul Khabir Wahid an envelope less than 48 hours

4   before the attack?

5   A.   Yes.                                                             10:49:22

6   Q.   And did you also come to learn that Elton Simpson had

7   provided a set of keys to Mr. Wahid less than 48 hours before

8   the attack?

9   A.   Yes.  A key.

10  Q.   How was it you came to learn that?                               10:49:34

11  A.   Well, the first time I think it became clear that an

12  envelope and a key had been given to Mr. Wahid by Elton Simpson

13  was when Mr. Wahid himself told us that on June 10 of 2015.  So

14  the same day that Abdul Malik Abdul Kareem was arrested Abdul

15  Wahid was interviewed and he told them, after being interviewed  10:50:00

16  earlier, he then told them that there was an envelope and he

17  revealed that the envelope had a title in it.  And then some

18  months later we then interviewed -- once we heard that it had

19  the title to his car, we interviewed Elton Simpson's father,

20  Dunston Simpson and learned that he had received the title of   10:50:21

21  Simpson's car from Saabir Nurse which is who the person that

22  Wahid said he had given the envelope to with the title to.  I

23  guess at that moment on 11-30, then it kind of became clear

24  that that had indeed happened.

25  Q.   So back on May 6 of 2015, would having known that Elton     10:50:38

United States District Court

STEWART WHITSON - Direct

1    Simpson had given the defendant, Mr. Wahid, an envelope been of          10:50:44
2    consequence to you in your investigation?
3    A.    Yes.
4    Q.    What would you have done?
5    A.    We would have immediately sought to obtain that envelope          10:50:55
6    for its evidentiary purposes.  So quickly we would have
7    determined where was it?  Try to seek a search warrant using
8    the evidence.  So had he told us that, we would take that
9    statement, include it in a warrant and ask permission of a
10   judge to go search whatever we thought that might be with the           10:51:12
11   aim of looking at the content and seeing if that would develop
12   other leads, or clues if you will, that would lead us down
13   other paths and in furtherance of the investigation.
14   Q.    Without having that information on May 6 of 2015, were you
15   able to obtain a search warrant or attempt to obtain a search           10:51:32
16   warrant of Nurse's house?
17   A.    We were not able to secure a warrant of Nurse's house.
18   Q.    Were you able to seek to obtain or -- let me put it a
19   better way.  Were you able to successfully obtain a
20   2703(d) order on Nurse?                                                  10:51:46
21   A.    We were not able to successfully obtain one.
22   Q.    Would that information have been placed inside a document
23   in an attempt to get it?
24   A.    Yes.  We would have used that information to try to seek a
25   2703(d) certainly against Nurse.                                        10:51:59

United States District Court

STEWART WHITSON - Direct

1    Q.   If at that time there was a suspected financial transfer          10:52:06

2    between Simpson's and Nurse, would that have been important to

3    your investigation?

4    A.   Yes.

5    Q.   And what would you have done?                                      10:52:13

6    A.   Well, we would have immediately focused in on Nurse's

7    finances obviously to see if we could find evidence of that

8    exchange.  In our questioning of Nurse and other related

9    individuals we would have asked pointed questions about that to

10   get to the bottom of that, how much was the amount?  When did      10:52:28

11   the exchange take place?  What was the purported reason for the

12   exchange?  Numerous investigative actions would have taken

13   place.  Obviously resources, massive resources that were

14   allocated to many different subjects and target would have been

15   shifted and focused toward Nurse immediately.                         10:52:46

16   Q.   So you say that resources would have been shifted and

17   focused to Nurse at that point based upon this information, the

18   knowledge that Simpson that given Wahid the envelope and keys

19   with directions to give them to Nurse after the attack.  Why is

20   that?  Why would your resources have been shifted to Nurse?       10:53:03

21   A.   Because it was so important.  The envelope, this was the

22   last package or envelope that he had given to anyone.  There's

23   nowhere in our investigation had we found any evidence that he

24   had given anything like this to anyone else other than Mr.

25   Wahid.                                                                 10:53:23

United States District Court

STEWART WHITSON - Direct

1    Q.    "He" being Simpson?

2    A.    Elton Simpson.  So, obviously, this is, in a sense, his

3    final act before departing on an attack where he's going to

4    die.  This is a critical piece of evidence that would have been

5    of the utmost importance.

6    Q.    Through the course of this investigation, was the FBI able

7    to recover the envelope?

8    A.    We were not.

9    Q.    Is the FBI able to know for certain exactly what was in

10   the envelope?

11   A.    We do not know for certain.

12   Q.    Are you familiar with an indented letter that was

13   recovered and forensically analyzed by an individual by the

14   name of Antoine Frazier?

15   A.    Yes.

16   Q.    And through the course of this of the case, did you

17   receive the results of that forensic analysis from him?

18   A.    Yes.

19   Q.    Actually, let's use the exhibit.  The PDF is a little

20   easier.  It's Exhibit 49.

21         MR. KOEHLER:  There's 48 and 49.  You want 49.

22   BY MS. BROOK:

23   Q.    We're looking a the 48 and then going to 49.  Do you

24   recognize this?

25   A.    Yes.

United States District Court

10:53:23

10:53:37

10:53:48

10:54:09

10:54:23

10:54:44

STEWART WHITSON - Direct

1    Q.   And what is it?                                              10:54:45

2    A.   This is the indented letter.  This is one of the copies.

3    And, ma'am, could I ask you, could you go back to 48 real

4    quick?

5             Yes.  So this is the same letter.  It's two different   10:54:56

6    copies.  What Mr. Frazier had provided is one where the writing

7    is in black with a background white and another, which is the

8    other exhibit, the writing is in white but the background

9    black, with the idea being by comparing the two, you can get a

10   better idea of what the message is.  But it's essentially the    10:55:17

11   same letter in two different formats.

12   Q.   You said be able to look at it and get an idea of what the

13   message is.  Through the course of your investigation, did you

14   do just that?

15   A.   Yes.                                                        10:55:28

16   Q.   And when was it that you obtained this information back

17   from the FBI forensic examination lab?

18   A.   So I received this on or about October 20 of 2015.

19   Q.   What were you able to do with this document?

20   A.   Well, so the first step was to look at it and essentially   10:55:47

21   come up with my assessment of what's written there and then

22   once I had that information, to then launch into a myriad of

23   investigative leads based off of it.

24   Q.   Were you able to do just that?

25   A.   Yes.                                                        10:56:01

United States District Court

STEWART WHITSON - Direct

1   Q.   Can you read for us what you were able to produce from          10:56:02

2   this document?

3   A.   Yes.  May I see a copy of my --

4   Q.   Did you write a 302 on it?

5   A.   Yes, I did.                                                      10:56:12

6   Q.   And was that Exhibit --

7            MS. BROOK:  Your Honor, can I just give him the

8   physical?

9            THE COURT:  You may.

10           THE WITNESS:  Thank you.                                     10:56:42

11  BY MS. BROOK:

12  Q.   So starting here were it says "bismillah," can you read

13  for us which you were able to deduce from looking at the

14  indented letter?

15  A.   Yes.  It reads:  Bismillah.  Dear akhi.  Fil Lah.  Subhan        10:56:51

16  Allah.  There was a change in plans indeed.  Something dreadful

17  came up.  The money that I had from you was being used for what

18  was needed for the initial plan but that changed.  This money

19  is what was left over.  And then that word I can't tell so I've

20  written "unintelligible."                                            10:57:17

21           I will leave you with the title of my car to do as

22  you please with it.  I believe Abdul Malik knows how to get

23  notarized.  I was also going to give you my tax return but it

24  won't be here in time.  Please forgive me if you do not get all

25  the money back.                                                      10:57:34

United States District Court

STEWART WHITSON - Direct

1      Always fear Allah and keep me in your du'a insha          10:57:35

2  Allah.  You have benefited me greatly.  Allah grant you Jannah.

3  Forgive me for my shortings and may Allah unite us in Jannah.

4  Signed Ibrahim.

5  Q.   Based upon the results of your investigation, were you    10:57:54

6  able to determine who this letter was intended for?

7  A.   We were able to assess who the letter was intended for but

8  not ultimately to determine with certainty.

9  Q.   And that's a good word choice.  Were you able to assess

10  who you suspect this letter was intended for?                 10:58:13

11  A.   Yes.

12  Q.   And who was that?

13  A.   Saabir Nurse.

14  Q.   And I just want to go back for a second to the letter

15  itself.  So how was it you were able to actually read it and  10:58:25

16  pull words from the page off of it?

