CR-17-00360-PHX-JJT-1, February 26, 2019

1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3          _____

4

   **United States of America,**    )

5                             )

                 Plaintiff,   )

6   vs.                   )

                           )  CR-17-00360-PHX-JJT-1

7   **Abdul Khabir Wahid,**       )

                           )

8               Defendant.   )

                           )  February 26, 2019

9                           )  11:01 a.m.

   _____ )

10

11

12      **BEFORE:  THE HONORABLE JOHN J. TUCHI, JUDGE**

13       **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

14            BENCH TRIAL - DAY 1

15            (Pages 1-147)

16

17

18

19

20

21   Official Court Reporter:

   **Elaine Cropper, RDR, CRR, CCP**

22   Sandra Day O'Connor U.S. Courthouse, Suite 312

   401 West Washington Street, SPC 35

23   Phoenix, Arizona  85003-2151

   (602) 322-7245/(fax) 602.322.7253

24

   Proceedings Reported by Stenographic Court Reporter

25   Transcript Prepared by Computer-Aided Transcription

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

<u>**I N D E X**</u>

**TESTIMONY**

| WITNESS | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| GREG STEVENS | 25 | | | |
| BRIAN MARLOW | 39 | | | |
| KIM EDWARD JENSEN | 56 | 103 | 109 | |
| ALI SOOFI | 111 | | | |

<u>**E X H I B I T S**</u>

| Number | | Ident | Rec'd |
|---|---|---|---|
| 1 | Overhead Photograph – Curtis Culwell Center | 26 | 30 |
| 2 | Helicopter Night Photo 1 | 34 | 34 |
| 3 | Helicopter Night Photo 2 | 36 | 36 |
| 5 | Garland crime scene photos | 40 | 41 |
| 6 | Photo of Elk River Tool and Die AK-74 rifle | 42 | 43 |
| 7 | Photo of Roman AK-47 pistol grip | 43 | 43 |
| 8 | Photo of Jimenez Arms 9mm pistol | 43 | 44 |
| 9 | Photo of Taurus .357 revolver in pocket | 44 | 44 |
| 10 | Photo of Keltec 9mm rifle | 44 | 45 |
| 11 | Photo of HiPoint 9mm pistol | 46 | 48 |
| 12 | Photo of ammunition | 46 | 48 |
| 13 | | | 48 |
| 14 | Photo of ammunition | 47 | 48 |

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

**E X H I B I T S** (Continued)

| Number | | Ident | Rec'd |
|---|---|---|---|
| 15 | | | 48 |
| 16 | White Samsung Galaxy S5 | 48 | 49 |
| 22 | Printed IS Flags | 49 | 50 |
| 24 | Book: Defence of the Muslim Lands | 50 | 51 |
| 25 | Wallet with Bank of America card and driver's license (Soofi) Item BB | 52 | 52 |
| 26 | Simpson's driver's license with wallet – Item H | 52 | 53 |
| 27 | Photo of Simpson/Soofi apartment living room | 117 | 117 |
| 28 | Photo of plexiglass table | 118 | 118 |
| 85 | Recording Excerpt 1 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 70 | 75 |
| 86 | Recording Excerpt 2 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 71 | 71 |
| 87 | Recording Excerpt 3 of Interview of Abdul Khabir Wahid dated May 6, 201 | 75 | |
| 88 | Recording Excerpt 4 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 75 | 75 |
| 89 | Recording Excerpt 5 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 76 | 76 |
| 90 | Recording Excerpt 6 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 77 | 77 |
| 91 | Recording Excerpt 7 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 78 | 78 |
| 92 | Recording Excerpt 8 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 80 | 80 |
| 93 | Recording Excerpt 9 of Interview of Abdul Khabir Wahid dated May 6, 2015 | 80 | 80 |

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

1            **E X H I B I T S** (Continued)

2   Number                                              Ident   Rec'd

3   94    Recording Excerpt 10 of Interview of          81      81
          Abdul Khabir Wahid dated May 6, 2015
4

5   95    Recording Excerpt 11 of Interview of          81      81
          Abdul Khabir Wahid dated May 6, 2015

6   96    Recording Excerpt 12 of Interview of          82      82
          Abdul Khabir Wahid dated May 6, 2015
7

8   97    Recording Excerpt 13 of Interview of          82      83
          Abdul Khabir Wahid dated May 6, 2015

9   98    Recording Excerpt 14 of Interview of          83      83
          Abdul Khabir Wahid dated May 6, 2015
10

11  99    Recording Excerpt 15 of Interview of          84      84
          Abdul Khabir Wahid dated May 6, 2015

12  100   Recording Excerpt 1 of Interview of           89      89
          Abdul Khabir Wahid dated June 10, 2015
13

14  101   Recording Excerpt 2 of Interview of           92      92
          Abdul Khabir Wahid dated June 10, 2015

15  102   Recording Excerpt 3 of Interview of           92      92
          Abdul Khabir Wahid dated June 10, 2015
16

17  103   Recording Excerpt 4 of Interview of           93      93
          Abdul Khabir Wahid dated June 10, 2015

18  104   Recording Excerpt 5 of Interview of           94      94
          Abdul Khabir Wahid dated June 10, 2015
19

20  105   Recording Excerpt 6 of Interview of           94      94
          Abdul Khabir Wahid dated June 10, 2015

21  106   Recording Excerpt 7 of Interview of           94      94
          Abdul Khabir Wahid dated June 10, 2015
22

23  107   Recording Excerpt 1 of Interview of           98      98
          Abdul Khabir Wahid dated December 11,
24        2015

25  108   Recording Excerpt 2 of Interview of           99      99
          Abdul Khabir Wahid dated December 11,
          2015

CR-17-00360-PHX-JJT-1, February 26, 2019

**E X H I B I T S** (Continued)

| Number | | Ident | Rec'd |
|---|---|---|---|
| 118 | Recording Clip 1 of Phone Call Between Abdul Khabir Wahid and A.S. on June 6, 2015 at 8:24 p.m. | 137 | 137 |
| 119 | Recording Clip 2 of Phone Call Between Abdul Khabir Wahid and A.S. on June 6, 2015 at 8:24 p.m. | 137 | 137 |
| 120 | Recording Clip 3 of Phone Call Between Abdul Khabir Wahid and A.S. on June 6, 2015 at 8:24 p.m. | 138 | 138 |
| 121 | Recording Clip 4 of Phone Call Between Abdul Khabir Wahid and A.S. on June 6, 2015 at 8:24 p.m. | 138 | 138 |
| 122 | Recording Clip 1 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 140 | 140 |
| 123 | Recording Clip 2 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 141 | 141 |
| 124 | Recording Clip 3 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 141 | 141 |
| 125 | Recording Clip 4 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 143 | 143 |
| 126 | Recording Clip 5 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 144 | 144 |
| 127 | Recording Clip 6 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 143 | 143 |
| 128 | Recording Clip 7 of Phone Call Between Abdul Khabir Wahid and A.S. on June 7, 2015 at 9:15 p.m. | 144 | 144 |

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

## E X H I B I T S (Continued)

| Number | | Ident | Rec'd |
|--------|--|-------|-------|
| 159 | Photo of Exterior of Abdul Khabir Wahid Residence, XXXX W. Port Au Prince Lane, Phoenix, AZ. | 66 | 66 |
| 160 | Photos of A.S. Cell Phone Properties Screen & Call Log | 133 | 134 |

## MISCELLANEOUS NOTATIONS

| Item | Page |
|------|------|
| Government's opening statement | 9 |
| Defendant's opening statement | 22 |

## RECESSES

| | Page | Line |
|--|------|------|
| (Recess at 12:12; resumed at 12:16.) | 55 | 9 |
| (Recess at 12:30; resumed at 1:46.) | 65 | 21 |
| (Recess at 3:07; resumed at 3:24.) | 110 | 25 |

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

**A P P E A R A N C E S**

For the Government:
          **JOSEPH E. KOEHLER, ESQ.**
          **KRISTEN BROOK, ESQ.**
          U.S. Attorney's Office
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004-4408
          602.514.7500

For the Defendant:
          **PRO SE**
          **ABDUL KHABIR WAHID**
          3407 W. Port Au Prince Lane
          Phoenix, Az  85053
          480.205.1354

For the Defendant as Advisory Counsel:
          **JOHN W. MCBEE, ESQ.**
          Law Office of John W. McBee
          3104 E. Camelback Road, PMB 851
          Phoenix, AZ  85016
          602.903.7710

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

# P R O C E E D I N G S

1

2          Court was called to order by the courtroom deputy.)

3          (Defendant is present and out of custody.)

4          (Proceedings begin at 11:01.)

5          COURTROOM DEPUTY:  This is criminal case 17-360,          11:01:21

6  *United States of America v. Abdul Khabir Wahid*, on for bench

7  trial, day one.

8          Parties, please announce.

9          MS. BROOK:  Good morning, Your Honor.  Kristen Brook

10  and Joe Koehler on behalf of the United States.          11:01:32

11          THE COURT:  Ms. Brook, Mr. Koehler, good morning.

12  Welcome.

13          MR. WAHID:  Abdul Khabir Wahid.

14          THE COURT:  Mr. Wahid, good morning.  Welcome.

15          MR. MCBEE:  Good morning, Your Honor.  John McBee,          11:01:44

16  advisory counsel.

17          THE COURT:  Mr. McBee.  Good morning.

18          Are the parties ready to proceed?

19          MS. BROOK:  Yes, Your Honor.

20          THE COURT:  And Mr. Wahid, are you ready to proceed          11:01:50

21  as well?

22          MR. WAHID:  Yes, sir.

23          THE COURT:  Thank you.  Then if the Government wishes

24  to make an opening statement, you can go ahead and proceed.

25          MS. BROOK:  Thank you, Your Honor.  And the          11:02:02

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

1    Government has provided to defense and Ms. Chopper --                    11:02:02

2              Am I pronouncing that right?

3              THE REPORTER:  Cropper.

4              MS. BROOK:  -- Cropper a copy of our PowerPoint

5    presentation.  Would Your Honor like one as well?                       11:02:11

6              THE COURT:  Please.

7              MS. BROOK:  Your Honor, on a Sunday evening in May of

8    2015, two men from Phoenix dressed in black, carrying an

9    arsenal of weapons, sprung from a car in an attempt to kill

10   Americans in support of ISIS.  It was a shootout in Texas.             11:02:46

11   When it was over, a security guard lay on the ground having

12   been shot in the leg and the shooters, the attackers, were

13   dead, killed at the scene by Texas law enforcement.

14             What did law enforcement do?  Immediately they rushed

15   to the scene to aid the victim, secure the scene and                    11:03:08

16   investigate.  Likewise here in Phoenix, agents started to

17   investigate a terrorism investigation.  ISIS, the terrorist

18   organization, had claimed responsibility for the attack.  So

19   here in Phoenix, hundreds of FBI agents worked round the clock

20   to investigate to gather every scrap of evidence, every piece          11:03:28

21   of evidence left behind when the attackers drove to Texas.

22             Why?  To flesh out and identify who all may have been

23   involved, who knew about the attack before it happened, to

24   gather every piece of information they could about the

25   attackers.  Again, why?  Most urgently, to prevent another             11:03:48

CR-17-00360-PHX-JJT-1, February 26, 2019

1    possible follow-on attack.                                        11:03:55

2          So it was in the midst of those first 72 hours after

3    the attack that the defendant, Mr. Wahid, lied to the FBI.  It

4    was in the midst of this terrorism investigation that he

5    deliberately withheld the truth.  You see, before the attack,  11:04:11

6    the attackers had come to Mr. Wahid's house.  They had given

7    him an envelope and a set of keys, car keys, and instructions

8    to deliver them to a third person.  The attackers had

9    instructed him to make that delivery just days after the attack

10   and when did Mr. Wahid make the delivery?  He made it the same  11:04:38

11   day that the FBI showed up at his house to interview him for

12   the first time.  It was that day that Mr. Wahid did as the

13   attackers instructed.  He delivered the envelope and the keys

14   just as he had said he would and he purposefully did not tell

15   the FBI a word about it.                                        11:05:03

16         So what did he do next?  He coercively attempted to

17   persuade a critical witness in this FBI terrorism investigation

18   to lie to the FBI.  Why?  To prevent the FBI from learning

19   potential incriminating information about him, about Wahid.

20   Your Honor, this morning we are going to preview our evidence   11:05:28

21   in this case and we're going to talk about four main topics.

22         First of all, who are the people that are involved?

23   Who are the people you're going to hear about?  Secondly what

24   happened on May 3 of 2015?  Third, we're going to talk about

25   the evidence that will be presented in this casing related to   11:05:42

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

1   Mr. Wahid's material lie to the FBI in the midst of this          11:05:44

2   terrorism investigation.  And, lastly, we will talk about the

3   evidence that will be presented in this case related to

4   Mr. Wahid's corrupt persuasion of the critical witness, Ali

5   Soofi.                                                            11:05:58

6          So who are the people that are involved?  Abdul

7   Khabir Wahid is also known as AK.  And over a decade before the

8   attack, back in 2005, he first met Elton Simpson, a man who he

9   called Ibrahim.  They met at a mosque.  They became close

10  friends, not casual friends but close friends.  At that point,   11:06:21

11  Ibrahim Simpson was 19 and that friendship carried on until the

12  time of the attack.

13         In 2010 and 2011 Simpson met Nadir Soofi, the other

14  attacker, at a pizza shop.  They lived together for a brief

15  time in 2011 and then moved back in together in 2014.  So there  11:06:39

16  it was that the three men spent time together, eating together,

17  being at each other's homes together, getting coffee together,

18  going to the mosque together.

19         What happened on May 3 of 2015?  As planned on that

20  Sunday night, nearly 200 people showed up at the Curtis Culwell  11:07:03

21  Center in Garland Texas.  It was an indoor stadium and

22  spectators had purchased tickets in advance to attend an event

23  known as the Draw the Prophet Muhammad contest.  The event was

24  two hours long.  And as it drew to an end, as planned, Simpson

25  and Soofi drove into the parking lot.  They wore body armor and  11:07:23

12

CR-17-00360-PHX-JJT-1, February 26, 2019

1    they jumped out of their car carrying assault rifles.  They          11:07:27

2    were armed with six weapons, these weapons, and 1500 rounds of

3    ammunition.  The plan was mass murder.

4           What they didn't count on was the quick action of

5    heroic law enforcement who were able to stave off the attack.        11:07:45

6    You can see the picture there in the bottom right after law

7    enforcement were able to secure the scene and prevent the

8    attack.  So why, why did Simpson and Soofi attempt to kill

9    hundreds of people in an attack on United States soil?  They

10   did so in support of ISIS.                                            11:08:08

11          You're going to hear that Simpson and Soofi were

12   disciples of a terrorist organization that advocates mass

13   murder and violence against the West and Western civilians.

14          Dr. Matthew Leavitt in this case will testify.  He is

15   a well-published author and scholar on the subject of ISIS.  He      11:08:24

16   will testify that these attacks are done to intimidate and

17   coerce a civilian population.

18          As Your Honor is likely aware, Abu Bakr al-Baghdadi

19   is the leader of ISIS.  In June of 2714 he stepped out in front

20   of the Grand Mosque in Mosul and declared himself to be the          11:08:43

21   Caliph or the leader of all Muslims.  The belief that there is

22   a Caliph is a unique concept to ISIS.  Other terrorist

23   organizations do not believe that here and now there exist

24   living amongst us a leader of all Muslims, a Caliph.  Al-Qaeda

25   doesn't believe that but ISIS does.                                  11:09:05

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

1        You will also hear that ISIS is committed to                    11:09:07
2   purifying the world by murdering nonbelievers.  And in that
3   effort, they seek to cause attacks that result in the loss of
4   human life here in the West.
5        Why?  You will hear testimony from Dr. Leavitt that            11:09:22
6   their intent is to coerce and intimidate civilian populations
7   in the West.  They want to affect and change the policy of the
8   United States Government and other Western countries in order
9   to bring about a showdown in Dabiq.  Dabiq, Syria, is the
10  place, the location, where individuals who are members of ISIS     11:09:42
11  believe there will be an apocalyptic showdown, a fight to end
12  all fights with the West and that is their intent.
13       You will see that just months after Abu Bakr
14  al-Baghdadi declared himself the Caliph, Abu Mohamed al-Adnani,
15  the spokesperson of ISIS, spoke out and called for ISIS attacks    11:10:03
16  in the West against civilian or military bases wherever they
17  may be, hunt them down.
18       It is with that agenda that Simpson and Soofi took
19  off and headed to Garland, Texas.  15 minutes before the
20  Garland, Texas attack, Soofi texted the following:  The bro        11:10:22
21  with me and myself have given bay'ah to Amirul Mu'mineen.
22       You will see and hear in this case that Amirul
23  Mu'mineen is Abu Bakr al-Baghdadi.
24       May Allah accept us as mujahideen, or violent jihadi
25  warriors.  Make dua, make sacrifice.  Hashtag, Texasattack.        11:10:40

CR-17-00360-PHX-JJT-1, February 26, 2019

1    And immediately after the attack, ISIS claimed

2    responsibility for this attack in Garland, the first attack on

3    United States soil that they have claimed responsibility for.

4    Here AbuHussain AlBritani:  2 brothers attain shahdah

5    in Texas.

6    So let's go back to the days before the attack.

7    Wahid lived here at a home on Port au Prince and it was less

8    than two days before the attack on that Friday night, May 1,

9    that Simpson and Soofi showed up at Wahid's front door.

10    Outside that front door that you can see there, the white door,

11    they knocked and Wahid eventually came outside to talk to them.

12    During that conversation, Nadir gave Wahid soup.  Nadir and

13    Soofi talked to -- I'm sorry.  Nadir Soofi and Simpson talked

14    to Wahid about their daughters, his daughter having a good role

15    model, Muslim role model.  They also talked to Wahid about his

16    son being a good Muslim and then Simpson handed Wahid an

17    envelope and keys and he instructed him specifically, deliver

18    this to Saabir Nurse on Wednesday.

19    The next day and into the following, Simpson and

20    Soofi drove off leaving Phoenix headed to Garland, Texas.  So

21    to recap those days and on Friday night at 9 p.m., Simpson and

22    Soofi showed up at Wahid's door and gave him the envelope.

23    They drove then to Texas on Saturday and into Sunday.  The

24    attack was at 5:51 p.m. on that Sunday evening and then on

25    Wednesday, Wahid did just as he was instructed.  He delivered

11:10:47

11:11:00

11:11:29

11:11:50

11:12:14

11:12:38

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

1    the envelope and the keys to Saabir Nurse.  The evidence will       11:12:43

2    show that something also happened in between.  What happened on

3    Monday?

4            In the early morning hours after the attack, at 7:21

5    p.m., Wahid text messaged Nurse:  Salam alaikum.  I need to see     11:13:01

6    you Wednesday if that's all right with you.

7            Then he texts again:  Don't be funky.  It's really

8    important.

9            To which Nurse responded to Wahid:  Okay.  Inshallah.

10           And then Wahid messaged Nurse again:  Salam alaikum,        11:13:18

11   from Allah we are, to Allah we must return.  Ibraheem is dead.

12   He was shot and killed Saturday at Prophet Muhammad cartoon

13   contest in Texas.

14           The evidence will show that, in fact, Nurse showed up

15   in the middle of the night on Wednesday night at Wahid's house     11:13:40

16   and picked up the keys and the envelope.  It was that same day

17   that the FBI came to Wahid's door.  The purpose of the

18   interview that Wahid had that day with the FBI was Simpson and

19   Soofi.  The purpose of the interview was to gather more

20   information about Simpson and Soofi.  They were obviously dead      11:14:00

21   and this was the aftermath of a terrorist attack.

22           So it was during that interview on May 6 that Wahid

23   lied to the FBI knowingly and deliberately.  Wahid did tell the

24   FBI that Simpson and Soofi had come to his house that Friday

25   night.  He told them about the soup and he told them about the     11:14:26

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

1   conversation regarding being a good Muslim, but Wahid lied to          11:14:29

2   conceal from federal agents what really transpired which was

3   that the men who he was being interviewed about who had just

4   opened fire on a Muhammed drawing contest, the men that Wahid

5   knew supported ISIS had, right before the attack, given him a          11:14:47

6   sealed envelope keys and instructions on what to do with them.

7           You will hear testimony in this case, Your Honor,

8   that law enforcement's investigation was impeded by that lie,

9   that the lie prevented law enforcement from gathering potential

10  evidence in this terrorism investigation.  You'll also hear            11:15:06

11  that Wahid was interviewed two more times, on June 10 and

12  December 11.  The June 10 interview was well over a month after

13  the first interview; and by that point, the defendant knew that

14  the FBI had figured out he was lying.  So the giving was up and

15  he talked about the envelope.                                          11:15:27

16          Let's return to the details for a moment about the

17  lies to the FBI during the May 6 interview.  He was asked

18  repeatedly:  Did they, Simpson and Nadir Soofi, ask you for

19  anything?

20          His response if he had told the truth:  Simpson gave          11:15:44

21  me a sealed envelope and his car keys and he told me to deliver

22  them to Saabir Nurse on Wednesday, which I did early this

23  morning.

24          But what he said, he lied:  Didn't ask for nothing.

25  They just left.                                                        11:15:59

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

1    This encounter was an important one for the FBI.  The    11:16:03
2    fact that Nurse and Simpson -- the fact that Simpson and Soofi
3    had come to his house.  So they pushed over and over again, as
4    you'll hear, for details.

5    So besides talking about the soup and besides talking    11:16:18
6    about the comment that your son is a good Muslim and daughters
7    need a good role model, those three things, did they mention
8    anything else at all?

9    Washid said:  That's all.

10    And, again, agents asked, they gave you soup, they    11:16:31
11    talked about those three things.  He asks if you're hungry.  He
12    says your kids are good Muslims.  He said that your daughters
13    need a Muslim role model.  Did I miss anything?

14    So they are still talking to you at your front door
15    for about five minutes and then what happens?  Wahid lied.    11:16:46
16    Then they just said, okay, well, we'll see you later, brother,
17    and then they turned around and he leaves.

18    The evidence will show that at the point that the
19    defendant made these statements, he knew it was a crime to lie
20    to the FBI.  And the evidence will also show that the statement    11:17:07
21    had a natural tendency to influence or is capable of
22    influencing the FBI's decision.  Additionally, that this
23    investigation was one of terrorism.  Again, the attack on the
24    drawing contest.  The Government will prove that the attack on
25    the Draw the Prophet Muhammad contest was, in fact, an act that    11:17:26

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

 1   involved acts or acts dangerous to human life that are illegal,      11:17:32

 2   i.e., attempted murder.

 3          Additionally, the investigation appeared to be

 4   intended because the crime appeared to be intended to

 5   intimidate or coerce a civilian population and to influence the     11:17:45

 6   policy of the Government.  And lastly, that it was both an act

 7   of domestic terrorism and international terrorism.  Domestic

 8   terrorism as the attack occurred here within the United States

 9   and international terrorism in that ISIS transcends

10   international boundaries in its message and the means by which     11:18:05

11   they request attacks.

12          Next we turn to Count 2.  The defendant is also

13   charged with witness tampering and the Government will govern

14   that Wahid, the defendant, knowingly attempted to corruptly

15   persuade Ali Soofi with the attempt to hinder or delay or          11:18:24

16   prevent communication, communication to law enforcement that

17   was related to the commission or possible commission of an

18   offense.

19          So who was Ali Soofi?  Ali Soofi, as the evidence

20   will show -- he'll testify in this case -- was Nadir Soofi's       11:18:41

21   brother.  He and his brother ran a carpet cleaning business

22   together and he also lived with Nadir Soofi, his brother, and

23   Elton Simpson up until the six week before the attack.  You'll

24   hear that when Ali lived with Simpson and Soofi for all of

25   those months, that he heard them talk about their support of       11:19:05

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

1   ISIS.  He saw them looking at guns, showing guns, and he also          11:19:08

2   saw beheading videos and other ISIS videos.

