CR-17-00360-PHX-JJT-1, February 27, 2019

1        **UNITED STATES DISTRICT COURT**

2        **FOR THE DISTRICT OF ARIZONA**

3        _____

4

**United States of America**,            )
5                                        )
                            Plaintiff,    )
6   vs.                                   )
                                         )   CR-17-00360-PHX-JJT-1
7   **Abdul Khabir Wahid**,               )
                                         )
8                           Defendant.    )
                                         )   February 27, 2019
9   _____    )   9:20 a.m.
                                         )
10

11

12        **BEFORE:   THE HONORABLE JOHN J. TUCHI, JUDGE**

13        <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

14              BENCH TRIAL - DAY 2

15           (Pages 148 through 334)

16

17

18

19

20   Official Court Reporter:
     **Elaine Cropper, RDR, CRR, CCP**
21   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 35
22   Phoenix, Arizona  85003-2151
     (602) 322-7245/(fax) 602.322.7253
23
     Proceedings Reported by Stenographic Court Reporter
24   Transcript Prepared by Computer-Aided Transcription

25

United States District Court

CR-17-00360-PHX-JJT-1, February 27, 2019

1                        **I N D E X**

2                         **TESTIMONY**

3     **WITNESS**              **Direct   Cross   Redirect   Recross**

4     ALI SOOFI                 156      182      192
      ANDREW KNUTSON            195
5     RUSSEL A. CARMAN          199
      JASON SAITTA              203
6     ANTOINE FRAZIER           210
      ROBERT MESHINSKY          217
7     GREGORY NEVILLE           234
      AMY VAUGHAN               279
8     MATTHEW LEVITT            293

9

10                      **E X H I B I T S**

11    Number                                      Ident  Rec'd

12    16      White Samsung Galaxy S5             228

13    17      Dabiq Issue 5                       228    229

14    18      Dabiq Issue 8                       229    230

15    19      Hijrah to the Islamic State         230    230

16    20      ISHD LEAK accessed on Samsung Galaxy 230   231
              S5
17
      21      ISHD LEAK pages                     282    283
18
      27      Photo of Simpson/Soofi apartment    157
19            living room

20    29      Desktop computer                    205    206

21    30      Page 13 of Dabiq Issue 2            222    222

22    31      Dabiq Issue 5                       223    223

23    32      Screencap from an official ISIS video 223  223
              of fighters loading artillery
24
      33      Screencap of an official ISIS video 224    224
25            from Wilayah Halab of a public
              beheading

                    United States District Court

CR-17-00360-PHX-JJT-1, February 27, 2019

**E X H I B I T S** (Continued)

| Number | | Ident | Rec'd |
|---|---|---|---|
| 34 | Advertisement for article, 'The Obligation of Appointing a Khilafah & The Forbiddance of Delaying Such', from Ansar al Khilafah, an ISIS supporter organization | 224 | 225 |
| 35 | Screencap from official ISIS Libya video showing prisoners being marched by their executioners along a beach | 225 | 225 |
| 36 | Screencap of an official ISIS video from Wilayah Halab showing the aftermath of a public beheading | 225 | 226 |
| 37 | Screencap of an official ISIS video from Wilayah Halab showing the aftermath of an execution | 226 | 226 |
| 38 | Picture of fighters with a truckload of prisoners | 226 | 227 |
| 39 | Twitter searches for #is | 227 | 227 |
| 40 | Twitter searches for #isis | 227 | 228 |
| 41 | LG GPLG440GB Cell Phone | 206 | 206 |
| 42 | Photo of the screen of another digital device  (LG GPLG440GB -- 480-849-8186; Item #38-41) | 231 | 232 |
| 43 | Photo of notebooks | 207 | 207 |
| 44 | Dark Blue Spiral Memo Book, 3" x 5" (Lab Item 16) | 206 | 208 |
| 45 | Images from Forensic Analysis of Dark Blue Spiral Memo Book (Item 16) | 212 | |
| 46 | Blue Spiral Notebook, 8.5" x 11" (Lab Item 17) | 208 | 208 |
| 47 | Electrostatic image of front page from forensic analysis of dark blue spiral memo book (Item 17) | 212 | 213 |

United States District Court

CR-17-00360-PHX-JJT-1, February 27, 2019

**E X H I B I T S** (Continued)

| Number | | Ident | Rec'd |
|---|---|---|---|
| 48 | Electrostatic image of front face of page 49 from forensic analysis of dark blue spiral memo book (Item 17) | 213 | 215 |
| 49 | Electrostatic image of rear face reversed of page 49 from forensic analysis of dark blue spiral memo book (Item 17) | 215 | 216 |
| 51 | Google Maps Printouts Dated April 26, 2015, Depicting Culwell Center (Items 19, 20) | 208 | 209 |
| 53 | Diagram of Jihad Leaders | 309 | |
| 61 | Twitter Records Declaration | 238 | |
| 69 | Twitter screenshot: Sharia is Light re AFDI Draw Muhammad Contest | 239 | 240 |
| 70 | Twitter screenshot: Sharia is Light re #texasattack | 252 | 253 |
| 73 | Twitter screenshots Elton Simpson | 240 | 241 |
| 74 | Simpson Twitter DM Excerpts | 256 | 257 |
| 76 | A.S. Cell Phone Call Log & Text Log to/from Abdul Khabir Wahid, A.M.A.K., and S.S. 5/3/2015 – 5/7/2015 | 265 | 267 |
| 77 | A.M.A.K. Cell Phone Call Log & Text Log to/from Abdul Khabir Wahid 5/3/2015 – 5/6/2015 | 268 | 269 |
| 78 | S.N. Cell Phone Call Log & Text Log to/from Abdul Khabir Wahid 5/3/2015 – 5/6/2015 | 272 | 275 |
| 79 | Abdul Khabir Wahid Cell Phone Call Log & Text Log to/from A.M.A.K., D.S., & S.N. 5/6/2015 – 6/10/2015 | 275 | 276 |
| 82 | Photo of Elton Simpson (Hava Java) | 289 | 290 |

United States District Court

CR-17-00360-PHX-JJT-1, February 27, 2019

1                    **E X H I B I T S** (Continued)

2    Number                                          Ident   Rec'd

3    83     Photo of Abdul Khabir Wahid (Hava        290     291
            Java)

4

5    129    Recording Clip 1 of Phone Call Between   162     162
            Abdul Khabir Wahid and A.S. on June
            18, 2015 at 2:24 p.m.

6

7    130    Recording Clip 2 of Phone Call Between   163     163
            Abdul Khabir Wahid and A.S. on June
            18, 2015 at 2:24 p.m.

8

9    131    Recording Clip 3 of Phone Call Between   164     164
            Abdul Khabir Wahid and A.S. on June
            18, 2015 at 2:24 p.m.

10

11   132    Recording Clip 4 of Phone Call Between   165     165
            Abdul Khabir Wahid and A.S. on June
            18, 2015 at 2:24 p.m.

12

13   133    Recording Clip 5 of Phone Call Between   165     165
            Abdul Khabir Wahid and A.S. on June
            18, 2015 at 2:24 p.m.

14

15   134    Recording Clip 6 of Phone Call Between   166     166
            Abdul Khabir Wahid and A.S. on June
            18, 2015 at 2:24 p.m.

16

17   135    Recording Clip 1 of Phone Call Between   167     167
            Abdul Khabir Wahid and A.S. on
            7/8/2015 at 6:06 p.m. EDT

18

19   136    Recording Clip 2 of Phone Call Between   168     168
            Abdul Khabir Wahid and A.S. on
            7/8/2015 at 6:06 p.m. EDT

20

21   137    Recording Clip 3 of Phone Call Between   168     168
            Abdul Khabir Wahid and A.S. on
            7/8/2015 at 6:06 p.m. EDT

22

23   138    Recording Clip 4 of Phone Call Between   169     169
            Abdul Khabir Wahid and A.S. on
            7/8/2015 at 6:06 p.m. EDT

24

25   139    Recording Clip 5 of Phone Call Between   170     170
            Abdul Khabir Wahid and A.S. on
            7/8/2015 at 6:06 p.m. EDT

CR-17-00360-PHX-JJT-1, February 27, 2019

1            **E X H I B I T S** (Continued)

| 2 | Number | | Ident | Rec'd |
|---|--------|---|-------|-------|
| 3<br>4 | 140 | Recording Clip 6 of Phone Call Between<br>Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 171 | 171 |
| 5<br>6 | 141 | Recording Clip 7 of Phone Call Between<br>Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 172 | 172 |
| 7<br>8 | 142 | Recording Clip 8 of Phone Call Between<br>Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 172 | 172 |
| 9<br>10 | 143 | Recording Clip 9 of Phone Call Between<br>Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 173 | 173 |
| 11<br>12 | 145 | Recording Clip 11 of Phone Call<br>Between Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 174 | 174 |
| 13<br>14 | 146 | Recording Clip 12 of Phone Call<br>Between Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 175 | 175 |
| 15<br>16 | 147 | Recording Clip 13 of Phone Call<br>Between Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 176 | 177 |
| 17<br>18 | 148 | Recording Clip 14 of Phone Call<br>Between Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 177 | 177 |
| 19<br>20 | 149 | Recording Clip 15 of Phone Call<br>Between Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 179 | 179 |
| 21<br>22 | 150 | Recording Clip 16 of Phone Call<br>Between Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 179 | 179 |
| 23<br>24 | 152 | Recording Clip 18 of Phone Call<br>Between Abdul Khabir Wahid and A.S. on<br>7/8/2015 at 6:06 p.m. EDT | 180 | 180 |

25

United States District Court

CR-17-00360-PHX-JJT-1, February 27, 2019

1                    **E X H I B I T S** (Continued)

2    Number                                        Ident   Rec'd

3    153     Recording Clip 19 of Phone Call        181     181
             Between Abdul Khabir Wahid and A.S. on
4            7/8/2015 at 6:06 p.m. EDT

5    154     Excerpt 1 from Anwar al-Awlaki Lecture  287     288
             "The Dust Will Never Settle Down"
6
     155     Excerpt 2 from Anwar al-Awlaki Lecture  287     288
7            "The Dust Will Never Settle Down"

8    156     Excerpt 3 from Anwar al-Awlaki Lecture  287     288
             "The Dust Will Never Settle Down"
9
     157     Excerpt 4 from Anwar al-Awlaki Lecture  287     288
10           "The Dust Will Never Settle Down"

11   158     Excerpt 5 from Anwar al-Awlaki Lecture  287     288
             "The Dust Will Never Settle Down"
12
     162     Recording Clip 7 of Phone Call Between  181     181
13           Abdul Khabir Wahid and A.S. on June
             18, 2005 at 2:24 p.m.
14

15                        **RECESSES**

16                                            Page    Line

17   (Recess at 10:41; resumed at 10:58.)      188     15
     (Recess at 12:03; resumed at 1:25.)       233     15
18   (Recess at 2:15; resumed at  2:26.)       270      2
     (Recess at 2:56; resumed at 3:30.)        292      8
19   (Recess at 4:01; resume at 4:05.)         314      1

20

21

22

23

24

25

                 United States District Court

CR-17-00360-PHX-JJT-1, February 27, 2019

1                    **A P P E A R A N C E S**

2

For the Government:
3          **JOSEPH E. KOEHLER, ESQ.**
           **KRISTEN BROOK, ESQ.**
4          U.S. Attorney's Office
           40 North Central Avenue, Suite 1800
5          Phoenix, AZ  85004-4408
           602.514.7500
6
For the Defendant:
7          **PRO SE**
           **ABDUL KHABIR WAHID**
8          3407 W. Port Au Prince Lane
           Phoenix, Az  85053
9          480.205.1354

10   For the Defendant as Advisory Counsel:
           **JOHN W. MCBEE, ESQ.**
11         Law Office of John W. McBee
           3104 E. Camelback Road, PMB 851
12         Phoenix, AZ  85016
           602.903.7710
13

14

15

16

17

18

19

20

21

22

23

24

25

                    United States District Court

ALI SOOFI - Direct

# P R O C E E D I N G S

 1          (Court was called to order by the courtroom deputy.)

 2          (Defendant is present and out of custody.)

 3          (Proceedings begin at 9:20.)

 4     THE COURT:  All right.  Thank you, everyone.  Please        09:20:06

 5  be seated.

 6          Thank you, Mr. Soofi, for returning to the stand.  It

 7  saves us a few minutes.

 8          One housekeeping matter before we begin, Mr. Wahid.

 9  We started about a half-hour late on Friday because of your     09:20:18

10  delays in getting a ride here.  We're 20 minutes late today.

11  This is not ordinarily an issue in criminal trials because the

12  defendant is usually in custody.

13          I have two choices.  If this happens again, I am

14  either going to reconsider your ability to remain out of        09:20:39

15  custody for the remainder of the trial or I'm going to move the

16  trial forward whether are you present or not given that

17  warning.  Please don't let it happen again, sir.

18          We may proceed.

19     MS. BROOK:  Thank you, Your Honor.                           09:20:56

20          (ALI SOOFI, a witness herein, was previously duly

21  sworn or affirmed.)

22          **DIRECT EXAMINATION** (Continued)

23  BY MS. BROOK:

24  Q.   Good morning.                                              09:21:03

United States District Court

ALI SOOFI - Direct

1    A.    Good morning.                                                09:21:03

2    Q.    We left off yesterday and I'm going to place on the

3    overhead what has been admitted as Exhibit Number 27.

4              Yesterday we talked about the inside of this

5    apartment and this was the apartment where you were living in    09:21:22

6    2014 through 2015 with your brother and Simpson; is that

7    correct?

8    A.    Yes.

9    Q.    You had spoken yesterday about a 52-inch TV that was on

10   the wall right next to where that black chair on the right is;   09:21:34

11   is that correct?

12   A.    Yes.

13   Q.    And you had described videos that you saw, violent videos

14   that you saw that were being played on that TV.

15             Can you explain for us how the TV was set up so that    09:21:49

16   those videos could play?

17   A.    It was a connected through the PC, connected through the

18   PC.

19   Q.    What was connected through the PC?

20   A.    The computer.  So anything that was streamed through the    09:22:07

21   computer would show up on the TV screen.

22   Q.    So it was through that streaming through the computer that

23   the image would be projected up onto that 52-inch TV?

24   A.    Yes.

25   Q.    And you spoke yesterday about the violent videos you had    09:22:23

United States District Court

ALI SOOFI - Direct

1  said that were constantly playing on that 52-inch TV.                    09:22:25

2          Who was present -- and I want to talk globally.  Who

3  all did you see present when those videos were playing?

4  A.   It was the main people in general:  Abdul Malik, my

5  brother, Elton, and AK.                                                  09:22:47

6  Q.   And you mentioned Abdul Malik.  In terms of visitors

7  during the time period that you were living at the house, how

8  frequently or how much would Abdul Malik be over at your home?

9  A.   It was pretty much throughout the whole week.  He would be

10 there off and on.  He would sometimes spend the night.  Other          09:23:09

11 times he would be there to eat.

12 Q.   So Abdul Malik, was he there the most of any other visitor

13 who didn't live at the house or something else?

14 A.   He was the most frequent person that would visit.

15 Q.   And that was pretty consistent throughout the time that          09:23:33

16 you were in the house?

17 A.   Yes.

18 Q.   Who was the second most frequent visitor?

19 A.   Other than that, it was just AK.

20 Q.   You had mentioned that Malik would sleep over at the             09:23:49

21 apartment?

22 A.   Yes.

23 Q.   Where is it that Malik would sleep?

24 A.   He would -- Elton would give up his side of the couch and

25 he would sleep on the floor because he had an air mattress that       09:24:07

ALI SOOFI - Direct

1  he could pull out so he would take his place on the couch.  I    09:24:11

2  remember he was a much larger person so he would kind of, you

3  know, spill into my side.

4  Q.   You testified yesterday that Mr. Wahid, who you know as

5  AK, would be at the house one to three times a week and I mean    09:24:29

6  the apartment; is that correct?

7  A.   Yes.

8  Q.   Was there a time of day that you would see him there?

9  A.   It would be early morning or evening when we would come

10 back.  We were mostly gone during the day for jobs but during    09:24:54

11 the evening we would be home.

12 Q.   So let's talk about early morning.  When you would see Mr.

13 Wahid in your apartment in the early morning, what would you

14 have -- how was it that you would see him?

15 A.   In -- the majority of the time he was with Elton, they    09:25:18

16 would hang out a lot so I was right there sleeping in the

17 entrance.  So anybody who would come through door, I would see

18 them right off.

19 Q.   Is there something that you would do in the mornings?

20 A.   I would usually wake up to go for my runs or go on a    09:25:34

21 carpet cleaning job if one was present to do.

22 Q.   Generally speaking, when you would wake up, was he there

23 or did he come at some point later in the morning?

24 A.   It would be after Elton would be up because he was the

25 only one that had the car.    09:25:58

ALI SOOFI - Direct

1  Q.   So after your runs?                                      09:26:01

2  A.   The majority of the time, yes, or I would hear that they

3  were hanging out or over at the house.

4  Q.   Were there other times of day that you frequently saw him

5  at the apartment, "he" being Mr. Wahid?                09:26:16

6  A.   Other than that, if we were eating or, you know, Abdul

7  Malik would come over and cook so it would be later that night

8  if anything.

9  Q.   So Malik would come over and cook and then it would be

10  later in the evening.  What, if anything, would you see Mr.   09:26:32

11  Wahid do in the apartments -- in the apartment later in the

12  evening?

13  A.   The majority of the time we would all be sitting on the

14  couch or the kitchen and there wasn't too much space in between

15  so you could only be either sitting on the couch or the person  09:26:51

16  that was cooking.

17  Q.   Did you ever hear the name Abu Bakr al-Baghdadi mentioned

18  in the apartment?

19  A.   Yes, plenty of times.

20  Q.   And who would talk about Abu Bakr al-Baghdadi?        09:27:15

21  A.   Elton was the biggest one.  Malik when they would get

22  together, the ones that would talk the most, basically would

23  work up, you know, anybody that was in there.  Like my brother

24  would get easily influenced through their words.

25  Q.   Did you say they would work up?                   09:27:39

ALI SOOFI - Direct

1    A.    I'm saying the way they would, like, glorify, like, any of          09:27:41

2    the videos that were being watched, you know, pretty much,

3    glorifying a movie or pumping people up on what they were doing

4    throughout the videos.

5    Q.    And "they" being you said --                                        09:28:02

6    A.    More of the Malik and Elton.

7    Q.    Was it also your brother from time to time?

8    A.    Eventually, yes.

9    Q.    And eventually you saw your brother worked up about those

10   ISIS videos that were being played?                                      09:28:18

11   A.    Yes.

12   Q.    Was there a point in time where you came to understand

13   that the violent videos were ISIS?

14   A.    Yes.  Eventually, after a couple of months, I learned

15   through, you know, my brother and Elton that the videos they             09:28:34

16   were playing were more of the militant side of Islam.

17   Q.    We left off yesterday about to start a call, a recorded

18   call, that you did with the defendant on June 18 of 2015.  Do

19   you recall making that recording on June 18 of 2015?

20   A.    Yes.                                                               09:29:09

21   Q.    And have you had an opportunity to listen to that

22   recording in its entirety?

23   A.    Yes, I have.

24   Q.    And have you also had an opportunity to review

25   Government's Exhibits 129 through 134?                                    09:29:21

United States District Court

ALI SOOFI - Direct

1    A.    Yes.                                                          09:29:26

2    Q.    And do those reflect snippets of that call?

3    A.    Yes.

4    Q.    And do 129 through 134 fairly and accurately represent the

5    call as you made and as you heard that was done on June 18 of      09:29:36

6    2015?

7    A.    Yes.

8    Q.    When you started to talk to Mr. Wahid on June 18 of 2015,

9    did he ask you if you had followed his advice?

10   A.    Yes.                                                          09:30:01

11   Q.    And does call number 129 reflect that part of the

12   conversation?

13   A.    Yes.

14           MS. BROOK:   Government moves to admit and play 129.

15           THE COURT:   If there's no objection, 129 is admitted.     09:30:13

16           (Exhibit Number 129 was admitted into evidence.)

17           (Exhibit 129 was played.)

18   BY MS. BROOK:

19   Q.    During this call, did Mr. Wahid tell you about an envelope

20   and a set of keys, a key that Simpson had given him before the     09:31:05

21   attack?

22   A.    Yes.

23   Q.    Does call 130, or Exhibit Number 130 rather, reflect that

24   part of the conversation?

25   A.    Yes.                                                          09:31:18

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | MS. BROOK:  Government moves to admit and play 130. | 09:31:20 |
| 2 | THE COURT:  If there's no objection, 130 is admitted. | |
| 3 | (Exhibit Number 130 was admitted into evidence.) | |
| 4 | (Exhibits 130 was played.) | |
| 5 | BY MS. BROOK: | 09:35:07 |
| 6 | Q.   When Wahid said, "Don't lie on me," what did you interpret | |
| 7 | that to mean? | |
| 8 | A.   Basically, not to give any information out regarding AK. | |
| 9 | Q.   Information to whom? | |
| 10 | A.   The FBI. | 09:35:23 |
| 11 | MR. WAHID:  Objection.  That's speculation. | |
| 12 | THE COURT:  The objection is overruled.  The question | |
| 13 | was asking what the statement meant to the witness.  The | |
| 14 | witness answered accordingly.  That is appropriate. | |
| 15 | You can move forward. | 09:35:39 |
| 16 | BY MS. BROOK: | |
| 17 | Q.   How did you feel when he said that? | |
| 18 | A.   You know, basically -- | |
| 19 | MR. WAHID:  Objection.  Relevance. | |
| 20 | THE COURT:  Hold on before you answer that. | 09:35:52 |
| 21 | No, I'll allow it.  The objection is overruled. | |
| 22 | You can answer it. | |
| 23 | THE WITNESS:  Basically, feeling that he's, you know, | |
| 24 | telling me I can -- if you speak on me, you know, basically he | |
| 25 | stated in there that people get put in the grave for talking so | 09:36:09 |

United States District Court

ALI SOOFI - Direct

1   I take that as a threat.  You know, basically saying to me if          09:36:14

2   you say any information regarding my name that, you know,

3   there's consequences to it.

4   BY MS. BROOK:

5   Q.   During this conversation, did Wahid suggest to you that           09:36:32

6   the FBI was going to get you?

7   A.   Yes.

8   Q.   Does Exhibit Number 131 depict that part of the call?

9   A.   Yes.

10          MS. BROOK:  Government moves to admit and play 131.             09:36:44

11          THE COURT:  If there's no objection, 131 is admitted.

12          (Exhibit Number 131 was admitted into evidence.)

13          (Exhibit 131 is played.)

14  BY MS. BROOK:

15  Q.   During this call, did Wahid tell you that he understood           09:37:30

16  the seriousness of the investigation?

17  A.   Yes.

18  Q.   And the interviews that were being conducted?

19  A.   Yes.

20          MS. BROOK:  Government moves to admit and play                  09:37:48

21  Exhibit Number 132.  Actual, I'm sorry, if I may.

22  BY MS. BROOK:

23  Q.   Does Government's Exhibit 132 depict that part of the

24  call?

25  A.   Yes.                                                              09:38:03

United States District Court

ALI SOOFI - Direct

1          MS. BROOK:  Government moves admit and play 132.            09:38:04

2          THE COURT:  All right.  If there's no objection, 132

3   is admitted.

4          (Exhibit Number 132 was admitted into evidence.)

5          (Exhibit 132 is played.)                                   09:38:11

6   BY MS. BROOK:

7   Q.   During this call with Wahid, did he talk to you more about

8   being in trouble with the FBI if you talked to the FBI?

9   A.   Yes.

10  Q.   Does clip number 133 reflect that part of the call?         09:39:26

11  A.   Yes.

12         MS. BROOK:  Government moves to admit and play clip

13  133.

14         THE COURT:  With no objection, 133 is admitted.

15         (Exhibit Number 133 was admitted into evidence.)          09:39:40

16         (Exhibit 133 was played.)

17  BY MS. BROOK:

18  Q.   Who did you interpret "they" to be?

19  A.   The FBI.

20  Q.   During this call, did Wahid talk to you about missing       09:40:24

21  Ibrahim Simpson?

22  A.   Yes.

23  Q.   Did he also talk to you about how frequently he would see

24  or spend time with Simpson?

25  A.   Yes.                                                        09:40:35

United States District Court

ALI SOOFI - Direct

```
 1   Q.   Does call number 1, though, reflect that part of the          09:40:36
 2   conversation?
 3   A.   Yes.
 4             MS. BROOK:  Government moves to admit and play 134.
 5             THE COURT:  If there's no objection, 134 admitted.       09:40:49
 6             (Exhibit Number 134 was admitted into evidence.)
 7             (Exhibit 134 was played.)
 8   BY MS. BROOK:
 9   Q.   Did you record another conversation with Mr. Wahid on July
10   8 of 2015?                                                        09:41:43
11   A.   Yes.
12   Q.   And how was it that this call came to pass?  Was it like
13   you had talked about before where you missed a call and then
14   called back or something else?
15   A.   Yes.  It would always be the same.  I would have to miss     09:41:59
16   the call and then redirect it with the 1-800 number.
17   Q.   And you did that this time on July 8?
18   A.   Yes.
19   Q.   Have you had an opportunity to listen to and review in its
20   entirety the phone call that you recorded with the defendant on   09:42:15
21   July 8 of 2015?
22   A.   Yes.
23   Q.   And does that recording fairly and accurately represent
24   the conversation that you had with him on that day?
25   A.   Yes.                                                         09:42:30
```

United States District Court

ALI SOOFI - Direct

| 1 | Q.   And likewise, have you had the opportunity to listen to | 09:42:35 |

1    Q.   And likewise, have you had the opportunity to listen to

2    Government's Exhibit 135 through 153 as well as 162?

3    A.   Yes.

4    Q.   And does 135 through 153 as well as 162, do those

5    exhibits -- I apologize.   162 was actually from June 18.

6           So let's just right now talk about 135 through 153.

7    Did you have the opportunity to listen to those clips in their

8    entirety?

9    A.   Yes.

10   Q.   And do those clips fairly and accurately represent parts

11   of the recorded call that you had with the defendant on July 8?

12   A.   Yes.

13   Q.   A moment ago I asked you if you missed a call from Wahid

14   and then called him back.   Does Government's Exhibit Number 135

15   reflect that part of the call?

16          MS. BROOK:   Government moves to admit and play 135.

17          THE COURT:   There being no objection, 135 is

18   admitted.

19          (Exhibit Number 135 was admitted into evidence.)

20          (Exhibit 135 was played.)

21   BY MS. BROOK:

22   Q.   Did Wahid next in this conversation tell you or did you,

23   rather, tell him that the FBI came to talk to you?

24   A.   I told him that they had come to speak with me.

25   Q.   Does 136 represent that part of the call?

United States District Court

ALI SOOFI - Direct

1    A.   Yes.                                                      09:44:47

2              MS. BROOK:  Government moves to admit and play 136.

3              THE COURT:  There's no objection.  136 is admitted.

4              (Exhibit Number 136 was admitted into evidence.)

5              (Exhibit 136 was played.)                            09:44:58

6    BY MS. BROOK:

7    Q.   Did Wahid talk to you during this call about what to say

8    to the FBI regarding weapons in the house?

9    A.   Yes.

10   Q.   And also weapons in relation to him and him being in the  09:47:41

11   house?

12   A.   Yes.

13   Q.   Does Exhibit Number 137 reflect that part of the call?

14   A.   Yes.

15             MS. BROOK:  The Government moves to admit and play    09:47:55

16   137?

17             THE COURT:  There being no objection, 137 is

18   admitted.

19             (Exhibit Number 137 was admitted into evidence.)

20             (Exhibit 137 was played.)                            09:48:09

21   BY MS. BROOK:

22   Q.   Did in this call Wahid continue to talk to you about the

23   weapons and himself in the apartment?

24   A.   Yes.

25   Q.   Does Exhibit Number 138 reflect the continuation of this  09:49:47

United States District Court

ALI SOOFI - Direct

```
 1   discussion?                                                    09:49:50
 2   A.   Yes.
 3          MS. BROOK:   Government moves to admit and play 138.
 4          THE COURT:   138 is admitted, there being no
 5   objection.                                                     09:50:01
 6          (Exhibit Number 138 was admitted into evidence.)
 7          (Exhibit 138 was played.)
 8   BY MS. BROOK:
 9   Q.   How did you feel when Wahid told you during this call to
10   tell the FBI that you didn't remember pieces of information?   09:52:19
11   A.   Basically, to me, that's telling me to lie, basically
12   going against what I saw in person.
13   Q.   And did you, in fact, remember Wahid being presented
14   weapons in the apartment there on 19th Avenue where you lived
15   with Simpson and your brother?                                 09:52:51
16   A.   Yes.  I mean, from everybody that was there with Elton,
17   myself, Abdul Malik, Elton, everybody was -- my own brother
18   brought the gun in, everybody had checked it out.
19   Q.   What do you mean by "checked it out"?
20   A.   You know, in general, when somebody pulls a weapon, they  09:53:14
21   are just checking out the sights, the general, I guess,
22   condition of the gun.
23   Q.   Do you remember at some point AK checking out that gun in
24   the apartment there on 19th Avenue?
25   A.   Yes.  It was the first day that my brother had bought it. 09:53:36
```

United States District Court

ALI SOOFI - Direct

1  Q.   During this call did Wahid also talk to you about the ISIS      09:53:44

2  videos that were played in the living room of your and your

3  brother and Simpson's apartment on 19th Avenue?

4  A.   Yes.

5  Q.   Does Exhibit Number 139 represent that part of the call?      09:53:56

6  A.   Yes.

7         MS. BROOK:   Government moves to admit and play

8  Exhibit Number 139.

9         THE COURT:   No objection appearing, it will be

10 admitted.                                                           09:54:15

11         (Exhibit Number 139 was admitted into evidence.)

12         (Exhibit 139 was played.)

13 BY MS. BROOK:

14 Q.   In this conversation with the defendant, did he caution

15 you further about talking to the FBI about these ISIS videos?      09:55:49

16 A.   Yes.

17 Q.   Did he caution you about getting himself, Wahid, in

18 trouble if you talked to the FBI about these videos?

