CR-17-00360-PHX-JJT-1, March 3, 2020

1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3                    _____

4
   **United States of America**,           )
5                                           )
                          Plaintiff,        )
6  vs.                                      )
                                            )   CR-17-00360-PHX-JJT-1
7  **Abdul Khabir Wahid**,                  )
                                            )
8                          Defendant.       )
                                            )   March 3, 2020
9  _____       )   9:01 a.m.
                                            )
10

11

12          **BEFORE:   THE HONORABLE JOHN J. TUCHI, JUDGE**

13          <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

14                       SENTENCING

15

16

17

18

19

20

21  Official Court Reporter:
    **Elaine Cropper, RDR, CRR, CCP**
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, SPC 35
23  Phoenix, Arizona  85003-2151
    (602) 322-7245/(fax) 602.322.7253
24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

                United States District Court

CR-17-00360-PHX-JJT-1, March 3, 2020

**A P P E A R A N C E S**

For the Government:
        **JOSEPH E. KOEHLER, ESQ.**
        **KRISTEN BROOK, ESQ.**
        U.S. Attorney's Office
        40 North Central Avenue, Suite 1800
        Phoenix, AZ  85004-4408
        602.514.7500

For the Defendant:
        **JOHN W. MCBEE, ESQ.**
        Law Office of John W. McBee
        3104 E. Camelback Road, PMB 851
        Phoenix, AZ  85016
        602.903.7710

United States District Court

CR-17-00360-PHX-JJT-1, March 3, 2020

1                        **I N D E X**

2

3    **TESTIMONY**

4    **WITNESS**                **Direct   Cross   Redirect   Recross**

5      JOHN O'STEEN, M.D.          13       23

6

7

8                    **MISCELLANEOUS NOTATIONS**

9    Item                                              Page

10     Court's sentencing                               60

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

4

CR-17-00360-PHX-JJT-1, March 3, 2020

# P R O C E E D I N G S

1

2          (Court was called to order by the courtroom deputy.)

3          (Defendant is present and in custody.)

4          (Proceedings begin at 9:01.)

5          COURTROOM DEPUTY:  This is criminal cse 17-360,     09:00:57

6    *United States of America v. Abdul Khabir Wahid*, on for

7    sentencing.

8          Counsel, please announce.

9          MS. BROOK:  Good morning, Your Honor.  Kristen Brook

10   on behalf of the United States.  Here as well, Joe Koehler and     09:01:06

11   Special Agent Brittany Stephenson from the FBI.

12         THE COURT:  All right.  Good morning.

13         MR. MCBEE:  Good morning, Your Honor.  John McBee

14   appearing on behalf of Mr. Wahid who is present and in custody.

15         THE COURT:  Good morning, Mr. McBee.     09:01:18

16         Good morning, Mr. Wahid.

17         THE DEFENDANT:  Good morning.

18         THE COURT:  One housekeeping matter before we move

19   forward.  I understand the probation officer is not in the

20   witness box because we will be having a witness as the     09:01:25

21   sentencing proceeds this morning.  In case I have questions and

22   I want to have you on the microphone, Officer, I probably would

23   rather have you over here.  That will save us a couple of

24   steps.  The first thing that we need to take up is the filing

25   that Mr. Wahid initiated on his own I think yesterday.  It     09:01:44

United States District Court

CR-17-00360-PHX-JJT-1, March 3, 2020

1   reached my chambers this morning and I've had the opportunity          09:01:51

2   to review it.  And that is a motion essentially to terminate

3   counsel again and I assume represent yourself Mr. Wahid.

4           DEFENDANT WAHID:  Yes.

5           THE COURT:  All right.  Thank you, sir.                        09:02:06

6           Mr. McBee, did you have an opportunity to see it?

7           MR. MCBEE:  I did.  And I also talked to my client

8   about it yesterday.  He indicated that at the time he was

9   willing to withdraw it, but I'm not sure that's still the

10  situation.                                                            09:02:16

11          THE COURT:  All right.  I'm going to check on that in

12  just a moment.

13          But I want to make sure that Ms. Brook, Mr. Koehler,

14  have you seen the motion as well?

15          MS. BROOK:  Yes, Your Honor.                                  09:02:23

16          THE COURT:  All right.  Thank you.

17          So Mr. Wahid, what is your desire at the moment?  Do

18  you wish to have the Court considering termination of Mr. McBee

19  as your counsel and to move forward representing yourself or do

20  you wish to withdraw the motion?                                     09:02:38

21          DEFENDANT WAHID:  I wish to withdraw it.

22          THE COURT:  All right.  Thank you, sir.  Then I will

23  consider the motion withdrawn and we will not have to rule on

24  it.

25          There are a number of steps that remain this morning          09:02:57

                        United States District Court

1 with regard to the sentencing hearing and the sentencing          09:03:00
2 exercise and I understand that the Government wishes to present
3 a witness and I think the logical point at which to do that is
4 once the Court has proceeded through the calculation of the
5 guidelines and -- because if I understand it correctly, the       09:03:27
6 Government is presenting the witness, Dr. O'Steen, to counter
7 the request for downward departure and so I'm going to
8 establish the baseline first and then we will do that if
9 appropriate.

10           So let me take us back in the ordinary course.          09:03:46

11           We are here today because after a bench trial upon
12 waiver of Mr. Wahid's right to a jury trial, this Court found
13 Mr. Wahid guilty of two counts, one was the 1001 count, the
14 false statement, and the other was the 1512 count, the witness
15 tampering.                                                         09:04:12

16           Based on the Court's determination as set forth in
17 the findings and conclusions and then amended, it is the
18 judgment of the Court that the defendant is guilty of Title 18,
19 violation of Title 18, United States Code, Section 1001.  That
20 is false statements to a Government official in this case          09:04:32
21 during the course of a criminal investigation, and 18 USC, 1512
22 which is tampering with a witness.  Those two incidents are
23 co-related and occurred during the same investigation which is
24 part of the reason that they are grouped for purposes of
25 sentencing analysis.  And it is the judgment of the Court that     09:04:56

United States District Court

CR-17-00360-PHX-JJT-1, March 3, 2020

1   Mr. Wahid is guilty of both of those offenses.                        09:05:04

2           Once the determination had been made and the findings

3   and conclusions were filed into the docket, the Probation

4   Office created and then filed and then disseminated to both

5   parties and the Court a Presentence Investigation Report, which   09:05:22

6   has since been amended as of February 26 due to some delays in

7   this case and the Court's resolution of some motions and

8   briefing which would have influenced it as well.

9           The current document is found at docket entry number

10  284.  And, Mr. Wahid, this document contains all of the          09:05:44

11  information that the Court knows about you and about the

12  offenses of conviction.

13          Mr. McBee, have you had the opportunity, adequate

14  opportunity, to go over this report with your client?

15          MR. MCBEE:  Yes, Your Honor.                              09:06:01

16          THE COURT:  And I have a couple of questions for you,

17  Mr. Wahid.  Did you receive a copy of the presentence report?

18          DEFENDANT WAHID:  Yes, I did.

19          THE COURT:  And did you read it all?

20          DEFENDANT WAHID:  Yes.                                     09:06:10

21          THE COURT:  And did you have the opportunity when you

22  were reading it or afterwards, to ask Mr. McBee any questions

23  that you wanted to ask him about what it means?

24          DEFENDANT WAHID:  Yes.

25          THE COURT:  As a result of that, do you feel like you    09:06:22

United States District Court

                                                                            8
                    CR-17-00360-PHX-JJT-1, March 3, 2020

 1    understood the report pretty well?                              09:06:23
 2              DEFENDANT WAHID:  Yes.
 3              THE COURT:  All right.
 4              Mr. McBee, are there any additions or corrections to
 5    the presentence report beyond the three objections that Mr.     09:06:38
 6    Wahid placed in writing which I'll deal with in a moment?
 7              MR. MCBEE:  Nothing further, Judge, no.
 8              THE COURT:  Thank you.
 9              Any additions or corrections from the Government,
10    Ms. Brook?                                                      09:06:51
11              MS. BROOK:  No, Your Honor.
12              THE COURT:  All right.  Thank you.
13              So in going back of the text of the objections
14    themselves, Mr. Wahid, when he was representing himself, before
15    he requested and the Court granted the reinstatement of         09:07:03
16    Mr. McBee from stand-by counsel to counsel, the first objection
17    dealt with in paragraph 36 of the presentence report the
18    presentence report writer's characterization of prior criminal
19    conduct when recounting criminal history as obstructing a
20    thoroughfare.                                                   09:07:30
21              The Government took no position on that objection.
22    The Probation Office's response was to indicate that the
23    information she placed in the report came directly from a
24    Phoenix DR, police department report.  So, therefore, to the
25    extent that the information existed in the report, she          09:07:49

                       United States District Court

CR-17-00360-PHX-JJT-1, March 3, 2020

1   accurately reported it.                                          09:07:54

2          I would note that the characterization of this

3   criminal activity in the past is both remote and minor enough

4   that it does not impact the Court's consideration one way or

5   the other.  Nonetheless, the objection is properly overruled    09:08:14

6   because the presentence report writer faithfully and accurately

7   reported the information in the report, in the police report.

8          As to the second objection, the objection was to the

9   18-level enhancement that was applied here, for connection with

10  or the underlying offense as alleged, and that was the false    09:08:37

11  statement being in support of, or related to, an act of

12  terrorism, international or domestic.  And in this case, the

13  Court made findings after the bench trial beyond a reasonable

14  doubt that that application applied and so the objection is

15  overruled.                                                      09:09:03

16         Finally, with regard to the third objection in

17  writing, defendant objected to the assertion, as he

18  characterized it, in the presentence report that he's an ISIS

19  supporter, the Court went back and read the presentence report

20  on that point and the probation officer in her responses        09:09:27

21  accurately characterized it.  What she indicated was that he

22  was associating with ISIS supporters and, again, the Court

23  found that to be proven beyond a reasonable doubt that the two

24  deceased men, Soofi and Simpson, were, in fact, ISIS supporters

25  and it was also proven of the association so this is not a      09:09:56

United States District Court

CR-17-00360-PHX-JJT-1, March 3, 2020

1   misstatement and so the objection is overruled.                    09:10:00

2           With those overruling of the objections, the Court

3   will order the presentence report be adopted into the record in

4   its current form.  I will now go through the guideline

5   calculations which come from that report and I ask the parties    09:10:20

6   to follow along.

7           Because as I've indicated, both of the offenses of

8   conviction were co-related in the same course of subject, the

9   guidelines require that they be grouped for purposes of the

10  calculation and they were.  And the way that is done is to        09:10:41

11  take first the 1001 offense and Section 2J1.2 of the guidelines

12  tells us that the base offense level for that sentence is a 14.

13  There is, as indicated previously, an 18-level upward

14  adjustment when the offense -- and in particular, the

15  allegation was connected to the 1001 offense, the false          09:11:13

16  statement, is intended to promote terrorism.  That is section

17  3A1.4 of the guidelines.  Because the Court has found beyond a

18  reasonable doubt that the Government has proven that intent,

19  the 18 levels are added.  And then there is a two-level upward

20  adjustment for obstruction of justice which could be found       09:11:37

21  either from the false statement to the Government investigators

22  or the attempt to tamper with a witness.