17  A.   So, again, essentially had to look at two separate copies

18  that are in the different formats.  You piece together part of

19  a word from one and then you could flip over to the other to

20  get the rest of the word and so I did that exercise.  I had an 10:58:44

21  analyst also do that exercise with me and we arrived at the

22  same language and then we -- where we found parts were where we

23  simply could not determine what was there I wrote

24  "unintelligible" or with the acronym UI inside my 302.

25  Q.   And approximately when, timewise, was it that you were    10:59:06

United States District Court

STEWART WHITSON - Direct

1    able to do exactly that process with this indented letter?                10:59:08

2    A.   I serialized this 302 the day after I received this and so

3    I don't recall the precise time but it would have been in less

4    than 24 hours from receiving the CD from Antoine Frazier, the

5    302 was serialized into FBI database.                                     10:59:29

6    Q.   We've talked a fair bit about the letter itself and the

7    envelope.  Was there investigative value that would have come

8    from knowing that Simpson provided a key to Wahid to give to

9    Nurse on May 6 of 2015?

10   A.   Yes.                                                                 10:59:52

11   Q.   And what value would that have been?

12   A.   For the key?

13   Q.   For your investigation.

14   A.   For our investigation, obviously, the first question would

15   be, what is that key to?  Sometimes in terrorism investigations          11:00:01

16   it's a key to a storage facility or something like that that

17   leads to other evidence.

18       Again, backing up, we're worried about follow-on

19   attacks.  So, obviously, knowing there's a key, we would be

20   searching what is it a key to?  If it's a key to a vehicle,            11:00:17

21   that's important, too, because we know that a lot of times

22   people will mask the transfer of funds between folks by using

23   valuable commodities to trade.  And vehicles are a perfect one

24   for them to do that with and so they will provide a vehicle to

25   someone else as a way that they think is masking a contribution          11:00:37

United States District Court

363

STEWART WHITSON - Direct

1    to someone else, so that would be important.                          11:00:40

2              But, again, all that financial analysis we talked

3    about before, all of that would be taking place right away

4    related to this to try to get to the bottom of it.

5    Q.    I think you answered this but in this investigation in May    11:01:12

6    and during the month of May, were you able to do any of that

7    follow-up that you said would have been necessary and you would

8    have wanted to do as it relates to Simpson's vehicle?

9    A.    No.

10   Q.    Were you ever able to find out how much money accompanied    11:01:54

11   that letter?

12   A.    I'm sorry.  Could you say that again?

13   Q.    Yes.  Were you ever able to ascertain how much money

14   accompanied that letter?

15   A.    No.                                                            11:02:06

16   Q.    And a more obvious question, were you ever able to

17   actually find the letter?

18   A.    No.

19   Q.    When we talk about the indented letter, we spoke yesterday

20   about the indented letter process, based on your knowledge, how   11:02:15

21   did that indented letter come to be?

22   A.    So essentially that little blue notebook we spoke about

23   earlier, next to that a large spiral notebook was discovered.

24   That spiral notebook had a blank page in it.  We sent that

25   entire spiral notebook to the FBI lab for processing.  And in     11:02:33

United States District Court

STEWART WHITSON - Direct

```
 1   one of the processes they did to that was called an                    11:02:39
 2   ElectroStatic Detection Apparatus Test upon the pages are just
 3   white.  And in conducting that test, they were able to see
 4   indents that are left on the page from a page that was on top
 5   of that page as the author wrote their letter.                          11:02:52
 6           So, essentially, someone wrote that letter presumably
 7   in that notebook, ripped the page out leaving the indent behind
 8   on the notebook which we were able to capture at the FBI lab.
 9   Q.   Changing subjects, have you had the opportunity to review
10   and to read Government's Exhibit 109 through 117?                       11:03:13
11   A.   Yes.
12   Q.   And what do they represent?
13   A.   If I'm remembering which part, it's the trial testimony of
14   Mr. Wahid in the previous trial about Abdul Malik Abdul Kareem.
15   Q.   So we had spoken a moment ago about the trial in CR               11:03:42
16   15-00707.  Being the case agent, you obviously were sitting at
17   counsel table during the presentation of evidence in that case.
18           Did Mr. Wahid testify?
19   A.   Yes.
20   Q.   And do you see Abdul Khabir Wahid here with us in the            11:04:00
21   courtroom?
22   A.   Yes.
23   Q.   Can you point to him and identify something that he's
24   wearing?
25   A.   Yes.  He's the gentleman seated at the table to my right.       11:04:08
```

United States District Court

STEWART WHITSON - Direct

1     He's wearing a maroon-colored shirt.                    11:04:11

2     Q.   Okay.

3            MS. BROOK:   Your Honor, may the record reflect that

4     the agent has identified the defendant?

5            THE COURT:   Yes.                                 11:04:18

6     BY MS. BROOK:

7     Q.   Have you had a chance to thoroughly review these excerpts

8     from Government's Exhibit 109 through 117?

9     A.   Yes.

10    Q.   Do they fairly and accurately represent portions of the   11:04:26

11    defendant's testimony when he was called in the defense case to

12    testify in that trial?

13    A.   Yes.

14           MS. BROOK:   Your Honor, the Government is going to

15    move to admit Government's Exhibit 109 through 117.      11:04:38

16           THE COURT:   Okay.

17           Any objection, Mr. Wahid?

18           MR. WAHID:   No.

19           THE COURT:   All right.   109 through 117 collectively

20    are admitted.                                            11:04:56

21           (Exhibit Numbers 109 through 117 were admitted into

22    evidence.)

23    BY MS. BROOK:

24    Q.   That testimony occurred on March 8 of 2016?

25    A.   Yes.                                                11:05:02

United States District Court

STEWART WHITSON - Direct

1        MS. BROOK:  Your Honor, may I approach the witness?          11:05:16

2        THE WITNESS:  Yes.

3  BY MS. BROOK:

4  Q.   I want to start by turning our attention to Exhibit

5  Number 112 and it may be easier -- I'm going to use this so I    11:05:53

6  have it closer to me but why don't we go ahead and read -- I'll

7  read the question and you read the answer that the defendant

8  was provided.  We'll switch to the document camera so that the

9  other copy is actually coming from the computer and then you

10 can read 112 that you have physically in front of you if it's    11:06:19

11 easier to do so.

12        COURTROOM DEPUTY:  Okay.  What method are you going

13 to use?

14        MS. BROOK:  I'm sorry.  I said the Elmo but we're

15 actually going to switch and transfer and use the computer.      11:06:28

16 Thank you.

17 Q.   So starting off question for Mr. Wahid:

18        Okay.  Did you see either Elton Simpson or Nadir

19 Soofi that evening of May 1?

20 A.   I can't remember.  I think I may have.  I think I may       11:06:42

21 have, yeah.

22 Q.   Did they stop by your house?

23 A.   Yeah.  They stopped by my house.

24 Q.   And what if anything, did they give you?

25 A.   Okay.  Nadir came to me.  I was kind of surprised because   11:06:53

United States District Court

STEWART WHITSON - Direct

| 1 | I think it was more like kids answered the door and they came | 11:06:57 |

1   I think it was more like kids answered the door and they came

2   to me and they said Ibrahim and Nadir is here.  And I was like

3   Nadir?  Because Nadir never comes to my house.  So I thought it

4   was kind of strange that he came with him.

5   Q.   What time was it approximately, if you remember?          11:07:15

6   A.   I want to say probably about maybe eight or 9 o'clock he

7   came to my house.

8   Q.   Okay.

9   A.   He came to my house.  Nadir gave me a bowl of soup.

10          He said:  Are you hungry?                               11:07:30

11          And I said:  Yeah, why?

12          He said:  I got a bowl of soup here for you fresh off

13   the stove.

14          He had just made it.

15          And I said:  Okay, thanks.  I don't have to cook        11:07:46

16   tonight.

17          So I laughed and I took the bowl from him and Ibrahim

18   turned around said:  I need you to give this to Saabir for me.

19          And at the time, I didn't know what it was, but he

20   gave me an envelope and then he gave me a key.  And I didn't    11:07:59

21   look at the key, because if I had looked at the key, I would

22   have realized that it was actually his car key.  But I didn't

23   pay nothing.  I just grabbed it and said okay.

24          He said:  Give it to him by Wednesday.

25          And I said:  Okay.  Fine, and that was that.            11:08:18

STEWART WHITSON - Direct

 1          He then he said to me about my daughter needing, I

 2   believe, a female role model in my house, you know, as far as a

 3   Muslim is concerned.  And he said my son is a good Muslim.  And

 4   he stood there for like -- after there was like silence.  Him

 5   and Nadir just stood there like for five minutes, like -- it

 6   was almost like they wanted to say something to me but they

 7   didn't say nothing.  And they turned around and they left and

 8   that was the last time I ever saw them.

 9          MS. BROOK:  Turning now to Exhibit 114, if we can

10   place that on the overhead.  And it's 114.