3           Critically, Ali Soofi also saw Wahid in all of those

4   circumstances.  At the apartment he heard him talking with them

5   in conversations, looking at the guns, and also watching the          11:19:25

6   ISIS propaganda beheading videos.

7           After the attack, Ali Soofi worked with the FBI and

8   he recorded conversations.  Immediately after the attack on May

9   5, Ali received a call from the defendant.  Wahid told him not

10  to talk to the FBI.  On that day, Ali Soofi talked to the FBI.        11:19:49

11  He also met with the FBI the next day at Phoenix Sky Harbor

12  Airport before he flew home to his father's house in Kansas.

13  And, again, you will hear that on May 7, Ali, while in his

14  father's home in Kansas, received a phone call from Salim

15  Simpson.  And during that phone call, Wahid got on the phone          11:20:10

16  and told him again to not talk to the FBI.

17          So Ali recorded five conversations with the

18  defendant.  The first was on June 6 where they talked for 21

19  minutes; June 7, 26 minutes; June 8, 32 minutes; June 18, one

20  hour and six minutes; and July 8, one hour and 13 minutes.            11:20:32

21          You will hear the excerpts of those calls, Your

22  Honor, and that Wahid was acting corruptly with a wrongful

23  purpose, a purpose to protect himself and to impede the

24  administration of justice and he worked to convince Ali to

25  provide false information.                                            11:20:53

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

1      You'll hear that he attempted to scare Ali.  If you        11:20:56

2  talk to the FBI, you will catch holy hell.  They are bad.  They

3  are evil.  He also says to Ali:  You ain't done nothing wrong

4  and then he tries to scare him.  You see what I'm saying.  I'm

5  serious.  If you ain't careful, brother, you'll be sitting here   11:21:12

6  on charges, and then he told them, he says to Ali:  Tell them,

7  the FBI, exactly what I told you.  I didn't see any guns.  I

8  didn't know about any guns.  They kept that stuff secret from

9  me.

10     The evidence will show that Ali was, in fact, in the        11:21:32

11  house with Wahid, Simpson and Soofi's house, when guns were

12  being shown and looked at.  Additionally, he says to him,

13  Wahid, acting in his own self-interest:  You can seriously wind

14  up getting somebody hurt.  And then he scares him:  Allah, he

15  will get you for that.  You don't want them to think that        11:21:51

16  anybody, or yourself, and have them looking at you and putting

17  you on a terror list and putting you on a no-flight list.

18     He went on in another call on June 18:  I'm glad you

19  called me.  I was worried about you.  I was, Lord, they done

20  got Ali.  I was, like, they done got Ali.  Please tell me they   11:22:11

21  didn't get Ali.  That poor boy, he says to him.

22     And again on June 7 he instructed him, first of all,

23  you don't know.  You had no idea what was going on.  You had no

24  idea, you had no clue, no clue.  I knew, you know, but I didn't

25  say anything.  And then he tells him to lie.  You gonna tell     11:22:37

CR-17-00360-PHX-JJT-1, February 26, 2019

1    them just because I was there . . . I didn't even know why he          11:22:41

2    did what he did, leave it at that.

3            And then again he says:  You had no idea what you

4    were looking at.  You understand me?  You tell them:  I was

5    never there, so I don't know.  Just tell them and be short and         11:22:55

6    quick with your answers.

7            Ali pushes back and you'll hear, that too.  He

8    corrects Wahid and he says:  It makes me, you know, kind of

9    scared in general, you know, 'cause I know I'm pretty sure that

10   you were there -- that you were there more than once.                  11:23:13

11           And then Wahid pushes the lie back.  No.  No.  No.

12   No.  I'm telling you I wasn't.  You may have thought I was but

13   I wasn't.  I wasn't.

14           And, again, in regards to the videos that he, Ali

15   Soofi, saw, everybody watched and also watched the ISIS videos.        11:23:31

16   Ali Soofi says:  I told them about, you know, how the ISIS

17   videos were being watched.  I mean, how we all watched them

18   together so.  And Wahid pushes back:  But I wasn't over there

19   watching.  See, you have to be very careful with what you say.

20   When you are saying they are over there watching videos, you're        11:23:52

21   making it -- you're implicating every last one of us.

22           He goes on to say:  They, the FBI, are building a

23   case against me and you can get somebody in trouble.

24           And then he says:  The more you say to them, the more

25   incriminating you make me look, and you could have me set up           11:24:10

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

 1    doing time.  You have got to be careful.  This is why I told          11:24:15
 2    you don't talk to them.
 3              Your Honor, I'm going to end where I began.  In the
 4    days and the weeks after the attack, Wahid purposefully lied to
 5    the FBI in the midst of a terrorism investigation.  He lied          11:24:29
 6    about important information which affected this FBI
 7    investigation and then he coercively attempted to persuade a
 8    critical witness in this case to lie to the FBI, to prevent the
 9    FBI from learning potentially incriminating information about
10    him.  Wahid worked to protect Wahid.                                 11:24:51
11              At the close of evidence, we will ask you to find the
12    defendant guilty as charged.  Thank you.
13              THE COURT:  All right.  Ms. Brook, thank you.
14              Mr. Wahid, do you have an opening statement, sir?
15              MR. WAHID:  Yeah.                                          11:25:15
16              Your Honor, as you already know, my name is Abdul
17    Khabir Wahid.  And I'm a disabled worker and the father of
18    three young adults who also live in my home.  Also as you
19    already know, I am the defendant in this matter and am pro per
20    representing myself.                                                 11:25:44
21              I would also like to say for the Court to bear with
22    me and have patience with me as I am not a professional lawyer
23    representing myself.  Therefore, I would not sound as
24    oratorical as my opponent as I am better at writing, would have
25    to say that oral presentation -- I'm a very soft-spoken person      11:26:02

United States District Court

CR-17-00360-PHX-JJT-1, February 26, 2019

1    and sometimes I may not project my voice.  That is why I'm                    11:26:06

2    asking this Court to bear with me and have patience.  I will do

3    my best of my ability in defending myself.

4            As far as this matter goes, the purpose of my opening

5    statement is to prove, number one, the false statements I did      11:26:18

6    not actually deliberately with knowledge making an untrue

7    statement and my conduct was not unlawful.  Second, with

8    tampering with the witness, through Ali Soofi's testimony, I

9    will prove that there was a lack of intent to attempt to tamper

10   with the witness, meaning the defendant did not try to corrupt     11:26:35

11   the witness, the defendant did not act with intent to hinder,

12   delay, or prevent communication of information to a law

13   enforcement officer of the United States.  And there was no

14   commission or possible commission of a federal offense.  And,

15   finally, there was -- and, finally, there was no acts or            11:26:52

16   actions demonstrated that a crime would take place unless

17   interrupted by independent circumstances.

18           And I jotted this down real quick as she was

19   speaking.  It says -- her statement of me knowing Nadir fairly

20   well is incorrect.  I never went to the mosque with Nadir.  I      11:27:14

21   didn't eat with Nadir but one time at his home.  I met Nadir

22   through Elton Simpson when Nadir owned the pizza shop.  And

23   even then, I would see Nadir sparingly, whenever I went into

24   the pizza shop.  There was no criminal activity on my part that

25   the witness Ali Soofi needed to expose as far as I'm concerned.    11:27:34

CR-17-00360-PHX-JJT-1, February 26, 2019

1    Ali -- oh, yeah, Ali Soofi, he gave me his phone                      11:27:43

2  number.  He gave to it Abdul Malik to give to me and that's why

3  I called him.  I didn't just call him out of the blue.  I never

4  said anything about a law would get you.  I don't remember

5  saying that and what I meant by that he didn't see me that many      11:27:55

6  times which she was referring, to what I meant was he asked me

7  when he talked to me -- he didn't ask me, he mentioned he

8  thought he seen me in Nadir Soofi's apartment more than once

9  and I said no.  You didn't see me the many times because I've

10  only been in Nadir's apartment twice.                                11:28:18

11          I'm done.

12          (The following excerpt was previously separately

13  transcribed and is incorporated herein.)

14          THE COURT:  All right.  Thank you, sir.

15          Ms. Brook or Mr. Koehler, if you want to call your           11:28:30

16  first witness.

17          MR. KOEHLER:  Thank you, Your Honor.  The United

18  States calls Greg Stevens.

19          THE COURT:  Mr. Stevens, if you will step up past the

20  bar to my courtroom the deputy, she will swear you in.              11:28:56

21          COURTROOM DEPUTY:  If you can please state your name

22  and spell your last name for the record.

23          THE WITNESS:  I'm Greg Stevens.  My last name is

24  spelled S-T-E-V-E-N-S.

25          COURTROOM DEPUTY:  Please raise your right hand.             11:29:09

GREG STEVENS - Direct

| 1 | (GREG STEVENS, a witness herein, was duly sworn or | 11:29:11 |

2  affirmed.)

3                          **DIRECT EXAMINATION**

4  BY MR. KOEHLER:

5  Q.   Good morning, Mr. Stevens.                          11:29:33

6  A.   Good morning.

7  Q.   Would you please introduce yourself to the Court and to

8  Mr. Wahid?

9  A.   I am Greg Stevens.   I am a retired police officer from the

10 Garland, Texas, police department.                       11:29:44

11 Q.   How long did you work for the Garland Police Department?

12 A.   Just over 40 years.

13 Q.   And what was your assignment when you worked there?

14 A.   Primarily I started out working in the Patrol Division for

15 about eight years.   After that I was assigned to the Traffic   11:30:00

16 Division and, for the most part, worked the rest of my career

17 there in the traffic division.

18 Q.   So you were a traffic officer?

19 A.   That is correct.

20 Q.   And were you on duty on March 3 of 2015?            11:30:13

21 A.   I was -- probably but -- are you referring to May 3?

22 Q.   I'm sorry, May 3, 2015.   I misspoke.

23 A.   Yes, sir, I was.

24 Q.   And what were you doing that day?

25 A.   I was working -- it was an off-duty assignment sponsored   11:30:31

GREG STEVENS - Direct

1   by the City.   There was an event at the Curtis Culwell Center,                    11:30:35

2   which is a convention center there in the City of Garland, and

3   I was working a security assignment there.

4   Q.   And what was the name of the event that was going on that

5   day there?                                                                          11:30:54

6   A.   It was called the Draw the Prophet art contest.

7   Q.   Okay.   And did that have to do with the Prophet Muhammed?

8   A.   Did it?

9   Q.   Do you recall where you were stationed there at the Curtis

10  Culwell Center?                                                                     11:31:05

11  A.   Yes, sir.   I was stationed at the West entrance, a

12  driveway entrance on the West side of the complex.

13         MR. KOEHLER:   If I could place Exhibit 1 up on the

14  monitor before the witness.

15  BY MR. KOEHLER:                                                                     11:31:56

16  Q.   Sir, do you recognize that photo?

17  A.   I do.

18  Q.   What is that?

19  A.   That's an aerial photograph including the Curtis Culwell

20  Center.                                                                             11:32:01

21  Q.   Are you able to see the place where you were stationed on

22  that photograph?

23  A.   I am.

24  Q.   If you touch it, you can draw a circle there.

25  A.   Okay (Witness complies).                                                       11:32:09

United States District Court

GREG STEVENS - Direct

1   Q.   And so where was your vehicle parked?                    11:32:13

2   A.   It was parked inside the driveway probably 20 feet, 20

3   plus feet back from the entrance of the driveway.

4   Q.   Okay.  And so the road that's running kind of vertical and

5   then curving back toward the right down at the lower right end   11:32:35

6   that's the entrance road; is that correct?

7   A.   That goes down kind of a hill to the -- to a large

8   entrance to the arena portion of the Culwell Center.

9   Q.   All right.  And that road that's wider that's going past

10  the point where your circle is, what the name of that road?     11:32:55

11  A.   That is Naaman Forest Boulevard.

12  Q.   And what time did you go on station there?

13  A.   I arrived about 1:30 in the afternoon and took up my

14  position almost immediately after that.

15  Q.   Was the security profile that you had there at that event   11:33:13

16  normal for the Culwell Center that day?

17  A.   No.  It was different than what we typically would have

18  done simply because we had some concerns about the nature of

19  the event.

20  Q.   Were you aware of threats having been made to the event?    11:33:30

21  A.   I was, yes.

22  Q.   And was there also private security on scene?

23  A.   The school district had their security officers, a number

24  of them, there as well.

25  Q.   Is that because the Garland School District owns the        11:33:44

United States District Court

GREG STEVENS - Direct

| | | |
|---|---|---|
| 1 | Curtis Culwell Center? | 11:33:47 |
| 2 | A.   Yes, sir. | |
| 3 | Q.   And then do you remember who the promoter of this event | |
| 4 | was? | |
| 5 | A.   It was a lady from New York named Pamela Geller. | 11:33:56 |
| 6 | Q.   Did she have her own security detail at the event? | |
| 7 | A.   She did, yes. | |
| 8 | Q.   Do you recall who the keynote speaker was for the event? | |
| 9 | A.   He was a Dutch politician.  I believe his name is | |
| 10 | pronounced Geert Wilders. | 11:34:10 |
| 11 | Q.   Very good.  And did he have his own security team as well? | |
| 12 | A.   Yes, sir, he did. | |
| 13 | Q.   All right.  Was there a point later in the day that you | |
| 14 | took a break? | |
| 15 | A.   Very late in the day.  Just several hours later, yes, sir. | 11:34:21 |
| 16 | Q.   Okay.  And where did you go? | |
| 17 | A.   I went up to the side of the building kind of on the front | |
| 18 | West side of the building there just to take a bathroom break. | |
| 19 | Q.   All right.  And from that did you return to your post? | |
| 20 | A.   I did. | 11:34:44 |
| 21 | Q.   When you returned to your post, how close was that in | |
| 22 | proximity to the end of the event? | |
| 23 | A.   Well, actually, when I was up at the building, I heard | |
| 24 | somebody, the radio or police radio kind of crackled and | |
| 25 | somebody said that it looked like it just ended.  So it was | 11:34:55 |

GREG STEVENS - Direct

1   ending just as I was going back to my post.                    11:34:58

2   Q.   When you returned to your post, did something unusual

3   happen?

4   A.   Yes, sir.

5   Q.   Could you please describe that?                            11:35:07

6   A.   Well, I had repositioned my car where I had it before kind

7   of parallel to the driveway entrance back away from the

8   entrance a ways.  I had large cones blocking the entirety of

9   the entrance to the parking area except for about an area ten

10  feet wide or so on the -- if you're looking at the street, it  11:35:30

11  was on the left-hand side.  And my assignment was just to allow

12  the dignitaries in and out and a caterer and nobody else was

13  supposed to be admitted to that entrance and so on.  So I had

14  it blocked to where I spent my time standing in that entrance.

15  Q.   If I can interrupt for a second.  Were there points        11:35:54

16  throughout the day that people pulled up to your checkpoint and

17  you had to direct them elsewhere in the course of the day?

18  A.   Yes.

19  Q.   Can you explain that briefly?

20  A.   On occasion somebody would pull up asking where to park or 11:36:02

21  where the event was -- the parking for the event was.  Those

22  kinds of things typical of any event where you have a gathering

23  of folks.  There's going to be people that need instruction.

24        MR. KOEHLER:  Before you go on, I would like to move

25  to admit Exhibit 1.                                            11:36:22

United States District Court

GREG STEVENS - Direct

1          THE COURT:  Any objection?                                 11:36:23

2          MR. WAHID:  No.

3          THE COURT:  There being no objection, Exhibit 1 is

4     admitted.

5          (Exhibit Number 1 was admitted into evidence.)            11:36:30

6     BY MR. KOEHLER:

7     Q.    Now, you mentioned something unusual happened.  Can you

8     describe what happened as you got back to your post?

9     A.    Yes, sir.  So I was standing in the open area of the

10    driveway where I had removed the cones and a small two-door    11:36:42

11    vehicle came from what would be my left down Naaman Forest

12    Boulevard, pulled into the driveway past where I was standing,

13    was partially in the driveway and partially in the road

14    parallel with the roadway and stopped kind of at the far side

15    of the entrance itself and did it rather abruptly, kind of got  11:37:08

16    my attention.  It was unusual.

17          My first thought, it was somebody was going to ask a

18    question and I didn't know why they would drive past me so it

19    kind of garnered my attention.

20    Q.    What color was the car?                                   11:37:27

21    A.    It was black.

22    Q.    Okay.  Go ahead.

23    A.    So as I'm watching, I can see the back of the car clearly.

24    I can see the passenger side clear.  I can't see the driver's

25    side as clearly.  It was a two-door car.  I remember noticed it  11:37:38

United States District Court

GREG STEVENS - Direct

1 had Arizona license plates on it, which is something we would    11:37:43

2 talked about in briefing, about out-of-state license plates.

3 But as I'm standing there watching it, I noticed both the

4 passenger and driver door -- it was a two-door car -- they both

5 opened simultaneously.    11:37:55

6        I was watching the passenger side more closely

7 because I had a better view of it.  And once the doors opened,

8 the next thing I see is somebody stepping out of the car.  They

9 were armed with some kind of a rifle and I saw the rifle barrel

10 coming up in my direction.    11:38:13

11 Q.   What did you do in response to that?

12 A.   Well, obviously I detected that to be a threat.  My

13 training kicked in at that point.  I unholstered and engaged

14 the passenger immediately with my duty pistol.  It was a Glock,

15 .45 caliber.  Fired several rounds.  The passenger that had    11:38:34

16 exited the vehicle fell to the ground, dropped his rifle, was

17 still within proximity but he was temporarily out of the fight

18 as far as I was concerned.  I then immediately acquired where

19 the driver was who was coming around the back of the car, the

20 driver had a rifle as well, had the rifle up.    11:39:02

21 Q.   Was he firing?

22 A.   Yes.  And I believe he was probably firing at a security

23 guard that had been assigned to that post with me.  He was

24 unarmed.  He had a uniform on but he was not a police officer.

25 He was a security officer and he wasn't authorized to be armed.    11:39:21

United States District Court

GREG STEVENS - Direct

1  Q.   What was the name of the security officer?                    11:39:26

2  A.   His name is Bruce Joiner.

3  Q.   Okay.  Go ahead.

4  A.   So I acquired the driver coming around.  I turned and I

5  fired several rounds at the driver who also fell, dropped his      11:39:36

6  rifle in a similar fashion as to what happened to the

7  passenger.  Once again, temporarily got him out of the fight.

8         I then redirected my attention back to the passenger

9  who was still on the ground within reach of the rifle.  My

10  greatest concern, though, was he had his hands up near his        11:40:00

11  upper chest and his throat area.  His hands are moving around.

12  You are concerned about -- we had talked about in briefings

13  about IEDs, improvised explosive devices.  I was concerned

14  whether he might be attempting to activate some kind of device

15  either that he had on his body or in the vehicle.                 11:40:21

16  Q.   Was there anything about his clothing that indicated that

17  that could be a possibility?

18  A.   Both of the occupants were wearing dark clothing, like a

19  military style clothing.  They both had load-bearing vests,

20  what we call load-bearing vests, which is a vest that goes over   11:40:37

21  the top of your clothing that has lots of pockets in it and

22  they both had extra magazines for their rifle in there.  They

23  both were wearing what looked like small backpacks.  They

24  looked very military in nature.

25  Q.   So did that contribute to your concern that they might       11:40:59

United States District Court

GREG STEVENS - Direct

1  have explosives on them?

2  A.   Absolutely.  And like I said, the passenger, the way he

3  had his hands up near his upper chest area and was moving

4  around, I couldn't -- I wasn't sure if he might be attempting

5  to pull a pin on like a grenade or trying to press a plunger or

6  a button of some sort to activate some kind of explosive

7  device.

8  Q.   And then what happened when you observed that?

9  A.   I reengaged and fired several more rounds simply because

10 he was still a very viable threat and then he seemed to stop

11 moving very much at all at that point.  And I redirected my

12 attention back to the driver who was less active but, once

13 again, was within proximity of the rifle.  I fired a couple

14 more rounds.  That's when my slide locked back on my service

15 pistol indicating that I needed to reload and I did.  I did a

16 tactical reload and redirected my attention back to the

17 passenger, was approaching the passenger when I was called to

18 the point of cover by some other officers that had arrived to

19 assist in what was going on.

20 Q.   And was that the S.W.A.T team?

21 A.   Yes, sir.  Primarily it was members of our S.W.A.T team.

22 Q.   And did members of the S.W.A.T team fire more rounds at

23 the two subjects?

24 A.   They did.

25 Q.   All right.  And were the two subjects deceased at the

United States District Court

11:41:02

11:41:16

11:41:33

11:42:02

11:42:22

11:42:32

GREG STEVENS - Direct

1   scene after that?                                                11:42:35

2   A.   Yes, sir.

3   Q.   All right.  I want to direct your attention now to Exhibit

4   Number 2.  Can you describe what this is on your screen?  And

5   can you hit -- I think it's the upper left corner of your       11:43:03

6   screen to clear?

7              COURTROOM DEPUTY:  I've got it.  I'll clear it.

8              MR. KOEHLER:  Okay.  Thank you.

9   BY MR. KOEHLER:

10  Q.   Can you describe what this photograph is?                  11:43:10

11  A.   This is -- I would call it a FLIR image or a heat image

12  taken above the crime scene where the attack occurred.

13  Q.   Does that photographically depict the scene after the two

14  subjects were neutralized?

15  A.   Yes, sir, it does.                                         11:43:31

16  Q.   And can you --

17             MR. KOEHLER:  First off, I'll move to admit Exhibit

18  Number 2.

19             THE COURT:  Mr. Wahid, any objection?

20             MR. WAHID:  No.                                      11:43:40

21             THE COURT:  There being no objection, number two is

22  admitted.

23             (Exhibit Number 2 was admitted into evidence.)

24  BY MR. KOEHLER:

25  Q.   Starting at the back of the vehicle and working your way   11:43:44

United States District Court

GREG STEVENS - Direct

1  left, there appears to be something on the ground near the        11:43:46

2  trunk of the car.  Can you tell us what that is?

3  A.   This -- shall I draw a circle on it to be sure we're

4  talking about the same thing?

5  Q.   Absolutely?                                                  11:44:02

6  A.   Is this the item you're talking about?

7  Q.   Yes.

8  A.   That is a weapon, a rifle.

9  Q.   Okay.  And whose weapon was that?

10 A.   That would be the passenger's.                              11:44:14

11 Q.   All right.  And where is the passenger in the photograph?

12 A.   Right beside it.  Right here (Indicating).  This is the

13 passenger.

14 Q.   Now, I think you can touch the upper left corner of the

15 screen and change the color from red to a different color.       11:44:26

16       And then can you indicate where the driver is and

17 then his rifle?

18 A.   This is the driver here and his rifle is right here

19 (Indicating)?

20 Q.   Now, can you put an X where you were standing when you      11:44:40

21 engaged these two?

22 A.   I was approximately -- when they stepped out of the

23 vehicle, I was about here (Indicating).