19 A.   Yes.

20 Q.   Have you listened to and reviewed Exhibit Number 140?         09:56:08

21 A.   Yes.

22 Q.   Does that reflect this part of the conversation?

23 A.   Yes.

24         MS. BROOK:   Government moves to admit and play 140.

25         THE COURT:   There being no objection, 140 is            09:56:18

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | admitted. | 09:56:20 |
| 2 | (Exhibit Number 140 was admitted into evidence.) | |
| 3 | (Exhibit 140 was played.) | |
| 4 | BY MS. BROOK: | |
| 5 | Q.   Was Wahid only at the apartment one time? | 09:57:44 |
| 6 | A.   No. | |
| 7 | Q.   How did you feel when he said that to you, that I was only | |
| 8 | there one time? | |
| 9 | A.   Saying the same things, basically telling me to lie, going | |
| 10 | against, you know, everything that I witnessed. | 09:58:08 |
| 11 | Q.   When Wahid said to you in that call, "I don't know who you | |
| 12 | thought you saw but I've only ever been there one time," what | |
| 13 | did you interpret to mean? | |
| 14 | A.   I took that as basically saying, you know, basically, I | |
| 15 | don't know what I'm talking about and I don't know what I | 09:58:38 |
| 16 | witnessed or saw.  Basically, I'm just, you know, talking just | |
| 17 | to talk. | |
| 18 | Q.   During this call did Wahid tell you that the statements | |
| 19 | you make to the FBI could harm him? | |
| 20 | A.   Yes. | 09:59:05 |
| 21 | Q.   And does Exhibit Number 141 reflect that part of the call? | |
| 22 | A.   Yes. | |
| 23 | MS. BROOK:  Government moves to admit and play 141. | |
| 24 | THE COURT:  There being no objection, 141 is | |
| 25 | admitted. | 09:59:18 |

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | (Exhibit Number 141 was admitted into evidence.) | 09:59:19 |
| 2 | (Exhibit 141 was played.) | |
| 3 | BY MS. BROOK: | |
| 4 | Q.   Who did you interpret "they're," so they're building a | |
| 5 | case against me?  Who was that? | 09:59:44 |
| 6 | A.   The FBI. | |
| 7 | Q.   Did Wahid go on in this call and tell you to stop talking | |
| 8 | to the FBI in order to protect Wahid, in order to protect | |
| 9 | himself? | |
| 10 | A.   Yes. | 10:00:03 |
| 11 | Q.   Does Exhibit Number 142 reflect that part of the phone | |
| 12 | call? | |
| 13 | A.   Yes. | |
| 14 | MS. BROOK:  Government moves to admit and play 142. | |
| 15 | THE COURT:  There being no objection, 142 is | 10:00:14 |
| 16 | admitted. | |
| 17 | (Exhibit Number 142 was admitted into evidence.) | |
| 18 | (Exhibit 142 was played.) | |
| 19 | BY MS. BROOK: | |
| 20 | Q.   Were you sure that you had seen Wahid there many more than | 10:01:07 |
| 21 | one time? | |
| 22 | A.   Yes. | |
| 23 | Q.   Throughout this call, did Wahid continue to push and say | |
| 24 | he was only in apartment one time?  I'm sorry. | |
| 25 | Throughout this call, did Wahid continue to push and | 10:01:32 |

United States District Court

ALI SOOFI - Direct

1   talk about the idea that he was only in the apartment one time?   10:01:35

2   A.   Yes.

3   Q.   Does Exhibit Number 143 reflect that part of the call?

4   A.   Yes.

5          MS. BROOK:   Government moves to admit and play 143.   10:01:45

6          THE COURT:   There being no objection, 133 is

7   admitted.

8          (Exhibit Number 143 was admitted into evidence.)

9          (Exhibit 143 is played.)

10  BY MS. BROOK:                                                      10:02:52

11  Q.   During the time that you lived in the 19th Avenue

12  apartment, how many times did you see the defendant there to

13  eat?

14  A.   It was numerous times.

15  Q.   Did Wahid say to you to not get him in trouble when you go   10:03:17

16  to court?

17  A.   Yes.

18         MR. WAHID:   Objection.

19         THE COURT:   Hold just a minute.

20         MR. WAHID:   Leading.                                       10:03:36

21         THE COURT:   No.  I'm going to overrule the objection.

22  This Court interprets a leading question as one that suggests

23  the answer.  When the witness is free to accept or refute the

24  premise of the question, as was the case here, it's not a

25  leading question so the question and answer will stand.           10:04:03

United States District Court

ALI SOOFI - Direct

1          You can continue.                                    10:04:06

2   BY MS. BROOK:

3   Q.   Does Exhibit Number 145 represent that part of the

4   conversation?

5   A.   Yes.                                                   10:04:10

6          MS. BROOK:  Government moves to admit and play 145.

7          THE COURT:  Did you say 145 or 144?

8          MS. BROOK:  145.

9          THE COURT:  There being no objection, 145 is

10  admitted.                                                   10:04:21

11          (Exhibit Number 145 was admitted into evidence.)

12          (Exhibit 145 was played.)

13  BY MS. BROOK:

14  Q.   Back on July 8 of 2015, had you received a subpoena to go

15  to court?                                                   10:05:40

16  A.   Yes.

17  Q.   So back in 2015, that summer, had the FBI given you a

18  subpoena or were you using the concept of a subpoena in your

19  conversation with him?

20  A.   Initially I was told to use -- that I had been subpoenaed   10:05:58

21  and then after I was -- actually received one to appear in

22  court.

23  Q.   Okay.  So at some point in 2015 or so you did receive a

24  subpoena to appear in court.  Was that for trial testimony?

25  A.   Yes.  That was for the grand jury.                     10:06:24

ALI SOOFI - Direct

1  Q.   When we were in this conversation, were you talking about      10:06:30

2  the subpoena to -- because you had received it or had you yet

3  received the subpoena at this point?

4  A.   I'm sorry?

5  Q.   No.   That's okay.   It was very confusing question.          10:06:48

6          So what I'm saying is, on July 8 of 2015, did you

7  have in your hand the subpoena yet if you recall?

8  A.   Yes.   I was in Kansas at the time and that's when I was --

9  they had brought one out to me.

10  Q.   Okay.   During this call, did Wahid tell you about           10:07:11

11  withholding information, he himself personally withholding

12  information from the FBI?

13  A.   Yes.

14  Q.   Does Exhibit Number 146 represent that part of the call?

15  A.   Yes.                                                         10:07:33

16  Q.   Government moves to admit and play 146.

17          THE COURT:   There being no objection, 146 is

18  admitted.   Hold for just a second before you play that, please.

19  I need to go off the record.

20          (Discussion off the record.)                              10:08:24

21          THE COURT:   Thank you for your patience.   We're ready

22  to proceed.

23          (Exhibit Number 146 was admitted into evidence.)

24          (Exhibit 146 was played.)

25  \\\

United States District Court

ALI SOOFI - Direct

1   BY MS. BROOK:                                                    10:09:13

2   Q.   So when Wahid said to you, "Even if I knew that I knew

3   he -- that he was holding a gun, I would not have never said

4   something like that," when he said that to you, what did

5   that -- what did you interpret that as?  What did that mean?   10:09:32

6   A.   I, basically, had knowledge of the weapons, basically not

7   to say anything, that he wouldn't say something like that

8   because, I mean, if you know that kind of information, then,

9   and you withhold it.

10  Q.   He went on to say, "Because I already know what time it   10:09:56

11  is.  I know what kind of heat you can bring on a person or down

12  on a person by saying stuff like that," what did you interpret

13  that to mean?

14  A.   Basically, he had understood the seriousness of what was

15  going on and saying anything of that sort is just going to get  10:10:15

16  you further in trouble.

17  Q.   Did Wahid also talk about what might happen to a person if

18  you talked to the FBI?

19  A.   Yes.

20  Q.   Does Exhibit Number 147 represent that part of the         10:10:34

21  conversation?

22  A.   Yes.

23           MS. BROOK:  Government moves to admit and play 147.

24           THE COURT:  Being no objection, 147 is admitted.

25           (Exhibit Number 147 was admitted into evidence.)       10:10:51

ALI SOOFI - Direct

```
 1              (Exhibit 147 was played.)                      10:10:52
 2    BY MS. BROOK:
 3    Q.    Who did you interpret "they" to be?
 4    A.    The FBI.
 5    Q.    When Wahid said to you, "Allah, he will get you for, that,   10:11:58
 6    trust me," what did that mean to you?
 7    A.    Basically saying, like, in the end, God will get me for my
 8    wrongdoing but, you know, you could take it into another aspect
 9    with a lot of, you know, Muslims who are fanatics, that's
10    basically saying like in the end, you're going to get yours.   10:12:27
11    Q.    And Allah will get you for what specifically?  What did
12    you interpret Wahid saying to you when he said, "Allah will get
13    you" -- rather, directly, "Allah, he will get you for that,
14    trust me"?
15    A.    For basically talking, for talking to the FBI and giving   10:12:48
16    them the information.
17    Q.    In this call did Wahid also talk to you about why he did
18    not want to be connected to the ISIS videos?
19    A.    Yes.
20    Q.    Does clip number 148 represent that part of the call?   10:13:20
21    A.    Yes.
22              MS. BROOK:  Government moves to admit and play 148.
23              THE COURT:  No objection, 148 is admitted.
24              (Exhibit Number 148 was admitted into evidence.)
25              (Exhibit 148 was played.)                      10:13:32
```

United States District Court

ALI SOOFI - Direct

| 1 | BY MS. BROOK: | 10:14:44 |
| 2 | Q.   In your apartment on 19th Avenue when you were living |
| 3 | there, 2014, 2015, did you see the defendant watching those |
| 4 | ISIS videos? |
| 5 | A.   Yes. | 10:14:57 |
| 6 | Q.   How did you feel when he said to you here, "You have to be |
| 7 | careful how you say that"?  What did you feel, if anything, |
| 8 | that he was trying to say to you? |
| 9 | A.   That I need to watch what I say. |
| 10 | Q.   In what way? | 10:15:31 |
| 11 | A.   Basically saying, you know, anything that I say -- |
| 12 | basically, like -- it's almost like coaching, you know, |
| 13 | somebody coaching you to say consistently throughout the calls |
| 14 | that, you know, they keep repeating the same thing, to not talk |
| 15 | to the FBI, that I don't know anything, you know, I was | 10:15:57 |
| 16 | completely left in the dark the whole time. |
| 17 | Q.   And you say "coaching," is that because what he was saying |
| 18 | to you was different than what you remembered? |
| 19 | A.   Yes. |
| 20 | Q.   Did Wahid tell you during this call that if you choose to | 10:16:20 |
| 21 | talk to the FBI, lie to them? |
| 22 | A.   I'm sorry? |
| 23 | Q.   That's okay.  Did Wahid say to you during this call, "If |
| 24 | you choose to talk to the FBI, lie to them"? |
| 25 | A.   Yes. | 10:16:40 |

United States District Court

ALI SOOFI - Direct

1    Q.   And is that represented in clip number 149?

2    A.   Yes.

3              MS. BROOK:  Government moves to admit and play 149.

4              THE COURT:  Hold that.

5              MR. KOEHLER:  Sorry.                              10:17:00

6              THE COURT:  Please keep a handle on that.

7              149, without objection, is admitted.

8              (Exhibit Number 149 was admitted into evidence.)

9              THE COURT:  You may play it now from the beginning,

10   please.                                                    10:17:12

11             (Exhibit 149 was played.)

12   BY MS. BROOK:

13   Q.   Did Wahid also say to you in this call, "Whoever you talk

14   to the FBI about, you can get them in trouble"?

15   A.   Yes.                                                  10:18:28

16   Q.   Does Exhibit Number 150 reflect that part of the call?

17   A.   Yes.

18             MS. BROOK:  Government moves to admit and play 150.

19             THE COURT:  There being no objection, 150 is

20   admitted.                                                  10:18:40

21             (Exhibit Number 150 was admitted into evidence.)

22             (Exhibit 150 was played.)

23   BY MS. BROOK:

24   Q.   In that call, Wahid mentioned Hakim.  Who is Hakim?

25   A.   He's the nephew of I think Salim's.  Salim's nephew or   10:20:57

ALI SOOFI - Direct

| 1 | Abdul Kareem, he was related to those. | 10:21:07 |

Q.   So he's somehow a relative of Salim and Abdul Wahid -- I'm
sorry.  You said Abdul Malik?

A.   I'm not -- I know they were related.  He was a cousin or
nephew.

Q.   And additionally in that call, the defendant mentioned
Salim.  Was that the individual you were just talking about?

A.   Yes.

Q.   Okay.

During this call, did Wahid say to you that the FBI
are bad people?

A.   Yes.

Q.   Does Exhibit Number 152 represent that part of the call?

A.   Yes.

MS. BROOK:  Government moves to admit and play 152.

THE COURT:  Without objection, 152 is admitted.

(Exhibit Number 152 was admitted into evidence.)

(Exhibit 152 was played.)

BY MS. BROOK:

Q.   Did in this call Wahid again warn you about what could
happen to him if you talked to the FBI?

A.   Yes.

Q.   Does clip number 153 represent that part of the call?

A.   Yes.

MS. BROOK:  Government moves to admit and play 153.

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  Without objection, 153 is admitted. | 10:23:50 |
| 2 | (Exhibit Number 153 was admitted into evidence.) | |
| 3 | (Exhibit 153 was played.) | |
| 4 | BY MS. BROOK: | |
| 5 | Q.   When Wahid says here, "All because you wanted to be honest | 10:24:31 |
| 6 | with them," who did you interpret "them" to be? | |
| 7 | A.   The FBI. | |
| 8 | Q.   I want to go back for a moment to June 18 of 2015.  During | |
| 9 | the call on June 18 of 2015, the call that you recorded with | |
| 10 | the defendant, did the defendant also mention not wanting to | 10:25:08 |
| 11 | get Saabir Nurse in trouble? | |
| 12 | A.   Yes. | |
| 13 | Q.   And have you had the opportunity to review Government's | |
| 14 | Exhibit 162? | |
| 15 | A.   Yes. | 10:25:26 |
| 16 | Q.   Does 162 fairly and accurately represent that part of the | |
| 17 | conversation you had with the defendant on June 18? | |
| 18 | A.   Yes. | |
| 19 | MS. BROOK:  Government moves to admit and play 162. | |
| 20 | THE COURT:  There being no objection, 162 is | 10:25:39 |
| 21 | admitted. | |
| 22 | (Exhibit Number 162 was admitted into evidence.) | |
| 23 | (Exhibit 162 was played.) | |
| 24 | MS. BROOK:  May I have one moment? | |
| 25 | I don't have any other questions. | 10:27:53 |

United States District Court

ALI SOOFI- Cross

| | | |
|---|---|---|
| 1 | THE COURT:  All right.  Thank you, Ms. Brook. | 10:27:54 |
| 2 | Mr. Wahid, do you have cross-examination for this | |
| 3 | witness? | |
| 4 | MR. WAHID:  Sure. | |
| 5 | THE COURT:  We'll go ahead and start it and then | 10:28:02 |
| 6 | we'll probably take our break in about ten minutes or so, ten | |
| 7 | or 15 minutes. | |

**CROSS - EXAMINATION**

BY MR. WAHID:

| | | |
|---|---|---|
| 10 | Q.   First of all, I was going to say I want to tell you I am | 10:28:35 |
| 11 | sorry for your brother, you know, passing away.  I am sorry | |
| 12 | about that.  I'm not going to sit up here and try to go back | |
| 13 | and forth -- | |
| 14 | MS. BROOK:  Your Honor, I would object to form. | |
| 15 | THE COURT:  Understood.  I'm going to give Mr. Wahid | 10:28:54 |
| 16 | a little bit of leeway since he's not a practiced lawyer. | |
| 17 | But, Mr. Wahid, I'm not going to allow you to make | |
| 18 | statements.  You need to ask questions.  So would you do that, | |
| 19 | sir? | |
| 20 | MR. WAHID:  Okay. | 10:29:08 |

BY MR. WAHID:

| | | |
|---|---|---|
| 22 | Q.   Did I admit to you that I committed a crime, "yes" or | |
| 23 | "no"? | |
| 24 | A.   I don't understand. | |
| 25 | Q.   Did I admit to you that I committed a crime?  I said "yes" | 10:30:17 |

United States District Court

ALI SOOFI- Cross

| | | |
|---|---|---|
| 1 | or "no" to the question, please. | 10:30:20 |
| 2 | A.   I don't know how that would be relevant. | |
| 3 | Q.   I didn't ask you that.  I just asked you "yes" or "no" to | |
| 4 | the question.  Did I admit to you that I committed a crime? | |
| 5 | A.   No. | 10:30:39 |
| 6 | Q.   Did I admit to you a crime that I wanted to conceal? | |
| 7 | "Yes" or "no" to the question, please. | |
| 8 | A.   Not that I know of, no. | |
| 9 | Q.   Did I mention to you about a crime that I committed which | |
| 10 | I didn't want you to report to law enforcement?  "Yes" or "no" | 10:31:05 |
| 11 | to the question, please. | |
| 12 | A.   Yes. | |
| 13 | Q.   Okay.  Did you say "yes"? | |
| 14 | A.   Yes. | |
| 15 | Q.   Okay.  What would that crime be? | 10:31:23 |
| 16 | A.   Basically, you were telling me to lie about everything I | |
| 17 | knew about.  You were telling me to lie to the FBI.  You were | |
| 18 | telling me to say I didn't know anything about what my brother | |
| 19 | was doing, about what was going on in that apartment.  So . . . | |
| 20 | Q.   Did I share any information with you concerning the | 10:32:00 |
| 21 | carrying out of a federal offense?  "Yes" or "no" to the | |
| 22 | question, please. | |
| 23 |      MS. BROOK:  Is he asking him to ascertain whether or | |
| 24 | not something is a federal offense?  I would object to | |
| 25 | speculation if that was the question.  I had a hard time | 10:32:15 |

United States District Court

ALI SOOFI- Cross

| | | |
|---|---|---|
| 1 | hearing it. | 10:32:17 |
| 2 | THE COURT:  Let's go ahead -- | |
| 3 | Mr. Wahid, ask the question again so I can evaluate | |
| 4 | it. | |
| 5 | BY MR. WAHID: | 10:32:22 |
| 6 | Q.   Did I share any information with you concerning the | |
| 7 | carrying out of a federal offense? | |
| 8 | MS. BROOK:  Same objection. | |
| 9 | THE COURT:  I'm going to sustain the objection | |
| 10 | because it calls for a legal conclusion.  The witness is not in | 10:32:30 |
| 11 | a position to tell or classify something as a federal offense | |
| 12 | one way or the other. | |
| 13 | I will sustain the objection. | |
| 14 | BY MR. WAHID: | |
| 15 | Q.   Since I mentioned to you that I wanted to commit or | 10:32:54 |
| 16 | intended to commit a crime, tell me, what crime was that? | |
| 17 | A.   I just explained that to you.  You were telling me to lie | |
| 18 | about everything I knew about.  And lying to the FBI, you know, | |
| 19 | is just as bad.  You know, withholding information about | |
| 20 | something you know that important is, you know -- | 10:33:15 |
| 21 | Q.   Withhold what information? | |
| 22 | MS. BROOK:  Your Honor, as to this question drawing | |
| 23 | for a legal conclusion, I would have the same objection. | |
| 24 | THE COURT:  I'm going to overrule the objection here | |
| 25 | because it goes to a question you didn't object to and the | 10:33:32 |

ALI SOOFI- Cross

1   witness answered.  And I think for completeness, I need to hear          10:33:35
2   it.

3          So the question is appropriately asked in this case.

4          Ms. Cropper, will you read back the question because
5   now that we've had this interruption, it's probably confusing           10:33:48
6   to the witness.

7          (Requested portion of record read:  Withhold what
8   information?)

9          THE WITNESS:  Information about my brother, about you
10  being at the apartment, the guns and everything in general, how          10:33:59
11  many times you visited, not to say anything to the FBI, I
12  didn't know anything when I was there seeing all of you guys
13  progressively get worse.

14  BY MR. WAHID:

15  Q.   It has been over four years and you had an opportunity to          10:34:30
16  tell law enforcement about this crime since you worked so
17  closely with them.  Why all of a sudden now you decide to say
18  something?

19          MS. BROOK:  Objection.  Foundation.

20          THE COURT:  You're going to have to expand on that             10:34:49
21  Ms. Brook.  What's the foundation lacking in that question?

22          MS. BROOK:  It assumes he didn't say something sooner
23  which goes beyond the scope of the testimony that was presented
24  in direct.

25          THE COURT:  All right.  Understood.  No, I'll allow            10:35:11

United States District Court

ALI SOOFI- Cross

1  the witness to answer that question and if he remembers things      10:35:15

2  differently than the question has been posed, he can answer

3  that way.

4          You can answer, Mr. Soofi.  Do you need it read back?

5          THE WITNESS:  Yes, please.                                  10:35:31

6          (Requested portion of record read:  It has been over

7  four years and you had an opportunity to tell law enforcement

8  about this crime since you worked so closely with them.  Why

9  all of a sudden now you decide to say something?)

10         THE WITNESS:  Originally I thought with the case I           10:35:56

11 was called with beforehand, everything was put out forth, you

12 know.  From my recollection, I thought everything was done and

13 over with at that point, especially regarding my brother.  I'm

14 sorry.  I don't really know anything else to answer that.

15 BY MR. WAHID:                                                        10:36:30

16 Q.   You stated that I mentioned to you about me committing a

17 crime or attempt to commit a crime yet none of the exhibit

18 recording clips that have been played to you hear me saying

19 such.  Can you please show me which recording clips by number

20 where I confess to committing a crime or possible attempt to     10:36:45

21 commit a crime?

22         MS. BROOK:  Objection, Your Honor.  One, asked and

23 answered as to this question.  Two, it misstates the prior

24 testimony.

25         THE COURT:  I'm going to sustain the objection in           10:36:57

United States District Court

ALI SOOFI- Cross

1    part.  First, there is a statement in that question or a    10:36:59

2    statement in what you've laid out, Mr. Wahid.  You can only ask

3    questions here.  I'll allow you to attempt to rephrase the

4    question but there are no affirmative statements.

5           Go ahead, please.    10:37:17

6    BY MR. WAHID:

7    Q.   Can you please show me which recording clips by number

8    where I confess to committing a crime or possible attempt to

9    commit a crime?

10          MS. BROOK:  Your Honor, I would object again to form    10:38:35

11    of the question.  If he wants to ask a question that elicits an

12    answer, that's one thing.  But asking the witness to recall an

13    exhibit number of items that are already in evidence is

14    practically impossible.

15          THE COURT:  I'm going to sustain the objection and    10:38:53

16    for the reason that, again, that it calls for a legal

17    conclusion which this witness is not qualified to make and it

18    is not his role in the trial.  That is a question for the Court

19    only.

20          When questions ask a witness to conclude whether a    10:39:12

21    crime has been committed or attempted to be committed, that's a

22    question for the Court and that's my problem with the question.

23    So the objection is sustained here.

24          Please move on.

25          MR. WAHID:  I can't think of anything right now, Your    10:40:38

ALI SOOFI- Cross

1    Honor.                                                          10:40:40

2              THE COURT:  Mr. Wahid, do you want to consult with

3    your advisory counsel?

4              MR. WAHID:  Sure.

5              MR. MCBEE:  Judge, would it be possible to take the    10:40:47

6    midmorning break?

7              THE COURT:  It is time for the break.  We're going to

8    go ahead and take 15 minutes and we will come back and we will

9    complete the cross-examination of Mr. Soofi and any redirect.

10             So if everybody can be ready to go at five minutes     10:40:59

11   'til 11 I, would appreciate it.

12             And Mr. Soofi, if you can return to the stand at that

13   point.

14             All right.  We're on recess.

15             (Recess at 10:41; resumed at 10:58.)                   10:41:09

16             THE COURT:  Thank you, everyone.  Please be seated.

17             Mr. Wahid, if you have any other questions for the

18   witness, you may proceed.

19   BY MR. WAHID:

20   Q.   Yesterday when the prosecutor played the exhibit recording  10:58:52

21   clip from -- when I was on the phone with you, I stated I was

22   over the apartment one time and you agreed by saying, "Yeah."

23   Now you're saying today in court that I was over at the

24   apartment three times a week.  And you also stated I was over

25   at the apartment a handful of times.                             10:59:15

ALI SOOFI- Cross

1          Yesterday you stated I was -- yesterday you stated in     10:59:18

2     court I was over twice a week.  So why does your story keep

3     shifting?

4     A.   I don't think that it is shifting.  I told in that phone

5     call, it clearly says that I said there were multiple times     10:59:40

6     that you were over there and I never agreed to once, never

7     agreed to saying that you came there once.

8     Q.   Yes, you did.  You did agree.

9               MS. BROOK:  Object.

10              THE COURT:  Sustained.                                10:59:57

11              MR. MCBEE:  Judge, may I be with my client at the

12     lectern?

13              THE COURT:  Excuse me?

14              MR. MCBEE:  May I be with my client at the lectern?

15              THE COURT:  If that's what you would like, Mr. Wahid,  11:00:07

16     you may.

17     BY MR. WAHID:

18     Q.   Do you remember yesterday on recordings which I said to

19     you I was over there only one time and you said, "Yeah, I was

20     doing my runs"?                                                11:00:37

21     A.   I never agreed to you being there one time.  I remember

22     saying I went on my runs but I never agreed.

23              (Defendant confers with counsel.)

24     BY MR. WAHID:

25     Q.   Well, yesterday when she played the recording, I stated in  11:01:10

United States District Court

ALI SOOFI- Cross

| | | |
|---|---|---|
| 1 | the clip that I had only been over to your house one time and | 11:01:18 |
| 2 | you said, "Yeah." | |
| 3 | If that was the case, why did you not correct me in | |
| 4 | the recording? | |
| 5 | THE COURT:  I'm going to sustain the objection. | 11:01:29 |
| 6 | And here's the issue, Mr. Wahid.  The recordings are | |
| 7 | in evidence.  This is now argument essentially.  I will | |
| 8 | certainly allow you to argue along these lines in the closing | |
| 9 | argument and even if you want to play clips or direct my | |
| 10 | attention to the transcript that the Government has prepared, | 11:01:49 |
| 11 | that's all fine.  But there's no profit now in asking the | |
| 12 | witness questions that rely on a statement of what the evidence | |
| 13 | said because the evidence is already in, so I can rely on that. | |
| 14 | So I would like you to move on if you have another | |
| 15 | topic that doesn't involve going over what's already in | 11:02:09 |
| 16 | evidence and that's my ruling.  Sustained. | |
| 17 | (Defendant confers with counsel.) | |
| 18 | BY MR. WAHID: | |
| 19 | Q.   Did you see me holding any guns? | |
| 20 | A.   Yes.  But the day my brother bought that AK and brought it | 11:02:40 |
| 21 | to the house you were there and you held it just like I had | |
| 22 | held it. | |
| 23 | Q.   Do you have pictures? | |
| 24 | A.   Pictures?  Nobody takes pictures on those kind of | |
| 25 | occasions.  That's not something special.  I mean, why would | 11:02:56 |

ALI SOOFI- Cross

1   there be pictures?                                                    11:03:00

2                MR. WAHID:  Hold on Your Honor.

3                (Defendant confers with counsel.)

4   BY MR. WAHID:

5   Q.   You stated on the tape that I was only there a handful of        11:04:01

6   times but then today in court you are saying that I was there

7   at least three times a week.  Why is there a discrepancy?

8                MS. BROOK:  Objection, Your Honor.

9                THE COURT:  Sustained and for the same reason.  It's

10  in evidence now.  The answer to that question, the Court is           11:04:16

11  already able to consider what is in evidence and it will decide

12  the credibility based on that so please move on.

13               (Defendant confers with counsel.)

14  BY MR. WAHID:

15  Q.   Why is your testimony on the tape different from what it         11:05:53

16  is in the court?

17               MS. BROOK:  Your Honor, I didn't hear the question.

18               MR. WAHID:  Why is his testimony on the tapes

19  different than what they are today in court?

20               MS. BROOK:  Same objection.                              11:06:07

21               THE COURT:  Same ruling.  The objection is sustained.

22  The Court will make a determination as to consistency between

23  what was testified to in court and what was recorded in

24  exhibits that have been admitted.

25               Do you have anything else, Mr. Wahid, for this           11:06:23

United States District Court

1   witness.                                                                    11:06:25

2              MR. WAHID:  No.  No.

3              THE COURT:  All right.  Thank you.

4              Ms. Brook, does the Government have any redirect?

5              MS. BROOK:  Just briefly.                                         11:06:31

6                        **REDIRECT EXAMINATION**

7   BY MS. BROOK:

8   Q.   On the morning of May 4, 2015, when you heard about and

9   learned about the attack on the Curtis Culwell Center, did you

10  call law enforcement?                                                        11:06:47

11  A.   Yes.

12  Q.   And approximately when in relation to when you learned

13  about the attack did you call law enforcement?

14  A.   Right after.

15  Q.   Prior to the attack, at any point when you were inside the              11:07:06

16  apartment or at any other time, did you hear about or learn

17  about a plan to attack the drawing contest?

18  A.   No, I didn't learn about it until I saw the news that

19  morning after.

20             MS. BROOK:  May I have one more moment, Your Honor.               11:07:33

21             I don't have any other questions Your Honor.

22             THE COURT:  All right.  Thank you.  Then the witness

23  may be excused.

24             Mr. Soofi, you may step down and you are free to go.

25             (Witness excused.)                                                11:07:59

                      United States District Court

1        THE COURT:  The Government can call its next witness.   11:07:59

2        MS. BROOK:  Your Honor, if I may, this witness we're

3   releasing from his subpoena to be here, which means he's not

4   any more going to be in Phoenix.  I just want to ensure that

5   defendant isn't relying upon our subpoena for which to call him   11:08:17

6   in his case.

7        (Defendant confers with counsel.)

8        MR. MCBEE:  May we have just one more minute, Your

9   Honor.

10        (Defendant confers with counsel.)   11:09:05

11        MR. WAHID:  Yes, Your Honor, I would like to recall

12   the witness.

13        THE COURT:  Let me make sure I understand this.  You

14   want to recall him now?  Or during the defense case?

15        MR. WAHID:  During the defense case.   11:10:29

16        THE COURT:  Had you listed this witness on your

17   witness list, Mr. Wahid?

18        MR. WAHID:  Say that again?

19        THE COURT:  Did you provide the Government and the

20   Court with a witness list in this case?   11:10:41

21        MR. WAHID:  No, I didn't.

22        THE COURT:  And I think that's something that I

23   specifically warned you about at one of the last hearings, that

24   the Government had already provided its witness and exhibit

25   lists.  I hadn't gotten any from you and that we need them   11:10:53

United States District Court

1    because everybody is entitled to know who is on the witness                    11:10:56

2    list, who is coming and prepare and that includes the Court and

3    I didn't get one with Mr. Soofi on there.

4            So there's a problem with notice.  The Government was

5    asking before they excused this person out of an abundance of       11:11:12

6    caution.  I don't know that they needed to ask but they did out

7    of an abundance of caution.