23          In any case, it's a single upward adjustment of two

24  levels.  When I do the arithmetic, it takes the offense level,

25  final offense level, to a 34.                                     09:12:02

United States District Court

CR-17-00360-PHX-JJT-1, March 3, 2020

1    Mr. Wahid's Criminal History Category, because what          09:12:06
2    criminal history he had was quite aged, would have been a level
3    I, the lowest.  But, again, due to the operation of Section
4    3A1.4(b) of the guidelines and the Court's finding that the
5    1001 offense was intended to promote terrorism, the operation   09:12:25
6    of the guidelines raises that to a Criminal History Category
7    VI.  And with an offense level of 34 and a Criminal History
8    Category of VI, the following ranges of consequences are
9    advised under the guidelines:  Imprisonment of between 262 and
10   327 months, a supervised release term of one to three years    09:12:47
11   after release, a fine of between $17,500 and $175,000 but only
12   if the Court found that the defendant was able to pay such a
13   fine and then ordered it, and then a special assessment of
14   $200, $100 for each count of conviction.

15           Not withstanding that the parties have filed a great   09:13:12
16   deal on the issue of the propriety of the range laid out, my
17   question to the attorneys at the moment is, do you agree that
18   the guidelines were properly calculated absent the operation of
19   other statutory factors?

20           Mr. McBee?                                              09:13:38
21           MR. MCBEE:  That's correct.
22           THE COURT:  And Ms. Brook?
23           MS. BROOK:  Yes, Your Honor.
24           THE COURT:  All right.  Thank you.
25           There is no logical way to go through the remainder     09:13:49

United States District Court

CR-17-00360-PHX-JJT-1, March 3, 2020

1  of issues here.  We have several.  I think probably the easiest    09:13:52
2  way to do it, and to keep from tying at least some people up
3  any longer than necessary, is to have Dr. O'Steen called,
4  examined and cross-examined so that I have the information I
5  need to rule on the motion for -- that one motion for downward    09:14:15
6  departure pursuant to issues dealing with health and then I
7  will serially go through the remaining issues.
8          Ms. Brook, if you would call your witness.
9          And, Mr. McBee and Mr. Wahid, if you would return to
10  counsel table, we'll go ahead and do that.    09:14:32
11          MS. BROOK:  Thank you, Your Honor.  Your Honor, the
12  Government is going to call Dr. John O'Steen.  And as Your
13  Honor had mentioned, the issues before the Court are 5H1.4,
14  which is extraordinary physical impairment; 5C1.1, which was a
15  physical condition or appearance; and 5H1.1, which is age,    09:14:52
16  three different bases from which defendant is arguing a
17  downward departure is appropriate and the Government's
18  objecting.
19          THE COURT:  Mr. O'Steen, if you would step forward to
20  my court reporter, she'll swear you in.  I'm sorry, to my    09:15:08
21  courtroom deputy.
22          COURTROOM DEPUTY:  Please state your name and spell
23  your last name for the record.
24          THE WITNESS:  John Thomas O'Steen, M.D.  O-S-T-E-E-N.
25          COURTROOM DEPUTY:  Raise your right hand.    09:15:24

United States District Court

JOHN O'STEEN, M.D. - Direct

1     (JOHN O'STEEN, M.D., a witness herein, was duly sworn     09:15:25

2  or affirmed.)

3          MS. BROOK:  Would you like a glass of water?

4          May I?

5          THE COURT:  You may.                                 09:16:01

6                    **DIRECT EXAMINATION**

7  BY MR. MCBEE:

8  Q.   Good morning, Doctor.

9  A.   Good morning.

10  Q.   Could you please introduce yourself to the court?      09:16:15

11  A.   I'm John Thomas O'Steen, M.D.

12  Q.   And how long have you been a doctor?

13  A.   For 40 years.

14  Q.   Are you licensed here within the State of Arizona to

15  practice medicine?                                          09:16:26

16  A.   Yes, I am.

17  Q.   And has that been for the last 40 years?

18  A.   It's actually 39 because I did my internship in Mexico.

19  Q.   Where are you employed?

20  A.   At Central Arizona Florence Correctional Complex.      09:16:38

21  Q.   And, Doctor, what is your assignment at that facility?

22  A.   I'm the complex medical director.

23  Q.   As the medical director, do you oversee other doctors?

24  A.   Yes.

25  Q.   And as the director, do you also treat patients at the  09:16:53

JOHN O'STEEN, M.D. - Direct

1  facility?                                                    09:16:57

2  A.    Yes.

3  Q.    In your time -- is it at FCC?  Is that what you call it?

4  A.    CAFCC.  The name was changed two years ago or so.

5  Q.    So in your time as a physician and as the director of   09:17:10

6  medical care at CAFCC, have you had occasion to treat Abdul

7  Khabir Wahid?

8  A.    Yes.

9  Q.    And when did you first treat him?

10  A.    On January 7 of this year.                             09:17:24

11  Q.    Do you recognize him here in the courtroom?

12  A.    Yes.

13  Q.    Can you point to him, articulate something that he's

14  wearing.

15  A.    He's the gentleman with glasses and orange jumpsuit on  09:17:34

16  sitting over to my right.

17        MS. BROOK:  Your Honor, may the record reflect that

18  the doctor has identified his patient, the defendant?

19        THE COURT:  Yes.

20  BY MS. BROOK:                                                09:17:47

21  Q.    So how many years have you been at CoreCivic?

22  A.    I have been there almost 17 years.

23  Q.    And when I say CoreCivic, is that another term that is

24  used to describe the CAFCC?

25  A.    CoreCivic the is the corporation name.  CoreCivic has   09:18:02

United States District Court

JOHN O'STEEN, M.D. - Direct

1    prisons all over the United States.                        09:18:05

2    Q.   You have been there for 16 years?

3    A.   Yes.

4    Q.   And at that facility, do they have standard treatment

5    protocols for HIV and AIDS?                                09:18:11

6    A.   Yes.

7    Q.   As the director of that facility, do you ensure that the

8    complex follows those procedures?

9    A.   Yes.

10   Q.   And are there national guidelines for the treatment of HIV 09:18:20

11   and AIDS?

12   A.   Yes.

13   Q.   Does CoreCivic following those national guidelines?

14   A.   Yes.

15   Q.   Are you familiar with the Bureau of Prisons?           09:18:31

16   A.   Yes.

17   Q.   And whether or not they, too, follow the national

18   guidelines when it comes to the treatment and care of patients

19   with HIV and AIDS?

20   A.   Yes.                                                   09:18:41

21   Q.   Do they?

22   A.   Yes.

23   Q.   Over your 16 years as a treating doctor and director at

24   CoreCivic, roughly how many patients have you treated with HIV

25   and AIDS?                                                   09:18:55

16

JOHN O'STEEN, M.D. - Direct

1   A.   Between 500 and a thousand.                                    09:18:56

2   Q.   And during those 16 years, have you lost any patients?

3   Have any of those patients under your care died at the

4   facility?

5   A.   No.                                                            09:19:08

6   Q.   What do you attribute that to?

7   A.   Hard work and dedication and following national guidelines

8   and having CoreCivic allow us to do what's needed to be done in

9   these cases.

10  Q.   By that do you mean providing the best medications?           09:19:27

11  A.   Yes.

12  Q.   And does Bureau of Prisons likewise provide to its inmates

13  and patients with HIV and AIDS the same type of medications?

14  A.   Yes.

15  Q.   You had mentioned that you first saw the defendant, Mr.      09:19:42

16  Wahid, in January of 2020.

17  A.   Yes.

18  Q.   When was the last time you saw him?

19  A.   This past Friday.

20  Q.   Have you continued to treat him over the last two months?    09:19:53

21  A.   Yes.

22  Q.   Are you aware that he has been diagnosed with AIDS?

23  A.   Yes.

24  Q.   And under your care over the last two months, have you

25  helped him modify his treatment regime?                            09:20:07

United States District Court

JOHN O'STEEN, M.D. - Direct

1   A.   I initiated his treatment regime.                           09:20:11

2   Q.   What do you mean by that?

3   A.   He was not taking any medication before when I first saw

4   him.  He initially refused laboratory work.  He refused any

5   medication.                                                      09:20:24

6   Q.   And now is he taking medication?

7   A.   Yes.

8   Q.   He is taking FDA-approved medication, antivirals for the

9   treatment of AIDS?

10  A.   Is he on a preferred treatment regimen for the treatment   09:20:37

11  of HIV and AIDS.

12  Q.   And over the last two months under your care, have you

13  seen any changes with him that you would attribute to him

14  taking medication?

15  A.   Symptomatically, he admits to being much improved.  He     09:20:50

16  feels better.  He made the comment that he was dragging when he

17  first came over to see me and now he's feeling rather normal.

18  Q.   How about with his viral load count, have you noticed any

19  difference with his viral load count?

20  A.   His initial viral load was 6,000 copies per milliliter of  09:21:09

21  blood.  And after only a five weeks of treatment with Genroya,

22  it dropped down to only 57 and that is very close to full

23  suppression on the technical.

24  Q.   So the viral load count at present shows that he has an

25  undetectable amount?                                            09:21:28

United States District Court

JOHN O'STEEN, M.D. - Direct

1   A.   It's almost.  40 is undetect -- less than 40 is                09:21:30

2   undetectable.  He dropped down to 57.  I would suspect if we

3   drew his lab work right now, he would be under technical.

4   Q.   In your medical opinion, is Mr. Wahid's AIDS diagnosis a

5   terminal condition?                                                 09:21:45

6   A.   No.

7   Q.   Can you explain that?

8   A.   There's been a phenomenal change in the ability to treat

9   HIV and AIDS patients since I graduated from the University of

10  Michigan, at which time we didn't even know what caused AIDS        09:21:58

11  and people were -- it was essentially a death notice if you

12  were diagnosed with HIV during that time.  With the advent of

13  these rather miraculous new drugs, people simply aren't dying

14  any more.  They are living, they are living very long lives.

15  And I would expect that to be the case with Mr. Wahid as long       09:22:18

16  as he continues to take his medication.

17  Q.   Does Mr. Wahid suffer presently from any significant

18  physical impairment?

19  A.   No, not that I'm aware.

20  Q.   Are you aware of whether or not he has presented with a        09:22:40

21  rash?

22  A.   I have actually not seen the rash.  I think he was

23  referring to a cyst that he has on his buttocks area that he

24  may feel is a rash.  It's really a cystic mass.

25  Q.   And is that a secondary condition onset to his other           09:22:58

United States District Court

JOHN O'STEEN, M.D. - Direct

1  diagnosis?                                                    09:23:02

2  A.   No.   It has nothing to do with HIV.

3  Q.   And for that cyst, with CoreCivic and also with the Bureau

4  of Prisons, are there medical interventions that he has

5  available to him for the treatment and care of the cyst?      09:23:17

6  A.   Yes.

7  Q.   Can you explain that?

8  A.   He's already been referred and seen by a general surgeon

9  which occurred just in the past week or two.   If necessary,

10 felt to be necessary by the surgeon, it could be operated on. 09:23:30

11 The surgeon deferred it for now because it's not actively

12 draining and asked him to return promptly if it should start

13 draining again.

14 Q.   Are you familiar with whether or not Mr. Wahid has used

15 hyper-chloric acid for treatment historically?               09:23:47

16 A.   Yes.

17 Q.   And to your knowledge, what was that hyper-chloric acid

18 used to treat?

19 A.   What he told me, and it's in the record, is that he was

20 using it to treat this rash or cyst, not for treating his HIV. 09:23:59

21 Q.   Other than the rash or the cyst, as you have referred to

22 it, has he presented with any other physical impairments to

23 your knowledge?