11          MR. KOEHLER:  That's 114.

12          MS. BROOK:  Hang on one second.  Go to 113 then.

13   They are all admitted, Your Honor, but for some reason --

14          THE COURT:  113 and 114 are reversed.

15          MS. BROOK:  Yes.  So this is going to be 113.

16   BY MS. BROOK:

17   Q.   Do you have that?

18   A.   Yes, ma'am.

19   Q.   Let's do the same presentation where I read the question.

20          Okay.  At some point you now have this envelope and a

21   key that Elton Simpson has given you the last you've seen him?

22   A.   Right.

23   Q.   All right.  Who do you give that envelope to?

24   A.   I gave it to Saabir.

25   Q.   Saabir who?

11:08:22

11:08:40

11:09:02

11:09:51

11:10:01

11:10:15

STEWART WHITSON - Direct

1  A.   Saabir Nurse.

2  Q.   And how do you know Saabir Nurse?

3  A.   From the masjid.  You know I've known him for a few years.

4  Q.   Do you know whether or not he was friends with Elton

5  Simpson?

6  A.   He was friends with him.

7  Q.   Okay.  How do you know that?

8  A.   I don't know.  Maybe because we all had sat down and ate

9  before and laughed and talked and, you know, they used to work

10  together at the same job.

11  Q.   Where do you understand that Elton Simpson and Saabir

12  Nurse worked together?

13  A.   What do you call -- a dental practice.

14  Q.   What did you do with the car key -- or the key that you

15  had?

16  A.   I gave it to Saabir like he asked me to.

17  Q.   Did you ever learn what was in the envelope that you gave

18  to Saabir Nurse?

19  A.   Saabir called me on the phone and he told me:  You know

20  what was in that envelope?

21          I said:  What?

22          He said, you know:  It was his title to his car.

23  Q.   I want to turn next to what we hope is 115.  Starting on

24  the bottom of that page:

25          Question:  On that Friday, so the Friday before the

United States District Court

STEWART WHITSON - Direct

```
1   attack, Ibrahim texted you two times that day, correct?      11:11:38
2   A.   I believe so.
3   Q.   And you, after Ibrahim was killed, deleted those text
4   messages, correct?
5   A.   Right.                                                    11:11:53
6   Q.   In fact, you went through and deleted your entire contact
7   history with Ibrahim after you found out he was killed,
8   correct?
9   A.   Right.  Right.
10  Q.   Okay.  Do you want to read that answer again, just so it's  11:12:02
11  clear?
12  A.   Right.  Right.
13  Q.   Question:  Okay.  So you would agree with me that it was
14  on May 6th -- I'm sorry -- yes, on May 6th of 2015 that you sat
15  down and talked to the FBI for the first time?                  11:12:18
16  A.   Yeah.
17  Q.   And on that day you told the FBI that immediately after
18  you learned Ibrahim was killed, you deleted your entire contact
19  history and all of your text messages with him, correct?
20  A.   Uh-huh, yes.                                               11:12:31
21  Q.   Back in May, so on May 3rd of 2015, was your phone number,
22  in fact, 480-432-1637?
23  A.   Yeah.
24  Q.   Turning now to 116.  Question:  You had told Malik that
25  you would call Ali Soofi and tell him not to talk to the FBI,   11:13:06
```

United States District Court

STEWART WHITSON - Direct

1   correct?                                                                           11:13:10

2   A.   I may have.  I don't know.  I don't remember.

3   Q.   It sounds like something you would have said to Malik?

4   A.   Probably.

5   Q.   And in fact, you did call and tell Ali Soofi to not talk      11:13:19

6   to the FBI?

7   A.   Right.

8   Q.   And as you testified here earlier on direct, you knew that

9   Ali Soofi himself had nothing to hide from the FBI, correct?

10  A.   Yeah.                                                          11:13:31

11  Q.   But yet you still called and told him not to talk to the

12  FBI, correct?  Just "yes" or" no."

13  A.   I can't answer that "yes" or "no".

14  Q.   You did, in fact, though, call him to tell him not to talk

15  to the FBI?                                                         11:13:53

16  A.   I guess I'd say no.

17  Q.   Say that again?

18  A.   I said I'd say no.  I did tell him don't talk to the FBI.

19  Q.   Okay.  Because you did tell Ali Soofi not to talk to the

20  FBI?                                                                11:14:06

21  A.   Right.  But not because he didn't have anything to hide,

22  because he didn't have anything to hide.

23  Q.   Just answer the question.  You called and told him not to

24  talk to the FBI?

25  A.   Right.  Yeah.                                                  11:14:22

United States District Court

STEWART WHITSON - Direct

1  Q.   And 117.

2        Defense counsel asked you about some videos that

3  Ibrahim showed you, in particular, one with a man who was

4  burned alive in a cage?

5  A.   Yeah.                                                       11:14:57

6  Q.   And what did Ibrahim show that video to you on?

7  A.   His phone.

8  Q.   And where were you when Ibrahim showed you that video?

9  A.   In my house.

10 Q.   And was Nurse there?                                        11:15:07

11 A.   No.

12 Q.   Was Malik there?

13 A.   Nope.

14 Q.   You mentioned another video that Ibrahim showed you, one

15 where a man was being beheaded.                                  11:15:15

16 A.   Right.

17 Q.   Is that "yes"?

18 A.   Yes.

19 Q.   And did he show you that video -- sorry.

20      What did he show you that video on?                         11:15:25

21 A.   His phone.

22 Q.   And where were you when he showed you the video of the man

23 being beheaded on his phone?

24 A.   In my house.

25 Q.   And was Nurse there?                                        11:15:40

United States District Court

STEWART WHITSON - Direct

1   A.   No.

2   Q.   Was Malik there?

3   A.   Nope.

4   Q.   You mentioned a third video as well that Ibrahim showed

5   you.  What did he show you on that video -- what did he show

6   you that video on?

7   A.   That video was the one where the guy was being thrown from

8   a building.

9   Q.   What did he show you that on?

10  A.   Oh.  On his phone.

11  Q.   His phone as well?

12  A.   Uh-huh.

13  Q.   And, again, where were you when he showed that you video

14  on his phone?

15  A.   In my house.

16  Q.   Who was there?

17  A.   My kids were there, but they weren't in the room with us.

18  Q.   Anybody else?

19  A.   Nope.

20  Q.   Did he show you these three videos all on the same day or

21  different days?

22  A.   Different days.

23  Q.   You testified earlier that in the months before the attack

24  Ibrahim had told you about his plan to attack a U.S. Marine

25  base?

United States District Court

11:15:41

11:15:45

11:15:56

11:16:04

11:16:12

11:16:30

STEWART WHITSON - Direct

1   A.   Uh-huh.                                                              11:16:30

2   Q.   Is that a "yes"?

3   A.   Yes.  Sorry.

4   Q.   Malik also told you about Simpson's plan to attack a

5   Marine base?                                                             11:16:36

6   A.   I think so.  I'm not sure.  I think he did.

7   Q.   Yes?

8   A.   Yes.

9   Q.   And, in fact, Malik told you that Simpson and Soofi

10  together were going to attack a Marine base; is that true?              11:16:45

11  A.   I believe so, yeah.

12  Q.   And Malik went on to tell you that Simpson and Soofi must

13  want to die.

14  A.   I'm not sure.  I think so, but I'm not sure.

15  Q.   Does it sound like what you recall him saying?                      11:16:59

16  A.   I think so.

17  Q.   And in that conversation you didn't tell him that you had

18  heard from Ibrahim about that plan too?

19  A.   Say that again?

20  Q.   You didn't tell Malik that you had heard about that plan            11:17:15

21  from Ibrahim?

22  A.   I think I may have mentioned it to him.

23  Q.   Now, you didn't tell Malik about what Ibrahim told you

24  about the plan to attack the U.S. Marine base?

25  A.   As I said, I think we discussed it.  I'm almost sure we             11:17:31

STEWART WHITSON - Direct

1    may have talked about it, yeah.                                          11:17:34

2    Q.   Malik told you that Ibrahim and Nadir had this plan before

3    the Garland attack, correct?

4    A.   I believe so.

5    Q.   Is that a "yes"?                                                    11:17:45

6    A.   Yes.

7    Q.   On March 15 of 2017, did you interview the defendant?

8    A.   Yes.

9    Q.   During that interview -- was it recorded?

10   A.   Yes.                                                                11:18:10

11   Q.   During that interview, did the defendant admit to you that

12   he watched ISIS type videos at Simpson and Soofi's house one

13   time?

14   A.   Yes.

15   Q.   Did he also say that Ali was also present in the                    11:18:21

16   residence?