24 Q.   All right.  Now, looking down below where you were

25 standing in the photo, there appears to be a vehicle and         11:44:58

United States District Court

GREG STEVENS - Direct

| | | |
|---|---|---|
| 1 | another vehicle.  What are those? | 11:45:00 |
| 2 | A.    The one that looks like a car is a car.  It is actually my | |
| 3 | car that I was assigned and that is where I had parked it when | |
| 4 | I returned and the vehicle next to it is a police motorcycle | |
| 5 | and it arrived after the attack. | 11:45:16 |
| 6 | Q.    So -- | |
| 7 | A.    Just as the attack was ending actually and was that | |
| 8 | Officer Orman, O-R-M-A-N. | |
| 9 | Q.    Now, I'm going to direct your attention to Exhibit | |
| 10 | Number 3.  If you could remove your marks, please.  Is that a | 11:45:32 |
| 11 | closeup of the same photograph, Mr. Stevens? | |
| 12 | A.    Yes, sir.  It appears to be. | |
| 13 | Q.    And does that also fairly and accurately depict the scene? | |
| 14 | A.    Yes, sir. | |
| 15 |        MR. KOEHLER:  Move to admit Exhibit 3. | 11:45:48 |
| 16 |        THE COURT:  Mr. Wahid, any objection? | |
| 17 |        MR. WAHID:  No. | |
| 18 |        THE COURT:  All right.  Number three is admitted. | |
| 19 |        (Exhibit Number 3 was admitted into evidence.) | |
| 20 | BY MR. KOEHLER: | 11:45:54 |
| 21 | Q.    Did you also create a diagram yourself of the scene? | |
| 22 | A.    No, sir, I didn't personally do that. | |
| 23 | Q.    So this right here is not something that you did? | |
| 24 | A.    I don't recall doing that unless somebody was interviewing | |
| 25 | me and asked me to do it but I don't remember doing that, no, | 11:46:11 |

GREG STEVENS - Direct

1    sir.                                                                    11:46:13

2    Q.   Okay.  We'll just move on from that one then.

3         The passenger of the vehicle when he was shooting, do

4    you recall whether he was shooting from the hip area or from

5    the shoulder area?                                                       11:46:32

6    A.   I do not recall specifically.  Probably somewhere between

7    the two.  As he got out of the vehicle, he had to transition

8    his weapon up if he were going to shoot from the shoulder.

9    Q.   And you got a look at his weapon after; is that right?

10   A.   Not other than what you see in these pictures here.                 11:46:51

11   Q.   Okay.  Fair enough.

12        And then the driver, how was he firing?

13   A.   The driver, by the time I acquired him and engaged him, he

14   did have his rifle shouldered.

15   Q.   He had it shouldered, all right.  And then last, but not            11:47:06

16   least, did the Garland PD respond to the explosives concern

17   that you had?

18   A.   Yes, sir.

19   Q.   What did they do?

20   A.   We have some officers that are dedicated bomb technicians.          11:47:21

21   They kind of took the scene once everybody was moved out of the

22   scene and they went through a rather arduous process.  And I

23   can't describe it because I'm not trained in that, but they

24   went through a rather arduous process of using robots and other

25   technology to be able to clear the vehicle and the victims to           11:47:40

United States District Court

1   be sure there weren't any explosive devices at hand.                    11:47:48

2   Q.   Did you witness them do that?

3   A.   Some of it.  I wasn't watching them do that but part of

4   what they did involved using explosive charges and I certainly

5   heard those.  And we were warned on the radio before they were   11:48:02

6   going to discharge something, but I wasn't -- I couldn't --

7   from the place I was, I couldn't see down to the actual scene.

8   Q.   Did you see the aftermath of that explosion?

9   A.   Mostly in photographs.

10  Q.   Okay.                                                            11:48:24

11           MR. KOEHLER:  I have no further questions for the

12  witness at this time.

13           THE COURT:  Thank you, Mr. Cole.

14           Mr. Wahid, do you have any questions?

15           MR. WAHID:  No questions, Your Honor.                       11:48:35

16           THE COURT:  All right.

17           Mr. Stevens, I can excuse you and I can let you down.

18  You may step down.

19           (Witness excused.)

20           THE COURT:  Mr. Koehler, would you call your next          11:48:49

21  witness, please.

22           MR. KOEHLER:  The United States calls Brian Marlow.

23           THE COURT:  Mr. Marlow, if you would step up to my

24  courtroom deputy, she will wear you in.

25           COURTROOM DEPUTY:  Please state your name and spell        11:49:15

United States District Court

```
 1    your last name for the record.                                    11:49:16
 2             THE WITNESS:  Brian Marlow.  M-A-R-L-O-W.
 3             (BRIAN MARLOW, a witness herein, was duly sworn or
 4    affirmed.)
 5                       DIRECT EXAMINATION                              11:49:21
 6    BY MR. KOEHLER:
 7    Q.    Sir, would you please introduce yourself to the Court?
 8    A.    My name is Brian Marlow.  I'm a Special Agent with the
 9    FBI.
10    Q.    And where are you stationed?                                 11:50:05
11    A.    In Dallas.
12    Q.    Are you a member of the Dallas Field Office?
13    A.    I am.
14    Q.    How long have you been with the FBI?
15    A.    Since 2006.                                                  11:50:14
16    Q.    Do you have any principal areas of responsibility?
17    A.    I'm the senior team leader for our Evidence Response Team.
18    Q.    So when an event happens, are you generally one of the
19    people who is in charge of going out to the scene and gathering
20    the evidence?                                                     11:50:28
21    A.    Yes.
22    Q.    And were you a team leader of the Evidence Response Team
23    on May 3 of 2015?
24    A.    I was.
25    Q.    And on that date, did an event occur to which you           11:50:39
```

United States District Court

BRIAN MARLOW - Direct

1  responded?                                                        11:50:42

2  A.   Yes, there was a shooting in Garland, Texas.

3  Q.   And did you respond to the Curtis Culwell Center for that

4  event?

5  A.   I did.                                                       11:50:51

6  Q.   What was your role at that event?

7  A.   I was the senior team leader.

8  Q.   Looking at your screen there on the right side of your

9  screen, do you see a photograph there?

10  A.   I do.                                                       11:51:16

11  Q.   Can you tell us what that depicts?

12  A.   That's a portion of the crime scene that we processed on

13  that date.

14  Q.   And is the entrance area in the building there straight

15  behind in the back of the photo, is that the entrance to the    11:51:30

16  Curtis Culwell Center?

17  A.   It is, yes.

18  Q.   All right.  So we're looking at the vehicle from the

19  backside; is that right?

20  A.   Yes.                                                        11:51:39

21  Q.   Does that photograph fairly and accurately depict the

22  crime scene as it appeared the morning after the attack?

23  A.   Yes, it does.

24  Q.   And I'm going to show you the second half of that.  Can

25  you tell the Court what that is?                                 11:52:00

United States District Court

BRIAN MARLOW - Direct

1  A.    That's another portion of the crime scene:  It's the          11:52:03

2  vehicle that we saw in the previous photo off to the right.

3  Q.    Does that fairly and accurately depict that portion of the

4  crime scene?

5  A.    It does.                                                       11:52:18

6           MR. KOEHLER:  Move to admit Exhibit Number 5.

7           THE COURT:  I have a question for you, Mr. Koehler.

8  This is all one exhibit?

9           MR. KOEHLER:  Yes, it is.

10          THE COURT:  How come I saw it in two pieces?               11:52:25

11          MR. KOEHLER:  I don't recall, Your Honor.

12          THE COURT:  Well, the exhibit is one photograph?

13          MR. KOEHLER:  Two photos in one image set.

14          THE COURT:  All right.  Understood.

15          Are there any objections, Mr. Wahid?                       11:52:39

16          MR. WAHID:  No.

17          THE COURT:  All right, sir.  The exhibit is admitted.

18          (Exhibit Number 5 was admitted into evidence.)

19  BY MR. KOEHLER:

20  Q.    And Mr. Marlow, can you tell us why this scene is so big,    11:52:46

21  why there's so much stuff so far away from the vehicle when it

22  was merely a shooting, at least the initiation of this event?

23  A.    Our bomb technicians removed certain bags out of the car

24  and also the car itself.  They made it safe, made sure there

25  wasn't any explosive devices there.                               11:53:13

BRIAN MARLOW - Direct

```
 1  Q.   Did they use a water device to essentially blow up the car    11:53:16
 2  and neutralize any potential explosives?
 3  A.   I believe so, yes.
 4  Q.   Let me move on to Exhibit Number 6.
 5            Did FBI agents recover weapons the scene?                 11:53:34
 6  A.   Yes.
 7  Q.   And directing your attention to Exhibit Number 6, do you
 8  recognize that?
 9  A.   I do.
10  Q.   Is that one of the weapons that was recovered at the          11:53:49
11  scene?
12  A.   It was.
13  Q.   And do you recall whose body that was near?
14  A.   That was near Mr. Soofi.
15  Q.   And do you know Mr. Soofi's full name?                        11:54:02
16  A.   I do not.
17  Q.   Okay.  Is that a fair and accurate depiction of that
18  rifle?
19  A.   It is.
20            MR. KOEHLER:  November to admit Exhibit 6.               11:54:14
21            THE COURT:  Any objection, Mr. Wahid?
22            MR. WAHID:  No.
23            THE COURT:  Thank you.
24            No objection.  Number six is admitted.
25            (Exhibit Number 6 was admitted into evidence.)          11:54:22
```

BRIAN MARLOW - Direct

1   BY MR. KOEHLER:                                                    11:54:25

2   Q.   Now moving on to Exhibit Number 7.  Do you recognize that?

3   A.   I do.

4   Q.   Was that also a rifle found at the scene?

5   A.   It was.                                                       11:54:36

6   Q.   What type of a rifle is that?

7   A.   It's a Romanian Draco AK47 pistol.

8   Q.   And whose body was that next to?

9   A.   That's near Mr. Simpson.

10  Q.   All right, sir.  Do you know which person was the            11:54:48

11  passenger and which person was the driver of the car?

12  A.   I do not.

13  Q.   Okay.  Very good.

14          MR. KOEHLER:  Move to admit Exhibit 7.

15          THE COURT:  Any objection, Mr. Wahid?                      11:55:01

16          MR. WAHID:  No objection, Your Honor.

17          THE COURT:  All right.  Seven is admitted.

18          (Exhibit Number 7 was admitted into evidence.)

19  BY MR. KOEHLER:

20  Q.   Now directing your attention to Exhibit Number 8.  Do you    11:55:11

21  recognize that?

22  A.   I do.

23  Q.   What is that?

24  A.   It's a Jimenez Arms 9mm pistol.

25  Q.   Do you recall where that was recovered from the scene?       11:55:18

BRIAN MARLOW - Direct

1  A.   That was recovered out of the ammo carrier, ammunition                11:55:20

2  carrier, that Mr. Simpson was wearing.

3  Q.   Does that fairly and accurately depict that firearm?

4  A.   It does.

5  Q.   Move to admit Exhibit 8.                                              11:55:34

6         THE COURT:  Any objection, Mr. Wahid?

7         MR. WAHID:  No.

8         THE COURT:  Eight is admitted.

9         (Exhibit Number 8 was admitted into evidence.)

10  BY MR. KOEHLER:                                                           11:55:44

11  Q.   Now, directing your attention to Exhibit 9, what is that?

12  A.   That's a Taurus .357 Magnum five shot revolver.

13  Q.   And where was that recovered?

14  A.   That was located in the pocket of Mr. Simpson.

15  Q.   Does that photo fairly and accurately reflect that item?           11:55:59

16  A.   It does.

17         MR. KOEHLER:  Move to admit Exhibit 9.

18         THE COURT:  Any objection, Mr. Wahid?

19         MR. WAHID:  No.

20         THE COURT:  Nine is admitted.                                     11:56:09

21         (Exhibit Number 9 was admitted into evidence.)

22  BY MR. KOEHLER:

23  Q.   Now, directing your attention to Exhibit Number 10.  Do

24  you recognize that?

25  A.   I do.                                                               11:56:20

BRIAN MARLOW - Direct

1    Q.    What is that?                                                    11:56:20

2    A.    It's a Keltec 9mm rifle.

3    Q.    Do you know where that was recovered?

4    A.    That was recovered next to the passenger door of the

5    vehicle on the ground.                                                11:56:28

6    Q.    And does that photograph fairly and accurately depict that

7    weapon?

8    A.    It does.

9              MR. KOEHLER:  Move to admit Exhibit 10.

10             THE COURT:  Mr. Wahid, any objection to number 10?          11:56:38

11             MR. WAHID:  No.

12             THE COURT:  All right.  Number ten is admitted.

13             (Exhibit Number 10 was admitted into evidence.)

14             THE COURT:  Mr. Koehler, it sounds like you've got

15   several more that you're going to go through here.                    11:56:44

16             MR. KOEHLER:  I'm going to go through Exhibit 16 and

17   then 22 through 26 with this witness.

18             THE COURT:  That's just fine.  Just to be efficient

19   with this, I have been asking Mr. Wahid whether he objects to

20   each exhibit.  I will simply hold for a moment.  As you move          11:57:00

21   something in and if, Mr. Wahid, if you have an objection,

22   please raise it.  If you don't, I will assume you don't.

23             MR. WAHID:  Okay.

24             THE COURT:  Thank you.

25   \\\

United States District Court

BRIAN MARLOW - Direct

1    BY MR. KOEHLER:                                                      11:57:17

2    Q.   Now moving on to Exhibit Number 11, do you recognize that?

3    A.   Yes.

4    Q.   What is that?

5    A.   It's a HiPoint 9mm pistol.                                      11:57:22

6    Q.   Does it have an extended magazine?

7    A.   It does.

8    Q.   And where was that recovered?

9    A.   It was on the ground next to Mr. Soofi.

10   Q.   Also fairly and accurately depicting that item?              11:57:32

11   A.   It does.

12   Q.   And I'll just hold moving for admission until we get

13   through these.

14            I'm going to direct your attention now to Exhibit 12.

15   Will you tell the Court what that is?                               11:57:45

16   A.   It's a bag of 9mm ammunition.

17   Q.   And does that fairly and accurately depict some of the

18   ammunition that was found at the scene?

19   A.   It does.

20   Q.   Exhibit 13?                                                    11:58:05

21   A.   Again, a bag of 5.45 x 35 millimeter ammunition.

22   Q.   And does this ammunition correspond to one of the weapons

23   that was recovered at the scene?

24   A.   Yes.  The Elk tool and die weapon by Mr. Soofi.

25   Q.   So the rifle with the two little drum barrels attached to     11:58:22

BRIAN MARLOW - Direct

1    it in the previous photo?                                          11:58:25

2    A.   Yes.

3    Q.   And that fairly and accurately depicts that ammunition?

4    A.   It does.

5    Q.   Now moving on to Exhibit Number 14, what is that?            11:58:37

6    A.   That's a bag of, again, the 5.45 x 35 millimeter

7    ammunition.

8    Q.   Also corresponding to that Elk River tool and die AK47

9    rifle?

10   A.   Yes.                                                         11:58:56

11   Q.   And does that fairly and accurately depict those items.

12   A.   It does.

13   Q.   15 and specifically I want you to look both at the

14   dashboard of the vehicle and at the front passenger seat of the

15   vehicle.  In the -- first of all, what does this picture        11:59:18

16   depict?

17   A.   It's the interior compartment of the vehicle that was on

18   the scene.

19   Q.   All right.  And on the dashboard in the upper right corner

20   to the right of the black card that says G on it, can you tell   11:59:35

21   the Court what is depicted there?

22   A.   It's a Galaxy S5 cell phone.

23   Q.   All right.  And then down on the seat itself, do you have

24   a book present there?

25   A.   Yes.  It was a fortress book is the title or portion of     11:59:51

United States District Court

BRIAN MARLOW - Direct

1  the title.

2  Q.   And does this photograph fairly and accurately depict the

3  interior of the car shortly after the scene was that under

4  control?

5  A.   Yes.

6         MR. KOEHLER:   All right.   I'm going to move to

7  admit -- I think we stopped at 12 or perhaps 11 and moved to

8  admit 11 through 15.

9         THE COURT:   There being no objection, Exhibits 11

10  through 15 are admitted.

11         (Exhibit Numbers 11 through 15 were admitted into

12  evidence.)

13         MR. WAHID:   No.

14         MR. KOEHLER:   If I may have the case agent approach

15  the witness with Exhibit Number 16, please.

16         THE COURT:   You may.

17         MR. KOEHLER:   And while we're at it, let's add 22,

18  23 -- excuse me, 23 is off.   22, 24, 25, and 26 to speed things

19  up.

20         Your Honor, may I approach the exhibit box, quickly?

21         THE COURT:   You may.

22         COURTROOM DEPUTY:   Mr. Koehler, did you take 16, 22,

23  24, 25 from the box?

24         MR. KOEHLER:   Yes.   They are physical items.   I am

25  going to staple the cover sheets to the plastic.

United States District Court

BRIAN MARLOW - Direct

1           COURTROOM DEPUTY:  I just want to track what you                12:04:21

2    took.

3           MR. KOEHLER:  May I approach the witness, Your Honor?

4    BY MR. KOEHLER:

5    Q.   Mr. Marlow, do you recognize that item?                          12:04:51

6    A.   I do.

7    Q.   What is it?

8    A.   This is the Galaxy S5 cell phone that was found at the

9    scene in the car.

10   Q.   Okay.  So that's the same -- the same phone that was on          12:05:00

11   the dashboard that is displayed in Exhibit Number 15?

12   A.   Yes.

13          MR. KOEHLER:  Move to admit Exhibit 16.

14          THE COURT:  There being no objection, 16 is admitted.

15          (Exhibit Number 16 was admitted into evidence.)               12:05:16

16          MR. KOEHLER:  May I approach the witness again, Your

17   Honor?

18          THE COURT:  You may.

19   BY MR. KOEHLER:

20   Q.   Directing your attention first to Exhibit Number 22, can        12:05:39

21   you tell the Court what that is, please?

22   A.   This is some paper ISIL or ISIS flags we found at the

23   scene?

24   Q.   Are you familiar with the ISIS flag?  Have you seen in it

25   your line of work in past?                                            12:05:57

United States District Court

BRIAN MARLOW - Direct

1  A.   I have.                                                              12:05:58

2  Q.   And do those printed sheets of paper match the ISIS flag

3  images that you've seen in the past?

4  A.   To the best of my knowledge, yes.

5  Q.   Was there a fairly large quantity of those found at the      12:06:08

6  scene?

7  A.   There was a stack of them.  They are all together.

8  Q.   And were they damaged in the water event that took apart

9  the car?

10  A.   Yes.                                                         12:06:20

11  Q.   Are those in substantially the same condition they were in

12  when they were recovered at the scene?

13  A.   Yes.

14        MR. KOEHLER:  Move to admit 22.

15        THE COURT:  There being no objection, 22 is in            12:06:31

16  evidence.

17        (Exhibit Number 22 was admitted into evidence.)

18  BY MR. KOEHLER:

19  Q.   Now, directing your attention to Exhibit Number 24.  Can

20  you tell us what that is?                                         12:06:38

21  A.   It's a book, Defence of the Muslim Lands.

22  Q.   Was that also recovered at the seen?

23  A.   It was.

24  Q.   Where was that recovered, if you recall?

25  A.   It was in the median in a grassy area near a bag that was   12:06:49

BRIAN MARLOW - Direct

1   opened up by the bomb techs.  It was just north, northwest of     12:06:55

2   the vehicle.

3   Q.   So it likely came out of the backpack that it was next to

4   or the bag?

5   A.   Yes.                                                         12:07:07

6   Q.   And is that in substantially the same condition it was in

7   when it was recovered?

8   A.   Yes.

9           MR. KOEHLER:  Move to admit Exhibit Number 24.

10          THE COURT:  All right.  There being no objection and      12:07:16

11  before we move on, Agent Marlow, as the supervisor of the

12  Evidence Response Team, are you signing off on each of these

13  seizures on the evidence bags?

14          THE WITNESS:  No, sir.  Members of my team do that.

15          THE COURT:  And they are signatures or initials that      12:07:35

16  you would recognize?

17          THE WITNESS:  Yes.

18          THE COURT:  All right.  24 is admitted.

19          (Exhibit Number 24 was admitted into evidence.)

20          MR. KOEHLER:  To be clear, we have a stipulation          12:07:42

21  about Mr. Marlow being entitled to serve as the evidence

22  custodian for all of these items from the Garland scene.

23          May the case agent approach the witness?

24          THE COURT:  She may.

25  \\\

United States District Court

BRIAN MARLOW - Direct

1   BY MR. KOEHLER:                                                     12:08:07

2   Q.   Before we move to those two exhibits, Mr. Marlow, looking

3   at Exhibit Number 24, does that reflect who the author of that

4   text is?

5   A.   It does.                                                       12:08:14

6   Q.   What is the name?

7   A.   I'll butcher the pronunciation but it's Shaykh Abdullah

8   Azzam.

9   Q.   Thank you.

10          Now, so now directing your attention to Exhibit           12:08:31

11  Number 25, what is that?

12  A.   This is a brown wallet with Mr. Soofi's driver's license

13  and a bank visa card.

14  Q.   And were those recovered from Mr. Soofi's body at the

15  scene?                                                              12:08:49

16  A.   No.   They were recovered from the vehicle itself.

17  Q.   Are they in substantially the same condition in as when

18  they were recovered?

19  A.   Yes.

20          MR. KOEHLER:   Move to admit 25.                           12:09:01

21          THE COURT:   25 is admitted.

22          (Exhibit Number 25 was admitted into evidence.)

23  BY MR. KOEHLER:

24  Q.   And now directing your attention to 26.   Can you tell us

25  what that is?                                                       12:09:16

United States District Court

BRIAN MARLOW - Direct

|    |                                                                            |          |
|----|----------------------------------------------------------------------------|----------|
| 1  | A.   It's a wallet with Mr. Simpson's driver's license.                    | 12:09:17 |
| 2  | Q.   And where was that recovered?                                         |          |
| 3  | A.   That was recovered on Mr. Simpson's body.                             |          |
| 4  | Q.   All right.  And is that in substantially the same                     |          |
| 5  | condition it was in at the time it was recovered?                          | 12:09:32 |
| 6  | A.   Yes.                                                                   |          |
| 7  |              MR. KOEHLER:  Move to admit Exhibit Number 26.                |          |
| 8  |              THE COURT:  Hearing no objection, 26 is admitted.             |          |
| 9  |              (Exhibit Number 26 was admitted into evidence.)              |          |
| 10 | BY MR. KOEHLER:                                                            | 12:09:42 |
| 11 | Q.   Now, Agent Marlow, given what you knew about what unfolded            |          |
| 12 | at the scene and these items, among other items that were                 |          |
| 13 | recovered at the scene, couple of things.  Number one,                    |          |
| 14 | approximately how many rounds of ammunition were recovered at             |          |
| 15 | the scene?                                                                 | 12:09:55 |
| 16 | A.   There was over 1500.                                                  |          |
| 17 | Q.   And what was the total number of firearms that they                  |          |
| 18 | carried?                                                                   |          |
| 19 | A.   Six firearms were recovered at the scene.                            |          |
| 20 | Q.   And in light of the nature of the contest, the ISIS flags            | 12:10:07 |
| 21 | and the other items recovered, what kind of investigation did             |          |
| 22 | the FBI treat this as at that point?                                      |          |
| 23 | A.   Courter-terrorism investigation.                                     |          |
| 24 |              MR. KOEHLER:  I have no further questions for the             |          |
| 25 | witness, Your Honor.                                                       | 12:10:23 |

United States District Court

```
 1              THE COURT:  All right.  Thank you, Mr. Koehler.        12:10:24
 2         Mr. Wahid, do you have any questions for Agent
 3    Marlow?
 4              MR. WAHID:  No.
 5              THE COURT:  All right.  Then the witness may be       12:10:31
 6    excused.
 7         Mr. Marlow, you may be excused.  You may step down.
 8    Thank you, sir.
 9              THE WITNESS:  Thank you.
10              (Witness excused.)                                   12:10:38
11              THE COURT:  Mr. Koehler, you can go ahead and call
12    your next witness.
13         Just for planning purposes, as I had told you
14    consistently with the Friday hearing, we're going to go until
15    about 12:30 so let's see what we can get done in the next 20   12:10:45
16    minutes.
17              MS. BROOK:  Just one moment, Your Honor.  If I may,
18    our next witness is going to be Kim Jensen.  He's actually
19    downstairs on the third floor.  We can bring him up.  Or if
20    Your Honor wants to break now, we can do that as well.         12:11:25
21    Whichever.
22              THE COURT:  Is he available?
23              MS. BROOK:  He's available but we have to go
24    downstairs and grab him.
25              THE COURT:  I would rather do that.                  12:11:33
```

United States District Court

1          MS. BROOK:  Okay.  I'll go down and get him.          12:11:35

2          MR. KOEHLER:  While we do that, I'm going to move the

3    laptop over to counsel table.