8            What is the Government's prediction for how much

9    longer their case-in-chief is going to take?

10           MS. BROOK:  I would say the remainder of today but          11:11:34

11   we -- and perhaps into the morning first thing if we don't

12   finish this afternoon.

13           We do not have any objection to defendant if he

14   wishes to calling Ali Soofi now so that he can return to work.

15           THE COURT:  In essence, take him out of order?             11:11:50

16           MS. BROOK:  Yes.

17           THE COURT:  I will allow that because it affords the

18   defendant the opportunity to ask questions that he wants to ask

19   of this witness as his witness and it does it in a way that

20   does not or that minimizes any inconvenience to Mr. Soofi given    11:12:10

21   that Mr. Soofi has already complied with the subpoena, being a

22   noticed witness of the Government only.  And if that's the

23   case, I will give the defendant the opportunity so prepare

24   questions over the lunch hour and so we'll call -- wherever we

25   are in the next Government witness, when we break for lunch,       11:12:39

United States District Court

1    we'll break with that witness.                                    11:12:42

2         When we come back from the lunch break, Mr. Wahid,

3    I'll allow you to put Mr. Soofi on the stand and ask him

4    questions on direct and then when we finish with that witness,

5    we'll go back to the Government's case-in-chief.                   11:12:56

6         MS. BROOK:  Thank you, Your Honor.

7         THE COURT:  All right.

8         So let's go ahead and call your next witness.  And if

9    somebody would, I guess, bring that person in.

10        MR. KOEHLER:  Your Honor, the United States calls           11:13:11

11   Andrew Knutson.

12        THE COURT:  If you would step up to the courtroom

13   deputy, she'll swear you in.

14        COURTROOM DEPUTY:  Please state your name and spell

15   your last name for the record.                                    11:13:20

16        THE WITNESS:  Andrew, A-N-D-R-E-W, Knutson,

17   K-N-U-T-S-O-N.

18        (ANDREW KNUTSON, a witness herein, was duly sworn or

19   affirmed.)

20                        **DIRECT EXAMINATION**                       11:13:37

21   BY MR. KOEHLER:

22   Q.   Good morning, sir.  Would you please introduce yourself to

23   the Court and Mr. Wahid?

24   A.   My name is Andrew Knutson and I'm a federal agent with the

25   FBI out of the Kansas City Field Office.                          11:13:58

                    United States District Court

ANDREW KNUTSON - Direct

1   Q.   Out of the Kansas City Field Office?                           11:14:01

2   A.   That's correct.

3   Q.   And how long have you been employed with the FBI?

4   A.   Since September 2008 but as a Special Agent since

5   September 2012.                                                      11:14:11

6   Q.   And prior to joining the FBI, what did you do?

7   A.   I worked for international NGO and also in state

8   Government.

9   Q.   Were you on duty on May 16 of 2015?

10  A.   Yes.                                                           11:14:27

11  Q.   On that date, did you have a meeting with a person by the

12  name of Ali Soofi?

13  A.   Yes.

14  Q.   What was the purpose of your meeting with Ali Soofi?

15  A.   I was called by a Special Agent and a task force officer    11:14:37

16  out of the division for a Cellebrite examination.

17  Q.   Could you spell Cellebrite for the court reporter, please.

18  A.   C-E-L-L-E-B-R-I-T-E.

19  Q.   Can you tell us what that a Cellebrite examination is,

20  please.                                                            11:15:02

21  A.   Yes.  Cellebrite is a forensics company that was founded

22  in 1999.  In 2007 they created a device call the UFED, it's the

23  Universal Forensic Extraction Device, and allows you to pull

24  data off of mobile devices such as cell phone.

25  Q.   And is that what you were called to do on May 16 of 2015?    11:15:22

United States District Court

ANDREW KNUTSON - Direct

1   A.   Yes.                                                           11:15:25

2   Q.   Did you do that -- did you go meet Mr. Soofi at the home

3   of his parents in Kansas?

4   A.   Yes.

5   Q.   And did Mr. Soofi consent to allowing you to search his    11:15:33

6   phone using the Cellebrite device?

7   A.   He did.

8   Q.   Did you, in fact, conduct an extraction of this phone?

9   A.   Yes.

10  Q.   What type of an extraction did you conduct?                 11:15:46

11  A.   A logical.

12  Q.   Can you explain what a logical extraction is?

13  A.   So with the Cellebrite UFED device, there's typically two

14  types of extractions, a logical and a physical.  And there's

15  also a file system extraction which is part of a logical.  I    11:15:58

16  attempted to do a physical extraction which pulls off all the

17  data on a user's device bit for bit.  I was unable to do that

18  so I proceeded to do a logical extraction which will acquire

19  text messages, images, videos, contact lists, call logs, et

20  cetera, whereas with a physical, you can also get deleted data  11:16:19

21  and file data and hidden data.

22  Q.   Okay.  Very good.

23       When you conduct such an extraction of the phone,

24  does Cellebrite create a report of that extraction?

25  A.   Yes, a UFED extraction file is created.                     11:16:39

United States District Court

ANDREW KNUTSON - Direct

1  Q.   And along with that UFED extraction file, does it also      11:16:43
2  create a file that operates as a validation file, also known as
3  a hash file?
4  A.   Yes.
5  Q.   And are the two of those stored together?                   11:16:54
6  A.   Yes.
7  Q.   And are they stored on read-only media?
8  A.   Yes.
9  Q.   Were you successful in the logical extraction?
10 A.   Yes.                                                        11:17:08
11 Q.   After you perform the logical extraction, did you send
12 that extractions to be uploaded into the FBI's evidence
13 collection systems?
14 A.   Yes.
15           MR. KOEHLER:  I have no further questions for the      11:17:19
16 witness.
17           THE COURT:  All right.  Thank you.
18           Mr. Wahid, do you have any questions for Agent
19 Knutson?
20           (Defendant confers with counsel.)                     11:17:24
21           MR. MCBEE:  I apologize, Your Honor.
22           THE COURT:  That's all right.
23           Do you have any questions for Agent Knutson?
24           MR. WAHID:  No.
25           THE COURT:  All right, sir.  You are free to step      11:17:48

RUSSEL A. CARMAN - Direct

1   down and you are excused.  Thank you.                          11:17:50

2              THE WITNESS:  Thank you.

3              (Witness excused.)

4              THE COURT:  The Government can call its next witness.

5              MR. KOEHLER:  The United States calls Russell Carman.   11:18:10

6   C-A-R-M-A-N.

7              THE COURT:  Mr. Carman, if you would step up past the

8   bar to my courtroom deputy, she'll swear you in up front.

9              COURTROOM DEPUTY:  Right up here.  If you can please

10  state your name and spell your last name for the record.       11:18:47

11             THE WITNESS:  Russell Alan Carman, C-A-R-M-A-N.

12             (RUSSEL A. CARMAN, a witness herein, was duly sworn

13  or affirmed.)

14                      **DIRECT EXAMINATION**

15  BY MR. KOEHLER:                                                 11:19:14

16  Q.   Good morning, Mr. Carman.  Would you please introduce

17  yourself to the Court and Mr. Wahid?

18  A.   My name is Russell Carman.  I'm a supervisor officer with

19  the U.S. Customs and Border Protection.

20  Q.   How long have you been employed by CBP?                    11:19:26

21  A.   15 years, sir.

22  Q.   And are you with the CBP field office operations?

23  A.   Yes, I am.

24  Q.   Where are you stationed?

25  A.   George Bush Intercontinental Airport in Houston.          11:19:35

United States District Court

RUSSEL A. CARMAN - Direct

1   Q.   How long have you been stationed at the airport in                          11:19:40

2   Houston, Texas.

3   A.   15 years, my entire career.

4   Q.   Do you joint with the Joint Terrorism Task Force as part

5   of your duties there?                                                            11:19:47

6   A.   I have in the past.  My current assignment, I'm a

7   supervisor; but prior to my promotion about 18 months ago, I

8   worked counter-terrorism with the Joint Terrorism Task Force.

9   Q.   So back in September of 2015, were you essentially a line

10  officer working with the JTTF?                                                   11:20:03

11  A.   Yes, sir.  At that time I was working with the Tactical

12  Terrorism Response Team within CBP and I liased with the FBI

13  through the Joint Terrorism Task Force.

14  Q.   Were you on duty on September 26 of 2015?

15  A.   I was, sir.                                                                 11:20:22

16  Q.   And on that date did you have an encounter with a person

17  by the name of Saabir, S-A-A-B-I-R; middle name Aquil,

18  A-Q-U-I-L; last name Nurse, N-U-R-S-E?

19  A.   Yes, sir, I did.

20  Q.   And was Mr. Nurse in transit?                                              11:20:36

21  A.   Yes, sir.  He was arriving from Trinidad and Tobago.

22  Q.   So he was arriving into the United States on an airplane

23  flight; is that correct?

24  A.   Yes, sir.  He arrived on a United flight from Port au

25  Spain.                                                                          11:20:47

United States District Court

RUSSEL A. CARMAN - Direct

1   Q.   As part of his arrival, did you conduct a search of his                     11:20:49

2   cellular telephone?

3   A.   Yes, sir.

4   Q.   Did you use a particular device to conduct that search?

5   A.   We used our issued Cellebrite device.                                       11:20:58

6   Q.   So it was a Cellebrite?

7   A.   Yes, sir.

8   Q.   And did you conduct a physical or a logical extraction of

9   that phone?

10  A.   What I did was I did the logical extraction.                                11:21:11

11  Q.   Very good.  And did you create a UFED report?

12  A.   Yes, sir.

13  Q.   And did you also create a hash file to validate the UFED

14  report?

15  A.   That's not a term that I'm used to.  But I'm sure that                      11:21:26

16  when we create it and put it through and send it over,

17  something along those lines was created.

18  Q.   Okay.  Does UFED, when it creates the report, is it

19  something that can be altered by somebody else after it's

20  created?                                                                         11:21:41

21  A.   No, sir.

22  Q.   All right.  And did you record that to read-only media?

23  A.   Yes, sir.

24  Q.   And after you did that, did you turn that report over to

25  the FBI to be loaded into its evidence collection system?                       11:21:50

United States District Court

1    A.   Yes, sir.                                                      11:21:54

2    Q.   And when you extracted the data, did you do it using CBP's

3    border search authorities?

4    A.   Yes, sir.

5    Q.   And did you turn it over to the FBI to be stored under        11:22:02

6    their evidence retention authorities?

7    A.   Yes, sir.

8             MS. BROOK:  I have no further questions for the

9    witness.

10            THE COURT:  Mr. Wahid, do you have any questions for      11:22:14

11   Agent Carman?

12            MR. WAHID:  No.

13            THE COURT:  All right.

14            Sir, that means that you may step down and I can

15   excuse you.  Thank you.                                            11:22:21

16            THE WITNESS:  Thank you, sir.

17            (Witness excused.)

18            THE COURT:  All right.  Will the Government call its

19   next witness, please.

20            MR. KOEHLER:  The United States calls Jason Saitta.       11:23:01

21   And if I can have one moment while he's coming in to hook up

22   the computer at the lectern.

23            THE COURT:  Mr. Saitta, if you would step up to the

24   courtroom deputy, she'll swear you in.

25            COURTROOM DEPUTY:  If you can please state your name      11:23:27

United States District Court

| | | |
|---|---|---|
| 1 | and spell your last name for the record. | 11:23:28 |
| 2 | THE WITNESS:  Jason Saitta.  Last name is | |
| 3 | S-A-I-T-T-A. | |
| 4 | COURTROOM DEPUTY:  Thank you. | |
| 5 | (JASON SAITTA, a witness herein, was duly sworn or | 11:23:35 |
| 6 | affirmed.) | |
| 7 | MR. KOEHLER:  For the record, I have on the monitor | |
| 8 | Exhibit Number 27 that is already in evidence. | |

**DIRECT EXAMINATION**

BY MR. KOEHLER:                                                    11:24:01

Q.   Mr. Saitta, could you please introduce yourself to the
Court and Mr. Wahid?

A.   Sure.  My name is Jason Saitta.  I'm a Special Agent with
Federal Bureau of Investigation.

Q.   How long have you been so employed?                          11:24:11

A.   Since June of 2014.

Q.   And were you on duty on May 3 and 4 of 2015?

A.   I was.

Q.   Did you execute a search warrant at an apartment complex,

13850 North 19th Avenue, Apartment 219, on or about May 4, the   11:24:36

morning thereof, in 2015?

A.   Yes, I did.

Q.   Do you recall whose residence that was?

A.   That was Simpson and Soofi.

Q.   Elton Simpson and Nadir Soofi?                               11:24:53

JASON SAITTA - Direct

 1   A.   Correct.                                                    11:24:56

 2   Q.   Were you part of the search and evidence response team for

 3   that apartment?

 4   A.   I was.

 5   Q.   Do you recognize the photo that is Exhibit Number 27?       11:25:05

 6   A.   Yes, I do.

 7   Q.   Is that the interior of the living room of that apartment?

 8   A.   It is.

 9   Q.   I'm going to take you now to Exhibit Number 28.  Do you

10   recognize that?                                                  11:25:21

11   A.   I do.  This is the plexiglass, like, coffee table in front

12   of the couch and then the phones, they were on it.

13   Q.   Very good.  And during the search of that apartment, did

14   you recover, among other things, a desktop computer, an LG cell

15   phone, a dark spiral -- dark blue spiral memo book, a blue       11:25:41

16   spiral notebook, and a Google Maps printout depicting the

17   Curtis Culwell Center?

18   A.   Yes, I did.

19            MR. KOEHLER:  If I could place Exhibits 29, 41, 44,

20   46, and 51 before the witness.  May the case agent approach?     11:25:58

21            THE COURT:  Yes.

22            MR. KOEHLER:  We can leave 29 on the cart.

23   BY MR. KOEHLER:

24   Q.   Mr. Saitta do you recognize Exhibits 29, 41, 44, 46, and

25   51?                                                              11:27:02

United States District Court

JASON SAITTA - Direct

1  A.   Is 29 the desktop?                                          11:27:03

2  Q.   Yes.

3  A.   Yes.  I do.

4  Q.   Starting with Exhibit 29, can you tell the Court what that

5  is?                                                              11:27:08

6  A.   That is a desktop tower computer that was found in the --

7  I guess the living room there under the desk.

8  Q.   And were you one of the two people who found that

9  particular item under the desk?

10 A.   I was.                                                      11:27:21

11 Q.   Was it connected to a monitor in that location?

12 A.   It was.

13 Q.   Do you remember the approximate size of the monitor?

14 A.   I believe it was almost like a TV being used as a monitor.

15 I don't recall the exact size.                                  11:27:41

16 Q.   But it was hooked up to a television that was being used

17 as monitor?

18 A.   Yes, I believe so.

19 Q.   And is that the same desktop computer that you recovered

20 from the apartment?                                             11:27:49

21 A.   It is.

22        MR. KOEHLER:  Move to admit 29.

23        THE COURT:  Any objection?

24        MR. WAHID:  No.

25        THE COURT:  All right.  29 is admitted.                   11:28:01

United States District Court

JASON SAITTA - Direct

1              (Exhibit Number 29 was admitted into evidence.)                    11:28:02

2    BY MR. KOEHLER:

3    Q.   Now, directing your attention to Exhibit Number 41 on the

4    table in front of you.  Do you recognize that?

5    A.   Is this the -- there was a Samsung LG.  Which one is this?      11:28:17

6    Q.   Would it help to look at the photograph 27 or 28 that's on

7    the screen in front of you?

8    A.   Yes, I believe this is the black one shown in the picture.

9    Q.   So the LG phone?

10   A.   Correct.                                                        11:28:39

11   Q.   Is that the same phone that you found in the apartment?

12   A.   It is.

13            MR. KOEHLER:  Move to admit 41.

14            THE COURT:  Mr. Wahid, any objection?

15            MR. WAHID:  No.                                             11:28:46

16            THE COURT:  Exhibit 41 is admitted.

17            (Exhibit Number 41 was admitted into evidence.)

18   BY MR. KOEHLER:

19   Q.   Now, directing your attention to Exhibit 44, do you

20   recognize that?                                                      11:28:55

21   A.   I do.

22   Q.   And what is that?

23   A.   This is the little spiral bound notebook.

24   Q.   And I'm going to direct your attention to Exhibit 43 on

25   the screen.  Do you recognize that photograph?                      11:29:10

JASON SAITTA - Direct

1   A.   I do.

2   Q.   And what is that photograph?                                    11:29:20

3   A.   This is the -- so 44 is the little blue spiral notebook at

4   the top of the photograph.

5   Q.   And does 43 fairly and accurately depict the items that        11:29:33

6   are shown in that photograph, a printout of some kind, an open

7   notebook, and two other notebooks as you found them on the day

8   of the execution of the search warrant?

9   A.   Yes.

10          MR. KOEHLER:  Move to admit 43.                              11:29:51

11          THE COURT:  Any objection, Mr. Wahid?

12          MR. WAHID:  No.

13          THE COURT:  All right.  43 is admitted.

14          (Exhibit Number 43 was admitted into evidence.)

15   BY MR. KOEHLER:                                                     11:29:58

16   Q.   And Exhibit Number 44, the notebook that you had in your

17   hand just a moment ago, is that the same notebook that is shown

18   there at the top center of 43?

19   A.   Yes, it is.

20          MR. KOEHLER:  Move to admit 44.                              11:30:10

21          THE COURT:  All right.

22          If there is no objection --

23          MR. WAHID:  No.

24          THE COURT:  -- then 44 is admitted.

25          (Exhibit Number 44 was admitted into evidence.)             11:30:20

208

JASON SAITTA - Direct

BY MR. KOEHLER:                                                          11:30:20

Q.   Now, directing your attention to Exhibit Number 46, can

you tell the Court what that is?

A.   Yes.   This is the larger spiral bound notebook that is

also depicted in this picture on the right-hand side.                    11:30:29

Q.   So not the one in the center but the one on the right-hand

side that's still closed with the blue cover?

A.   That's correct.

Q.   And is that the same notebook?

A.   It is.                                                              11:30:40

          MR. KOEHLER:   Move to admit 46.

          THE COURT:   Mr. Wahid, any objection?

          MR. WAHID:   No.

          THE COURT:   All right.   46 is admitted.

          (Exhibit Number 46 was admitted into evidence.)               11:30:47

BY MR. KOEHLER:

Q.   And, finally, directing your attention to Exhibit

Number 51.

A.   Yes.

Q.   What is that?                                                       11:30:57

A.   This is the printout here.   It's like a photograph of

the -- it looks like the Exhibit 4 that's shown in the

photograph.

Q.   And that's the same one that was found in the apartment?

A.   It is.                                                              11:31:11

                    United States District Court

```
 1            MR. KOEHLER:  Move to admit 51.                    11:31:12

 2            THE COURT:  All right.

 3            Any objection, Mr. Wahid?

 4            MR. WAHID:  No.

 5            THE COURT:  All right.  Thank you.                  11:31:16

 6            51 is admitted.

 7            (Exhibit Number 51 was admitted into evidence.)

 8            MR. KOEHLER:  I have no further questions for the

 9    witness.

10            THE COURT:  Mr. Wahid, do you have any questions for  11:31:22

11    Agent Saitta?

12            MR. WAHID:  No.

13            THE COURT:  All right.

14            Special Agent Saitta, then you can be excused and you

15    may step down.  You are free to go.                        11:31:31

16            THE WITNESS:  Thank you.

17            (Witness excused.)

18            MR. KOEHLER:  May the case agent approach to gather

19    the evidence?

20            THE COURT:  The case agent may.                    11:31:50

21            MR. KOEHLER:  Thank you.

22            THE COURT:  All right.  Will the Government call its

23    next witness, please.

24            MR. KOEHLER:  The United States calls Antoine

25    Frazier.                                                   11:32:11
```

United States District Court

1        THE COURT:  All right.

2        Mr. Frazier, if you will pass the bar and come up to

3   the courtroom deputy here, she will swear you in.

4        COURTROOM DEPUTY:  If you can please state your name

5   and spell your last name for the record.

6        THE WITNESS:  Antoine Frazier.  Last name is spelled

7   F-R-A-Z-I-E-R.

8        COURTROOM DEPUTY:  Thank you.  Please raise your

9   right hand.

10       (ANTOINE FRAZIER, a witness herein, was duly sworn or

11  affirmed.)

12                      **DIRECT EXAMINATION**

13  BY MR. KOEHLER:

14  Q.   Good morning, Mr. Frazier.

15  A.   Good morning.

16  Q.   Would you please introduce yourself to the Court and Mr.

17  Wahid?

18  A.   Yes.  My name is Antoine Frazier.

19  Q.   And where do you work, Mr. Frazier?

20  A.   I'm employed by the Federal Bureau of Investigation.  I'm

21  assigned to the Laboratory Division that is located at

22  Quantico, Virginia.

23  Q.   And what do you do in the Laboratory Division there?

24  A.   I'm a forensic document examiner and I examine documentary

25  evidence.  It can include handwriting, hand printing, indented

11:32:12

11:32:21

11:32:31

11:32:54

11:33:04

11:33:18

ANTOINE FRAZIER - Direct

1   writing examinations, torn edge exams, and other examinations.     11:33:21

2   Q.   How long have you been employed in that position?

3   A.   I have been employed by the FBI for over 31 years.  I have

4   been employed as a document examiner since 1998 so about 21

5   years.                                                             11:33:41

6   Q.   Very good.  And tell us about your educational background.

7   A.   In 1984 I did receive a bachelor of science degree from

8   Middle Tennessee State University with a major in biology.  In

9   1996 I did take continuing education courses at George

10  Washington University that also included a course in document      11:33:57

11  examination.  And also in 2011 I received my master of science

12  degree in forensic studies from Stevenson University.

13  Q.   And can you tell us about the training that you received

14  to prepare you to become a document examiner?

15  A.   Yes.  In 1998 I did complete a two-year training program      11:34:14

16  in the field of questioned documents, document examination.

17  That training included classroom instruction, testing, working

18  practical problems and also working the direct supervision of

19  other qualified forensic document examiners.

20  Q.   Do you also receive continuing training in that field?       11:34:43

21  A.   Yes.  I attend meetings, professional meetings, for

22  continuing education training as well in that field.

23  Q.   And do you devote the majority of your time to the

24  examination of questioned documents?

25  A.   Yes, I do.                                                    11:35:02

United States District Court

ANTOINE FRAZIER - Direct

1    Q.   Very good.                                                    11:35:04

2         I'm going to place on you -- in front of you on the

3    monitor a few different items here.  I'm going to start with

4    Exhibit Number 45.

5    A.   Is 45 to the left?                                           11:35:28

6    Q.   I'm waiting for it to come up on your screen.  Oh, I know

7    why.  Do you recognize that?

8    A.   I do recognize my initials in the bottom right corners of

9    those pages.

10   Q.   And are those copies of pages that you made in the course   11:35:51

11   of examining documents in this case?

12   A.   Yes.

13   Q.   And are these true and correct copies of the document that

14   you examined?

15   A.   Yes, they are.                                              11:36:04

16   Q.   All right.  I'm going to direct your attention now to

17   Exhibit Number 47.  Do you recognize that?

18   A.   Yes, I do.  Exhibit Number 47 is the front cover of a

19   notebook using side lighting for identifying examinations.

20   Side lighting would be just placing a light on each side of the  11:36:27

21   page to look for indented writing.

22   Q.   And did you assign an item number to this item, a

23   laboratory item number?

24   A.   Yes.  That was my item number 17.

25   Q.   Very good.  Is that a true and correct copy of the image    11:36:44

United States District Court

ANTOINE FRAZIER - Direct

1  that you created using side lighting of the front of that                    11:36:50

2  notebook?

3  A.   Yes, it is.

4            MR. KOEHLER:  Move to admit 47.

5            THE COURT:  Any objection?                                         11:36:57

6            MR. WAHID:  No.

7            THE COURT:  All right.  Thank you, Mr. Wahid.

8            47 is admitted.

9            (Exhibit Number 47 was admitted into evidence.)

10 BY MR. KOEHLER:                                                              11:37:07

11 Q.   I'm now going to direct your attention to Exhibit

12 Number 48.  Can you tell the Court what that is?

13 A.   Yes.  Exhibit 48 is an image of electrostatic processing

14 of indented writing.  Electrostatic processing is another way

15 to conduct indented writing examinations.  It involves -- if I  11:37:21

16 may just go into a little bit on how that works.  It's used

17 with the ESDA machine, the ElectroStatic Detection Apparatus

18 machine, and basically page 49 of my item 47 was placed on this

19 machine.

20         I actually put a piece of imaging film over that page   11:37:39

21 and just to give you a visual, imaging film, it was almost like

22 Saran wrap but a mylar filming imaging.  And then the next step

23 would be to give that electrical charge to the document using a

24 Corona bar and then finally just placing black toner beads on

25 that imaging film will bring up the indentations if they are    11:38:02

United States District Court

ANTOINE FRAZIER - Direct

1    present on the page.

2            And then the final step would be to complete an

3    adhesive sheet over that to have a permanent image of the

4    indented writing.

5    Q.   So the ElectroStatic Detection Apparatus is designed for

6    the recovery of indented writing from a piece of paper?

7    A.   Yes, it is.  And if I could just explain what indented

8    writing would be.

9    Q.   That's what I was going to ask you next.

10   A.   Indented writing is when two or more pages are stacked,

11   one on top of the other, and the indentations or the writing

12   from the top page may become indented or impressed on the pages

13   below that top page.  That's what indented writing is.

14   Q.   So it comes from the pressing of the point of the pen when

15   somebody is writing on one page and it transfers to the page

16   below?

17   A.   That's correct.  The writing could be pen or pencil.

18   Q.   All right.  And is this a true and correct copy of the

19   indented writing on that item?

20   A.   Yes, it is.

21   Q.   And what page of this notebook was that and is this the

22   same item, 17?

23   A.   Yes, same item 17.  It was on page 49 of Government

24   Exhibit Number 46, 47.

25   Q.   All right.

United States District Court

11:38:05

11:38:15

11:38:29

11:38:44

11:38:57

11:39:13

ANTOINE FRAZIER - Direct

1      MR. KOEHLER:  Move to admit Exhibit Number 48.                    11:39:13

2      THE COURT:  There being no objection, 48 is admitted.

3      MR. WAHID:  No, Your Honor.

4      (Exhibit Number 48 was admitted into evidence.)

5  BY MR. KOEHLER:                                                      11:39:55

6  Q.   All right.  I'm directing your attention to Exhibit

7  Number 49 now.  Can you tell the Court what that is?

8  A.   Yes.  Exhibit Number 49 is a Photoshop imaging of --

9  software imaging enhancement of the indented writing,

10 electrostatic processing lift that was conducted at the           11:40:20

11 laboratory.  This is actually the back page reversed and it's

12 enhanced to show the actual writing.

13 Q.   So just so we're clear, this is still page 49 but it's the

14 backside of it and you reverse it like a mirror; is that

15 correct?                                                            11:40:37

16 A.   Correct.  It was reversed for right reading.

17 Q.   So, in other words, if you took a page and flipped it

18 over, you would be reading it like you're looking in a mirror

19 and what you did is mirror that to make it flip so that you can

20 read it clearly?                                                    11:40:49

21 A.   That's correct.

22 Q.   And then you used Photoshop to enhance to get a better

23 view of the writing?

24 A.   That's correct.

25 Q.   In your enhancement did you do anything to alter any of       11:40:55

United States District Court

ANTOINE FRAZIER - Direct

1  the wording or any of the writing that appears on that page?                    11:41:00

2  A.   Not at all.

3            MR. KOEHLER:  Move to admit 49.

4            THE COURT:  Any objection, Mr. Wahid?

5            MR. WAHID:  No.                                                        11:41:08

6            THE COURT:  All right.  Thank you.

7            49 is admitted.

8            (Exhibit Number 49 was admitted into evidence.)

9  BY MR. KOEHLER:

10 Q.   And just for the Court's edification, did you prepare some                  11:41:12

11 PowerPoint slides that kind of visually depict what did you?

12 A.   Yes, I did.

13 Q.   I'm going to direct your attention to 161.

14           MR. KOEHLER:  It is not pulling up on my screen for

15 whatever reason.  I'm going to go ahead and skip that because I                  11:41:57

16 think you've already described it well.  Unless the Court has

17 any questions about how that process was done, then I have no

18 further questions for the witness.

19           THE COURT:  All right.

20           Thank you, Mr. Koehler.                                                11:42:10

21           Mr. Wahid, do you have any questions for Mr. Frazier?

22           MR. WAHID:  No.

23           THE COURT:  All right.

24           Thank you.  Then, Mr. Frazier, that means that I can

25 excuse you and you are free to go.  You may step down, sir.                      11:42:19

ROBERT MESHINSKY - Direct

1        THE WITNESS:  Thank you, Your Honor.                    11:42:22

2        (Witness excused.)

3        THE COURT:  All right.  Mr. Koehler, would the

4   Government call its next witness, please.

5        MR. KOEHLER:  The United States calls Robert          11:42:50

6   Meshinsky.

7        THE COURT:  All right.

8        Mr. Meshinsky, if you would step up to my courtroom

9   deputy, she will swear you in.

10       COURTROOM DEPUTY:  If you could please state your      11:43:31

11  name and spell your last name for the record.

12       THE WITNESS:  Robert Meshinsky.  M-E-S-H-I-N-S-K-Y.

13       (ROBERT MESHINSKY, a witness herein, was duly sworn

14  or affirmed.)

15       MR. KOEHLER:  Your Honor, may I retrieve Exhibits 16,  11:43:51

16  29, and 41 so that I can place them before the witness?

17       THE COURT:  You may.

18                    **DIRECT EXAMINATION**

19  BY MR. KOEHLER:

20  Q.   Good morning.                                          11:45:04

21  A.   Good morning.

22  Q.   Would you please introduce yourself to the Court and Mr.

23  Wahid?

24  A.   Good morning.  My name is Robert Meshinsky and I am a

25  retired Special Agent.                                      11:45:12

ROBERT MESHINSKY - Direct

1    Q.   When did you retire from the FBI?                          11:45:15

2    A.   May of 2016.

3    Q.   And how long did you work for the FBI?

4    A.   22 years.

5    Q.   What was your title there?                                 11:45:22

6    A.   Special Agent.

7    Q.   And what was your principal area of responsibility --

8    A.   Computer forensics.

9    Q.   -- in your career?

10             And can you talk to us about your education and       11:45:31

11   training in the field of computer forensics?