24 A.   He had issues with a peripheral neuropathy in the past

25 which is somewhat commonly seen in people with HIV and AIDS.  09:24:27

United States District Court

JOHN O'STEEN, M.D. - Direct

| | |
|---|---|
| 1 | That seems to have improved with his initiation of treatment. | 09:24:32 |
| 2 | He had an episode of pleuritic-like chest pain, inflammation of |
| 3 | the lining of the lung, when I first saw him but that |
| 4 | apparently has gone away as well with initiation of treatment. |
| 5 | Q.   So let's go back to that first condition, was that some | 09:24:49 |
| 6 | leg pain that he had suffered? |
| 7 | A.   Yes. |
| 8 | Q.   And that has gone away with treatment? |
| 9 | A.   Yes. |
| 10 | Q.   And additionally you mentioned pleurisy? | 09:24:56 |
| 11 | A.   Yes. |
| 12 | Q.   Has he recently complained of any chest pain? |
| 13 | A.   No. |
| 14 | Q.   Additionally, has he shown to have any fluid in his lungs? |
| 15 | A.   No. | 09:25:07 |
| 16 | Q.   Have there been chest x-rays conducted of him to determine |
| 17 | whether or not there is a fluid in his lung? |
| 18 | A.   He's had three chest x-rays at our facility. |
| 19 | Q.   And the results of those chest x-rays, have any of them |
| 20 | shown to have fluid in his lungs? | 09:25:20 |
| 21 | A.   No. |
| 22 | Q.   I want to talk about his over all physical condition.  In |
| 23 | your assessment, how would you rate or describe his physical |
| 24 | condition? |
| 25 | A.   He seems to be rather fit for someone in his condition. | 09:25:34 |

United States District Court

JOHN O'STEEN, M.D. - Direct

1    Q.   Is part of that analysis a determination of body mass          09:25:41

2    index?

3    A.   Yes, and he's at the upper limit of normal.  He's almost

4    beginning to approach the point where he'll be classified as

5    overweight.                                                          09:25:50

6    Q.   And through CoreCivic and also the Bureau of Prisons, are

7    you familiar with the nutritional plans that patients, inmates,

8    are provided?

9    A.   Yes.

10   Q.   Are patient inmates provided access to nutrition?              09:26:01

11   A.   Yes.

12   Q.   And if an individual starts to waste or have body mass

13   issues, what is CoreCivic and Bureau of Prisons able to do or

14   provide that patient?

15   A.   We can provide them with additional food and supplements      09:26:18

16   like on behalf of the defendant.

17            In the case of AIDS-wasting syndrome, we provide them

18   with medications that help to stimulate their appetite.

19   Q.   And so an AIDS-wasting scenario, can you describe what

20   that would be?                                                      09:26:37

21   A.   It's really essentially anorectic.  They lose their

22   appetite much like a cancer patient and it usually occurs with

23   advanced AIDS and they can severely waste away.  I had

24   mentioned to you we had one patient at our facility that went

25   from 1 -- at the hospital, not inside our facility, went from      09:26:54

United States District Court

JOHN O'STEEN, M.D. - Direct

1   182 pounds down to 120 pounds over the course of one month.    09:26:58

2   And came to us with AIDS-wasting.  And we had to do fluid

3   resuscitation, give him several different medications to

4   stimulate his appetite, food supplements, Boost, and he left

5   the facility weighing 185 pounds.    09:27:17

6   Q.   So an individual came to you roughly at 120 in an

7   AIDS-wasting condition?

8   A.   Yes.

9   Q.   And you were able to alter or change that condition

10  through the implementation of nutritional supplements?    09:27:29

11  A.   Yes.

12  Q.   Such that they were no longer in an AIDS-wasting

13  condition?

14  A.   Correct.

15  Q.   That's a scenario that can be rectified or fixed within    09:27:35

16  CoreCivic or the Bureau of Prisons?

17  A.   Correct.

18          MS. BROOK:  May I have one moment?

19          THE COURT:  You may.

20  BY MS. BROOK:    09:28:11

21  Q.   Since Mr. Wahid arrived in CoreCivic in your facility, has

22  he improved or declined in his physical condition?

23  A.   He's improved significantly.

24  Q.   Can you describe that?

25  A.   His various aches and pains have gone away, he's gained    09:28:21

23

JOHN O'STEEN, M.D. - Cross

| | |
|---|---|
| 1 | weight.  He's quite functional.  I've seen him out in the cell | 09:28:25 |
| 2 | blocks where he's as functional as anyone else.  He's doing |
| 3 | quite well. |
| 4 |        One of the interesting things about Mr. Wahid is that |
| 5 | he shared with me that it was his understanding of AIDS that | 09:28:37 |
| 6 | once his CD4 count dropped down to 40 that it was inevitable |
| 7 | that he was going to progress on to death, and I have spent |
| 8 | quite a bit of time trying to reassure him that that simply is |
| 9 | not true unless he refused treatment.  If he accepts treatment, |
| 10 | he can live for many decades yet. | 09:28:58 |
| 11 | Q.   And CoreCivic and the Bureau of Prisons provides that |
| 12 | treatment that you're referring to? |
| 13 | A.   Absolutely. |
| 14 |        MS. BROOK:  I don't have any other questions. |
| 15 |        THE COURT:  All right, sir.  Thank you Ms. Brook. | 09:29:10 |
| 16 |        Mr. McBee? |
| 17 |        MR. MCBEE:  Thank you, Your Honor. |
| 18 | **CROSS - EXAMINATION** |
| 19 | BY MR. MCBEE: |
| 20 | Q.   Good morning, Doctor. | 09:29:20 |
| 21 | A.   Good morning. |
| 22 | Q.   What is the CD4 you were talking about a moment ago? |
| 23 | A.   Pardon? |
| 24 | Q.   What is the CD4 you were mentioning? |
| 25 | A.   It's a white blood cell that's attacked by the HIV virus | 09:29:28 |

United States District Court

JOHN O'STEEN, M.D. - Cross

1   and ultimately destroyed if the virus is not contained and          09:29:32

2   controlled and it's necessary for fighting off various

3   infections and cancers, the CD4 cell.

4   Q.    If the viral load goes down, does the CD4 go back up?

5   A.    Yes.  There's -- sometimes there's a discordance between      09:29:48

6   those two but it's rarely seen.  Most of the time, particularly

7   with our modern medications, CD4 or the load rapidly declines

8   and the CD4 count increases.

9   Q.    Now, does that potentially lead to an infection?

10  A.    Pardon?                                                       09:30:10

11  Q.    Could that lead to an infection?

12  A.    Well, as long as he has a CD4 count under 200, he's at

13  risk.  He is taking medications to prevent opportunistic

14  infections now in addition to his HIV medication.

15  Q.    So he still has that opportunity of opportunistic            09:30:26

16  infection?

17  A.    Of course.

18  Q.    Doctor, is the care given inside the prison, is that

19  equivalent to what somebody would find in the health care

20  facility outside of prison?                                         09:30:39

21  A.    We recently had an outside nephrologist claim that he felt

22  our inmates were receiving better care than most people in the

23  general public were and we provide exceptional care.  You know,

24  CAFCC in 2018 was voted the best correctional health care

25  facility in the United States by NCCHC, so we do a good job        09:30:59

25

JOHN O'STEEN, M.D. - Cross

1   there.                                    09:31:07

2   Q.   Other than anecdotally speaking with that other doctor, do

3   you know if the care is equivalent to or better than the care

4   that you would receive in the private sector?

5   A.   I think many cases it's better.            09:31:16

6   Q.   And when you say "in many," do you mean most or?

7   A.   Most.

8   Q.   Okay.  So in most cases you would say that prison health

9   care is better than --

10  A.   At least at our prison.  I'm not talking about other    09:31:25

11  prisons such as Arizona Department of Corrections.

12  Q.   Are you talking about the federal prison system in general

13  as well?

14  A.   You know, I've never had direct experience with the Bureau

15  of Prisons as far as working there.  So I couldn't say with  09:31:38

16  certainty.  I know what their protocols are because we have

17  access to those.

18  Q.   You mentioned a moment ago that CADC basically lets you do

19  what you need to do in order to treat patients?

20  A.   Yes.                                 09:31:57

21  Q.   Do you mean in terms of giving them drugs or what do you

22  mean by that exactly?

23  A.   Subspecialty consultations, hospitalizations, medications,

24  supplemental feeding if needed.  We're really not restricted by

25  CoreCivic.                               09:32:11

United States District Court

JOHN O'STEEN, M.D. - Cross

1   Q.   Do you know if the federal Bureau of Prisons is?                09:32:13

2   A.   I don't think they are restricted either.  They can pretty

3   much do whatever needs to be done.

4   Q.   Do you know if they do that?

5   A.   Yes.  They even have their own prison hospitals where they     09:32:22

6   can take care of very seriously ill people.

7   Q.   Okay.  So you're saying that you would know that the care

8   in the federal Bureau of Prisons would be at least equivalent

9   to what you do at CADC?

10  A.   No, I didn't say that.  I said the actual care I've never      09:32:35

11  witnessed.  I just know what their protocols are.

12  Q.   So you're assuming if they follow protocols, then they

13  would have good care?

14  A.   Yes.  And they don't have monetary concerns that cause

15  their care to be limited.                                           09:32:50

16  Q.   And that was going to be my next question.  Do you know

17  how much it's going to cost the taxpayers per year for

18  treatment like this?

19  A.   The Genvoya that he's on currently costs $3500 a month.

20  Q.   And are there other associated costs besides that one?         09:33:07

21  A.   Well, he's take something other medications, too, to

22  prevent opportunistic infections, but those are generic and the

23  cost of those are not great.  Lab work is somewhat costly.

24  That has to be done on a regular basis.

25           Physician time is somewhat costly.                         09:33:25

United States District Court

1    Q.   Thank you, Doctor.                                          09:33:27

2              MR. MCBEE:  May I have just one moment, Your Honor?

3              THE COURT:  You may.

4              (Defendant confers with counsel.)

5              MR. MCBEE:  No further questions.                      09:33:41

6              THE COURT:  All right.  Thank you, Mr. McBee.

7         Ms. Brook, may the witness step down or do you have

8    redirect?

9              MS. BROOK:  I have no further questions.

10             THE COURT:  All right.  May the witness be excused?    09:33:50

11             MS. BROOK:  Yes.

12             MR. MCBEE:  Yes, Your Honor.

13             THE COURT:  All right.  Dr. O'Steen, thank you.  You

14   may step down.

15             THE WITNESS:  Thank you.                               09:33:58

16             (Witness excused.)

17             THE COURT:  All right.  Thank you, counsel.  Does the

18   Government have anything further to present with regard to this

19   issue other than argument which we'll suspend for the moment?

20             MS. BROOK:  No, Your Honor.                            09:34:15

21             THE COURT:  Thank you.

22             MR. MCBEE:  Your Honor, should we return to the

23   lectern?

24             THE COURT:  Yes.  I think that will facilitate moving

25   things along.                                                    09:34:38

                    United States District Court

1    Before we heard from the witness, the Court had
2  confirmed the judgment, gone through the guidelines, set forth
3  the calculations.

4    I will now begin to process through the issues.  What
5  remains is to address departures and then address the
6  evaluation of the 3553(a) factors.