17   A.   Yes.

18          MS. BROOK:   May I have one moment, Your Honor?

19          THE COURT:   Yes.

20   BY MS. BROOK:                                                            11:19:23

21   Q.   Are you familiar, based upon your role in this

22   investigation as well as the investigation against Abdul Malik

23   Abdul Kareem, with the recorded calls that Ali Soofi made to

24   the defendant?

25   A.   Yes.                                                                11:19:39

United States District Court

STEWART WHITSON - Direct

1   Q.   Are you, in fact, familiar with one record call on June 6      11:19:39
2   of 2015?
3   A.   Yes.
4        MS. BROOK:  And, Your Honor, I'm going to read from a
5   clip.                                                               11:19:49
6        Your Honor, may we play once again a short portion of
7   the clip of already admitted Exhibit 118?
8        THE COURT:  It's in evidence.  You may.
9        (Exhibit 118 played.)
10  BY MS. BROOK:                                                       11:21:41
11  Q.   Who do you interpret Hassan to be?
12  A.   A close friend of Simpson and Saabir Nurse's known as
13  Abujihaad to the group whose last name was Hassan.
14  Q.   Who is Abujihaad?
15  A.   Abujihaad was an individual who was a former member of the    11:21:54
16  U.S. Navy who, back in or about 2008, was indicted on espionage
17  and terrorism related charges based upon the allegation that he
18  had provided information to al-Qaeda and he was sent to prison
19  and then subsequently maintained contact through writings,
20  letters, to Saabir Nurse and Simpson and then would              11:22:21
21  occasionally talk to them on the phone.
22  Q.   So based upon your investigation, at some point Hassan
23  lived here in Phoenix?
24  A.   Yes.
25  Q.   And based upon your investigation, Hassan had ties to        11:22:32

United States District Court

```
 1    Simpson and the defendant?                                11:22:35

 2    A.    Yes.

 3              MS. BROOK:  I don't have any other questions.

 4              THE COURT:  All right.

 5              Mr. Wahid, do you have any cross-examination?    11:22:49

 6              MR. WAHID:  No.

 7              THE COURT:  You do not?  All right.

 8              Then, Agent, you may step down.  You are excused.

 9    Thank you, sir.

10              THE WITNESS:  Thank you, Your Honor.            11:23:01

11              (Witness excused.)

12              THE COURT:  Does the Government have any further

13    witnesses?

14              MR. KOEHLER:  It does not, Your Honor.  If we may

15    have a moment to confer with the clerk that our exhibits that  11:23:09

16    we intend to admit are in.

17              THE COURT:  You may.

18              MR. MCBEE:  Your Honor, may we go to the restroom?

19              THE COURT:  As soon as the Government is finished

20    conferring with the clerk, I'm going to call the morning break.  11:24:01

21              MR. KOEHLER:  Your Honor, the Government rests.

22              THE COURT:  All right.  Thank you, Mr. Koehler.

23              THE WITNESS:  Mr. Wahid, I know that you intend, or

24    at least the last time we spoke, you intended to testify.  I'm

25    going to go ahead and call the morning break before we do that.  11:25:24
```

1    We'll come back and you may do that and/or call any other          11:25:27

2    witnesses that you plan on calling.

3            So let's take a 15-minute break.  We'll come back at

4    11:40 and resume with trial.  Thank you.

5            MR. WAHID:  I hope you feel better.                        11:25:40

6            THE COURT:  Thank you.

7            (Recess at 11:25; resumed at 11:41.)

8            THE COURT:  All right.  Thank you, everyone.  Please

9    be seated.

10           The Government having rested, we are ready to hear         11:42:17

11   from the defense now.

12           Mr. Wahid, you can call your first witness.

13           MR. WAHID:  Say it again?

14           THE COURT:  You can call your first witness.  And if

15   that's you, that's fine.                                          11:42:27

16           MR. WAHID:  Sorry.

17           THE COURT:  That's fine.

18           Mr. Wahid, if you would please step forward, the

19   courtroom deputy will swear you in.

20           COURTROOM DEPUTY:  Please state your name for the         11:44:41

21   record and spell your first and last name for me.

22           THE WITNESS:  Spell my first and last name?

23           My name is Abdul Khabir Wahid.  I spell my name

24   A-B-D-U-L, K-H-A-B-I-R, W-A-H-I-D.

25           (ABDUL KHABIR WAHID, a witness herein, was duly sworn     11:45:01

United States District Court

1    or affirmed.)                                                      11:45:01

2              THE WITNESS:  No, I affirm.

3              THE COURT:  All right.  Please step into the witness

4    box.

5              All right.  Sir, you may begin whenever you're ready.   11:45:26

6                          **DIRECT EXAMINATION**

7              THE WITNESS:  First I want -- first I want to address

8    the issue of tampering with a witness.  First and foremost and

9    most important, I want to say I believe a lot of what was

10   transcribed out of the recordings between I speaking to Ali       11:45:46

11   Soofi were taken completely out of context.  And, therefore,

12   deliberately made me look suspect.  That's why I decided to

13   take the stand, because the prosecution can only assume and

14   speculate what I was trying to say to Ali Soofi.  And the truth

15   is, only I would know what I was trying to say since I was the    11:46:08

16   one that spoke the words.

17             First I need to clarify something and get this out of

18   the way.  In the first recordings with Ali Soofi, I did state

19   that if -- when asked, he should tell the authorities that he

20   should say either there was no guns or he didn't see any guns    11:46:36

21   or videos, in my defense, I will say this.  I will say this:  I

22   mentioned that statement was made initially in our very first

23   conversation because I had only been in Ali Soofi's apartment

24   no more than two times.  And, therefore, naturally I forgot

25   that Ali Soofi may have been in Nadir's apartment when Nadir     11:47:09

ABDUL KHABIR WAHID - Direct

1  showed me a gun and Ibrahim started to play a video.  It wasn't    11:47:13

2  until Ali Soofi jarred my memory in the third recording that I

3  realized that Nadir showed me a gun.  Therefore, it was

4  important to understand I was not trying to mislead Ali Soofi

5  by mentioning that he told the authorities that he didn't see    11:47:28

6  any guns or videos.  I just simply forgot.

7          Please also remember I was only at Nadir's apartment

8  twice and each time not very long.  The first time for no more

9  than about -- the first time for no more than about an hour and

10 the second time I was there no more than a half-hour.  After    11:47:46

11 that I never returned.

12         Now that I've gotten through -- now that I have

13 gotten through part of the initial conversation, I will go on

14 and explain my language as to what I meant when I was talking

15 to Ali Soofi.  Ali Soofi called me up one day in about    11:48:00

16 midafternoon sounding frantic and said that the FBI wanted him

17 to come in and testify and he sounded worried.  Naturally, my

18 first response was to try and help him and offer assistance.  I

19 believed in my mind I was giving Ali Soofi advice on how to

20 protect himself from FBI harassment.  I also believe    11:48:22

21 erroneously that Ali Soofi not talk to the FBI would be

22 exercising his Fifth Amendment that is preserved by the U.S.

23 Constitution.

24         I also had no problem with Ali Soofi talking to the

25 FBI.  In fact, I even stated in the recorded conversation that    11:48:40

United States District Court

ABDUL KHABIR WAHID - Direct

1  I couldn't stop him from talking to the FBI and using -- I

2  couldn't stop -- oh.  I screwed up.

3          Basically, I couldn't stop him and this does not

4  imply that I was trying to stop him from talking to the FBI.

5  It meant the choice is yours and it is strictly up to you what

6  you decide to do.  The only thing I stated -- the only thing I

7  stated and was concerned about, and I constantly repeated this

8  to Ali Soofi, that should he decide to talk to the FBI, to pay

9  attention to what he was saying to the FBI and to make sure by

10  him involving someone by name that he does not get someone

11  hurt.

12          I will explain momentarily what I meant by "getting

13  someone hurt."  Most of my conversations with Ali Soofi were

14  spent with my constantly and repetitively telling Ali Soofi,

15  "Don't mention other names.  Don't mention other people's

16  names," meaning just generally mention anybody's name, that he

17  might get that person hurt, meaning by the FBI.  I also stated

18  to Ali Soofi that if he was going to mention people's names,

19  then make sure you're being truthful, meaning if are you going

20  to mention a person's name, then make sure are you going to

21  tell the truth about that person when you mention their name.

22          I didn't mean what was I implying that by mentioning

23  people's names, that I was trying to hide something about that

24  person or conceal something.