4          THE COURT:  While we wait, if anybody in the

5    courtroom needs a break to stand and stretch, that's fine.   12:11:46

6          MR. WAHID:  I need to go to the bathroom.

7          THE COURT:  And if you need to go to the restroom,

8    we'll take a break for five minutes.  That's fine.

9              (Recess at 12:12; resumed at 12:16.)

10          THE COURT:  All right.  Let's go back on the record   12:16:03

11   for just a second while we wait.

12          Ms. Martinez is going to have to handle some of the

13   exhibits that have been recently introduced and I need to ask a

14   question on the record because I see that the case agent is

15   handling everything with gloves but the witness did not.  What  12:16:15

16   is the precaution?  Are the gloves to keep from altering the

17   evidence or are the gloves because there is some concern that

18   the handler could be harmed by the evidence?

19          MS. BROOK:  And it would be the latter, Your Honor.

20   The concern would be with some --                               12:16:32

21          If you want to respond, Joe.

22          MR. KOEHLER:  There's one piece inside the envelope

23   that is not in sealed plastic and the other exhibits that have

24   been pulled out are in sealed plastic so they are fine.  But

25   when she reaches into the envelope to retrieve those pieces,    12:16:48

| | | |
|---|---|---|
| 1 | there's one piece that could be contaminated.  That's why she's | 12:16:52 |
| 2 | wearing gloves. | |
| 3 | THE COURT:  My concern is that Ms. Martinez is not at | |
| 4 | any risk by having to sign or handle the documents? | |
| 5 | MR. KOEHLER:  No risk whatsoever, Your Honor. | 12:17:05 |
| 6 | THE COURT:  All right.  Thank you. | |
| 7 | All right.  Mr. Jensen, if you would come up past of | |
| 8 | the bar and to my courtroom deputy, she'll swear you in. | |
| 9 | COURTROOM DEPUTY:  If you can please state your name | |
| 10 | and spell your last name for the record. | 12:17:32 |
| 11 | THE WITNESS:  Kim Edward Jensen.  J-E-N-S-E-N. | |
| 12 | (KIM EDWARD JENSEN, a witness herein, was duly sworn | |
| 13 | or affirmed.) | |
| 14 | **DIRECT EXAMINATION** | |
| 15 | BY MS. BROOK: | 12:18:01 |
| 16 | Q.   Good afternoon. | |
| 17 | A.   Good afternoon. | |
| 18 | Q.   Would you please introduce yourself to the Court? | |
| 19 | A.   My name is Kim Jensen. | |
| 20 | Q.   And, sir, for the better part of your professional career, | 12:18:08 |
| 21 | what did you do for a living? | |
| 22 | A.   I was an FBI agent for approximately 30 years.  Prior to | |
| 23 | that I was in the military. | |
| 24 | Q.   When did you first become an FBI agent? | |
| 25 | A.   I first became an FBI agent in 1987. | 12:18:24 |

KIM EDWARD JENSEN - Direct

1    Q.   And then when did you retire from the FBI?                    12:18:27

2    A.   Three years ago, in 2016.

3    Q.   You had mentioned that at some point prior to 1987 that

4    you were in the military?

5    A.   Yes, I was.                                                   12:18:39

6    Q.   So during your time in the military, your 30-some odd

7    years working with the FBI, were you trained in interview

8    skills?

9    A.   Yes, I was.  I was what's called the 96 Charlie in the

10   military.  I was an interrogator.                                 12:18:50

11   Q.   And then again when you joined the FBI in '87 throughout

12   your 30 years with them as a Special Agent, did you have

13   training to do interviews?

14   A.   I did throughout my career, yes.

15   Q.   And in fact, when you were working in the military, were   12:19:07

16   you certified as an interviewer?

17   A.   I was.  I was certified as an interviewer and interrogator

18   as a 96 Charlie.

19   Q.   So let's focus in on May of 2015.  Which branch of the FBI

20   were you working for?                                             12:19:21

21   A.   I was working in the Phoenix Division within the JTTF,

22   which is the Joint Terrorism Task Force.

23   Q.   So as a special agent within the JTTF, in the immediate

24   aftermath of the Garland, Texas, attack, what were your

25   specific roles?                                                   12:19:40

United States District Court

KIM EDWARD JENSEN - Direct

1    A.   My specific roles in the -- after the attack was to        12:19:40

2    interview -- was to conduct as many interviews as I could and

3    to follow leads and then report those interviews and leads back

4    to my supervisor.

5    Q.   And did you interview just one person or multiple people   12:19:56

6    during the time you were assigned to work?

7    A.   As a result of those attacks we -- I myself interviewed

8    multiple people.

9    Q.   As you were working in the field as part of the follow-up

10   investigation to the Garland, Texas, attack, did you get an     12:20:13

11   idea roughly of the amount of assets or resources that the

12   Phoenix FBI was contributing to this particular investigation?

13   A.   I did.   As a member of the JTTF, I saw that our entire

14   JTTF, which is approximately five or six squads, was completely

15   mobilized to deal with all of the leads that came about as the  12:20:32

16   Garland attack.   So there was probably, I would estimate,

17   around 100 people at least in the Phoenix Division that was

18   involved in investigating those attacks.

19   Q.   At what point during the course of this investigation did

20   it become a terrorism investigation?                            12:20:51

21   A.   Immediately.   In my opinion, immediately because there was

22   a significant amount of press coverage regarding that Garland

23   attack and myself and as well as other people that I work with

24   knew that there was the Draw the Prophet Muhammed contest being

25   in Texas which had been targeted before by people that belonged 12:21:16

United States District Court

KIM EDWARD JENSEN - Direct

1   to al-Qaeda and ISIS.  So when that happened everyone, that I                    12:21:20

2   worked with knew it was probably or most likely a result of a

3   terrorist incident.

4   Q.   And you had mentioned the news as well.  Was that you

5   reporting that this was a suspected terrorism attack?                            12:21:35

6   A.   Yes.  It was reported extensively.

7   Q.   Were you aware that ISIS had claimed responsibility for

8   the attack?

9   A.   No, I was not aware immediately that ISIS had -- I

10  postulated that but I was not aware immediately until about a                    12:21:48

11  day afterwards.

12  Q.   So roughly around May 4 or so?

13  A.   May 4, yeah.

14  Q.   Let's take a step back.  So you had mentioned that you

15  were staffed on the JTTF.  At is pertains to engaging in                         12:22:05

16  terrorism investigations, were you specifically trained on

17  leads to follow and important pieces of evidence to collect?

18  A.   Yes, I was.  I had been trained regarding terrorism

19  investigations extensively.

20  Q.   And that training obviously was before the May of 2015?                     12:22:24

21  A.   Pardon?

22  Q.   Was before the May of 2015, that training?

23  A.   Yes.  Yes.  It was, it was for several decades.

24  Q.   And additionally out in the field, is this something that

25  you would put into practice if need be during other types of                    12:22:35

United States District Court

KIM EDWARD JENSEN - Direct

1    terrorism investigations?                                    12:22:38

2    A.   Yes, it would be.

3    Q.   So let's break it down for a moment.  During a terrorism

4    investigation, what sorts of pieces of evidence are important

5    to collect?                                                  12:22:49

6    A.   During a terrorism investigation, it is almost like

7    putting together a jigsaw puzzle with an innumerate amount of

8    small, tiny pieces of puzzle which then, during the course of

9    the investigation, that you try to amass and to try to collect

10   or gather a picture of what's happening.                     12:23:05

11       Even though those pieces may be disparate or

12   seemingly insignificant; but when you look a at them in the

13   totality of everything else, they paint a pretty good picture.

14   So the type of evidences that we are looking for when we do a

15   terrorism investigation are things like individuals involved, 12:23:20

16   monetary, any kind of monetary instruments that was used, just

17   a myriad of evidentiary things which you're looking for,

18   people, places, who, what, where, when, and how.

19   Q.   So let's unpack that just a little bit.  You had mentioned

20   that some of the evidence that you're looking for may appear  12:23:43

21   insignificant.  What does that mean?

22   A.   Well, some of the -- for example, money.  Money in and of

23   itself is just a monetary instrument.  But in a lot of times in

24   my experience, money is used to repay people for services they

25   committed or especially to repay people, survivors of terrorist 12:24:00

United States District Court

KIM EDWARD JENSEN - Direct

1  attacks.  So something that doesn't seem that much or to have     12:24:06

2  that much weight, for example, money, maybe could be overlooked

3  but, in fact, that is a clear indication as to intention and

4  it's evidence.

5  Q.   And additionally, if you are in the field and you find      12:24:20

6  evidence of a financial transaction or some sort of money

7  distribution in a case like this, do you follow up on it?

8  A.   We certainly do.  We employ a vast amount of resources to

9  follow up on those types of evidence.

10 Q.   What are some of the other things that you are looking for   12:24:46

11 in the immediate aftermath of a terrorism attack investigation

12 like this?  What are some of the concerns that you have

13 investigatively?

14 A.   The primary concern that we have is preventing a secondary

15 incident from taking place.                                       12:25:02

16       Oftentimes in terrorism investigations, there's --

17 there are more than one incidences or planned events which may

18 take place.  So our primary goal, the reason why we go out as

19 fast as we do and as hard as we do is to prevent a secondary

20 attack from happening.                                            12:25:23

21 Q.   And in order to do so, are there types of evidence that

22 you look for or things that you are on the watch for during

23 that investigation?

24 A.   Yes.  We are.  We are primarily looking for things

25 obviously like bombs, like weapons, caches of money that could    12:25:41

United States District Court

KIM EDWARD JENSEN - Direct

1  be used to purchase things, individual involved, communications          12:25:47

2  equipment, transportation equipment.  A myriad of things that

3  one could use to perpetrate another attack.

4  Q.   Are you also looking to identify who the attackers, the

5  original attackers, were in connection with or contact with          12:26:02

6  before the attack?

7  A.   Absolutely.  We're trying to identify those individuals

8  that did the attack, if that can be done, and then to

9  immediately identify their circle of associates so that we can

10 investigate whether those individuals were involved or will be          12:26:19

11 involved in a subsequent attack.

12 Q.   So to go out, speak with or communicate, interview, follow

13 up on those circle of associates?

14 A.   Absolutely.

15 Q.   Let's turn our attention to May 6 of 2015.  On that          12:26:38

16 particular day, did you interview an individual by the name of

17 Abdul Khabir Wahid?

18 A.   Yes, I did.

19 Q.   And here with us in the courtroom today, do you recognize

20 him?          12:26:48

21 A.   Yes, I do.

22 Q.   Can you point to him and identify him by something that

23 he's wearing?

24 A.   He's sitting there, wearing a maroon shirt.

25          MS. BROOK:  Your Honor, may the record reflect that          12:26:57

United States District Court

KIM EDWARD JENSEN - Direct

| 1 | the witness has identified the defendant? | 12:26:58 |

2          THE COURT:  It does.

3 BY MS. BROOK:

4 Q.   On May 6 of 2015, did you interview Mr. Wahid?

5 A.   Yes, I did.                                         12:27:10

6 Q.   And where was it that you interviewed him?

7 A.   At his house on Port au Prince Lane in Glendale.

8 Q.   Do you remember or recall roughly what time it was?

9 A.   It was in the afternoon, probably around 2:30.

10 Q.   And when you arrived to do the interview, did you call in   12:27:29

11 advance?

12 A.   No, we did not.  We didn't actually know where he lived

13 and so prior to showing up at his house, we had gone to two

14 other residences to try to track down where Mr. Wahid lived.

15 Q.   So when you arrived at that address on Port au Prince and   12:27:42

16 I think you mentioned it was in the 3,000 block of Port au

17 Prince?

18 A.   Yes.  Somewhere in the 3000 block.

19 Q.   When you arrived at that house, were you by yourself?

20 A.   I was not.  I was with another special agent by the name   12:27:57

21 of Robert Byrne.

22 Q.   And how were you two dressed?

23 A.   We were dressed fairly casually which is what we typically

24 do when we do investigations.

25 Q.   How was it that you first made contact with Mr. Wahid   12:28:11

United States District Court

KIM EDWARD JENSEN - Direct

1   there at the house on Port au Prince?                          12:28:14

2   A.   We drove our vehicle up to his house and parked in the

3   street and then we entered through a gate which he has on his

4   property which is about 15 feet away from his front door.

5   After entering the gate, which is a courtyard, we knocked on   12:28:27

6   his house.

7   Q.   Were you using recording equipment?

8   A.   Yes.  Special Agent Byrne was wearing recording equipment.

9   Q.   And was that recording equipment recording from the point

10  that you came up and knocked at the door?                      12:28:41

11  A.   Yes, it was.

12  Q.   And that equipment, is it on your exterior or is it on the

13  interior of clothing?

14  A.   Interior, principally in a pocket.

15  Q.   Do you announce and did you announce during this interview 12:28:52

16  that you were recording the interview?

17  A.   No, we did not.

18  Q.   So what was the purpose of going to Mr. Wahid's house to

19  interview him on that day?

20  A.   Well, the day before, on May 5, I had on opportunity to    12:29:06

21  speak with Ali Soofi regarding the incident regarding his

22  brother Nadir who was one of the attackers in Garland, Texas.

23  And in the course of that short interview that I conducted at

24  the airport while he was preparing to fly out to Missouri, I

25  asked him some details regarding his brother.  Regarding the   12:29:30

KIM EDWARD JENSEN - Direct

1  apartment and where he lived with his brother and I also asked          12:29:34

2  him about some associates that he saw over at his residence.

3  And as a result of that interview, we decided to go speak with

4  Mr. Wahid.

5          MS. BROOK:  At this is point, Your Honor, we're          12:29:54

6  briefly going to start the recordings.  Do you think this is a

7  good time?

8          THE COURT:  If you think this is a good breaking

9  point, this is when I intended to let you all go for lunch.

10  Why don't we go ahead and do that then?          12:30:06

11          All right.  Ladies and gentlemen, it's 12:30.  The

12  parties need time to prepare so we're going to start again at

13  1:45.  If everybody can be ready to go then.  Until then, we

14  will be in adjournment.

15          Mr. Jensen, to save us just a minute, when we come          12:30:21

16  back, if you want to just resume your place on the stand, it

17  will save us an interruption calling you up.

18          THE WITNESS:  Okay.

19          THE COURT:  All right.  Thank you.

20          MS. BROOK:  Thank.  You, Your Honor.          12:30:32

21          (Recess at 12:30; resumed at 1:46.)

22          THE COURT:  All right.  Looks like we're ready to

23  proceed.  Thank you, everyone, for resuming your positions as

24  well.

25          Ms. Brook, you can proceeds whenever you're ready.          01:46:19

United States District Court

KIM EDWARD JENSEN - Direct

1          MS. BROOK:  Thank you, Your Honor.                    01:46:21

2     BY MS. BROOK:

3     Q.   Sir, we left off, we were talking about interviews that

4     you conducted on May 6 of 2015?

5     A.   Yes.                                                  01:46:29

6     Q.   And that was at a residence on Port au Prince Lane?

7     A.   Yes.

8          MS. BROOK:  Can we place on the overhead Exhibit

9     Number 159, please.

10    Q.   I just wanted to clarify.  So what has been put up on the   01:47:10

11    overhead as Exhibit 159, do you see, recognize what's in this

12    photo?

13    A.   I do.

14    Q.   And what is it?

15    A.   It's the residence of Mr. Wahid's residence.          01:47:18

16    Q.   So when you went to the residence on Port au Prince on May

17    6 of 2015, is this the residence you're referring to?

18    A.   Yes, it is.

19         MS. BROOK:  Your Honor, may the Government move to

20    admit Exhibit 159?                                         01:47:27

21         THE COURT:  There being no objection --

22         MR. WAHID:  No.

23         THE COURT:  -- then, yes, 159 is admitted.

24         (Exhibit Number 159 was admitted into evidence.)

25    \\\

United States District Court

KIM EDWARD JENSEN - Direct

1   BY MS. BROOK:                                                      01:47:38

2   Q.   So as you look at this residence, is that a green gate?

3   A.   Yes, it is.

4   Q.   If you're going to go in and knock on the front door of

5   this residence, how do you approach it?                          01:47:46

6   A.   You have to open the green gate and walk about 15 feet

7   away to the front door which is right behind it.

8   Q.   Can you go ahead and I think just by touching it, you

9   could put an X on what is actually the front door of this

10  residence.                                                        01:47:59

11  A.   (Witness complies).

12  Q.   Just a dot.  Do you mind putting an X?

13  A.   (Witness complies).

14  Q.   So where the X and the arrow is the front door and then

15  draw a line through the green gate so we all know what we're     01:48:13

16  referring to.

17          So as you and Special Agent Byrne approached that

18  afternoon and came to the front door, is that where you went?

19  A.   Yes, it is.

20  Q.   And at some point you mentioned you came into contact with  01:48:29

21  Mr. Wahid?

22  A.   Yes.

23  Q.   What happened at that point?  Where did the interview

24  actually take place?

25  A.   Initially we knocked on the green gate to look for dogs,    01:48:36

United States District Court

KIM EDWARD JENSEN - Direct

1  which is a safe thing to do.  And once we determined there were    01:48:39

2  no dogs in there, we let ourselves in the green gate but we did

3  knock on at first just to see if there was any dogs.  Once we

4  passed the green gate, we approached the front door and we

5  knocked on the front door.    01:48:54

6  Q.   And what happened then?

7  A.   Mr. Wahid's daughter answered the door and we identified

8  ourselves to his daughter and we asked that we be able to speak

9  with her father.

10 Q.   And at that point, did you see Mr. Wahid?    01:49:08

11 A.   We did not because it was a closed screen door so we asked

12 him to open the screen door.

13 Q.   And then was the screen door opened?

14 A.   Yes.  Mr. Wahid opened the screen door and we asked if we

15 could come in to speak with him.    01:49:26

16 Q.   And what did he say?

17 A.   He said we could so we entered his house and spoke with

18 him.

19 Q.   And when was it after you entered his house that you spoke

20 with him?    01:49:34

21 A.   In the living room in close proximity to the front door.

22 Q.   Describe for us what the setup was during the interview.

23 Were you standing or sitting or something else?

24 A.   We were all seated on chairs and couches in his front

25 living room.    01:49:47

United States District Court

KIM EDWARD JENSEN - Direct

| | |
|---|---|
| 1 | Q.   And by "all," who are we talking about? | 01:49:48 |

1  Q.   And by "all," who are we talking about?

2  A.   Myself, Special Agent Robert Byrne, and Mr. Wahid.

3  Q.   And was that for the duration of the interview?

4  A.   That was for the duration of the interview, yes.

5  Q.   It seems like an obvious question but at any point were

6  your guns drawn?

7  A.   No.

8  Q.   And the tone and demeanor, was it pretty much consistent

9  throughout the interview?

10 A.   It was.  Everything was very amicable and very

11 cooperative.

12 Q.   Did you explain to Mr. Wahid why you were there?

13 A.   We did.  We explained that we were there because of the

14 attack in Garland, Texas.

15 Q.   And at what point during the interview was that?

16 A.   Within a few minutes of speaking with him.

17 Q.   And did Mr. Wahid seem to understand what that meant?

18 A.   Yes.  He did seem to understand what that meant.

19 Q.   Did you also explain to him that it's a crime to lie to

20 the FBI?

21 A.   We did.  We explained that it was a crime to lie to the

22 FBI and withhold anything that was of material.

23 Q.   Have you had the opportunity to listen to and review the

24 full audio recording of that May 6 interview?

25 A.   I have.

KIM EDWARD JENSEN - Direct

1   Q.   And additionally, have you had the opportunity to sit and          01:51:05

2   listen to review audio clips 85 through 99?

3   A.   Yes, I have.

4   Q.   Do each of those clips fairly and accurately represent a

5   portion of the interview that you had that day with the                01:51:17

6   defendant on May 6?

7   A.   Yes, they do.

8   Q.   You mentioned a moment ago that there was a portion of the

9   interview where you explained that it was a crime to lie to the

10  FBI.                                                                    01:51:32

11  A.   Yes.

12  Q.   Does Exhibit Number 85 fairly and accurately represent

13  that component of the conversation?

14  A.   Yes, it does.

15          MS. BROOK:  Your Honor, we're going to move to play            01:51:40

16  Exhibit Number 85.

17          THE COURT:  Any objection, Mr. Wahid?

18          MR. WAHID:  No.

19          THE COURT:  All right.  You may.

20          (Exhibit 85 was played.)                                       01:51:48

21  BY MS. BROOK:

22  Q.   Shortly after that portion of the conversation, did Wahid

23  talk about watching Simpson in the months nearing the attack

24  become more radicalized?

25  A.   Yes, he did.                                                      01:53:44

KIM EDWARD JENSEN - Direct

1    Q.   And what was said?                                          01:53:45

2    A.   He basically said that he watched the process in which

3    Simpson was becoming more and more upset.

4    Q.   And what did you say, more and more upset?

5    A.   More and more upset, radicalized.                           01:53:58

6    Q.   Did Mr. Wahid describe the last time that he saw Simpson

7    and Soofi before the attack?

8    A.   Yes.  He spoke to us about the occasion that he had to

9    meet with Simpson and Nadir Soofi on Friday before the attack.

10   Q.   And does Exhibit Number 86 reflect that part of the        01:54:25

11   conversation?

12   A.   Yes, it does.

13           MS. BROOK:  Your Honor, the Government is going to

14   move to admit and play 86.

15           THE COURT:  All right.  Hearing no objection, 86 is     01:54:33

16   admitted.  You may play.

17           (Exhibit Number 86 was admitted into evidence.)

18           (Exhibit Number 86 was played.)

19   BY MS. BROOK:

20   Q.   As part of this terrorism investigation into the Garland   01:55:14

21   attack, was this component of the interview you had with Wahid

22   important?

23   A.   Yes, it was important, very important.

24   Q.   Why so?

25   A.   Because at this point in the interview, we realized that   01:55:27

United States District Court

KIM EDWARD JENSEN - Direct

1    Mr. Wahid may have been the very last person to see Simpson and    01:55:30

2    Soofi prior to their travel to Garland, Texas, to carry out the

3    attack.

4    Q.   So, therefore, why would the details of that interaction

5    be important in this terrorism investigation?    01:55:43

6    A.   Historically, the last person to spend time with subjects

7    who are going to go perpetrate or go do something nefarious,

8    that last person has some cogent details and facts that will

9    aid in the investigation of the case and help us recover

10   evidence as quickly as we can.    01:56:01

11   Q.   And is the timing of the recovery of that evidence

12   important?

13   A.   It's very important because almost all evidence is

14   perishable.  It disappears, it goes away, it walks away and so

15   the speed at which we can get to that evidence is extremely    01:56:17

16   important.  And specifically in this case, it's very important

17   because there was a terrorist attack and we were concerned

18   there was going to be another one.

19   Q.   Based upon your training and experience, your work in the

20   JTTF as well as your work in the military dealing with these    01:56:33

21   type of situations, are you familiar with something called a

22   farewell message?