12   A.   Through the FBI I had over 800 hours of specialized

13   training for computer forensics.  I did computer forensics for

14   19 years while I was in the FBI.  We had to be certified every

15   year by taking tests, taking classes.                          11:45:52

16   Q.   As part of your duties, would you regularly examine

17   computers and cellular telephones and those types of devices?

18   A.   Yes, I did.

19   Q.   And did you regularly create forensic images of those

20   devices?                                                        11:46:12

21   A.   Yes, I did.

22   Q.   When you encounter a computer and need to make a forensic

23   image of that computer, can you please describe the steps that

24   that involves?

25   A.   Yes.  We would remove the hard drive from the computer,    11:46:24

United States District Court

ROBERT MESHINSKY - Direct

1    place the hard drive behind a write blocker so that no data can      11:46:26

2    be written to the original evidence.   We make an image of it.

3    An image is a bit-for-bit copy of the hard drive.

4    Q.   Is the image that you create likewise write-protected so

5    that nobody can alter it?                                            11:46:43

6    A.   That is correct.

7    Q.   Once that image is created, do others with the FBI,

8    whether they be Special Agents or Intelligence Analysts, search

9    through that image and then flag items for you to export from

10   that device?                                                         11:46:59

11   A.   Once we are -- create the image, we process the image in

12   another application and then it is placed in what we call CAIR,

13   Case Agent Investigative Review mode, and then have access to

14   it.

15   Q.   So they can access it through the CAIR at their leisure as      11:47:14

16   they need to and then request that you export items from the

17   CAIR?

18   A.   That is correct.

19   Q.   Very good.

20        Let's talk about cellular telephone examination.   How          11:47:23

21   do you conduct a cellular telephone exam?

22   A.   A cellular telephone, we'll power the phone on, place it

23   into airplane mode so that no files can be -- the phone cannot

24   be accessed.   If we're able to process it, we'll use

25   Cellebrite.   Cellebrite is a tool that the FBI used to process      11:47:39

United States District Court

ROBERT MESHINSKY - Direct

| | | |
|---|---|---|
| 1 | cell phones and we'll do a data dump and then create a report | 11:47:42 |
| 2 | there. | |
| 3 | Q.   And what kind of a report does the Cellebrite system | |
| 4 | create? | |
| 5 | A.   We create an HDML report or a PDF. | 11:47:51 |
| 6 | Q.   Is it commonly referred to as a UFED report? | |
| 7 | A.   Yes. | |
| 8 | Q.   And is that, likewise, write-controlled so that it cannot | |
| 9 | be altered once it is created? | |
| 10 | A.   That is correct. | 11:48:05 |
| 11 | Q.   And does that likewise get uploaded into either CAIR or | |
| 12 | the FBI's Sentinel system? | |
| 13 | A.   That's correct. | |
| 14 | Q.   And similarly, if an intel analyst wants to access that, | |
| 15 | can they do that through that system without making any changes | 11:48:15 |
| 16 | to the original data? | |
| 17 | A.   That is correct. | |
| 18 | Q.   Do you have another tool that you use for discovering the | |
| 19 | contents of a cellular telephone that cannot be processed | |
| 20 | through Cellebrite? | 11:48:31 |
| 21 | A.   We do.  It's called the Zippy tool, ZRT. | |
| 22 | Q.   The Zippy Reporting Tool? | |
| 23 | A.   That's correct. | |
| 24 | Q.   And can you describe for the Court how that works? | |
| 25 | A.   Sure.  If the phone cannot be downloaded using the | 11:48:41 |

United States District Court

ROBERT MESHINSKY - Direct

1  Cellebrite tool, we would have to take photographs of the          11:48:46

2  screen shots and we would have the phone mounted, take --

3  scroll through and do a screen capture of each screen.

4  Q.    So you essentially mount a camera above the phone, focused

5  on the phone, and then take photographs of each screen?          11:49:00

6  A.    That is correct.

7  Q.    All right.  And did you use all three of those tools in

8  connection with evidence that was processed from the apartment

9  of Elton Simpson and Nadir Soofi at 13850 North 19th Avenue,

10 Apartment 219 in Phoenix?                                         11:49:16

11 A.    I did.

12 Q.    Was one of those items a desktop computer?

13 A.    Yes.

14 Q.    You have Exhibit 29 in front of you on the floor.  Is that

15 the desktop computer that you processed, or one of them?          11:49:26

16 A.    Yes.

17 Q.    And did you perform exam that we just talked about with

18 that desktop computer?

19 A.    I did.

20 Q.    Were you instructed to export items from that computer?     11:49:37

21 A.    Yes.

22 Q.    Among those items, was one of them page 13 of the *Dabiq*

23 magazine, issue number two?

24 A.    Yes.

25 Q.    And was another of those items the full magazine *Dabiq*,   11:49:52

United States District Court

ROBERT MESHINSKY - Direct

1    issue number five?                                              11:49:56

2    A.   Yes.

3    Q.   Was another a screencap from an official ISIS video of

4    fighters loading artillery?

5    A.   Yes.                                                       11:50:06

6    Q.   And prior to coming to court, did you review Government

7    exhibits that are associated with these items?

8    A.   Yes.

9    Q.   We'll do them in trios here to make it go a little faster.

10   I'm going to go to number 30 first, Government's Exhibit 30.    11:50:19

11   Is that page 13 of *Dabiq*, issue two?

12   A.   Yes.

13   Q.   Is that a true and correct copy of what you extracted from

14   the desktop computer?

15   A.   Yes.                                                       11:50:32

16             MR. KOEHLER:  Move to admit 30.

17             THE COURT:  Any objection, Mr. Wahid?

18             Any objection, Mr. Wahid?

19             MR. WAHID:  No.  Sorry.

20             THE COURT:  30 is admitted.                           11:50:56

21             (Exhibit Number 30 was admitted into evidence.)

22   BY MR. KOEHLER:

23   Q.   Now, directing your attention to Exhibit Number 31, is

24   Exhibit 31 the full magazine *Dabiq*, issue five, with some

25   redactions for material that was not appropriate for Court?    11:51:06

United States District Court

ROBERT MESHINSKY - Direct

1  A.   Yes.                                                              11:51:09

2  Q.   And is Exhibit 31 a true and correct copy of what you

3  found on the computer?

4  A.   Yes.

5         MR. KOEHLER:  Move to admit 31.                                 11:51:19

6         THE COURT:  Any objection, Mr. Wahid?

7         MR. WAHID:  No.

8         THE COURT:  All right.  31 is admitted.

9         (Exhibit Number 31 was admitted into evidence.)

10 BY MR. KOEHLER:                                                        11:51:26

11 Q.   I now direct you to Exhibit Number 32.  Do you recognize

12 that?

13 A.   Yes.

14 Q.   Is that the screencap from the official ISIS video of

15 fighters loading artillery?                                            11:51:37

16 A.   Yes.

17 Q.   True and correct copy of what you found on Exhibit 29?

18 A.   Yes.

19         MR. KOEHLER:  Move to admit 32.

20         THE COURT:  All right.  Any objection, Mr. Wahid?             11:51:45

21         MR. WAHID:  No.

22         THE COURT:  32 is admitted.

23         (Exhibit Number 32 was admitted into evidence.)

24 BY MR. KOEHLER:

25 Q.   Did you also export a screencap of a video of a public          11:51:49

United States District Court

ROBERT MESHINSKY - Direct

1  beheading?                                                    11:51:53

2  A.   Yes.

3  Q.   And did you export an advertisement on the obligation of

4  appointing a Khalifah and the forbiddance of delaying such?

5  A.   Yes.                                                     11:52:03

6  Q.   And did you also export another ISIS video screencap

7  showing prisoners being marched to their execution along a

8  beach?

9  A.   Yes.

10 Q.   All right.  Starting with Exhibit 33, is that a true and  11:52:13

11 correct copy of the image recovered from Exhibit 29 of the

12 public beheading?

13 A.   Yes.

14          MR. KOEHLER:  Move to admit 33.

15          THE COURT:  Any objection, Mr. Wahid?               11:52:28

16          MR. WAHID:  No.

17          THE COURT:  All right.  33 is admitted.

18          (Exhibit Number 33 was admitted into evidence.)

19 BY MR. KOEHLER:

20 Q.   Exhibit Number 34, is this a true and correct copy of the  11:52:40

21 advertisement on the obligation for appointing a Khalifah and

22 forbiddance of delaying such?

23 A.   Yes.

24 Q.   And from Exhibit 29?

25 A.   Yes.                                                     11:52:49

United States District Court

ROBERT MESHINSKY - Direct

1          MR. KOEHLER:  Move to admit 34.                    11:52:51

2          THE COURT:  All right.

3          Any objection, Mr. Wahid?

4          MR. WAHID:  No.

5          THE COURT:  All right.  34 is admitted.            11:52:55

6          (Exhibit Number 34 was admitted into evidence.)

7   BY MR. KOEHLER:

8   Q.   Exhibit Number 35, is that a true and correct copy of the

9   screencap from the video showing the prisoners marched along

10  the beach?                                                11:53:08

11  A.   Yes.

12  Q.   And from Exhibit 29?

13  A.   Yes.

14         MR. KOEHLER:  Move to admit 35.

15         THE COURT:  Any objection, Mr. Wahid?               11:53:14

16         MR. WAHID:  No.

17         THE COURT:  35 is admitted.

18         (Exhibit Number 35 was admitted into evidence.)

19  BY MR. KOEHLER:

20  Q.   Did you also export a screencap from a video showing the  11:53:26

21  aftermath of a public beheading?

22  A.   Yes.

23  Q.   Is that fairly and accurately depicted in Exhibit 36?

24  A.   Yes.

25         MR. KOEHLER:  Move to admit 36.                     11:53:36

United States District Court

ROBERT MESHINSKY - Direct

1          THE COURT:  Any objection, Mr. Wahid?                    11:53:39

2          MR. WAHID:  No.

3          THE COURT:  All right.  36 is admitted.

4          (Exhibit Number 36 was admitted into evidence.)

5   BY MR. KOEHLER:                                                11:53:45

6   Q.   Now to 37.  Is that another screencap exported from

7   Exhibit Number 29 showing the aftermath of an execution?

8   A.   Yes.

9   Q.   Does it fairly and accurately depict what you exported?

10  A.   Yes.                                                      11:54:03

11         MR. KOEHLER:  Move to admit 37.

12         THE COURT:  Any objection?

13         MR. WAHID:  No.

14         THE COURT:  37 is admitted.

15         (Exhibit Number 37 was admitted into evidence.)        11:54:11

16  BY MR. KOEHLER:

17  Q.   Exhibit Number 38, is that an export from Exhibit

18  Number 29?

19  A.   Yes.

20  Q.   Showing fighters with a truckload of prisoners?          11:54:21

21  A.   Yes.

22  Q.   True and accurate copy of what you exported?

23  A.   Yes.

24         MR. KOEHLER:  Move to admit 38.

25         THE COURT:  There being no objection --                 11:54:32

United States District Court

ROBERT MESHINSKY - Direct

1          MR. WAHID:  No.                                          11:54:33

2          THE COURT:  -- 38 is admitted.

3          (Exhibit Number 38 was admitted into evidence.)

4  BY MR. KOEHLER:

5  Q.   Did you also export two documents that depicted Twitter   11:54:41

6  searches for IS, for the Islamic State?

7  A.   Yes.

8  Q.   Looking at Exhibit Number 39, does that fairly and

9  accurately depict one of the searches that you recovered?

10 A.   Yes.                                                       11:55:32

11 Q.   Was that from Exhibit 29?

12 A.   Yes.

13         MR. KOEHLER:  Move to admit 39.

14         THE COURT:  Any objection, Mr. Wahid?

15         MR. WAHID:  No.                                          11:55:39

16         THE COURT:  39 is admitted.

17         (Exhibit Number 39 was admitted into evidence.)

18 BY MR. KOEHLER:

19 Q.   Now directing your attention to Exhibit 40, is that the

20 other recovery of the Twitter search for ISIS?                  11:56:00

21 A.   Yes.

22         MR. KOEHLER:  Move to admit 40.

23         THE COURT:  Any objection?

24         MR. WAHID:  No.

25         THE COURT:  All right.  Thank you, Mr. Wahid.           11:56:12

United States District Court

                                                                  228

                          ROBERT MESHINSKY - Direct

1            40 is admitted.                                              11:56:13

2            (Exhibit Number 40 was admitted into evidence.)

3    BY MR. KOEHLER:

4    Q.   All right.  Now on the witness stand in front of you you

5    have two cellular telephones; correct?                              11:56:24

6    A.   That is correct.

7    Q.   On Exhibit Number -- I'm sorry, Exhibit Number 16, did you

8    access the UFED report for that and export items from that

9    phone?

10   A.   Yes.                                                           11:56:39

11   Q.   And were those exports, did they include *Dabiq*, issue

12   number five?

13   A.   Yes.

14           MR. KOEHLER:  I'll put on the screen Exhibit Number

15   17.                                                                 11:56:55

16   Q.   And, again, have you reviewed all of these exhibits prior

17   to coming to court today, the full range of pages of each of

18   these?

19   A.   Yes.

20   Q.   And is Exhibit Number 17 a true and correct copy of what      11:57:09

21   you exported from the Samsung Galaxy S5?

22   A.   Yes.

23           MR. KOEHLER:  Move to admit 17.

24           THE COURT:  Any objection, Mr. Wahid?

25           MR. WAHID:  No.                                             11:57:20

                        United States District Court

ROBERT MESHINSKY - Direct

1        THE COURT:  All right.  17 is admitted.                    11:57:21

2        (Exhibit Number 17 was admitted into evidence.)

3        THE COURT:  Mr. Koehler, so I'm following along the

4   exhibit that was just admitted fairly closely identical to the

5   one that was admitted previously.  The difference is they were  11:57:36

6   taken from two different sources; is that correct?

7        MR. KOEHLER:  That is correct.

8        THE COURT:  One was the desktop, or the tower, and

9   the other one was the phone?

10        MR. KOEHLER:  Correct.                                      11:57:46

11        THE COURT:  All right.  Thank you.

12   BY MR. KOEHLER:

13   Q.   So Exhibit Number 18, is that an issue of *Dabiq*, issue

14   number eight, that was recovered from the cell phone?

15   A.   Yes.                                                        11:57:59

16   Q.   And just to be clear, 17 and 18, were those both the full

17   magazine of *Dabiq* on that device?

18   A.   Yes.

19   Q.   With some redactions made?

20   A.   Yes.                                                        11:58:11

21   Q.   All right.  And 18 true and correct copy; correct?

22   A.   Yes.

23        MR. KOEHLER:  Move to admit 18.

24        THE COURT:  There being no objection --

25        MR. WAHID:  No.                                             11:58:19

United States District Court

ROBERT MESHINSKY - Direct

| | | |
|---|---|---|
| 1 | THE COURT:  -- 18 is admitted. | 11:58:19 |
| 2 | (Exhibit Number 18 was admitted into evidence.) | |
| 3 | BY MR. KOEHLER: | |
| 4 | Q.   Mr. Meshinsky, did you also recover from the Samsung | |
| 5 | Galaxy S5 phone a document entitled Hijrah to the Islamic | 11:58:36 |
| 6 | State? | |
| 7 | A.   Yes. | |
| 8 | Q.   And is that a multiple page document as well? | |
| 9 | A.   Yes. | |
| 10 | Q.   And is Exhibit 19 that document? | 11:58:46 |
| 11 | A.   Yes. | |
| 12 | Q.   At this a true and correct copy? | |
| 13 | A.   Yes. | |
| 14 | MR. KOEHLER:  Move to admit 19. | |
| 15 | THE COURT:  All right.  There being no objection -- | 11:58:55 |
| 16 | MR. WAHID:  No. | |
| 17 | THE COURT:  -- 19 is admitted. | |
| 18 | (Exhibit Number 19 was admitted into evidence.) | |
| 19 | BY MR. KOEHLER: | |
| 20 | Q.   Did you also export from the search history of that Galaxy | 11:59:35 |
| 21 | S5 information showing that the phone had been used to access a | |
| 22 | site known as justpaste.it looking for a document called | |
| 23 | ISHD_leak? | |
| 24 | A.   Yes. | |
| 25 | Q.   And is Exhibit Number 20 reflective of that? | 11:59:59 |

United States District Court

ROBERT MESHINSKY - Direct

1    A.   Yes.                                                          12:00:01

2             MR. KOEHLER:  Move to admit Exhibit Number 20.

3             THE COURT:  Any objection, Mr. Wahid?

4             MR. WAHID:  No.

5             THE COURT:  20 is admitted.                               12:00:07

6             (Exhibit Number 20 was admitted into evidence.)

7    BY MR. KOEHLER:

8    Q.   And now directing your attention to Exhibit Number 41 on

9    the table there in front of you, did you use the Zippy

10   Recording Tool to obtain information from that phone?             12:00:22

11   A.   Yes.

12   Q.   And was one of the images from that phone related to

13   apparent travel to Bulgaria, going to Sabiha Gökcen Airport and

14   not the Ataturk?

15   A.   Yes.                                                         12:00:58

16   Q.   And is Exhibit Number 42 a reflection of that and a true

17   and correct copy of that screen?

18   A.   Yes.

19   Q.   And were there more than one screen addressing that?

20   A.   Yes.                                                         12:01:11

21   Q.   I'll go to the second page of that.  And now the third

22   page.

23            And are those images true and correct copies of the

24   photographs that you took of the screens of that phone?

25   A.   Yes.                                                         12:01:40

United States District Court

1        MR. KOEHLER:  Move to admit Exhibit 42.                    12:01:41

2        THE COURT:  Any objection, Mr. Wahid?

3        MR. WAHID:  No.

4        THE COURT:  42 is admitted.

5        (Exhibit Number 42 was admitted into evidence.)           12:01:49

6   BY MR. KOEHLER:

7   Q.   I'm going to circle back to Exhibit 29 in front of you on

8   the floor of the desktop computer.  Did you also export from

9   that computer an audio file that had the name The Dust Will

10  Never Settle Down, a lecture from Anwar al-Awlaki?             12:02:12

11  A.   Yes.

12  Q.   And did you export the entire audio file from that?

13  A.   Yes.

14  Q.   All right.

15       MR. KOEHLER:  That's all I have at this time.             12:02:25

16       THE COURT:  All right.  Thank you, Mr. Koehler.

17       Mr. Wahid, do you have any questions for

18  Mr. Meshinsky?

19       MR. WAHID:  No.

20       THE COURT:  There being none, then I am able to           12:02:32

21  excuse you now and you may step down and take your leave.

22  Thank you.

23       THE WITNESS:  Thank you.

24       (Witness excused.)

25       THE COURT:  Counsel, it is now just a few minutes         12:02:41

                    United States District Court

1    after noon.  So rather than start another witness, why don't we          12:02:42

2    go ahead and take the lunch break now?

3          If we can be ready to go at 1:20.  As I had indicated

4    before, that will give you, Mr. Wahid, time to consult with

5    advisory counsel in case you have any questions for Mr. Soofi.          12:03:00

6    And then after that we'll return to the regular order.

7          There is a problem with one of the exhibits that has

8    been admitted.  You need to see --

9          Both sides, Julie?

10         COURTROOM DEPUTY:  Yes, since it was admitted, yes.           12:03:16

11         THE COURT:  And that's Exhibit Number 51 so you can

12   take care of that before you go on a break.

13         All right.  Thank you.

14         We are on break.  Thank you.

15         (Recess at 12:03; resumed at 1:25.)                          12:03:32

16         THE COURT:  All right.  Thank you, everyone.  Please

17   be seated.

18         So where we had left it, Mr. Wahid, you were going to

19   recall to the stand Mr. Soofi.  Do you still intend to do that,

20   sir?                                                               01:25:45

21         MR. WAHID:  No.

22         THE COURT:  All right.

23         And you've talked to your advisory counsel about

24   this, sir?

25         MR. WAHID:  Yes.                                             01:25:51

                    United States District Court

1    THE COURT:  All right.  Very good.  Then if that's     01:25:51

2  the case, then we'll just proceed with the remainder of the

3  Government's case or at least as far as we get today.

4    Mr. Koehler, do you want to go ahead and call your

5  next witness then?     01:26:01

6    MR. KOEHLER:  Yes, Your Honor.  The United States

7  calls Gregory Neville.

8    THE COURT:  Mr. Neville, if you would step up to the

9  courtroom deputy, she will swear you in.

10    COURTROOM DEPUTY:  If you could please state your     01:26:16

11  name and spell your last name for the record.

12    THE WITNESS:  Gregory Neville.  N-E-V-I-L-L-E.

13    (GREGORY NEVILLE, a witness herein, was duly sworn or

14  affirmed.)

15    **DIRECT EXAMINATION**     01:26:26

16  BY MR. KOEHLER:

17  Q.   Good afternoon, Mr. Neville.  Could you please introduce

18  yourself to the Court and to Mr. Wahid?

19  A.   My name is Greg Neville.  I'm an intelligence analyst with

20  the FBI.     01:26:52

21  Q.   How long have you worked for the FBI?

22  A.   Just under four years.

23  Q.   Prior to coming to work for the FBI, what did you do?

24  A.   I worked in contract security.  I managed a contract

25  between a company and a private company.     01:27:06

United States District Court

GREGORY NEVILLE - Direct

| 1  | Q.    And can you tell the Court your educational background? | 01:27:10 |
| 2  | A.    I have a master's degree in applied criminology and a |
| 3  | bachelor's degree in criminology and criminal justice. |
| 4  | Q.    And can you tell us what your job title is with the FBI? |
| 5  | A.    Intelligence analyst. | 01:27:23 |
| 6  | Q.    And has that been your job the whole approximately four |
| 7  | years that you've been with the FBI? |
| 8  | A.    Yes. |
| 9  | Q.    Can you describe for the Court what your day-to-day duties |
| 10 | involve as an intelligence analyst? | 01:27:34 |
| 11 | A.    We look at various information and compile it and put it |
| 12 | together and make assessments about that information. |
| 13 | Q.    Do you personally focus on analyzing communication? |
| 14 | A.    Yes. |
| 15 | Q.    And does that include cellular telephone records? | 01:27:53 |
| 16 | A.    Yes, it does. |
| 17 | Q.    Does it include text message communications? |
| 18 | A.    Yes. |
| 19 | Q.    Does it include social media exploitation and |
| 20 | communications? | 01:28:04 |
| 21 | A.    Yes, it does. |
| 22 | Q.    Let's talk for a minute about social media.  Can you give |
| 23 | the Court just a brief overview of the types of social media |
| 24 | that you work to exploit and analyze? |
| 25 | A.    We review things like Facebook, Twitter, Google plus, | 01:28:18 |

United States District Court

GREGORY NEVILLE - Direct

1   Instagram, anything that is what we call Open Source.          01:28:22

2   Q.   And so you do open source exploitation.  Do you also --

3   and before I go past that point, can you explain to the Court

4   what Open Source means?

5   A.   Open Source is things that are publicly available on the   01:28:37

6   Internet.  So it's the social media sites, web sites, things

7   like that.

8   Q.   Do you also review collection that comes from search

9   warrants, wiretaps, 2703(d) orders and the like?

10  A.   Yes, we do.                                                01:28:54

11  Q.   And can you explain to the Court how those are acquired

12  and stored and how you access them?

13  A.   They are usually housed into two different systems that we

14  use.  One is called Sentinel.  The other one is CAIR, Case

15  Agent Investigative Review.  Depending on what we get back from  01:29:09

16  the provider, it will be uploaded in there and then we can go

17  and access that.

18  Q.   When that data is uploaded into Sentinel and/or CAIR, is

19  it something that you can alter in any way?

20  A.   No.                                                        01:29:27

21  Q.   What do you do when you find something of interest in

22  Sentinel or CAIR?

23  A.   We will open up a local copy and then, depending on what

24  it is, extract the information that we're interested in.

25  Q.   And when you do that, do you sometimes do that directly    01:29:43

United States District Court

GREGORY NEVILLE - Direct

1   yourself and other times ask the CART team to do that?          01:29:45

2   A.   Yes.

3   Q.   And by CART is that the Computer Analysis Response Team?

4   A.   Yes.

5   Q.   In this case, did you participate in analyzing          01:29:58

6   communication records relating to Elton Francis Simpson?

7   A.   Yes, I did.

8   Q.   Did you also look for communications records relating to

9   Nadir Soofi?

10  A.   Yes, I did.          01:30:11

11  Q.   Abdul Malik Abdul Kareem?

12  A.   Yes.

13  Q.   Abdul Khabir Wahid?

14  A.   Yes.

15  Q.   Did you also look at communications, devices and results          01:30:19

16  relating to Saabir Nurse?

17  A.   Yes, I did.

18  Q.   And Ali Soofi?

19  A.   Yes, I did.

20  Q.   Let's start with Elton Simpson first.  Did FBI execute          01:30:32

21  search warrants on Twitter accounts belonging to Mr. Simpson?

22  A.   Yes.

23  Q.   Was one of those accounts number 2827006337?

24  A.   Yes, I believe so.

25  Q.   And was another 3062911044?          01:30:49

United States District Court

GREGORY NEVILLE - Direct

1  A.    Yes.                                                      01:30:57

2  Q.    Was another one 3070170972?

3  A.    Yes.

4  Q.    And 3092582583?

5  A.    Yes.                                                      01:31:13

6  Q.    And 3121473777?

7  A.    Yes.

8  Q.    And 3154850044?

9  A.    Yes.

10 Q.    And, finally, 3161708545?                                01:31:28

11 A.    Yes.

12 Q.    And when Twitter responded to the search warrants that

13 were issued for those various Twitter accounts, did they

14 accompany that with a certification of authenticity of those

15 records?                                                        01:31:52

16 A.    Yes, they did.

17 Q.    I'm going to direct your attention to what's on the

18 screen.  It's Exhibit Number 61.  Do you recognize that?

19 A.    Yes, I do.

20 Q.    Is that the custodian declaration of records?            01:31:59

21 A.    Yes.

22 Q.    And do the numbers on that correspond to the numbers I

23 just read?

24 A.    Yes, they do.

25 Q.    Now, Agent Neville, and that was signed under penalty of  01:32:17

United States District Court

GREGORY NEVILLE - Direct

1  perjury declaring that those records were authentic on behalf          01:32:21
2  of somebody at Twitter?
3  A.   Yes.
4  Q.   Did you take from the records that you obtained in
5  those -- and so did you go through and analyze the different          01:32:29
6  account numbers that I just read off?
7  A.   Yes, I did.
8  Q.   And did all of the results of those search warrants, the
9  content that came from Twitter, was it all related to Elton
10 Simpson?                                                              01:32:44
11 A.   Yes.
12 Q.   And did you go through and pull out relevant information
13 from each of those Twitter accounts that got compiled into some
14 of the other Government exhibits in this case?
15 A.   Yes, I did.                                                      01:32:55
16 Q.   All right.  Let's go to Exhibit Number 69 now.  Do you
17 recognize that?
18 A.   Yes, I do.
19 Q.   And can you tell the Court what that is?
20 A.   That was a tweet that was put out by Elton Simpson on his        01:33:09
21 tawaakul account on April 23 referring to the Draw the Prophet
22 contest in Garland, Texas.
23 Q.   And is @tawaakul, and that's the at symbol followed by
24 T-A-W-A-A-K-U-L, is that one of the @ handles that Mr. Simpson
25 frequently used on Twitter?                                           01:33:33

United States District Court

GREGORY NEVILLE - Direct

1    A.   Yes.                                                          01:33:35

2    Q.   Was another one @brdofgreen?

3    A.   Yes.

4    Q.   Short for Bird of Green?

5    A.   Yes.                                                          01:33:43

6    Q.   And is this a true and correct copy of the tweet that he

7    posted on April 23?

8    A.   Yes, it is.

9              MR. KOEHLER:  Move to admit Exhibit Number 69.

10             THE COURT:  Is there any objection, Mr. Wahid?           01:33:57

11             MR. WAHID:  No.

12             THE COURT:  No objection.  69 is admitted.

13             (Exhibit Number 69 was admitted into evidence.)

14   BY MR. KOEHLER:

15   Q.   And what was this tweet about?                               01:34:09

16   A.   It's a news article related to the Draw the Prophet

17   contest in Garland, Texas, and Elton Simpson has tweeted out:

18   When will they ever learn?  They are planning on selecting the

19   best drawn of Rasulullah (saws) in Texas.

20   Q.   All right.  I'm going to skip forward to Exhibit            01:34:31

21   Number 73.  And I'm going to, for ease, use the document camera

22   with this one.

23             You've reviewed Exhibit Number 73 before coming to

24   court today; is that correct?

25   A.   Yes, it is.                                                   01:35:07

United States District Court

GREGORY NEVILLE - Direct

1    Q.   And are all of the contents of Exhibit Number 73 derived          01:35:08

2    from the Twitter records that were listed in Exhibits 62

3    through 78 with the account numbers that I read?

4    A.   Yes, sir.

5    Q.   All right.  And have you reviewed every page of this?             01:35:19

6    A.   Yes, I have.

7    Q.   Is all of it true and accurate copies of what you pulled

8    out of those records?

9    A.   Yes, they are.

10          MR. KOEHLER:  I'm going to move to admit Exhibit                01:35:32

11   Number 73.

12          THE COURT:  Any objection?

13          MR. WAHID:  No.

14          THE COURT:  73 is admitted.

15          (Exhibit Number 73 was admitted into evidence.)                 01:35:38

16   BY MR. KOEHLER:

17   Q.   Directing your attention to the first page of 73, what is

18   the date of this tweet?

19   A.   It's February 13, 2015.

20   Q.   And is this tweet also related to that same contest?              01:35:49

21   A.   Yes.  Yes, it is.

22   Q.   And Elton Simpson is tweeting about the contest on

23   February 13; is that right?

24   A.   Yes.  He did a retweet, so it's a tweet that somebody else

25   had posted that, he then posted the same tweet.                        01:36:04

United States District Court

242

GREGORY NEVILLE - Direct

| | |
|---|---|
| 1 | Q.   And do you know approximately when the contest itself had | 01:36:07 |
| 2 | been announced? |
| 3 | A.   I do not know. |
| 4 | Q.   Okay.  Looking now at the second page of this, and I'm |
| 5 | going to zoom in a little bit to make it a little bit easier. | 01:36:21 |
| 6 | Another tweet from Mr. Simpson; correct? |
| 7 | A.   This is a screen shot of his the Twitter home page? |
| 8 | Q.   And does that show his handle? |
| 9 | A.   Yes, it does. |
| 10 | Q.   And what is his handle that he's using at that point? | 01:36:40 |
| 11 | A.   It's @tawaakul. |
| 12 | Q.   And what is the nickname that he's posting under that day? |
| 13 | A.   Shariah is Light. |
| 14 | Q.   And do you know what the word "Shariah" means? |
| 15 | A.   It's Islamic law. | 01:36:53 |
| 16 | Q.   And do you know whose picture is there right above Shariah |
| 17 | is Light as well as on the main banner? |
| 18 | A.   Yes.  It's Anwar al-Awlaki. |
| 19 | Q.   Now, on the third page of this, another tweet from Elton |
| 20 | Simpson? | 01:37:14 |
| 21 | A.   This is another screen shots of his profile? |
| 22 | Q.   All right.  And is he using the @tawaakul handle again -- |
| 23 | A.   Yes, he is. |
| 24 | Q.   -- with a different nickname?  What is the nickname there? |
| 25 | A.   Fan of Hoorul Ayn. | 01:37:26 |

United States District Court

GREGORY NEVILLE - Direct

1  Q.   And do you know what the term "Hoorul Ayn" stands for?        01:37:29

2  A.   It refers to the pure souls in Jannah, commonly referred

3  to as the virgins.