7    As a starting point, one of the reasons that this
8  sentencing hearing was continued was at the last sentencing
9  hearing when Mr. Wahid was representing himself, was the
10 homework that the Court gave the parties if they elected to
11 brief the Court on the issue of what I perceived as an
12 incongruency between the guideline calculations and a limiting
13 factor of statutory max on the 1001 charge.  The issue, if the
14 parties will recall, is that the guidelines, properly
15 calculated as this Court found them to be in the last instance
16 and that the parties have agreed, the guideline here is 262 to
17 327 months.  That is roughly 22 to 27 years.

18    But that the false statement charge has a statutory
19 maximum of eight years and the Court found that the 18-level
20 enhancement for being intended to promote terrorism was proven
21 but it was only alleged and, therefore, only found to be proven
22 as to the false statements charge and so there was a logical
23 disconnect that the Court sought to have the parties argue and
24 enlighten.

25    The Government took the opportunity to file a brief

United States District Court

09:34:40
09:35:09
09:35:36
09:36:05
09:36:36
09:37:04

29

1    according to the Court's schedule and the Court appreciates the          09:37:07

2    contents thereof.

3         The Government's position was that the enhancement

4    for being terrorism-related applies to any obstruction-related

5    charge.  That would include witness tampering as well and the          09:37:37

6    Court agrees that it is true that you start off under Section

7    2J1.2, whether the conviction is for a false statement or

8    witness tampering, but the issue that the Court continues to

9    have is that the terrorism allegation was made in the

10   indictment and then proven or at least the Court found proven          09:38:02

11   only as to the false statement charge.

12        The argument is made in the Government's brief that

13   in so finding that the terrorism allegation has been proven, it

14   could apply to either charge.

15        I think that given that this enhancement of 18 levels          09:38:26

16   is greater than the base offense level by itself, it is truly

17   or would be the tail wagging the dog.  In other words, having

18   an outsized effect on the overall range and, therefore, would

19   need to be proven as to the specific charge.

20        And so there the Court parts ways with the Government          09:38:46

21   and I don't conclude that the application of the enhancement

22   for 18 levels could be applied to the witness-tampering charge

23   in this circumstance where it was not alleged in the indictment

24   and not expressly found to be proven by the Court.

25        For that reason, the sentence on the false statement          09:39:14

United States District Court

1    claim necessarily would be limited to 96 months, eight years.      09:39:21

2          I understand exactly why Officer Duran wrote the

3    report and did the calculations the way she did.  Again, the

4    calculations themselves are correct.  They are created,

5    executed and formulated and then calculated in a vacuum that      09:39:42

6    doesn't necessarily consider the application of statutory

7    maximum up to a given case.

8          And if the guideline calculation were done as to the

9    witness-tampering charge without the enhancement, it would not

10   yield a number like 166 which is what was given.      09:40:15

11         Mr. Koehler?

12         MR. KOEHLER:  Your Honor, if I might be heard on that

13   precise point.  Section 1512 doesn't have the same enhancement

14   that Section 1001 has.  If the Government had only charged Mr.

15   Wahid under Section 1512, so no 1001 charge at all, no      09:40:34

16   terrorism enhancement at all, the same guideline would apply,

17   the 2J guideline.  The same cross-reference would apply.  The

18   Government would have the burden under the guidelines and under

19   the Ninth Circuit case law to prove that cross-reference by

20   clear and convincing evidence and then that same      09:40:55

21   cross-reference would apply if, in fact, we had done so.  And

22   we would submit in this case that we did, in fact, prove the

23   applicability of that cross-reference to Section 1512 even

24   independently of the 1001 charge.

25         THE COURT:  All right.  I don't think -- okay.  I      09:41:13

don't think that anything you said is inconsistent with where I      09:41:14

was going.  If my communication wasn't clear, I will say now

that I agree with what you stated.  The one thing I don't agree

with is that because it was alleged in association -- the

terrorism enhancement was alleged in association with the 1001      09:41:35

in the indictment only and because I expressly found the

relationship to terrorism only with regard to 1001, it can't

carry forward in this case.  That is the Court's ruling on that

point.

        In some ways, however, while the Court feels it      09:41:54

necessary to clarify this now, in some ways, the issue of

statutory limitation and their effect here are mooted by the

Government's own position which the Court credits, and that was

that the Government's recommendation is a sentence of eight

years on each claim to be served concurrently or at the same      09:42:25

time and that would entirely obviate the concern, the legal

concern, of limitation and the guidelines being at

cross-purposes if the Court accepts that.  And I will indicate

that the Court does accept that position as rational.

        I will next move on to the motions for departure and      09:42:59

I would find that the defendant has not proven by a

preponderance or otherwise that he qualifies for departures

under 5H1.4 for extraordinary physical impairment or 5C1.1 for

physical condition based not only on the testimony of

Dr. O'Steen today but on the disclosure and submittal for the      09:43:30

09:43:38
1   Court of several of the same underlying facts in the

2   Government's brief prior.

3          And Government would also find that the requested

4   departure under Section 5H1.1 of the guidelines for age is not

09:43:58
5   triggered here given that where Mr. Wahid is in his life and

6   with health, he doesn't meet the qualifications for that

7   departure.

8          I think at this point, having streamlined what the

9   remaining issues are, it is now appropriate for the Court to

09:44:34
10  hear from the parties.  I want to make a record that there were

11  copious filings in this case pertaining to the sentencing issue

12  which the Court considered, reviewed, internalized all of them

13  and that includes several filings that Mr. Wahid made on his

14  own even after Mr. McBee had been reappointed as counsel.  The

09:45:03
15  Court didn't need to consider those because under ethical Rule

16  1.2, the client is responsible for the decisions involving the

17  strategic objectives of the representation; that is, whether to

18  go to trial or plead guilty, whether to testify at trial,

19  whether to appeal if the result is not favorable, but that the

09:45:30
20  attorney is specific for all tactical decisions to implement or

21  seek the strategic objective that the client has identified and

22  that includes things like filing motions or not, calling

23  witnesses or not, asking certain questions or not.

24         And so -- and I indicated this in an order, just to

09:45:53
25  be clear, that once Mr. McBee was reappointed, the Court need

1    not consider the filings that Mr. Wahid made because it is the    09:45:58

2    decision of the attorney to make those filings or not.

3            Nonetheless, given that Mr. Wahid had filed them and

4    may have been confused about it at the time, I went ahead and

5    read them and considered them and internalized all of them and    09:46:13

6    they are part of this.

7            So in addition to the indictment, the amended

8    findings of fact and conclusions of law, the presentence report

9    in its final form, all of the objections filed and all of the

10   motion practice, I'm now ready to hear from the parties.    09:46:35

11           I would like to start with the defense.  And

12   Mr. McBee, I will allow you to control the order of

13   presentation in case it's more than just you speaking.

14           MR. MCBEE:  Thank you, Judge.  If possible, I would

15   like some of the family members to speak first if that is    09:46:48

16   acceptable to the Court.

17           THE COURT:  That's fine.  And if you would like them

18   to go first, then if you and Mr. Wahid would return to counsel

19   table, we can have them come forward.

20           Good morning, ma'am, and welcome.  If you want to    09:47:09

21   step up to the lectern.  And if you could start by telling us

22   your name for the record.

23           MS. HYMEN:  My name is Yazmin Hymen.

24           Your Honor, I am writing this urge leniency in the

25   sentence of my father.  Not only is he my best friend but he is    09:47:22

United States District Court

1    a good man with a good heart.  He's kind and caring, person who      09:47:28

2    puts everyone's needs before his own.  If you need a place to

3    stay to get back on your feet, my father will welcome you with

4    open arms.  He simply wants the best for everyone.

5            My father is also the one who stayed when my mother       09:47:42

6    left.  Even with the very little he had, he still managed to do

7    the best and give us the world.  For that I will be forever

8    thankful.  Therefore, losing my father would hurt a million

9    times more, probably no different than the feeling from losing

10   my sister in a car accident.                                    09:48:01

11           Locking my father up would force to us lose our home

12   and separate the very few family I have.  So, Your Honor, my

13   father means no harm and I am begging you to take what I said

14   into consideration.  Thank you.

15           THE COURT:  All right.  Ms. Hymen, thank you.           09:48:18

16           MR. MCBEE:  And, Your Honor, I would just like to

17   make a quick record.  Normally, most of his kids, if not all of

18   his children, are able to come.  They just weren't all able to

19   make it today, but he does have good family support from those

20   individuals.                                                    09:48:39

21           In reference to the sentencing itself, from my

22   perspective Your Honor, it's kind of challenging in the sense

23   that I think this case is one of perception more than many and

24   what do I mean by that?  Well, if you have somebody, for

25   example, who committed kidnapping or an aggravated assault or   09:48:54

United States District Court

1    homicide and with a certain criminal history and how the act   09:49:01

2    was committed, most people involved in the criminal justice

3    system could say, "Your plea is probably going to end up in

4    this range," and be close within a couple of years.  Or, "If

5    you go to trial and lose, your range is probably going to be   09:49:12

6    within this range."

7           But when you talk about a situation like this,

8    there's just not a lot of every day analogs.  There's just not.

9    That's what I mean when it comes down to perception, Your

10   Honor.  I know the Court has read many, many filings over the   09:49:25

11   years on this case then it was -- and that was the most

12   challenging part for me I think is to say something that I

13   didn't think the Court was already aware of because I know the

14   Court has reviewed so much and so much of it is duplicative.

15          But at the end of the day, Your Honor, I would   09:49:39

16   implore the Court to really look at this case and I know you

17   have, Your Honor, because we are talking about something that

18   is on the same level, even if you're talking about eight years.

19   You know, you find that frequently in home invasion cases,

20   people who have been selling large amounts of drugs and usually   09:49:55

21   have priors, in that case, unless it's a very large quantity of

22   drugs and so forth.

23          It just seems incongruous that Mr. Wahid would do

24   that kind of time for an offense like this.  And, again, as an

25   American, I know we hear the word "terrorism," we get terribly   09:50:13

United States District Court

1    bristled at that because, obviously, this nation is the target          09:50:18

2    of a lot of it.  But on the other side of the equation, Judge,

3    most of the things I have found, the person was at least

4    similar to Mr. Wahid's situation, most of those individuals

5    were much more involved in terrorism.                                    09:50:31

6          In this case Mr. Wahid is sort of a tangential

7    character.  He was asked, you know, by some individuals to do

8    them a favor and he did it and then he lied about it later and

9    all of that is wrong.  And then, you know, as basically

10   advising another individual not to cooperate.                            09:50:46

11         But as I mentioned in my memo, Judge, this one to

12   make sure that the plan came to fruition or they knew of the

13   plan was hoping that it would be carried out, that he was

14   actively seeking to, you know, siderail the investigation.  I

15   think this is really much more of a situation that Mr. Wahid           09:51:03

16   feels that Muslims in this country are kind of unfairly

17   targeted and sometimes charges are brought up without having a

18   lot of evidence.  And so he has a certain fear of the

19   Government, Judge, and I think more than any kind of terrorism

20   ties, that's really what led his two offenses, Judge.  He             09:51:20

21   didn't want the other individual to get, you know, investigated

22   for something that he felt nobody could do anything about at

23   this juncture in terms of witness tampering.

24         In terms of the false statement again I don't think

25   he thought much of that envelope and I don't think he thought         09:51:37

United States District Court

1   it had anything to do with terrorism and he just didn't feel     09:51:39

2   the need to, you know, throw other individuals under the bus

3   that has been killed already or -- or any individuals who might

4   have had the envelope to be prosecuted.  And, again, Judge,

5   none of that is right but it gets back to the issue of     09:51:53

6   perspective.  When you talk about Mr. Wahid who, in all other

7   details, just lived an ordinary life, lived with his children,

8   helps raise his children, does what he can to get by on a daily

9   basis.