25          What I meant by mentioning people's names is that it

United States District Court

ABDUL KHABIR WAHID - Direct

1   is best for him to be silent and not mention anyone's names          11:50:25
2   because by Ali mentioning names, he could be implicating
3   totally innocent person who has nothing to do with the
4   situation at all.   That's what I meant by "getting the person
5   hurt."   By implicating somebody by name who may be completely      11:50:40
6   innocent, he has now subjected that person to the scrutiny of
7   the FBI and gives the FBI the automatic right to treat this
8   person as suspect and now this person is being harassed by an
9   FBI investigation.

10          This is exactly how I was implicated in the FBI           11:50:57
11   investigation, because little did I know Ali Soofi had
12   mentioned my name to the FBI.   And, therefore, I became a part
13   of the investigation.   And here I sit in the courtroom today.
14   I am a prime example of what I mean by mentioning names in
15   general and getting them hurt.   Let me repeat that.   I'm a       11:51:12
16   prime example of what I meant by mentioning people's names in
17   general and getting them hurt.   I am hurt by the fact that I
18   was completely innocent, yet my name was given to the FBI and I
19   was treated suspect because over two years ago my home was
20   invaded by FBI agents with a search warrant, all because simply   11:51:30
21   because someone decided to give the FBI my name.

22          And also if Ali Soofi had not given the FBI an
23   innocent man's name, I most likely would not be sitting in this
24   courtroom fighting for my freedom.

25          Also, I was not trying to influence Ali Soofi to not      11:51:45

United States District Court

ABDUL KHABIR WAHID - Direct

1  say anything at all, nor was I trying to get him to testify in    11:51:55

2  a certain way.  That was never my intention.  All I was trying

3  to tell Ali Soofi, that if he was going to talk you, then be

4  truthful and leave innocent people's names out of the

5  conversation with the FBI.  As I stated before, I had no idea    11:52:09

6  Ali Soofi had implicated me by name in the FBI investigation

7  until about a year later when I went to get a copy of the

8  search warrant and read it.  That's when I realized he had

9  implicated me.

10      More important, I put the finishing pieces to the    11:52:25

11  puzzle together when I was called as a witness for the defense

12  by attorney Daniel Maynard in the Abdul Malik Abdul Kareem case

13  is when I learned from Mr. Maynard, who played these audio CDs

14  of recorded conversations of Ali Soofi and myself, is when I

15  learned that Ali Soofi had been working with the FBI all along    11:52:43

16  and had been recording all of my conversations.  It was also

17  said that I had been calling Ali Soofi on his cell phone and

18  harassing him as to why he told the FBI about our wrongdoings.

19  Wrongdoings may not assume conspiracy with Abdul Malik and

20  Nadir Soofi and Elton Simpson.    11:53:03

21      However, that is the furthest thing from the truth,

22  an absolute untruth.  I never once talked to Ali Soofi by

23  telephone since August of 2015.

24      After I found out that he had been recording me,

25  which was a year later, I did not talk to Ali Soofi by    11:53:19

United States District Court

ABDUL KHABIR WAHID - Direct

1   telephone.  For one, I had lost his number so I reached out to          11:53:21
2   him on Facebook.  I messaged him several times and I wanted to
3   know from him why did he do what he did by getting me involved
4   in something I clearly had nothing to do with?  And that I felt
5   I deserved an apology from him.  He saw my messages but he         11:53:36
6   never responded.  He even had his mother at one point talk to
7   me.  The last time I actually talked with Ali Soofi on
8   Facebook, I said something to him about him being cowardly
9   because he couldn't man up and stand up and apologize to me.
10  Those words actually made him angry because then he finally        11:53:54
11  messaged me and basically told me to shut up, that he knew
12  jujitsu.  And if I didn't shut my mouth, he would personally
13  come to Phoenix and do bodily harm, and then he blocked me from
14  sending him any more messages.

15          Also in my defense, there was no information              11:54:11
16  whatsoever in our phone conversation that I intended to hinder,
17  delay, or prevent communication to a law enforcement officer,
18  nor is there a possible commission of any federal offense, nor
19  was there any indication in our conversation that demonstrated
20  that a crime was going to take place.                              11:54:27

21          Like I said, before, what I stated to Ali Soofi was
22  taken out of context by the prosecution which -- let me repeat
23  that.  Like I said before I stated to Ali Soofi -- like I said
24  before, what I stated to Ali Soofi was taken out of context by
25  the prosecution, which made what I said to appear suspect.        11:54:48

ABDUL KHABIR WAHID - Direct

1        I never intended to hinder, delay, or prevent Ali                    11:54:52

2   Soofi from saying anything.  What I actually was trying to

3   convey -- what I actually was conveying to him was, it's better

4   for you not to say anything if you should say something about

5   anyone who was truly innocent.  And if you do say something      11:55:08

6   about anyone, just make sure that person really isn't -- let me

7   slow down.  I'm going to repeat that.

8        Ali Soofi from saying anything that was actually

9   conveyed to him was, it's better for you not to say anything.

10  If you should say something about anyone who is truly innocent   11:55:23

11  and if you do say something about anyone, just make sure that

12  person really isn't innocent.

13       And I did -- I didn't try to corrupt Ali Soofi.  Like

14  I just stated previously, I was conveying to him it's better

15  for you not to say anything.  If you should say something about  11:55:41

16  someone who was truly innocent, and if you do say something

17  about something -- about anyone, just make sure that person is

18  innocent -- isn't innocent.

19       Moving along with the false statement, it is true

20  that I did omit that what I was given by Elton Simpson, an       11:55:55

21  envelope and a key.  However, the material fact of the

22  admission that made the statement false was corrected by the

23  defendant before the false statement charge was even filed.

24  Even Kim Jensen testified and admitted the fact that I

25  corrected the statement.  Doesn't matter whether he asked me     11:56:13

ABDUL KHABIR WAHID - Direct

1   two or three times.  The fact still remains it was corrected.        11:56:15

2           Also in my defense, was never my intention to mislead

3   investigation as far as the false statement is concerned.  As

4   you heard in the exhibit recorded clip, I real didn't give it

5   much thought about importance considering it was just an         11:56:30

6   envelope and a key.  And when I found out what was in the

7   envelope, which was Elton Simpson's certificate of title to his

8   vehicle and the key was -- and the key was to his vehicle, I

9   still did not understand how a certificate of title to

10  someone's vehicle shed a lot of light on investigation as well   11:56:45

11  as a key to the vehicle.

12          However, when the FBI agent asked me if Elton Simpson

13  gave me anything, I was hesitant at first but then I did

14  volunteer and shared information about the envelope and the

15  key.  I shared this information with the FBI agent because I      11:57:00

16  assumed that Abdul Malik Abdul Kareem had already mentioned it

17  to the agent.

18          So when he asked me I told him because I felt that if

19  I did not tell them then I stood chance of being brought up on

20  lying to the FBI.                                                11:57:18

21          And my reasons for not volunteering this information

22  when I first decide to do talk to him was because I didn't want

23  to dash let me start all over.

24          In my reasons for not volunteering this information,

25  when I first decided to talk to him was because I didn't want    11:57:31

United States District Court

ABDUL KHABIR WAHID - Direct

1    the FBI to harass Saabir like they were harassing me.  I didn't    11:57:35
2    feel that he needed to be aggravated by the FBI.  That's all.
3    There was no secret scandal or conspiracy or unfinished terror
4    plot as the prosecution would like you to believe, Your Honor.

5            If that were the case, how come since I handed over    11:57:52
6    the key -- sorry.  If that were the case, how come since I
7    handed over the vehicle key and the title to the car to Saabir
8    Nurse no terror attacks have taken place?  Also, as Kim Jensen
9    testified, that since the envelope and the key were turned over
10   to Saabir Nurse, no one was injured or killed.  It has been    11:58:14
11   almost four years since I gave Saabir Nurse the key to Elton
12   Simpson's vehicle and the title to his vehicle.  I believe
13   naturally, as a result of me giving the key and the car and
14   title to Saabir Nurse, if something was going to happen, such
15   as more attacks, don't you think it would have happened by now,    11:58:31
16   Your Honor?

17           With that, Your Honor, I have finished testifying.
18   I'm done.

19           THE COURT:  All right.  Thank you, sir.

20           Ms. Brook, do you have any cross?    11:58:42

21           Mr. Wahid, she -- Ms. Brook gets the opportunity to
22   ask you a question.

23           MS. BROOK:  Thank you, Your Honor.  May I have just a
24   moment to grab a couple of things?

25           THE COURT:  You may.    11:58:53

ABDUL KHABIR WAHID - Cross

**CROSS - EXAMINATION**                                         11:58:53

BY MS. BROOK:

Q.   Good afternoon.

A.   Hello.

Q.   Back in May of 2015 at the time of the attack, you did not      11:59:58

own a car; correct?

A.   No, I don't think so.

Q.   You traveled around by bus?

A.   Yes.

Q.   Sometimes your friends would pick you up and take you to      12:00:15

locations if you needed to get there?