23   A.   Yes, I am.

24   Q.   And what is that in relationship to terrorism attacks?

25   A.   Oftentimes when individuals go to commit an act of    01:56:48

United States District Court

KIM EDWARD JENSEN - Direct

1  terrorism they leave behind either a written message or          01:56:51

2  recorded message or video message explaining their motives and

3  giving some clues as to what they were going to do and why they

4  were going to do it so it's a common practice for people to

5  leave a message of some sort.                                    01:57:06

6  Q.    Additionally we spoke briefly before the break about the

7  follow-on attack.  Based upon your training and experience,

8  both in the JTTF as well as in relation to other terrorist

9  attacks that have happened in other locations, is the concern

10 of a follow-on attack an important one?                          01:57:27

11 A.    The concern of a follow-on attack is probably one of the

12 most important things we look at in the course of an

13 investigation.  Typically, a lot of attacks happen in

14 coordination and are linked to other attacks that follow those

15 attacks.  So we were focused like a laser beam on anything that  01:57:45

16 could happen as a result of that attack to see if there was a

17 pending attack or if there was a planned attack or if there was

18 anything set in motion which may precipitate a secondary

19 attack.

20 Q.    You mentioned the word "coordination," how could that or   01:58:02

21 has it, based on your training and experience, come into play

22 in terms of the aftermath of a first attack leading to a second

23 attack?

24 A.    Many, also times, many occasions, specifically in

25 terrorist attacks, many bombings or it could be any type of     01:58:18

United States District Court

KIM EDWARD JENSEN - Direct

```
 1   attack really are daisy or chain-linked to other events.          01:58:23
 2              So, for example, a bomb could go off and that bomb
 3   would cause people to scurry in one direction and many times
 4   there is a secondary device at that location and many times
 5   there's a third or a fifth device which I've seen in my career   01:58:41
 6   on numerous occasions.
 7   Q.   Is it possible for the attackers to coordinate via
 8   messages?
 9   A.   And the attackers do communicate with each other via
10   messages or telephone calls or video messages or couriers or     01:58:57
11   any manner or means they communicate with each other, either to
12   aid or assist or to redirect.
13   Q.   Did you follow up specifically on different components
14   after the defendant said about the interaction he had with
15   Simpson and Soofi on Friday?                                      01:59:18
16   A.   We followed up on everything that he told us.
17   Q.   Let me ask a better question.  Did you follow up with him
18   in the interview when you were talking to him?
19   A.   We followed up on questions that -- that we asked him and
20   we followed up on the answers that he gave us.                    01:59:35
21   Q.   Did you inquire about what the attackers were wearing when
22   they were at his house?
23   A.   I did.
24   Q.   Whether or not they were carrying or bringing anything?
25   A.   Yes, I did.                                                  01:59:44
```

United States District Court

KIM EDWARD JENSEN - Direct

1   Q.   Does Exhibit Number 87 reflect that part of the                    01:59:46

2   conversation?

3   A.   Yes, it does.

4           MS. BROOK:   The Government is going to move to admit

5   and play 87.                                                            01:59:55

6           THE COURT:   There being no objection, 87 is admitted.

7           (Exhibit Number 86 was admitted into evidence.)

8           (Exhibit Number 87 was played.)

9   BY MS. BROOK:

10  Q.   Did you then ask Wahid where the attackers, the two men,           02:00:23

11  Simpson and Soofi, were standing when they came to the house?

12  A.   Yes, I did.

13  Q.   Does clip number 88 represent that part of the

14  conversation?

15  A.   Yes, it.                                                           02:00:37

16          MS. BROOK:   Your Honor, the Government is going to

17  move to admit and play Exhibit 88.

18          THE COURT:   There being no objection, 88 is being

19  admitted; and if I didn't say it before, 85 is admitted.

20          (Exhibit Number 85 was admitted into evidence.)               02:00:48

21          (Exhibit Number 88 was admitted into evidence.)

22          (Exhibit Number 88 was played.)

23  BY MS. BROOK:

24  Q.   Let me just follow up on that for a moment.  Did you

25  understand or did he point to or explain exactly where the part       02:01:10

KIM EDWARD JENSEN - Direct

1    of the house was that Simpson, he, and Soofi stood that Friday      02:01:14

2    night?

3    A.    Yes. Mr. Wahid was adamant about where they were standing

4    when they had the conversation.

5    Q.    And where was that?                                          02:01:26

6    A.    In front of his front door outside of his house on his

7    property.

8    Q.    Outside of that white door that we were just looking at a

9    minute ago on exhibit admitted number 159?

10   A.    Yes.                                                         02:01:39

11   Q.    Did you then ask him to describe again what happened when

12   Simpson and Soofi visited his home on May 1 that evening?

13   A.    I did.

14   Q.    And does Exhibit Number 89 represent that part of the

15   conversation?                                                     02:01:51

16   A.    Yes, it does.

17         MS. BROOK:   The Government moves to admit and play

18   Exhibit 89.

19         THE COURT:   All right.   There being no objection, 89

20   is admitted.                                                      02:02:00

21         (Exhibit Number 89 was admitted into evidence.)

22         (Exhibit Number 89 was played.)

23   BY MS. BROOK:

24   Q.    Did you follow up on this and ask exactly what Simpson and

25   Soofi said to him that night?                                     02:03:53

KIM EDWARD JENSEN - Direct

1    A.    I did.   I asked him repeatedly.                          02:03:56

2    Q.    And does clip number 90 represent one of the times where

3    you asked?

4    A.    Yes, it does.

5            MS. BROOK:   Government moves to admit and play          02:04:04

6    Exhibit Number 90.

7            THE COURT:   All right.   There being no objection, 90

8    is admitted.

9            (Exhibit Number 90 was admitted into evidence.)

10           (Exhibit Number 90 was played.)                         02:04:14

11   BY MS. BROOK:

12   Q.    At this point in the interview, based upon your training

13   experience, did it seem odd to you that Simpson and Soofi came

14   over to the house that night, gave a bowel of soup to Wahid,

15   talked about the kids needing good Muslim role models and his    02:05:48

16   son needing -- being a good Muslim and that was it?

17   A.    Yes, it did.   And I --

18           MR. WAHID:   Objection.   Speculation.

19           THE COURT:   The objection is overruled.   The witness

20   can answer the reasons he has and the Court will test those.     02:06:04

21           Go ahead.

22           THE WITNESS:   Yes.   It felt very strange and very odd

23   to me and that's why I kept pressing him and asking the same

24   questions over and over.

25   \\\

United States District Court

KIM EDWARD JENSEN - Direct

1    BY MS. BROOK:                                                    02:06:14

2    Q.   Based upon your training and experience, why did it seem

3    odd?

4    A.   It seemed odd that someone would come over before they

5    were going to commit a horrendous act to give someone a bowl of   02:06:23

6    soup.

7    Q.   At this point, did you continue to push, to ask what all

8    happened?

9    A.   Yeah, because of the -- because of the oddity of that, we

10   continued to push I think for another hour asking the same      02:06:43

11   questions over and over.

12   Q.   Does Exhibit 91 represent the next part of the

13   conversation on that point?

14   A.   Yes.

15        MS. BROOK:   Government moves to admit and play            02:06:56

16   Exhibit Number 91.

17        THE COURT:   There being no objection, 91 is admitted.

18        (Exhibit Number 91 was admitted into evidence.)

19        (Exhibit Number 91 is played.)

20   BY MS. BROOK:                                                    02:10:17

21   Q.   Did Wahid's statement to you that Simpson had asked him to

22   join in conducting another attack on a military base before the

23   attack on the Draw the Prophet Muhammed contest in Garland, did

24   that affect your interview with the defendant?

25   A.   It certainly did.                                          02:12:34

KIM EDWARD JENSEN - Direct

1   Q.   How so?                                                    02:12:35

2   A.   Well, now we know that Simpson had approached Mr. Wahid

3   approximately two months before the day we were interviewing

4   him and asked him to go on an attack mission with him to a

5   marine base.  And it's conversation, according to what he told  02:12:50

6   me, was that it took place right outside his house, the same

7   place that the conversation was taking place where the soup was

8   exchanged at this point, our feelers and suspicions were

9   realized based on our experience that terrorist attacks usually

10  are accompanied by numerous other similar events.  And so this  02:13:20

11  put the interview in a different light.

12  Q.   Did you ask Wahid again at that point what else he

13  remembered about what transpired with he, Simpson, and Soofi on

14  that Friday night?

15  A.   Yes, I did.  Because he let us know that he was invited to  02:13:35

16  participate in one attack previously two months ago and I

17  suspected at that point that they came to his house Friday

18  night possibly asking him to join them in another attack in

19  Garland, Texas.

20  Q.   Does Exhibit Number 92 represent that part of the          02:13:58

21  conversation?

22  A.   Yes, it does.

23          MS. BROOK:  Your Honor, the Government is going to

24  move to admit and play Government Exhibit Number 92.

25          THE COURT:  All right.  There being no objection, 92    02:14:11

United States District Court

KIM EDWARD JENSEN - Direct

1  is admitted.                                                   02:14:14

2           (Exhibit Number 92 was admitted into evidence.)

3           (Exhibit 92 is played.)

4  BY MS. BROOK:

5  Q.   What was the top of the black car that was referred to in   02:15:34

6  the questions asked to Wahid?

7  A.   It was the car that was sitting outside of the fence just

8  on the other side of his property.

9  Q.   Was that Nadir's car that was driven over that night?

10 A.   That was I believe Nadir's car.                            02:15:52

11 Q.   Did you go on to ask Wahid why he thought that Simpson and

12 Soofi came to his house that night of all places?

13 A.   I did.

14 Q.   And does Exhibit Number 93 represent fairly that part of

15 the conversation?                                               02:16:05

16 A.   Yes, it does.

17           MS. BROOK:   Government moves to admit and play

18 Exhibit Number 93.

19           THE COURT:   All right.   Without objection, 93 is

20 admitted.                                                       02:16:14

21           (Exhibit Number 93 was admitted into evidence.)

22           (Exhibit 93 was played.)

23 BY MS. BROOK:

24 Q.   Did you ask Wahid which one of the two, Simpson or Soofi,

25 had told him that his daughter needed a good role model?        02:18:29

KIM EDWARD JENSEN - Direct

| | | |
|---|---|---|
| 1 | A.   Yes, I did. | 02:18:33 |
| 2 | Q.   Does 94 represent that part of the conversation? | |
| 3 | A.   Yes, it does. | |
| 4 | MS. BROOK:   Government moves to admit and play 94. | |
| 5 | COURTROOM DEPUTY:   There being no objection, 94 is | 02:18:42 |
| 6 | admitted. | |
| 7 | (Exhibit Number 94 was admitted into evidence.) | |
| 8 | (Exhibit 94 was played.) | |
| 9 | BY MS. BROOK: | |
| 10 | Q.   Did you ask Wahid when he thought that Simpson and Soofi | 02:19:24 |
| 11 | left Phoenix and drove to Texas? | |
| 12 | A.   Yes, I did. | |
| 13 | Q.   And does Exhibit Number 94 fairly and accurately represent | |
| 14 | that part of the conversation? | |
| 15 | A.   Yes, it does. | 02:19:39 |
| 16 | MS. BROOK:   Government moves to admit and play 95. | |
| 17 | THE COURT:   With no objection, 95 is admitted. | |
| 18 | (Exhibit Number 95 was admitted into evidence.) | |
| 19 | (Exhibit 95 is played.) | |
| 20 | BY MS. BROOK: | 02:21:17 |
| 21 | Q.   Did you ask Wahid exactly how Nadir handed the soup to | |
| 22 | him? | |
| 23 | A.   Yes, I did. | |
| 24 | Q.   Does Exhibit Number 96 fairly and accurately represent | |
| 25 | that part of the conversation? | 02:21:28 |

United States District Court

KIM EDWARD JENSEN - Direct

1  A.   Yes, it does.                                              02:21:29

2           MS. BROOK:   The Government moves to admit and play

3  Exhibit Number 96.

4           THE COURT:   All right.   If there's no objection, 96

5  is admitted.                                                   02:21:36

6           (Exhibit Number 96 was admitted into evidence.)

7           (Exhibit 96 is played.)

8  BY MS. BROOK:

9  Q.   A few minutes ago we listened to a clip where Wahid talked

10 about receiving phone calls that day or text messages from      02:22:22

11 Simpson.

12 A.   Yes.

13 Q.   During this interview, did you follow up with Wahid on

14 that point and ask him to show you his call history from his

15 phone from Friday through the weekend?                          02:22:36

16 A.   Yes, I did.

17 Q.   And does Exhibit Number 97 fairly and accurately represent

18 that part of the conversation?

19 A.   Yes, it does.

20          MS. BROOK:   The Government moves to admit and play     02:22:44

21 Exhibit Number 97.

22          THE COURT:   Hang on for a second.

23          There being no objection, 97 is admitted.

24          Now you may publish.

25          (Exhibit Number 97 was admitted into evidence.)        02:23:02

United States District Court

KIM EDWARD JENSEN - Direct

| | | |
|---|---|---|
| 1 | (Exhibit 97 was played.) | 02:23:04 |
| 2 | BY MS. BROOK: | |
| 3 | Q.   Again, it was Wednesday, May 6, that you were at the | |
| 4 | house? | |
| 5 | A.   Yes. | 02:23:53 |
| 6 | Q.   Does you ask Wahid for Abdul Malik's phone number? | |
| 7 | A.   Yes, I did. | |
| 8 | Q.   And does Exhibit Number 98 fairly and accurately represent | |
| 9 | that part of the phone call? | |
| 10 | A.   Yes, it does. | 02:24:08 |
| 11 | Q.   Abdul Malik Abdul Kareem, was that the individual that | |
| 12 | Wahid was referring to a few clips ago? | |
| 13 | A.   Yes, it is. | |
| 14 | MS. BROOK:   The Government moves to admit and play | |
| 15 | Exhibit Number 98. | 02:24:25 |
| 16 | THE COURT:   All right, sir.   With no objection, 98 is | |
| 17 | admitted. | |
| 18 | (Exhibit Number 98 was admitted into evidence.) | |
| 19 | (Exhibit 98 is played.) | |
| 20 | BY MS. BROOK: | 02:25:08 |
| 21 | Q.   Did you ask Wahid for his phone number? | |
| 22 | A.   Yes, I did. | |
| 23 | Q.   And does Exhibit Number 99 fairly and accurately represent | |
| 24 | that part? | |
| 25 | A.   Yes, it does. | 02:25:14 |

KIM EDWARD JENSEN - Direct

1      MS. BROOK:   The Government moves to admit and play     02:25:15

2    Exhibit Number 99.

3          THE COURT:   There being no objection, 99 is admitted.

4          (Exhibit Number 99 was admitted into evidence.)

5          (Exhibit 99 is played.)     02:25:25

6    BY MS. BROOK:

7    Q.   When -- well, a few moments ago before we started playing

8    these clips, I asked you if Government Exhibit Numbers 95

9    through 99 fairly and accurately represented each of the clips

10   that you listened to and that we played here in court.   I just     02:25:57

11   want to ask that one more time because we didn't do that for

12   each one, just for the sake of expediency throughout, but I

13   wanted to make sure that the record is correct.

14   A.   Yes.   All of those clips accurately represent what

15   happened.     02:26:13

16   Q.   How long was this interview that you had with the

17   defendant on May 6 at his house?

18   A.   A little more than two hours.

19   Q.   And at any point during this two-hour plus interview did

20   the defendant tell you that Simpson and Soofi also provided him     02:26:31

21   an envelope?

22   A.   No, he did not.

23   Q.   At any point during this interview, did the defendant also

24   tell you that Simpson and Soofi, when they were there, also

25   provided him a set of car keys?     02:26:48

United States District Court

KIM EDWARD JENSEN - Direct

1  A.   No, he did not.                                                      02:26:50

2  Q.   At any point did he mention an envelope or car keys?

3  A.   No, he did not.

4  Q.   At any point during this interview, did he mention whether

5  or not he was given instructions by Simpson or by Soofi to do     02:26:58

6  something after they left that night?

7  A.   No, he did not.

8  Q.   Would that have been important in your investigation?

9  A.   That would have been very important.

10 Q.   How?                                                               02:27:10

11 A.   Well, you have to realize this was Wednesday.  The attack

12 happened on Sunday.  We had two dead bodies.  We were rushing

13 to find everything that we could as quickly as we could to

14 prevent anything else from happening.  So any material fact on

15 this case would have helped us out significantly.  It would     02:27:29

16 have given us leads.  It would have given us the opportunity to

17 examine the perishable evidence before it disappeared before we

18 had a chance to examine it and look at it to see where those

19 leads took us, to see if there was another pending attack, to

20 see if there were other individuals involved, to see the     02:27:44

21 totality of all of these circumstances.  We were not able to do

22 that.

23 Q.   During this interview, at any point, was Saabir Nurse

24 brought up?

25 A.   No, I do not believe he was brought up in this interview.     02:27:57

1  Q.   And if you had known that the defendant had been given an    02:28:01

2  envelope and a set of car keys and asked to provide them to

3  another person, what would you have done with that information?

4  A.   We would have immediately set out possibly to retrieve

5  the -- those pieces of evidence to see what they were to see if    02:28:17

6  they were coded messages, to see if it was a last will, to see

7  if it provided instructions to anyone else.  We would have run

8  that to ground as quickly as we possibly could have.

9  Q.   At any point during this interview were you told that he

10 provided those keys and envelope to Saabir Nurse in the early    02:28:36

11 hours of that particular day, Wednesday, May 6?

12 A.   No.

13 Q.   And if you had been told that, what specifically would you

14 have done with regard to the investigation of Saabir Nurse?

15 A.   We probably would have requested Mr. Wahid help us out and    02:28:56

16 trying to track down that evidence to see who he gave it to,

17 when he gave it to him, where he was when he gave it to him,

18 where were they possibly located.  And we may have asked for

19 his assistance and if he had declined assisting us, then we

20 would have had to figure out other means to get ahold of that    02:29:17

21 material that was given to Saabir Nurse.

22 Q.   What are other investigative means that you have at your

23 disposal that you may have used if you knew about this

24 information?

25 A.   Well, we could have employed undercover agents.  We could    02:29:28

KIM EDWARD JENSEN - Direct

1   have employed sources.  We could have everything at our                02:29:31

2   disposal to find out where that evidence was.

3   Q.   Would a search warrant have been possible?

4   A.   A search warrant definitely would have been possible,

5   either orders for text messages, 2703(d) orders, electronic            02:29:41

6   order, physical search orders.

7   Q.   And, again, did any of that happen?

8   A.   None of that happened.

9   Q.   On June 10 of 2015, did you interview the defendant again?

10  A.   Yes, I did.                                                        02:30:04

11  Q.   And where was that?

12  A.   That was at the same residence on Port au Prince Lane.

13  Q.   Let's talk a little bit about the setup to that interview.

14  Where did it occur, the interview itself?

15  A.   It occurred in the yard, on the side of his house.               02:30:18

16  Q.   And during the interview, was the defendant restrained at

17  all?

18  A.   Initially he was.  It was an interview that was concurrent

19  with a search warrant and so, typically, what we do when we

20  serve a search warrant, we secure the scene to make sure              02:30:35

21  there's nothing dangerous that's going to happen.  And then

22  after we secure the scene, we let everybody go.  And is exactly

23  what happened with Mr. Wahid.  We --

24  Q.   I'm sorry.  Go ahead.

25  A.   We initially handcuffed him, as what we always do when we        02:30:48

United States District Court

KIM EDWARD JENSEN - Direct

1  serve a search warrant, and we read him his rights.  We tell          02:30:52

2  them after we have secured the scene, he is free to go and we

3  informed him that he was not under arrest.

4  Q.   Okay.  And the restraint that's used, is that used for

5  officer safety or something else?                                      02:31:05

6  A.   That is for everyone's safety, to include his safety, as

7  well as anyone in the vicinity.

8  Q.   So during the duration of the interview, was he

9  handcuffed?

10 A.   No, he was not handcuffed.                                        02:31:13

11 Q.   And were your weapons drawn?

12 A.   During the knock of serving the search warrant there were

13 weapons drawn, yes.

14 Q.   But during the duration of the interview, during that time

15 period, were weapons drawn?                                            02:31:26

16 A.   After the scene was secure, after his house was secure and

17 the proximity of his house was secure -- when I say "secure,"

18 someone went and looked to make sure there was no one there --

19 then all of our weapons were put back in holsters.

20 Q.   This interview, like the first interview we talked about,        02:31:44

21 the May 6 one, was it recorded?

22 A.   Yes, it was.

23 Q.   And did the recording mechanism work as it should?

24 A.   Yes, it did.

25 Q.   Have you had an opportunity to review the recording in its       02:31:55

United States District Court

KIM EDWARD JENSEN - Direct

| 1 | entirety? | 02:31:58 |
| 2 | A.    Yes, I have. | |
| 3 | Q.    Have you also separately had an opportunity to review | |
| 4 | Government's Exhibits 100 through 106? | |
| 5 | A.    Yes, I have. | 02:32:06 |
| 6 | Q.    And do each of those exhibits fairly and accurately | |
| 7 | represent component parts of the interview that you did with | |
| 8 | the defendant on June 10 of 2015? | |
| 9 | A.    Yes, they do. | |
| 10 | Q.    Was he provided his rights? | 02:32:23 |
| 11 | A.    Pardon? | |
| 12 | Q.    Was he read his rights? | |
| 13 | A.    Yes, he was. | |
| 14 | Q.    And does Exhibit Number 100 represent that part of the | |
| 15 | conversation? | 02:32:30 |
| 16 | A.    Yes, it does. | |
| 17 |      MS. BROOK:  Government moves to admit and play | |
| 18 | Exhibit Number 100. | |
| 19 |      THE COURT:  With there being no objection, 100 is | |
| 20 | admitted. | 02:32:40 |
| 21 |      (Exhibit Number 100 was admitted into evidence.) | |
| 22 |      (Exhibit 100 was played.) | |
| 23 | BY MS. BROOK: | |
| 24 | Q.    Couple of quick points.  We heard somebody's voice on that | |
| 25 | recording.  Who was reading the defendant his rights? | 02:33:45 |

United States District Court

KIM EDWARD JENSEN - Direct

1    A.    Special Agent Robert Byrne.                                    02:33:49

2    Q.    And, again, like the first interview you did, was it you

3    and Special Agent Byrne together that conducted that interview?

4    A.    Yes, we were together.

5    Q.    Were there additional agents there or primarily you two?    02:33:59

6    A.    There were several agents there that were effecting a

7    search warrant, but myself and Special Agent Byrne were the

8    ones that accompanied Mr. Wahid throughout the duration.

9    Q.    And, again, just to ground ourselves a little bit here,

10   Special Agent Byrne made mention of Malik.  Who was that?      02:34:15

11   A.    Abdul Malik, we -- at this point, we ascertained that he

12   may be a co-conspirator in this case regarding the Garland,

13   Texas attack, an associate of Mr. Wahid.

14   Q.    And that's Abdul Malik Abdul Kareem?

15   A.    Abdul Malik Abdul Kareem, yes.                              02:34:39

16   Q.    Did Mr. Wahid at that point agree to talk and to continue

17   talking with you?

18   A.    Yes, he did.

19   Q.    What was the purpose of this interview?

20   A.    The purpose of this interview, honestly, we didn't think   02:34:58

21   that he would speak with us while we were effecting the search

22   warrant at his house.  And we just asked to ask him some

23   follow-up questions, to which he agreed.  So we wanted to ask

24   him some follow-up questions regarding the first interview

25   which took place on the sixth of May.                           02:35:14

United States District Court

KIM EDWARD JENSEN - Direct

1   Q.   So, again, these questions, follow-up questions, following    02:35:17

2   up on the May 6 interview, the essence of the questions, what

3   were they about?