4  Q.   And is Jannah heaven in Islamic terms?

5  A.   Yes.                                                          01:37:44

6  Q.   All right.  Now, under the fourth page here again using

7  the Anwar al-Awlaki image; is that correct?

8  A.   Yes.

9  Q.   Does he have a different nickname on this fifth page here?

10 A.   Yes.  It's the sword.                                         01:38:00

11 Q.   And what -- does he have a tweet here that he's retweeting

12 down at the bottom of the page?

13 A.   Yes, he does.

14 Q.   And what is the subject matter of that tweet?

15 A.   "The dead Assad regime pilot whose fighter jet was shot      01:38:16

16 down by #ISIS forces today in Bir Qasb #Damascus."

17 Q.   And are you familiar with a pilot having been shot down in

18 Syria?

19 A.   Yes, it was a Jordanian pilot.

20 Q.   All right, sir.  Next, is this another tweet from Elton      01:38:37

21 Simpson?

22 A.   Yes, it is.

23 Q.   And what is the date of that?

24 A.   October 31, 2014.

25 Q.   And just the -- do you know what this picture is of?        01:38:47

United States District Court

GREGORY NEVILLE - Direct

1  A.  I do not.                                                    01:38:56

2  Q.  Is it a page from a book?

3  A.  Yes.

4  Q.  And what is the title of this segment of that book?

5  A.  "Those Who Beheaded For the Prophet."                       01:39:03

6  Q.  Next we have page seven, did he retweet something there?

7  A.  Yes.  He retweeted a link to the Flames of War video.

8  Q.  Have you seen the Flames of War video?

9  A.  I have.

10 Q.  Can you briefly describe what it is for the Court?          01:39:20

11 A.  It's an English language propaganda video that was created

12 and disseminated by ISIS.

13 Q.  Could you describe the production quality of that video?

14 A.  It's very professional, high-quality video.

15 Q.  Did it depict people being killed --                        01:39:38

16 A.  Yes, it does.

17 Q.  -- and executed?

18 A.  Yes.

19 Q.  What is this tweet from November 25, 2014?

20 A.  That's a tweet that features Abu Bakr al-Baghdadi, who is   01:39:54

21 the leader of ISIS.

22 Q.  And December 24, what is this tweet about?

23 A.  It's a cover of a book, Defence of the Muslim Lands.

24 Q.  Tweet from December 26, 2014.  Do you recognize the person

25 depicted in the photograph on this?                            01:40:26

United States District Court

GREGORY NEVILLE - Direct

1    A.    Yes.    That is Anwar al-Awlaki.                              01:40:28

2    Q.    And can you read the quote at the bottom of this?

3    A.    "The caravan is moving.    The more you delay joining it,

4    the further it will get away and the harder it will be to catch

5    up with it!"                                                       01:40:39

6    Q.    On page 11 we have a tweet from December 26, 2014.    Can

7    you tell the Court what is depicted there?

8    A.    It's a group of ISIS fighters beheading people.

9    Q.    A tweet on December 30, 2014, it begins, "Make lots of

10   du'a for Amirul-Mu'minin."    Do you know who Amirul Mu'mineen    01:41:06

11   is?

12   A.    Yes.    That's referring to the leader of ISIS, Abu Bakr

13   al-Baghdadi.

14   Q.    January 1, 2015, what does this image depict?

15   A.    It's a painting of the Islam State banner.                  01:41:22

16   Q.    Here we have a tweet from January 6 of 2015.    Can you tell

17   us who the person who is depicted in the photograph on that?

18   A.    Sheikh Abdullah Azzam.

19   Q.    Is he the author of that book Defence of the Muslim Lands

20   that we saw a few pages earlier?                                  01:41:47

21   A.    Yes, I believe so.

22   Q.    And who is in this photo here on page 15?

23   A.    It's Anwar al-Awlaki.

24   Q.    And is this a quote of his?

25   A.    Yes, it is.                                                  01:42:02

United States District Court

GREGORY NEVILLE - Direct

1    Q.   What does the quote read?                                    01:42:03

2    A.   I'm sorry.  Can you repeat?

3    Q.   What does the quote read?

4    A.   "We have chosen the path of WAR in order to defend

5    ourselves from your oppression.  God Willing, we will continue    01:42:12

6    with this war and you will find us persistent."

7    Q.   And this tweet was January 7, 2015; is that correct?

8    A.   That's correct.

9    Q.   All right.  This one here, with whom is Mr. Simpson

10   communicating on these tweets here?                               01:42:32

11   A.   An individual who goes by the name Mujahid Miski.

12   Q.   And do you know what Mujahid Miski's or Mujahid Miski's

13   true name was?

14   A.   Mohamed Abdullahi Hassan.

15   Q.   Is that M-O-H-A-M-E-D, middle name A-B-D-U-L-L-A-H-I, last    01:42:53

16   name H-A-S-S-A-N?

17   A.   Yes.

18   Q.   And the date of these tweets January 9 of 2015; is that

19   correct?

20   A.   Yes.                                                         01:43:13

21   Q.   All right.  January 13, 2015.  Do you recognize this?

22   A.   Yes, I do.

23   Q.   What is he tweeting about here?

24   A.   These are the attackers from the Charlie Hebdo attack that

25   was perpetrated on January 7, 2015.                               01:43:26

United States District Court

GREGORY NEVILLE - Direct

1    Q.   And the weapons depicted here, do you know that if these    01:43:30

2    are consistent with the weapons that were recovered in that

3    attack?

4    A.   Yes.

5    Q.   January 13, 2015.    01:43:43

6    A.   It's another depiction of the ISIS banner.

7    Q.   January 14, of 2015?

8    A.   This is another tweet with Charlie Hebdo.

9    Q.   Looking at the person in all black in the lower right

10   corner of the picture, can you tell what that person is doing    01:44:02

11   with his left hand?

12   A.   Yes.  He's holding up his index finger.

13   Q.   Does that have significance in the world of

14   counter-terrorism?

15   A.   Yes, it does.    01:44:13

16   Q.   Can you describe what that significance is?

17   A.   It's a symbol of tawhid which is the oneness of Allah.

18   And it's used by extremists to exemplify their devotion to

19   Allah.

20   Q.   January 27, 2015?    01:44:30

21   A.   This is another tweet about an Abu Bakr al-Baghdadi?

22   Q.   January 28, 2015?

23   A.   This is a propaganda photo of the Islamic State describing

24   the various things that they have to offer.

25   Q.   So extolling of the virtues of the caliphate of the    01:44:53

United States District Court

GREGORY NEVILLE - Direct

1    Islamic State?                                                      01:44:57

2    A.   Yes.

3    Q.   Page 22, do you recognize that image?

4    A.   These are photos of the Jordanian pilot who was shot down

5    and later burned alive by ISIS.                                     01:45:07

6    Q.   And Mr. Simpson was tweeting about that?

7    A.   Yes, he was.

8    Q.   Next page, 23, what are these images?

9    A.   These are the depictions of that pilot being burned alive.

10   Q.   Page 24.                                                       01:45:23

11   A.   This is a photo of an individual being executed by an ISIS

12   member with an ISIS flag in the background.

13   Q.   What are the words that he tweeted at the top of that?

14   A.   "When will they ever learn?"

15   Q.   Do those words match the tweet that he made on April 23,       01:45:37

16   2015, about the Mohammed Drawing Contest?

17   A.   Yes.

18   Q.   February 10, 2015.

19   A.   This is another photo of an execution being perpetrated by

20   on ISIS member.                                                     01:45:54

21   Q.   Page 26.  I'm going to zoom out a little bit.  What is

22   Mr. Simpson doing there?

23   A.   He's comparing a photo of individuals being kept in a cage

24   by U.S. Army with the burning alive of the Jordanian pilot.

25   Q.   Page 27.                                                       01:46:28

United States District Court

249

GREGORY NEVILLE - Direct

1   A.   It's another propaganda photo exemplifying why they          01:46:29

2   believe that they are the ultimate group.

3   Q.   And by "they" you are talking about ISIS?

4   A.   ISIS, yes.

5   Q.   Can you tell what this tweet is about?                       01:46:43

6           MR. KOEHLER:   Whoa.  The monitor just went off.  I

7   can see it on the camera down here.  Did I do something wrong?

8   I can see it on the camera down here but I'm not seeing it on

9   the monitors.

10          COURTROOM DEPUTY:   It's just not there.  It's still      01:47:00

11  searching like it did the other day.

12          MR. KOEHLER:   There we go.  Thank you.

13  BY MR. KOEHLER:

14  Q.   What is this tweet about?

15  A.   This is was a propaganda video put out by ISIS of the       01:47:26

16  execution of a group of Christians.  It was titled "A Message

17  Signed with Blood to the Nation of the Cross."

18  Q.   And was that put out by ISIS in Libya?

19  A.   Yes.

20  Q.   So ISIS was not just confined to Syria and Iraq?            01:47:38

21  A.   No.

22  Q.   Can you tell us what this one was?

23  A.   This is a young photo of Abu Bakr al-Baghdadi.

24  Q.   And this tweet from March 1?

25  A.   "Khilafah has returned," another ISIS propaganda image.     01:48:04

United States District Court

GREGORY NEVILLE - Direct

1   Q.   Page 31?                                               01:48:15

2   A.   This was another propaganda video "Strike Their Necks."

3   It's a beheading video.

4   Q.   And this one here?

5   A.   These are links to the English language magazine *Dabiq*   01:48:26

6   magazine which was one of their English language propaganda

7   magazines that they released.

8   Q.   And this one here?

9   A.   It's an image of people swearing allegiance to ISIS.

10  Q.   That's from April 7, 2015?                            01:48:45

11  A.   Yes, it is.

12  Q.   April 8, 2015?

13  A.   It's another execution image.

14  Q.   Page 35, April 10, 2015.

15  A.   This is another depiction of an ISIS propaganda video that  01:49:02

16  was put out.

17  Q.   And this one?

18  A.   This is also a propaganda video that was put out by ISIS.

19  Q.   Now, here you have some communications; is that correct?

20  A.   Yes.                                                  01:49:22

21  Q.   And can you tell us, A, what is the nickname that

22  Mr. Simpson is using on April 23, 2015 on this one?

23  A.   I'm your bro fillalh.

24  Q.   And is he still using that @tawaakul handle?

25  A.   Yes.                                                  01:49:38

United States District Court

GREGORY NEVILLE - Direct

1   Q.   And in that communication stream, does he have                    01:49:39

2   communications with Miski?

3   A.   Yes, he does.

4   Q.   And are those communications about the Charlie Hebdo

5   attack?                                                                 01:49:50

6   A.   Yes.

7   Q.   And are they comparing them to the Draw Muhammad Contest

8   in Garland, Texas?

9   A.   Yes, they are.

10  Q.   And is that what that Breitbart link is that I'm pointing          01:49:57

11  out right here (Indicating)?

12  A.   Yes, that's it.

13  Q.   And can you read what Miski's tweet was about that contest

14  at the top of this page?

15  A.   "If only we had men like these brothers in the #states,           01:50:15

16  our beloved Muhammad would not have been drawn."

17  Q.   And then the tweet right below that?

18  A.   "The brothers from Charlie Hebdo attack did their part.

19  It's time for the brothers in the #US to do their part."

20  Q.   Are these more communications that Simpson had via                01:50:41

21  Twitter?

22  A.   Yes.

23  Q.   And is he the one in the middle, the sword @tawaakul?

24  A.   Yes, he is.

25  Q.   And talking about your home getting raided and have a gift        01:50:50

United States District Court

GREGORY NEVILLE - Direct

1   with you even if you take a shower, keep your shower time                     01:50:53

2   short?

3   A.   Yes.

4   Q.   Did you assess the meaning of having a gift with you in

5   the shower?                                                                  01:51:03

6   A.   Having a weapon ready.

7   Q.   And here on April 30, 2015, still talking about Amirul

8   Mu'mineen?

9   A.   Yes.

10  Q.   And that's referring to Abu Bakr al-Baghdadi?                           01:51:20

11  A.   Yes, it is.

12  Q.   So based on these samplings from Mr. Simpson's Twitter

13  accounts, is it fair to say that he was rather focused on

14  loyalty to the Islamic State and their point of view?

15  A.   Yes.                                                                    01:51:40

16  Q.   Now I'm going to switch back to the computer, please.

17       I'm going to directing your attention to Exhibit

18  Number 70 on the screen there.  Do you recognize that?

19  A.   Yes.

20  Q.   And did that -- was that something that you found on      01:52:26

21  Twitter Open Source?

22  A.   Yes.

23  Q.   And tell us what that is.

24  A.   This is the last tweet that was put out by Elton Simpson

25  before he committed the attack in Garland, Texas.             01:52:35

GREGORY NEVILLE - Direct

```
 1   Q.   Is that a true and correct copy of that tweet?          01:52:38
 2   A.   Yes, it is.
 3            MR. KOEHLER:  Move to admit 70.
 4            THE COURT:  Mr. Wahid, any objection?
 5            MR. WAHID:  No.                                      01:52:47
 6            THE COURT:  All right.  70 is admitted.
 7            (Exhibit Number 70 was admitted into evidence.)
 8   BY MR. KOEHLER:
 9   Q.   And did he, again, mention Amirul Mu'mineen in that tweet?
10   A.   Yes.                                                     01:52:56
11   Q.   And what does it mean where he says "the bro with me and
12   myself have given bay'ah"?
13   A.   It's an oath of allegiance.
14   Q.   And "may Allah accept us as mujahideen"?
15   A.   He's referring to being accepted as soldiers of Islam.   01:53:09
16   Q.   And do you know what "make du'a" means?
17   A.   Make prayer.
18   Q.   All right.  Now, directing your attention to 71.  Do you
19   recognize this, Mr. Neville?
20   A.   Yes, I do.                                               01:53:59
21   Q.   And was this also obtained through Open Source Twitter?
22   A.   Yes.
23   Q.   And can you tell us what this is?
24   A.   These are screen shots of Junaid Hussain tweeting about
25   the attack in Garland, Texas, after it occurred.             01:54:12
```

United States District Court

GREGORY NEVILLE - Direct

1   Q.   First off, who is Junaid Hussain?                              01:54:16

2   A.   He was an ISIS member.   He was involved in online

3   radicalization for other people.   He was an English speaker

4   from Britain.   He also head up the Islamic State Hacking Group.

5   Q.   And was -- did he use the Twitter handle @AbuHu55ain would   01:54:35

6   look like spelling out Abu Hussain?

7   A.   Yes.

8   Q.   And Abu Hussain al-Britani was the nickname that he used?

9   A.   Yes.

10  Q.   And did he tweet specifically in relation to the Garland,    01:54:51

11  terror attack?

12  A.   Yes, he did.

13  Q.   And what did he say?

14  A.   "And do not say about those who are killed in the way of

15  Allah, 'They are dead.'  Rather, they are alive, but you         01:55:02

16  perceive it not."

17       "The 2 brothers attained shahdah in Texas.  O Kuffar

18  know that death is better than living humiliated.  Allahu Akbar

19  #garland shooting."

20  Q.   Okay.  Can you tell us what the word "shahdah" means?        01:55:19

21  A.   Shahdah is a plural of shahid which is to be a martyr.

22  Q.   And what is kuffar?

23  A.   It's the infidels, the unbelievers.

24  Q.   Okay.  So here's he's telling the unbelievers that death

25  is better than living humiliated?                                 01:55:36

United States District Court

GREGORY NEVILLE - Direct

1    A.    Yes.                                                           01:55:39

2    Q.    All right.  Next one.

3    A.    "If there is no check on the freedom of your speech, then

4    let your hearts be open to the freedom of our actions

5    #GarlandShooting #TexasAttack."                                     01:55:46

6    Q.    On the right-hand side.

7    A.    "Kill those that insult The Prophet #GarlandShooting."

8    Q.    Next?

9    A.    "Allahu Akbar!!!!!  2 of our brothers just opened fire at

10   the Prophet Muhammad (s.a.w.) art exhibition in Texas!            01:56:02

11   #TexasAttack."

12   Q.    And is that s.a.w. an abbreviation for something?

13   A.    Yes.  It's sallallahu alayhi wa Salam.

14   Q.    And what does that mean?

15   A.    It's a term of reference to the Prophet.  So anytime the    01:56:17

16   Prophet is mentioned, you say it.  And it's prayer -- may

17   Allah -- I can't remember.

18   Q.    Is an easy English translation for it, peace be upon him?

19   A.    Yes, essentially.

20   Q.    All right.  And then next did he tweet @atawaakul himself?  01:56:37

21   A.    Yes.  "@atawaakul May Allah swt reward you and give you

22   Jannah! #TexasAttack.

23   Q.    Can you read rest of his communications about this on the

24   screen?

25   A.    "If there is no check on the freedom of your speech, then   01:57:13

GREGORY NEVILLE - Direct

1    let your hearts be open to the freedom of our actions                01:57:16
2    #GarlandShooting #TexasAttack."
3            "They Thought They Was Safe in Texas From The
4    Soldiers of the Islamic State #garlandshooting #TexasAttack."
5            "Kill Those That Insult The Prophet                          01:57:28
6    #GarlandShooting."
7            "Allahu Akbar!!!!!  2 of our brothers just opened
8    fire at the Prophet Muhammad (s.a.w.) art exhibition in texas!
9    #TexasAttack."
10           "@atawaakul May Allah swt reward you and you and."           01:57:43
11   Q.    And so that's a repeat of the message from the previous
12   page; is that right?
13   A.    Yes.
14   Q.    So in light of what was found, did you also go looking
15   through Mr. Simpson's direct messages for communications with  01:58:03
16   others that might relate to his ideology as well as to this
17   event?
18   A.    Yes.
19           MR. KOEHLER:  If I can switch back to the document
20   camera, please.                                                      01:58:35
21   BY MR. KOEHLER:
22   Q.    I've placed on the document camera what's been marked for
23   identification as Exhibit Number 74.  Do you recognize that?
24   A.    Yes, I do.
25   Q.    And can you describe in general terms what that is?           01:58:47

United States District Court

GREGORY NEVILLE - Direct

1   A.    Those are Twitter direct messages between Elton Simpson    01:58:51

2   and Miski.

3   Q.    And did he have a couple of Twitter direct messages with

4   somebody else later on in the exhibit?

5   A.    Yes.    01:59:00

6   Q.    All right.  And are those true and correct copies of

7   Twitter direct messages that you had extracted from the Twitter

8   data that you received?

9   A.    Yes.

10            MR. KOEHLER:  Move to admit Exhibit Number 74.    01:59:10

11            THE COURT:  Any objection, Mr. Wahid?

12            MR. WAHID:  No.

13            THE COURT:  74 is admitted.

14            (Exhibit Number 74 was admitted into evidence.)

15   BY MR. KOEHLER:    01:59:17

16   Q.    So on this first page, what are Simpson and Miski talking

17   about here?

18   A.    Simpson is asking Miski if the brother interpreted the

19   dream of his.

20   Q.    Is dream interpretation something that you frequently see    01:59:29

21   in connection with Islamic counter-terrorism investigations?

22   A.    Yes.

23   Q.    And can you describe generally to the Court what that is

24   about?

25   A.    We see it frequently just in terms of people looking for    01:59:44

GREGORY NEVILLE - Direct

1    meaning in their dreams and justification for future actions.        01:59:46

2    Q.    All right.  Now directing your attention to the next page

3    of that, did Mr. Miski actually provide an interpretation?

4    A.    Yes, he did.

5    Q.    And let's start with the first one.                           02:00:02

6    A.    "Akhi the sheikh said that this dream is a glad tidings

7    from Allah swt.

8              "You will loose an Opportunity to doing something

9    good like Hijra.  Then you'll be saddened over the lost of the

10   great opertunity.  You will miss out in allot of Ajar because   02:00:18

11   of that."

12   Q.    Can we stop for a moment?

13   A.    Yes.

14   Q.    First, hijra, what is that?

15   A.    It's immigration to Islamic lands.  In terms of ISIS, it   02:00:28

16   refers to going over and joining the caliphate in Syria or

17   Iraq.

18   Q.    And what does the word "ajar" mean?

19   A.    Reward.

20   Q.    Now keep going.                                             02:00:39

21   A.    "Allah swt will hold you back from doing so, so that you

22   can get another opportunity for a better place with greater

23   Ajar.

24             "The time between the two H's is a bit long.  It's

25   not gonna be as soon as you loose the first opportunity.  It's  02:00:53

United States District Court

GREGORY NEVILLE - Direct

1   gonna be a bit later."                                              02:00:56

2   Q.   All right.  As you continue with the -- does Mr. Simpson

3   ask him about that fifth item?

4   A.   Yes.  Simpson asks, "The time between the two H's is a bit

5   long.  It's not gonna be as soon as you loose the first           02:01:11

6   opportunity.  It's gonna be a bit later.

7          "Two H's.  You didn't mean to type H's sah?"

8          Miski replies, "What about it akhi?  I did.  Hijrah."

9          And Simpson replies, "He's saying hijra will happen

10  again?  Or just another way of getting ajr from Allah?  As of     02:01:30

11  number 4."

12         Miski replies, "He said it will happen again insha

13  Allah but to a better place."

14  Q.   Stop for a moment.  Insha Allah, what does that mean?

15  A.   God willing.                                                  02:01:52

16  Q.   Okay.  Keep going.

17  A.   Simpson's replies, "Can I ask you this.  When sheikh

18  adnani gives a public address, can we assume that this is what

19  Al Khalifah wants as well?  Seeing that adnani is the

20  spokesman?  And seeing Al Khalifah hasn't come out to correct     02:02:02

21  what sh adnani says?"

22  Q.   How does Miski respond to that?

23  A.   "Yes akhil kareem.  Adnani never speaks unless he's been

24  ordered by the Khalif of the Muslims.  He can never speak

25  without the order of the Khalif."                                 02:02:16

United States District Court

GREGORY NEVILLE - Direct

1  Q.   Go ahead.                                                          02:02:23

2  A.   Simpson states, "Maybe then, it's is possible that the ajr

3  is in what he said earlier."

4         Miski replies, " And Afwan the Sheikh said Allah will

5  hold you back for something far better in Ajar than the last     02:02:33

6  time.  It could be H or something else."

7         Simpson corrects an earlier thing and says, "It is."

8  Q.   And then -- go ahead.

9  A.   Miski replies, "Akhi yes, Matter of fact that is far

10 better in Ajar than H right now."                                 02:02:49

11 Q.   And so when he's talking about something being far better

12 than ajar, is he referring back to this comment about Shaykh

13 Adnani's public address?

14 A.   Yes.

15 Q.   All right.  Next one, January 3, 2015.                       02:03:00

16 A.   Simpson asks, "I wonder what it means when one sees imam

17 Anwar in a dream.  You don't have to ask the sheikh akhi.

18 Lol."

19 Q.   When he says, "You don't have to ask the sheikh akhi,"

20 what did you assess he's meaning there?                          02:03:24

21 A.   He doesn't need to have that dream interpreted by the

22 sheikh.

23 Q.   And then what is Miski's response to that?

24 A.   "Maybe he's telling you what he told nidal."

25         MR. KOEHLER:  May I have a moment, Your Honor?           02:03:35

United States District Court

GREGORY NEVILLE - Direct

1    BY MR. KOEHLER:                                                    02:03:50

2    Q.   Okay.  January 9, 2015.

3    A.   "Subhan Allah things seem to be moving along so fast."

4         Miski replies, "Masha Allah akhi, What happened in

5    France made the Muslims happy everywhere happy akhi."          02:04:00

6    Q.   Stop right there for a moment.  What happened in France?

7    Do you know the approximate date of the Charlie Hebdo attack?

8    A.   It was January 7, 2015.

9    Q.   So just two days before this message?

10   A.   Yes.                                                       02:04:14

11   Q.   Okay.  Keep going.

12   A.   Simpson replies, "I got confused though.  They mentioned

13   two brothers at first and then they mentioned a brother and a

14   sister."

15        Miski replies, "With what akhi?"                           02:04:23

16        Simpson replies, "There were 2 separate events?"

17        Miski replies, "Na3m akhi they were separate."

18   Q.   So were there two separate events involved in Paris,

19   France, when the Charlie Hebdo attack occurred?

20   A.   Yes.                                                       02:04:42

21   Q.   All right.  Keep going.

22   A.   Simpson's replies, "I heard about the two who got shahadah

23   insha Allah at the grocery store.  What about the two

24   brothers?"

25        Miski replies, "Akhi they all got Shahadah."               02:04:54

United States District Court

GREGORY NEVILLE - Direct

1      Simpson replies, "I only heard about the bro and the        02:04:57

2   sister Jzk.  Where did the other two get it?  House?

3   Warehouse?"

4      Miski replies, "They went inside a place and took

5   hostage. they killed the hostages and then they got martyred.   02:05:08

6   They were told to surrender and they said no, We came for

7   shahadah."

8   Q.   And, again, shahadah means martyrdom?

9   A.   Yes.

10  Q.   All right.  Is he talking to Miski about somebody else    02:05:25

11  here?

12  A.   Yes.

13  Q.   What is this about?

14  A.   Vetting out somebody who he believes to be an ISIS member.

15  Q.   And April 23, 2015.                                        02:05:39

16  A.   He's asking Miski to check a tweet that was posted to

17  Miski specifically.

18  Q.   Okay.

19  A.   And it's in reference to the Draw the Prophet contest in

20  Garland, Texas.                                                 02:05:56

21  Q.   Is that the same day that he tweeted at Miski about that

22  same contest publicly?

23  A.   Yes.

24  Q.   So they both had a public exchange on it as well as this

25  private direct message exchange?                                02:06:05

United States District Court

GREGORY NEVILLE - Direct

1   A.   Yes.                                                           02:06:07

2   Q.   All right.  May 2, 2015.

3   A.   Simpson asks Miski if his ss is working.  He replies, "Yes

4   akhil habeeb."

5        Simpson replies, "And juba89."                                02:06:21

6        Miski replies, "I sent you a request akhi."

7   Q.   Now, this is -- correct me if I'm wrong -- the day before

8   the attack in Garland, Texas?

9   A.   Yes, it is.

10  Q.   And is ss an abbreviation for something that you're          02:06:34

11  familiar with in your work?

12  A.   Yes.  It's Surespot.

13  Q.   S-U-R-E-S-P-O-T, one word?

14  A.   Yes.

15  Q.   And what is Surespot?                                         02:06:50

16  A.   It's a multimedia communication application.  It's an

17  encrypted application so that the communications are secure.

18  Q.   And are they encrypted end to end?

19  A.   Yes, they are.

20  Q.   Was the FBI able to recover any content data from Surespot  02:07:01

21  between Simpson and Miski or anyone else?

22  A.   No.

23  Q.   Did the FBI recover from Surespot information showing

24  communications between Simpson and Miski?

25  A.   Yes.                                                          02:07:18

264

GREGORY NEVILLE - Direct

1  Q.   Did you get a count on those communications?                    02:07:18

2  A.   I do not have it.  I know it was in the hundreds.

3  Q.   And were those communications in the vicinity of the

4  attack itself?

5  A.   Yes.                                                            02:07:31

6  Q.   And juba89, was that a handle that was associated with

7  Elton Simpson on Surespot?

8  A.   Yes, it is.

9  Q.   And on April 15, 2015, different communication with

10 someone else.  Who is he communicating with there?                  02:07:47

11 A.   This is a direct message exchange between Elton Simpson

12 and Junaid Hussain.

13 Q.   And can you tell us what this is about?

14 A.   Simpson is asking Junaid Hussain about Surespot, asking

15 him if he has a Surespot.  Junaid Hughes replies that he does        02:08:02

16 and that it is more secure than Whatsapp -- I'm sorry, than

17 Kick and provides him with his Surespot ID.

18 Q.   All right.  Go ahead.

19 A.   Simpson asks if he minds if he adds him to Surespot and

20 gives him his Surespot name and then tells him that he's added       02:08:17

21 him.

22 Q.   And that's a different handle, juba8021, than the previous

23 handle, juba89; correct?

24 A.   Yes.

25 Q.   Earlier we talked about using data recovered from cellular      02:09:06

United States District Court

GREGORY NEVILLE - Direct

```
 1  telephones as well as cell phone records obtained in connection   02:09:11
 2  with this case; is that correct?
 3  A.   Yes.
 4  Q.   Did you analyze records that were obtained from the cell
 5  phone of Ali Soofi?                                                02:09:22
 6  A.   Yes, I did.
 7  Q.   And did you also use telephone call detail records that
 8  came from Abdul Khabir Wahid's cellular telephone records?
 9  A.   Yes.
10  Q.   All right.  I'm going to place on the camera here for you    02:09:40
11  what's been marked for identification for you as Exhibit 76.
12  Do you recognize this?
13  A.   Yes.
14  Q.   And can you tell the Court what this is?
15  A.   This is the call between Ali Soofi and Abdul Khabir Wahid,   02:09:52
16  Salim Sampson, and Abdul Malik Abdul Kareem from May 3, 2015,
17  through May 7, 2015, extracted from the call log of the SCH-i535
18  Galaxy III.   MEID:   256691432504785177 utilized by Ali Soofi.
19  Q.   And did this come from a UFED report that was obtained by
20  Russell Carman with Customs and Border Protection, this cell     02:10:25
21  phone extraction of Ali Soofi?
22  A.   No.   I think this one came from the Kansas City office.
23  Q.   Oh, I'm sorry.   I'm thinking of Saabir Nurse's phone.
24       Did this come from Andrew Knutson's extractions of
25  Ali Soofi's cell phone?                                          02:10:44
```

United States District Court

GREGORY NEVILLE - Direct

1   A.   Yes.                                                    02:10:46

2   Q.   And did you access that through the FBI either CAIR or

3   Sentinel evidence systems?

4   A.   Yes, I did.

5   Q.   And when you received that data from there, was it     02:10:51

6   something that could be altered in any way on your end?