10          Again, as the Court is aware, there was a pretty big     09:52:07

11  investigation into Mr. Wahid and they found no personal links

12  to ISIS our ISIL or any of those kind of organizations where he

13  was seeking to do harm.

14          So, Judge, since he really -- again, the Court is

15  fully aware of his crime.  Since he lied about the envelope and     09:52:21

16  then advised somebody not to come forward later, does that

17  amount to the worst kind of conduct you can see in this case

18  which would justify a max sentence?  On the one hand, you could

19  say of course because that's why they had the guideline so

20  draconian; but on the other side of the equation, when you look     09:52:37

21  at the individuals that I pointed out in my sentencing

22  memorandum, I think all of those individuals were worse.

23          Those were all west side of the country cases.  And

24  of course they took plea agreements.  And, again, there would

25  be benefits or plea agreements.  That's why it's in there.  But     09:52:50

United States District Court

1   really when you look at a plea agreement you usually talk about        09:52:53

2   four, maybe five the you're lucky departures downward for

3   taking a plea which in Mr. Wahid's case would still lead to a

4   fairly serious sentence, Judge.  And that's why I point more to

5   the *Booker* decision, Your Honor, because these things should be      09:53:08

6   advisory because when you're talking about an 18-level

7   enhancement, there should be a gatekeeper that says, well,

8   maybe that just doesn't apply in this case factually.

9          And that's where I was -- really where I was going

10  for things more than anything, because if you look at the facts       09:53:21

11  of this case and Mr. Wahid as an individual, it just seems out

12  of whack to implement eight years.  And on a certain level,

13  it's hard to articulate because, again, we all are in the

14  criminal justice system so there's just something we know.

15  When you do eight years ago there's a certain level baseline          09:53:37

16  offenses you do to get eight years.  And if it's somebody who

17  has a negligible criminal history, it has to be something

18  pretty serious.

19         Was this serious?  Absolutely it was serious but,

20  again, nobody was hurt as a result of his actions.  Nobody got        09:53:49

21  killed.  Nobody got maimed.  Nobody got injured.  And in fact,

22  I think it's pure speculation that the investigation would have

23  turned up anything else because I just don't think Mr. Wahid

24  was involved in that level.

25         So for those reasons, Your Honor, I would ask the              09:54:02

United States District Court

Court to take an objective look at this case and Mr. Wahid as    09:54:05
an individual and really what he's done in context with the
criminal justice system as a whole.  Because if you add all of
those things, 96 months of incarceration seems very steep.  And
really, even an area of five years is very steep.  But, again,    09:54:19
I recognize that it's one of perception and the Court is maybe
different.  But my overall objective this morning, Your Honor,
is that we could talk about departures and we could talk about
aggregating and mitigating factors; but at the end of the day,
it boils down to how does each individual view Mr. Wahid's    09:54:37
behavior?  Because I think the charge itself is really what is
driving this bus because it's not just his criminal history.
It is what he's done but, again, the terrorist enhancement is
pretty broad.  And when you look at it in a sense that it can
apply to somebody who is actually involved in terrorism or    09:54:55
somebody who is just peripherally involved in it, it really
seems like there should be a gatekeeper, again, Your Honor, and
I think that's why the *Booker* decision is so important.

          So as I note in my memorandum, my perception in this
case is that it really doesn't call for any more than three or    09:55:11
four years of incarceration at the max.  It seems like the
goals of the criminal justice system would be met.  We're
talking about a individual who has never been to prison before,
never done anything substantially wrong before.  Four years is
a long time in prison for somebody who made a false statement    09:55:26

United States District Court

1   and, you know, tampered with witnesses afterwards.              09:55:28

2           So I think that would meet just punishment,

3   deterrence and so forth and that is the kind of sentence I

4   would ask the Court to impose.

5           THE COURT:  All right.  Mr. McBee, thank you.           09:55:40

6           Mr. Wahid, is there anything you would like to add

7   sir?

8           DEFENDANT WAHID:  Can I get some tissue, first?

9           THE COURT:  Yes.

10          DEFENDANT WAHID:  I kind of prepared -- it's a little   09:56:15

11  lengthy.  I know you know how I like to write stuff.

12          THE COURT:  That's fine Mr. Wahid.

13          DEFENDANT WAHID:  It's kind of an addendum to my

14  sentencing memorandum and I'm going start and read it to you.

15  It says:  Your Honor, I have received the Government's          09:56:32

16  sentencing memorandum and felt compelled to respond to it in my

17  defense.  In my addendum for sentencing memorandum, Your Honor,

18  I wanted to respond to their sentencing memorandum in my

19  addendum for memorandum to clarify anything the Government had

20  stated in their sentencing memorandum to persuade you by        09:56:51

21  distorting my character, thereby clearing up any misconceptions

22  the Government presented to you about me.

23          Point one, beginning with the Government's memorandum

24  regarding imposition of consecutive sentences, on page five

25  under line ten, the prosecution states in relevant part, quote,  09:57:05

United States District Court

1   defendant was aware as of May 6, 2015, when he first spoke to          09:57:11

2   agents that the matter agents were investigating involved

3   international terrorism.

4            True, it did involve terrorism, but I was not aware

5   that there was an ongoing investigation that involved             09:57:22

6   international terrorism.   Why?   Because the FBI never mentioned

7   that there was an ongoing investigation.

8            Your Honor, point two, Your Honor, also on page five,

9   lines four, 14 and 15, the Government states in relevant part,

10  quote, this court found Wahid called and spoke to Ali at length     09:57:54

11  several times, including four telephone calls, unquote.   Please

12  note that -- please note this, Your Honor.   The Government only

13  played clips of what they wanted you to hear.   They didn't play

14  the actual entire phone calls where you will hear Ali Soofi

15  dialing my number, calling me more than twice, because he was      09:58:13

16  there inadvertently working with the FBI, recording our phone

17  calls.

18           The entire phone calls can be found on Bates CD.   The

19  way the Government portrays it, it is as if I went out of my

20  way to call Ali Soofi.                                              09:58:28

21           Once more, the truth lies within the Bates CD,

22  recordings of Abdul Malik, Ali Soofi and myself.   It can be

23  heard on one of the Bates CDs, Ali Soofi telling Abdul Malik on

24  the phone for Abdul Malik to take Ali Soofi's phone number and

25  give to it me so I can call Ali Soofi.   Initially, it was Ali      09:58:49

1    Soofi reaching out to me, not the other way around.  In fact,    09:58:52

2    the first time I speak to Ali Soofi, it was him calling me.

3    This is the truth.  I have no reason to lie.  The Bates CDs

4    prove I am telling the truth.

5           Point three, moving along to the Government's    09:59:06

6    sentencing memorandum, Your Honor, also on page three, lines 14

7    through 28, it shows a dialogue of the prosecutor and I.  The

8    prosecutor is asking me questions about Elton Simpson and ISIS

9    attacks.  And I made it correctly, exactly, true, correct and

10   right as to what I meant about knowing that Elton Simpson was    09:59:28

11   an ISIS supporter in contrast to the prosecutor asking me

12   questions on the stand about me knowing that Simpson was a

13   supporter for ISIS was a great error on my part -- on my part.

14          Had I been paying close attention with how she was

15   questioning and the entire contents of her questioning and not    09:59:45

16   just focusing on the first half of her questioning and,

17   therefore, not paying any attention to the second half of her

18   questioning that all ended with ISIS attacks.  In other words,

19   I didn't pay any attention to her constantly referring to ISIS

20   attacks.  Had I paid attention to what she was asking me, I    10:00:01

21   would have told her that I couldn't answer her with a "Yes" or

22   "No" because, yes, I did not like him to encourage my son

23   concerning jihad, but I did not know at the time that he was an

24   ISIS supporter.

25          Also, yes, he did ask me to join him in the attack on    10:00:16

United States District Court

1   a military base, but he didn't mention to me that it was in the      10:00:19

2   name of ISIS.

3            The prosecution also goes as far as and says that I

4   am paraphrasing -- I am paraphrasing what they state on May 6,

5   2015, before their period, that I knew that Elton Simpson's was    10:00:39

6   an ISIS supporter.  That is an untrue statement and

7   inconsistent with the FBI May 6, 2015, transcript.  Your Honor,

8   if you read over the transcript, you will find a dialogue with

9   the FBI and I discussing Elton Simpson asking me to join him in

10  his attack on the military base.  Please take note, Your Honor,   10:00:57

11  I never ever mentioned that I was aware or knew that Elton

12  Simpson was an ISIS supporter, nor did the FBI ask me about

13  Elton Simpson having ties to ISIS, nor did Elton Simpson

14  mention to me before May 6, 2015, that he was an ISIS

15  supporter.                                                        10:01:15

16           Point four, also in the Government's sentencing

17  memorandum where the prosecution states in part, quote, Wahid

18  failed to alert law enforcement of the danger -- I'm sorry.

19  Let me start over.

20           It says:  Also in the Government's sentencing           10:01:30

21  memorandum where the prosecution states in part, quote, Wahid

22  failed to alert law enforcement of the danger Simpson and Soofi

23  presented to the United States, unquote.

24           It's true I did not alert law enforcement with good

25  reason.  Where I come from in Philadelphia, the rule of code is   10:01:48

United States District Court

| | | |
|---|---|---|
| 1 | mind your own business.  In other words, if something sinister | 10:01:53 |
| 2 | is going down, you mind your own business or else something | |
| 3 | sinister could happen to you. | |
| 4 |         This is something that is naturally passed down from | |
| 5 | generation to generation in the black community, something that | 10:02:06 |
| 6 | some of the white race would not understand.  In other words, | |
| 7 | look at it from my perspective.  When Elton Simpson came to me | |
| 8 | with the idea, imagine how I felt?  For one, I didn't really | |
| 9 | think he would do something so crazy.  And at the same time, I | |
| 10 | felt a little leery and a bit frightened; and had I chose to | 10:02:23 |
| 11 | tell law enforcement, I'm pretty sure he would have figured out | |
| 12 | it was me, since I was probably one of his few people he told | |
| 13 | this -- he told in his circle of friends. | |
| 14 |         I don't know who he knows or what connects he could | |
| 15 | have had and, therefore, if I alerted law enforcement, how | 10:02:39 |
| 16 | would I know if he -- how would I know if he had my name put on | |
| 17 | some sort of hit list and had me killed or hurt my family? | |
| 18 | These are the reasons why I didn't think of calling law | |
| 19 | enforcement. | |
| 20 |         And point five, and on page five of the Government's | 10:02:53 |
| 21 | sentencing memorandum, on page five, lines two and four where | |
| 22 | the prosecution states:  Wahid's crimes were motivated by his | |
| 23 | allegiance and commitment to his friend Elton Simpson, let me | |
| 24 | state this and make this very clear:  I have no allegiance to | |
| 25 | no man, except Allah, who is my creator, who is not a man | 10:03:16 |

United States District Court

1    because he is my creator.                                              10:03:19

2            Secondly, what good would allegiance mean to him?  He

3    is nonexistent; therefore, it's no benefit for him.  Most

4    important, Your Honor, how could the prosecutor say that I was

5    an allegiance and committed to Elton Simpson?  Clearly, if       10:03:35

6    there was allegiance and a commitment to Mr. Simpson, then

7    there should have been no problem with Mr. Simpson trying to

8    influence my son to join his cause in jihad.  I reiterate, the

9    prosecution states that I have an allegiance and commitment to

10   Elton Simpson, yet in their own pleading -- in fact, in their    10:03:53

11   sentencing memorandum, page three, lines 14 through 22, the

12   prosecution is asking me on the witness stand about Elton

13   Simpson talking to my son about jihad or the fact that he was

14   trying to influence my son and I started -- and I stated

15   negative, I did not approve.                                     10:04:08

16           This clearly proves that there was no allegiance or

17   commitment to Elton Simpson because if I were in allegiance or

18   committed to him, I would have approved of him speaking or

19   influencing my son concerning jihad.