A.   Sometimes.

Q.   The night that Ibrahim was killed, your friend Malik

picked you up that night; right?

A.   I can't say if he really picked me up the night that      12:00:34

Ibrahim was killed because I wasn't sure whether Ibrahim was

dead or not.

Q.   So that night of the attack on May 3 when you suspected

that something had happened to Ibrahim, you met up with Malik;

right?                                                          12:00:50

A.   Well, he met up with me.  He came to my house.

Q.   So Malik came to your house.  Did you call him or did he

call you?

A.   No.  He didn't call me.  He just showed up because my

daughter, she answered the door.                               12:01:00

United States District Court

ABDUL KHABIR WAHID - Cross

1   Q.   And you got into his car with him?                    12:01:02

2   A.   Yes.

3   Q.   Just the two of you?

4   A.   No.  It was him and his nephew.

5   Q.   What was his nephew's name?                           12:01:10

6   A.   I can't remember his name right now.

7   Q.   The three of you drove over to Ibrahim's house on 19th

8   Avenue, that apartment?

9   A.   Correct.

10  Q.   And as you looked around, you saw that the FBI were    12:01:26

11  swarming around that apartment.

12  A.   I didn't see the FBI swarming.  I just saw police cars

13  like Christmas lighting up around the apartment.

14  Q.   So like Christmas.  There were a lot of police cars and

15  lights that you could see?                                 12:01:41

16  A.   Right.

17  Q.   Is that correct?

18  A.   Yes.

19  Q.   And you looked up and you saw over the wall that they were

20  there; correct?                                            12:01:46

21  A.   I didn't look over the wall.

22  Q.   Did you learn that they were there just by looking?  You

23  could see the lights?

24  A.   I could see that there was police presence there but I

25  didn't know the FBI were there.                            12:01:57

United States District Court

ABDUL KHABIR WAHID - Cross

1   Q.   Pretty significant presence; right?  Looked like                    12:02:00

2   Christmas?

3   A.   Right.

4   Q.   So you got back into the car with Malik and you, too, as

5   well as perhaps with Malik's nephew, drove directly over to             12:02:06

6   Ibrahim's parents' house; right?

7   A.   Correct.

8   Q.   And that night you sat with Ibrahim's parents in their

9   home with Malik and watched the news coverage of what was going

10  on and happening at the Garland attack; right?                          12:02:23

11  A.   Correct.

12  Q.   Watched it on CNN?

13  A.   I don't know exactly what we watched it on.  His dad had

14  saved the news I guess on his TiVo or something like that.

15          MS. BROOK:  I'm going to use the Elmo for a minute               12:02:56

16  placing on the overhead what has been marked as Government's

17  Exhibit 52.

18  BY MS. BROOK:

19  Q.   You recognize this, don't you, sir?

20  A.   I'm not sure.  What is it?                                         12:03:12

21  Q.   Take a look.  You notice that it's Simpson's writing.

22  A.   I notice it's Simpson's writing because you told me it was

23  his writing.

24  Q.   Okay.  Do you remember talking to the FBI before telling

25  them that you noticed this was Simpson's writing?                       12:03:26

United States District Court

ABDUL KHABIR WAHID - Cross

1   A.   I'm not sure.                                                    12:03:35

2   Q.   In fact, as you look at this, you recognize it as

3   something that was found in your home; right?

4   A.   Oh, you're referring to I guess this page that Elton had

5   gave to my son?                                                      12:03:54

6   Q.   So, yes, this was found in your home?

7   A.   Yes.  Yes.  Yes.

8   Q.   And in fact, you know that on May 1, that Friday of 2015,

9   Elton Simpson had come to your house before he met with you at

10  9 o'clock that night.  He had come earlier that day; right?         12:04:06

11  A.   No.  He did not.  That is totally incorrect.

12  Q.   This list was given to your son Waseem by Ibrahim;

13  correct?  Just "yes" or "no"?

14  A.   Wait a minute.  No.  That's not -- that's an incorrect

15  question.  What he did was, he came by my house when I wasn't       12:04:22

16  there.  And you know that already.

17  Q.   That's what I'm saying.  He came by --

18  A.   Well, why would you say that I knew this when you know he

19  was already there before I got there, because I was angry about

20  that.                                                               12:04:38

21  Q.   You were angry about that.  You were angry about that

22  because you didn't like the idea of Simpson talking to your son

23  Waseem without you there?

24  A.   Correct.

25  Q.   And that frustrated you because you knew that Simpson was      12:04:46

United States District Court

ABDUL KHABIR WAHID - Cross

1   obsessed with violent jihad?                                    12:04:51

2   A.    Exactly.

3   Q.    You didn't want Simpson putting ideas into your son's head

4   about violent ISIS attacks?

5   A.    This is true.                                             12:05:00

6   Q.    And you knew that because Simpson, just months before, had

7   asked you to partake in an ISIS attack with him; right?

8   A.    Correct.

9   Q.    He had asked you to, with guns, go in and attack a

10  military base; correct?                                         12:05:14

11  A.    Right.

12  Q.    And you would agree with me, as we look at this

13  Exhibit 52, which the Government would move to admit.

14         MS. BROOK:  I guess procedurally the Government moves

15  to admit Exhibit 52.                                            12:05:44

16         THE COURT:  Let's hold that off until the witness is

17  done testifying and then when he resumes his role as his own

18  counsel, I'll ask him if he has any objection.

19  BY MS. BROOK:

20  Q.    You would agree with me that this list lists seven of the  12:05:58

21  world's worst terrorists?

22  A.    First of all --

23  Q.    Just "yes" or "no".

24  A.    No, I can't agree with you because I don't know who these

25  people are.                                                     12:06:11

United States District Court

ABDUL KHABIR WAHID - Cross

1  Q.   You don't know who Anwar al-Awlaki is.                    12:06:12

2  A.   No.  I don't.  I know the first one?  The name you

3  mentioned, where is he?  Where is he?  Okay, Anwar al-Awlaki, I

4  heard of him.  The rest of these people, I don't know who they

5  are.                                                           12:06:26

6  Q.   Simpson was a very close friend of yours; right?

7  A.   True.

8  Q.   You and he would spend nearly every other day spending

9  some portion of time together; right?

10 A.   Not every other day.  Just a few times a week he would    12:06:42

11 come over.  He didn't come over every single day.

12 Q.   He would come over at least a few times a week to your

13 home; right?

14 A.   Sporadically.  I would say, like, maybe two, three times a

15 week, no more.  Maybe every two weeks or something like that.   12:07:00

16 He didn't come over every day.  He didn't come over every other

17 day of the week.

18 Q.   So fair to say, on average, a few times a week he would

19 come over to your house; correct?

20 A.   I just told you that he would only come over a few times   12:07:18

21 every two weeks meaning like that.  Not every day every week or

22 anything like that.

23 Q.   You all would also go out to eat often; correct?

24 A.   True.

25 Q.   You would go to an Afghani restaurant called Khyber Halal? 12:07:37

394

ABDUL KHABIR WAHID - Cross

1   A.    I don't know the name of the restaurant but it was an          12:07:41
2   Afghani restaurant.  That's all I know.
3   Q.    And you would eat together?
4   A.    M'hum.
5   Q.    You would get coffee together?                                  12:07:47
6   A.    Sometimes.
7   Q.    You would go to the mosque together?
8   A.    No.  We used to go to the mosque together many, many years
9   ago.  By the time I would say -- I don't know.  There was a
10  mosque that we used to go to on 27th Avenue and Orangewood.  We      12:08:00
11  stopped going there years ago and we split our ways.  I don't
12  know where he was going to mosque at.
13  Q.    So other than your family, who was a closer friend to you
14  than Simpson or was he probably the closest?
15  A.    I can't say he's the closest, because I have a lot of          12:08:31
16  friends.  But I'm a very private person so a lot of people
17  don't come to my house.
18        So I want to say that -- I can't really say that --
19  he's close but he maybe probably the only person that visited
20  my the most, put it that way.                                        12:08:52
21  Q.    And Ibrahim trusted you; right?
22  A.    I assume he did.
23  Q.    He trusted you enough to ask you to attack that military
24  base with him; right?
25  A.    I can't say "yes" to that.                                     12:09:15

United States District Court

ABDUL KHABIR WAHID - Cross

1  Q.   Well, obviously, he realized you may have said "no";                    12:09:17
2  right?
3  A.   Say that again?
4  Q.   Obviously he realized that when he asked you to attack
5  that military base, that you might have said "no"?              12:09:24
6  A.   No.   I don't know what he was thinking.
7  Q.   But you did say "no"?
8  A.   Yeah.
9  Q.   And you didn't call the police at that time to tell them
10 that he was going to attack a military base, "yes" or "no"?     12:09:36
11 A.   No.
12 Q.   We've listened to the recordings, Government Exhibits 118
13 through 153 and 162 which were the recordings from your
14 conversations with Ali; right?
15 A.   M'hum.                                                      12:10:12
16 Q.   You've heard them; right?
17 A.   Yes.
18 Q.   And you would agree with me that was your voice on those
19 recordings?
20 A.   Yes.                                                        12:10:21
21 Q.   And it's your testimony that if Ali Soofi hadn't told the
22 FBI about you, that the FBI would not have had you under
23 investigation; right?
24 A.   True.
25 Q.   The last time you saw Ibrahim and Nadir was outside your   12:10:51

United States District Court

ABDUL KHABIR WAHID - Cross

1  house at 9 o'clock at night on Friday, May 1; correct?          12:10:54

2  A.   Incorrect because I wasn't sure whether it was 8 o'clock

3  or 9 o'clock.  It was at night and I was in the house and they

4  knocked on my door.  I was tired.