4   A.   Well, like I said previously, the onset of my testimony,

5   these cases are like a giant puzzle piece so in the course of    02:35:31

6   all of these interviews that we were conducting, we would

7   ascertain a small piece or a small puzzle piece, small puzzle

8   piece.   And at this time we were starting to put those small

9   puzzle pieces together to form a picture.

10          And from that picture, we had ascertained that Mr.    02:35:48

11  Wahid may be in receipt of something from Simpson and Soofi.

12  Q.   When you say "these cases," what type of cases in

13  particular are we referring to?

14  A.   We're talking about terrorism cases.

15  Q.   So, again, was this more information, gathering more    02:36:08

16  information about the Garland attack and the people that may be

17  involved?

18  A.   Yes.

19  Q.   Did you ask Wahid if he texted Simpson and Soofi to thank

20  them for the soup after that Friday night encounter before the    02:36:21

21  attack?

22  A.   Yes, we did.

23  Q.   And does clip 101 represent that part of the conversation?

24  A.   Yes, it does.

25          MS. BROOK:   The Government moves to admit and play    02:36:37

United States District Court

KIM EDWARD JENSEN - Direct

1    Exhibit 101.                                                          02:36:40

2              THE COURT:   If there's no objection, 101 is admitted.

3              (Exhibit Number 101 was admitted into evidence.)

4              (Exhibit 101 was played.)

5    BY MS. BROOK:                                                        02:38:36

6    Q.   Was this the first time during any of your interviews with

7    Wahid where he told you that Simpson and Soofi gave him a key

8    and an envelope?

9    A.   Yes, it was the first time he mentioned that.

10   Q.   Did you ask him why he didn't tell you about the envelope    02:38:47

11   and the key the first time you all talked to him?

12   A.   Yes, I did.

13   Q.   Does Exhibit Number 102 reflect part of that?

14   A.   Yes, it does.

15             MS. BROOK:   The Government moves to admit and play      02:39:13

16   Exhibit Number 102.

17             THE COURT:   All right.   With no objection, 102 is

18   admitted.

19             (Exhibit Number 102 was admitted into evidence.)

20             (Exhibit 102 is played.)                                 02:39:24

21   BY MS. BROOK:

22   Q.   Did Wahid talk to you during this interview about him

23   knowing about Simpson's loyalties with ISIS or violent jihadi

24   tendencies?

25   A.   During this particular interview?                            02:41:29

United States District Court

KIM EDWARD JENSEN - Direct

1    Q.    Yes.                                                              02:41:31

2    A.    I believe he did.

3    Q.    Did you ask him in these conversations about Simpson's

4    loyalties, did Wahid talk about any ISIS videos that he had

5    seen through Simpson?                                                  02:41:48

6    A.    Yes, he did.

7    Q.    And does clip 103 represent that part of the interview?

8    A.    Yes, it does.

9          MS. BROOK:   Government moves to admit and play

10   Exhibit Number 103.                                                    02:42:01

11         THE COURT:   If there's no objection, 103 is admitted.

12         (Exhibit Number 103 was admitted into evidence.)

13         (Exhibit 103 played.)

14   BY MS. BROOK:

15   Q.    Did you ask Wahid how he knew that the key he was provided       02:42:40

16   was a car key?

17   A.    Pardon?

18   Q.    Did you ask Wahid how he knew the car or the key he was

19   provided was a car key?

20   A.    Yes, I did.                                                      02:42:50

21   Q.    And does Exhibit 104 represent that?

22   A.    Yes, it does.

23         MS. BROOK:   The Government moves to admit and play

24   Exhibit Number 104.

25         THE COURT:   If there's no objection, 104 is admitted.          02:43:00

United States District Court

KIM EDWARD JENSEN - Direct

1       (Exhibit Number 104 was admitted into evidence.)          02:43:05

2       (Exhibit Number 104 is played.)

3  BY MS. BROOK:

4  Q.   And I apologize, Exhibit 104 certainly talks about the key

5  and the envelope but the distinction between the two, is that    02:44:00

6  also in Exhibit 105?

7  A.   Yes.

8       MS. BROOK:   The Government moves to admit and play

9  Exhibit Number 105.

10      THE COURT:   With no objection, 105 is admitted.           02:44:11

11      (Exhibit Number 105 was admitted into evidence.)

12      (Exhibit 105 is played.)

13 BY MS. BROOK:

14 Q.   Did you again in this interview ask him more about the

15 envelope and the key?                                            02:44:32

16 A.   Yes, I did.

17 Q.   And is that represented in Exhibit Number 106?

18 A.   Yes.

19      MS. BROOK:   Government moves to admit and play

20 Exhibit Number 106.                                              02:44:42

21      THE COURT:   With no objection, 106 is admitted.

22      (Exhibit Number 106 was admitted into evidence.)

23      (Exhibit 106 is played.)

24 BY MS. BROOK:

25 Q.   So this interview on June 10 of 2015 was approximately one  02:45:23

KIM EDWARD JENSEN - Direct

1    month and seven days after the attack on the Curtis Culwell      02:45:29

2    Center?

3    A.    Yes.

4    Q.    How, if at all, does the discovery of the transfer of this

5    envelope and key at that point, one month and one week after     02:45:39

6    the event, affect the investigation?

7    A.    Well, I initially thought when he told me about the key

8    that the key could just as well have been to a locker.  And

9    numerous cases that I've worked, terrorism investigations,

10   there have been things that have been locked up and in          02:46:00

11   containers, there have been things have been locked up in cars

12   and trunks in which they are materially relevant to a case, for

13   example, explosives and other such evidence.

14          So without having -- with passing over a month, that

15   evidence was not available to us and we could have dispatched a  02:46:19

16   number of individuals on the fifth probably at 5 o'clock that

17   afternoon the first time we interviewed him to ascertain

18   whether there was anything locked in any compartment, any

19   storage facility, anything which would require a key to open it

20   wherein explosive material or other perishable evidence could    02:46:38

21   be.  And that happens quite a bit during terrorism

22   investigations.

23   Q.    And so you said the fifth.  Were referring to the

24   interview on May 6?

25   A.    Right.  The first interview in May.                        02:46:54

KIM EDWARD JENSEN - Direct

1   Q.   So the passage of time, does that affect the potential to          02:46:57
2   recover something like the envelope?
3   A.   It does because all evidence, as I said, is perishable.
4   After one month and five days, a lot of things can happen to
5   evidence after that amount of time.   That's why when we conduct      02:47:13
6   these investigations, that is why we try to cover every single
7   lead as expeditiously and as quickly as we possibly can, to
8   avoid that loss of evidence.
9   Q.   To your knowledge, was the envelope ever recovered in this
10  investigation?                                                        02:47:31
11  A.   I do not know.
12  Q.   On December 11 of this same year, 2015, did you, again,
13  interview the defendant?
14  A.   Yes, I did.
15  Q.   And where did that interview occur?                              02:47:40
16  A.   It occurred in the lobby of the FBI office on 7th Street.
17  Q.   How was it that Mr. Wahid came to appear, come to the FBI
18  office?
19  A.   It had to do with something with his son's computer.
20  Q.   Did he come voluntarily?                                         02:47:55
21  A.   Yes, he did.
22  Q.   And were you by yourself when you interviewed him or with
23  somebody else?
24  A.   I was not.   I was with Robert Byrne and Rob -- I can't
25  remember Rob's last name but I was with two other individuals.        02:48:06

United States District Court

KIM EDWARD JENSEN - Direct

1    Q.    Rob, is he also an employee of the FBI?                    02:48:10

2    A.    Yes.  He's a DHS agent.

3    Q.    Okay.  Where did the interview happen?

4    A.    In the lobby of the FBI building.

5    Q.    And, again, was this interview recorded?                  02:48:24

6    A.    It was recorded.

7    Q.    Have you had the opportunity to review in totality the

8    interview of December 11, 2015, of the defendants?

9    A.    Yes, I have.

10   Q.    And did you also have an opportunity to review and listen 02:48:36

11   to Exhibit Number 107 and Government's Exhibit 108?

12   A.    Yes, I have.

13   Q.    Do those two clips fairly and accurately represent

14   component pieces of the interview that you conducted that day

15   of the defendant at the FBI?                                    02:48:51

16   A.    Yes, they do.

17   Q.    During this interview, did Wahid tell you -- did he

18   explain to you, in his words, why he lied to you all on May 6

19   of 2015?

20   A.    Yes, he did.                                              02:49:13

21   Q.    Does clip number 107 fairly and accurately represent that

22   part of the conversation?

23   A.    Yes, it does.

24   Q.    And, again, this lie was about the key, the envelope, and

25   the instructions?                                              02:49:25

United States District Court

KIM EDWARD JENSEN - Direct

1   A.   Yes.                                                              02:49:26

2          MS. BROOK:  Government moves to admit and play

3   Government's Exhibit 107.

4          THE COURT:  All right.  There being no objection --

5          MR. WAHID:  I object to the characterization of        02:49:38

6   lying.

7          THE COURT:  I'm going to sustain that objection as

8   well as leading on that.

9          Please be careful with the kind of questions that you

10  ask the witness, Ms. Brook.                                   02:49:46

11         But the exhibit is admitted.  There being no

12  objection to that, you may publish.

13         (Exhibit Number 107 was admitted into evidence.)

14         (Exhibit 107 was played.)

15  BY MS. BROOK:                                                 02:50:28

16  Q.   Did you explain to Wahid why you continued to ask him

17  questions that Friday night?

18  A.   Yes, I did.

19  Q.   And does Exhibit Number 108 reflect that part of the

20  interview?                                                    02:50:52

21  A.   Yes, it does.

22         MS. BROOK:  Government moves to admit and play

23  Exhibit Number 108.

24         THE COURT:  There being no objection, 108 is

25  admitted.                                                     02:51:02

United States District Court

KIM EDWARD JENSEN - Direct

| 1 | You may publish. | 02:51:03 |

2         (Exhibit Number 108 was admitted into evidence.)

3         (Exhibit 108 is played.)

4  BY MS. BROOK:

5  Q.   At this point, did you have any concerns about the type of      02:51:31

6  answers he was providing during his interview?

7  A.   Yes, I did.

8  Q.   And what were those concerns?

9  A.   Those concerns were based on what he told me, that

10 information that we were asking wasn't our business and he      02:51:46

11 emphatically demonstrably told me that it was none of my damn

12 business regarding the information that he had received from

13 Ibrahim.

14 Q.   When we started talking a while ago, you mentioned that

15 you also were part of other pieces of the investigation related      02:52:09

16 to the Garland attack?

17 A.   Yes.

18       MS. BROOK:   And Your Honor, I saw you looking at the

19 clock.  Are we okay to keep going?

20       THE COURT:   You're fine.      02:52:20

21 BY MS. BROOK:

22 Q.   Did you happen in this investigation to also interview an

23 individual by the name of Ali Soofi?

24 A.   I did.

25 Q.   And who is Ali Soofi?      02:52:26

United States District Court

1    A.    Ali Soofi is Nadir Simpson's brother.                          02:52:28

2    Q.    On May 5, 2015, did you interview Ali?

3    A.    I did.

4    Q.    And where was it that you interviewed Ali on May 5?

5    A.    The interview took place at the Phoenix Airport, I believe    02:52:42

6    in Terminal 2.

7    Q.    Do you recall how that interview was set up?

8    A.    I do.  I was asked to accompany a couple of FBI agents to

9    go and speak with Ali at any time prior to his departure.

10   Q.    And did you do that?                                          02:53:00

11   A.    I did.

12   Q.    Did you have an opportunity to talk to Ali during that

13   interview?

14   A.    I did.

15   Q.    Describe for us what Ali's demeanor was like during that     02:53:08

16   interview.

17   A.    This was the day before that we interviewed Mr. Wahid so

18   just a short period of time after his brother was killed in

19   Garland, Texas.  So, understandably, he was very distraught.  I

20   felt bad about asking him questions because I could see how he    02:53:24

21   was suffering mentally and emotionally.  He was very upset that

22   his brother had been killed.  I believe he told me he was going

23   to go get ready for his brother's funeral around the Kansas

24   City area.

25   Q.    Without getting into the details of exactly what he said,    02:53:43

United States District Court

KIM EDWARD JENSEN - Direct

1    was he able to sit with you all and provide you some                    02:53:46

2    information about things he had witnessed?

3    A.    He was.

4    Q.    And did he provide you and the FBI information that was of

5    investigative value to the FBI?                                          02:53:58

6    A.    It was.  The types of questions that I asked him was

7    specifically who was at his apartment when he was residing with

8    his brother -- his brother Nadir and also Ibrahim Simpson, and

9    I also asked him the duration of the time that -- what kind of

10   time frame we were looking at, the individuals that came over      02:54:22

11   to his house to visit his brother, if there were any weapons at

12   his brother's house.

13   Q.    And without telling us what he said, did he answer those

14   questions?

15   A.    Yes, he did.                                                       02:54:37

16   Q.    On May 2012, so roughly seven days after meeting Ali at

17   the airport, did you meet up with Ali again?

18   A.    I believe we did.

19   Q.    And without telling us what city, what state was it where

20   he was interviewed?                                                      02:54:56

21   A.    Missouri.

22   Q.    Could it have been Kansas?

23   A.    It was right on the border so I'm unsure exactly what

24   state because that city is split right down the middle.

25   Q.    Additionally, on June 4 of 2015, were you present in             02:55:17

United States District Court

KIM EDWARD JENSEN - Direct

1   another meeting with FBI agents with Ali Soofi?                    02:55:21

2   A.   Yes, I was.

3   Q.   And without telling us what he said, what was the purpose

4   of that interview?

5   A.   The purpose of the interview was to talk to Ali about some   02:55:30

6   of the previous questions that we had asked him, specifically

7   about the individuals that were visiting his brother, if there

8   were any weapons at all.  We wanted him to give us more precise

9   details about the weapons that his brother had in his

10  possession and also Mr. Simpson may have had in his possession.   02:55:50

11  Q.   Are you aware of whether or not during that particular

12  interview Ali was instructed in how to use recording devices to

13  make phone calls?

14  A.   Yes, he was.

15  Q.   Were you there for that?                                      02:56:04

16  A.   I was.  However, I was speaking with his parents most of

17  the time so I wasn't privy to the exact nature of those

18  conversations regarding the technical aspects of the phone.

19  Q.   Do you know whether or not Ali had agreed at that point to

20  make consensual calls on behalf of the FBI?                       02:56:24

21  A.   Yes, he had.

22  Q.   Throughout the time that you met with Ali during the month

23  of May and that time in June, June 4 of 2015, did Ali continue

24  to provide information to the FBI that was of investigative

25  value?                                                            02:56:40

United States District Court

KIM EDWARD JENSEN - Cross

1  A.    He did.                                                                02:56:41

2           MS. BROOK:  May I have a moment?

3           THE COURT:  You may.

4           MS. BROOK:  I have no more questions of this witness.

5           THE COURT:  All right.  Ms. Brook, thank you.            02:57:00

6           Mr. Wahid, do you have any questions for this

7  witness?

8           MR. WAHID:  Yes.

9           THE COURT:  All right.  If you're going to ask him

10 questions, I would like you to do it from the lectern so that   02:57:08

11 the witness has a clear line of sight to you, please.

12                     **CROSS - EXAMINATION**

13 BY MR. WAHID:

14 Q.    In your first visit to Mr. Wahid's home, did you have a

15 subpoena?                                                        02:57:31

16 A.    Pardon?

17 Q.    Did you have a subpoena?

18 A.    I received a subpoena, yes.

19 Q.    No.  No.  I said in your visit to Mr. Wahid's home, did

20 you have a subpoena?                                             02:57:38

21 A.    I'm sorry.  I can't understand the question.

22           THE COURT:  Mr. Wahid, you're asking him did he have

23 a subpoena for you when he came to see you the first time?

24           MR. WAHID:  Right.  Yes.

25 \\\

United States District Court

KIM EDWARD JENSEN - Cross

BY MR. WAHID:                                                      02:57:50

Q.    "Yes" or "no"?

A.    I did not have a subpoena the first time I came to see

you.  You're talking about the fifth?

Q.    The very first time.  That's what I mean by the first    02:57:59

time.

A.    On the sixth, now, we did not have a subpoena.

Q.    Both times when you were at Mr. Wahid's home, was he

obligated to speak with you?

A.    No, he was not.                                           02:58:10

Q.    Would you say that both times you were at Mr. Wahid's

home, it was voluntary on his part that he spoke with you?

A.    Yes.

Q.    Was Mr. Wahid obligated to tell you about the envelope and

the key?                                                         02:58:31

A.    He was obligated -- he was admonished to tell the truth,

yes.

Q.    In your first visit to Mr. Wahid's home, did you ask him

if Elton Simpson gave him anything?

A.    Yes.                                                      02:58:54

Q.    Your first visit?

A.    I asked him what else did he tell you, what else happened?

I asked I think what else three or four different times.  If I

said, "What else did Simpson give you," no, I did not ask,

"What else did Simpson give you," because Mr. Wahid told me     02:59:09

United States District Court

KIM EDWARD JENSEN - Cross

1    that Nadir gave him the soup.                                        02:59:13

2    Q.   When you returned on your second visit with the search

3    warrants, did you ask Mr. Wahid if Elton Simpson had given him

4    anything?

5    A.   Can you say that one more time?                                 02:59:27

6    Q.   When you returned on your second visit with the search

7    warrant, did you ask Mr. Wahid if Elton Simpson had given him

8    anything?

9    A.   Yes.

10   Q.   In your first visit to Mr. Wahid's home, what was it that      02:59:43

11   Mr. Wahid had told you that this gentleman Nadir Soofi had

12   given him?

13   A.   I think Mr. Wahid told me that Nadir Soofi gave him a bowl

14   of soup.

15   Q.   In your first visit to Mr. Wahid's home, what was the         03:00:05

16   statement that Mr. Wahid omitted and not tell you that Elton

17   Simpson had given him?

18            THE WITNESS:  Can you read that one?

19   A.   I can't hear your words very well.

20   Q.   Okay.  In your first visit to Mr. Wahid's home, what was      03:00:16

21   the statement that Mr. Wahid omitted and not tell you that

22   Elton Simpson had given him?

23   A.   What he admitted was the instructions that he had received

24   from Simpson, the key that he received from Simpson --

25            MS. BROOK:  Your Honor, I'm going to object.  I           03:00:41

KIM EDWARD JENSEN - Cross

1  believe the question was not heard by the witness.                              03:00:43

2          THE COURT:  I believe the question was "omitted," not

3  "admitted."

4          But the other reason that this is confusing for

5  everyone is, because Mr. Wahid, you're referring to yourself in   03:00:49

6  the third person.

7          And, Mr. Jensen, you're answering in the third

8  person.  I think it would simplify, and we would all be on the

9  same page, if we used "I" and "me" rather than "Mr. Wahid."

10  Let's try it that way.                                            03:01:06

11          If you could ask the question again, Mr. Wahid, using

12  "I" and "me."

13  BY MR. WAHID:

14  Q.   In your first visit to my home, what was the statement

15  that I omitted and not tell you that Elton Simpson had given      03:01:15

16  him?

17  A.   That Elton Simpson had given you?  That what you omitted

18  were the statements from Elton Simpson that he gave you some

19  instructions, that he gave you an envelope, and that he gave

20  you a key.  Those were the three things that you omitted.        03:01:38

21  Q.   When did you find out that I had omitted a statement about

22  the envelope and the key?

23  A.   Probably four or five days after I spoke to you the first

24  time.

25  Q.   Okay.  This is a "yes" or "no" question.  Did Mr. Wahid     03:02:05

KIM EDWARD JENSEN - Cross

1  correct his omitted statement by admitting that Elton Simpson       03:02:11

2  had given him a key and envelope?

3         MS. BROOK:  Your Honor, I didn't hear the question.

4         THE COURT:  Please repeat it and please try and use

5  "I" and "me."                                                       03:02:21

6         MR. WAHID:  Okay.  Yeah.  I keep forgetting about

7  that.

8  BY MR. WAHID:

9  Q.   Did I correct the omitted statement by admitting that

10  Elton Simpson had given me a key and envelope?                     03:02:29

11  A.   You corrected -- you corrected your own statement when

12  you -- the second time that we interviewed you when Mr. Byrne

13  asked if you Elton Simpson gave you something.  You said, "No."

14  And then you corrected yourself after you said, "No."

15  Q.   I asked you "yes" or "no".  I didn't ask for all of that.     03:02:46

16  A.   Yes.

17  Q.   Okay.  What did Mr. Wahid say he did with the key and

18  envelope?

19         MS. BROOK:  Your Honor, objection to the form of the

20  question.                                                          03:03:02

21         THE WITNESS:  Can you say that one more time?

22  BY MR. WAHID:

23  Q.   I keep forgetting.  I'm sorry.

24         What did I say that I did with the key and envelope?

25  A.   I still can't hear you very well.  You say what did I         03:03:08

United States District Court

KIM EDWARD JENSEN - Cross

1    say --                                                                03:03:11

2    Q.    -- that I did with the key and the envelope?

3           MS. BROOK:  And, Your Honor, just speculation in

4    terms of what time.  So what date is he referring to?  May 6?

5    June 10.                                                            03:03:22

6           THE COURT:  Right.  So this is a foundational issue.

7    There have been multiple meetings between the two of you.  If

8    you could tell us May 6, the June meeting or the December

9    meeting, which one are you referring to, Mr. Wahid?

10          MR. WAHID:  I guess June 10.                          03:03:42

11          THE COURT:  And do you need the question repeated

12    again?

13          THE WITNESS:  Yes, please.

14          THE COURT:  I'm going to ask the court reporter to

15    read it back.                                                      03:03:49

16          (Requested portion of record read:  What did I say

17    that I did with the key and envelope?)

18          THE WITNESS:  The second time we interviewed you, you

19    said you gave the key and the envelope to Saabir Nurse.

20    BY MR. WAHID:                                                       03:04:17

21    Q.    Were there any more attacks because Mr. Wahid - because I

22    failed to give you that information about the key and envelope?

23    A.    Not to my knowledge.

24    Q.    Were there any more new developments in the investigation

25    such as naming more terrorists?                                    03:04:31

United States District Court

KIM EDWARD JENSEN - Redirect

| | |
|---|---|
| 1 | A.    Yes. | 03:04:33 |
| 2 | Q.    Was anyone injured or killed because I failed to give you |
| 3 | the information about the key and envelope? |
| 4 | A.    Not to my knowledge. |
| 5 |             MR. WAHID:  I have nothing else, Your Honor. | 03:05:09 |
| 6 |             THE COURT:  All right.  Thank you, Mr. Wahid. |
| 7 |             Is there any redirect, Ms. Brook? |
| 8 |             MS. BROOK:  Briefly. |
| 9 |                     **REDIRECT EXAMINATION** |
| 10 | BY MS. BROOK: | 03:05:18 |
| 11 | Q.    For clarification sake, at any point during your two plus |
| 12 | hour interview of the defendant on May 6 of 2015, did he tell |
| 13 | you that Simpson and Ibrahim had provided him on the Friday |
| 14 | before the attack an envelope and a key? |
| 15 | A.    No, he did not. | 03:05:41 |
| 16 | Q.    At any point did he say either of them gave him an |
| 17 | envelope or a key? |
| 18 | A.    No, he did not. |
| 19 | Q.    At any point did he make any reference or indication to |
| 20 | there being an envelope and a key? | 03:05:50 |
| 21 | A.    No, he did not. |
| 22 | Q.    At any point did he discuss any instructions that either |
| 23 | Simpson or Soofi gave him on May 1? |
| 24 | A.    No, he did not. |
| 25 | Q.    As we listened to in the audio clip on June 10, 2015, when | 03:06:25 |

1    first asked if there was anything else given or anything else          03:06:29

2    that happened during that May 1 of 2015 encounter, at first did

3    he say, "No."