7   A.   No.

8   Q.   So you started with May 3, 2015, and went to May 7 of

9   2015, to get that narrow window; is that correct?

10  A.   Yes.                                                    02:11:06

11  Q.   And are these all of the communications between Ali Soofi

12  and those other individuals that are listed on this exhibit

13  during that time frame?

14  A.   Yes.

15  Q.   And so did Ali Soofi have two missed phone calls on May 3  02:11:20

16  of 2015 at 9:44 p.m. and 11:58 p.m. Arizona time?

17  A.   Yes.

18  Q.   When you went through the records that came out of that

19  phone as well as the cell phone records that came from AT&T for

20  Mr. Wahid's phone, did you convert all the times in those      02:11:40

21  records to Arizona time for ease of understanding?

22  A.   Yes, I did.

23  Q.   All right.  And did he have phone calls on May 4 with

24  Abdul Kareem that looked like calls that did not go through as

25  well as Salim Sampson that did, Abdul Kareem that went through, 02:11:59

United States District Court

GREGORY NEVILLE - Direct

1  another call with Salim Sampson that went through, and then a          02:12:05

2  missed call from Abdul Kareem?

3  A.   Yes.

4  Q.   And then did he have a call from Abdul Wahid on May 4 that

5  had a seven-second duration on it from -- coming from Mr.             02:12:17

6  Wahid's number?

7  A.   Yes.

8  Q.   With a seven-second duration, did you make an assessment

9  about that?

10  A.   The phone likely went to voicemail.                            02:12:29

11  Q.   All right.  And, by the way, are all of these true and

12  correct reflections of what you found in the data?

13  A.   Yes.

14        MR. KOEHLER:  I'm going to move to admit Exhibit

15  Number 76.                                                          02:12:39

16        THE COURT:  Mr. Wahid, any objection to 76?

17        MR. WAHID:  No.

18        THE COURT:  76 is admitted.

19        (Exhibit Number 76 was admitted into evidence.)

20  BY MR. KOEHLER:                                                     02:12:45

21  Q.   All right.  Now looking at May 4 at 3:36 p.m., did Ali

22  Soofi place a call to Abdul Khabir Wahid?

23  A.   Yes.

24  Q.   And what was the duration of that?

25  A.   17 seconds.                                                    02:12:55

United States District Court

GREGORY NEVILLE - Direct

1    Q.   And then did he place another one to Wahid about half-hour          02:12:56

2    later at 3:58 p.m., also 17 seconds?

3    A.   Yes.

4    Q.   Did you make an assessment, based on the lengths of those

5    two, what must have occurred?                                           02:13:08

6    A.   Those also likely went to voicemail.

7    Q.   All right.  Did they finally have a call that took place

8    on Monday, May 4, that lasted for nine minutes and 14 seconds

9    at approximately 4:54 p.m. Arizona time?

10   A.   Yes.                                                               02:13:23

11   Q.   And nine minutes and 54 seconds -- or nine minutes and 14

12   seconds?

13   A.   Yes.  Nine minutes, 14 seconds.

14   Q.   And then did he have a call a few days later with Salim

15   Samson on May 7 at 5:57 p.m. that lasted eight minutes and 19          02:13:32

16   seconds?

17   A.   Yes.

18   Q.   All right.  Now going to Exhibit Number 77, do you

19   recognize this?

20   A.   Yes, I do.                                                         02:13:48

21   Q.   What is depicted in this exhibit?

22   A.   This is the SMS content between Abdul Malik Abdul Kareem

23   and Abdul Khabir Wahid from May 3, 2015, through May 6, 2015,

24   taken from the call log of the MaxWest Gravity55 smart phone.

25   IMEI-1: 359020053707845.                                               02:14:07

United States District Court

GREGORY NEVILLE - Direct

Q.   And were there also phone calls reflected in these          02:14:17
records?

A.   Yes.  The T-Mobile records for phone number 623-204-7295.

Q.   And is this true and correct copy of the data that you
recovered both from the MaxWest phone as well as from the        02:14:33
T-Mobile call detail records?

A.   Yes.

        MR. KOEHLER:  Move to admit Exhibit 77.

        THE COURT:  Any objection, Mr. Wahid?

        MR. WAHID:  No.                                          02:14:46

        THE COURT:  77 admitted.

        (Exhibit Number 77 was admitted into evidence.)

        THE COURT:  Mr. Koehler, are you moving on to another
record now?

        MR. KOEHLER:  No.  I'm still on this is one but I'm      02:14:56
happy to take a break if you would like.

        THE COURT:  I think, yeah, let's go ahead and take
our -- the first break of the afternoon.  I'm going to give us
two breaks this afternoon, both a little shorter.  Let's take
ten minutes now.  All right.                                    02:15:09

        MS. BROOK:  Your Honor, just quickly for planning
purposes, we're ending today at 4:30 as well or are we going to
go after?

        THE COURT:  I won't keep you all beyond 4:30.

        MS. BROOK:  Okay.  I just wanted to make sure for        02:15:22

United States District Court

GREGORY NEVILLE - Direct

1   witness readiness.   Thanks.                                            02:15:24

2                    (Recess at 2:15; resumed at  2:26.)

3                    THE COURT:  Thank you, all.   Please be seated.

4                    All right.   Mr. Koehler, you can resume.

5                    MR. KOEHLER:  Thank you.   I just want to confirm if I   02:27:01

6   moved to admit 77 already.

7                    THE COURT:  It's admitted.

8                    MR. KOEHLER:  Very good.

9   BY MR. KOEHLER:

10  Q.   So Mr. Neville, I want to draw your attention --              02:27:09

11                   COURTROOM DEPUTY:  Are you on the document camera or

12  your computer?

13                   MR. KOEHLER:  Document camera still.   Thank you.

14                   THE COURT:  So I know for planning purposes,

15  Mr. Koehler, about how much longer with this witness on direct?    02:27:24

16                   MR. KOEHLER:  15 minutes.

17                   THE COURT:  Thank you.

18  BY MR. KOEHLER:

19  Q.   So directing your attention to May 4, 2015, at 8:10 a.m.

20  did Mr. Wahid text Mr. Kareem?                                     02:27:36

21  A.   Yes.

22  Q.   What did he have to say there?

23  A.   "Abdul Malik extremely important that you call me, brother

24  based on what I read this morning I believe Ibrahim is dead."

25  Q.   Did he have more conversations with Mr. Kareem that           02:27:50

United States District Court

GREGORY NEVILLE - Direct

1    morning?                                                                02:27:52

2    A.   Yes.

3    Q.   So the times on this are in seconds instead of minutes; is

4    that right?

5    A.   Yes.                                                               02:28:04

6    Q.   Did he text Mr. Kareem again later that same morning, just

7    a couple hours later?

8    A.   Yes.

9    Q.   And what did he say there?

10   A.   "Abdul Malik if you type the name Elton Simpson on the            02:28:15

11   internet Ibraheem picture pops up with them talking about the

12   attack in Texas and his father now knows what that Ibraheem is

13   dead because he made a comment to ABC news."

14   Q.   And then did they have three somewhat lengthier phone

15   calls in between that time and their next text message?             02:28:36

16   A.   Yes.

17   Q.   All right.  And then at 3:05 p.m., did Wahid text Kareem?

18   A.   Yes.

19   Q.   And what does it say?

20   A.   "Would just send me he dang number already."                   02:28:51

21   Q.   And then did they have another call not long after that

22   text?

23   A.   Yes.

24   Q.   And is that 55 seconds so just under minute?

25   A.   Yes.                                                           02:29:04

United States District Court

GREGORY NEVILLE - Direct

| | | |
|---|---|---|
| 1 | Q.   And then did Kareem text him back at 3:30 p.m.? | 02:29:04 |
| 2 | A.   Yes. | |
| 3 | Q.   And what did he text him back? | |
| 4 | A.   "Ali" and then the number 602-446-9730. | |
| 5 | Q.   And do you know if that was the number that Ali Soofi was | 02:29:16 |
| 6 | using at that point in time? | |
| 7 | A.   Yes. | |
| 8 | Q.   And how did Mr. Wahid respond to that? | |
| 9 | A.   "Right on" with a smiley face emoji. | |
| 10 | Q.   And then on May 4 at 7:02 p.m. did they have another call | 02:29:30 |
| 11 | that lasted approximately nine minutes? | |
| 12 | A.   Yes. | |
| 13 | Q.   And then on May 6 of 2015 at 12:02 p.m., did he send a | |
| 14 | text to Kareem? | |
| 15 | A.   Yes. | 02:29:52 |
| 16 | Q.   And what does that text say? | |
| 17 | A.   "Dunstons contact number is 602 920 3040." | |
| 18 | Q.   Did Elton Simpson have a brother by the name of Dunston? | |
| 19 | A.   Yes. | |
| 20 | Q.   And does that phone number correspond to that brother | 02:30:05 |
| 21 | Dunston's number? | |
| 22 | A.   Yes. | |
| 23 | Q.   That's it for 77. | |
| 24 |      Now I'm going to direct your attention to Exhibit 78. | |
| 25 | Can you tell the Court what this is? | 02:30:25 |

United States District Court

GREGORY NEVILLE - Direct

1    A.    This is communication between Abdul Wahid and Saabir Nurse    02:30:28

2    from May 3, 2015, through May 6, 2015, extracted by CBP from

3    the cell phone of a Saabir Nurse on September 26, 2015.

4    Q.    So did this come from the UFED report from Russell Carman?

5    A.    Yes, it did.    02:30:45

6    Q.    Thank you.  I apologize for that confusion earlier.

7          All right.  And so Mr. Nurse and Mr. Wahid, did you

8    isolate communication that the two of them had when you were

9    going through the UFED report in Mr. Nurse's phone?

10   A.    Yes, I did.    02:31:01

11   Q.    And on Monday, May 4 at 7:21 a.m., did Mr. Wahid text

12   Mr. Nurse?

13   A.    Yes, he did.

14   Q.    And what did he say?

15   A.    "Salam alaikum I need to see u Wed if that's all right    02:31:13

16   with you."

17   Q.    Okay.  And did Nurse respond to that?

18   A.    Yes.

19   Q.    What did he say?

20   A.    "Walaikum salaam if I have the time inshallah I'll you    02:31:21

21   know."

22   Q.    And how did Wahid respond to that?

23   A.    "Don't.  Funky its really important."  Followed by, "Don't

24   be funky it's really important."

25   Q.    And then next?    02:31:37

United States District Court

GREGORY NEVILLE - Direct

1   A.   "So I hope to see you inshallah."                                    02:31:38

2   Q.   All right.  And then two messages down from that did he

3   say something about Ibrahim?

4   A.   Yes.

5   Q.   And can you read that?  Obviously, he corrected aloha to   02:31:51

6   Allah so just read it as he intended.

7   A.   (Reading) Salam alaikum.  From Allah we are and to Allah

8   we must return.  Ibrahim is dead.  He was shot and killed

9   Saturday at the Prophet Muhammad Cartoon contest in Texas.

10  Q.   Now, let's skip forward to Wednesday, May 6.  Did Saabir   02:32:16

11  Nurse have what appeared to be attempted phone calls to Abdul

12  Khabir Wahid?

13  A.   Yes.

14  Q.   And were those at 2:26 and 2:27 a.m.?

15  A.   Yes.                                                        02:32:32

16  Q.   And what was the duration?

17  A.   Two seconds and one second.

18  Q.   And did you assess that to be an incomplete phone call?

19  A.   Yes.

20  Q.   All right.  And then what happened next?                   02:32:41

21  A.   Saabir Nurse sent a text message to Abdul Wahid saying, "I

22  don't have time today I'm busy, but I'm outside your door now."

23  Q.   And then did he try to call him again at 2:28 a.m.?

24  A.   Yes.

25  Q.   And then did they have another conversation at 6:52 p.m.   02:32:54

United States District Court

GREGORY NEVILLE - Direct

1   that evening that was a minute and two seconds?                02:32:58

2   A.   Yes.

3   Q.   And another one at 8:30 p.m. that was a minute and 54

4   seconds?

5   A.   Yes.                                                      02:33:05

6   Q.   And then two more phone calls, two missed, and then two

7   more phone calls at 8:50 and 8:59 p.m. between the two of them?

8   A.   Yes.

9   Q.   And that was all Wednesday, May 6 of 2015?

10  A.   Yes.                                                      02:33:19

11          MR. KOEHLER:  And I can't remember if I did.  Did I

12  move to admit 78?

13          COURTROOM DEPUTY:  No.

14          THE COURT:  It's not admitted.

15          MR. KOEHLER:  The Government moves to admit 78.        02:33:36

16          THE COURT:  Any objection, Mr. Wahid?

17          MR. WAHID:  No.

18          THE COURT:  78 is admitted.

19          (Exhibit Number 78 was admitted into evidence.)

20  BY MR. KOEHLER:                                                02:33:44

21  Q.   All right.  The last one is 79.  Do you recognize this?

22  A.   Yes, I do.

23  Q.   And from what is this derived?

24  A.   This is from the Huawei phone belonging to Abdul Wahid.

25  Q.   And was a search warrant executed on that phone?         02:33:58

United States District Court

GREGORY NEVILLE - Direct

1    A.   Yes.                                                              02:34:00

2    Q.   And did this come from the UFED report that was derived

3    from that search warrant's execution?

4    A.   Yes.

5    Q.   Is the data here true and correct copy of data that came        02:34:06

6    that's relevant to his communications with Abdul Khabir Wahid,

7    Dunston Simpson, Saabir Nurse, and Abdul Malik Abdul Kareem

8    from May 6, 2015, through June 10, 2015?

9    A.   Yes, it is.

10             MR. KOEHLER:  All right.  Move to admit Exhibit 79.         02:34:23

11             THE COURT:  Any objection, Mr. Wahid?

12             MR. WAHID:  No.

13             THE COURT:  All right.  79 is admitted.

14             (Exhibit Number 79 was admitted into evidence.)

15   BY MR. KOEHLER:                                                       02:34:38

16   Q.   And in this did you see a fairly significant series of

17   phone calls back and forth between Abdul Malik, Abdul Kareem

18   and Abdul Khabir Wahid?

19   A.   Yes.

20   Q.   And did it also correspond to some of his communications        02:34:50

21   with other individuals we've named?

22   A.   Yes.

23   Q.   And then is there a phone call to a number or a text to a

24   number corresponding to Dunston Simpson, Elton Simpson's

25   brother?                                                              02:35:05

United States District Court

GREGORY NEVILLE - Direct

1   A.   Yes.                                                            02:35:05

2   Q.   And what nickname does he have in his call log for that

3   person?

4   A.   Brother Ibrahim's.

5   Q.   And did Elton Simpson have a nickname?                         02:35:13

6   A.   He was Ibrahim.

7   Q.   And can you read what he texted to Elton Simpson's brother

8   Dunston?

9   A.   "Hey Dunston it's Abdul Khabir.  Hey if it's all right

10  with u, I wanted ur mom and dads number just to check on them.      02:35:24

11  I used to have their number years ago when they use to live in

12  Avondale.  Anyhow if u could I would appreciate it if you could

13  give me their number.  I dreamt about Ibraheem.  It was a good

14  dream."

15  Q.   And did Dunston Simpson respond to that?                       02:35:39

16  A.   Yes.  He responded, "Glad to hear you had a positive dream

17  please share with them."

18  Q.   All right.  And next.

19  A.   "I will, Sababir had a dream as well.  In Saabir's dream

20  Ibraheem came to his house.  Saabir let him in, in the dream         02:35:56

21  Saabir knew Ibraheem was dead already Saabir asked Ibraheem

22  what's your situation now and Ibraheem told Saabir that Allah

23  had put him in the highest heaven and that it was sweet, now

24  that's what he dream of all dreams.  I know u may or may not

25  understand and why ur brother did what he did, but I do ur          02:36:14

United States District Court

```
 1   brother was STRONG in the religion and very sincere and          02:36:17
 2   passionate about his sincerity and dedication to Allah enough
 3   where some of us could take a lesson from him he believed and
 4   feared not because he knew God was on his side and thats what
 5   makes me believe he was successful and he got what we all are    02:36:30
 6   struggling for which is heaven."
 7   Q.   And what was the date and time of that message?
 8   A.   It's May 20, 2015.
 9   Q.   And 4:14 p.m.?
10   A.   Yes.                                                        02:36:45
11             MR. KOEHLER:  If I can have a moment, Your Honor.
12             I have no further questions for the witness, Your
13   Honor.
14             THE COURT:  All right, sir.  Thank you, Mr. Koehler.
15             Mr. Wahid, do you have any questions for this         02:37:44
16   witness?
17             MR. WAHID:  No.
18             THE COURT:  All right.  Thank you.
19             Then, Mr. Neville, you may step down and you are
20   excused.                                                         02:37:52
21             (Witness excused.)
22             MR. KOEHLER:  The United States calls Amy Vaughan.
23             THE COURT:  Ms. Vaughan, if you would step up to the
24   courtroom deputy, she'll swear you in.
25             COURTROOM DEPUTY:  Can you state your full name and    02:38:25
```

United States District Court

1    spell your last name for the record?                     02:38:25

2              THE WITNESS:  Amy Vaughan.  V-A-U-G-H-A-N.

3              (AMY VAUGHAN, a witness herein, was duly sworn or

4    affirmed.)

5                        **DIRECT EXAMINATION**                02:38:37

6    BY MR. KOEHLER:

7    Q.   Ms. Vaughan, could you please introduce yourself to the

8    Court?

9    A.   Yes.  Hello.  I'm Amy Vaughan.  I'm an intelligence

10   analyst for the Counter-Terrorism Division of the FBI.      02:39:15

11   Q.   Are you presently stationed in Washington DC?

12   A.   Yes.

13   Q.   How long have you been with the FBI?

14   A.   Just about nine years now.

15   Q.   And that whole time have you served as an intelligence   02:39:27

16   analyst?

17   A.   Yes.

18   Q.   What has been your principal area of focus during your

19   career as an intelligence analyst?

20   A.   I have primarily worked counter-terrorism cases dealing   02:39:38

21   with al-Qaeda and ISIS.

22   Q.   And has your focus been on Islamic extremism and terrorism

23   as it relates to that?

24   A.   Absolutely, yes.

25   Q.   During 2015, were you stationed in Phoenix, Arizona?     02:39:52

280

AMY VAUGHAN - Direct

1  A.   Yes.                                                                02:39:55

2  Q.   Did you participate in the investigation into the

3  aftermath of the terrorist attack or the attack that Elton

4  Simpson and Nadir Soofi committed in Garland, Texas?

5  A.   Yes.                                                                02:40:08

6  Q.   As part of that, did you analyze computer devices?

7  A.   Yes, I did.

8  Q.   And can you tell the Court what your role is a in terms of

9  analyzing electronic evidence with counter-terrorism in mind?

10 A.   As an intelligence analyst that specializes in Islamic      02:40:25

11 extremism, my job was to find any evidence within the digital

12 media that would indicate a nexus to terrorism.  For example,

13 terrorist propaganda.

14 Q.   And would you access the devices themselves or would you

15 access the media in some other form?                                     02:40:48

16 A.   No.  Another team within the FBI would process what's

17 called an image of the device and then I would use special

18 software to interact with the image in order to prevent any

19 alteration or like malware type incidents.

20 Q.   Okay.  And would you flag items for members of the CART     02:41:10

21 team to export on your behalf?

22 A.   Yes.

23 Q.   In this case did you work directly with Agent Robert

24 Meshinsky to have data exported from electronic devices that

25 were seized in connection with this case?                                02:41:25

United States District Court

AMY VAUGHAN - Direct

1   A.   Yes, I did.                                                    02:41:28

2   Q.   And specifically, was one of those devices that you worked

3   with him on the image of a Samsung Galaxy S5 cell phone that

4   was seized in Garland, Texas?

5   A.   Yes.                                                           02:41:40

6   Q.   I'm doing to direct your attention to Exhibit Number 20

7   which is in evidence and on your screen.  Do you recognize

8   that?

9   A.   Yes.

10  Q.   I'm going to zoom in on a portion of that page.  Do you       02:41:52

11  recognize that portion of the page?

12  A.   Yes, I do.

13  Q.   And can you tell the Court what that is?

14  A.   This is an item from the Internet history on that device

15  and what it indicates is that the user visited a page which is    02:42:03

16  justpaste.it slash ISIHD_leak.  And, actually, the item

17  directly below that indicates that that they first clicked on a

18  link on Twitter which took them to justpaste.it.  The title of

19  the just paste it is on the left and -- would you like me to

20  talk about the content of that particular page?                   02:42:29

21  Q.   We're going to get there in a moment.  So first off, can

22  you tell the Court in general terms what is just paste it?

23  A.   Justpaste.it is a website that provides a service.  It's

24  very, very simple.  It essentially allows people to copy and

25  paste text and then have that text be hosted for other people     02:42:47

AMY VAUGHAN - Direct

1  to look at.  So they can share, you know, reports or stories or        02:42:51

2  links to whatever they desire.

3  Q.   So seeing these two links in here, is it fair to say that

4  somebody using this phone went to justpaste.it and accessed the

5  document ISHD_leak?                                                    02:43:10

6  A.   Yes.

7  Q.   All right.  And did you go to justpaste.it to see what

8  that document was?

9  A.   So at the time that I reviewed this, that particular link

10  had been removed but there is what's called a mirror of that          02:43:25

11  content which is actually listed in the title of the item.  The

12  belinszky.eu.  So I visited the mirror and retrieved the PDF

13  that would have been on the justpaste.it page.

14  Q.   I'm going to direct your attention to Exhibit Number 21.

15  Do you recognize this?                                                02:43:55

16  A.   Yes.  That is the PDF.

17  Q.   And is that a true and correct copy of the relevant pages

18  of the PDF that you found on the justpaste.it side that had the

19  title ISHD_leak?

20  A.   Yes.                                                             02:44:07

21  Q.   All right.  I'm going to -- let's back up one second.

22  That's a true and correct copy.

23        MR. KOEHLER:  The Government moves to admit

24  Exhibit 21.

25        THE COURT:  Mr. Wahid, any objection?                          02:44:18

United States District Court

AMY VAUGHAN - Direct

1        All right.  I need to be clear.  The last question    02:44:20
2  you asked the witness:  Is this a true and correct copy of the
3  relate paged of the PDF you found on the justpaste.it site?
4            MR. KOEHLER:  The mirror site.
5            THE COURT:  The mirror hosted in Europe?            02:44:32
6            MR. KOEHLER:  Correct.
7            THE COURT:  All right.  With that, the exhibit is
8  admitted and that's 21.
9  BY MR. KOEHLER:
10 Q.   And just to be clear, that mirror corresponded to the same   02:44:40
11 link that you found in the Samsung Galaxy S5?
12 A.   Yes.  In fact, the justpaste.it was made at the same time
13 as all of the mirrors and they all had exactly the same
14 content.
15            (Exhibit Number 21 was admitted into evidence.)    02:44:53
16 BY MR. KOEHLER:
17 Q.   All right.  And is this one of the pages of that document?
18 A.   Yes.
19 Q.   In general terms, can you tell the Court what the document
20 as a whole was?                                               02:45:12
21 A.   Yes.  It was a compilation of names and addresses and
22 assignments of military personnel that was stolen or otherwise
23 acquired by members of what was called the IS Hacking Division
24 which they distributed to encourage people to attack or harm
25 the people on the list.                                       02:45:39

United States District Court

AMY VAUGHAN - Direct

1   Q.   Was the IS Hacking Division the Islamic State Hacking                    02:45:41

2   Division?

3   A.   Yes.

4   Q.   And was the head of that Junaid Hussain?

5   A.   Yes.                                                                     02:45:48

6   Q.   And is this image on the screen, Major Gena Fedoruk, was

7   that image obscured on the original version online?

8   A.   I believe it may have been, yes.

9   Q.   And Major Gena, G-E-N-A, last name F-E-D-O-R-U-K, was

10  person one of a number of U.S. service members whose address           02:46:08

11  was released as part of the ISHD_leak release?

12  A.   Yes.

13  Q.   Did you also go through an image of a desktop computer

14  that was found in the Simpson and Soofi residence?

15  A.   Yes, I did.                                                             02:46:41

16  Q.   And did you assess the content of that computer and ask

17  Special Agent Meshinsky to export certain items from that

18  computer yes?

19  A.   Yes.

20  Q.   Was one of those items page 13 of *Dabiq*, issue two?          02:46:53

21  A.   Yes.

22  Q.   Another one *Dabiq*, issue five?

23  A.   Yes.

24  Q.   Was another one a screen cap from an official ISIS video

25  of fighters loading artillery?                                              02:47:05

United States District Court

AMY VAUGHAN - Direct

1    A.   Yes.                                                          02:47:08

2    Q.   And have you looked at all of these exhibits before coming

3    to court today?

4    A.   Yes.

5    Q.   So rather than place them on the monitor before you, I'm    02:47:12

6    just going to talk generally about them while you're on the

7    stand if that's okay.

8    A.   Sure.

9    Q.   Another one of a public beheading from Wahliah Halab?

10   A.   Yes.                                                          02:47:24

11   Q.   And an advertisement of an obligation of appointing a

12   Khilafah and the forbiddance of delaying such?

13   A.   Yes.

14   Q.   And a screen cap from an official ISIS Lybia video showing

15   prisoners marched along a beach?                                   02:47:38

16   A.   Yes.

17   Q.   And another one, a video from Wahliah Halab showing the

18   aftermath of a public beheading?

19   A.   Yes.

20   Q.   And then pictures of ISIS fighters with a truckload of       02:47:46

21   prisoners?

22   A.   Yes.

23   Q.   And Twitter searches for both IS as well as ISIS?

24   A.   Yes.

25   Q.   In going through that computer, what would you say the       02:47:56

United States District Court

AMY VAUGHAN - Direct

1    quantity of this kind of information was?                                    02:48:03

2    A.   It was extensive and given that what I found was most

3    likely from a very short period of time, like under a week, it

4    was voluminous.  Someone had to have been sitting there pretty

5    much continuously paging through page after page of            02:48:18

6    ISIS-related content.

7    Q.   The list of things the I just read off to you, could you

8    give the Court an approximate percentage that that represents

9    of what you actually found on the computer?

10   A.   Oh, it's almost certainly less than 10 percent, maybe two    02:48:36

11   or three percent of the total.

12   Q.   Did you find anything on the computer that indicated that

13   the people who were using the computer had any real significant

14   interest in anything outside of this?

15   A.   It's difficult to say.  I've only recorded the pertinent     02:49:00

16   items.  We don't typically spend much time on what we deem not

17   relevant to the case so I don't have a strong recollection of

18   what other kinds of activity were going on in the computer.

19   Q.   That makes sense.

20        All right.  I'm going to move on from there but was          02:49:20

21   it fair to say that the people who were using the computer

22   appeared to be fairly focused on the Islamic State in

23   particular?

24   A.   Yes.

25   Q.   All right.  Now, did you also, when you were looking         02:49:34

United States District Court

AMY VAUGHAN - Direct

1   through the computer, look for items that related to Anwar                     02:49:37

2   al-Awlaki?

3   A.   Yes.

4   Q.   And why would you look for things that are related to

5   Anwar al-Awlaki?                                                                02:49:48

6   A.   Anwar al-Awlaki is one of the most prolific and important

7   radicalizers of the modern era.  He's a figure who is reveeered

8   by jihadists, by ISIS, and al-Qaeda alike.  And he -- his

9   sermons and writings are very frequently, if not usually,

10  encountered among the effects of individuals who become                        02:50:15

11  radicalized.

12  Q.   And the certain speeches of his, are they reflective of

13  the mind set of groups like al-Qaeda and ISIS?

14  A.   Absolutely.

15  Q.   Did you find one of his lectures on there that is known as                 02:50:31

16  "The Dust Will Never Settle Down"?

17  A.   Yes.

18  Q.   And did you listen to the entirety of that lecture as it

19  appeared on the desktop computer?

20  A.   It's quite long so I listened to some excerpts.                           02:50:49

21  Q.   Okay.  And I'm going to play for you exhibits.  Have you

22  reviewed Exhibits 154 through 158 before coming to court today?

23  A.   Yes.

24  Q.   And are those all clipped excerpts from "The Dust Will

25  Never Settle Down"?                                                            02:51:05

United States District Court

288

AMY VAUGHAN - Direct

1   A.   Yes, they are.                                                          02:51:06

2          MR. KOEHLER:  I'm going to move to admit those but

3   not place those at this time.

4          THE COURT:  You're moving to admit 154 through 158 en

5   masse?                                                                       02:51:21

6          MR. KOEHLER:  That's correct.

7          THE COURT:  Any objection?

8          MR. WAHID:  No.

9          THE COURT:  They are admitted.

10         (Exhibit Numbers 154 through 158 were admitted into        02:51:27

11  evidence.)

12         MR. KOEHLER:  Can I have a moment, Your Honor?

13         MR. MCBEE:  I apologize, Your Honor.  May we pause

14  for just a moment?  Client is in some discomfort.  I just want

15  to talk to him for a second.                                                 02:52:15

16         (Defendant confers with counsel.)

17         MR. MCBEE:  Judge, Mr. Wahid would like to address

18  the Court about how he's feeling at the moment in terms of

19  being able to proceed.

20         MR. WAHID:  My head is pounding.  It has been                02:52:39

21  pounding for like over an hour.  It seems like it's getting

22  worse.

23         THE COURT:  All right, Mr. Wahid.  So a headache of

24  some type?