20           Also, point six, also regarding my request for a         10:04:24

21   downward departure, concerning 4A1.3, the prosecution states on

22   page seven of the sentencing memorandum, lines one and two, the

23   prosecution in part states, quote, Wahid offers no

24   justification for this argument.  Rather, he simply asserts

25   that Section 3A1.4 overstates his criminal history placing him   10:04:43

1    in a category VI.                                                    10:04:50

2           Therefore, I state my justification for a downward

3    departure 4A1.3, that is by placing me into a category VI from

4    a category I classifies me as a career offender and that a

5    category VI would be equivalent to nine or ten felonies, which    10:05:02

6    is something I've never committed in my life, which I feel is

7    grossly unfair, and not just -- it also -- and not just that.

8    It also creates fictitious felonies.  The above reasons are my

9    justification for the request of a downward departure for

10   4A1.3.                                                             10:05:20

11          It would be as if I shot someone, as one of them did,

12   even though I was not par -- I was not -- even though I was not

13   a participant in their group.

14          Also by accepting responsibility -- wait a minute.  I

15   skipped.  Oh.  I did.  Sorry.  So sorry.  Hold on.                 10:05:46

16          I have to back up.

17          It says, point seven, now moving into accepting

18   personal responsibility, my reason as to why I revoked my

19   acceptance of personal responsibility, I will not accept

20   responsibility because the prosecution wants me to accept         10:06:01

21   responsibility per rule of Congress which is, if I committed

22   the act myself -- which is as if I committed the act myself.

23   This implies that I carried out the act of terrorism along with

24   Elton Simpson and Nadir Soofi; and, therefore, it would be as

25   if I shot someone as one of them did -- as one of them did,       10:06:20

1   even though I was a participant in that group.  I'm just going   10:06:26

2   in circles.

3          It would be as if I shot someone as one of them did,

4   even though I was -- what I'm trying to say is that, basically,

5   because I kind of messed this when I was writing it.  I was   10:06:43

6   writing it pretty fast.  What I was saying was that I feel that

7   them asking me to accept responsibility would be as if,

8   according to the Congress rule or law or something like that,

9   where it states that it's as if I did the act myself, and that

10  made me assume that it meant that it is as if I went out there   10:07:02

11  and shot this guy in the leg along with the other two when they

12  were out there in Texas.  And I was nowhere near them.

13          So that was one of the reasons why I wouldn't accept

14  personal responsibility.

15          I am also agreeing that I shouldn't be placed in a   10:07:18

16  category VI -- hold on.

17          I'm going to skip that part.  Basically, the U.S. is

18  asking me to lie on myself in the name of justice.  To me, that

19  doesn't sound like justice.  That sounds like insanity.  If I'm

20  wrong, then I apologize.  However, I will not lie on myself for   10:07:58

21  the sake of justice.

22          Also, point eight, also in the prosecution's

23  sentencing memorandum, or memorandum regarding potential

24  imposition of consecutive sentences, it was stated by the

25  prosecution that my behavior by filing motions in my defense   10:08:14

was obstructive.  If this is the place as to where the U.S.        10:08:18

justice system is, then why bother having trials and court?

Just simply snatch people up and lock them up in the name of

the United States.

        The last time I checked, I thought I had a right to      10:08:31

stand up and at least halfway try and defend myself according

to the U.S. Constitution, especially if I feel injustice is

being done to me.  So I guess according to U.S. Attorney, if

you try to defend yourself or don't agree with the judge's

decision or you don't agree with the prosecution, you are,       10:08:45

therefore, undermining authority and jurisdiction and being

disrespectful to the U.S. Government.

        So, basically, the prosecution is implying that I

should be respectful and be silent and not stand up for myself

while the U.S. Government tramples all over my character and     10:09:04

labels me in the worst way possible.  To be honest, Your Honor,

that doesn't sound like justice and fairness to me.  It sounds

like the U.S. Government is being oppressive simply because it

can be.

        I will say this:  I am sincerely apologetic for any      10:09:19

harm or wrong I may have caused by lying, by omission, and the

fact that I may have tampered with a witness unknowingly.  With

the false statement, I truly believed I was protecting a friend

from being scrutinized by the FBI.  I didn't see or understand

the bigger picture that was seen by the Government with my       10:09:34

1  actions.                                                             10:09:38

2          And as far as the tampering with a witness, once

3  more, I truly believe that I was helping a friend who portrayed

4  or pretended to act as if he was scared and didn't know how he

5  was going to deal with the FBI.  It was never my intention that  10:09:49

6  he should lie to them.  I was simply trying to encourage him

7  that if he didn't want to talk them, he didn't have to.

8          I paid no attention that he was a witness because I

9  did not understand that he was a witness for the Government,

10 which is something he never told me.                              10:10:03

11         Also, Your Honor, the theory of the Government's

12 terrorist enhancement, even though it has enhancement on the

13 false statement, it appears to me that the Government has its

14 own theory as to how it's justified that the terrorist

15 enhancement also applies to the tampering with the witness.      10:10:23

16 What I notice is that legally, there is no lone laws on the

17 books such as the United States Code or Code of Federal

18 Regulations that gives the prosecution a right to enhance

19 tampering with a witness, considering there was no threat, no

20 injury or death to the witness, yet somehow they are requesting  10:10:38

21 that the judge sentence me to eight years for this charge.

22         Your Honor, as far as my health is concerned, like I

23 told you, I spoke with Dr. O'Steen and he did, in fact, educate

24 me with the right -- he did educate me that with the right

25 antiretrovirals, my viral level will decrease.  However, it      10:11:01

1   will take at least three months for my T cells to increase up          10:11:05

2   to 200.  Even though my viral load is decreasing, the fact

3   remains since my CD4 is still low, I am susceptible for

4   opportunistic infections.  This is the reason why I requested

5   home detention.                                                         10:11:20

6          I would like to say -- I would like to say as what my

7   attorney stated in the sentencing memorandum in the case of the

8   *United States District Court v. Akram Musa Abadallah* received

9   only 18 months from a judge from this very court for the same          10:11:38

10  offense I am being charged with, which is false statement,

11  except his level of degree concerning this charge was much more

12  serious than my statement.  The fact that he was giving

13  material support to a terrorist organization whereas no such

14  thing happened in my case with the same charge, but yet the

15  prosecution is requesting that I receive eight years.                   10:11:57

16         Your Honor, as I stated before, I am not a terrorist

17  and I don't aspire to be one.  Why, I don't even own a gun.  I

18  am just a typical, average American who is dad with his

19  children living with him.  I am very close to my children and

20  that's -- I'm very close to my children -- I'm very close to my        10:12:19

21  children and that's all I have time for, devoting,

22  concentrating on working and taking care of my children, making

23  sure they will eventually get out into the world with the tools

24  they need on how to protect and take care of themselves so they

25  can become productive members of society.  Therefore, I don't           10:12:36

1    have time for the terror nonsense.  That prosecution -- I don't        10:12:40
2    have time for the terror nonsense that the prosecution is so
3    desperately trying to portray me as.

4           I am still asking for leniency, Your Honor.
5    Therefore, I am still asking for home detention or probation.          10:12:55
6    Also, it's true my attorney requested 36 months.  However,
7    based off the *United States v. Akram Musa Abdallah*, who
8    received 18 months, considering the level of his false
9    statement was more heinous than mine, I also feel that there
10   would be a harm -- it would not be a harm in you giving me a           10:13:13
11   lesser sentence than what Akram Musa Abdallah received, which
12   is 12 months, and also included six months that I have been
13   incarcerated as time served.

14          If you don't feel that I deserve home detention or
15   probation, then I feel -- then I implore you to please send me        10:13:27
16   to Black Canyon prison.  That way it would create -- would it
17   not create a hardship for my children to come see me.  I am
18   asking you this, Your Honor, because my children are my life
19   and not being able to see them would definitely spiral me into
20   a deep depression.                                                     10:13:54

21          Without seeing my children, I might as well --
22          No.  I'm all right (to his attorney).
23          Without seeing my children, I might as well not be
24   alive or have a life.  Sorry.

25          THE COURT:  All right.  Thank you, Mr. Wahid.                   10:14:21

                        United States District Court

```
 1        Ms. Brook?                                              10:14:26

 2        MS. BROOK:  Your Honor, I have a number of things to

 3   address.  Would Your Honor mind if I addressed it at the

 4   podium?

 5        THE COURT:  If you would like to, that's fine.  I'll    10:14:33

 6   ask Mr. Wahid and Mr. McBee to return to counsel table.

 7        MS. BROOK:  Your Honor, before I begin, I'm wondering

 8   the Court reporter could read back something that the defendant

 9   just stated.

10        Cannot?  I'll incorporate that later then.  I wasn't    10:14:51

11   sure if that was something we could do.

12        Your Honor, the Government, as we have stated in our

13   filings before the Court, is requesting a sentence of no less

14   than eight years.  There have a number of filings before Your

15   Honor.  You sat before and presided over the trial in this     10:15:11

16   case.  You're well aware of the facts.  I'm going to tailor my

17   comments specifically to the application of 3553(a) factors,

18   the terrorism enhancement.

19        And before I begin, I want to come back and discuss

20   the two remaining downward departures that defendant has made   10:15:27

21   before the Court and had brought in argument.

22        The first, Your Honor, is that of family ties or

23   family responsibilities.  As set forth in our sentencing

24   motion, the defendant has three adult children.  In the PSR

25   under paragraph 47 it states clearly where each of those three  10:15:49
```

United States District Court

children are employed, and they are employed in positions where    10:15:53

they are receiving full-time work and full-time pay.  So with

that, there is not a circumstance that rises to the level of a

family ties downward departure such that his family or his

children need him for financial support.    10:16:07

Additionally, the defendant made a motion for minimal

role and aberrant behavior and I want to be clear.  As Your

Honor is well aware, this is not an instance of a one-time

lapse in judgment.  This is not an instance of an individual

who was otherwise leading a law-abiding life and in one moment    10:16:27

made a bad choice.

The defendant, over a course of months, engaged in

premeditated, deliberate obstructionist behavior.  That

behavior not only obstructed a terrorism investigation, kept

evidentiary from the FBI, it also obstructed, attempted to    10:16:44

obstruct testimony and information related to a critical

witness coming forward with information.

So aberrant behavior is not applicable in this

particular case because we have a course and scheme of conduct;

and, additionally, minimal role, he's the only participant.    10:17:01

That, too, is not available.

Your Honor, before I delve more into some 3553

factors, I want to discuss the issue of parity which was

brought before the Court in defense counsel's filing last

Thursday.  This area of law is not one that is rich with case    10:17:16

1    law examples.  It's not a dense field.  But defense counsel has        10:17:20
2    cited four cases.  Those four cases, when we look at them more
3    closely, are instructive in this case that the defendant
4    deserves a sentence of at least eight years.