5  Q.   So fair enough.                                            12:11:09

6  A.   Yeah.

7  Q.   So at some point between 8 or 9 o'clock that evening was

8  the last time that you saw the two of them?

9  A.   Correct.

10 Q.   And as you stood with them outside your porch or on your  12:11:17

11 porch, you saw Nadir's black car outside your house; right?

12 A.   Yes.

13 Q.   You knew that the two of them had driven over to your home

14 to talk to you; correct?

15 A.   I knew that they had driven to my house.  I didn't know   12:11:35

16 that they were coming to talk to me.

17 Q.   You lived back on that day in the 3400 block of Port au

18 Prince; right?

19 A.   Correct.

20 Q.   And that is near Greenway and 35th Avenue; right?         12:11:58

21 A.   Correct.

22 Q.   Do you know where Nurse lived?

23 A.   Actually I don't.

24 Q.   Did you know that he lived at Northern and I-17?

25 A.   No, but thanks for sharing that because I didn't know.    12:12:13

United States District Court

ABDUL KHABIR WAHID - Cross

1    Q.   Did you know that?                                          12:12:16

2    A.   No.

3    Q.   So that night as Simpson handed you the envelope and the

4    keys, Simpson told you that was headed out of town?

5    A.   Could you repeat that?  I didn't hear it.                   12:12:36

6    Q.   As Simpson handed you the envelope and the keys, he told

7    you he was headed out of town?

8    A.   No, he didn't.

9    Q.   So it's your testimony that you believed he was going to

10   be in town?                                                      12:13:02

11   A.   I didn't know what to think.  He didn't tell me where he

12   was going.

13        MS. BROOK:  Can we place on the overhead what's going

14   to be marked as Government's Exhibit Number 164, please.  It's

15   on the computer.                                                 12:13:16

16        THE WITNESS:  And before you play that --

17        MS. BROOK:  There's no question.  Just hang on one

18   second.

19   BY MS. BROOK:

20   Q.   This is marked for identification.  Can you see that       12:13:33

21   picture all right there as Government's Exhibit number 164?

22   A.   Which one.  There's three of them.

23   Q.   So just look at the one in the middle there.

24   A.   Yeah.

25   Q.   Do you recognize that individual?                          12:13:47

United States District Court

ABDUL KHABIR WAHID - Cross

1    A.    That's Saabir Nurse.                                          12:13:50

2    Q.    The same Nurse that Simpson instructed you to deliver the

3    envelope and the keys to on that coming Wednesday?

4    A.    Correct.

5    Q.    The same Nurse who you didn't know where he lived?           12:14:04

6    A.    Correct.

7    Q.    You would agree with me that he was somewhat of a distant

8    associate of yours, not a close friend?

9    A.    It was kind of strange.  We were sort of close.  We just

10   never saw each other.                                              12:14:24

11   Q.    So let me ground you back in May of 2015, not what's

12   transpired since.  Back in May of 2015, you would agree with me

13   that he was Ibrahim's friend much more than he was your friend?

14   A.    I guess you could say that because they both went to high

15   school together.                                                   12:14:46

16   Q.    So "yes"?

17   A.    Yeah.

18   Q.    When you interviewed with law enforcement in your living

19   room on May 6 of 2015, you did not tell them, as you just

20   testified, about the envelope or the keys that Simpson had        12:15:20

21   given you?

22   A.    Correct.

23   Q.    And you didn't tell them about the envelope and the keys

24   because you didn't want to get Nurse in trouble?

25   A.    No.  I didn't say that.                                      12:15:34

United States District Court

ABDUL KHABIR WAHID - Cross

1   Q.   Just "yes" or "no"?                                    12:15:36

2   A.   No.

3   Q.   You would agree with me that you were afraid of the FBI

4   talking to Nurse?

5   A.   Say that again.                                        12:15:44

6   Q.   You didn't want the FBI talking to Nurse?

7   A.   No, I wouldn't say that, I didn't want him to talk to

8   them, no.

9   Q.   So why is it that you didn't tell them about Nurse?

10  A.   Were you listening to my narrative?  So why would you ask   12:15:59

11  me that?

12  Q.   Why is it that you didn't tell them about Nurse?

13  A.   Okay.  The reason why I didn't tell them -- I'm over here.

14          The reason why I didn't tell them about Nurse was

15  simply, like I said, I did not want them to harass him.  Had   12:16:15

16  nothing to do with there was some secret plot or anything like

17  that.  I just didn't want them to harass him.  That's all.

18  Q.   Before you gave the envelope and the keys to Nurse, you

19  talked to Abdul Malik Abdul Kareem about having the envelope

20  and the keys; right?                                        12:16:42

21  A.   Yes.

22  Q.   And Malik told you that he wanted you to open the

23  envelope?

24  A.   Correct.

25  Q.   You didn't open the envelope?                          12:16:55

United States District Court

ABDUL KHABIR WAHID - Cross

1   A.   No.                                                              12:16:57

2   Q.   Malik pushed, right, and he argued with you?

3   A.   Yes, he did.

4   Q.   Malik is a pretty big guy, isn't he?

5   A.   Yes.                                                             12:17:07

6   Q.   About six foot four?

7   A.   I don't think he's that tall.

8   Q.   Maybe six two?

9   A.   He may be.  He just looks big.  He looks tall because he's

10  so fat so I would say -- he looks like he's five 11, something      12:17:22

11  like that.

12  Q.   Did he physically try to open the envelope?

13  A.   He tried to snatch it from me but he didn't open -- I

14  didn't let him.

15  Q.   How did you keep him from snatching it from you?               12:17:43

16  A.   Pulled it back like, "No."

17  Q.   And you told him that it would be disrespectful to Ibrahim

18  for him to open it; right?

19  A.   M'hum.

20  Q.   Is that a "yes"?                                               12:18:05

21  A.   Yes.

22  Q.   You have three children; correct?

23  A.   They are right behind you.

24  Q.   And they are all adults.  They are all over the age of 18?

25  A.   Yeah.                                                          12:18:36

ABDUL KHABIR WAHID - Cross

| | | |
|---|---|---|
| 1 | MS. BROOK:  May I have one moment? | 12:18:49 |
| 2 | BY MS. BROOK: | |
| 3 | Q.   Placing on the overhead Government's Exhibit Number 163, | |
| 4 | do you recognize this person? | |
| 5 | A.   Yes. | 12:19:34 |
| 6 | Q.   Who is it? | |
| 7 | A.   Salim. | |
| 8 | Q.   Who is Salim? | |
| 9 | A.   Salim is Abdul Malik's nephew. | |
| 10 | Q.   Was that the individual you were referring to earlier who | 12:19:44 |
| 11 | was in the car with you our was it somebody else? | |
| 12 | A.   No.  It was his brother. | |
| 13 | Q.   You didn't know Nadir very well, Nadir Soofi? | |
| 14 | A.   No. | |
| 15 | Q.   Didn't spend much time with him? | 12:20:34 |
| 16 | A.   No. | |
| 17 | MS. BROOK:  Placing on the overhead Government's | |
| 18 | Exhibit 84, if I can go back to the document camera. | |
| 19 | BY MS. BROOK: | |
| 20 | Q.   Tell us about this day. | 12:21:10 |
| 21 | THE COURT:  It's not up yet.  Hang on. | |
| 22 | THE WITNESS:  Oh, okay.  This was one time.  It | |
| 23 | doesn't mean that he was with me all the time.  This is one | |
| 24 | time a few years ago when he and me and his son were together | |
| 25 | and he came and he picked me up and he took me to somewhere far | 12:21:30 |

United States District Court

ABDUL KHABIR WAHID - Cross

1  away.  It was a river, and a lot of people and stuff like that.    12:21:36
2  That was it.  We just took with them.