4    A.    He said, "No."

5              MS. BROOK:  I have no further questions.                      03:07:05

6              THE COURT:  All right.  Thank you, Ms. Brook.

7              And then the witness may be excused.

8              Mr. Jensen, you may step down.  Thank you, sir.

9              (Witness excused.)

10             THE COURT:  Counsel, for the parties, let's go ahead           03:07:14

11   and take the afternoon break now.

12             Mr. Wahid, I saw you trying to get my attention.

13             MR. WAHID:  I was just going to ask you could I use

14   the bathroom.

15             THE COURT:  Yes.  We're going to go ahead and take a           03:07:23

16   15-minute break.  Everybody can be ready to go just a little

17   bit after 3:20 and we'll go through to the end of the day at

18   4:30.

19             We're on recess.  Thank you.

20             MR. MCBEE:  Your Honor, may I ask what time the Court          03:07:38

21   intends to start court tomorrow?

22             THE COURT:  I was intending to start at 9 o'clock.

23   Does that work for you?

24             MR. MCBEE:  Yes.  That's fine.

25             (Recess at 3:07; resumed at 3:24.)                            03:07:50

                    United States District Court

|  |  |
|---|---|
| 1 | THE COURT:  All right.  Thank you, everyone.  The | 03:24:19 |
| 2 | Government can call its next witness. |
| 3 | MS. BROOK:  Thank you, Your Honor.  The Government |
| 4 | calls Ali Soofi. |
| 5 | THE COURT:  All right.  Mr. Soofi, if you would step | 03:24:53 |
| 6 | up past the bar to my courtroom deputy, she'll swear you in. |
| 7 | COURTROOM DEPUTY:  If I can have you state your name, |
| 8 | spell your first and last name for the record, please. |
| 9 | THE WITNESS:  First name is Ali, A-L-I.  Last name is |
| 10 | Soofi, S-O-O-F-I. | 03:25:07 |
| 11 | COURTROOM DEPUTY:  Thank you.  Please raise your |
| 12 | right hand. |
| 13 | (ALI SOOFI, a witness herein, was duly sworn or |
| 14 | affirmed.) |
| 15 | **DIRECT EXAMINATION** | 03:25:12 |
| 16 | BY MS. BROOK: |
| 17 | Q.   Good afternoon.  And Mr. Soofi, can you please introduce |
| 18 | yourself to the Court? |
| 19 | A.   My name is Ali Hamid Soofi. |
| 20 | Q.   And just as you get up there and get comfortable, there's | 03:25:49 |
| 21 | water right there if you need it and want to pour yourself a |
| 22 | cup. |
| 23 | A.   I'm good.  Thank you. |
| 24 | Q.   How old are you? |
| 25 | A.   36. | 03:25:58 |

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | Q.   And do you live here in Phoenix, Arizona? | 03:26:00 |
| 2 | A.   No.  I live outside the state. | |
| 3 | Q.   When was it that you moved away from Phoenix? | |
| 4 | A.   It was in, like, 2015. | |
| 5 | Q.   Was it during summertime? | 03:26:20 |
| 6 | A.   It was during May, May 4 or 5 I left to go to Kansas. | |
| 7 | Q.   And so that's when you left and you didn't come back here | |
| 8 | to Phoenix to live? | |
| 9 | A.   Yes. | |
| 10 | Q.   Let's talk for a moment, is Nadir Soofi, was he your | 03:26:37 |
| 11 | brother? | |
| 12 | A.   Yes. | |
| 13 | Q.   Was he older or younger than you? | |
| 14 | A.   Younger. | |
| 15 | Q.   And back in 2014, did you live here in Phoenix? | 03:26:47 |
| 16 | A.   I'm sorry? | |
| 17 | Q.   Back in 2014, did you live here in Phoenix? | |
| 18 | A.   Yes. | |
| 19 | Q.   And when you were living here in Phoenix in 2014, who did | |
| 20 | you move in with? | 03:27:03 |
| 21 | A.   My brother. | |
| 22 | Q.   And that's Nadir? | |
| 23 | A.   Yes. | |
| 24 | Q.   Did you live with just him or somebody else, too? | |
| 25 | A.   He had a friend Ibrahim, or Elton Simpson, that he was | 03:27:12 |

United States District Court

ALI SOOFI - Direct

1  living with.                                                              03:27:17

2  Q.   So did the three of you move in together?

3  A.   They were already living together.  I had moved in with

4  them because I had nowhere to go so I pretty much had got

5  divorced and moved out so I moved in with them.              03:27:32

6  Q.   So you got divorced you moved here to Phoenix, you moved

7  in with your brother Nadir and he was living with Elton

8  Simpson?

9  A.   Yes.

10 Q.   Do you remember generally where that apartment complex was 03:27:42

11 that you lived?

12 A.   I think it was off of 16th Avenue and Thunderbird area.

13 Q.   Was it near 19th Avenue?

14 A.   19th.  I'm sorry, I can't remember the exact address.  I

15 know it was on Thunderbird around -- that area.              03:27:59

16 Q.   And you mentioned that the three of you lived together.

17 Do you remember when in 2014 that started?  Do you remember

18 about what time of year in 2014 you moved in with the two of

19 them?

20 A.   It would be -- it was February.                        03:28:15

21 Q.   February of 2014?

22 A.   Yes.

23 Q.   And how long was it that you stayed living there in that

24 apartment with your brother and with Elton Simpson?

25 A.   A little bit less than a year and a half, about two months 03:28:31

United States District Court

ALI SOOFI - Direct

1   less.  About a year and four months.                           03:28:34

2   Q.   So approximately when in 2015 did you move out?  You had

3   mentioned that you moved back to Kansas on May 4.  At that

4   point, had you been no longer living with your brother and

5   Elton Simpson?                                                  03:28:50

6   A.   Yes.  I was -- I had moved in with a girlfriend in the

7   beginning of April.

8   Q.   So April of 2015.

9         So I want to rewind a little bit and ask you about

10  how it was you first met Elton Simpson.                         03:29:06

11  A.   My wife had kicked me out previously in 2010.  I had moved

12  to Phoenix.  My brother owned a pizza place so I came out to

13  live with him and he was still in the same apartment that he

14  was in after.  Elton was someone that would come to the

15  restaurant, the pizza place we owned, on almost like a daily    03:29:35

16  basis because my brother would pray with him, go to the mosque

17  nearby.

18  Q.   So was this 2010, 2011?

19  A.   Yes.

20  Q.   So you were working at the pizza shop with your brother?   03:29:50

21  A.   Yes.  When I arrived there, my brother had given me a cook

22  position.

23  Q.   And -- I'm sorry.  Go ahead.

24  A.   I was going to say I would work every day, pretty much

25  all -- six to seven days a week sometimes.                      03:30:06

United States District Court

ALI SOOFI - Direct

1   Q.   So it was during that period of time that you first met                03:30:11

2   Elton Simpson at the pizza shop?

3   A.   Yes.

4   Q.   Did you spend time with him back then outside of the pizza

5   shop?                                                                        03:30:20

6   A.   Not really because I wasn't really religious so the only

7   time would be when we went out to eat or when my brother would,

8   you know, take us to eat.  Other than that, it was nothing

9   really.

10  Q.   At some point did you leave Phoenix during that time                    03:30:39

11  period, the 2011 time period?

12  A.   It was probably around the same time, around February,

13  March that I had gone back to get back with my wife or ex-wife.

14  Q.   And at that point in time, who was your brother living

15  with?                                                                        03:31:05

16  A.   Nobody.

17  Q.   And then you returned back to Phoenix in February of 2014?

18  A.   Well, so in 2011 when I left, Elton took my position like

19  pretty much.  I left and he moved in.  So when I left, he

20  wasn't in there living with him but he moved in after the fact               03:31:22

21  I had left.

22  Q.   So for a period of time in 2011 he lived there but you had

23  left or were about to leave?

24  A.   Yes.

25  Q.   So I want to talk about the apartment complex that you                  03:31:36

United States District Court

ALI SOOFI - Direct

| | |
|---|---|
| 1 | were living in for that roughly 14-month period, February of | 03:31:38 |

were living in for that roughly 14-month period, February of
2014 through April of 2015. You had mentioned who you lived
with. You lived with your brother and Simpson. Can you
describe the apartment for us?

A.   It was a small, one-bedroom apartment. The main living
area was not that big. I mean, it had the living room and the
kitchen and then it would go straight to the bathroom and
bedroom.

Q.   So there was one bedroom. Who had the one bedroom?

A.   My brother occupied that.

Q.   And then where did you sleep?

A.   I slept on the couch. We had a big L-shaped couch in the
living room. We kind of divided that so we could sleep, like
our feet would kind of meet at one point.

Q.   Who is "our." Who is the other person?

A.   Elton. He was the other one that lived -- basically, we
would share the living room.

Q.   And other than the living room, the one bedroom, I presume
a kitchen, bathroom, is that the extent of the apartment?

A.   Yes. We had a small balcony with a storage room, a little
storage room.

Q.   Can you explain to us roughly how big that living room
was?

A.   It was probably, like, 20 by 15 and it was pretty small.

Q.   I'm going to place on the overhead what's already been

United States District Court

ALI SOOFI - Direct

```
1   marked as Government's Exhibit number 27.                         03:33:16

2            COURTROOM DEPUTY:  Is it on the computer or the Elmo?

3            MS. BROOK:  It's on the computer.

4   BY MS. BROOK:

5   Q.   Looking at Government's Exhibit Number 27, do you            03:33:28

6   recognize that?

7   A.   Yes.

8   Q.   And what do you recognize it as?

9   A.   It's the living room of the apartment.

10  Q.   The apartment that we've been talking about?               03:33:51

11           MS. BROOK:  Your Honor, the Government moves to admit

12  Government's Exhibit Number 27.

13           THE COURT:  Any objection, Mr. Wahid?

14           MR. WAHID:  No.

15           THE COURT:  All right.  27 is admitted.                03:34:02

16           (Exhibit Number 27 was admitted into evidence.)

17  BY MS. BROOK:

18  Q.   And Mr. Soofi, on the back wall depicted in this

19  photograph, what are the black boxes?

20  A.   Those are surround speakers.  We hooked up a stereo         03:34:18

21  system.

22  Q.   Sorry?

23  A.   They were just surround speakers.

24  Q.   Did that stereo system connect at all to the TV or what

25  was playing on the TV?                                            03:34:35
```

United States District Court

                        ALI SOOFI - Direct

1   A.    Yes.                                                          03:34:37

2   Q.    And do we see the TV in this picture?

3   A.    No.

4   Q.    Was the TV in this room?

5   A.    Yes, where the black chair is, it would have been on the     03:34:48

6   table.

7   Q.    Okay.  So looking here on the right side where that black

8   chair is?

9         We're going to put another picture up there,

10  Government's Exhibit Number 28.  Just one moment.  What's this     03:35:02

11  a picture of?

12  A.    That's a plexiglass -- we had turned it into a table but

13  it was a plexiglass -- it was an idea that my brother and I had

14  to use to clean the air vents because we had an air vent

15  cleaning business as well.  So it was made too heavy so we        03:35:41

16  converted it into a table.

17  Q.    And was that in the living room?

18  A.    Yes.  That was the middle, the main table.

19        MS. BROOK:  The Government moves to admit Exhibit

20  Number 28 and to place back on the overhead Exhibit Number 27.    03:35:57

21        THE COURT:  Any objection to 28, Mr. Wahid?

22        MR. WAHID:  No.

23        THE COURT:  28 is admitted.

24        (Exhibit Number 28 was admitted into evidence.)

25        THE COURT:  Ms. Brook, I could use a little context         03:36:08

                     United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | as to the dating of the two photographs because we have had | 03:36:10 |
| 2 | testimony that Mr. Soofi lived in this apartments two different | |
| 3 | times and I don't know when this came from. | |
| 4 | MS. BROOK:  Sure. | |
| 5 | BY MS. BROOK: | 03:36:18 |
| 6 | Q.   Was it in this apartment that you lived two different | |
| 7 | times? | |
| 8 | A.   Yes. | |
| 9 | Q.   So in looking at this picture that we see, Government's | |
| 10 | Exhibit Number 27, does this fairly and accurately represent | 03:36:25 |
| 11 | how the apartment looked during the time period that you lived | |
| 12 | there the last time period, so the 2014-2015 time period? | |
| 13 | A.   Yes.  It's exactly the same minus -- I mean, the table was | |
| 14 | 2014 when we made that but from 2010 it's pretty much the same. | |
| 15 | Q.   You had mentioned that you moved out of the apartment | 03:36:55 |
| 16 | early April of 2015.  Did you have occasion to go back into the | |
| 17 | apartment before the attack happened on May 3, in that | |
| 18 | in-between period of time? | |
| 19 | A.   I would visit at times. | |
| 20 | Q.   And so the room as it's depicted here, is that how it | 03:37:14 |
| 21 | continued to look when you were back in the apartment? | |
| 22 | A.   Yes. | |
| 23 | Q.   We had talked a moment ago about a TV.  Roughly how large | |
| 24 | was the TV that was in this room? | |
| 25 | A.   It was about 52 inch. | 03:37:33 |

120

ALI SOOFI - Direct

1   Q.   When you were in this particular room, the living room,    03:37:40

2   could you clearly see that TV?

3   A.   Yes.  Sitting in that room, anybody that was sitting in

4   there, it was positioned in front of them.

5   Q.   Was there anything that obstructed your view of that TV?    03:37:54

6   A.   No, not at all.

7   Q.   At some point did you meet an individual by the name of

8   Abdul Khabir Wahid?

9   A.   Yes.

10  Q.   How did you meet him first?    03:38:14

11  A.   It was through my brother.  I had heard about him

12  previously in 2010, you know, when we were at the pizza place

13  but I had never met him until 2014.

14  Q.   Do you see him here in the courtroom with us?

15  A.   Yes.    03:38:40

16  Q.   Can you point to him and identify something that he's

17  wearing?

18  A.   The plaid red shirt.

19          MS. BROOK:  Your Honor, may the record reflect that

20  the witness identified the defendant?    03:38:49

21          THE COURT:  It does.

22  BY MS. BROOK:

23  Q.   What did you call him?  Did you call him Mr. Wahid or what

24  name was he referred to as?

25  A.   I knew him by AK.    03:38:58

United States District Court

ALI SOOFI - Direct

1   Q.   And is that how others referred to him, that you heard?       03:39:02

2   A.   Yes.

3   Q.   You had mentioned that in 2010, 2011 you had heard of him.

4   When was the first time that you met him?

5   A.   It was at the apartment with my brother and Elton.       03:39:19

6   Q.   Which apartment?

7   A.   The one on the screen.

8   Q.   And roughly during which time period was that when you met

9   him in this apartment that we're looking at here, Exhibit

10  Number 27?       03:39:35

11  A.   I think it was -- I think it was shortly after I had

12  reached -- I was living there.

13  Q.   So shortly after you moved in in February of 2014?

14  A.   Yes.

15  Q.   Did you see him at that apartment, your apartment, the       03:40:01

16  apartment you shared with Nadir and with Simpson, just once or

17  more than once?

18  A.   I had seen him there more than once.  A lot of the times

19  as well I would go on runs.  I would, you know, just some

20  conversation after I would hear from my brother or Elton that       03:40:23

21  they were hanging out.

22  Q.   Hanging out at the house, the apartment, or somewhere

23  else?

24  A.   Both.

25  Q.   And approximately how many times do you think that you saw       03:40:37

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | him in this apartment with your brother and or Simpson? | 03:40:41 |
| 2 | A.    It was on occasion.  Me personally, it was maybe once or | |
| 3 | twice here and there.  Just from their conversation, I would | |
| 4 | hear other times. | |
| 5 | Q.    So did you see him more than two times in this apartment? | 03:41:06 |
| 6 | A.    Yes. | |
| 7 | Q.    And you say here that, to your knowledge, was he there | |
| 8 | once a week, once a month, how often? | |
| 9 | A.    I would say once or twice a week maybe. | |
| 10 | Q.    I want to talk about what was occurring in this living | 03:41:25 |
| 11 | room that we're looking at.  During the time that you lived in | |
| 12 | 2014 and 2015 with your brother and with Elton Simpson, were | |
| 13 | there videos that were watched, displayed on the TV in the | |
| 14 | living room of this house? | |
| 15 | A.    Yes.  At first I didn't know what they were.  It was a lot | 03:41:51 |
| 16 | of guys with their head wraps driving around in trucks shooting | |
| 17 | guns with black flags with -- you know, there was Arabic | |
| 18 | writing with the swords crossing.  I mean, we would get a lot | |
| 19 | of, you know, complaints because they would have it up so loud. | |
| 20 | Q.    Who is "they"? | 03:42:13 |
| 21 | A.    Just general neighbors.  We had people that lived around | |
| 22 | us. | |
| 23 | Q.    So there were, obviously, people in the living room that | |
| 24 | were watching those videos.  Who was it that you recall | |
| 25 | watching those videos? | 03:42:30 |

United States District Court

ALI SOOFI - Direct

1    A.   I mean, Elton would always or my brother would always be          03:42:35

2    at the computer.   It would be Abdul Kareem, the other guy, and

3    then I remember on occasions there would be AK as well.

4    Q.   And when AK was there, were there ever any of these videos

5    playing?                                                               03:43:00

6    A.   They had them constantly playing unless I got on the

7    computer and like put on something I personally watched.   They

8    were always --

9    Q.   Go ahead.

10   A.   They would always have something of that sort playing.          03:43:13

11   Q.   You said of that sort, so you talked about videos with

12   people head wraps, with guns in the back of trucks with the

13   black flags, with the swords.   Did you see any other types of

14   videos?

15   A.   On occasion they would put on the execution videos of          03:43:33

16   people that went against the beliefs of, you know -- of the

17   people that were in the videos.

18   Q.   In the execution videos that you saw shown on the TV in

19   this living room, how were people executed?

20   A.   By beheading.                                                    03:43:54

21   Q.   You had mentioned that Simpson and your brother watched

22   those videos all the time.   Is that something that happened

23   daily?   Weekly?   How often is all the time?

24   A.   It was a daily thing.

25   Q.   During the time that you were in the apartment, did you         03:44:27

United States District Court

ALI SOOFI - Direct

1  hear Simpson express support for ISIS?                          03:44:29

2  A.   Not directly but a lot of hate towards people that didn't

3  believe in the same beliefs that he had, basically saying that,

4  you know, if you didn't believe what he did, you were a kaffir

5  and that basically you should be killed because you're going     03:44:47

6  against, you know, the beliefs.

7  Q.   Did he the word "kaffir"?

8  A.   Yes.  I was called a kaffir plenty of times.

9  Q.   And by whom?

10  A.   My brother and Elton.                                       03:45:02

11  Q.   Anybody else?

12  A.   I mean, Abdul Kareem would joke around with me but he

13  directly wouldn't come at me with that, kind of like accusing

14  me of, you know, doing wrong.

15  Q.   And what were the wrong things that you did that got        03:45:21

16  judgment by your brother and others in this home?

17  A.   Dating outside of marriage.  I guess having relations with

18  females in general outside of marriage.

19  Q.   Did Simpson and your brother ever talk about violence

20  towards you for things that you did?                             03:45:45

21  A.   I mean, my brother had at times told me that people like

22  me that usually do that, you know, they usually, you know,

23  should be killed because, you know, you're -- I mean I was

24  raised Muslim but I was never really practicing.  I mean I did

25  it more for, you know, to please my dad at times and my          03:46:08

United States District Court

ALI SOOFI - Direct

1    brother.  If I went against it, I wouldn't have had a place to      03:46:11

2    live.  So, I mean, I kind of just, you know, did it to please,

3    you know.

4    Q.   At any point when you were living in this house, did you

5    hear anybody talk about an attack on the Draw the Prophet        03:46:31

6    Muhammed contest?

7    A.   No.

8    Q.   Did Simpson and your brother know that you did not share

9    their views on violence towards people who didn't believe what

10   they believe?                                                    03:46:54

11   A.   I mean, yes, they clearly understood that I wasn't

12   anywhere near, you know, on their level of things thinking

13   towards especially harming people.

14   Q.   Did they try to convince you to believe what they

15   believed?                                                        03:47:10

16   A.   When I first moved there, yes.  I mean, I had to pray five

17   times a day.  I had to go to the mosque.  You know, I had to

18   listen to my brother's lectures.  It's almost like when I would

19   leave and come back, my brother would have a whole knew agenda,

20   he would have this whole new -- almost like the vibe of my       03:47:32

21   brother was different.  He was -- he would try to push things

22   onto me, you know, and threaten me with, you know, "I'm going

23   to kick you out," or -- you know, "You're not my brother unless

24   you believe the same things I do."

25   Q.   Did the lectures that your brother gave you talk about      03:47:51

United States District Court

ALI SOOFI - Direct

 1  violence towards people who didn't believe what he did?                    03:47:53

 2  A.   Yes.

 3  Q.   Did Simpson also regularly talk to you about violence

 4  against people who didn't believe what he believed?

 5  A.   He wouldn't directly talk to me but my brother and Elton   03:48:08

 6  would talk in front of me.

 7  Q.   Did you see weapons in this apartment during the months

 8  that you lived there in 2014 and 2015?

 9  A.   Yes.

10  Q.   Were the weapons regularly kept in the apartment?        03:48:25

11  A.   The original handguns that they had in there were

12  concealed to where they would stay.  My brother would have his

13  in his room and Elton would have his tucked away on the side of

14  the couch.  But later on they had acquired the two AK47s and

15  those were in plain sight.                                    03:48:48

16  Q.   Did you ever see Wahid near the weapons that were inside

17  this apartment?

18  A.   I can remember the first day my brother had got his

19  weapon, we were all over there and we were passing it around

20  checking it out.                                              03:49:08

21  Q.   So Nadir got a weapon and you're in this apartment that we

22  are looking at here in 19th Avenue.  What type of weapon was

23  it, just generally?

24  A.   I think it was AK74.

25  Q.   And was Wahid there at any point?  Did he -- did you see   03:49:27

ALI SOOFI - Direct

1  him near the weapon?                                                    03:49:32

2  A.   I mean, Elton, my brother, and I and AK were there that

3  day when he had brought it back.

4  Q.   Abdul Malik Abdul Kareem was also there?

5  A.   Yes.                                                               03:49:47

6  Q.   What happened when the weapon was brought back, when the

7  weapon was in the house and Wahid was there?

8  A.   I mean it was passed around.  Naturally when people get

9  new things, they pass them around.  Everybody was checking it

10 out, basically just seeing how the weapon was.                         03:50:04

11 Q.   Why was it that you moved out?

12 A.   Just the increasing -- you know, my brother had changed

13 completely.  My brother was getting more violent towards me.  I

14 was -- you know, I slept there and Elton would sleep next to me

15 so, you know, I felt that, you know, sooner or later something         03:50:37

16 was going to happen to me.  So I felt like the need to get out

17 and get away just for my own safety.

18 Q.   How do you mean your brother was becoming more violent?

19 A.   He wasn't my brother any more.  He was always -- he didn't

20 want to leave the apartment.  He was talking about, you know,          03:51:00

21 people outside you are, you know, are kaffirs, people that

22 should be killed that don't believe in what I believe in.  And,

23 you know, that you're -- basically, it's hard when you know

24 your own family member switches up on you and is willing to

25 kill you over something that someone else has put that idea            03:51:23

United States District Court

ALI SOOFI - Direct

1   into his head.                                                        03:51:26

2   Q.   Over the time that you were living in the house in 2014,

3   2015, did Simpson change as well?

4   A.   Oh, yeah.  He would stay in the apartment as well.  They

5   would rarely leave towards the end.  They would both stay         03:51:42

6   secluded with each other basically just playing their videos

7   and reading their books nonstop.