25         MR. WAHID:  Yes.                                                       02:52:52

United States District Court

289

AMY VAUGHAN - Direct

1          THE COURT:  All right.  Let's -- let me see where we    02:52:52
2    are in the process.
3          Mr. Koehler, how much more do you have with
4    Ms. Vaughan?
5          MR. KOEHLER:  I have two exhibits.  It should take    02:53:01
6    about two or three minutes.
7          THE COURT:  Are you going to ask questions about the
8    exhibits afterwards or are you just laying the foundation?
9          MR. KOEHLER:  Laying the foundation for admission.
10         THE COURT:  All right.  I'm going to go ahead and do    02:53:13
11   that and then take a break.  I'll give you some substantial
12   amount of time to see if you -- some aspirin or otherwise will
13   make you feel better and if not, I'll take that up if I have
14   to.
15         Let's go ahead and do that.    02:53:25
16   BY MR. KOEHLER:
17   Q.   So Ms. Vaughan, in front of you on the monitor is Exhibit
18   Number 82.  Do you recognize that?
19   A.   Yes, I do.
20   Q.   And --    02:53:33
21         MR. KOEHLER:  It just disappeared.
22         COURTROOM DEPUTY:  We can't control it.  It's a
23   short.  They are working on it.
24         MR. KOEHLER:  It's back.
25   \\\

United States District Court

AMY VAUGHAN - Direct

```
 1  BY MR. KOEHLER:                                              02:53:47
 2  Q.   Can you tell us where this photo came from?
 3  A.   Yes.  This was a photo taken by Abdul Malik Abdul Kareem's
 4  MaxWest phone.
 5  Q.   Was it stored on his phone?                            02:54:00
 6  A.   Yes.
 7  Q.   And did you recover that during your review of the search
 8  warrant execution on Mr. Abdul Malik Abdul Kareem?
 9  A.   Yes, I did.
10  Q.   Is that a true and correct copy of the photo that came off 02:54:13
11  the phone?
12  A.   Yes.
13          MR. KOEHLER:  Move to admit 82.
14          THE COURT:  Is there any objection?
15          MR. WAHID:  No.  No.                                02:54:20
16          THE COURT:  82 is admitted.
17          (Exhibit Number 82 was admitted into evidence.)
18  BY MR. KOEHLER:
19  Q.   Now, Exhibit Number 83.  Was this also a photograph
20  present on the MaxWest phone?                               02:54:33
21  A.   Yes, it was.
22  Q.   And is it a true and correct copy of the photo that you
23  had pulled off of that phone?
24  A.   Yes.
25          MR. KOEHLER:  Move to admit 83.                     02:54:43
```

United States District Court

|  |  |
|---|---|
| 1 | THE COURT:  All right. | 02:54:45 |
| 2 | Mr. Wahid, any objection? |
| 3 | MR. WAHID:  No. |
| 4 | THE COURT:  All right.  83 is admitted. |
| 5 | (Exhibit Number 83 was admitted into evidence.) | 02:54:48 |

1        THE COURT:  All right.

2        Mr. Wahid, any objection?

3        MR. WAHID:  No.

4        THE COURT:  All right.  83 is admitted.

5        (Exhibit Number 83 was admitted into evidence.)

6        MR. KOEHLER:  I have nothing further for this

7   witness, Your Honor.

8        THE COURT:  All right.  Mr. Wahid, are you going to

9   have questions for this witness when we resume?

10        MR. WAHID:  No.

11        THE COURT:  All right.  If that is the case, then I

12   can excuse the witness now.

13        Ms. Vaughan, you may step down and you are excused.

14   Thanks you.

15        (Witness excused.)

16        THE COURT:  We're going to go ahead and take a

17   half-hour break and see if that improves Mr. Wahid's

18   circumstances.

19        Mr. Koehler, Ms. Brook, if you can tell me, as I read

20   it, the Government only has three witnesses noticed.  I don't

21   know whether you're calling all of them.  Two of them are

22   special agents and one of them an expert witness.  What is your

23   current plan?

24        MR. KOEHLER:  We're going to call Matthew Levitt next

25   and then Stewart Whitson.  I believe the third witness is

1        THE COURT:  All right.                                    02:54:45

2        Mr. Wahid, any objection?

3        MR. WAHID:  No.

4        THE COURT:  All right.  83 is admitted.

5        (Exhibit Number 83 was admitted into evidence.)          02:54:48

6        MR. KOEHLER:  I have nothing further for this

7   witness, Your Honor.

8        THE COURT:  All right.  Mr. Wahid, are you going to

9   have questions for this witness when we resume?

10        MR. WAHID:  No.                                          02:54:59

11        THE COURT:  All right.  If that is the case, then I

12   can excuse the witness now.

13        Ms. Vaughan, you may step down and you are excused.

14   Thanks you.

15        (Witness excused.)                                       02:55:05

16        THE COURT:  We're going to go ahead and take a

17   half-hour break and see if that improves Mr. Wahid's

18   circumstances.

19        Mr. Koehler, Ms. Brook, if you can tell me, as I read

20   it, the Government only has three witnesses noticed.  I don't   02:55:22

21   know whether you're calling all of them.  Two of them are

22   special agents and one of them an expert witness.  What is your

23   current plan?

24        MR. KOEHLER:  We're going to call Matthew Levitt next

25   and then Stewart Whitson.  I believe the third witness is      02:55:33

```
 1   Ms. Stephenson but we are not going to call her to the stand.        02:55:38
 2           THE COURT:  All right.  Let's go ahead and take a
 3   break until 3:30.  We'll come back then.  We'll see if that has
 4   improved things.  So our afternoon break will be a little
 5   longer than usual and I'll see you all then.  We'll figure out   02:55:51
 6   what we're doing from then.  Thank you.
 7           MR. WAHID:  Thank you, Your Honor.
 8           (Recess at 2:56; resumed at 3:30.)
 9           THE COURT:  All right.  Thank you.  Please be seated.
10           Mr. Wahid, how are you feeling?  Do you think you'll    03:30:23
11   be able to concentrate sufficiently?
12           MR. WAHID:  I'm going to try.  I'm just going to hang
13   in there and get it over with, try.
14           THE COURT:  All right.  If you find yourself unable
15   to do so, let me know because if you're representing yourself,  03:30:34
16   I don't want anything to interfere with the effective
17   representation.  We're on schedule so we would just break for
18   the day; all right?
19           Ms. Brook or Mr. Koehler, would you like to call your
20   next witness?  We'll see what we can get done.                  03:30:56
21           MS. BROOK:  Thank you, Your Honor.  Your Honor, the
22   Government calls Dr. Matthew Levitt.
23           Your Honor, it's also possible, depending on how the
24   defendant is feeling, if we just want to make sure that he's
25   capable of following along and isn't affected in any way by not 03:31:53
```

United States District Court

feeling good. We could do his training and experience and start tomorrow morning with more substantive material just as an option. 03:31:57

THE COURT: All right. How long will that preliminary section take? 03:32:08

MS. BROOK: Probably about 25 minutes.

THE COURT: So that puts us close to 4 o'clock. I'll check in with both sides at that point and see how everybody is doing.

Mr. Levitt, if you would step forward to the courtroom deputy, she'll swear you in. 03:32:19

COURTROOM DEPUTY: If you could please state your name and spell your last name for the record.

THE WITNESS: Matthew Levitt. L-E-V-I-T-T.

(MATTHEW LEVITT, a witness herein, was duly sworn or affirmed.) 03:32:45

MS. BROOK: Your Honor, as there's no jury here, would the Court mind if I called him "doctor" or would you prefer "mister"?

THE COURT: Given that there isn't a jury and I don't have the same concerns about the appearance of people being put on different levels if you know him as Dr. Levitt, that's fine. 03:32:58

MS. BROOK: Thank you.

**DIRECT EXAMINATION**

\\\

MATTHEW LEVITT - Direct

1    BY MS. BROOK:                                                          03:33:12

2    Q.    Good afternoon.

3    A.    Good afternoon.

4    Q.    Would you please introduce yourself to the Court?

5    A.    I am Matthew Levitt.  I direct a counter-terrorism program      03:33:15

6    at the Washington Institute for Near East Policy and am an

7    adjunct professor at Georgetown University's School of Foreign

8    Service.

9    Q.    For how long have you been the director of the

10   Counter-terrorism Institute?                                          03:33:29

11   A.    I've directed the counter-terrorism program at the

12   Washington Institute since we founded it in late 2001.  I have

13   been in and out of the Washington Institute since 1997.  I've

14   gone into Government a few times and each time I've come back

15   out of Government, I've gone back and returned to the             03:33:46

16   Washington Institute.

17   Q.    Let's touch briefly on your educational background.  Did

18   you get your Ph.D.?

19   A.    I did.

20   Q.    And where?                                                       03:33:53

21   A.    The Fletcher School of Law and Diplomacy at Tufts

22   University.

23   Q.    And what was the focus of your doctoral there?

24   A.    The impact of terrorist attacks on an ongoing negotiation

25   process.  In particular, I looked at Jewish terrorism and         03:34:09

United States District Court

MATTHEW LEVITT - Direct

1   Islamic terrorism impacting the Oslo peace process.                    03:34:12

2   Q.   Did you also get your master's degree?

3   A.   I did.

4   Q.   And from where?

5   A.   The same.  Fletcher School at Tufts.                              03:34:21

6   Q.   What was your focus for your master's?

7   A.   The Fletcher School, you have to have three areas of

8   concentration and mine were the Middle East, conflict

9   resolution, and international security studies.

10  Q.   So in your field of expertise, have you also at times           03:34:35

11  worked for the Government?

12  A.   I have.

13  Q.   And describe for us what you did when you worked for the

14  Government.

15  A.   Well, the first time I worked for the Government was -- I       03:34:46

16  served as a counter-terrorism analyst for the FBI at

17  headquarters from 1998 through late 2001 including 9/11.  I

18  then returned to the Washington Institute, founded the

19  counter-terrorism program, taught at John's Hopkins University

20  School of Advanced International Studies and was then recruited    03:35:13

21  to serve as the Deputy Assistant Secretary for Intelligence and

22  Analysis at the U.S. Department of the Treasury.  That would --

23  sorry.

24  Q.   Generally speaking, what were the areas of focus during

25  your work there?  So as the Deputy Assistant Secretary of          03:35:33

MATTHEW LEVITT - Direct

1   Treasury for Intelligence and Analysis?                          03:35:38

2   A.   Well, at Treasury our focus was, in particular, on

3   financing and logistical support networks for terrorism and for

4   proliferation.  We focused primarily on terrorism issues and

5   proliferation issues, Iran, Syria, and North Korea, that type   03:35:56

6   of stuff.  And at the FBI, it was more generally on Middle

7   Eastern terrorist groups and their activities either in the

8   United States or targeting U.S. interests abroad.

9   Q.   You mentioned teaching at Johns Hopkins?

10  A.   Correct.                                                    03:36:11

11  Q.   Did you teach other places as well?

12  A.   I've taught at Johns Hopkins University for seven or eight

13  years courses in counter-terrorism and now I teach at

14  Georgetown University.

15  Q.   And the classes that you teach at Georgetown, what are     03:36:23

16  they related to?

17  A.   I teach a course at Georgetown now called Combating the

18  Financing of Transnational Threats.

19  Q.   Have you also lectured at West Point?

20  A.   I have.                                                     03:36:35

21  Q.   And specifically at what center at West Point?

22  A.   The Combating Terrorism Center at West Point.

23  Q.   As part of your job, your field of expertise, do you stay

24  current in literature in the field of terrorism?

25  A.   I do.                                                       03:36:49

United States District Court

MATTHEW LEVITT - Direct

1    Q.   Today for the focus of your testimony we're going to focus        03:36:50

2    on the Islamic State and so as we start off, I want to frame

3    our vocabulary a little bit.   When we talk about the Islamic

4    State, from time to time are they referred to by different

5    names?                                                                  03:37:05

6    A.   Several.   The group that we now refer to as the Islamic

7    State sometimes as ISIS or ISIL, sometimes in Arabic Dawla, had

8    a variety of names over time and, in fact, morphed over time

9    out of what we used to call, among other things, al-Qaeda in

10   Iraq.                                                                   03:37:25

11   Q.   So they have gone by the name al-Qaeda in Iraq?

12   A.   And multiple other names as well.   Their real inception

13   begins with a man named Abu Musab al-Zarqawi who started off as

14   someone who was close to, but parallel to, al-Qaeda.   He never

15   pledged a bayat, B-A-Y-A-T, oath to bin Laden himself but bin          03:37:46

16   Laden allowed him to open up his own training camp in

17   Afghanistan near Herat, H-E-R-A-T.   And later he founded what

18   became known as al-Qaeda in Iraq and eventually formally became

19   part of the al-Qaeda franchise.

20   Q.   So does ISIS, as it exists now, have derivative roots that        03:38:12

21   go back and include historical figures like Zarqawi?

22   A.   Absolutely.

23   Q.   So when we talk about the research, the writing, the

24   publications that you have done on the Islamic State, does that

25   research extend all the way back to 2002, 2003?                        03:38:30

MATTHEW LEVITT - Direct

1   A.   Yes.  In 2002, 2003, 2004, I was writing about Abu Musab          03:38:36
2   al-Zarqawi and I have been following him and the group he
3   founded under its various names, through and including to
4   today, as the Islamic State.
5   Q.   And your publications back in 2002, 2003, on this subject,       03:38:50
6   were they published in the Washington Institute?
7   A.   Some were published by the Washington Institute.  The
8   Washington Institute generally, unless there's a copyright
9   issue, also posts on its website with permission things that
10  are published elsewhere.  But, for example, some of the things     03:39:07
11  I published in that period of time appeared in places like
12  "Jane's Intelligence Review" or the "Terrorism Monitor" from
13  the Jamestown Foundation.  They weren't always published by the
14  Washington Institute itself.
15  Q.   And throughout the years since have you continued to            03:39:21
16  publish on the subject of the Islamic State?
17  A.   Yes.
18  Q.   Specifically, have you published lectures and been
19  involved in publications including "From the Boston Marathon to
20  the Islamic State, Encountering Violent Extremism"?                 03:39:39
21  A.   Correct.
22  Q.   And was that published by you in April of 2015?
23  A.   Yes.
24  Q.   Additionally, "The Rise of ISIL," August of 2016?
25  A.   Yes.                                                           03:39:49

United States District Court

MATTHEW LEVITT - Direct

1  Q.   And "Neither Remaining Nor Expanding, the Decline of the      03:39:50

2  Islamic State," published in July of 2018?

3  A.   Correct.

4  Q.   Those three publications, where were they published?

5  A.   Those were compilations published by the Washington          03:40:01

6  Institute for Near East Policy.  They included several

7  contributions of my own and then I was the editor and so the

8  forward essay was mine as well.

9  Q.   Again, the Washington Institute is a peer-reviewed

10 publication?                                                       03:40:20

11 A.   Well, the Washington Institute is a think tank.  It's a

12 nonpartisan think tank focused on U.S. policy towards the

13 Middle East and it publishes its own material as well as

14 allowing its scholars like myself to publish outside of the

15 institute, whether it's in the "New York Times" or "The          03:40:34

16 Washington Post" or other places.

17        Before the publications that we publish ourselves,

18 including the ones that you noted, we do have a peer-review

19 process.

20 Q.   Do you run a counter-terrorism lecture series?                03:40:48

21 A.   Yes.

22 Q.   And where is that?

23 A.   At the Washington Institute for Near East Policy.

24 Q.   So as part of running that counter-terrorism series, do

25 you bring in lecturers from around the world?                      03:40:58

MATTHEW LEVITT - Direct

1   A.   Correct.                                                    03:41:01

2   Q.   And do those lecturers, as part of that series, discuss

3   and publish on ISIS?

4   A.   Yes.

5   Q.   Are you, in fact, the editor of the volumes that are       03:41:11

6   produced for that lecture series?

7   A.   Yes.

8   Q.   Have you conducted primary field research on the subject

9   of ISIS?

10  A.   I have.                                                     03:41:29

11  Q.   And is that throughout the world?

12  A.   Not everywhere in the world but, yes, in the Middle East,

13  in Europe as far as Australia and New Zealand, here in North

14  America.

15  Q.   While conducting that research, are you exchanging with,   03:41:42

16  interacting with other people who research and study the

17  subject of ISIS?

18  A.   That's right.  So I will interact with other academics or

19  journalists or Government officials who are studying the same

20  phenomenon I am and we will compare notes.  And part of the    03:41:59

21  process of following something like terrorism out of

22  Government, meaning in the Open Source academic realm, is then

23  kind of balancing that idea, those ideas, off of others that

24  you meet and going through that vetting process.

25          And so, yeah, I do this regularly.  Most recently       03:42:15

United States District Court

MATTHEW LEVITT - Direct

1    week before last.                                                   03:42:18

2    Q.   Part of the vetting process related to your own research,

3    you have the opportunity to discuss your ideas, your

4    conclusions with other academics in the field?

5    A.   Absolutely.  And long before they become conclusions.        03:42:30

6    Q.   Additionally, have you had the opportunity to provide

7    congressional testimony on the Islamic State?

8    A.   I have.

9    Q.   And is that before various different United States House

10   and Senate Congressional committees?                               03:42:45

11   A.   That's right.

12   Q.   Specifically, twice before the Senate Foreign Relations

13   Committee, once in 2014 and another time in 2016?

14   A.   Correct.

15   Q.   Twice before the House Financial Services Committee again     03:42:55

16   2014, 2016?

17   A.   Correct.

18   Q.   At the United Nations Counter-Terrorism Executive

19   Committee in New York?

20   A.   That's right.                                                  03:43:05

21   Q.   November of 2017.  And as well have you provided

22   Congressional testimony in Canada before their Senate and

23   House --

24   A.   That's right.

25   Q.   -- on the subject of ISIS?                                     03:43:14

United States District Court

MATTHEW LEVITT - Direct

1   A.   Yes.                                                              03:43:16

2   Q.   Speaking about terrorism organizations at large, have you

3   testified before in federal court in the United States in

4   terrorism cases?

5   A.   Yes, both in the United States and abroad.                       03:43:31

6   Q.   And approximately how many times have you been called as

7   an expert witness to testify in terrorism cases throughout the

8   United States?

9   A.   Probably two dozen.

10  Q.   And that would be related to different variations,               03:43:45

11  different organizations and terrorist organizations?

12  A.   Correct.

13          MS. BROOK:  Your Honor, if the defendant is feeling

14  okay, perhaps we can move on into substantive information.

15          THE COURT:  Let me just ask.                                  03:44:09

16          Mr. Wahid, how are -- how has your ability to

17  concentrate?

18          MR. WAHID:  I can do it.

19          THE COURT:  I'm sorry?

20          MR. WAHID:  I can do it.                                      03:44:18

21          THE COURT:  Then let's go ahead and push forward.

22  BY MS. BROOK:

23  Q.   In this particular case doctor, were you hired and

24  retained by the Government?

25  A.   Yes.                                                             03:44:27

United States District Court

MATTHEW LEVITT - Direct

1   Q.   And as such, do you expect to be compensated as part of                03:44:28

2   your work that you've provided in this particular case?

3   A.   For my time.

4   Q.   And how much do you make an hour?

5   A.   $550 an hour.                                                           03:44:38

6   Q.   Do you know roughly how much you expect to bill in this

7   particular case?

8   A.   Probably 10 to $15,000 depending on how long your

9   questions go.

10  Q.   Fair enough.                                                           03:44:51

11       What were you asked to do in this case?

12  A.   I was asked to review and opine on the history of Islamic

13  State.  In some cases I'm asked to review a tremendous amount

14  of material related to the case and others not.  This case was

15  the latter.  I was asked to review a few tweets and text         03:45:14

16  messages but that's it related specifically to this case.

17  Otherwise, I was asked to explain the history of the Islamic

18  State, to explain some of the Islamic State's propaganda,

19  organs, walk through the timeline of what happened when and

20  explain in particular the relevance of the incidence where       03:45:37

21  people either drawing pictures of the Prophet Muhammad, Peace

22  Be Upon Him, or even going so far to do that in a kind of way

23  that made fun.  But at any rate drawing pictures of the

24  Prophet.

25  Q.   So in a nutshell, let's start at the top, what does ISIS     03:45:58

304

MATTHEW LEVITT - Direct

1  believe in?                                                    03:46:02

2  A.   That's a tough question.   ISIS believes in several things

3  and sometimes they seem contradictory.   But at its core, the

4  Islamic State believes that the entire world should believe and

5  practice its form, its variation of Islam, which is not the     03:46:18

6  same that the vast majority of Muslims around the world believe

7  in.

8           And it believes that anybody that doesn't do that is

9  open game for being killed.   In fact, it's praiseworthy to do

10  so.   The Islamic State does not believe in states or in borders  03:46:37

11  or boundaries.   In fact, Islamic State members don't refer to

12  themselves as the Islamic State in the way that we would think

13  of it.   They say the dawla.   D-A-W-L-A, meaning the state, the

14  state of Islam.

15           And so, therefore, for them, the idea of the state at  03:46:56

16  its height, for example, the size of territory the size of

17  Great Britain across Syria and Iraq wasn't just Syria and Iraq.

18  The parts in the Sinai in Egypt or in Libya or Yemen or

19  whenever they try to take over a town in the southern

20  Philippines, that's all as much as a part of the state.   And   03:47:17

21  the fact that there's not contiguity doesn't matter because the

22  borders don't matter.

23  Q.   So the state of ISIS is wherever the believers happen to

24  be.   It doesn't bow down to or acknowledge the territorial

25  states that we see; it's just where the people who believe are  03:47:32

United States District Court

MATTHEW LEVITT - Direct

1    located?                                                        03:47:35

2    A.    Exactly.  And the ideas of the state is not meant by

3    definition to be limited to any particular border.

4         So the Islamic State would feel distant, antagonistic

5    towards fellow Arabs or Muslims who they believe are          03:47:50

6    insufficiently Islamic but would feel, for example, very close

7    to an American or a French or an Australian Muslim who

8    practiced the way they do because that nationality doesn't mean

9    anything to them.  It's the belief system that matters to them.

10   Q.    So you mentioned that ISIS believes that individuals who  03:48:10

11   are disbelievers should be killed.  What constitutes a

12   disbeliever?

13   A.    Ultimately, anybody who does not believe in their

14   variation of Islam in its extreme.

15        And so if you believe that you can live in a state        03:48:30

16   and be subservient to that state and that state's rules as

17   opposed to only the rule of God, not enough.  If you do not --

18   if you do anything against that state, the Islamic State, that

19   makes you beyond the pale.

20        For people who lived within their territory, if you       03:48:49

21   did things like smoking a cigarette, that could be beyond the

22   pale.  So this is a state that believed in things like sexual

23   slavery, the legitimacy in attempting to carry out, for

24   example, genocide against minorities such as the Yazidi,

25   Y-A-Z-I-D-I, minority in Iraq and that that is perfectly        03:49:07

United States District Court

MATTHEW LEVITT - Direct

1   legitimate.  In fact, it's actually good, that blood needs to         03:49:14

2   be spilt to cleanse the world in pursuit of their idyllic

3   Islamic society, Islamic in the sense that they saw it.  Let's

4   not taint, by any stretch of the imagination, the rest of the

5   world's Muslims with this.  The vast majority of the Muslims        03:49:29

6   around the world found the Islamic State to be extremely

7   distasteful.

8   Q.   So does the Islamic State caliphate believe in a caliph?

9   A.   Yes.

10  Q.   And what is the caliph to them?                                 03:49:40

11  A.   In simple terms, the caliph is the ruler of the caliphate

12  but it is also the head of the Muslim ummah, U-M-M-A-H, or

13  nation, the Muslim nation, on earth.  And so the idea is that

14  when Omar al-Baghdadi declared the caliphate and declared

15  himself caliph in late June 2014, the idea was then people need     03:50:06

16  to rally around this caliph.  There is caliphate now.

17        Remember that the idea of a caliphate is something

18  that all Muslims share, right, not necessarily this caliphate.

19  And so what the Islamic State was trying to do was tell Muslims

20  that the caliphate is here now.  It's not just an idea.  It has     03:50:24

21  been actualized and now that it has been actualized, you have

22  an obligation to get on board.

23  Q.   Let's break that down just a little bit.

24        So you gave a date at which point the caliph was

25  announced or came into acknowledgment or existence according to     03:50:37

United States District Court

MATTHEW LEVITT - Direct

1    ISIS.  What date was that?                                        03:50:41

2    A.    It was June 29, 2014, when he declared himself to be the

3    caliph of this new caliphate.

4    Q.    So by "he" do you mean a Abu Bakr al-Baghdadi?

5    A.    Correct.                                                     03:50:55

6    Q.    And how did he do that?  How was it that he declared

7    himself?

8    A.    He took the podium, pulpit, at a famous mosque in Mosul in

9    northern Iraq and gave a speech, which was highly publicized,

10   making this declaration and calling on all Muslims to now         03:51:07

11   follow and contribute towards this new caliphate.

12   Q.    Did that sermon, that announcement, have an effect on the

13   followers of ISIS?

14   A.    Certainly.  First of all, it brought the group to its

15   latest incarnation and name, right?  Al-Qaeda in Iraq had         03:51:28

16   become over time the Islamic State in Iraq.  Then as it moved

17   over into Syria as well, it broadened out and started calling

18   itself ISIS, or Islamic State in Iraq and al-Sham, S-H-A-M, or

19   in English perhaps ISIL, Islamic State in Iraq and the Levant.

20   And now no longer limiting itself to borders that it doesn't      03:51:56

21   recognize anyway in Iraq, Syria.  It was just the Islamic State

22   with literally transnational ambitions.

23         And followers not only in Syria and Iraq began to

24   follow the call.  And so we saw actually at one point multiple

25   Islamic State entities, for example, in Syria and in Sinai and    03:52:17

United States District Court

MATTHEW LEVITT - Direct

1    in Yemen and in Afghanistan, et cetera, and then many more          03:52:21
2    followers who maybe didn't have the strength or the numbers or
3    the power to actually set up an entity-governing space but were
4    like-minded followers around the world.
5    Q.   So is the belief that there is a caliph that exists now a       03:52:40
6    unique concept to ISIS?
7    A.   It is in the sense that it exists now.  The idea that
8    there certainly was historically and that there should be
9    sometime again an Islamic caliphate and a caliph.  That is not
10   unique to the Islamic State at all, which is part of the reason     03:53:01
11   it resonates so much with so many Muslims around the world.
12   This is not a foreign concept.  This is not an innovation.

13         The innovation is that Baghdadi can simply get up on
14   the podium and announce that he's the caliph and everybody is
15   supposed to follow him.  And the innovation is that then you        03:53:18
16   can engage in the kinds of barbarism, the beheadings and
17   setting people on fire and sexual slavery and all of that kind
18   of stuff that they did, and did in kind of a way that wasn't --
19   they were doing it and didn't feel good about it.  They
20   embraced it.  They promoted it online.  It was part of their       03:53:36
21   radicalization and propaganda.  That entirely is an innovation.
22   Q.   So suffice it to say if you're a follower of al-Qaeda, you
23   don't see Abu Bakr al-Baghdadi as the leader of you or the
24   leader of all Muslims?
25   A.   So of course al-Qaeda is, in and of itself, a very radical     03:53:53

MATTHEW LEVITT - Direct

1   and violent transnational terrorist organization.  But no, even      03:53:57
2   they don't subscribe to the Islamic State and to Baghdadi as
3   the caliph.  There's tremendous tension between them.  And on
4   the ground in Iraq and Syria, they have fought tooth and nail.
5   And yet at the same time, they have had plenty of instances      03:54:15
6   around the world where even as they fight back in the Levant,
7   ISIS and al-Qaeda optives would cooperate in different places
8   in the world in their diaspora.
9        So in some ways the things that they share, the ties
10   that bind are very, very strong, especially in the diaspora      03:54:31
11   when you get into Syria and Iraq where they were competing for
12   space and power, they were oil and water.
13        MS. BROOK:  So, Your Honor, for the purpose of the
14   record, this is an enlarged version of Government's Exhibit
15   Number 53.      03:54:48
16   BY MS. BROOK:
17   Q.  As we look at Exhibit Number 53, you have been talking
18   about Abu Bakr al-Baghdadi.  Do you see him here?
19   A.  Yes.  The top middle.
20   Q.  So this one (Indicating)?      03:55:00
21   A.  Yes.
22   Q.  And, additionally, a few moments ago you were talking
23   about Zarqawi.  Is that this individual?
24   A.  The top left, yes.
25   Q.  We're going to come back to him in just a moment but I      03:55:10

United States District Court

MATTHEW LEVITT - Direct

1   want to dive a little bit deeper into some of the beliefs and          03:55:12
2   the ideology of ISIS, especially back in 2014, 2015.

3           So does ISIS seek to cause attacks in the West
4   including in the United States?

5   A.   Certainly.                                                          03:55:29

6   Q.   And how is it that they -- what sort of form do they want
7   those attacks to take?

8   A.   The Islamic State is looser in its kind of tactical plans
9   than, say, al-Qaeda, which was very hierarchical and wanted
10  things to be tightly controlled and, for example, had pretty           03:55:46
11  strict rules about who could formally join the organization.
12  Whereas for the Islamic State, so long as you say that you are
13  part of the Islamic State and you pledge allegiance, bayat,
14  al-Baghdadi, you're in.  So there's a spectrum of types of
15  attacks on behalf of the Islamic State.                                03:56:09

16          The Islamic State itself can carry out attacks,
17  including sending people abroad to carry out attacks, for
18  example, like the attacks in Paris in late 2015.

19  Q.   Does ISIS encourage home-grown extremists to act here or
20  in other countries in the west?                                        03:56:31

21  A.   Yes.  That's the other part of the spectrum.  You can have
22  attacks that are directed that kind of trained ISIS members are
23  not themselves carrying out but through communication usually
24  in online social media platforms are encouraging or directing
25  people to do all the way to the far end of the spectrum where          03:56:48

United States District Court

MATTHEW LEVITT - Direct

1   it's completely home-grown violent extremists.                    03:56:51

2          Somebody sitting in their momma's basement can access

3   all kinds of material online and because of whatever personal

4   local grievance they are feeling that may not have anything to

5   do with ideology creates an intellectual space within which      03:57:02

6   ideology can fill and can be radicalized and then even

7   mobilized to actually carry out violence without ever

8   necessarily even having been in touch with someone from the

9   Islamic State.

10         Of course, in the middle you can be a lone offender        03:57:19

11  acting on your own but with encouragement or direction from

12  someone online or on a phone, et cetera.

13  Q.    Based on your research, your studies, your familiarity

14  with the field, why is it that ISIS encourages individuals to

15  support them to attack in the West?  What's the purpose of it?    03:57:38

16  A.    Well, the first point is that just tactically they do it

17  because they can.  The rise of the Islamic State coincided with

18  the rise of social media.  And so suddenly there was this

19  ability to be able to reach not just across oceans and borders

20  boundaries but into people's homes and not just into their       03:57:57

21  computers but into their cell phones.

22         So I have children -- for those of you that have

23  children, it can be difficult to know what your kids are on at

24  any point.  But they were able to reach in all the way into

25  someone's private space.  But they also want to carry out        03:58:12

United States District Court

MATTHEW LEVITT - Direct

1    attacks for a variety of reasons.  And on one hand, they want          03:58:15
2    to deter the West from trying to fight them and undermining
3    their ability to build this state.  And then at the same time,
4    even though it seems contradictory, they are also trying to go
5    to goad the international communities into coming into Syria          03:58:30
6    and Iraq, Syria in particular because they really do believe in
7    this end of days millinerial ideology where there will be an
8    end-of-days fight in the Syrian town of Dabiq.  And they really
9    do believe that they need to draw the West in so that they can
10   defeat the West in Dabiq per certain interpretations of             03:58:55
11   prophecy.