5         And I want to walk through those a little bit.  There           10:17:34
6    are -- there is a case here, it's the Abdallah case, Akram
7    Abdallah.  He pled.  And when he pled guilty, so did the other
8    three cases that were cited by defense.  And just to be clear,
9    with the four cases total that were cited by the defendant,
10   none of those cases involved obstructing an ongoing terrorism      10:17:59
11   investigation in the aftermath of a terroristic attack.  None
12   of those cases cited involved a lie to the FBI about evidence
13   in that terrorism investigation.  And none of the cases cited
14   by the defendant involved tampering with a witness in a
15   terrorism investigation and a witness that was later a witness    10:18:19
16   in a material support charge.

17        All four of those cases cited by the defendant were
18   individuals who pled.  Two of them, the Arizona case, Akram
19   Abdallah, as well as the Montana case, Fabjan Alameti, when
20   they pled, they were subject to a different sentencing            10:18:39
21   guideline than that which is applicable today, so both of their
22   guideline calculations were 46 to 57 months.  The Montana case,
23   Fabjan Alameti, pled guilty and was sentenced to the maximum
24   under the sentencing regime which was 57 months.

25        There's a case out of San Diego cited by the                  10:19:00

United States District Court

1    defendant which is also instructive.  This individual was not        10:19:01

2    charged with material support.  It was a false statement with a

3    terrorism enhancement.  He pled guilty to a stipulated 96

4    months.  Again, his conduct were lies, amongst others, was

5    whether or not he knew ISIS supporters.  The conduct there          10:19:18

6    received the sentence of eight years.  And the Government here,

7    too, is asking for a sentence of no less than eight years for

8    conduct that is much more egregious.  We were in the midst of a

9    terrorism investigation as the Court knows.

10           Additionally, Jonathan Paul Jimenez, he was sentenced       10:19:35

11   to 120 months.  And when reading the transcript of sentencing,

12   it's clear that the Court said there were two counts from which

13   he was found guilty.  One was tax fraud.  The other was a 1001

14   with a terrorism enhancement.  The Court found a sentence of

15   120 months to be appropriate and said it didn't matter to which    10:19:52

16   count, Count 1 or Count 2, that he applied the 96-month

17   sentence but he applied it to Count 1.  Count 2 was sentenced

18   to 24 months for them to run consecutively for a sentence of

19   120 months.

20           At the end of the day, Your Honor, when it comes to        10:20:09

21   parity, the conduct by the defendant, as Your Honor is aware,

22   is different.  It's unique.  It's not just a lie to the FBI.

23   This was a lie to the FBI that was perpetuated over a period

24   time with systematic engaged conduct that was perpetuated by

25   the defendant in the midst of a terrorism investigation and the    10:20:29

1    obstruction of a witness in that terrorism investigation as                    10:20:33

2    well.

3            To go back to the 3553 factors, I want to touch upon

4    briefly the nature and circumstances of this offense.  Wahid

5    obstructed a terrorism investigations.  It was into an          10:20:50

6    attempted mass murder to provide support to ISIS.  In the hours

7    after that attempted mass murder, he boldly and repeatedly lied

8    to the FBI.  He decided that he would be the arbiter of

9    information that was given to the FBI.  He substituted his own

10   judgment for that of the FBI in determining what they should    10:21:07

11   know and when they should know it, who they should go and talk

12   to, where the investigation should go.  He lied and he tried to

13   get Ali Soofi to do the same.

14           The nature and the circumstances of this crime are

15   severe and they are significant.  Additionally, I want to talk   10:21:22

16   about general deterrence.  Intentional deception, as we were

17   just talking about, is, at its very core, about general

18   deterrence as articulated by the Sentencing Commission when

19   they enacted the sentencing enhancement.

20           The purpose of the terrorism enhancement is to            10:21:40

21   provide a message to the community that in these scenarios,

22   just like the defendant found himself, that conduct like the

23   defendant engaged in is so significant and so serious, we have

24   to send a message to the public in order to promote respect for

25   the law and to deter this type of conduct, that the sentence    10:21:56

United States District Court

1    needs to be significant and it needs to be serious.                        10:22:00

2          As the Court found in this particular case, the

3    defendant's conduct prevented the recovery of evidence that was

4    related to the investigation in the aftermath of this terrorist

5    attack.                                                                      10:22:13

6          Additionally, under the 3553, Your Honor, specific

7    deterrence for this defendant is critical.  And it is a very

8    important 3553 factor.  Wahid failed to alert law enforcement

9    to the danger of Simpson and Soofi even after he knew that he

10   had been invited by Simpson to participate in an armed attack              10:22:30

11   on a U.S. military base.  He got up here just a few moments ago

12   and denied that, said he didn't understand it.  He didn't know

13   the questions as he was multiple times asked not only on the

14   stand but also previously about this.

15         Your Honor, we put this excerpt into our sentencing                  10:22:49

16   motion but I just want to highlight.  So this is page 391 of

17   the transcript when Mr. Wahid was under oath and on the stand

18   he was asked in regards to Simpson showing up to talk to his

19   son:

20              You were angry about that.  Question.  You were angry           10:23:04

21         about that because you didn't like the idea of

22         Simpson talking to your son Waseem without you there?

23         His answer:  Correct.

24         Question:  And that frustrated you because you knew

25         that Simpson was obsessed with violent jihad?                        10:23:18

1        Exactly.  His answer.                                    10:23:22

2        You didn't want Simpson putting ideas into your son's

3        head about violent ISIS attacks?

4        This is true.

5        And you knew that because Simpson, just months          10:23:32

6        before, had asked you to partake in an ISIS attack

7        with him; right?

8        Correct, he responded.

9        He asked you to, with guns, go in and attack a

10       military base; correct?                                  10:23:48

11       Mr. Wahid responded:  Right.

12       These questions weren't confusing and the defendant

13   now is engaging in revisionist history about what he knew or

14   didn't know.  The primary concern is not only that he has

15   changed his position on these facts which were crystal clear  10:24:01

16   previously but that he is not taking responsibility for that

17   which he did, that which he knew, and that creates a concern

18   for specific deterrence.

19       Additionally, Wahid, when he spoke before, tried to

20   cast blame and said, "Ali is the one that contacted me."  We  10:24:19

21   know from the record at trial that that is absolutely not true.

22   Government's Exhibit Number 76, Kareem, who was with Wahid at

23   the time -- that's Abdul Malik Abdul Kareem -- was with Wahid,

24   was the first to call Ali the night of the attack, at 11:58

25   a.m.  And then the next day, this is Government admitted trial  10:24:42

Exhibit Number 77, Wahid texted Abdul Malik Abdul Kareem:          10:24:46
Would you send me the dang number already?  And then roughly 20
minutes later, they talk on the phone and then he texts, Kareem
texts to Wahid Ali's phone number.  And then Wahid messages
back to Kareem:  Right on, with a smiley face.  In that exact          10:25:06
same minute Wahid called Ali.

       Your Honor, just a couple more notes.  As has been
articulated through the testimony here today and filings, it is
through the defendant's care and treatment at CoreCivic and in
the future at the Bureau of Prisons that he will receive          10:26:00
extraordinary care in the sense that he will receive
medication, costly medication, but medication to which he is
entitled, the same medication which the Government would be
paying for regardless of whether or not he was in or out
because he is on disability.          10:26:15

       And by nature of the fact that he's now taking
medication, he recognizes that through treatment and care, he
can live a long and healthy life.

       The Government's hope for the defendant is that
through the course of the sentencing in this case that the          10:26:32
court exercises a verdict upon him that will deter him
specifically; that will resonate with him that the crime he has
committed is serious; and it will correct and adequately deter
him from criminal conduct in the future.

       The Government asks for a sentence of no less than          10:26:50

United States District Court

1   eight years to find a just punishment for this defendant for          10:26:53

2   his lying, his obstruction, and witness tampering in the midst

3   of a terrorism investigation and the aftermath of an attempted

4   mass murder to support ISIS.

5           Thank you.                                                     10:27:09

6           THE COURT:  All right.  Thank you, Ms. Brook.

7           All right.  Thank you for returning to the lectern.

8           As a way forward, I think the way that I'm going to

9   do this is to address the outstanding requests for downward

10  departures, in other words, address the guideline issues first       10:27:57

11  and then once the guideline issues have all been exhaustively

12  addressed, moving to the 3553(a) factors which would be the

13  ordinary course in a sentencing although not as involved as it

14  is in this case.

15          I do still have the outstanding issues for minimal           10:28:18

16  role and I agree with the Government on that point that there

17  can't be a minimal role in an offense that is conducted

18  entirely by one individual, nor do -- and so that request will

19  be denied as will be the request for a downward departure based

20  on aberrant behavior because it was -- the conduct of             10:28:39

21  conviction consisted of more than one offense, that while all

22  related, took place with time in between to reevaluate and

23  abandon a course of conduct and that didn't happen.

24          With regard to the request for a downward departure

25  for overrepresentation of Criminal History Category, I will         10:29:15

10:29:20

1   deny that request as well because the upward adjustment under

2   the guidelines to a Criminal History Category VI is mandated

3   once the Court makes the finding that it did.

4          To the extent that that bump from a Criminal History

10:29:37

5   Category I to a Criminal History Category VI and all that it

6   implies is outsized or the Court concludes it to be outsized

7   that can be addressed in a variance, which variance I think may

8   well be necessary in this case even if I accept the

9   Government's position that no less than eight years is an

10:30:07

10  appropriate sentence, because there's still a lot of distance

11  between a range of 262 to 327 months down to a sentence of 96

12  or more months.  So that addresses the guideline issues.

13         Once the guidelines have been correctly calculated,

14  the law mandates that the Court move on to consider the

10:30:35

15  sentencing factors that are listed exhaustively in Title 18 of

16  the United States Code, Section 3553(a).  I would note that the

17  briefing by both Ms. Brook and Mr. Koehler on the one side and

18  Mr. McBee's sentencing memorandum on the other efficiently and

19  squarely took on all of the issues that the Court has been

10:30:58

20  thinking about in this case and the lawyers are to be commended

21  because they did not waste time and they brought to the fore

22  all of the issues in favor of each party that the Court

23  necessarily needs to consider when evaluating.

24         The 3553(a) factors, Ms. Brook --

25         MS. BROOK:  Your Honor, I'm sorry for the

10:31:23

United States District Court

1    interruption.  Did the Court make a finding on 5H1.6 which is    10:31:24

2    family ties and responsibilities?

3            THE COURT:  I thought I did previously.  If I didn't

4    make that expressly for the reasons that the Government

5    mentioned, both in its brief and then Ms. Brook just presented    10:31:36

6    to the Court, the defendant does not qualify for the downward

7    departure under family ties given the situation of his family

8    now or I should say responsibilities.

9            Regarding the 3553(a) factors, there are, depending

10   on how you count them, seven or eight, the Court has to    10:32:03

11   consider all of them and then balance them to determine what

12   the appropriate sentence is in the case.

13           The factors that the Court concludes have an outsized

14   effect in this case include the nature of the offense and the

15   quantum of the harm, number one.  Number two, the individual    10:32:28

16   history and characteristics of the defendant, number two.

17   Number three, the need to protect the community from future

18   acts such as this by the defendant or by others who would see

19   what happened here and how the Court resolved it, which I will

20   shorthand as deterrence, both specific and general; and the    10:32:53

21   need for similarly situated defendants who commit similar

22   offenses under similar circumstances to receive similar

23   consideration or consequence from the Court, what Ms. Brook

24   referred to as parity and what I look to more broadly as

25   consistency and fairness.    10:33:24

United States District Court

1          With regard to the first factor, the nature of the          10:33:32
2  offense or offenses of conviction here, tied as they are, the
3  Court will not understate or underestimate the seriousness of
4  the offense.  It would be grossly inaccurate to characterize
5  the offense as nothing more than, on the one hand, a          10:33:56
6  misstatement or lie to agents of the FBI and an attempt to, on
7  the other hand, an attempt to get someone not to speak to those
8  officers or not to speak the truth to those officers.