3  BY MS. BROOK:

4  Q.   So this was something that happened occasionally?

5  A.   No.  No.  No.  This happened one time.    12:21:51

6  Q.   One time?

7  A.   Right.

8  Q.   But you didn't remember this road trip that you took with

9  Nadir?

10  A.   It's been a few years.  Why should I remember it?  I'm not    12:21:58

11  going to sit here and think about it.  It has been a while

12  since this -- I don't even know how you got this picture.

13  Q.   And so this was certainly a bit before Simpson asked you

14  to join Nadir and he and attack a military base in support of

15  ISIS?    12:22:18

16  A.   I would say so.  Do you see any gray in my hair?

17  Q.   So was that a, "yes"?  This picture was taken before

18  Simpson asked you to --

19  A.   Way.  Way.  Way before.

20  Q.   It was way before.    12:22:32

21          You would agree with me when the FBI came to your

22  home to interview you on May 6 of 2015 that they were there to

23  talk to you about Simpson and Soofi and the attack on Garland?

24  A.   I will assume that, yeah.

25  Q.   Yes?    12:23:18

United States District Court

ABDUL KHABIR WAHID - Cross

1  A.   Yes.                                                              12:23:19

2  Q.   And it was important for them to know the truth about

3  information that you might have had about Simpson and Soofi;

4  right?

5  A.   I guess so.                                                       12:23:34

6  Q.   Yes?

7  A.   I guess so because I'm not sure.

8  Q.   But you think that sounds right, right?  The FBI needed to

9  know the truth about information that you had about Simpson and

10 Soofi; right?                                                          12:23:47

11 A.   To be honest with you --

12 Q.   Just "yes" or "no"?

13 A.   I'm going to say no then.

14 Q.   They didn't need to know the truth?

15 A.   No, I'm not saying that.                                          12:23:52

16 Q.   You're refusing to answer the question?

17 A.   No.  Just that you're wording the question where I can't

18 answer "yes" or "no" to it.

19 Q.   Do you remember, as we all heard, that the FBI told you it     12:24:08

20 was important to tell them the truth and, in fact, to lie to

21 them was a crime; right?

22 A.   True.

23 Q.   And you knew that well before; right?

24 A.   What do you mean?

25 Q.   You've always known that it's a crime to lie to the FBI?      12:24:19

United States District Court

404

ABDUL KHABIR WAHID - Cross

1  A.   Yeah.                                                          12:24:24

2  Q.   You knew that back from Hassan's investigation in 2008;

3  right?

4  A.   I didn't know anything about it.  I just know they came to

5  my house.                                                          12:24:38

6  Q.   You didn't want the FBI to go after Nurse; right?

7  A.   Yes.

8  Q.   You didn't want the FBI to go after Malik; right?

9  A.   I don't follow you.

10  Q.   You didn't want the FBI to investigate Malik; right?        12:25:00

11  A.   I didn't know Malik was being investigated.

12  Q.   But you wouldn't want the FBI to be doing that; correct?

13  A.   I guess I wouldn't but it depends on the circumstances.

14  Q.   So you didn't want the FBI investigating your friends;

15  right?                                                            12:25:24

16  A.   Would you want the FBI investigating your friends?

17  Q.   The way this is set up, I need you to answer the question,

18  sir.

19          So you did not want the FBI investigating you;

20  correct?                                                          12:25:37

21  A.   Investigating me?

22  Q.   Correct.

23  A.   Me?

24  Q.   Yeah.

25  A.   Sure.                                                        12:25:43

United States District Court

ABDUL KHABIR WAHID - Cross

1  Q.   You didn't want them investigating you; right?                  12:25:44

2  A.   Sure.  For what?  I didn't do anything.

3  Q.   So that's a "yes," you didn't want them investigating you?

4  A.   Yes.

5  Q.   And you knew, obviously, the investigation was an               12:25:57

6  investigation into a terrorist attack; right?

7  A.   Yes.

8  Q.   I had asked you before about when you learned that lying

9  to the FBI is a crime.  You would agree with me that back when

10 Simpson was prosecuted in 2010, Elton Simpson, he was your          12:26:20

11 friend; right?

12 A.   Yes.

13 Q.   And you learned through his prosecution that it's a crime

14 to lie to the FBI; right?

15 A.   Yes.  But he actually lied to the FBI.                          12:26:34

16 Q.   "Yes" or "no," you learned back then?

17 A.   Yes.

18 Q.   Is that a "yes"?

19 A.   Yes.

20        MS. BROOK:  Your Honor, I don't have any other               12:26:43

21 questions.

22        THE COURT:  All right.  Thank you, Ms. Brook.

23        Mr. Wahid, as you noticed during the trial, the order

24 is that the person who puts on -- or the side who puts on the

25 witness has a direct, then there's a cross and then if there's      12:27:00

ABDUL KHABIR WAHID - Cross

1  any redirect, then the proponent of the witness gets to do          12:27:03

2  redirect.

3          It's a little awkward to have you do redirect of

4  yourself.  But if there's anything that you need to say to

5  testify in response to the questions you were just asked, you       12:27:15

6  have that right now.  If you don't have anything, that's fine,

7  too, but you have the opportunity.

8          THE WITNESS:  To say what?

9          THE COURT:  The idea of redirect, sir, is that if a

10  side thinks that anything has been muddied by                       12:27:32

11  cross-examination, they can hit issues to attempt to clear it

12  up.  So if you think something was muddied by the

13  cross-examination, I give you an opportunity to make a

14  statement to clear it up.  If not, you don't have to.

15          THE WITNESS:  Okay.  Let me think about it.               12:27:52

16          I just wanted to state that in my defense, it is true

17  Ibrahim -- because he told me, he -- I forget what he said.  It

18  was something really stupid, too, but he actually -- oh.  He

19  mentioned something about jihad and he used the word "jihad" in

20  a recorded conversation that he didn't know he was being          12:28:27

21  recorded.  And the FBI asked him if he ever used the word

22  "jihad" and he said, "no," and that's how he they were able to

23  get him, because he said, "no."

24          And my situation, I didn't actually lie.  I did omit

25  but I did not lie.  And so to be honest with you, I mean from     12:28:56

United States District Court

1    what I know, I really thought that I had not told a lie because      12:29:09

2    I admitted it.   I didn't think that lying meant that by me not

3    saying something, I was lying.   I really did think that.   So,

4    no.

5              THE COURT:   Thank you, sir.   You are excused and you     12:29:29

6    may step down.

7              (Witness excused.)

8              THE COURT:   And Mr. Wahid, now, resuming your -- go

9    ahead, please take your place at the table.   Resuming your role

10   now as advocate, there is a motion to admit an exhibit             12:29:48

11   currently pending.   I believe it's 52.

12             Is that right?

13             MS. BROOK:   Yes, Your Honor.   And I also didn't move

14   to admit the other exhibit simply based upon the same.

15             THE COURT:   Let's take care of 52 first.                 12:30:02

16             Mr. Wahid, is there an objection?

17             MR. WAHID:   No.

18             THE COURT:   All right.   52, which was the list, is

19   admitted.

20             (Exhibit Number 52 was admitted into evidence.)          12:30:09

21             THE COURT:   Now, Ms. Brook, what was the other?

22             MS. BROOK:   84.

23             THE COURT:   All right.

24             MS. BROOK:   Which was the photo on the Elmo right

25   now?                                                               12:30:18

United States District Court

1          THE COURT:  That was the photo in front of the body    12:30:21

2   of water; correct?

3          MS. BROOK:  Yes.

4          THE COURT:  All right.

5          Any objection, Mr. Wahid, to the photo?    12:30:27

6          MR. WAHID:  No.

7          THE COURT:  All right.  Then 84 is also admitted.

8          (Exhibit Number 84 was admitted into evidence.)

9          (End of excerpted portion.)

10                          *  *  *  *  *    12:30:32

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

1        C E R T I F I C A T E                                    12:30:32

2

3        I, ELAINE M. CROPPER, do hereby certify that I am

4  duly appointed and qualified to act as Official Court Reporter

5  for the United States District Court for the District of       12:30:32

6  Arizona.

7

8        I FURTHER CERTIFY that the foregoing pages constitute

9  a full, true, and accurate transcript of all of that portion of

10 the proceedings contained herein, had in the above-entitled     12:30:32

11 cause on the date specified therein, and that said transcript

12 was prepared under my direction and control, and to the best of

13 my ability.

14

15       DATED at Phoenix, Arizona, this 8th day of February,      12:30:32

16 2019.

17

18

19

20                        s/Elaine M. Cropper                      12:30:32

21                        _____

22                        Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                 12:30:32

                    United States District Court