8   Q.   You mentioned that Simpson would rarely leave.  To your

9   knowledge, was he working?

10  A.   He wasn't able to get employment because he had told me he   03:52:04

11  was on the FBI watch list previously so he was working for a

12  friend just to make enough money to pay rent.

13  Q.   Were you or your brother working in 2014, 2015?

14  A.   Yes.  We were contracted through a carpet cleaning

15  company, but then we opened up our own cleaning company after     03:52:27

16  that.  So we would work during those times.  But towards the

17  end, my brother didn't get any contracts.  He kind of shut

18  down, you know, and said that God would provide for us.  So it

19  kind of fell apart.

20  Q.   How were you paying rent?                                     03:52:48

21  A.   My dad.  He would send money for rent.

22  Q.   How was it that you heard that your brother was dead?

23  A.   It was the morning I woke up.  My girlfriend had turned on

24  the news and I basically saw his car on the news and saw

25  Elton's face.  So I pretty much put two and two together and I    03:53:42

United States District Court

ALI SOOFI - Direct

1    kind of figured, you know, they had -- they had gotten so close    03:53:50

2    and so intense with each other, it was a pretty much a dead

3    give-away that he would have gone with him.

4    Q.   From what you heard on the news, did you know right away

5    that there was a terrorism investigation?    03:54:08

6    A.   From what I saw on the news, the headlines, yes, that he

7    had gone to shoot up a cartoon drawing contest.

8    Q.   Did you reach out to the FBI?

9    A.   Yes.  The morning that I found out, my girlfriend had a

10   friend in the FBI that she had contacted and I had met up with    03:54:36

11   two agents that morning to answer any questions they had.

12   Q.   So that was on the first morning after May 4, the Monday?

13   A.   Yes.

14   Q.   On that day, May 4, did you get a phone call from AK?

15   A.   Yes.    03:55:02

16   Q.   And did you talk to him?

17   A.   Yes.

18   Q.   What did he say to you?

19   A.   Just basically that he was checking, basically letting me

20   know like more of what had happened and basically advising me    03:55:23

21   not to speak with the FBI about anything.

22   Q.   You said "more of what had happened."  More of what had

23   happened in relation to what?

24   A.   To the incident with my brother because I guess they had

25   gone to the apartment to go check and that's when they had    03:55:49

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | everything boarded up and the FBI or the cops were there. | 03:55:54 |
| 2 | Q.   So that AK Wahid had gone to Nadir and Simpson's apartment | |
| 3 | and seen stuff boarded up? | |
| 4 | A.   Yes. | |
| 5 | Q.   And you also said that he told you not to talk to the FBI. | 03:56:11 |
| 6 | Was that in that call there on the fourth? | |
| 7 | A.   Yes. | |
| 8 | Q.   Do you recall had you had a conversation on the phone with | |
| 9 | AK before that day?  Had he ever called you before? | |
| 10 | A.   Not really.  I mean, it was more of just, you know, the | 03:56:41 |
| 11 | occasional run-in when I was with my brother. | |
| 12 | Q.   Do you have any memory of ever talking to him on the phone | |
| 13 | before that day? | |
| 14 | A.   No. | |
| 15 | Q.   And May 5, the next day, Tuesday, did you meet again with | 03:57:03 |
| 16 | the FBI? | |
| 17 | A.   Yes. | |
| 18 | Q.   Both days, on May 4 and May 5 when you met with the FBI, | |
| 19 | did you talk to them? | |
| 20 | A.   Yes. | 03:57:21 |
| 21 | Q.   And generally speaking, what were some of the topics that | |
| 22 | you talked to them about? | |
| 23 | A.   It basically was everything that had happened.  It was -- | |
| 24 | just because of what had happened, it all came out jumbled but | |
| 25 | pretty much they had asked, you know, the involvement, who was | 03:57:41 |

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | all involved, the names of the people, if I recognized, you | 03:57:45 |
| 2 | know, pictures of other people, just the generally of what had | |
| 3 | happened. | |
| 4 | Q.   Without telling us what you said, did you tell them about | |
| 5 | what you had seen inside the apartment? | 03:58:06 |
| 6 | A.   Yes. | |
| 7 | Q.   And start to talk to them about things that you heard | |
| 8 | inside the apartment? | |
| 9 | A.   Yes. | |
| 10 | Q.   People that you saw that came to the apartment and visited | 03:58:16 |
| 11 | your brother and Simpson? | |
| 12 | A.   Yes. | |
| 13 | Q.   Weapons that you saw in the apartment? | |
| 14 | A.   Yes. | |
| 15 | Q.   Did you talk to them voluntarily?  Did you choose to talk | 03:58:30 |
| 16 | to them? | |
| 17 | A.   Yes. | |
| 18 | Q.   On that day, on May 5, did you leave Phoenix and fly | |
| 19 | somewhere else? | |
| 20 | A.   Yes. | 03:58:46 |
| 21 | Q.   What state did you go to?  Where did you head to? | |
| 22 | A.   To Kansas. | |
| 23 | Q.   On May 7 did you receive a phone call from Salim Sampson? | |
| 24 | A.   Yes. | |
| 25 | Q.   And where were you when you got that call? | 03:59:07 |

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | A.   I was at my parents' house. | 03:59:11 |
| 2 | Q.   When you were on the phone with Salim, did anybody else | |
| 3 | get on the phone? | |
| 4 | A.   AK was with him the original time that I was called. | |
| 5 | Q.   And did you talk to AK? | 03:59:31 |
| 6 | A.   Yes. | |
| 7 | Q.   Do you recall what AK said to you on the phone that day on | |
| 8 | May 7? | |
| 9 | A.   The first time I talked to him he was basically just | |
| 10 | saying, you know, how I was and what was going on, you know, | 03:59:54 |
| 11 | where I was, when was I coming back.  Basically just giving me | |
| 12 | advice on what to say and who not to talk to. | |
| 13 | Q.   What do you mean "who not to talk to"? | |
| 14 | A.   To not say anything, you know, that doesn't need to be | |
| 15 | said to the FBI. | 04:00:17 |
| 16 | Q.   Did he specifically talk about the FBI to you during that | |
| 17 | conversation on May 7? | |
| 18 | A.   Yes. | |
| 19 | Q.   Do you recall the FBI coming to your father's home there | |
| 20 | in Kansas on May 12? | 04:00:34 |
| 21 | A.   Yes. | |
| 22 | Q.   And did you show them your phone during the time that they | |
| 23 | were at the house? | |
| 24 | A.   Yes.  They had taken my phone and examined it. | |
| 25 | Q.   Did they take some screen shots of your phone? | 04:00:50 |

United States District Court

ALI SOOFI - Direct

1    A.   Yes.                                                              04:00:53

2    Q.   I'm going to place on the overhead what's been marked as

3    Government's Exhibit 160.

4           MS. BROOK:   And, Your Honor, this I believe is three

5    pages so we're just going to look at each page for foundation   04:01:23

6    purposes.

7           Your Honor, may I approach?   We can do it off the

8    Elmo.

9           THE COURT:   You can use the Elmo if you like, yeah.

10   BY MS. BROOK:                                                         04:02:11

11   Q.   We're going to look at three separate pages all marked as

12   Government's Exhibit 160.   Here's the first page, second page,

13   and third page.   Do you recognize what's depicted in these

14   photos?

15   A.   It's from my old cell phone.                                     04:02:40

16   Q.   And can you tell by -- how can you tell?

17   A.   On the previous page it had contacts for my ex-girlfriend,

18   my mom, friends, and Salim.

19   Q.   You had mentioned a call that you received from Salim on

20   May 7.   Who is Salim Sampson?                                        04:03:03

21   A.   He was a mutual friend of the group I guess.

22   Q.   Which group?

23   A.   With Elton, AK, my brother.

24   Q.   And looking at page three of Exhibit Number --

25          MS. BROOK:   Before I do that Your Honor, the                  04:03:28

United States District Court

ALI SOOFI - Direct

1   Government moves to admit Exhibit Number 160.                    04:03:29

2           THE COURT:  If there is no objection, 160 is

3   admitted.

4           (Exhibit Number 160 was admitted into evidence.)

5   BY MS. BROOK:                                                    04:03:40

6   Q.   Do you recognize this call detail?

7   A.   Yes.

8   Q.   And what is it?

9   A.   It was a call that I received from Salim.

10  Q.   And here where it says eight minutes and 19 seconds, based  04:03:55

11  on using your phone and looking at this, what does that mean?

12  A.   That means that -- the duration of the call.

13  Q.   You had spoken a moment ago about a call where AK got on

14  the phone when you were talking to Salim Sampson.  Was it this

15  call?                                                            04:04:14

16  A.   Yes.

17  Q.   Did you continue to talk to the FBI during the month of

18  May?

19  A.   Yes.  I was in contact with them.

20  Q.   And did you continue to provide them information of things  04:04:33

21  that you had seen when you lived in the apartment on 19th

22  Avenue?

23  A.   Yes.

24  Q.   Details of things that were said, what you saw, what you

25  knew?                                                            04:04:51

United States District Court

ALI SOOFI - Direct

1   A.   Yes.                                                          04:04:51

2   Q.   On June 4 of 2015, did you meet with some agents who

3   provided you recording devices?

4   A.   Yes.

5   Q.   Explain to us what happened that day.  What did you agree     04:05:03

6   to do?

7   A.   Well, basically, they had given me a 1-800 number and a

8   password.  When I was receiving a phone call, I would basically

9   agree to put that in and so they would record the call.

10  Q.   Did you need to dial the 1-800 number before you connected    04:05:30

11  to the person that you were speaking with to make the

12  recording?

13  A.   Yes.  I would have to let the call go through and then

14  dial the number, the 1-800 number, their phone number and the

15  password for it to record the call.                               04:05:46

16  Q.   Did you agree to make recorded conversations or recordings

17  based upon conversations with AK?

18  A.   Yes.

19  Q.   And did you, over the month of June and July do that?

20  A.   Yes.                                                         04:06:09

21  Q.   You had mentioned that you would need to call him to set

22  up the recording device.  How was it that that would happen?

23  Would he call and it would be a missed call or what would spur

24  the time that you would call him to talk?

25  A.   I would receive a call and I would let it go through and      04:06:29

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | then after that, I would put in the 1-800 number and then call | 04:06:34 |
| 2 | back. | |
| 3 | Q.   So you would receive a call from AK, Mr. Wahid, let it go | |
| 4 | to voicemail and then call him back using the 1-800 number? | |
| 5 | A.   Yes. | 04:06:47 |
| 6 | Q.   On June 6 of 2015, did you record a conversation with | |
| 7 | Wahid? | |
| 8 | A.   Yes. | |
| 9 | Q.   And have you had the opportunity to listen to the entire | |
| 10 | recorded -- recording of the recording that you made of that | 04:07:08 |
| 11 | conversation? | |
| 12 | A.   Yes. | |
| 13 | Q.   That recording, does it fairly and accurately reflect the | |
| 14 | conversation you recorded with the defendant on June 6 of 2015? | |
| 15 | A.   Yes. | 04:07:26 |
| 16 | Q.   Did you also listen to Government Exhibits 118, 119, 120 | |
| 17 | and '21? | |
| 18 | A.   Yes. | |
| 19 | Q.   And did those fairly and accurately represent snippets of | |
| 20 | the conversation that you had that day and recorded with the | 04:07:38 |
| 21 | defendant? | |
| 22 | A.   Yes. | |
| 23 | Q.   During that call on June 6, did the defendant tell you not | |
| 24 | to call the FBI? | |
| 25 | A.   Yes. | 04:08:02 |

United States District Court

ALI SOOFI - Direct

| 1 | Q.   Does Government's Exhibit 118 reflect that part of the | 04:08:02 |
| 2 | call? |
| 3 | A.   Yes. |
| 4 |       MS. BROOK:  Government moves to admit and play |
| 5 | Government's Exhibit 118. | 04:08:12 |
| 6 |       THE COURT:  Any objection, Mr. Wahid? |
| 7 |       No objection.  It's admitted. |
| 8 |       (Exhibit Number 118 was admitted into evidence.) |
| 9 |       (Exhibit 118 was played.) |
| 10 | BY MS. BROOK: | 04:09:58 |
| 11 | Q.   Did the defendant tell you to tell the FBI that you didn't |
| 12 | know anything? |
| 13 | A.   Yes. |
| 14 | Q.   Does Government's Exhibit 119 reflect that part of the |
| 15 | conversation? | 04:10:14 |
| 16 | A.   Yes. |
| 17 |       MS. BROOK:  Government moves to admit and play |
| 18 | Exhibit Number 119. |
| 19 |       THE COURT:  There being no objection, 119 is |
| 20 | admitted. | 04:10:22 |
| 21 |       (Exhibit Number 119 was admitted into evidence.) |
| 22 |       (Exhibit 119 is played.) |
| 23 | BY MS. BROOK: |
| 24 | Q.   Throughout this call, did the defendant tell you multiple |
| 25 | times to not call and not talk to the FBI? | 04:11:11 |

United States District Court

ALI SOOFI - Direct

1  A.   Yes.

2  Q.   Does Exhibit 120 reflect that?

3         MS. BROOK:  Government moves to admit and play

4  Exhibit Number 120.

5         THE COURT:  Without objection, 120 is admitted.

6         Can you start it again, Mr. Koehler?  I didn't hear

7  the first part.

8         (Exhibit Number 120 was admitted into evidence.)

9         (Exhibit 120 is played.)

10 BY MS. BROOK:

11 Q.   Did the defendant tell you during this conversation what

12 happens if the FBI catches you in a lie?

13 A.   Yes.

14 Q.   Does Exhibit Number 121 reflect that part of the

15 conversation?

16 A.   Yes.

17        MS. BROOK:  Government moves to admit and play

18 Exhibit Number 121.

19        THE COURT:  There's no objection so 121 is admitted.

20        (Exhibit Number 121 was admitted into evidence.)

21        (Exhibit 121 is played.)

22 BY MS. BROOK:

23 Q.   In Exhibit Number 199, which we heard a moment ago, the

24 defendant told you to tell the FBI that you didn't know

25 anything.  From your perspective, did you know information that

04:11:16

04:11:38

04:12:00

04:12:12

04:12:23

04:12:57

ALI SOOFI - Direct

1   you wanted to convey to the FBI?                                      04:13:02

2   A.   Yes.

3   Q.   And was that information that you were telling the FBI?

4   A.   Yes.

5   Q.   Did that information relate in part to things you had            04:13:20

6   observed with AK, Mr. Wahid?

7   A.   Yes.

8   Q.   On June 7, so the next day, did you miss another call from

9   the defendant?

10  A.   Yes.                                                             04:13:38

11  Q.   And did you call him back?

12  A.   Yes.  He was in -- using the number they had provided me.

13  Q.   Using the recording system?

14  A.   Yes.

15  Q.   Have you had an opportunity to review that recording in         04:13:50

16  its entirety?

17  A.   Yes.

18  Q.   And did that recording fairly and accurately represent the

19  conversation that you had with the defendant on June 7 of 2015?

20  A.   Yes.                                                             04:14:02

21  Q.   Have you also had the opportunity to review clips,

22  Government's Exhibit 122, 123, 124, 125, 126, 127 and 128?

23  A.   Yes.

24  Q.   Do those clips fairly and accurately reflect component

25  parts or snippet pieces of the recorded conversation you            04:14:22

                          ALI SOOFI - Direct

1    recorded of the defendant from that day?                          04:14:24

2    A.    Yes.

3    Q.    During that call, did the defendant say to you that the

4    FBI doesn't know what you know?

5    A.    Yes.                                                         04:14:43

6    Q.    And, again, tell you to tell the FBI that you don't know

7    anything?

8    A.    Yes.

9    Q.    Does Exhibit Number 122 reflect that part of the

10   conversation?                                                     04:14:55

11   A.    Yes.

12             MS. BROOK:   Government moves to admit and play 122.

13             THE COURT:   Without objection, 122 will be admitted.

14             (Exhibit Number 122 was admitted into evidence.)

15             (Exhibit 122 is played.)                                04:15:07

16   BY MS. BROOK:

17   Q.    When the videos were being played, the ISIS propaganda

18   videos --

19   A.    Yes.

20   Q.    -- did you see them?                                        04:16:48

21   A.    Yes.

22   Q.    During this call, did the defendant tell you to call the

23   FBI, don't go in and talk to them in person?

24   A.    Yes.

25   Q.    Does Exhibit Number 123 reflect that part of the            04:17:03

                    United States District Court

ALI SOOFI - Direct

1    recording?                                                      04:17:07

2    A.   Yes.

3              MS. BROOK:   Government moves to admit and play

4    Exhibit 123.

5              THE COURT:   No objection.   123 is admitted.         04:17:23

6              (Exhibit Number 123 was admitted into evidence.)

7              (Exhibit 123 is played.)

8    BY MS. BROOK:

9    Q.   Did the defendant tell you to make your answers to the FBI

10   short and quick?                                                04:18:00

11   A.   Yes.

12   Q.   And, additionally, for you to tell them that you weren't

13   there, you don't know anything?

14   A.   Yes.

15   Q.   Does Exhibit Number 124 reflect that?                      04:18:11

16   A.   Yes.

17             MS. BROOK:   Government moves to admit and play 124.

18             THE COURT:   There's no objection so 124 is admitted.

19             (Exhibit Number 124 was admitted into evidence.)

20             (Exhibit 124 is played.)                              04:18:24

21   BY MS. BROOK:

22   Q.   Is it true that you were never at the apartment?

23   A.   No.

24   Q.   And is it true that you only saw Wahid, the defendant, at

25   the apartment one or two times?                                 04:19:39

United States District Court

ALI SOOFI - Direct

1   A.   No.                                               04:19:42

2   Q.   Why did you say that?

3   A.   I'm sorry.  I kind of lost my train of thought.

4   Q.   That's okay.

5          So the defendant said to you in this recording:  I've   04:20:06

6   never seen you except one time.

7          And you said:  Yeah, I would always take off on my

8   runs.  Is it true that you only saw him there one or two times?

9   A.   No.

10   Q.   So in the midst of this conversation with him, do you have   04:20:19

11   a purpose?  What are you trying to do as you talk to him?

12   A.   Just to, you know, let him know that they have, you know,

13   all the -- you know, all the evidence all in front of them.

14   So, I mean, like me saying, like, I can't lie to them.

15   Basically I came forward and told them what it was, you know,   04:20:54

16   how everything played out.

17   Q.   Throughout the course of this conversation, did the

18   defendant tell you what to say to the FBI?

19   A.   Yes.

20   Q.   Did he also tell you that if you talked to the FBI, you   04:21:13

21   would be charged?

22   A.   Yes.

23   Q.   Does clip number 125 represent that part of the

24   conversation?

25   A.   Yes.                                             04:21:25

United States District Court

ALI SOOFI - Direct

| | |
|---|---|
| 1 | Q.   Government moves to admit and play 125. | 04:21:26 |
| 2 | THE COURT:  If there's no objection, 125 is admitted. |
| 3 | (Exhibit Number 125 was admitted into evidence.) |
| 4 | (Exhibit 125 is played.) |
| 5 | BY MS. BROOK: | 04:22:14 |
| 6 | Q.   Did Simpson and your brother keep the weapons secret from |
| 7 | you? |
| 8 | A.   No. |
| 9 | Q.   Were they readily apparent when you were in the apartment? |
| 10 | A.   Yes. | 04:22:22 |
| 11 | Q.   And at times was Wahid present when those guns were |
| 12 | readily apparent or obvious in plain sight in the apartment? |
| 13 | A.   Yes. |
| 14 | Q.   During this call, did the defendant repeatedly tell you |
| 15 | that you don't know anything? | 04:22:48 |
| 16 | A.   Yes. |
| 17 | Q.   Does Exhibit Number 127 reflect that? |
| 18 | A.   Yes. |
| 19 | MS. BROOK:  The Government moves to admit and play |
| 20 | 127. | 04:22:58 |
| 21 | THE COURT:  There being no objection, 127 is |
| 22 | admitted. |
| 23 | (Exhibit Number 127 was admitted into evidence.) |
| 24 | (Exhibit 127 is played.) |
| 25 | \\\ |

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | BY MS. BROOK: | 04:24:01 |
| 2 | Q.   Did the defendant also tell you to tell the FBI that you | |
| 3 | never saw any guns? | |
| 4 | A.   Yes. | |
| 5 | Q.   Does 126 reflect that? | 04:24:13 |
| 6 | THE COURT:  Oh, I see. | |
| 7 | MS. BROOK:  I inadvertently skipped one, Your Honor. | |
| 8 | The Government moves to admit and play 126. | |
| 9 | THE COURT:  If there's no objection, 126 is admitted. | |
| 10 | (Exhibit Number 126 was admitted into evidence.) | 04:24:30 |
| 11 | (Exhibit 126 is played.) | |
| 12 | BY MS. BROOK: | |
| 13 | Q.   Did the defendant also tell you again don't go into the | |
| 14 | office; call them? | |
| 15 | A.   Yes. | 04:25:05 |
| 16 | Q.   Does Exhibit Number 128 reflect that part of the call? | |
| 17 | A.   Yes. | |
| 18 | MS. BROOK:  Government moves to admit 128. | |
| 19 | THE COURT:  With no objection, 128 is admitted. | |
| 20 | (Exhibit Number 128 was admitted into evidence.) | 04:25:19 |
| 21 | (Exhibit 128 is played.) | |
| 22 | BY MS. BROOK: | |
| 23 | Q.   On June 18 of 2015, did you also record a conversation | |
| 24 | with the defendant? | |
| 25 | A.   Yes. | 04:26:23 |

United States District Court

ALI SOOFI - Direct

1   Q.   And did it occur the same way that we've talked about                04:26:24

2   previously where you missed a call and then you called him back

3   with the recording phone number or did it come about a

4   different way?

5   A.   It was the same process with the recording.                          04:26:35

6   Q.   So you missed a call from him and then you called him

7   back?

8   A.   Yes.

9        THE COURT:  Ms. Brook, I'm thinking if we were going

10  to end for the day in about two and a half or three minutes       04:26:47

11  anyway, this is a new call, maybe this is a good place to break

12  for the day.

13       MS. BROOK:  Okay.

14       THE COURT:  Does that work?

15       MS. BROOK:  Yeah.                                                     04:26:54

16       THE COURT:  All right.

17       So, ladies and gentlemen, we're going to go ahead and

18  recess for the day.  It's just two minutes shy of 4:30.  If the

19  parties can be ready to go again tomorrow morning at 9 o'clock,

20  we will resume.                                                           04:27:05

21       MS. BROOK:  Thank you.

22       THE COURT:  All right.  Thank you, all.  We are

23  adjourned.

24       The courtroom should open up at about 8:45.

25       Is that right, Julie?                                                04:27:15

United States District Court

ALI SOOFI - Direct

1     COURTROOM DEPUTY:  Correct.                        04:27:18

2     THE COURT:  Okay.

3     (End of excerpted portion previously transcribed.)

4     (Whereupon, these proceedings recessed at 4:27 p.m.)

5                    *  *  *  *  *                       04:27:19

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

ALI SOOFI - Direct

C E R T I F I C A T E

        I, ELAINE M. CROPPER, do hereby certify that I am
duly appointed and qualified to act as Official Court Reporter
for the United States District Court for the District of
Arizona.


        I FURTHER CERTIFY that the foregoing pages constitute
a full, true, and accurate transcript of all of that portion of
the proceedings contained herein, had in the above-entitled
cause on the date specified therein, and that said transcript
was prepared under my direction and control, and to the best of
my ability.


        DATED at Phoenix, Arizona, this 15th day of June,
2020.




                        s/Elaine M. Cropper
                        _____
                         Elaine M. Cropper, RDR, CRR, CCP




                 United States District Court