12          They also find these types of attacks very useful for
13   building themselves up as a successful and powerful force to be
14   reckoned with.  Many Western recruits, for example, came from
15   broken homes or had criminal backgrounds, especially in Europe.     03:59:16
16   One Belgian counter-terrorism official put it to me as seeing
17   people constantly wanting to go from zero to hero, being part
18   of this very powerful group that was reestablishing the
19   caliphate and gave people the opportunity, as they presented
20   it, to kind of get in on the ground floor and help build up the    03:59:33
21   new caliphate, just like the original followers of the Prophet
22   Muhammad Peace be Upon Him.  This was empowering.

23          This was getting involved in something bigger than
24   one's self.  And these attacks kind of built that perception of
25   the Islamic State being a force to contend with and, therefore,    03:59:52

United States District Court

MATTHEW LEVITT - Direct

1  it was -- aside from everything else, it was a very successful          03:59:55

2  recruitment platform, fundraising platform, and especially then

3  as the international community took the fight to the Islamic

4  State, starting with air strikes in about August 2014, it

5  became increasingly important for the Islamic State to show not         04:00:12

6  only relevance, but that they could still hit us.

7            Like you might be able to defeat us on the

8  battlefield with your better weapons and tanks and planes, but

9  we can still hit you behind he enemy lines in your underbelly

10 where it hurts you, in your cities; and, therefore, we saw             04:00:31

11 attacks from Nice, France, to Berlin to Turkey, to the United

12 States, France, Paris, really all over the world.

13 Q.   So along those lines, what effect, if any, did ISIS want

14 these attacks in the West to have on ordinary civilians who

15 lived in the United States?                                             04:00:50

16           MR. MCBEE:  Judge, I'm sorry.  Before the answer, Mr.

17 Wahid would like to address the Court.

18           MR. WAHID:  I'm sorry.  I've have a weak -- I need go

19 to the bathroom.

20           THE COURT:  Let's go ahead and take a restroom break         04:01:03

21 for anybody that needs it.

22           And anybody else in the courtroom, if you need to

23 stand up and stretch, and that includes in the box or

24 elsewhere, that's fine.

25           Thank you, Mr. McBee.                                        04:01:21

United States District Court

MATTHEW LEVITT - Direct

1           (Recess at 4:01; resume at 4:05.)                    04:01:24

2           THE COURT:  All right.  Everyone is back so you can

3    proceed whenever you're ready.

4           MS. BROOK:  Thank you.

5    BY MS. BROOK:                                               04:05:16

6    Q.   Sir, I think we left off on talking about the effect of

7    civilians in the West of these attacks.  Based upon your

8    research, your qualifications, staying current in the field,

9    what effect, if any, does ISIS believe that these attacks in

10   the West will cause on ordinary civilians here in the West?   04:05:31

11   A.   So terrorism is meant to terrify and it's meant to scare.

12   Understanding that in the West and Western democracies we have

13   a bottom-up system where people vote, leaders need to take into

14   account what people are feeling, that if you can affect a

15   population's commitment to fighting abroad, to sending their    04:05:56

16   sons and daughters to fight, perhaps you can minimize or negate

17   a nation's will to fight.

18          So there is the issue of just deterrence of trying to

19   make it more complicated for countries to want to be able to

20   continue taking the fight to them, in this case primarily in    04:06:17

21   Syria and Iraq.  And there's historical precedent for that.

22   Consider, for example, when al-Qaeda in Iraq, again which is

23   ISIS under one of the earlier names, successfully got the

24   Spanish Government to pull out of the coalition in Iraq by

25   carrying out an attack in Madrid several years ago.             04:06:37

United States District Court

MATTHEW LEVITT - Direct

1   But part of the Islamic State ideology and propaganda    04:06:43
2   is also that, you know, this is an ideological battle.  You
3   need to take the fight to the nonbelievers and it's not enough
4   just to target their soldiers.  Those are people who sign up
5   for dangerous things and expect maybe to die.  If you really    04:07:01
6   want to be able to affect their commitment to their world view,
7   you have to be able to hit their civilians, too.  Show that we
8   and our idea are stronger.
9   Q.   You had mentioned the end of days and an apocalyptic
10  battle in Dabiq.  Does, based on your research, publications,    04:07:19
11  ISIS's agenda play into governmental policy here in the West
12  hoping to have an effect on that end of days apocalypse?
13  A.   As I said earlier, one of their goals is to draw the West
14  into this fight.  They need their enemy to come to *Dabiq* to
15  engage in this battle in this town in Syria for that prophecy,    04:07:46
16  as they understand it, to be realized.  And so they see
17  themselves as literally taking actions that are making the
18  prophecy be realized.  These actions -- these acts of violence
19  are for ISIS.  Again, we're not talking about the vast majority
20  of Muslims; but for ISIS, these are a form of worship of    04:08:11
21  service.
22  Q.   So let's talk about some of the historical origins of the
23  tenets or the beliefs within ISIS.  You had spoken earlier
24  about Zarqawi and the influence that he may have had on ISIS.
25  Describe for us who he is.    04:08:34

United States District Court

MATTHEW LEVITT - Direct

1   A.   Was.   He was killed in Iraq and he was the forefather of        04:08:37

2   what is now called the Islamic State.   Again, he had his own

3   kind of militant group that shared the ideology of al-Qaeda but

4   worked alongside them in Afghanistan.   He ran his own training

5   camp with al-Qaeda's permission but independent of al-Qaeda.       04:08:56

6   But then later founded what became al-Qaeda in Iraq and did

7   pledge a bayat to al-Qaeda leadership.   Al-Qaeda leadership was

8   not happy that his al-Qaeda branch was so much more violent

9   than any other and didn't seem to be bothered whatsoever if

10  they carried out attacks that killed fellow Muslims.              04:09:18

11  Especially they didn't mind in his case if it was Shia Muslims,

12  these are Sunni Muslim groups, in part because they believe

13  this sectarian fight was part of the divine prophecy.

14        Al-Qaeda leaders tried to hold him to task for that

15  and failed and that kind of idea of extreme violence started     04:09:40

16  with him and has been taken to a whole new level now by those

17  who have succeeded him in the Islamic State and they constantly

18  point back to quotes of his as founding doctrine for who they

19  are today.

20  Q.   And I think you said but I may have missed it, is he still   04:10:00

21  alive?

22  A.   No.   He was skilled.

23  Q.   Do you know roughly when he was killed?

24  A.   He was killed in an air strike in Iraq during the

25  coalition war 2006 or '7 maybe.   I don't know.                   04:10:11

MATTHEW LEVITT - Direct

1        MS. BROOK:  Your Honor, I'm going to place on the                    04:10:17

2   overhead what already has been admitted into evidence as

3   Government's Exhibit Number 17.

4   BY MS. BROOK:

5   Q.   Do you recognize what this is?                                       04:10:37

6   A.   Yes.

7   Q.   Describe it.

8   A.   This is the fifth issue of *Dabiq* which I believe was

9   published in November, late November, 2014.  Today *Dabiq* is one

10  of the primary Islamic State glossy magazines in English.  It          04:10:54

11  produced several in multiple languages and it was made

12  available online through social media platforms, a wide range

13  of platforms.  And if you took one down, it would pop up

14  somewhere else.  You can still get it online today.

15        And it included interviews with Islamic State leaders          04:11:17

16  and it literally is the mouthpiece, one of the mouth pieces of

17  the Islamic State.

18  Q.   So following up on that, does the contents of these

19  magazines speak for the ideology that is ISIS?

20  A.   Absolutely.  So they would do things like frequently             04:11:33

21  either interview or have long quotes from ISIS Islamic State

22  leaders.  You have on the board, for example, Abu Mohamed

23  al-Adnani on the top right who was an ISIS spokesman until he

24  was killed I think in 2016.  He appears frequently in *Dabiq*.

25  Q.   Let's turn to the first page of *Dabiq* and pull in.  Again,     04:11:56

MATTHEW LEVITT - Direct

1   this is issue number five.  Is there a quote or -- a quote that    04:12:07

2   is constant throughout these issues?

3   A.   They all start with this quote on the table of contents

4   page from Abu Musab al-Zarqawi who was, as we said, kind of

5   their forefather and it's kind of the same quote every time.    04:12:27

6   Q.   What does it say?

7   A.   "The spark has been lit here in Iraq, and its heat will

8   continue to intensify -- by Allah's permission -- until it

9   burns the crusader armies in *Dabiq*."

10  Q.   What does that mean?    04:12:41

11  A.   In other words, Zarqawi had said back in the day that they

12  had lit this spark of jihad, this religious fight, and that it

13  would not be limited to Iraq, that ISIS heat would intensify.

14  It would draw in others and with God's permission, with God's

15  help, it would continue until eventually there was this    04:13:03

16  end-of-days battle that we have been referring to in the Syrian

17  town of Dabiq where they would, as it says here, burn the

18  crusader, meaning Western armies.

19  Q.   Who do ISIS followers believe they are going to be

20  fighting against in this battle in Dabiq?    04:13:21

21  A.   It's the West in general but in particular armies of

22  countries that have engaged in the fight against them in Syrian

23  Iraq.  Let's be clear, they were already dead set opposed to

24  the entire Western world, the entire non-Muslim world, the

25  entire non-Islamic State Muslim world before anybody, you know,    04:13:43

MATTHEW LEVITT - Direct

1  pointed a gun in their direction.  Certainly once the                    04:13:48

2  international community decided to try and prevent the Islamic

3  State from conquering more territory, enslaving more people, et

4  cetera, they focused their anger on Western countries like the

5  United States and France and Germany, et cetera.                         04:14:04

6  Q.   We'll come back to this.  Tell us about who Shayk Abdullah

7  Azzam is.

8  A.   Shayk Abdullah Azzam who also appears on your board there

9  on the bottom left --

10  Q.   This one (Indicating)?                                             04:14:27

11  A.   Yes.

12  Q.   -- was an extremist Palestinian preacher, originally from

13  the West Bank of the Palestinian territories who moved to

14  Afghanistan and was a dominant force in what became the Afghan

15  jihad against the Soviets back in the 1980s.  He together with          04:14:53

16  Osama bin Laden founded something called the Afghan Services

17  Bureau or Makhtabal-Kidmat, M-A-K-H-T-A-B-A-L, hyphen,

18  K-I-D-M-A-T, rough transliteration, which grew into an

19  international logistical facilitation and fundraising network

20  that helped radicalize, recruit, facilitate and pay for the            04:15:24

21  travel of Muslims from around the world to go and fight in

22  Afghanistan, the first of the modern flow of what we now call

23  foreign terrorist fighters.

24      He died in a mysterious car bombing that some people

25  attribute to bin Laden.  No one really knows.  The reason some         04:15:46

United States District Court

MATTHEW LEVITT - Direct

 1   people attribute to it bin Laden is because by the end of the          04:15:49

 2   Afghan jihad, the two of them began to have a disagreement over

 3   where to take this transnational network next.  There was never

 4   an idea of just disbanding.  They built this system.  Abdullah

 5   Azzam wanted to leverage it next to destroy Israel.  He was a          04:16:03

 6   Palestinian.

 7           Bin Laden said, no.  We should leverage it to knock

 8   off the head of the snake, as he put it, meaning the United

 9   States and the Western countries that support Israel and the

10   insufficiently Islamic Arab states without the support of the          04:16:22

11   West, they could never function and then they will just

12   collapse.

13           But the point is, he wrote a series of tracts which

14   became tremendously inspirational for people at the time and

15   ever since.  And so even though, by all logic, the Islamic          04:16:37

16   State goes far beyond where he was, his original writing and

17   some of the fundamental ideas about how there is an obligation,

18   a personal obligation on each individual Muslim, not in the

19   Muslim community but on each and every person to go and engage

20   in jihad, in militant jihad, that idea has become something          04:16:58

21   that makes his material required reading for just about every

22   prospective jihadi.

23   Q.   Did he author the book Defence of the Muslim Lands?

24   A.   Yes.

25   Q.   And did that book, likewise, discuss the concept of          04:17:12

United States District Court

MATTHEW LEVITT - Direct

1  personal responsibility that you were speaking about a moment                04:17:17

2  ago?

3  A.   Yes.

4  Q.   And just in layman's terms, the concept of personal

5  responsibility, that has to do with taking action in your own                04:17:23

6  hands?

7  A.   Well, there are certain things within most religions,

8  including Islam, that need to be done.  But they are not

9  necessarily a requirement on every individual that needs to get

10 done.  The community needs to make sure that they get done.                   04:17:37

11         And then there are things that are the obligation on

12 each and every person.  I don't think that that is necessarily

13 unique to the Muslim religion.  For Azzam, and ones that came

14 after, the idea that a militant jihad, as the title of his book

15 suggests, in <u>Defence of Muslim Lands</u>, and in defense of the            04:17:55

16 Islamic nation more generally is an obligation on every

17 individual Muslim.

18 Q.   And is that related to the offensive jihad concept?

19 A.   Yes.  Of course jihad has two basic meanings.  One, which

20 the Prophet Muhammed, Peace be Upon Him, actually described as                04:18:14

21 the greater jihad, is self-improvement, becoming a better

22 person, practicing your religion better.  And of course there's

23 nothing wrong with any of that.

24         And there's also violent jihad, which the Prophet

25 described as the lesser jihad.  And the innovation of modern                   04:18:31

United States District Court

MATTHEW LEVITT - Direct

```
 1  jihadism today is that they describe this as the more important  04:18:34
 2  of the jihads.  And, in fact, some of them -- traditional Islam
 3  has five pillars of Islam, five core ideas, including fasting
 4  in the holy month of Ramadan and giving charity and going on
 5  pilgrimage once in one's life.  For the jihadis there's a sixth  04:18:53
 6  pillar of jihad, and the most important -- sixth pillar of
 7  Islam, excuse me, the most important, and that is jihad.
 8  Q.  So let's move on for a moment.  We are going to pull an
 9  exhibit up, Defence of the Muslim Lands.  It's a book that's in
10  evidence.                                                        04:19:11
11          MS. BROOK:  Oh, it's up there?  I'll get to that in a
12  minute.
13  BY MS. BROOK:
14  Q.  Let's move on and talk about Anwar al-Awlaki.  Do you see
15  Anwar al-Awlaki on Exhibit Number 53?                            04:19:21
16  A.  Awlaki's picture is being used here in the Twitter handle.
17  Q.  Okay.  So on the overhead is already admitted, Exhibit
18  Number 70, and then likewise Exhibit Number 53 on the board.
19  Let's turn to 70.  You recognize Anwar al-Awlaki here?
20  A.  Yes.                                                         04:19:36
21  Q.  And that Anwar al-Awlaki inspired or affected people who
22  are violent extremists?
23  A.  Anwar al-Awlaki was a U.S. born Muslim cleric who became
24  very, very extreme and became a leader of al-Qaeda in the
25  Arabian Peninsula, al-Qaeda's branch in Saudi Arabia and Yemen.  04:20:00
```

United States District Court

MATTHEW LEVITT - Direct

 1   He was based in Yemen.  He was extremely articulate.  And on          04:20:00

 2   top of that, because he spoke American-accented, American

 3   vernacular English, he was extremely accessible to people from

 4   English-speaking countries.

 5          A lot of his earlier lectures he had -- he gave many,          04:20:24

 6   many lectures, which are available as audio files online even

 7   today.  Many of them are about the history of Islam, the

 8   history of the Prophet Muhammed, Peace be Upon Him, and they

 9   really are very -- became very popular lectures for people who

10   were either Muslim but were not particularly observant, didn't    04:20:43

11   know much about their religion, or people who were converts or

12   looking to convert.

13          But then as you go farther along, al-Awlaki's career

14   and trajectory, his lectures become explicitly violent,

15   extremely violent calling for terrorism targeting civilians,       04:21:01

16   explaining why targeting soldiers is not enough, specifically

17   calling for attacks in the West, specifically in the United

18   States.  And many, many cases of either attacks that were

19   successful here in the United States have had connections back

20   to Anwar al-Awlaki.                                                 04:21:19

21          He was killed in I think 2011 but he -- as if lives

22   on online and continues to come up in cases today because you

23   can still access his material online.

24   Q.   Did Anwar al-Awlaki also espouse on the idea of end of

25   days?                                                               04:21:43

United States District Court

MATTHEW LEVITT - Direct

1  A.   He did espouse on the ideas of end of days.  He talked          04:21:43

2  about the idea of this ultimate fight in Dabiq.  Although he,

3  in his lifetime, was al-Qaeda in the Arabian Peninsula, he died

4  before the rise of the Islamic State.  The Islamic State quotes

5  him in their *Dabiq* magazines.  They have a battalion named the   04:22:05

6  Anwar al-Awlaki Battalion.

7         The Islamic State has kind of adopted him because his

8  positions were so close to theirs, even though he died before

9  they came to be in their current incarnation.  And so it

10  doesn't surprise at all.  It's not uncommon at all for Anwar      04:22:25

11  al-Awlaki to feature as a prominent ideologue and radicalizer

12  even in the context of the Islamic State.

13  Q.   Are you familiar with the sermon by Anwar al-Awlaki "The

14  Dust Will Never Settle"?

15  A.   I am.                                                        04:22:44

16  Q.   And have you had the opportunity to listen to audio clips

17  Government Exhibits 154, 155, 156, 157 and 158?

18  A.   I have.

19  Q.   And do those clips reflect parts of that sermon "The Dust

20  Will Never Settle Down"?                                          04:23:02

21  A.   Yes.

22         MS. BROOK:  Your Honor, these are already admitted.

23  What I intend to do -- they are very brief -- is just play

24  three of them and to talk about them quickly.

25         THE COURT:  All right.  Go ahead.                          04:23:12

United States District Court

MATTHEW LEVITT - Direct

1          MS. BROOK:  At this point we're going to play 154.        04:23:15

2          (Exhibit 154 was played.)

3          MS. BROOK:  And then let's go ahead and play 156.

4          (Exhibit 156 played.)

5    BY MS. BROOK:                                                    04:23:55

6    Q.   What is Anwar al-Awlaki talking about in those two clips?

7    A.   He's making it clear that people who are not respectful of

8    the prophet and his message don't need to ask permission to

9    carry out an act of violence in retribution for that and that

10   for those people, for example, who think that the way to        04:24:18

11   respond to that is boycotting products.  For example,

12   boycotting Danish products, a reference to boycotting Danish

13   products in the wake of a Danish cartoon fiasco where they were

14   publishing cartoons of the Prophet which for the majority of

15   Muslims is considered an insulting thing, whether or not the     04:24:37

16   picture is kind of an insulting picture.  And sometimes they

17   really are insulting.  That boycotting products, that's more

18   Gandhi.  That's not what the Prophet Muhammed would have done

19   or wanted according to al-Awlaki.

20   Q.   So, in fact, was this sermon a response to those cartoons   04:24:56

21   in referencing there the Danish cartoons?

22   A.   Yes.

23   Q.   And let's go ahead and play 158.

24          (Exhibit 158 played.)

25   Q.   What, during this sermon, was he advocating?               04:25:23

United States District Court

MATTHEW LEVITT - Direct

1   A.   He's advocating people carrying out acts of violence in        04:25:26

2   retribution for these depictions of the Prophet Muhammad.

3        MS. BROOK:   So this is 158.  I believe inadvertently

4   159 was played a moment ago but they were all admitted.

5   Q.   But I want to break down for a moment what 158 is about.    04:26:38

6   Blasphemy against whom?

7   A.   Blasphemy against the Prophet Muhammad, blasphemy against

8   Islam.  That those who are blasphemist, disrespectful -- in

9   this case we're talking about the cartoons -- about the Prophet

10  Muhammad, they are creating a storm that will not have an end.    04:26:59

11  The dust will not settle down, as he says.  In other words,

12  it's going to rile up, radicalize, mobilize Muslims around the

13  world to want to exact revenge for this blasphemy.

14       Remember for these types of extremists, whether it's

15  al-Awlaki or as you continue to the Islamic State, blasphemy is    04:27:22

16  worthy of death.  Not just that it's okay, that that's the

17  appropriate punishment, and in doing it is a good thing.

18  Q.   What is interpreted by the phrase here "have actually

19  walked straight into a hornets' nest"?

20  A.   That by virtue of being blasphemous about the Prophet    04:27:41

21  Muhammad, these people have brought this upon themselves.  They

22  have -- you walk into a hornets' nest and the hornets can't

23  help but attack in defense.

24       And so the idea is the same here, that this is now --

25  that Muslims will not have a choice but to attack the West in    04:27:59

United States District Court

327
MATTHEW LEVITT - Direct

1   response for this blasphemous action targeting the beloved          04:28:05

2   Prophet Muhammad.

3   Q.   Are you familiar with another attack, the Charlie Hebdo

4   attack January 7, 2015?

5   A.   I am.                                                            04:28:17

6   Q.   And what was that about?

7   A.   Charlie Hebdo is and was a satirical magazine based out of

8   Paris, satirical in the extreme.  It supposedly is that, so

9   satirical making fun and insulting everybody, that it's

10  supposed to be a statement about freedom of the press.               04:28:38

11        They do things that are borderline or well over the

12  borderline of anti-Semitism, Islamophobia -- I don't know if

13  there's anybody that is safe from their satire, so many people

14  don't like them very much.

15        But in this particular attack, two brothers, the               04:28:56

16  Kouachi brothers, K-O-A-C-H-I, carried out a shooting attack at

17  the Charlie Hebdo offices killing several people there.  And

18  the attack was later claimed by al-Qaeda in the Arabian

19  peninsula.  They received their weapons from another individual

20  named Ahmed Coulibaly, Ahmed, A-H-M-E-D; Coulibaly,                  04:29:29

21  C-O-U-L-I-B-A-L-Y.  He went on to kill a French Muslim police

22  officer and to carry out a shooting attack at a kosher grocery

23  store.  This was all in Paris.  And he self-identified in a

24  video he had taped as having done this for and on behalf of the

25  Islamic State.                                                       04:29:55

United States District Court

MATTHEW LEVITT - Direct

1    Q.   You had mentioned, as our chronology of 2014, 2015 is put          04:29:56

2    together, that there was a proclamation that came from Adnani

3    in September of 2014.

4    A.   That's right.

5    Q.   I'm turning to the last article segment inside issue          04:30:09

6    number five of *Dabiq*, which is Government's Exhibit 17.

7         Are you familiar with this article?  I don't know if

8    it's showing on the overhead.

9         MS. BROOK:  Can we switch to the -- I'm sorry.  Thank

10   you.          04:30:30

11   Q.   So are you familiar with this article which is the last

12   article inside issue five of *Dabiq*?

13   A.   Yes.

14   Q.   And in this article -- and we'll get to the essence of the

15   article in a moment.  But does it quote Adnani's address or          04:30:42

16   call to action?

17   A.   Yes.

18   Q.   Do you see it here on page one of the article here "If I

19   were the U.S. President Today" by John Cantlie?

20   A.   Yes.  The title you just read is off the screen but that          04:31:00

21   is at the top of the screen.  Yes.

22   Q.   Can you read for us where it starts to talk about Sheikh

23   al-Adnani?

24   A.   I'm starting from the very bottom right of the page 36.

25   Q.   M'hum.          04:31:18

United States District Court

MATTHEW LEVITT - Direct

1  A.    "It was Shaykh Abu Muhammad al-Adnani's call to action for   04:31:18

2  Muslims wherever they were to rise up and fight the enemies of

3  the Islamic State that brought almost instant reaction from

4  around the world."

5        "Quote, do not let this battle pass you by wherever   04:31:38

6  you may be, end quote, commanded the Shaykh.

7        "Quote, you must strike the soldiers, patrons, and

8  troops of the tawaghit.  Strike their police, security and

9  intelligence members.  If you can kill a disbelieving American

10 or European -- especially the spiteful and filthy French -- or   04:31:58

11 an Australian, or a Canadian, or any other disbeliever from the

12 disbelievers waging war against it's Islamic State, then rely

13 upon Allah, and kill him in any manner or way however it may

14 be."

15 Q.    The article there continues in the red block on the right.   04:32:19

16 What does that red block on the right discuss?

17 A.    So as the article points out, immediately following the

18 September call to action where for the first time the Islamic

19 State wasn't just saying, "Come, join the Islamic State," they

20 were also saying, "Stay where you are and carry out attacks in   04:32:39

21 your home land if you can," that immediately people started

22 heeding that call.

23        And in this red block on the right-hand side of the

24 page, they cite to two actions, two attacks, that occurred, one

25 in Canada one in Australia, both in October, so within weeks   04:32:54

United States District Court

MATTHEW LEVITT - Direct

1  after this call to action and individuals whose actions were          04:33:01

2  claimed by the Islamic State.

3  Q.   And down below does the article go on to discuss the

4  desired effect of these articles or of these attacks rather?

5  A.   Yes.                                                             04:33:18

6  Q.   Can you read for us where it talks about that?

7  A.   It's on the bottom right.  "All of these attacks were the

8  direct result of the Shaykh's call to action, and they

9  highlight what a deadly tinderbox is fizzing just beneath the

10 surface of every western country, waiting to explode into        04:33:33

11 violent action at any moment given the right conditions.

12 Suddenly the mujahidin of the Islamic State weren't some

13 esoteric concept fighting in a land nobody knew or cared about,

14 they were on the doorstep of millions of people living in some

15 of the biggest, most modern cities in the western world.  The    04:33:52

16 attacks served as a damning indictment of America's continued

17 policy of foreign intervention.  Everything in the United

18 States and its allies had been fighting for in the, quote, war

19 on terror, end quote, the old, quote, if we don't fight them

20 there we'll," next page, "have to fight them here, quote,        04:34:11

21 reasoning, was in one week shown to have completely failed."

22 Q.   Let's go back to the first page for a moment.  Who is this

23 article purported to be written or authored by?

24 A.   By John Cantlie.

25 Q.   Who is John Cantlie?                                         04:34:41

United States District Court

MATTHEW LEVITT - Direct

1   A.   John Cantlie is a Western journalist who was kidnapped and          04:34:43

2   was and believed still is being held by the Islamic State.

3   Q.   And based upon what you know about John Cantlie and his

4   use by the Islamic State, what is the purpose of having him

5   author these articles?                                                   04:34:58

6   A.   So the Islamic State effectively forced John Cantlie to

7   serve as a reporter for them.  Presumably he wrote these

8   presumably based on information that he was told to share.

9   There are also videos that he did.  And the idea is that you

10  have a Western journalist, respected journalist, who will speak         04:35:17

11  to the West and that it will be better received than if one of

12  their fighters gives the same message.

13       Sort of the same way like when an Anwar al-Awlaki

14  speaks in an American-accented or vernacular English, it's more

15  accessible here to John Cantlie, who is a reputable, well-known         04:35:39

16  journalist who can speak to a Western audience in a way that

17  they commonly are familiar with hearing news on like they do on

18  their evening newscasts.

19  Q.   Does the last page of this article also reference American

20  governmental leaders and how that plays into ISIS's agenda?             04:36:00

21  A.   So it does.  It cites to a former U.S. official, Michael

22  Scheuer, and uses something he said or wrote actually to make

23  their own point.

24  Q.   Who is Michael Scheuer?

25  A.   Michael Scheuer is a retired CIA official who at one point         04:36:26

MATTHEW LEVITT - Direct

1  led the Alec Station which was the bin Laden group and the          04:36:31

2  period leading up to and right after 9/11.  I think he was

3  there in the period leading up to.

4  Q.    And does this article reference a quote by Michael

5  Scheuer?                                                            04:36:47

6  A.    Yes.

7  Q.    What does it say?

8  A.    It says, "I've quoted him far too often in past but hope

9  he will forgive me if I reach into the box of Michael Scheuer

10 quotes once again.  In a text published on the 2nd of September    04:36:58

11 commented, quote, we are far past facing terrorists.  Rather,

12 we are in the midst of fighting an international insurgency,

13 and we are on the way to a world war that the United States

14 will have to fight at home and abroad if the foreign-policy

15 status quo is retained, end quote."                                04:37:17

16        And then he continues in his own voice:  "Boom --

17 there it is, just as Michael predicted.  Spurred on by

18 continual American intervention, the sphere of influence of the

19 Islamic State has expanded to such a degree that they can now

20 order attacks on U.S. soil by complete strangers via word         04:37:32

21 alone.  An international insurgency.  It's the nightmare

22 scenario for the governments, one they've spent trillions

23 trying to avoid but, ironically, fueled instead with their

24 constant meddling in the affairs of the Muslim world."

25        MS. BROOK:  Your Honor, this is probably a good place       04:37:53

MATTHEW LEVITT - Direct

1    to end for the night if you wanted to stick with that                    04:37:55

2    timetable.

3              THE COURT:  About how much more do you have with this

4    witness tomorrow?

5              MS. BROOK:  20 minutes.                                          04:38:01

6              THE COURT:  All right.  Then we will adjourn for the

7    evenly.

8              Dr. Levitt, you may step down if you like.  We're

9    going to go ahead and start a little bit later tomorrow.  If

10   everybody can be ready to go at 10 o'clock, we will commence    04:38:16

11   then and we will go through the conclusion of the Government's

12   evidence and then if Mr. Wahid wishes to call any witnesses

13   himself or testify himself, we'll do that.

14             MR. MCBEE:  Judge, I was just hoping if I could

15   humbly ask if we could start at 10:30 tomorrow and if we can't,  04:38:33

16   it's not a huge issue.  I just have a client in Superior Court

17   and there's a slim chance I might be able to get her out.

18             THE COURT:  I think I'm going to hold to the plan to

19   start at 10 o'clock.  If you're close and know and need a few

20   minutes after that, I'll be all right.  But I need to keep this  04:38:54

21   matter moving; all right?

22             All right.  Thank you, all.  We are adjourned.

23             (Whereupon, these proceedings recessed at 4:38 p.m..)

24                         *  *  *  *  *

25

United States District Court

MATTHEW LEVITT - Direct

C E R T I F I C A T E

        I, ELAINE M. CROPPER, do hereby certify that I am
duly appointed and qualified to act as Official Court Reporter
for the United States District Court for the District of
Arizona.


        I FURTHER CERTIFY that the foregoing pages constitute
a full, true, and accurate transcript of all of that portion of
the proceedings contained herein, had in the above-entitled
cause on the date specified therein, and that said transcript
was prepared under my direction and control, and to the best of
my ability.


        DATED at Phoenix, Arizona, this 15th day of June,
2020.




                              s/Elaine M. Cropper

                              _____
                              Elaine M. Cropper, RDR, CRR, CCP




                    United States District Court