9          The context which is recognized in the -- both the
10 offense and in the enhancing factor, is that this was a          10:34:28
11 misstatement and an attempt to get someone else not to talk or
12 misstate in the process of a federal criminal investigation of
13 the gravest importance and significance.  An attack in service
14 of a foreign and international terroristic organization that,
15 if successful, would result in the loss of life and just by its          10:34:57
16 existence, whether successful or not, would result in striking
17 fear and uncertainty into the public about their safety at
18 home.

19          Because of the nature of the existence of the
20 investigation and the nature of the existence of that          10:35:26
21 investigation, a misstatement, a lie, an attempt to get someone
22 not to speak has the potential for immediate effects that could
23 cascade into a lot more harm, a lot more loss.  It is unknown
24 at the time the lie is told or the person is persuaded not to
25 speak what those consequences will be and that is the          10:35:59

United States District Court

1  particular danger here.                                        10:36:05

2       Even if the Bureau was delayed for an hour or a day

3  in following assets, they and we will never know what

4  information was lost, what other harm could have been

5  prevented.                                                     10:36:29

6       It is proven, and the Court so found in writing, that

7  Mr. Wahid committed these two offenses and that he committed

8  them knowing something about the people involved, what their

9  sympathies were, what one of their past intentions was.  It has

10 not been proven, nor did it need to be proven, that Mr. Wahid  10:37:12

11 intended for them to succeed.  And the Court takes that into

12 account as well.  The gravity of the harm is thereby proof of

13 the elements of the offense itself regardless of what he

14 intended.

15      With regard to the second factor, the individual        10:37:41

16 history and characteristics of the defendant, the Court has

17 before it an individual that has some criminal history,

18 although nothing like this and nothing violent and all of it

19 quite old.  The defendant has made some statements during the

20 course of this matter, particularly when he was representing   10:38:06

21 himself on his own election, that could suggest hostilities,

22 recalcitrance and other things, but they also could be

23 something else and they also could reflect lack of legal

24 training, lack of understanding how to breach issues and lack

25 of how to contest evidence put on by the opponent.  And so the 10:38:41

United States District Court

1  Court puts no weight on any of those statements that Mr. Wahid    10:38:45

2  may have made in the course of executing his own defense,

3  conducting his own defense.

4          With regard to the third factor, deterrence, both

5  specific and general, the Court still has a bit of the question   10:39:12

6  on the issue of specific deterrence, in other words, it is not

7  as confident as the Government counsel is that a large sentence

8  is necessary to specifically deter this defendant from ever

9  doing something like this again based on lack of criminal

10 history, lack of recent criminal history, new indication of a    10:39:49

11 propensity towards violence, family situation and other things.

12         With regard to general deterrence and somewhat tied

13 to the issue of the seriousness of the offense itself, the

14 Court does conclude that the sentence must reflect the possible

15 consequences of doing something like this to anybody else who    10:40:21

16 is contemplating lying to a federal investigative agency in the

17 course of an investigation like this where the stakes are so

18 high and the potential for harm is so outsized.  And so that

19 factor at least militates towards a more serious sentence.

20         Finally, the fourth factor that the Court views as       10:40:48

21 having an outsized impact on the balance here is the parity

22 factor as referred to treating similarly situated defendants

23 who do similar things under similar circumstances similarly.

24         And I will agree with counsel for both Government and

25 defendant that this is not a situation that comes up so often     10:41:09

United States District Court

1    that there is a ready catalog of similar situations.                    10:41:15

2         In the Court's view, Ms. Brook did a nice job and a

3    credible job and a persuasive job of highlighting those

4    differences where they mattered.  The difference in the context

5    in which the offenses that were laid out by Mr. McBee were        10:41:40

6    different from here.

7         Mr. McBee also did a credible and persuasive job how

8    the overall impact of these cases and how they have been

9    treated and presenting a range of reasonable outcomes, if

10   favorable to a defendant, some unfavorable to a defendant, and   10:42:11

11   in that range established credibility.

12        When I evaluate all of the factors, including the

13   four that I've highlighted and the remaining three, and do my

14   best to balance them, given where this process started, first

15   of all, I conclude that a sentence of more than eight years is   10:42:40

16   problematic for the reasons that I stated before.  But I

17   conclude that something slightly less than that eight years is

18   justified by a balancing of those 3553(a) factors.  I am going

19   to impose a sentence of 67 months in this case because I find

20   that that sentence is sufficient, but not greater than           10:43:06

21   necessary, to recognize and balance in their appropriate

22   weights all of those factors focusing on the gravity of the

23   harm and the need for general deterrence at least, but

24   accounting for what comparable sentences and comparable

25   situations are out there that the Court can evaluate and then    10:43:33

1    count or discount, based on similarity, and accounting for the          10:43:39

2    individual history and characteristics of Mr. Wahid which

3    factor by itself weighs in his favor.

4          Pursuant to the Sentencing Reform Act of 1984, it is

5    the judgment of the Court that Abdul Khabir Wahid is hereby          10:43:58

6    committed to the Bureau of Prisons for an imprisonment term of

7    67 months with credit for time served.  This consists of 67

8    months on Count 1 and 67 months on Count 2, terms to run

9    concurrently.

10         In so doing, the Court grants a downward variance.          10:44:23

11   The defendant shall pay a special assessment of $200 which will

12   be due while in custody according to a schedule I'll lay out

13   momentarily, but I find he does not have the ability to pay a

14   criminal fine and I order that fine to be waived.  That $200

15   will be due at a rate of not less than $25 per quarter,          10:44:44

16   payments to be made through the Bureau of Prisons' Inmate

17   Financial Responsibility Program.

18         And then upon release from imprisonment, the

19   defendant shall be placed on supervised release for three

20   years.  That term consists of 36 months on Count 1, 36 months          10:44:56

21   on Count 2, terms to run concurrently.

22         Backing up to the sentence.  Mr. McBee, you haven't

23   said it yet but I anticipate it, and I heard it from Mr. Wahid,

24   a request for a designation in central Arizona to facilitate

25   visitation by his children and I will make that recommendation          10:45:19

United States District Court

1   to the Bureau of Prisons.

2            MR. MCBEE:  Thank you, Your Honor.

3            THE COURT:  While on supervised release, Mr. Wahid

4   shall comply with mandatory and standard conditions of

5   supervision that have been adopted by this Court in our General

6   Order 17-18.

7            Of particular importance, he must not commit another

8   federal, state, or local offense during the term of

9   supervision.  And within 72 hours of release from the Bureau of

10  Prisons, he must report in person to the Probation Office in

11  whatever District he is released in.  He must also comply with

12  the following special conditions, of which there are five:

13           One, he must participate as instructed by the

14  probation officer in a program of substance abuse treatment,

15  either outpatient or inpatient, which may include testing for

16  substance abuse; number two, he must submit to substance abuse

17  testing and not attempt to obstruct or tamper with testing

18  methods; number three, he must not use or possess alcohol or

19  alcoholic beverages; number four, he must not be involved with

20  or knowingly communicate or associate with any person

21  affiliated with a domestic or international terrorist group;

22  and, finally, number five, he must cooperate in the collection

23  of DNA as directed by the probation officer.

24           Mr. Wahid, you have not waived your right to appeal

25  my condition in this case so I must advise you if you wish to

United States District Court

1    appeal, you have 14 days from the entry of judgment to file a

2    Notice of Appeal with the clerk of the court.

3              Mr. McBee do you have anything further on behalf of

4    your client today?

5              MR. MCBEE:  No, thank you, Your Honor.

6              THE COURT:  Thank you.

7              Mr. Koehler or Ms. Brook, do you have anything

8    further on behalf of the Government?

9              MS. BROOK:  Your Honor, I have a brief housekeeping

10   matter that I just wanted to put on the record before we close

11   the record today.  And that is that over the last two months,

12   Mr. McBee and I and Mr. Koehler have had a chance to

13   communicate about three defense filings by Mr. Wahid, 268, 269

14   and 270, and we have had a chance to confirm that the requested

15   items of discovery in those filings were, in fact, provided to

16   the defendant before trial.  The only item that wasn't was Kim

17   Jensen's trial testimony that occurred during trial and was

18   provided to the defendant after trial.

19             THE COURT:  All right.  Thank you, Ms. Brook.  I did

20   have three other housekeeping matters as well.

21             There are three filings that Mr. Wahid made at the

22   period he was representing himself which, out of an abundance

23   of caution, the Court will treat as motions which I think I've

24   resolved already but expressly I'll do that now.  Docket entry

25   number 246 is denominated amended request for downward

                    United States District Court

10:46:43

10:46:52

10:46:57

10:47:18

10:47:34

10:47:53

1    departure.  248 -- and that is denied because I've addressed

2    the departures.  248 is a motion for home detention as a

3    substitute for imprisonment and for the reasons the Court has

4    ruled, it finds that improper resolution of the matter and so

5    it will be denied.

6         Finally, motion for revoking acceptance of

7    responsibility and I think this refers to the fact that in a

8    previous filing, Mr. Wahid had indicated he accepted

9    responsibility and then as he addressed in his statement to the

10   Court today, he gave his reasons for why he revoked it.  This

11   document, 250, entitled Motion for Revoking Acceptance, may now

12   be -- I think it does not ultimately affect the result whether

13   I grant it or deny it as moot, because the acceptance of

14   responsibility credit was not given in the guidelines so I am

15   going to grant the motion.

16        All right.  Ms. Brook, did the Government have

17   anything further?

18        MS. BROOK:  Yes, Your Honor.  Sorry, one last

19   housekeeping item and that would relate to terms of condition

20   of release and supervised release and that would be that the

21   Government requests that the defendant not have contact with

22   Ali Soofi.

23        THE COURT:  Mr. McBee, do you wish to be heard on

24   that?

25        MR. MCBEE:  May I have a moment, Your Honor?

United States District Court

1          (Defendant confers with counsel.)

2          MR. MCBEE:  My client doesn't even know where he

3   currently is, Your Honor, so today there's no objection.

4          THE COURT:  With that, that will be added to the

5   conditions.  We'll have a no-contact provision.

6          Thank you.  We are adjourned.

7          MR. MCBEE:  Thank you, Your Honor.

8          MS. BROOK:  Thank you, Your Honor.

9          (Whereupon, these proceedings recessed at 10:49 a.m.)

10                    *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

```
 1              C E R T I F I C A T E                          10:49:42

 2

 3         I, ELAINE M. CROPPER, do hereby certify that I am

 4   duly appointed and qualified to act as Official Court Reporter

 5   for the United States District Court for the District of       10:49:42

 6   Arizona.

 7

 8         I FURTHER CERTIFY that the foregoing pages constitute

 9   a full, true, and accurate transcript of all of that portion of

10   the proceedings contained herein, had in the above-entitled    10:49:42

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control, and to the best of

13   my ability.

14

15         DATED at Phoenix, Arizona, this 18th day of June,        10:49:42

16   2020.

17

18

19

20                          s/Elaine M. Cropper                     10:49:42

21                          _____

22                          Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                  10:49:42

                    United States District Court
```